# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

Drahcir S. Parson,

     Plaintiff,

  v.             5:25-CV-956
                  (AJB/MJK)

Judge Julie Campbell, *et al.*

      Defendants.

---

Drahcir S. Parson, Plaintiff, *pro se*

Mitchell J. Katz, U.S. Magistrate Judge

To the Honorable Anthony J. Brindisi, U.S. District Judge:

## ORDER & REPORT- RECOMMENDATION

Parson commenced this action on July 21, 2025, by filing a Complaint ("Compl.") and moving for leave to proceed in forma pauperis ("*IFP*"). (Dkts. 1, 2). The Clerk has sent the Complaint and *IFP* application to this Court for its review. (Dkts. 1, 6).

* * *

## TABLE OF CONTENTS

I. BACKGROUND ................................................................. 3

II. *IFP* APPLICATION ......................................................... 3

III. STANDARD OF REVIEW ............................................... 4

IV. DISCUSSION ................................................................... 5

1

B.    Laurie A. Michelman ....................................................................8

C.    Patrick Perfetti, Finney Raju, Christopher Simser, Elizabeth Healy, and Ray Kyles ...............................................................10

D.    Victoria Monty.........................................................................13

E.    C.O. Stacey, C.O. Traphagen,  C.O. Haskins, C.O. Dorsett, C.O. Gleason,  C.O. Reynolds, C.O. Fosbrook, C.O. Barhans, S. Delucia, D. Gage, N. Hawks, C.O. Smith, C.O. Ken Eaton, C.O. Nater, C.O. Barber, and C.O. Cavanagh ...................................15

F.    Luke Fenchel, Jarrod Smith, Melissa Smith, and Kevin Jones 17

G.    Cheyenne Cute .........................................................................20

H.    Nicholas Lynch and Mark Helms. ...........................................23

I.    Cortland County........................................................................25

J.    Group Pleading ........................................................................31

K.    Adam Raymond and Thomas Kiehle ........................................32

    1.    Eighth Amendment.............................................................32

    2.    Fourteenth Amendment.......................................................34

L.   J. Tyler ......................................................................................36

    1.    Failure to protect from intolerable prison conditions. ...............36

    2.    Fourteenth Amendment.......................................................37

    3.    Eighth Amendment .............................................................40

    4.    Derogatory Comments ........................................................43

M.    Sgt. Clark ...............................................................................44

M.    C.O. Johnston .........................................................................46

N.    C.O. Jobson .............................................................................47

O.    Nurse Christine – Jane Doe #46 ..............................................48

P.    C.O. John Doe – Auburn C.F. ..................................................53

Q.    John Doe #49 – Elmira C.F. ....................................................56

R.  Fed. R. Civ. P. 8, 10, 18 and 20.......................................................58

   1.  Rule 8.............................................................................................58

   2.  Rule 10...........................................................................................58

   3.  Rules 18 and 20.............................................................................58

VI.  CONCLUSION.............................................................................65

* * *

## I.    BACKGROUND

Parson's claims arise from his December 15, 2020 arrest for cashing a forged payroll check. (Dkt. 1, at 16). The forged check was drawn on the account of Ithaca Dispatch Taxi Company. (*Id.*).

The Complaint asserts nine separate claims against 53 Defendants, spanning several years and numerous varying events. The facts giving rise to Parson's claims are presented in prose, consisting of 113 pages, and not in short, separately numbered paragraphs as required by Fed. R. Civ. P. 8 and 10.

The Court will not provide a summary of the facts but will include them where necessary in its review of Parson's claims.

## II.    *IFP* APPLICATION

Parson declares in his *IFP* application that he is unable to pay the filing fee. (Dkt. 6). After reviewing the *IFP* application, this Court finds that Parson is financially eligible for *IFP* status.

## III. STANDARD OF REVIEW

In addition to determining whether a plaintiff meets the financial criteria to proceed *IFP*, courts must also review the sufficiency of the allegations in the complaint under 28 U.S.C. § 1915. That statute requires a court to dismiss a case—at any time—if it determines that the action is (1) frivolous or malicious; (2) fails to state a claim on which relief may be granted; or (3) seeks monetary relief against a defendant who is immune from such relief. See 28 U.S.C. § 1915 (e)(2)(B)(i)-(iii).

When determining whether an action is frivolous, courts must consider whether the complaint lacks an arguable basis in law or in fact. *See Neitzke v. Williams*, 490 U.S. 319, 325 (1989), *abrogated on other grounds* by *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and 28 U.S.C. § 1915. Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *see also Harkins v. Eldredge*, 505 F.2d 802, 804 (8th Cir. 1974).

To be sure, courts have a duty to show liberality toward *pro se* litigants and must use extreme caution when *sua sponte* dismissing *pro se* complaints before adverse parties have been served and had an

opportunity to respond. *See Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (finding that a district court may dismiss a frivolous complaint *sua sponte* even when plaintiff has paid the filing fee). But courts still have a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. See id.

## IV.   DISCUSSION

### A. Judge Defendants

Parson names thirteen judges (the "Judges") as defendants in this action, all of whom are immune from suit.[1]

"The New York State Unified Court System is unquestionably an arm of the State and is entitled to Eleventh Amendment sovereign immunity." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) (cleaned up). Similarly, judges within the New York State Unified Court System are entitled to Eleventh Amendment immunity to the extent they are sued in their official capacity. *See Aron v. Becker*, 48 F. Supp. 3d 347, 366 (N.D.N.Y. 2014) (dismissing claim against a Delaware County judge on sovereign immunity grounds). Therefore, Parson

---

[1] The Complaint refers to Judge Alexander who is not listed as a party to this action. But even if the District Court finds that Judge Alexander is not entitled to the privileges afforded by the Eleventh Amendment and/or judicial immunity, the Complaint should nevertheless be dismissed against him under Fed. R. Civ. P. 10.

cannot assert his claims against the Judges in their official capacities, and the Court recommends that the Complaint be dismissed against the Judges *with prejudice and without leave to amend*.

In addition to the Eleventh Amendment, the Judges are also immune on judicial immunity grounds. *See McNair v. Utica Police Dep't*, 6:23-CV-699 (DNH/ATB), 2023 WL 4935993, at *3 (N.D.N.Y. June 26, 2023), *report and recommendation adopted*, No. 6:23-CV-699, 2023 WL 4931609 (N.D.N.Y. Aug. 1, 2023). It is well settled that judges have absolute immunity for their judicial acts performed in their judicial capacities. *See Mireles v. Waco*, 502 U.S. 9, 11 (1991); *see also Shtrauch v. Dowd*, 651 F. App'x 72, 73-74 (2d Cir. 2016) ("Generally, 'acts arising out of, or related to, individual cases before the judge are considered judicial in nature'") (internal quotation omitted). "Judicial immunity applies even when the judge is accused of acting maliciously or corruptly." *Coon v. Merola*, No. 1:19-CV-394 (DNH/ATB), 2019 WL 1981416, at *3 (N.D.N.Y. Apr. 8, 2019) (cleaned up) (citing *Imbler v. Pachtman*, 424 U.S. 409, 419 n.12, (1976)). "The only two circumstances in which judicial immunity does not apply is when he or she acts 'outside' his or her judicial capacity and when the judge takes action

that, although judicial in nature, is taken 'in absence of jurisdiction.'"

*Serrano v. Diperna*, No. 24-CV-483, 2024 WL 5247710, at *5 (W.D.N.Y.

Dec. 30, 2024) (quoting *Mireles*, 502 U.S. at 11-12).

The fact that Parson alleges throughout the Complaint that some

of the Judges "deprived him of his speedy trial rights—or any other

rights—does not make that conduct any less judicial." *Serrano,* 2024

WL 5247710, at *5 (dismissing the allegations against the judge

defendants). The allegations against the Judges relate to actions

allegedly taken by them in connection with Parson's various speedy

trial law motions, his motion to proceed *pro se*, or his habeas petitions

in the Appellate Division – Third Department. None of the

rulings/actions taken by the Judges in response to Parson's procedural

maneuverings can be considered as anything other than judicial in

nature. *See id.*

Parson's allegations that some of the Judges "lacked jurisdiction"

to continue prosecuting the forged instrument case because of the

speedy trial law violation does not mean that they "acted in the

complete absence of all jurisdiction." *Mireles*, 502 U.S. at 11; *see also*

(Compl., Dkt. 1, at 63-75). There is a difference between a judge who

acts in "excess of jurisdiction" and one who acts in "the clear absence of all jurisdiction over the subject[ ]matter." *Stump v. Sparkman*, 435 U.S. 349, 356-57, 356 n.6, 98 (1978) (citations omitted). Here, Parson does not claim that any Judge erred in exercising jurisdiction over his criminal matter. Rather, Parson alleges that the Judges erred in not dismissing it based on the government's delay. In other words, Parson's allegations—at most—suggest that the Judges exceeded their jurisdiction or exercised their authority "error[neously]" or "maliciously" which are insufficient grounds to overcome the application of judicial immunity. *See Stump*, 435 U.S. at 356.

Accordingly, the Court recommends that the Complaint be dismissed against the Judges, including Judge Alexander, *with prejudice and without leave to amend*. Any amendment would be futile.

### B. Laurie A. Michelman

Laurie Michelman is immune from suit and the Complaint should be dismissed against her *with prejudice and without leave to amend*.

Judicial immunity has been extended to court clerks and "others who perform functions closely associated with the judicial process" when they are performing discretionary acts of a judicial nature which

are essential to the judicial process, especially the filing of court documents and managing a court's calendar. *See Cleavinger v. Saxner*, 474 U.S. 193, 200 (1985); *see also Rodriguez v. Weprin*, 116 F.3d 62, 66 (2d Cir. 1997) (extending judicial immunity to state court clerks who were ordered by Appellate Division judges not to provide a litigant with documents and not to expand the record on appeal). Indeed, a "clerk's office activities of filing and docketing legal documents" are an "integral part of the judicial process" and are thus entitled to absolute immunity. *McKnight v. Middleton*, 699 F. Supp. 2d 507, 526 (E.D.N.Y. 2010) (cleaned up), *aff'd*, 434 F. App'x 32 (2d Cir. 2011); *see also Bey v. New York*, No. 11-CV-3296, 2012 WL 4370272, at *7 (E.D.N.Y. Sept. 21, 2012) (holding that court clerks were entitled to "absolute quasi[-]judicial immunity" in suits alleging they refused to file documents); *Humphrey v. Court Clerk for the Second Circuit*, No. 08-CV-0363, 2008 WL 1945308, at *2 (N.D.N.Y. May 1, 2008) (court clerks enjoy absolute immunity "if the task was undertaken pursuant to the explicit direction of a judicial officer or pursuant to the established practice of the court" (citing *Rodriguez*, 116 F.3d at 67)).

Here, Parson alleges that:

> V. Monty lied to Court Assistant Michelman who turned a blind eye to Plaintiff's illegal detention. V. Monty lied to her in letter saying I was arraigned on assault indictment on 11/9/2023 when bail was set at $100k when in fact I was not arraigned on the indictment until 2/22/24. Ms. Michelman requested the transcript to court appearance for 2/22/24 with deadline yet no transcripts were ever turned over 'til this day.

(Dkt. 1, at 79).

Michelman's alleged actions, or inactions, occurred within the scope of her functions as a court clerk, which entitles her to immunity. The Court therefore recommends that Parson's Complaint as to Defendant Michelman be dismissed *with prejudice and without leave to amend*. Any amendment would be futile.

## C. Patrick Perfetti, Finney Raju, Christopher Simser, Elizabeth Healy, and Ray Kyles

Prosecutors sued under § 1983 enjoy absolute immunity 'from claims for damages arising out of prosecutorial duties that are intimately associated with the judicial phase of the criminal process.'" *Joyner v. Cty. of Cayuga*, No. 5:20-CV-1904088 (MAD/TWD), 2020 WL 1904088, at *9 (N.D.N.Y. Apr. 17, 2020) (cleaned up) (*quoting Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). Assistant attorney generals enjoy the same immunity. *See, e.g., Barr v. Abrams*, 810 F.2d 358, 361 (2d

10

Cir. 1987) (holding assistant attorney generals immune from suit based on their actions in filing a criminal information and procuring arrest warrant). Prosecutorial immunity from § 1983 liability covers "virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate." *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995) (quoting *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994)). This includes "the decision to bring charges against a defendant, presenting evidence to a grand jury, and the evaluation of evidence prior to trial." *Moye v. City of New York*, No. 11-CV-316, 2012 WL 2569085, at *5 (S.D.N.Y. July 3, 2012) (quoting *Johnson v. City of New York*, No. 00-CV-3626, 2000 WL 1335865, at *2 (S.D.N.Y. Sept. 15, 2000)). Immunity even extends to "the falsification of evidence and the coercion of witnesses[;]" "the knowing use of perjured testimony[;]" "the deliberate withholding of exculpatory information[;]" the "making [of] false or defamatory statements in judicial proceedings[;]" and the "conspiring to present false evidence at a criminal trial[.]"[2]

---

[2] *Taylor v. Kavanagh*, 640 F.2d 450, 452 (2d Cir. 1981) (citing *Lee v. Williams*, 617 F.2d 320, 321-22 (2d Cir. 1980)); *Imbler*, 424 U.S. at 431 n. 34; *Burns v. Reed*, 500 U.S. 478, 490 (1991); *Dory,* 25 F.3d at 83.

Perfetti, Raju, Simser, Elizabeth, and Kyles are immune from suit. Parson alleges that: (1) Simser, among other things, allowed Cute to present false and misleading testimony to the grand jury, and conspired to bury evidence that "implicated the actual culprits" (T. 26-27); (2) Healy conspired to bury evidence that allegedly "implicated the actual culprits in order to effect a scape goat prosecution of plaintiff" (T. 27); (3) Raju allowed a witness to offer perjurious testimony in a criminal mischief case (T. 81); (4) Kyles conspired to "prolong illegal detention of plaintiff and all other defendants" in the forged instrument prosecution (T. 27), and "argued against Habeas release" (T. 79); and (5) Perfetti conspired to bury evidence "that implicated the actual culprits in order to effect a scape goat prosecution of plaintiff" (T. 27), omitted 4 months from the speedy trial law calculation arising from a December 8, 2022 complaint for assault (T. 33), approved Defendant Healy's "blatant misconduct" (T. 41), and failed to supervise and train the assistant district attorneys (T. 44). All this alleged conduct occurred within the scope of their employment. So Simser, Healy, Raju, Perfetti, and Kyles are immune from suit. Thus, the Court recommends that the

Complaint be dismissed against them *with prejudice and without leave to amend*.

### D. Victoria Monty

The Court recommends that the District Court dismiss the Complaint as to Monty *with prejudice and without leave to amend*. The Complaint is unclear as to whether Monty was an Assistant District Attorney or the Cortland County Attorney at the time of the alleged acts giving rise to Parson's claims against her. *Compare* (T. 43) *with* (T. 79). So the Court analyzes Monty's alleged liability under both scenarios and finds that she is immune either way.[3]

To the extent Monty was acting as Corporation Counsel and not as an Assistant District Attorney at the time Parson's alleged claims accrued, she is nevertheless immune from suit. Government attorneys are immune from suit under Section 1983 for damages "when functioning as an advocate of the state [or local government] in a way that is intimately associated with the judicial process." *Mangiafico v. Blumenthal*, 471 F.3d 391, 396 (2d Cir. 2006). This immunity applies to

---

[3] To the extent that Monty was acting in her capacity as an Assistant District Attorney, she would be immune from suit for the reasons more fully articulated in Section IV(D) above.

government attorneys who perform functions "'that can fairly be characterized as closely associated with the conduct of litigation or potential litigation' in civil suits. *Id*.; *see also O'Callaghan v. City of New York, No*. 16-CV-1139, 2016 WL 7177509, at *11 (S.D.N.Y. Dec. 8, 2016) (holding that an Assistant Corporation Counsel defendant was entitled to absolute immunity for defending the City of New York in a state civil action).

Here, Parson claims that Monty: (1) "buried evidence that implicated the actual culprits in order to effect a scape goat prosecution of Plaintiff" (T. 27); (2) omitted 4 months from the speedy trial calculations in connection with a felony complaint for assault (T. 33); (3) lied about the date that Parson was arraigned on the assault indictment (T. 43); (4) lied about Parson allegedly throwing his "own waste on a correction officer in Cortland County in [an] attempt to have restraints on me at trial which Judge did grant" (T. 43); and (5) lied to Michelman about Parson's arraignment date (T. 79). All this conduct arises from Monty litigating activities in Cortland County courts. So she is immune from suit. The Court, therefore, recommends the Complaint should be

dismissed against her *with prejudice and without leave to amend*. Any amendment would be futile.

### E. C.O. Stacey, C.O. Traphagen,  C.O. Haskins, C.O. Dorsett, C.O. Gleason,  C.O. Reynolds, C.O. Fosbrook, C.O. Barhans, S. Delucia, D. Gage, N. Hawks, C.O. Smith, C.O. Ken Eaton, C.O. Nater, C.O. Barber, and C.O. Cavanagh

The Court recommends that the Complaint be dismissed *without prejudice and with leave to amend* as to Defendants C.O. Stacey, C.O. Traphagen, C.O. Haskins, C.O. Dorsett, C.O., Gleason, C.O. Reynolds, C.O. Fosbrook, C.O. Barhans, S. Delucia, D. Gage, N. Hawks, C.O. Smith, C.O. Ken Eaton, C.O. Nater, C.O. Barber, and C.O. Cavanagh.

Pleadings must contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (cleaned up). "The purpose of [Rule 8] is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Flores v. Graphtex*, 189 F.R.D. 54, 55 (N.D.N.Y. 1999) (internal quotations and citations omitted). Rule 8 also requires the pleading to include "a short and plain statement of the grounds for the court's jurisdiction" and "a demand for the relief sought[.]" Fed. R. Civ.

P. 8(a)(1), (3). "Although 'no technical form is required,' the Federal Rules make clear that each allegation contained in the pleading 'must be simple, concise, and direct.'" *Cole v. Smrtic*, No. 1:24-CV-847 (MAD/CFH), 2024 WL 4870495, at *2 (N.D.N.Y. 2024) (quoting Fed. R. Civ. P. 8(d)). Allegations "so vague as to fail to give the defendants adequate notice of the claims against them" are subject to dismissal. *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009) (summary order).

Although listed in the caption, the Complaint lacks any specific allegations against Defendants C.O. Stacey, C.O. Traphagen, C.O. Haskins, C.O. Dorsett, C.O., C.O. Gleason, C.O. Reynolds, C.O. Fosbrook, C.O. Barhans, S. Delucia, D. Gage, N. Hawks, C.O. Smith, C.O. Ken Eaton, C.O. Nater, C.O. Barber, and C.O. Cavanagh. Instead, Parson alleges that "[a]ll C.O.s and higher[-]ranking officers in the various facilities that are named in this claim are involved in the conspiracy to 'squeeze' a plea bargain out of me which did not work and they all punished me for not copping out." (T. 81). Parson further alleges that "[e]ach correction officer who wrote [a] ticket for not closing gate is liable for wrongful/unlawful confinement[.]" (T. 96). As pleaded, Parson's allegations do not afford the above-named defendants with

16

sufficient information to allow them to properly defend themselves. Stated differently, the Complaint is a "unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft, 556 U.S. at 678. And that is not enough to state a claim. *See Scott v. Djeck*, No. 5:09-CV-1122 (GTS/GHL), 2010 WL 145297, at *3 (N.D.N.Y. Jan. 11, 2010) ("Where a defendant is listed in the caption but the body of the complaint fails to indicate what the defendant did to the plaintiff, dismissal is appropriate."). The Complaint should therefore be dismissed.

## F. Luke Fenchel, Jarrod Smith, Melissa Smith, and Kevin Jones

The Court recommends dismissing the Complaint against Fenchel, Jarrod Smith, Melissa Smith, and Jones *with prejudice and without leave to amend* because they are not state actors. Criminal defense attorneys, who represent a client during criminal proceedings, are not "persons" acting under color of state law for purposes of liability under Section 1983. *See Polk County v. Dodson*, 454 U.S. 312, 325, (1981).

To support a Section 1983 claim, the defendant must be acting under "color of state law." However, an attorney representing a client in

a criminal trial, whether that attorney is a public defender, legal aid attorney, or court-appointed counsel, is not acting under the color of state law. *See Polk County*, 454 U.S. at 325; *see also Rodriquez v. Weprin*, 116 F.3d 62, 65-66 (2d Cir. 1997) (stating that it is well established that private attorneys—even if the attorney was court appointed—are not state actors for the purposes of Section 1983 claims.). Parson's attorneys are therefore not state actors under Section 1983.

Even if these Defendants were liable under §1983, Parson has not plausibly alleged conduct they could be held liable for. Section 1983 liability may attach to defense attorneys if they conspire with state officials. *See Tower v. Glover*, 467 U.S. 914, 923 (1984) (public defender who conspired with state officials held liable under section 1983). But Parson has not plausibly alleged facts that give rise to a conspiracy. For example, Parson alleges that Jarrod Smith "conspired with Judge Campbell and DA Perfetti to change the commencement date of assault charge from December 8, 2022 to April 21, 2023." (T. 53). Parson further alleges that Fenchel was "ignorant to the law and going along with the DA and Judge (Perfetti and Campbell) in ignoring clear speedy trial

violation." (T. 41). Finally, Parson alleges that "[a]ll defendants conspired with Judge J. Campbell and Cortland County Municipality to deprive Plaintiff's State and Federal Constitutional rights in order to inflate arrest and conviction rates for County of Corland and whatever *quid prop quo* they established." (T. 20). These allegations are simply too conclusory to state a claim that Parson's attorneys conspired with state officials to violate his constitutional rights. *See Ciambriello v. County of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) ("A merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a [section] 1983 claim against the private entity.").

Finally, the Court recommends that Parson's claim for legal malpractice against Fenchel, M. Smith, J. Smith, and Jones be dismissed *without prejudice and without leave to amend* because "an action for legal malpractice . . . is not cognizable under [Section] 1983 since there is a total absence of state action as required by that section." *Sommer v. Rankin*, 449 F. Supp. 66, 67 (S.D.N.Y. 1978); *see also Stevenson v. Schiano*, 2025 WL 1895830, at *9 fn. 7  (W.D.N.Y. Mar. 19, 2025).

## G. Cheyenne Cute

The Court recommends that the District Court dismiss Parson's malicious prosecution claim against Defendant Cute *with prejudice and without leave to amend.*

Under New York law, "the elements of an action for malicious prosecution are (1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause and (4) malice." *Rivas v. Suffolk County*, 326 F.Supp. 2d 355, 362 (E.D.N.Y. Jul. 21, 2004) (quoting *Colon v. City of New York,* 60 N.Y.2d 78, 82 (1983)).

The existence of probable cause is a complete defense to a claim of malicious prosecution. *Id.* (citing *Colon*, 60 N.Y.2d at 82). An indictment before a grand jury creates a presumption of probable cause that may only be rebutted by evidence that the indictment was procured by "fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Id.* (quoting *Colon*, 60 N.Y.2d at 83); *see also Bermudez v. City of N.Y.*, 790 F.3d 368, 377 (2d Cir. 2015). Plaintiffs cannot "rebut the presumption of probable cause with mere conjecture and surmise that [their] indictment was procured as a result of conduct

undertaken by the defendants in bad faith." *Savino v. City of New York,* 331 F.3d 63, 73 (2d Cir. 2003) (cleaned up).

To plausibly allege a malicious prosecution claim, plaintiffs must plead that the criminal proceeding terminated in their favor. *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 130 (2d Cir. 1997). In this context, favorable termination means a "final disposition" that "indicate[s] the innocence of the accused." *Murphy v. Lynn,* 118 F.3d 938, 948 (2d Cir. 1997); *see also Russell v. Smith,* 68 F.3d 33, 36 (2d Cir. 1995) ("In the absence of a decision on the merits, the plaintiff must show that the final disposition is indicative of innocence.").

In support of his claim for malicious prosecution, Parson alleges that:

- "[w]ithout probable cause, [Cute] closed his eyes to facts that would have helped clarify the circumstances of the incident concerning negotiation of the check on June 15, 2020" (Compl., Dkt. 1, at 22),

- "probable cause dissipated well before Grand Jury testimony of Sgt. Cute on June 4, 2021" (*Id.,* at 22), and

- "[it] must be undisputed that probable cause dissipated once indictment expired 9/12/2021 yet prosecution continued maliciously." (*Id.,* at 24).

Parson's allegations are meritless. "The fact that the Grand Jury returned an indictment against [Plaintiff] creates a presumption that

his arrest and indictment were procured with probable cause."

*Lawrence v. Sherman*, No. 1:20-CV-694 (MAD/DJS), 2020 WL 7029171,

\*2 (N.D.N.Y. July 28, 2020) Since Parson was indicted, his argument

that there was a lack of probable to prosecute him is presumptively

without merit.

A counterargument on this score does not pass muster. To be sure,

malicious prosecution claimants may rebut probable cause findings by

proffering evidence that the indictment was procured by "fraud, perjury,

the suppression of evidence or other bad police conduct." *Id.* But

Parson's attempt to do so is unavailing. While Parson claims that

"[e]vidence was deliberately and maliciously suppressed from plaintiff

and the Grand Jury" his allegations, without more, are insufficient to

obviate the finding of probable cause. *See* (Compl., Dkt. 1, at 25); *see

also Savino*, 331 F.3d at 73.

Last, Parson's reliance on Judge Campbell's April 22, 2024 order

dismissing the underlying indictment on speedy trial grounds as a

predicate for negating the existence of probable cause in the first

instance is misplaced. *See* (Dkt. 1-1) Speedy trial dismissals are

"insufficient to establish the absence of probable cause" for an

underlying arrest. *Everett v. Dean*, No. 3:20-CV-01260 (AMN/ML), 2023 WL 5452753, *7 (N.D.N.Y. Aug. 24, 2023). So Parson cannot rely on Judge Campbell's April 22, 2024 decision to counter a finding of probable cause. Parson's claim for malicious prosecution therefore fails and any amendment would be futile.

## H. Nicholas Lynch and Mark Helms.

The Court recommends that the District Court dismiss the Complaint as to Lynch and Helms *without prejudice and with leave to amend.*

Parson's ninth claim alleges that Lynch and Helms (sued in their individual capacities) "fail[ed] to train, supervise, or discipline officers at the jail in order to protect Plaintiff from obvious threat of retaliation." (Compl., Dkt. 1, at 83). Specifically, Parson alleges that the jail "implement[ed] a close your door while out of your cell rule" which was "pure oppression and retaliation serving no penological purpose." (*Id*.). Parson also alleges that "a jury could permissibly find that the harassment, intimidation, and endangerment of Plaintiff was at least indirectly caused by Helms and directly caused by Lynch, both through their acquiescence in that misconduct and through their deliberate

indifference to the need to train their staff not to retaliate against an inmate for exercising his First Amendment rights." (Compl., Dkt. 1, at 91).

Parson's vague and conclusory assertions are insufficient to establish that Lynch and Helms knew their subordinates engaged in any purported misconduct. The Complaint lacks facts about what Lynch and Helms did or did not do to supervise or instruct their subordinates. These unadorned claims are insufficient to plausibly allege that Lynch and Helms' personal involvement in their subordinates' alleged misconduct. *See Villafane v. Sposato*, No. 16-CV-3674, 2017 WL 4179855, at *15 (E.D.N.Y. Aug. 22, 2017) (dismissing plaintiff's claim because, in part, he "fail[ed] to set forth any detail regarding how [the supervisory] Defendant . . . failed to supervise his subordinates or which subordinates he failed to supervise"); *see also McRae v. Gentile*, No. 14-CV-783, 2015 WL 7292875, at *5 (N.D.N.Y. Oct. 20, 2015) ("[V]ague and conclusory allegations that a supervisor failed to properly monitor the actions of subordinate employees do not suffice to establish the requisite personal involvement and support a finding of liability.") (*citing Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d Cir. 2009)); *Styles v. Goord*, 431 F.

App'x 31, 33 (2d Cir. 2011) (no personal involvement where plaintiff "did not allege . . . any facts concerning [supervisor defendants'] particular conduct in supervising their subordinates"). The Complaint should therefore be dismissed against Lynch and Helms.

## I.    Cortland County

Liberally construed, the Complaint asserts two different theories of liability against Cortland County. Parson's first claim is predicated on a theory of failure to train and supervise officers in its police department. (Complaint, Dkt. 1, at pg. 37). Next, Parson seeks to impose liability against Cortland County on the theory that Helms and Lynch are "policy makers." (Compl, Dkt., 1, at 90). This Court recommends that Parson's claims against Cortland County on both theories be dismissed *without prejudice and with leave to amend*.

### 1. Failure to Train/Supervise

To succeed on a municipal liability claim for failure to supervise, discipline, or train, a plaintiff must establish "deliberate indifference." *Kosmidis v. Port Auth. of New York & New Jersey*, 2021 WL 4442812, at *7 (S.D.N.Y. Sept. 28, 2021) (cleaned up). Plaintiffs may satisfy the "deliberate indifference" requirement by pleading that (1) "a policy-maker knows to a moral certainty that her employees will confront a

given situation;" (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation;" and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Id*. (citation omitted). Plaintiffs must plausibly allege that there was an obvious need for more or better protocols or supervision to protect against constitutional violations, by, for example, proof of repeated complaints of civil rights violations. *See Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995). "Deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Id*.

Parson alleges that "Defendant Cortland County should know that officers of its police department would face situations in which they are expected to conduct investigations, collect information, and create reports about event based on those activities." (Complaint, Dkt. 1, at pg. 37). Parson's conclusory allegations are insufficient to plausibly allege deliberate indifference. A single incident of alleged wrongdoing by individual police officers is not enough to sustain a Section 1983 claim

against a municipality. *See Bird v. Cnty. of Westchester*, No. 20-CV-10076, 2022 WL 2263794, at *12 (S.D.N.Y. June 23, 2022) ("[The] [p]laintiff fails to allege the existence of any other similar incident, which dooms [the p]laintiff's claim because a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality." (internal quotation marks and citation omitted). Yet Parson does not include any information about the police department's training or supervisory procedures and "has not alleged that the 'policymaker fail[ed] to make meaningful efforts to address the risk of harm to [the] plaintiff[].'" *Fantozzi v. City of New York*, No. 21-CV-4439, 2023 WL 4472305, at *5 (S.D.N.Y. July 11, 2023) (citation omitted). Parson does not cite "other instances of police misconduct which could be attributed to a failure to train." *Reynolds v. City of New York*, 21-CV-6111, 2024 WL 371863 at *18 (E.D.N.Y. Aug. 8, 2024). The Court therefore recommends that the District Court dismiss the claims against Cortland County for failure to train/supervise *without prejudice and with leave to amend*.

## 2. Helms and Lynch as policy makers/a *Monell* claim against the County

Next, Parson alleges that "Helms and Lynch was county's final

27

policymaker with respect to conduct of his staff members towards inmates exercising their First Amendment rights to speak publicly." (Compl, Dkt., 1, at 90). According to the Complaint, "[r]etaliation for [Parson's] grievances and promise to sue was directly caused by Sheriff Helms with captain Lynch direct involvement." (*Id.*). Even though Parson indicates that Lynch and Helms are being sued in their individual capacities as more fully addressed above, Parson's allegations against them suggest a possible *Monell* claim against Cortland County, and the Court proceeds to analyze it accordingly. *See Monell v. Dep't of Social Services. Of the City of N.Y.*, 436 U.S. 658 (1978). *Monell* dictates that any § 1983 claim against a municipal entity must be premised on the theory that the municipal actor's allegedly unconstitutional "acts were performed pursuant to a municipal policy or custom." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004).

Courts in this Circuit apply a two-prong test for Section 1983 claims brought against a municipal entity. *See Vippolis v. Vill. Of Haverstraw,* 768 F.2d 40, 44 (2d Cir. 1985) (internal citation omitted). First, a plaintiff must "prove the existence of a municipal policy or custom in order to show that the municipality took some action that

caused his injuries beyond merely employing the misbehaving officer."

*Id.* "Second, the plaintiff must establish a causal connection—an

'affirmative link'—between the policy and the deprivation of his

constitutional rights." *Id.* (citing *City of Oklahoma City v. Tuttle,* 471

U.S. 808, 836, n.8 (1985)).

To satisfy the first requirement, a plaintiff must plausibly allege

the  existence of:

> (1) a formal policy which is officially endorsed by the
> municipality; (2) actions taken or decisions made by
> government officials responsible for establishing municipal
> policies which caused the alleged violation of the plaintiff's
> civil rights; (3) a practice so persistent and widespread that it
> constitutes a custom or usage and implies the constructive
> knowledge of policy-making officials; or (4) a failure by official
> policy-makers to properly train or supervise subordinates to
> such an extent that it amounts to deliberate indifference to
> the rights of those with whom the municipal employees will
> come into contact.

*Moray v. City of Yonkers*, 924 F.Supp. 8, 12 (S.D.N.Y. 1996)

(internal citations and quotation marks omitted).

Although "[a] plaintiff is not required to identify an express rule or

regulation in order to establish a *Monell* claim, and a court may infer a

municipal policy from acts or omissions of the municipality's policy

makers, . . . in the absence of other evidence, a 'single incident of errant

behavior is an insufficient basis for finding that a municipal policy caused plaintiff's injury.'" *JF v. Carmel Cent. Sch. Dist.*, 168 F. Supp, 3d 609, 617 (S.D.N.Y. 2016) (quoting *Sarus v. Rotundo*, 831 F.2d 397, 402-03 (2d Cir. 1987)).

As an initial matter, Parson surmises that Lynch and Helms are policy makers. And, even if they were, "rubberstamp[ing]" or "turn[ing] a blind eye" to their subordinates' decision-making is not sufficient to establish either a municipal policy or the delegation of policymaking authority. *Baity v. Kralik*, 51 F. Supp. 3d 414, 442 (S.D.N.Y. 2014) (citations omitted). Parson cannot just assert *Monell* liability simply by alleging that Lynch and Helms knew of their subordinates' actions. (Dkt. 1, at pg. 90). Parson must allege, which he has not, that Defendants Lynch and Helms themselves caused the purported deprivation of Parson's rights. *See Stalter v. Cnty. of Orange*, No. 15-CV-5274, 2016 WL 8711397, at *10 (S.D.N.Y. Aug. 5, 2016). And to the extent that Parson intends to assert a claim against Cortland County, he has not complied with the pleading requirements to maintain a *Monell* claim. The Court therefore recommends that Parson's claim

against Cortland County be dismissed *without prejudice and with leave to amend.*

### J. Group Pleading

The Court recommends that the District Court dismiss the Complaint as to the "Cortland County Jail Officials" and "[e]ach Correction[s] Officer who wrote [me a] ticket for not closing [my] gate" *without prejudice and with leave to amend.* (Complaint, Dkt. 1, at 89). Group pleading is generally impermissible as a violation of the Federal Rules of Civil Procedure's notice requirements. *See Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (explaining that "lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct" fails to satisfy minimum "fair notice" standard of FRCP Rule 8).

Here, Parson makes allegations against "[e]ach Correction[s] Officer who wrote [me a] ticket for not closing [my] gate" be dismissed (Complaint, Dkt. 1, at pg. 96). However, Parson's group pleading fails to provide fair notice to any Cortland County Jail Official or Corrections Officer. Parson's inclusion of the "Cortland County Jail Officials" and "each Correction Officer who wrote ticket for not closing gate" also violates Fed. R. Civ. P. 10 as the individuals purportedly comprising

31

these classes of individuals were not specifically named in the caption of this action. Accordingly, the Court recommends that the Complaint be dismissed *without prejudice and with leave to amend* as to the "Cortland County Jail Officials" and "Corrections Officers."

## K. Adam Raymond and Thomas Kiehle

The Court recommends that the District Court permit Parson's excessive force claim against Defendants Raymond and Kiehle to proceed.

The Court cannot determine based on the allegations in the Complaint whether Parson was a pre-trial detainee or incarcerated at the time his claim for excessive force accrued. So the Court will analyze Parson's claim under the Eighth and Fourteenth Amendments.

### 1. Eighth Amendment

Incarcerated individuals enjoy Eighth Amendment protection against the use of excessive force and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *See Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992). To sustain an Eighth Amendment excessive-force claim, plaintiffs must establish both an objective and subjective

element. *See Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999); *see also Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993).

To satisfy the objective element, plaintiffs must prove that a defendant's conduct was "inconsistent with the contemporary standards of decency." *Whitely v. Albers*, 475 U.S. 312, 327 (1986) (citation omitted); *Hudson*, 503 U.S. at 9 (1992). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (citations omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000) (citation omitted). Claims "of excessive force may be established even if the victim does not suffer serious . . . or  significant injury, . . . provided that the amount of force used is more than *de minimis* or involves force that is repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 7-10 (cleaned up).

To prove the subjective element, plaintiffs must show that the Defendant's actions were wanton. *See Sims*, 230 F.3d. at 21 (citation

omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id.* (quoting *Hudson*, 503 U.S. at 7). When determining whether defendants acted in a malicious or wanton manner, courts consider five factors: (1) the extent of the injury and the mental state of the defendant; (2) the need for the application of force; (3) the correlation between that need and the amount of force used; (4) the threat reasonably perceived by the defendants; and (5) any efforts made by the defendants to temper the severity of a forceful response. *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003).

## 2. Fourteenth Amendment

A pretrial detainee bringing a Fourteenth Amendment excessive-force claim must plausibly allege the defendant acted deliberately and "that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396-9 (2015). Factors to consider in determining the objective reasonableness of the force used under the Fourteenth Amendment include:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat

> reasonably perceived by the officer; and whether the plaintiff
> was actively resisting.

*Id.* at 397. "[A] claim of excessive force," under the Fourteenth

Amendment, "may be established even if the victim does not suffer

'serious,' . . . or 'significant' injury, . . . provided that the amount of force

used is more than 'de minimis,' or involves force that is 'repugnant to

the conscience of mankind.'" *United States v. Walsh*, 194 F.3d 37, 47-48

(2d Cir. 1999) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9, (1992)).

Parson's Complaint plausibly alleges an excessive force claim

under the Eighth or Fourteenth Amendments. Parson alleges that he

was taken "to a holding cell and slammed face first by C.O. Adam

Raymond/C.O. Kiele then sat on my hands which were cuffed behind me

breaking my left thumb where my knuckle remains in the front of my

thumb unable to ever move it again unless I get surgery." (Compl., Dkt.

1, at 97). These allegations plausibly allege C.O. Adam Raymond/C.O.

Kiele use excessive force. As a result, this Court recommends the

District Court allow Parson's excessive-force claim against C.O. Adam

Raymond/C.O. Kiele to proceed. [4]

---

[4] The fact that the Court is recommending that Parson's claim for excessive force
against Defendants Raymond and Kiehle survive *sua sponte* review does not mean
that it will survive a properly filed dispositive motion.

## L.  J. Tyler

The Court recommends that Parson's claims against Defendant Tyler arising from the alleged failure to protect him from foreseeable harm be *dismissed without prejudice and with leave to amend*. To the extent the Complaint alleges a claim against Tyler arising from purported derogatory remarks made by him to Parson, the Court recommends that the same be *dismissed with prejudice and without leave to amend*.

### 1. Failure to protect from intolerable prison conditions.

Parson alleges that "there were no measures taken" by Defendant Tyler "to prevent [any] foreseeable harm" associated with being placed in "A-block next to Frank." (Dkt. 1, at 87). In support of his claim, Parson's relies on Defendant Tyler's purported statement that "I'm surprised Frank didn't beat your ass." (*Id.*). Reading Parson's *pro se* pleading leniently as it must do, the Court construes his allegations as a failure to protect claim. However, the Court cannot discern whether Parson was a pre-trial detainee or incarcerated individual  at the time his purported claim accrued. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d

Cir. 2017). The Court will therefore analyze Parson's failure to protect

claim under the Eighth and Fourteenth Amendments.

## 2. Fourteenth Amendment

"The Due Process Clause of the Fourteenth Amendment protects

pre-trial detainees . . . against intolerable prison conditions." *Damon v.*

*New York*, No. 8:23-CV-74, 2023 WL 11965130 (GLS/CFH), *14

(N.D.N.Y. Mar. 28, 2023). "The failure to protect a pre-trial detainee

from harm is one type of intolerable prison condition. Thus, a prison

official's deliberate indifference to a substantial risk of serious harm to

an inmate may form the basis of a deliberate indifference claim." *Id.*

(cleaned up). "Not every injury suffered by one inmate at the hands of

another imposes constitutional liability on officials responsible for the

victim's safety." *Little v. Cnty. of Nassau*, 708 F. Supp. 3d 252, 263

(E.D.N.Y. 2023) (citation omitted).

Plaintiffs must plausibly allege two elements "to prove a

deliberate-indifference claim under the Fourteenth Amendment,

including when invoking a theory of failure to protect against (*i.e.*,

prevent) an inmate attack." *Id.* The first element is an "'objective prong'

showing that the challenged conditions were sufficiently serious to

37

constitute objective deprivations of the right to due process." *Darnell*, 849 F.3d at 29. The second element is the *mens rea* prong which requires the plaintiff to plausibly allege "that the officer acted with at least deliberate indifference to the challenged conditions." *Id*.

"When a prisoner is subjected to specific threats from another inmate, and there are indication[s] that the threat will be carried out, the failure of prison officials to act may give rise to a deliberate indifference claim." *Damon*, 2023 WL 11965130, at *14 (cleaned up). "The objective prong can be satisfied even where no serious physical injury results." *Id*. (cleaned up). "At bottom, in assessing whether the risk of an inmate's violence against other inmates is sufficiently serious, to trigger constitutional protection, the focus of inquiry must be, not the extent of the physical injuries sustained in an attack, but rather the existence of a substantial risk of serious harm." *Id*. (cleaned up).

### a. Objective Prong

There is no "static test" as to whether the evidence establishes sufficiently serious conditions to satisfy the "objective prong." *Darnell*, 849 F.3d at 30. A prison official's failure to "intervene in an attack . . . may under certain circumstances create a condition which poses a

substantial risk of serious harm thus constituting a sufficiently serious

constitutional violation." *Molina v. County of Westchester*, No. 16-CV-

3421, 2017 WL 1609021, at *3 (S.D.N.Y. Apr. 28, 2017). When

evaluating whether the risk of an inmate being harmed by another

inmate is "'sufficiently serious," the inquiry is whether "a substantial

risk of serious harm existed." *Blake v. Kelly*, No. 12-CV-7245, 2014 WL

4230889, at *5 (S.D.N.Y. Aug. 26, 2014). While a prior altercation may

support the factual finding of a substantial risk of serious harm, there

is no requirement of a prior altercation. *See Luckey v. Jonas*, No. 18-CV-

8193, 2019 WL 4194297, at *4 (S.D.N.Y. Sept. 2019).

### b. *Mens rea* prong

To satisfy the *mens rea* prong, "the pretrial detainee must

[plausibly allege] that the defendant-official acted intentionally . . . or

recklessly failed to act with reasonable care to mitigate the risk that the

condition posed to the pretrial detainee even though the defendant-

official knew, or should have known, that the condition posed an

excessive risk to health or safety." *Darnell*, 849 F.3d at 35. The *mens

rea* prong is objective in nature (unlike in the Eighth Amendment

context where it is subjective). *Id.*, at 35-36. A pretrial detainee must

therefore plausibly allege that the prison official acted purposefully or with an objectively reckless disregard of the risk to the inmate - mere negligence is insufficient. *Id.* at 36.

### 3. Eighth Amendment

"The Eighth Amendment requires prison officials 'to take reasonable measures to guarantee the safety of the inmates.'" *Morgan v. Dzurenda*, 956 F.3d 84, 89 (2d Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832, (1994)). This responsibility "extends to 'protect[ing] prisoners from violence at the hands of other prisoners.'" *Id.* (alteration in original) (quoting *Farmer*, 511 U.S. at 832). An incarcerated individual "seeking to establish an Eighth Amendment violation for failure to protect or deliberate indifference to safety must prove (1) 'that [the plaintiff] is incarcerated under conditions posing a substantial risk of serious harm,' and (2) that the prison official had a 'sufficiently culpable state of mind,' which in 'prison-condition cases' is 'one of deliberate indifference to inmate health or safety.'" *Morgan*, 956 F.3d at 89 (alteration in original) (quoting *Farmer*, 511 U.S. at 834).

The "deliberate indifference" standard is comprised of both an objective and subjective prong. *See Hathaway v. Coughlin*, 37 F.3d 63,

40

66 (2d Cir. 1994). "First, the alleged deprivation must be, in objective terms, sufficiently serious." *Id*. (internal quotation marks and citation omitted). "Second, the charged official must act with a sufficiently culpable state of mind." *Id*. This *mens rea* requirement is "more than negligence, but less than conduct undertaken for the very purpose of harm." *Id*. "More specifically, a prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id*. (quoting *Farmer*, 511 U.S. at 837).

Parson cannot satisfy the objective prong under the Eighth or Fourteenth Amendments. Specifically, the Complaint is devoid of any allegations that: (1) Tyler was personally involved in the decision to place Parson in A-block; (2) Tyler physically placed Parson in A-block; (3) Frank *ever* attacked or threatened to attack Parson; and (4) Parson ever told any official at the Cortland County Jail that he felt unsafe or threatened being in A-block. Thus, the Parson has not plausibly alleged a substantial risk of serious harm existed.

Similarly, Parson cannot satisfy the subjective prong under the Eighth or Fourteenth Amendments. There are no allegations in the Complaint plausibly suggesting that Tyler acted in an objectively reckless manner or that Tyler was aware of facts from which he could draw and inference that Frank posed a substantial risk of serious harm. Again, the Complaint lacks any allegations that Tyler was personally involved in placing Parson in A-block or that Frank previously threatened and/or attacked Parson. Even if Parson plausibly alleged that he did not feel safe around Frank or that Frank might be after him, which he did not, that too would be insufficient for Parson's claim against Defendant Tyler to survive initial review. *See Morgan v. Dzurenda*, 956 F.3d 84 90 (2d Cir. 2020) (general complaints to officer that inmate had been "threatened" by a certain inmate and "feared for his safety" were not sufficient to notify officers of substantial risk of harm); *see also Wilson v. Campbell*, No. 06-CV- 175 (GLS/RFT), 2008 WL 902187, at *5 (N.D.N.Y. Mar. 31, 2008) ("A general, conclusory statement that an inmate fears for his safety, without more, is insufficient information from which an inference can been drawn that such inmate's a safety is actually at risk.")

42

Accordingly, the Court recommends that the Complaint be dismissed against Defendant Tyler *without prejudice and with leave to amend.*

### 4. Derogatory Comments

The Court recommends that the Complaint be *dismissed with prejudice and without leave to amend* to the extent that it asserts a claim against Tyler for derogatory comments.

Section 1983 is not designed to remedy harassment or verbal abuse. *See Alnutt v. Cleary*, 913 F. Supp. 160, 165-66 (W.D.N.Y. 1996) (citations omitted). Accordingly, mere allegations of verbal abuse do not rise to the level of a constitutional violation and are not cognizable under 42 U.S.C. § 1983. *See Moncrieffe v. Witbeck*, No. 97-CV-253, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (Mordue, J.) (allegations that corrections officer laughed at inmate not actionable under section 1983) (citation omitted); *see also Carpio v. Walker*, No. Civ.A.95CV1502, 1997 WL 642543, at *6 (N.D.N.Y. Oct. 15, 1997) (Pooler, J. and DiBianco, M.J. ) ("verbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it

might seem, does not rise to the level of an Eighth Amendment violation").

Parson's derogatory comments claim should not proceed. The Complaint alleges that Tyler "announced to the A-Block inmates" at the Cortland County Jail that parson "was getting raped in Auburn and that's why he's back." (Dkt. 1, at 103). Parson further alleges that Tyler declared that "[y]ou were too pussy to fight Frank last time you were here." (*Id.*). According to Parson, Tyler's purported comments/statements "should offend society's sense of decency" and that "this is an intolerable practice in modern society." (*Id*). While Defendant Tyler's comments, as alleged, may be wholly inappropriate, they do not give rise to a cognizable claim under Section 1983 and any purported claim arising therefrom should be dismissed *with prejudice and without leave to amend*.

## M.      Sgt. Clark

The Court cannot determine based on the allegations in the Complaint whether Parson was a pre-trial detainee or incarcerated individual at the time his claim for excessive force against Clark accrued. So the Court will analyze Parson's claim under the Eighth and Fourteenth Amendments. In either scenario, the Court recommends

that Parson's claim against Clark for excessive force arising under the Eighth or Fourteenth Amendments survive *sua sponte* review and require a response.[5]

"Pepper spray can be considered objective excessive force." *Celestin v. Angeletta*, No. 19-CV-1887, 2021 WL 1062344, at *4 (S.D.N.Y. Mar. 19, 2021). Fourteenth Amendment excessive-force claims require force that is either "more than *de minimis*" or "repugnant to the conscience of mankind." *United States v. Walsh*, 194 F.3d 37, 48 (2d Cir. 1999) (citation and quotation marks omitted). "Even a single burst of chemical spray can constitute more than a *de minimis* use of force." *Urena v. City of New York,* No. 22-CV-4679*,* 2024 WL 4149182, *5 (S.D.N.Y. Sep. 10, 2024). The "infliction of pepper spray" may have a "variety of incapacitating and painful effects, and [thus], its use constitutes a significant degree of force." *Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010).

The Complaint alleges that on November 21, 2022, Clark ordered an unidentified corrections officer to open Parson's cell. Clark entered

---

[5] See the Court's discussion regarding Defendants Raymond and Kiehle for the standard of an excessive force claim arising under the Eighth and Fourteenth Amendments.

Parson's cell with his "hands up to fight" asking Parson, "You wanna go?" (Dkt. 1, at 97). Parson "started swinging" and then "immediately layed down on [his] chest to be handcuffed." (*Id.*). Once handcuffed, Parson alleges that Clark "ordered C.O. Johnston to pepper spray[him]." (*Id.*). Hesitating, Johnston asked "[y]ou want me to spray him?" and Clark responded "[y]eah, spray him." (*Id.*).

The Complaint plausibly alleges that Clark personally directed Johnston to pepper spray Parson knowing that Parson was handcuffed and the use of the pepper spray did not serve any legitimate penological purpose. "A defendant who plans or directs an unreasonable use of force is liable for the resulting constitutional violation as a direct participant." *Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014). "In this Circuit, a 'direct participant' includes a person who authorizes, orders, or helps others to do the unlawful acts, even if he or she does not commit the acts personally." *Id.* (quotation omitted); *see also Campbell v. City of Yonkers*, No. 19-CV-2117, 2023 WL 4867459, at *9 (S.D.N.Y. July 31, 2023).

### M. C.O. Johnston

The Court cannot determine based on the allegations in the Complaint whether Parson was a pre-trial detainee or incarcerated

individual at the time his claim for excessive force against Johnston accrued. So the Court will analyze Parson's claim under the Eighth and Fourteenth Amendments. In either scenario, the Court recommends that Parson's claim against Johnston for excessive force arising under the Eighth or Fourteenth Amendments survive *sua sponte* review and require a response. (Complaint, Dkt. 1, at 97).[6]

### N.C.O. Jobson[7]

The Court recommends that the Complaint as to Defendant Jobson be dismissed *without prejudice and with leave to amend.*

"To establish a defendant's individual liability in a suit brought under [42 U.S.C.] § 1983, a plaintiff must show, [among other things], the defendant's personal involvement in the alleged constitutional deprivation." *Morabito v. New York*, 803 F. App'x. 463, 466 (2d Cir. 2023) (cleaned up). "Pursuant to this requirement, a Section 1983 plaintiff must allege a tangible connection between the acts of the defendant and the injuries suffered." *Keyes v. Venettozzi*, No. 9:18-CV-

---

[6] See the Court's discussion regarding Defendants Raymond and Kiehle for the standard of an excessive force claim arising under the Eighth and Fourteenth Amendments.

[7] Defendant Jobson is referred to as "Jobston" in the Complaint. (Dkt. 1, at 80). The Court will assume that there is a typographical error in the spelling of this Defendant's last name.

0372 (GTS/DJS), 2022 WL 991402, at *6 (N.D.N.Y. Mar. 31, 2022)

(quotation and internal quotation marks omitted). In other words, "the

actions or omissions attributable to each defendant must be the

proximate cause of the injuries and consequent damages that the

plaintiff sustained." *Durr v. Slator,* 558 F. Supp. 3d 1, 20 (N.D.N.Y.

2021) (citations omitted).

Parson has not plausibly alleged Jobson's personal involvement.

According to Parson, Jobson's report notes that "Neely stated that he

did not get anything on him and that he was ok." (Complaint, Dkt. 1, at

80). The Complaint further alleges that Judge Walsh did not allow

Parson to call Jobson "as a witness and [the] ADA did not call her."

(*Id.*). Beyond that, the Complaint is devoid of any allegations suggesting

that Jobson was personally involved in any deprivation of Parson's

constitutional rights. The Court therefore recommends that the

Complaint be dismissed against Defendant Jobson *without prejudice*

*and with leave to amend.*

### O.  Nurse Christine – Jane Doe #46

Parson alleges that because of his situation in Cortland County,

he "requested sleeping pills from nurse (Christine?) Jane [D]oe named

in this claim that I was taking to get though the nights." (Compl., Dkt.

1, at 92). Parson further claims that "[c]ome to find out the sleeping pills were actually psyche meds that I immediately stop taking once I found out by Auburn Correctional Facility nurses." (*Id.*). As an initial matter, the Court is unable to discern whether Parson was a pre-trial detainee or an incarcerated individual at the time of the event alleged in the Complaint.

"To state an Eighth Amendment deliberate-indifference-to-medical-needs claim, incarcerated persons "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). This standard "includes both subjective and objective components." *Mallet v. New York State Dep't of Corr. & Cmty. Supervision*, 126 F.4th 125, 132 (2d Cir. 2025) (quotation omitted).

The objective prong is satisfied when an incarcerated person plausibly alleges the alleged deprivation is sufficiently serious. *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). "There is no single metric" to determine whether a medical condition is sufficiently serious. *Mallet*, 126 F.4th at 132. To be a sufficiently serious medical condition, the condition must be one "of urgency" and one that "may

result in degeneration or extreme pain, significantly affect[] daily activities," or the condition "involves chronic and substantial pain." *Id.* (quotations omitted). "A serious medical need can also" exist where the "failure to treat" an incarcerated person's "condition" results "in further significant injury or the unnecessary and wanton infliction of pain." *Webster v. Fisher*, 694 F. Supp. 2d 163, 191 (N.D.N.Y. 2010). But "not every lapse in prison medical care will rise to the level of a constitutional violation." *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003).

To satisfy the subjective prong, an incarcerated person must show that prison officials "acted with a sufficiently culpable mind." *Mallet,* 126 F.4th at 132 (cleaned up). The act, or omission, must show that the prison officials consciously disregarded a substantial risk of serious harm. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994). In simpler terms, plaintiffs must show a defendant acted with a mental state like criminal recklessness. *Id* at 839-40.

Conversely, if Parson was confined as a pretrial detainee at the time he was administered he "psyche med," his claims are governed by the Due Process Clause of the Fourteenth Amendment, rather than the

Cruel and Unusual Punishments Clause of the Eighth Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citation omitted).

"A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions." D*arnell*, 849 F.3d at 29. Such a claim is typically analyzed under a two-pronged standard. First, the pretrial detainee must satisfy the "objective prong" showing that the conditions were "sufficiently serious" as to constitute objective deprivations of constitutional rights. *Id.* at 29. Second, the pretrial detainee must satisfy the "subjective prong" by showing that the officer acted with deliberate indifference to the challenged conditions. *Id.*

The objective prong of the deliberate indifference claim is the same as a convicted prisoner under the Eighth Amendment. *Id.* at 30. To satisfy the objective prong, "the [pre-trial detainee] must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health,' which includes the risk of serious damage to 'physical and mental soundness." *Id.*

51

To satisfy the *mens rea* prong, a pretrial detainee must allege facts showing that "the defendant official acted intentionally to impose the alleged condition or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35; *see also Bruno v. City of Schenectady*, 727 F. App'x 717 (2d Cir. 2018).

Parson plausibly alleges that Nurse Christine (Jane Doe #46) violated his constitutional rights when she administered the "wrong medication" by giving "psyche meds" rather than a sleeping pill, as he requested. (Complaint, Dkt. 1, at pg. 92). The Complaint, however, lacks any facts plausibly suggesting that Nurse Christine (Jane Doe #46) acted with a culpable state of mind. As pleaded, the allegations against Nurse Christine (Jane Doe #46) amount to a disagreement with the nature of treatment and not a violation of Parson's constitutional rights which is not actionable. *See Wright v. Conway*, No. 05-CV-6723, 584 F.Supp.2d 604, 607 (W.D.N.Y. Nov. 5, 2008) ("[the plaintiff's] complaints demonstrate no more than his personal dissatisfaction with

the level of care that he received, and these claims must therefore be dismissed.").

Even if Nurse Christine's (Jane Doe #46) decisions surrounding Plaintiff's treatment implicate medical malpractice or negligence, her actions and/or inactions do not give rise to either an Eighth or Fourteenth Amendment violation. *See Hendricks v. Coughlin,* 942 F.2d 109, 113 (2d Cir. 1991) (holding that proof of negligence will not give rise to a constitutional violation); *see also McNamee v. Schoharie County Jail*, 06-CV-1364 (LED/GHL), 2008 WL 686796, at *6-7 (N.D.N.Y. March 10, 2008).

For these reasons, the Court recommends that the Complaint be dismissed against Nurse Christine (Jane Doe #46) *without prejudice and with leave to amend.*

### P.   C.O. John Doe – Auburn C.F.

The Court recommends that Parson's claim that John Doe Defendant #47, a Corrections Officer at Auburn Correctional Facility, ("Auburn C.F.") who allegedly "sexually molested him" be dismissed *without prejudice and with leave to amend.* (Complaint, Dkt. 1, at pg. 18).

Incarcerated individuals alleging Eighth Amendment sexual abuse claims must allege both subjective and objective elements. *See Crawford v. Cuomo,* 796 F.3d 252, 257 (2d Cir. 2015). Namely, the incarcerated person must plausibly allege that the "officer's intentional contact with an inmate's genitalia or other intimate area . . . serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate[.]" *Crawford,* 796 F.3d at 257. A court's principal inquiry "is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is taken to arouse or gratify the officer or humiliate the inmate." *Id.* at 257-58.

A pretrial detainee's claim of sexual abuse against a correctional officer is governed by the due process clause of the Fourteenth Amendment, and not by the Eighth Amendment, as "pretrial detainees have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." *Darnell v. Pineiro,* 849 F.3d 17, 29 (2d Cir. 2017*)* (internal quotation marks, citations, and alterations omitted). However, courts in this Circuit have noted that it is not yet clear whether a pretrial detainee's sexual abuse

54

claim under the Fourteenth Amendment—as opposed to an excessive force claim—is subject to an objective or subjective *mens rea* requirement. *See, Lewis v. Huebner,* No. 17-CV-8101, 2020 WL 1244254, at *9 (S.D.N.Y. Mar. 16, 2020) ("[I]t is presently unclear whether both prongs required for Eighth Amendment sexual abuse claims are also required for claims of sexual abuse under the Fourteenth Amendment.") (citation and internal quotation marks omitted).

The Complaint is vague as to whether Parson was a pretrial detainee or an inmate at the time of the alleged occurrence making it difficult for the Court to determine whether his claim is subject to Eighth or Fourteenth Amendment scrutiny. Further complicating the Court's analysis is Parson's complete failure to provide any factual support for his conclusory assertion that he was "sexually molested." (Complaint, Dkt. 1, at pg. 18). Parson's lack of factual support also runs afoul Fed. R. Civ. P. 8, making it difficult for John Doe Defendant #47, once identified, to have sufficient notice of the claims against him.

The Court therefore recommends District Court dismiss the claims against John Doe Defendant #47 *without prejudice and with leave to amend.*

## Q.  John Doe #49 – Elmira C.F.

The Court recommends that Parson's claim against the individual who allegedly destroyed his property be dismissed.

Parson alleges that a lieutenant at the Elmira Correctional Facility "sprayed [a] fire hose on my neighbor and flooding much of my cell destroying much of my legal documents." (Dkt. 1, at 42). The Court construes Parson's allegations as asserting a claim for deprivation of property. That claim cannot lie in federal court if the state court provides an adequate remedy for the deprivation of that property. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *see also Marino v. Ameruso*, 837 F.2d 45, 47 (2d Cir. 1988) (citations omitted). New York provides such a remedy in § 9 of the New York Court of Claims Act which allows an inmate to pursue a claim for deprivation of property against the State of New York in the New York Court of Claims. *See Forman v. Coughlin*, No. 93CV- 8412 (LAK), 1994 WL 708150, at *1 (S.D.N.Y. Dec. 20, 1994) ("New York has adequate remedies [for

deprivation of property claims] via recourse to the New York Court of Claims. The Constitution requires nothing further."). Because New York State provides an adequate post-deprivation remedy for the purported destruction of his property, Parson may pursue his claim in state court even if he was a pre-trial detainee at the time of the alleged loss. *See Ortiz v. City of New York*, No. 12-CV-3118, 2012 WL 6200397, at *7 (S.D.N.Y. Dec. 12, 2012) (pre-trial detainee could pursue his claim for deprivation of property through the New York Court of Claims and not under § 1983).

The Court therefore recommends that the Complaint be dismissed against John Doe – Elmira C.F. (Defendant # 49) *without prejudice and without leave to amend. See, e.g., Green v. Niles*, No. 11-CV-1349, 2012 WL 987473, at *6 (S.D.N.Y. Mar. 23, 2012) (dismissing an inmate's claim because "a prison's loss of an inmate['s] property . . . will not support a due process claim redressable under § 1983 if adequate state post-deprivation remedies are available" (citation and quotation marks omitted)).

### R. Fed. R. Civ. P. 8, 10, 18 and 20

#### 1. Rule 8

See Section IV(E) above for a discussion of Fed. R. Civ. P. 8.

#### 2. Rule 10

Fed. R. Civ. P. 10 states in relevant part that "[a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances . . . . If doing so would promote clarity, each claim founded on a separate transaction or occurrence — and each defense other than a denial — must be stated in a separate count or defense."

#### 3. Rules 18 and 20

Fed. R. Civ. P. 18 and 20 govern joinder of claims and parties, respectively. Rule 18 permits a plaintiff to join as many claims as he has against a particular defendant. *See* Fed. R. Civ. P. 18(a). However, under Fed. R. Civ. P. 20, a plaintiff may not pursue unrelated claims against multiple defendants. *See* Fed. R. Civ. P. 20(a)(2).

Fed. R. Civ. P. 20(a)(2) states:

[p]ersons . . . may be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences;

and (B) any question of law or fact common to all defendants will arise in the action.

"Although courts have interpreted Rule 20(a) liberally to allow related claims to be tried within a single proceeding, 'the mere allegation that Plaintiff was injured by all Defendants is not sufficient to join unrelated parties as defendants in the same lawsuit pursuant to Rule 20(a).'" *Clay v. Doe*, No. 20-CV-7692, 2020 WL 6151436, at *1 (S.D.N.Y. Oct. 20, 2020) (citation omitted).

Parson's Complaint runs afoul of Fed. R. Civ. P. 8, 10, 18, and 20. First, the Complaint lacks a short and plain statement showing that Parson is entitled to relief. Second, Parson's failure to adhere to the pleading rules and instead, provide the Court with 113 pages of prose, makes the Court's review of the Complaint a monumental and arduous task. For example, Parson's inartful pleading makes it difficult for the Court to determine whether he was a pre-trial detainee or an incarcerated individual at the time his alleged claims accrued. Third, Parson's multitude of claims against 53 Defendants alleged to have occurred in multiple courthouses and correctional facilities over an extended period is a blatant violation of Fed. R. Civ. P. 10 and 20 and weaves a tangled web that the remaining Defendants should not be

entangled in. *See Smith v. Goord*, No. 04-CV-6432, 2006 WL 2850597, at *3-4 (W.D.N.Y. Sep. 22, 2006) (recommending disallowing joinder of claims against defendants at different correctional facilities where there was no suggestion that the original defendants were involved in the actions taken against the plaintiff in a different facility more than one year later), *report and recommendation adopted* by 2007 WL 496371 (W.D.N.Y. Feb. 12, 2007); *see also Webb v. Maldonaldo*, No. 3:13-CV-144 (RNC), 2013 WL 3243135, at *3 (D. Conn. June 26, 2013) ("Unrelated claims against different defendants belong in different suits . . . to prevent the sort of morass" created by a complaint with more than twenty defendants and countless unrelated claims.") (quotation and citation omitted).

Because of Parsons' failure to comply with Fed. R. Civ. P. 8,  10, 18, and 20, the Court recommends dismissing the Complaint. *See Griffith v. New York State*, No. 5:23-CV-1266 (DNH/ML), 2024 WL 1641587, at *4 (N.D.N.Y. Mar. 20, 2024) (recommending "dismissal of the Complaint because it is not acceptable under Rules 8 and 10 of the Fed. R. Civ. P. and because Plaintiff's Section 1983 claim or claims

against Defendant are entirely unclear"), *report and recommendation adopted*, 2024 WL 1639856 (N.D.N.Y. Apr. 16, 2024).

However, the Court further recommends that Parson be allowed to file an amended pleading and, if the District Court allows, commence additional actions where each action asserts claims that arise out of the same transactions or occurrences, limited to defendants allegedly involved in the same, with respect to his claims against the **following Defendants, provided he complies with Fed. R. Civ. P. 8 and 10, 18, and 20:**

1. C.O. Stacey, C.O. Traphagen, C.O. Haskins, C.O. Dorsett, C.O., Gleason, C.O. Reynolds, C.O. Fosbrook, C.O. Barhans, S. Delucia, D. Gage, N. Hawks, C.O. Smith, C.O. Ken Eaton, C.O. Nater, C.O. Barber, and C.O. Cavanagh;

2. Nicholas Lynch and Mark Helms;

3. Cortland County Jail Officials (Dkt. 1, at 89) and "Each Correction Officer who wrote ticket for not closing gate" (Dkt. 1, at 96);

4. Adam Raymond and Thomas Kiehle;

5. J. Tyler **only** as to the failure to protect claim;

6. Sgt. Clark;

7. C.O. Johnston;

61

8.    C.O. Jobson;[8]

9.    Nurse Christine – Jane Doe #46;

10.    C.O. John Doe – Auburn C.F.; and

11.    Cortland County

To be clear, Parson may not pursue unrelated claims against

unrelated defendants in a single action. <u>For example</u>:

    a.  Parson may pursue his claims against Sgt. Clark and C.O.
        Johnston in the same action *if* the claims against them
        arise from the same nucleus of operative facts. If,
        however, Parson's claim against them emanates from
        different facts, he *may not* sue them in a single action –
        Parson would be required to commence separate actions;

    b.  Parson may not pursue claims against C.O. Stacey, C.O.
        Traphagen, C.O. Haskins, C.O. Dorsett, C.O., Gleason,
        C.O. Reynolds, C.O. Fosbrook, C.O. Barhans, S. Delucia,
        D. Gage, N. Hawks, C.O. Smith, C.O. Ken Eaton, C.O.
        Nater, C.O. Barber, and  C.O. Cavanagh *if* his claims
        against them arise from different facts. It might be the
        case that Parson's claims against several of the
        defendants in this subparagraph arise from the same
        operative facts in which case Parson could sue them in a
        single action.

---

[8] As noted in footnote 6, C.O. Jonson is referred to as C.O. "Jobston" in the
Complaint. The Court requests that Parson determine, if possible, which spelling is
correct.

## V.    OPPORTUNITY TO AMEND

Generally, before the court dismisses a *pro se* complaint or any part of the complaint *sua sponte*, the court should afford a plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile. *See Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Futility is present when the problem with plaintiff's causes of action is substantive such that better pleading will not cure it. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted).

Here, the Court recommends that Parson be granted leave to file an amended pleading and commence additional actions consistent with Section IV(S) above. Should the District Court allow Parson to amend the Complaint, the operative pleading must clearly be labeled "Amended Complaint" and bear the docket number *5:25-CV-956* (AJB/MJK). Parson is strongly encouraged to read and comply with the prisoner *pro se* handbook, a copy of which the Clerk is directed to send to him. The amended pleading, and any additional pleadings, must be

signed[9] and otherwise comply with Fed. R. Civ. P. 8, 10, 18, and 20 as noted herein.

Parson must set forth all claims he intends to assert and plausibly allege that a case or controversy exists between her and any Defendants by name over which this Court has jurisdiction. Parson must clearly set forth facts giving rise to his purported claims in separate and consecutively numbered paragraphs. The amended pleading must be a wholly integrated and a complete pleading that does not rely upon, or incorporate by reference, any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect." (internal quotation marks omitted)). Piecemeal pleadings are not permitted. *See* L.R. 15.1.

---

[9] Rule 11(a) of the Federal Rules of Civil Procedure requires that "[e]very pleading . . . must be signed . . . by a party personally if the party is unrepresented." Fed. R. Civ. P. 11(a). Moreover, Rule 10.1(c)(2) of the Local Rules of Practice of this District requires that all documents submitted to the Court include the original signature of the attorney or the *pro se* litigant.

## VI.    CONCLUSION

WHEREFORE, based on the findings above, it is

ORDERED, that Parson's motion to proceed *in forma pauperis*

(Dkt. 6) is **GRANTED**, and it is further

RECOMMENDED, that the Complaint be **DISMISSED** against

the Judges, including Judge Alexander, **WITH PREJUDICE AND**

**WITHOUT LEAVE TO AMEND** because any amendment would be

futile, and it is hereby further

RECOMMENDED, that the Complaint be **DISMISSED** against

Defendant Michelman **WITH PREJUDICE AND WITHOUT LEAVE**

**TO AMEND** because any amendment would be futile, and it is hereby

further

RECOMMENDED, that the Complaint be **DISMISSED** against

Defendants Simser, Healy, Raju, Perfetti, and Kyles **WITH**

**PREJUDICE AND WITHOUT LEAVE TO AMEND** because any

amendment would be futile, and it is hereby further

RECOMMENDED, that the Complaint be **DISMISSED** against

Defendant Monty **WITH PREJUDICE AND WITHOUT LEAVE TO**

**AMEND** because any amendment would be futile, and it is hereby further

RECOMMENDED, that the Complaint be **DISMISSED** against Defendants C.O. Stacey, C.O. Traphagen, C.O. Haskins, C.O. Dorsett, C.O., Gleason, C.O. Reynolds, C.O. Fosbrook, C.O. Barhans, S. Delucia, D. Gage, N. Hawks, C.O. Smith, C.O. Ken Eaton, C.O. Nater, C.O. Barber, and C.O. Cavanagh **WITHOUT PREJUDICE AND WITH LEAVE TO AMEND**, and it is hereby further

RECOMMENDED, that the Complaint be **DISMISED** against Defendants Fenchel, Jarrod Smith, Melissa Smith, and Jones **WITH PREJUDICE AND WITHOUT LEAVE TO AMEND** because any amendment would be futile, and it is hereby further

RECOMMENDED, that the Complaint be **DISMISED** against Defendant Cute **WITH PREJUDICE AND WITHOUT LEAVE TO AMEND** because any amendment would be futile, and it is hereby further

RECOMMENDED, that the Complaint be **DISMISSED** against Defendants Lynch and Helms **WITHOUT PREJUDICE AND WITH LEAVE TO AMEND**, and it is hereby further

**RECOMMENDED**, that the Complaint be **DISMISSED** against Cortland County **WITHOUT PREJUDICE AND WITH LEAVE TO AMEND**, and it is hereby further

**RECOMMENDED**, that the Complaint be **DISMISSED** against the "Cortland County Jail Officials" and "[e]ach Correction[s] Officer who wrote [parson] a ticket for not closing [his] gate" **WITHOUT PREJUDICE AND WITH LEAVE TO AMEND**, and it hereby further

**RECOMMENDED**, that Parson's claim against Defendants Raymond and Kiehle proceed and that a response be required, and it is hereby further

**RECOMMENDED**, that the Complaint be **DISMISSED** against Defendant Tyler **WITHOUT PREJUDICE AND WITH LEAVE TO AMEND**, and it is hereby further

**RECOMMENDED**, that Parson's claim against Defendant Clark proceed and that a response be required, and it is hereby further

**RECOMMENDED**, that Parson's claim against Defendant Johnston proceed and that a response be required, and it is hereby further

**RECOMMENDED**, that the Complaint be **DISMISSED** against Defendant Jobson **WITHOUT PREJUDICE AND WITH LEAVE TO AMEND**, and it is hereby further

**RECOMMENDED**, that the Complaint be **DISMISSED** against Defendant Nurse Christine (Jane Doe #46) **WITHOUT PREJUDICE AND WITH LEAVE TO AMEND**, and it is hereby further

**RECOMMENDED**, that the Complaint be **DISMISSED** against John Doe (Defendant #47 who allegedly "sexually molested [Parson]" **WITHOUT PREJUDICE AD WITH LEAVE TO AMEND**, and it is hereby further

**RECOMMENDED**, that the Complaint be **DISMISSED** against John Doe – Elmira C.F. (Defendant #49) **WITHOUT PREJUDICE AND WITHOUT LEAVE TO AMEND**, and it is further

**RECOMMENDED**, that the Complaint be **DISMISSED** in its entirety **WITHOUT PREJUDICE AND WITH LEAVE TO AMEND** for failure to comply with Fed. R. Civ. P. 8, 10, 18, and 20 and that Parson be allowed to file an amended pleading and, if the District Court allows, commence additional actions where each action asserts claims that arise out of the same transactions or occurrences, limited to

defendants allegedly involved in the same, with respect to his claims

against the **following Defendants, provided he complies with**

**Fed. R. Civ. P. 8 and 10, 18, and 20:**

1. C.O. Stacey, C.O. Traphagen, C.O. Haskins, C.O. Dorsett, C.O., Gleason, C.O. Reynolds, C.O. Fosbrook, C.O. Barhans, S. Delucia, D. Gage, N. Hawks, C.O. Smith, C.O. Ken Eaton, C.O. Nater, C.O. Barber, and C.O. Cavanagh;

2. Nicholas Lynch and Mark Helms;

3. Cortland County Jail Officials (Dkt. 1, at 89) and "Each Correction Officer who wrote ticket for not closing gate" (Dkt. 1, at 96);

4. Adam Raymond and Thomas Kiehle;

5. J. Tyler **only** as to the failure to protect claim;

6. Sgt. Clark;

7. C.O. Johnston;

8. C.O. Jobson;

9. Nurse Christine – Jane Doe #46;

10. C.O. John Doe – Auburn C.F.;

11. Cortland County; and it is further

**ORDERED**, that the Clerk provide Parson with a copy of this

Order and Report-Recommendation, along with copies of the

unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

In accordance with 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *See Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.


Dated: December 8, 2025.

_____
Hon. Mitchell J. Katz
U.S. Magistrate Judge

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 71 of 529

McNair v. Utica Police Department, Not Reported in Fed. Supp. (2023)

2023 WL 4935993

2023 WL 4935993
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Brandon T. MCNAIR, Plaintiff,
v.
UTICA POLICE DEPARTMENT, et al., Defendants.

6:23-CV-699 (DNH/ATB)
|
Signed June 26, 2023

**Attorneys and Law Firms**

BRANDON T. McNAIR, Plaintiff, pro se.

**ORDER and REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** The Clerk has sent to the court for review a pro se complaint filed by plaintiff Brandon T. McNair, in which he has sued various defendants based on several civil rights claims pursuant to 42 U.S.C. § 1983. (Dkt. No. 1) ("Compl."). Plaintiff has also moved to proceed in forma pauperis ("IFP"). (Dkt. No. 2).

**I. IFP Application**

Plaintiff declares in his IFP application that he is unable to pay the filing fee. (Dkt. No. 2). After reviewing his application and supporting documents, this court finds that plaintiff is financially eligible for IFP status.

However, in addition to determining whether plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915 (e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989), *abrogated on other grounds by Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544 (2007) and 28 U.S.C. § 1915. Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldredge*, 505 F.2d 802, 804 (8th Cir. 1974). Although the court has a duty to show liberality toward pro se litigants and must use extreme caution in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (finding that a district court may dismiss a frivolous complaint sua sponte even when plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555).

In addition, Fed. R. Civ. P. 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Although Rule 8 does not require detailed factual allegations, it does "demand[ ] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Houston v. Collerman*, No. 9:16-CV-1009 (BKS/ATB), 2016 WL 6267968, at *2 (N.D.N.Y. Oct. 26, 2016) (quoting *Ashcroft*, 556 U.S. at 678). A pleading that contains allegations that " 'are so vague as to fail to give the defendants adequate notice of the claims against them' is subject to dismissal." *Id.* (citing *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009)). The court will now turn to a consideration of plaintiff's complaint under the above standards.

**II. Complaint**

**\*2** Plaintiff alleges that on July 27, 2021 at approximately 10:00 a.m., he was on the "east side" of Utica, New York when the "cops hopped out [and] detained [him and] tried to search [him.]" (Compl. at 4). He further alleges that, based off a general description, the police searched plaintiff because he was "black in a certain area where a man with a gun had been alleged to be there." (*Id.*). Plaintiff was arrested after "running for [his] life in an attempt to keep [the police] from violating [his] rights." (*Id.*). Plaintiff was "thrown in jail" and charged

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 72 of 529

McNair v. Utica Police Department, Not Reported in Fed. Supp. (2023)

2023 WL 4935993

with "possession of an instrument that was found almost an hour after, under some car in the parking lot of a car shop." (*Id.* at 7).

Plaintiff then states that he appeared at a bail hearing in Oneida County Court, with the defendants District Attorney ("DA") McNamara and Judge Michael L. Dwyer. (Compl. at 7). Plaintiff alleges that when Judge Dwyer learned of plaintiff's intention to post bail, he "then raised it in a clear attempt to make it unreachable post bail reform[.]" (*Id.*). Plaintiff states that he was "denied audience with the Supreme Court and [his] habeas corpus was illegally unheard," having been put "right back in front of [Judge] Dwyer for him to answer[.]" (*Id.*). Plaintiff claims that this is "not how the process works," and that Judge Dwyer "didn't have the authority to answer [his] habeas corpus." (*Id.*).

Plaintiff further alleges that Judge Dwyer and DA McNamara proceeded to "violate [his] rights in every court proceeding leading up to trial." (Compl. at 7). Plaintiff cites to a decision from the Fourth Department relative to his criminal case for the underlying facts surrounding his claims. According to *Matter of McNair v. McNamara*, plaintiff's jury trial commenced on November 1, 2021, at which time a jury was selected and sworn, and three witnesses testified. 206 A.D. 3d 1689, 1690 (4th Dep't 2022). November 2nd was a holiday, during which the trial was recessed. (*Id.*). On November 3rd, Judge Dwyer's secretary notified plaintiff's counsel that the Judge had a cold, wanted to make sure it was not COVID-19, he would not be in that day, and the jury would be sent home. (*Id.*). Plaintiff's counsel was notified several days later that the matter would be scheduled for a retrial on November 15th. (*Id.*). Essentially, the Judge believed a mistrial was necessary because it was "physically impossible" for him to come to court and proceed with the trial, while he waited three to five days for the result of his COVID-19 test. (*Id.*). Over plaintiff's counsel's objections, the mistrial was declared as of November 3rd. (*Id.*). The Fourth Department ultimately agreed with plaintiff in concluding that there was no "manifest necessity" for the mistrial, and that the county court abused its discretion in granting the mistrial sua sponte. (*Id.* at 1690-92). Accordingly, the government was prohibited from retrying plaintiff on the underlying indictment based on double jeopardy grounds. Liberally construed, this court interprets plaintiff's claims of constitutional violations in the instant complaint to relate to the underlying trial proceedings as described in *Matter of McNair*. Plaintiff also alleges that the police were "selective [and] omitted certain facts to

allow the proceedings to continue," and that DA McNamara "also did not reveal certain facts in order to secure an indictment." (Compl. at 7).

Plaintiff alleges damages including mental and physical injuries sustained during his incarceration. (Compl. at 5). He seeks monetary damages in the amount of twenty million dollars, as well as "punitive damages of relieving the officials of their official capacities." (*Id.*).

## DISCUSSION

### III. Sovereign and Judicial Immunities

**\*3** The complaint must be dismissed as against named defendants Oneida County Courts and Officials and Judge Dwyer, because they are immune from suit. The Second Circuit has ruled that "the New York State Unified Court System is unquestionably an arm of the State, and is entitled to Eleventh Amendment sovereign immunity." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009). Because the Oneida County Court is a part of the New York State Unified Court System, it is entitled to sovereign immunity. Similarly, judges within the New York State Unified Court System are entitled to Eleventh Amendment immunity to the extent they are sued in their official capacity. *See Aron v. Becker*, 48 F. Supp. 3d 347, 366 (N.D.N.Y. 2014) (dismissing claim against a Delaware County judge on sovereign immunity grounds). As both the Oneida County Court and Judge Dwyer are arms of the State, they are entitled to Eleventh Amendment immunity, and it is recommended that the complaint against them be dismissed with prejudice.

The complaint against Judge Dwyer in his personal capacity is subject to dismissal on judicial immunity grounds. *See, e.g., Washington v. Ciccone*, No. 3:21-CV-0564 (MAD/ML), 2021 WL 2935950, at \*4 (N.D.N.Y. July 13, 2021) (Judicial immunity "shields judges from suit to the extent they are sued in their individual capacities[.]"), *report and recommendation adopted*, 2021 WL 4859663 (N.D.N.Y. Oct. 19, 2021). It is well settled that judges have absolutely immunity for their judicial acts performed in their judicial capacities. *See Mireles v. Waco*, 502 U.S. 9, 11 (1991); *Forrester v. White*, 484 U.S. 219, 225 (1988); *Shtrauch v. Dowd*, 651 F. App'x 72, 73-74 (2d Cir. 2016) ("Generally, 'acts arising out of, or related to, individual cases before the judge are considered judicial in nature' ") (quoting *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009)); *Kim v. Saccento*, No. 21-2865, 2022 WL 9583756, at \*2 (2d Cir. Oct. 17, 2022), *cert. denied*, No.

McNair v. Utica Police Department, Not Reported in Fed. Supp. (2023)

2023 WL 4935993

22-732, 2023 WL 2959393 (U.S. Apr. 17, 2023) ("the actions that [plaintiff] complains of – adverse decisions in a criminal proceeding – are plainly judicial in nature"); *Root v. Liston*, 444 F.3d 127, 132 (2d Cir. 2006) (judges who set bail enjoy absolute immunity) (collecting cases). "Judicial immunity applies even when the judge is accused of acting maliciously or corruptly." *Coon v. Merola*, No. 1:19-CV-394 (DNH/ATB), 2019 WL 1981416, at *3 (N.D.N.Y. Apr. 8, 2019) (citing *Imbler v. Pachtman*, 424 U.S. 409, 419 n.12 (1976)), *report and recommendation adopted*, 2019 WL 1978595 (N.D.N.Y. May 3, 2019).

"The only two circumstances in which judicial immunity does not apply is when he or she takes action 'outside' his or her judicial capacity and when the judge takes action that, although judicial in nature, is taken 'in absence of jurisdiction.' " *Id.* (quoting *Mireles*, 502 U.S. at 11-12). Here, plaintiff has failed to plausibly allege that Judge Dwyer was acting outside of his judicial capacity or in the absence of jurisdiction. To the extent that plaintiff alleges that his habeas corpus petition was not properly before Judge Dwyer, Article 70 of the New York Civil Practice Law and Rules specifically authorizes a petition for the writ to be made to a county judge being or residing within the county in which the petitioner is detained. N.Y. C.P.L.R. § 7002(b)(4). In the absence of any other allegation suggesting that the general rule regarding judicial immunity can be overcome, the court recommends dismissing with prejudice the complaint as against Judge Dwyer in his individual capacity. *See Edwardsen v. Aloi*, No. 5:17-CV-00202 (LEK/TWD), 2017 WL 1283496, at *3 (N.D.N.Y. Mar. 3, 2017) (recommending dismissal with prejudice on judicial immunity grounds), *report and recommendation adopted*, 2017 WL 1283763 (N.D.N.Y. Apr. 5, 2017).

Plaintiff has also included unidentified "officials" of the Oneida County Court as defendants in the caption of his complaint. There is, however, no specific allegation anywhere in the complaint referencing any other court official who was involved in the alleged violations of plaintiff's constitutional rights. In any event, even if plaintiff had identified another court "official" as a defendant, judicial immunity has been extended to " 'certain others who perform functions closely associated with the judicial process.' " *Marshall v. New York State Pub. High Sch. Athletic Ass'n, Inc.*, 374 F. Supp. 3d 276, 288 (W.D.N.Y. 2019) (quoting inter alia *Cleavinger v. Saxner*, 474 U.S. 193, 200 (1985)). Quasi-judicial immunity is absolute if the official's role "is 'functionally comparable' to that of a judge." *Butz v. Economou*, 438 U.S. 478,

513 (1978); *see Cleavinger*, 474 U.S. at 201 ("Absolute immunity flows not from rank or title or location within the Government, but from the nature of the responsibilities of the individual official." (internal quotation marks and citation omitted)); *Gross v. Rell*, 585 F.3d 72, 81 (2d Cir. 2009) ("Judicial and quasi-judicial immunity are both absolute immunities." (citations omitted)). Much like judicial immunity, "[a] defendant entitled to quasi-judicial immunity loses that privilege only if [he or] she acts in the clear absence of all jurisdiction." *Finn v. Anderson*, 592 F. App'x 16, 19 (2d Cir. 2014) (internal quotation marks and citation omitted). Thus, it is likely that the unidentified court official defendants would also be protected from suit based on the doctrine of quasi-judicial immunity.

## IV. Prosecutorial Immunity

**\*4** The complaint is also subject to dismissal as against DA McNamara. The doctrine of absolute immunity applies broadly to shield a prosecutor from liability for money damages (but not injunctive relief) in a § 1983 lawsuit, even when the result may be that a wronged plaintiff is left without an immediate remedy." *Anilao v. Spota*, 27 F.4th 855, 863-64 (2d Cir. 2022) (citing *Imbler v. Pachtman*, 424 U.S. 409, 427 (1976)). In *Anilao*, the Second Circuit explained:

Our cases make clear that prosecutors enjoy "absolute immunity from § 1983 liability for those prosecutorial activities intimately associated with the judicial phase of the criminal process." *Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir. 1987)(quotation marks omitted). The immunity covers "virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate." *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995) (quoting *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994)). For example, a prosecutor enjoys absolute immunity when determining which offenses to charge, initiating a prosecution, presenting a case to a grand jury, and preparing for trial. *See id.*; *Imbler*, 424 U.S. at 431, 96 S. Ct. 984 (concluding that a prosecutor is absolutely immune from a § 1983 suit for damages based on his "initiating a prosecution and ... presenting the State's case"). For that reason, we have held that absolute immunity extends even to a prosecutor who "conspir[es] to present false evidence at a criminal trial. The fact that such a conspiracy is certainly not something that is properly within the role of a prosecutor is immaterial, because the immunity attaches to his function, not to the manner in which he performed it." *Dory*, 25 F.3d at 83 (cleaned up).

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 74 of 529

McNair v. Utica Police Department, Not Reported in Fed. Supp. (2023)

2023 WL 4935993

*Id.* at 864. *See also Pinaud v. County of Suffolk*, 52 F.3d 1139, 1149 (2d Cir. 1995) (holding that absolute prosecutorial immunity protects a prosecutor for advocacy in connection with a bail application).

"By contrast, prosecutors receive only qualified immunity when performing 'administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings.' " *Simon v. City of New York*, 727 F.3d 167, 172 (2d Cir. 2013) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)). "Investigation, arrest, and detention have historically and by precedent been regarded as the work of police, not prosecutors, and they do not become prosecutorial functions merely because a prosecutor has chosen to participate." *Id.* (interior quotation marks and citations omitted); *see Giraldo v. Kessler*, 694 F.3d 161, 166 (2d Cir. 2012) (" '[A]ctions taken as an investigator enjoy only qualified immunity.' ") (quoting *Zahrey v. Coffey*, 221 F.3d 342, 346 (2d Cir. 2000)). "Under a functional approach, actions are not shielded by absolute immunity merely because they are performed by a prosecutor. 'A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity.' " *Giraldo*, 694 F.3d at 166 (quoting *Buckley*, 509 U.S. at 273).

Liberally construed, in this case plaintiff alleges that DA McNamara violated his rights by "hold[ing] plaintiff in an attempt to retry [him] illegally for 7 months" after the mistrial (Compl. at 7), and for failing to "reveal certain facts in order to secure an indictment" (*id.*). Otherwise, plaintiff generally alleges that DA McNamara violated his rights "in every court proceeding leading up to trial[,] in the trial [and] after the first trial[.]" (*Id.*). With respect to the indictment, the courts have long held that a prosecutor's determination to bring charges against an individual by presentment of a case to the grand jury is an act by an advocate intimately related to the judicial phase of the criminal process to which absolute prosecutorial immunity applies. *See Bernard v. County of Suffolk*, 356 F.3d 495, 503 (2d Cir. 2004) (The act of "knowingly presenting false evidence to, while at the same time withholding exculpatory evidence from [the grand jury] ... lie[s] at the very core of a prosecutor's role as an advocate engaged in the judicial phase of the criminal process.") (citing *Imbler*, 424 U.S. at 431 & n. 34); *Pinaud v. County of Suffolk*, 52 F.3d at 1149 (holding district attorneys absolutely immune from claim for malicious

prosecution and presentation of false evidence to the grand jury); *Maglione v. Briggs*, 748 F.2d 116, 118 (2d Cir. 1984) ("The presentation of a case to a grand jury falls squarely within the prosecutor's traditional function and is thus subject to absolute immunity...."); *J. & W. Trading & Leasing Inc. v. New York*, No. 5:15-CV-327 (GLS/DEP), 2015 WL 4135961, at *3 (N.D.N.Y. 2015) (granting absolute immunity where prosecutor allegedly presented false testimony before grand jury). Accordingly, plaintiff may not pursue his § 1983 action against DA McNamara based on his alleged failure to disclose evidence to the grand jury.

**\*5** The court concludes that DA McNamara is also immune from any suit by plaintiff based on his efforts to continue the prosecution of plaintiff's criminal case, although there is certainly less case law involving this scenario. Bearing in mind the standard of determining whether the specific conduct at issue is 'intimately associated with the judicial phase of the criminal process,' the court cannot conclude that DA McNamara's efforts to retry plaintiff's case after Judge Dwyer granted a mistrial runs afoul of the prosecutor's protected function of initiating a prosecution and presenting the State's case. *See, e.g.*, *Davis v. State of N.Y.*, No. 90 Civ. 6170, 1991 WL 156351, at *6 (S.D.N.Y. Aug. 6, 1991) (whatever the defendant prosecutors may have done to delay plaintiff's criminal retrial, "they acted in their capacity as advocates in the state's prosecution ... [and] are entitled to absolute immunity ...."), *aff'd sub nom. Davis v. New York*, 106 F. App'x 82 (2d Cir. 2004); *Russo v. Vermont*, No. 1:10-CV-296, 2011 WL 4537956, at *6, 8 (D. Vt. July 29, 2011) (notwithstanding the plaintiff's claim that the prosecutors in his case were "obsessed and won't let go[,]" their decision "to proceed with a retrial ... is protected by prosecutorial immunity"), *report and recommendation adopted*, 2011 WL 4566303 (D. Vt. Sept. 29, 2011).

There is no evidence that DA McNamara's conduct in this regard fell outside the scope of his function as an advocate. *See Anilao*, 27 F.4th at 865 (" '[A]bsolute immunity must be denied' only where there is both the absence of all authority (because, for example, no statute authorizes the prosecutor's conduct) and the absence of any doubt that the challenged action falls well outside the scope of prosecutorial authority.... Prosecutors thus have absolute immunity in a § 1983 action ... so long as 'they have at least a semblance of jurisdiction' that does not run far afield of their job description.' ") (citations omitted). In particular, there is no suggestion that DA McNamara's conduct in this respect could be interpreted as an "investigative or administrative task[ ]", for which the

McNair v. Utica Police Department, Not Reported in Fed. Supp. (2023)

2023 WL 4935993

prosecutor would only be eligible for qualified immunity. *Van de Kamp v. Goldstein,* 555 U.S. 335, 342 (2009) (quoting *Imbler,* 424 U.S. at 431 n.33); *see also McDonough v. Smith,* No. 1:15-CV-1505 (MAD/DJS), 2022 WL 3279348, at *17 (N.D.N.Y. Aug. 11, 2022) ("Investigative tasks beyond the scope of absolute immunity are those 'normally performed by a detective or police officer.' ") (quoting *Buckley,* 509 U.S. at 273); *Moye v. City of New York,* 11 Civ. 316, 2012 WL 2569085, at *6 (S.D.N.Y. July 3, 2012) ("[T]he Second Circuit has distinguished 'preparing for the presentation of an existing case,' on the one hand, and attempting to 'furnish evidence on which a prosecution could be based,' on the other hand, with only the former entitling a prosecutor to absolute immunity.") (quoting *Smith v. Garretto,* 147 F.3d 91, 94 (2d Cir. 1998)). Accordingly, the complaint should be dismissed as against DA McNamara based on his absolute prosecutorial immunity.

## V. Defendant Utica Police Department

"Although a municipality is subject to suit pursuant to section 1983, *see Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690 (1978), a municipal police department does not have the capacity to be sued as an entity separate from the municipality in which it is located." *White v. Syracuse Police Dep't,* No. 5:18-CV-1471(GTS/DEP), 2019 WL 981850, at *1 (N.D.N.Y. Jan. 7, 2019), *report and recommendation adopted,* 2019 WL 974824 (N.D.N.Y. Feb. 28, 2019) (citing *Krug v. Cnty. of Rennselaer,* 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008)); *see also Turczyn ex rel. McGregor v. City of Utica,* No. 13-CV-1357 (GLS/ATB), 2014 WL 6685476, at *2 (N.D.N.Y. Nov. 26, 2014). Accordingly, the complaint as against defendant Utica Police Department must be dismissed for failure to state a claim upon which relief may be granted.

Even if the court were to construe plaintiff's claims against the Utica Police Department as against the City of Utica, dismissal would still be warranted. A municipality may only be named as a defendant in certain circumstances. Pursuant to the standard for establishing municipal liability laid out in *Monell,* in order to set forth a cognizable claim for municipal liability under Section 1983, a plaintiff must plead and prove that a deprivation of his constitutional rights "was caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven,* 691 F.3d 72, 80 (2d Cir. 2012) (citing *Monell,* 436 U.S. 658); *see also Vippolis v. Vill. of Haverstraw,* 768 F.2d 40, 44 (2d Cir. 1985) ("The plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some

action that caused his injuries beyond merely employing the misbehaving officer.").

**\*6** A municipality may be liable for deprivation of constitutional rights under Section 1983 for policies or customs resulting in inadequate training, supervision, or hiring when the failure to train, supervise, or hire amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact. *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 388-89 (1989). A plaintiff must also establish a causal connection - an affirmative link - between the policy and the deprivation of his constitutional rights. *Oklahoma v. Tuttle,* 471 U.S. 808, 823 (1985). Indeed, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right; it "may not be held liable on a theory of respondeat superior." *Jeffes v. Barnes,* 208 F.3d 49, 56 (2d Cir. 2000).

"[A] prerequisite to municipal liability under *Monell* is an underlying constitutional violation by a state actor." *Henry-Lee v. City of New York,* 746 F. Supp. 2d 546, 567 (S.D.N.Y. 2010). As the Second Circuit has noted, "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir. 2006); *see also id.* (noting that once a "district court properly [finds] no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* [is] entirely correct").

In this case, plaintiff has (1) not identified any of the Utica police officers who allegedly violated his constitutional rights as defendants in this action, and (2) has offered no evidence that any such officer was acting pursuant to a policy or custom of the City when they detained and/or arrested plaintiff, or throughout the course of plaintiff's criminal proceeding. Accordingly, the City cannot be held liable for plaintiff's allegations of false arrest/imprisonment, malicious prosecution or unspecified due process violations, as stated in the complaint.

## VI. Eighth Amendment Cruel and Unusual Punishment

Plaintiff has alleged an Eighth Amendment claim of cruel and unusual punishment. (Compl. at 7-8). Plaintiff does not specify against whom he alleges this violation of his

McNair v. Utica Police Department, Not Reported in Fed. Supp. (2023)

2023 WL 4935993

constitutional rights. (*Id.*). In any event, these protections of the Eighth Amendment "only apply to a person who has been criminally convicted and sentenced; they do not apply to the conduct of police officers in connection with the investigation and arrest of suspects prior to conviction and sentencing." *Spicer v. Burden*, 564 F. Supp. 3d 22, 31 (D. Conn. 2021) (citing *Whitley v. Albers*, 475 U.S. 312, 318-19 (1986)); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). Accordingly, any claim purportedly brought by plaintiff under the Eighth Amendment for cruel and unusual punishment must be dismissed.

## VII. Opportunity to Amend

Generally, before the court dismisses a pro se complaint or any part of the complaint sua sponte, the court should afford the plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Futility is present when the problem with plaintiff's causes of action is substantive such that better pleading will not cure it. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted).

Here, the court is recommending dismissal with prejudice as to defendant Utica Police Department, because the department may not be sued under § 1983. The court is further recommending dismissal with prejudice as to defendants Judge Dwyer, the Oneida County Courts and Officials, and DA McNamara, based on their absolute immunity from suit.

*7 Notwithstanding my recommendation that each of the named defendants be dismissed with prejudice, the court cannot say at this early stage of the litigation that plaintiff would be unable to amend his complaint to state a viable claim. Thus, the court recommends providing plaintiff the opportunity to amend his complaint for the limited purpose of asserting those claims alleging constitutional violations surrounding his detention, arrest, and subsequent criminal prosecution as set forth in his complaint, against the appropriate defendants. Plaintiff is reminded that if he intends to name the City of Utica as a defendant, he must plead, and ultimately prove, that a deprivation of his constitutional rights was caused by a custom, policy, or usage of the municipality. Likewise, plaintiff must specifically identify any individual law enforcement officer he is alleging violated his constitutional rights. If plaintiff chooses to amend his complaint, he must also specifically set forth the personal involvement of each named defendant relative to the conduct alleged to have violated his constitutional rights.

If the court approves this recommendation and allows plaintiff to submit a proposed amended complaint, plaintiff should be warned that any amended complaint must be a ***complete and separate pleading***. Plaintiff must state all of his claims in the new pleading and may not incorporate by reference any part of his original complaint.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's motion to proceed IFP (Dkt. No. 2) is **GRANTED**, [1] and it is

[1]    Although his IFP Application has been granted, plaintiff will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

**RECOMMENDED**, that this action be **DISMISSED WITH PREJUDICE** as against named defendants **UTICA POLICE DEPARTMENT, JUDGE MICHAEL L. DWYER, ONEIDA COUNTY COURTS a/k/a/ ONEIDA COUNTY COURTS AND OFFICIALS, and DISTRICT ATTORNEY SCOTT McNAMARA**, and it is

**RECOMMENDED**, that plaintiff's complaint otherwise be **DISMISSED WITHOUT PREJUDICE,** and that, if the District Court adopts this recommendation, plaintiff be given forty-five (45) days to amend his complaint to the extent authorized, and that plaintiff be advised that any amended pleading must be a **COMPLETE PLEADING, WHICH WILL SUPERSEDE THE ORIGINAL**, and that plaintiff must include all remaining facts and causes of action in the amended complaint. No facts or claims from the original complaint may be incorporated by reference, and it is

**RECOMMENDED**, that if the District Court adopts this recommendation, and plaintiff does not elect to amend his complaint within the imposed deadline, the case be dismissed in its entirety, with prejudice, and it is

**RECOMMENDED**, that if the District Court adopts this recommendation, and plaintiff files a proposed amended complaint, the proposed amended complaint be returned to me for review of the amended complaint and any orders relating to service on the defendants, and it is

McNair v. Utica Police Department, Not Reported in Fed. Supp. (2023)

2023 WL 4935993

**ORDERED**, that the Clerk of the Court serve a copy of this Order and Report-Recommendation on plaintiff by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Hum. Servs.,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 4935993

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **1.  Docket 6:23-CV-00699**<br>McNair v. Utica Police Department et al | — | N.D.N.Y. | June 12, 2023 | Docket |

**History (2)**

**Direct History (2)**

1.  McNair v. Utica Police Department
    2023 WL 4935993 , N.D.N.Y. , June 26, 2023

*Report and Recommendation Adopted by*

2.  McNair v. Utica Police Department
    2023 WL 4931609 , N.D.N.Y. , Aug. 01, 2023

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

McNair v. Utica Police Department, Not Reported in Fed. Supp. (2023)

2023 WL 4931609

2023 WL 4931609
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Brandon T. MCNAIR, Plaintiff,

v.

UTICA POLICE DEPARTMENT et al., Defendants.

6:23-CV-699
|
Signed August 1, 2023

**Attorneys and Law Firms**

BRANDON T. MCNAIR, Plaintiff, Pro Se, 421 Margaret Street, Herkimer, NY 13350.

## ORDER ON REPORT & RECOMMENDATION

DAVID N. HURD, United States District Judge

**\*1** On June 12, 2023, *pro se* plaintiff Brandon T. McNair ("plaintiff") filed this 42 U.S.C. § 1983 action alleging that various defendants violated his civil rights. Dkt. No. 1. Along with his complaint, plaintiff also sought leave to proceed *in forma pauperis* ("IFP Application"). Dkt. No. 2.

On June 26, 2023, U.S. Magistrate Judge Andrew T. Baxter granted plaintiff's IFP application and advised by Report & Recommendation ("R&R") that plaintiff's complaint be dismissed with partial leave to amend. Dkt. No. 4. As Judge Baxter explained, plaintiff's claims against defendants Utica Police Department, Judge Michael L. Dwyer, Oneida County Courts, and District Attorney Scott McNamara must be dismissed with prejudice because those defendants were shielded from plaintiff's claims by various immunity doctrines. *Id.* However, Judge Baxter concluded that plaintiff might still be able to assert a viable claim, or perhaps claims, for "alleged constitutional violations surrounding his

detention, arrest, and subsequent criminal prosecution as set forth in his complaint, against the appropriate defendants." *Id.*

Plaintiff has not filed objections. The time period in which to do so has expired. *See* Dkt. No. 4. Upon review for clear error, the R&R is accepted and will be adopted in all respects. *See* FED. R. CIV. P. 72(b).

Therefore, it is

ORDERED that

1. The Report & Recommendation is ACCEPTED;

2. Plaintiff's complaint is DISMISSED with prejudice against defendants Utica Police Department, Judge Michael L. Dwyer, Oneida County Courts a/k/a Oneida County Courts and Officials, and District Attorney Scott McNamara;

3. Plaintiff's complaint is otherwise DISMISSED without prejudice;

4. Plaintiff shall have forty-five days in which to file an amended complaint that conforms with the instructions set forth in Judge Baxter's June 26, 2023 Report & Recommendation;

5. If plaintiff files an amended complaint within this forty-five-day period, the matter shall be REFERRED to Judge Baxter for further review and any other action as appropriate; and

6. If plaintiff does not file an amended complaint within this forty-five-day period, the Clerk of the Court is directed to close this action without further Order of this Court.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 4931609

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 6:23-CV-00699**<br>McNair v. Utica Police Department et al | — | N.D.N.Y. | June 12, 2023 | Docket |

**History (2)**

**Direct History (2)**

1. McNair v. Utica Police Department
2023 WL 4935993 , N.D.N.Y. , June 26, 2023

*Report and Recommendation Adopted by*

2. McNair v. Utica Police Department
2023 WL 4931609 , N.D.N.Y. , Aug. 01, 2023

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Coon v. Merola, Not Reported in Fed. Supp. (2019)

2019 WL 1981416

2019 WL 1981416
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Donald James COON, Plaintiff,

v.

Frank MEROLA, et al., Defendants.

1:19-CV-394 (DNH/ATB)
|
Signed 04/08/2019

**Attorneys and Law Firms**

Donald James Coon, Troy, NY, pro se.

### ORDER and REPORT-RECOMMENDATION

Hon. Andrew T. Baxter, U.S. Magistrate Judge

**\*1** The Clerk has sent to the Court a civil rights complaint filed by pro se plaintiff Donald James Coon, together with a motion to proceed in forma pauperis ("IFP"). (Dkt. Nos. 1, 2).

### I. In Forma Pauperis ("IFP") Application

A review of plaintiff's IFP application shows that he declares he is unable to pay the filing fee. (Dkt. No. 2). The court finds for purposes of this recommendation, that plaintiff meets the financial criteria for IFP status.

In addition to determining whether plaintiff meets the financial sufficiency to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldridge*, 505 F.2d 802, 804 (8th Cir. 1974). Although the court has a duty to

show liberality toward *pro se* litigants, and must use extreme caution in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (finding that a district court may dismiss a frivolous complaint *sua sponte* even when plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555). The court will now turn to a consideration of the plaintiff's complaint under the above standards.

### II. Complaint

Although plaintiff's complaint is very conclusory, a liberal reading of the allegations contained therein show that plaintiff is attempting to allege that the Rensselaer County Clerk and his John/Jane Doe Deputy Clerks have violated plaintiff's constitutional rights in connection with a state court law suit that plaintiff has attempted to bring. (Complaint ("Compl.") *generally*) (Dkt. No. 1). In order to understand plaintiff's allegations in this action, the court must discuss another action filed by this plaintiff in 2016. In 2016, plaintiff filed a federal action in this court in which he named a variety of defendants, including Police Chief George Bell, the Villages of Cambridge and Greenwich, various district attorneys, Claverack Insurance Company, Glens Falls Hospital, Washington County Child Protective Services, and a police officer. *Coon v. Bell*, No. 1:16-CV-291 (TJM/DJS).

**\*2** After initial review of plaintiff's complaint in *Coon v. Bell*, Magistrate Judge Daniel Stewart found that plaintiff failed to state claims against the defendants and recommended that he be allowed to file an amended complaint in an effort to cure the deficiencies in the original. (Dkt. No. 8 in 16-CV-291). United States District Court Judge Thomas J. McAvoy adopted Magistrate Judge Stewart's recommendation on May 23, 2016. (Dkt. No. 11 in 16-CV-291). Plaintiff complied with the court's direction and filed an amended complaint on May 23, 2016. (Dkt. No. 12 in 16-CV-291).

Coon v. Merola, Not Reported in Fed. Supp. (2019)

2019 WL 1981416

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 86 of 529

Magistrate Judge Stewart conducted an initial review of the amended complaint and found that plaintiff failed to cure most of the deficiencies that were in the original. (Dkt. No. 13 in 16-CV-291). Magistrate Judge Stewart recommended dismissing most of the claims and most of the defendants from the action, while allowing a Fourth Amendment illegal search claim and Fourth Amendment excessive force claim to proceed against defendant Bell.[1] (Dkt. No. 13 in 16-CV-291). Magistrate Judge Stewart's recommendation was adopted by Judge McAvoy on November 2, 2016. (Dkt. No. 16 in 16-CV-291).

[1]   Defendant Bell has since passed away, and his estate's representative has been substituted as a party. (Dkt. Nos. 52, 71). Another defendant was joined to 16-CV-291, and there have been various other proceedings in that case, but those details are not relevant to this action.

In Magistrate Judge Stewart's report and recommendation, he found that plaintiff's defamation claims against defendant Bell and his attempted contract claims against defendant Bell and Claverack Insurance Company were, at best, state law claims.[2] (Dkt. No. 13 in 16-CV-291 at 4). Plaintiff then states that he "filed said claims" in the Rensselaer County Supreme Court. (Compl. at 1). Plaintiff states that in 2017, Judge Andrew G. Ceresia granted plaintiff poor person status, but that when he went to the Rensselaer County Clerk's office, defendant Merola told plaintiff that Judge Ceresia's order was "no good and they wouldn't honor it." (Compl. at 2). Plaintiff states that he brought Judge Ceresia's order to the Clerk's office four more times, and "finally" on March 11, 2019, a clerk that plaintiff had never seen before stamped the Judge's order and kept a copy. (Id.)

[2]   Although plaintiff states in this action that Magistrate Judge Stewart told plaintiff that the contract and defamation claims "needed to be refiled in Supreme Court," that is not exactly what Magistrate Judge Stewart said. His exact words were that "[l]iberally construed, plaintiff **might** be attempting to make state law defamation and intentional interference with a contract claims. **Again, however, Plaintiff's vague and conclusory allegations fail to plausibly state such claims.**" (Dkt. No. 13 in 16-CV-291 at 4) (emphasis added). The court merely notes this for the record. Magistrate Judge Stewart's dismissal

and his language are not relevant to the findings herein.

Plaintiff alleges that he has been denied his "rightful benefits and access to the court." Plaintiff states that he even had "to choose between the suit or my housing," and that he was homeless from January 12, 2018 until April 24, 2018. (Id.) Plaintiff states that the Rensselaer County Supreme Court wrote plaintiff "2 times the County Clerk's staff made me pay for RJI motion I had already paid for. They told me to give letter [sic] to the Clerk and I would get my monies back." (Id.)

Plaintiff states that he is seeking "just compensation" for the Rensselaer County Clerks' actions who refused to recognize his "poor person status" from 2017 until 2019. Plaintiff states that he still has not "received anything" from the "grant[ed] status" because the Clerks refused to grant "my said status." (Id.) Plaintiff seeks substantial monetary relief. (Id.)

## III. Judicial Immunity

### A. Legal Standards

**\*3**  With minor exceptions, judges are entitled to absolute immunity for actions relating to the exercise of their judicial functions. *Mireles v. Waco*, 502 U.S. 9, 9-10 (1991). Judicial immunity has been created for the public interest in having judges who are "at liberty to exercise their functions with independence and without fear of consequences." *Huminski v. Corsones*, 396 F.3d 53, 74 (2d Cir. 2004). Judicial immunity applies even when the judge is accused of acting maliciously or corruptly. *Imbler v. Pachtman*, 424 U.S. 409, 419 n.12 (1976) (citing *Pierson v. Ray*, 386 U.S. 547, 554 (1967)). Judicial immunity is immunity from suit, not just immunity from the assessment of damages. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The only two circumstances in which judicial immunity does not apply is when he or she takes action "outside" his or her judicial capacity and when the judge takes action that, although judicial in nature, is taken "in absence of jurisdiction." *Mireles*, 502 U.S. at 11-12.

Absolute immunity extends to court clerks who perform tasks " 'which are judicial in nature and an integral part of the judicial process.' " *Proctor v. Quinn*, No. 19-CV-833, 2019 WL 692935, at \*2 (E.D.N.Y. Feb. 19, 2019) (quoting *Rodriguez v. Weprin*, 116 F.3d 62, 66 (2d Cir. 1997)). The court's " 'inherent power to control its docket is part of its function of resolving disputes between parties' and is thus 'a function for which judges and their supporting staff

Coon v. Merola, Not Reported in Fed. Supp. (2019)

2019 WL 1981416

are afforded absolute immunity.' " *Id.* (quoting *Rodriguez*, 116 F.3d at 66); and citing *Pikulin v. Gonzalez*, No. 07-CV-0412 (CBA), 2007 WL 1063353, at *2 (E.D.N.Y. Apr. 5, 2007) (finding that absolute judicial immunity extends to "the Clerk's Office activities of filing and docketing legal documents"). However, a court clerk may not be entitled to absolute immunity where the clerk's refusal to accept the papers of a litigant seeking to commence an action results in the deprivation of the individual's constitutional rights. *Glass v. New York Supreme Court Appellate Division*, No. 1:17-CV-226, 2017 WL 9487181, at *3 (N.D.N.Y. Apr. 26, 2017) (citations omitted).

In determining whether the clerk's conduct in a particular case is "judicial" in nature, the court takes a "functional approach" and allows the defendant absolute immunity when the clerk is performing a "discretionary act, or performing a duty that inherently relates to resolving a dispute." *Vance v. State of New York Dep't of Corrections*, No. 9:18-CV-748, 2018 WL 6047828, at *10 (N.D.N.Y. Nov. 19, 2018) (quoting *Dzwonczyk v. Suddaby*, No. 10-CV-0300, 2010 WL 1704722, at *6 (N.D.N.Y. Apr. 28, 2010) (citing *Rodriguez*, 116 F.3d at 67) (internal quotation marks omitted)).

**B. Application**

Plaintiff's statements in this case are conclusory and essentially, he is suing the "clerks" because they would not file his poor person status order between 2017 and 2019. At best, he alleges a delay in granting him poor person status because it appears that a clerk finally took and filed plaintiff's order, and at the end of his complaint, plaintiff alleges that he "still" has not "received a thing or any help from *the granyted [sic] status*." (Compl. at 2) (emphasis added). It is unclear what plaintiff believes he should have "received" or to what "help" he thinks he is entitled from the clerks beyond filing his order.

It is also unclear how plaintiff alleges that he was denied "access to courts" because he states that he filed his state law claims in the Rensselaer County Supreme Court. (Compl. at 1). However, he claims he was denied his "rightful benefits," and that somehow the clerk's actions in delaying the filing of his poor person order were related to his homelessness between January 12, 2018 and April 24, 2018. Plaintiff claims that he had to choose between "the suit" or his housing, but he does not explain why this is true or why this would be a denial of his constitutional rights. Plaintiff also states that the clerks made plaintiff pay for his RJI "motion," but that he was told that if he wrote a letter, he would get his money back.

**\*4** As it is written, plaintiff's complaint is too conclusory to state a claim against any of the clerks in this action, whether named or unnamed, [3] and the court will recommend dismissal.

[3]    Finally, the court must note that the United States Marshal would not be able to effect service of process on a "John or Jane Doe" defendant. In order for plaintiff to pursue his claims against John Doe defendants, he would ultimately be required to ascertain their identity. *LaPoint v. Vasiloff*, No. 5:15-CV-185, 2015 WL 1524437, at *4 (N.D.N.Y. Apr. 2, 2015).

**IV.** **Opportunity to Amend**

**A. Legal Standards**

Generally, when the court dismisses a pro se complaint *sua sponte*, the court should afford the plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993).

**B. Application**

In this case, the court will recommend dismissal without prejudice, even though the court has serious doubts that plaintiff will be able to amend his complaint to state a claim. However, because there are situations in which a clerk would not be entitled to absolute immunity, and plaintiff in this case has failed to include enough facts for the court to make an accurate determination, the court will recommend dismissal without prejudice to plaintiff submitting an amended complaint.

If the court adopts this recommendation, and plaintiff is afforded the opportunity to amend, he should be afforded forty-five (45) days from the date of the order adopting this court's recommendation. Plaintiff should also be advised that if he files an amended complaint, it must be a complete pleading which must supercede the original and may not incorporate any facts from the original by reference.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's motion to proceed IFP (Dkt. No. 2) be **GRANTED for purposes of filing**, and it is further

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 88 of 529

Coon v. Merola, Not Reported in Fed. Supp. (2019)

2019 WL 1981416

**RECOMMENDED**, that the complaint be **DISMISSED** based on quasi-judicial immunity and for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and (iii) **WITHOUT PREJUDICE** to plaintiff filing an amended complaint, and it is

**RECOMMENDED**, that if the District Court adopts this recommendation, plaintiff be directed to file his amended complaint or ask for an extension of time to do so within **FORTY-FIVE (45) DAYS** from the date of the District Court's order adopting the recommendation, and it is

**RECOMMENDED**, that if plaintiff files an amended complaint within the appropriate time, the court return the proposed amended complaint to me for initial review, and it is

**RECOMMENDED**, that if the court adopts this recommendation, and plaintiff fails to file an amended complaint or ask for an extension of time to do so at the expiration of the forty-five (45) days, the complaint be dismissed with prejudice and the case closed, and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Order and Report-Recommendation on plaintiff by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1981416

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.** **Docket 1:19-CV-00394**<br>Coon v. Merola et al | — | N.D.N.Y. | Apr. 03, 2019 | Docket |

**History (2)**

**Direct History (2)**

1. Coon v. Merola
   2019 WL 1981416 , N.D.N.Y. , Apr. 08, 2019

*Report and Recommendation Adopted by*

2. Coon v. Merola
   2019 WL 1978595 , N.D.N.Y. , May 03, 2019

2024 WL 5247710
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Louis E. SERRANO III, Plaintiff,

v.

Anthony DIPERNA, et al., Defendants.

24-CV-483-LJV
|
Signed December 30, 2024

**Attorneys and Law Firms**

Louis E. Serrano, III, Rochester, NY, Pro Se.

ORDER

LAWRENCE J. VILARDO, UNITED STATES DISTRICT
JUDGE

**\*1** The pro se plaintiff, Louis E. Serrano III, was a prisoner
confined at the Monroe County Jail when he filed this action.
He asserts claims under 42 U.S.C. § 1983 related to his
criminal proceedings pending in New York State Supreme
Court, Monroe County. Docket Item 1. He also has moved to
proceed in forma pauperis ("IFP")—that is, as a person who
should have the prepayment of the ordinary filing fee waived
because he cannot afford it. [1] Docket Item 4.

[1]    Serrano initially filed his complaint without paying
       the required fees or moving to proceed IFP. So
       on May 23, 2024, this Court ordered the case
       administratively terminated and informed Serrano
       that if he wished to reopen the action, he was
       required either to pay the fees or submit a properly
       supported IFP motion. Docket Item 2. Serrano then
       timely moved to proceed IFP. Docket Item 4.

Because Serrano meets the statutory requirements of 28
U.S.C. § 1915(a) and has filed the required authorization and
certification, Docket Item 4, the Court grants his motion to
proceed in forma pauperis. Therefore, under 28 U.S.C. §§
1915(e)(2)(B) and 1915A(a), the Court screens the complaint.
For the reasons that follow, some of Serrano's claims are
dismissed under sections 1915(e)(2)(B) and 1915A, and
the remaining claims will be dismissed under those same

sections unless he files an amended complaint correcting the
deficiencies addressed below.

DISCUSSION

Section 1915 "provide[s] an efficient means by which a court
can screen for and dismiss legally insufficient claims." *Abbas
v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (citing *Shakur v.
Selsky*, 391 F.3d 106, 112 (2d Cir. 2004)). The court shall
dismiss a complaint in a civil action in which a prisoner seeks
redress from a governmental entity, or an officer or employee
of a governmental entity, if the court determines that the
complaint (1) fails to state a claim upon which relief may be
granted or (2) seeks monetary relief against a defendant who
is immune from such relief. *See* 28 U.S.C. § 1915A(b)(1)-(2).

Generally, the court will afford a pro se plaintiff an
opportunity to amend or to be heard prior to dismissal "unless
the court can rule out any possibility, however unlikely it
might be, that an amended complaint would succeed in stating
a claim." *Abbas*, 480 F.3d at 639 (quoting *Gomez v. USAA
Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)); *see also
Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("A pro
se complaint is to be read liberally. Certainly the court should
not dismiss without granting leave to amend at least once
when a liberal reading of the complaint gives any indication
that a valid claim might be stated." (italics omitted) (quoting
*Gomez*, 171 F.3d at 795)). But leave to amend pleadings may
be denied when any amendment would be "futile." *Cuoco*,
222 F.3d at 112.

**I. SCREENING THE COMPLAINT**
In evaluating the complaint, the court accepts all factual
allegations as true and draws all inferences in the plaintiff's
favor. *See Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003)
(per curiam); *King v. Simpson*, 189 F.3d 284, 287 (2d Cir.
1999). Although "a court is obliged to construe [pro se]
pleadings liberally, particularly when they allege civil rights
violations," *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d
Cir. 2004), even a pro se complaint "must plead 'enough facts
to state a claim to relief that is plausible on its face,' " *Shibeshi
v. City of New York*, 475 F. App'x 807, 808 (2d Cir. 2012)
(summary order) (quoting *Bell Atl. Corp. v. Twombly*, 550
U.S. 544, 570 (2007)). "A claim will have 'facial plausibility
when the plaintiff pleads factual content that allows the court
to draw the reasonable inference that the defendant is liable
for the misconduct alleged.' " *Id.* (quoting *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009)). In other words, although a pro se complaint need not provide every last detail in support of a claim, it must allege some facts that support the claim. *See id.* (concluding that district court properly dismissed pro se complaint under section 1915(e)(2) because complaint did not meet pleading standard in *Twombly* and *Iqbal*. And even pro se pleadings must meet the notice requirements of Rule 8 of the Federal Rules of Civil Procedure, *see Wynder v. McMahon*, 360 F.3d 73, 79 n.11 (2d Cir. 2004), and "give the defendant fair notice of what the ... claim is and the grounds upon which it rests," *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (alteration in original) (quoting *Twombly*, 550 U.S. at 555).

**\*2** Serrano has sued New York State Supreme Court Justice Charles A. Schiano Jr. and Monroe County Assistant District Attorney Anthony DiPerna [2] for violating his Fifth, Eighth, and Fourteenth Amendment rights, including his right to a speedy trial and to be free from cruel and unusual punishment. [3] Docket Item 1 at 1-3. [4] A liberal reading of the complaint tells the following story.

> [2]     Serrano's complaint incorrectly fails to capitalize the third letter of DiPerna's last name. *See* Docket Item 1 at 1.

> [3]     Serrano refers to "Judge" Schiano and does not clearly identify the court in which the latter sits. *See* Docket Item 1 at 2. This Court nonetheless takes judicial notice of Justice Schiano's official title and position. *See Blair v. Iliou*, 2024 WL 1532257, at \*2 n.2 (E.D.N.Y. Apr. 8, 2024) (taking judicial notice of judge's official title).

> [4]     Page numbers in docket citations refer to ECF pagination. Throughout this order, some capitalization has been omitted when quoting from the complaint.

Sometime around March 2022, Serrano was "false[ly] accus[ed]" of a crime, and criminal proceedings were initiated against him in New York State Supreme Court, Monroe County. *See id.* at 2, 7. The case has been prosecuted, at least in part, by DiPerna and presided over by Justice Schiano. [5] *See id.* at 1-2, 4-5. And the two men have acted "in c[a]hoots" to "malicious[ly] pros[e]cut[e]" Serrano and deny his right to "due process" and a "speedy trial." *Id.* at 4.

[5]     Serrano gives very few details about his criminal prosecution; indeed, while he says that the events that give rise to his claims occurred on March 30, 2022, it is unclear whether he refers to the date when charges were filed, when one of the court proceedings at issue took place, or some other date. *See* Docket Item 1 at 3-7. Somewhat similarly, Serrano seems to suggest that prosecutors other than DiPerna also were involved in his case, but he does not say who they were or what they did. *Id.* at 4; *see generally id.* The exact timeline—and the identities and precise actions of the prosecutors involved—are irrelevant to this Court's analysis, however. Indeed, for the reasons that follow, none of the allegations related to any prosecutor survive prosecutorial immunity, at least as currently pleaded. *See supra* Section II.B.2.b.

More specifically, Serrano was incarcerated for more than six months before the prosecutor even obtained an indictment against him. *Id.* at 4. For that reason, he should have been released upon the expiration of "the [six-]month time period," [6] but the District Attorney's office "m[a]nipulated the court time[ ]lines by repeatedly switching [district attorneys]." *Id.* Moreover, Justice Schiano repeatedly allowed the prosecution to "postpon[e]" the criminal proceedings while "ignor[ing Serrano's] motions" seeking to vindicate his rights. *Id.* at 4-5, 7. In fact, Serrano says, Justice Schiano had previously sentenced him to probation and thus is "bias[ed]" against him. *Id.* at 4. So Serrano remains detained at Monroe County Jail pending trial. *Id.* at 5 (indicating that Serrano is a "[p]retrial detainee").

[6]     Under section 30.30 of New York State's Criminal Procedure Law, a defendant may move to dismiss the charges against him if "the [government is] not ready for trial within ... six months of the commencement of a criminal action" in which at least one of the charges is a felony. *See* N.Y. Crim Proc. Law § 30.30(1); *see also Murphy v. Lynn*, 118 F.3d 938, 942 (2d Cir. 1997) ("Under New York's speedy[ ]trial statute, the prosecution [i]s required to be ready for trial within six months after the filing of the first accusatory instrument [charging the defendant with a felony].") This Court assumes that Serrano's argument that he should have been released is grounded in that statute.

Serrano v. DiPerna, Slip Copy (2024)

2024 WL 5247710

**\*3** Serrano asks "to be relieved of th[e] false accusation" against him and to be released from incarceration. *Id.* at 7. He also seeks $376,800 in damages. *Id.* at 6.

## II. SECTION 1983 CLAIMS

"To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994)). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

### A. Claims for Dismissal of Charges and Release from Custody

This Court first considers Serrano's request for an order dismissing the charges against him and releasing him from detention. *See id.* at 7. "Th[e Supreme Court] has held that a prisoner in state custody cannot use a [section] 1983 action to challenge 'the fact or duration of his confinement.' " *Wilkinson v. Dotson*, 544 U.S. 74, 78 (2005) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 489 (1973)); *see Hickman v. McDonnell*, 2024 WL 4635462, at \*2 (S.D.N.Y. Oct. 28, 2024) (explaining that plaintiff could not "seek[ ] release from his pretrial incarceration [or the] dismissal of the [state] charges against him" in a "civil rights action" under section 1983). Instead, individuals seeking to challenge their state detention "must seek federal habeas corpus relief (or appropriate state relief)." *Wilkinson*, 544 U.S. at 78. "For those individuals who have yet to be sentenced, a petition brought under 28 U.S.C. § 2241 is the proper vehicle for challenging the constitutionality of pretrial detention." *Slade v. United States*, 2024 WL 3797383, at \*4 (S.D.N.Y. Aug. 6, 2024).

Serrano thus cannot seek release or the dismissal of the charges against him in this section 1983 action. *See Hickman*, 2024 WL 4635462, at \*2. Further, because Serrano alleges no "facts suggesting that he has exhausted his state court remedies," as is required to seek federal habeas relief, this Court "declines to recharacterize [his] allegations ... as a [habeas] petition" under section 2241. *See Slade*, 2024 WL 3797383, at \*5. Therefore, insofar as Serrano seeks his release

and the dismissal of the state charges against him, his claims are dismissed. And because amendment of those claims—at least in this section 1983 action—would be "futile," those claims are dismissed without leave to amend. [7] *Cuoco*, 222 F.3d at 112.

[7]    If Serrano's current custody continues—and once he has exhausted his state court remedies—"he may return to federal court" to "file a petition for a writ of habeas corpus in the appropriate venue." *See Slade*, 2024 WL 3797383, at \*5 (italics omitted). Serrano is advised, however, that section 2241 provides "a narrow window for a state detainee to challenge his pretrial detention" and "cannot be used to 'permit the derailment of a pending state proceeding by an attempt to litigate constitutional defenses prematurely in federal court.' " *Burns v. Valhalla*, 2023 WL 7301394, at \*2 (S.D.N.Y. Nov. 6, 2023) (quoting *Braden v. 30th Jud. Cir. Ct.*, 410 U.S. 484, 493 (1973)), *appeal dismissed* No. 24-1364 (2d Cir. Sept. 11, 2024).

### B. Damage Claims

**\*4** Section 1983 suits can be brought against government officials in both their official and individual capacities. As the Second Circuit has explained, "[i]n an official capacity suit, 'the real party in interest is the governmental entity and not the named official.' " *Tanvir v. Tanzin*, 894 F.3d 449, 459 (2d Cir. 2018) (alteration omitted) (quoting *Hafer v. Melo*, 502 U.S. 21, 25 (1991)), *aff'd*, 592 U.S. 43 (2020). "By contrast, individual capacity suits 'seek to impose individual liability upon [ ] government officer[s] for actions under color of law.' " *Id.* (alterations omitted) (quoting *Hafer*, 502 U.S. at 25).

Here, Serrano sues Justice Schiano and Assistant District Attorney DiPerna in only their official capacities. *See* Docket Item 1 at 2. In light of its obligation to construe pro se pleadings "liberally," *see Cuoco*, 222 F.3d at 112—and because, for the reasons explained below, Serrano's official capacity claims are barred by sovereign immunity—the Court construes his complaint as asserting claims against the defendants in both their official and individual capacities.

### 1. Official Capacity Claims

"The Eleventh Amendment bars damage[ ] actions in federal court against a state and against state officials acting in

their official capacities, unless the state waives sovereign immunity or Congress abrogates it." *Chris H. v. New York,* 740 F. App'x 740, 741 (2d Cir. 2018) (summary order). "New York has not waived its sovereign immunity in federal court for actions seeking damages" under section 1983, "[n]or has Congress abrogated [it]." *Id.* (first citing *Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 39-40 (2d Cir. 1977); and then citing *Dube v. State Univ. of N.Y.,* 900 F.2d 587, 594 (2d Cir. 1990)); *see also Huminski v. Corsones,* 396 F.3d 53, 70 (2d Cir. 2005) (explaining that "[n]either a [s]tate nor its officials acting in their official capacities are 'persons' under [section] 1983" (quoting *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71 (1989))).

In this case, the Eleventh Amendment bars Serrano's official capacity claims for damages against both defendants. First, because a state court justice clearly is a state official, Serrano cannot seek damages from Justice Schiano in his official capacity. *See Curto v. Siwek,* 2007 WL 9777896, at *3 (W.D.N.Y. Feb. 12, 2007) (Eleventh Amendment prohibited plaintiff from suing New York State Supreme Court justice for damages in her official capacity), *aff'd,* 322 F. App'x 62 (2d Cir. 2009) (summary order). And second, while DiPerna is a Monroe County assistant district attorney, he is deemed to be an agent of the state in matters like this one.

"Whether a defendant is a state or local official depends on whether the defendant represented a state or a local government entity when engaged in the events at issue." *Huminski,* 396 F.3d at 70 (citing *McMillian v. Monroe County,* 520 U.S. 781, 785-86 (1997)). "It is well established that New York prosecutors act on behalf of the state, not the county in which they serve, when prosecuting a criminal matter." *See Schnitter v. City of Rochester,* 556 F. App'x 5, 9 n.4 (2d Cir. 2014) (summary order) (citing *Baez v. Hennesy,* 853 F.2d 73, 77 (2d Cir. 1988)). "Thus, if ... an assistant district attorney acts as a prosecutor, [ ]he is an agent of the [s]tate, and therefore immune from suit in h[is] official capacity."[8] *D'Alessandro v. City of New York,* 713 F. App'x 1, 8 (2d Cir. 2017) (summary order).

[8]       In contrast, if a suit "centers 'on the administration of the district attorney's office'—that is, on the 'office policy' that the district attorney sets—then the district attorney is 'considered a municipal policymaker,' and the Eleventh Amendment does not immunize [that official] from suit." *D'Alessandro v. City of New York,* 713 F. App'x 1, 8 (2d Cir. 2017) (summary order) (quoting

*Ying Jing Gan v. City of New York,* 996 F.2d 522, 536 (2d Cir. 1993)). But Serrano's complaint includes no such claims: It alleges only that the prosecutors involved in his criminal case violated his rights in the course of those proceedings. *See* Docket Item 1; *see also infra* Section II.B.2.b.

*5  Serrano's claims against DiPerna relate solely to DiPerna's role in prosecuting Serrano's criminal case. *See* Docket Item 1; *see also infra* Section II.B.2.b. Thus, with respect to all of Serrano's claims against DiPerna in his official capacity, DiPerna was acting as an "agent of the state" and is immune from any damage claim. *See D'Alessandro,* 713 F. App'x at 8.

In sum, because Serrano's damage claims against Justice Schiano and Assistant District Attorney DiPerna in their official capacities are barred by sovereign immunity, those claims are subject to dismissal. And because "better pleading w[ould] not cure" that defect, they are dismissed without leave to amend. *Cuoco,* 222 F.3d at 112.

### 2. Individual Capacity Claims

Unlike official capacity claims, individual capacity claims for damages against state officials are not barred by the Eleventh Amendment. Nonetheless, for the reasons explained below, immunity of a different sort—judicial or prosecutorial immunity—bars Serrano's individual capacity claims as pleaded.

#### a. Judicial Immunity

"It is well settled that judges generally have absolute immunity from suits for money damages for their judicial actions." *Bliven v. Hunt,* 579 F.3d 204, 209 (2d Cir. 2009). This is to ensure "that a judicial officer, in exercising the authority vested in [that judge], shall be free to act upon [the judge's] own convictions, without apprehension of personal consequences." *Bradley v. Fisher,* 80 U.S. 335, 347 (1871). Judicial immunity therefore does not give way even to "allegations of bad faith or malice." *Mireles v. Waco,* 502 U.S. 9, 11 (1991).

Judicial "immunity is overcome in only two sets of circumstances." *Id.* "First, a judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity." *Id.* (citations and italics omitted).

"Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Id.* at 12 (citations omitted).

Here, Serrano's claims relate to Justice Schiano's alleged conduct and decisions while presiding over Serrano's state prosecution. *See* Docket Item 1. Serrano says that Justice Schiano violated his constitutional rights by granting the government's motions for adjournments while ignoring Serrano's motions. *Id.* at 4-5, 7. And he says that Justice Schiano was "bias[ed]" against him because the justice had sentenced him in a previous case, implicitly asserting that Justice Schiano violated Serrano's rights by failing to recuse himself. *See id.* at 4, 7.

"The Supreme Court has generally concluded that acts arising out of, or related to, individual cases before the judge are considered judicial in nature." *Bliven*, 579 F.3d at 210. Further, courts have held that judges' decisions on motions— even motions to recuse—are indisputably judicial in nature. *See Buhannic v. Friedman*, 2019 WL 481732, at *5 (S.D.N.Y. Feb. 7, 2019) (ruling on motions is a "quintessential judicial act[ ]"); *Moskovits v. Bank of Am. N.A.*, 2021 WL 230193, at *4 (S.D.N.Y. Jan. 20, 2021) ("[A] judge's decision to recuse or not to recuse himself is itself a judicial act protected by immunity." (citing *Bobrowsky v. Yonkers Courthouse*, 777 F. Supp. 2d 692, 714 (S.D.N.Y. 2011))). And the fact that Serrano says Justice Schiano's conduct deprived him of his speedy trial rights—or any other rights—does not make that conduct any less judicial. *See Coombs v. United States*, 2021 WL 2453496, at *2-3 (S.D.N.Y. June 15, 2021) (judge's issuance of orders excluding time under federal Speedy Trial Act during Covid-19 pandemic, which plaintiff said deprived him of his speedy trial rights, were judicial acts protected by judicial immunity).

**\*6** Serrano's allegations that Justice Schiano has conspired with prosecutors and is "bias[ed]" against him, *see* Docket Item 1 at 4-5, 7, do not change this analysis. For one thing, his claims are largely conclusory: Serrano says that Justice Schiano acted "in c[a]hoots" with the prosecutors to violate his rights, but he does not provide any facts to support this claim other than Justice Schiano's apparently granting the government's motions while "ignor[ing]" Serrano's.[9] *See id.* at 4-5. Such conduct clearly is "judicial" and thus protected by absolute judicial immunity. *Bobrowsky*, 777 F. Supp. 2d at 715 (holding that judge's "rulings[, even though] adverse to plaintiff, [we]re the very essence of 'judicial functions' and [could]not, therefore, be the basis for liability" (citation

omitted)). And even "[m]ore fundamentally, since absolute immunity spares [judges] any scrutiny of [their] motives, an allegation that an act was done pursuant to a conspiracy has no greater effect than an allegation that it was done in bad faith or with malice, neither of which defeats a claim of absolute immunity." *See Dorman v. Higgins*, 821 F.2d 133, 139 (2d Cir. 1987).

[9]    Serrano also says that Justice Schiano had sentenced him to probation in a previous case. *See* Docket Item 1 at 4. But he does not explain why that shows that the judge is "biased": Indeed, judges frequently hear cases involving defendants who may have appeared before them previously.

Serrano does allege that Justice Schiano "lack[ed] jurisdiction" to allow the government to continue to prosecute the case against him "after the [six-]month time period ... allot[t]ed" the government "to bring forth indictment" had elapsed. *See* Docket Item 1 at 4. But that does not mean that Justice Schiano acted "in the complete absence of all jurisdiction." *See Mireles*, 502 U.S. at 12. As the Supreme Court has explained, there is a difference between a judge who acts in "excess of jurisdiction" and one who acts in "the clear absence of all jurisdiction over the subject[ ]matter." *Stump v. Sparkman*, 435 U.S. 349, 356-57, 356 n.6 (1978) (quoting *Bradley*, 435 U.S. at 351-52). Only in the second situation is the judge "deprived of [judicial] immunity." *Id.* at 356-57. In *Stump*, the Court provided an example to illustrate the point:

> If a probate judge, with jurisdiction over only wills and estates, should try a criminal case, he would be acting in the clear absence of jurisdiction and would not be immune from liability for his action; on the other hand, if a judge of a criminal court should convict a defendant of a nonexistent crime, he would merely be acting in excess of his jurisdiction and would be immune.

*Id.* at 357 n.7 (citing *Bradley*, 435 U.S. at 352).

Here, Serrano asserts constitutional violations based on a state criminal case. Docket Item 1. The New York State Supreme Court—which is a court of "general jurisdiction"—certainly has jurisdiction over such cases. *See Muka v. Murphy*, 358

F. App'x 239, 240 (2d Cir. 2009) (summary order); *Bramble v. Hynes*, 2024 WL 4309231, at *1, *5 (E.D.N.Y. Sept. 26, 2024) (New York State Supreme Court justices did not act in "the clear absence of all jurisdiction" in presiding over plaintiff's criminal proceedings). Indeed, Serrano does not say that Justice Schiano erred in exercising jurisdiction over the case in the first place; rather, he says that the justice erred in not dismissing it based on the government's delay. *See* Docket Item 1 at 4-5, 7. In other words, his allegations—at most —suggest that Justice Schiano exceeded his jurisdiction or exercised his authority "error[neously]" or "maliciously." *See Stump*, 435 U.S. at 356. And such allegations do not overcome judicial immunity. *See id.*

Serrano's damage claims against Justice Schiano in his individual capacity therefore are subject to dismissal because of absolute judicial immunity. And because "better pleading w[ould] not cure" that defect, those claims are dismissed without leave to amend. *Cuoco*, 222 F.3d at 112.

### b. Prosecutorial Immunity

Like judges, prosecutors are absolutely immune from suit, and that immunity "appl[ies] with full force" to activities that are "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). Prosecutorial immunity

> **\*7** encompasses not only [prosecutors'] conduct of trials but all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation, including presentation of evidence to a grand jury to initiate a prosecution, activities in deciding not to do so, and conduct of plea bargaining negotiations.

*Barrett v. United States*, 798 F.2d 565, 571-72 (2d Cir. 1986) (internal citations omitted); *see also Ogunkoya v. Monaghan*, 913 F.3d 64, 72 (2d Cir. 2019) (holding that prosecutors had absolute immunity for acts that "constituted an exercise of their prosecutorial discretion in preparing a case for indictment and deciding when, where, and how to prosecute").

But that immunity does not include "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate." *Warney v. Monroe County*, 587 F.3d 113, 121 (2d Cir. 2009) (quoting *Imbler*, 424 U.S. at 430-31). Likewise, a prosecutor who "proceeds in the clear absence of all jurisdiction" is not shielded by immunity. *Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005) (quoting *Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir. 1987)). "The relevant question, therefore, is whether a reasonable prosecutor would view the acts challenged by the complaint as reasonably within the functions of a prosecutor." *Giraldo v. Kessler*, 694 F.3d 161, 166 (2d Cir. 2012). "If the generic acts are within those functions, absolute immunity applies to protect the prosecutor even in the face of a complaint's allegations of malicious or corrupt intent behind the acts." *Id.*

Serrano says that DiPerna violated his rights by conspiring with the judge to seek "postpon[e]ments," thus violating Serrano's right to a speedy trial. Docket Item 1 at 4. He further asserts that the District Attorney's office "m[a]nipulated ... court time[ ]lines by repeatedly switching [district attorneys]." *Id.*

Such conduct is "closely associated with the conduct of litigation or potential litigation." *See Barrett*, 798 F.2d at 571-72; *see also Gadreault v. Bent*, 2022 WL 943669, at *6 (D. Vt. Mar. 3, 2022) (holding that prosecutors were immune from suit for "[a]ny actions that they allegedly undertook in connection with [plaintiff's] prosecution—including their alleged delay of [his] trial—[because those actions were] within the ambit of their prosecutorial duties"), *report and recommendation adopted*, 2022 WL 910927 (D. Vt. Mar. 29, 2022). Absolute prosecutorial immunity therefore applies with "full force" here. *See Imbler*, 424 U.S. at 430.

Serrano also argues that the defendants' deprivation of his speedy trial rights divested the District Attorney's office of jurisdiction to prosecute him. Docket Item 1 at 4. But that does not mean that DiPerna (or any prosecutor) acted "in the clear absence of all jurisdiction" so as to defeat prosecutorial immunity. *See Schmueli*, 424 F.3d at 237. As the Second Circuit has explained, "[i]n considering whether a given prosecution was clearly beyond the scope of th[e prosecutor's] jurisdiction," courts "inquire whether the pertinent statutes may have authorized prosecution for the charged conduct." *Id.* Serrano does not allege facts suggesting that no statute authorizes prosecution for the crime

with which he was charged; instead, he asserts that the prosecution has been conducted in a way that violates his rights. *See* Docket Item 1. Such allegations do not overcome prosecutorial immunity*, and* Serrano's conclusory allegations that DiPerna conspired with Justice Schiano do not change the calculus. [10] *See Schmueli*, 424 F.3d at 237-38 (noting that prosecutorial immunity is "not affected by allegations that improperly motivated prosecutions were commenced or continued pursuant to a conspiracy"); *see also supra* Section II.B.2.a.

[10]   Serrano does say—without providing any additional details—that the "accusation" against him is "false." Docket Item 1 at 7. But he does not say that the law he was accused of violating does not exist or does not authorize criminal charges. *See id.* And claims that an assistant district attorney maliciously prosecuted a defendant despite knowing he was innocent do not overcome prosecutorial immunity. *See Schmueli*, 424 F.3d at 238-39.

 **\*8**  For those reasons, Serrano's claims against DiPerna, as asserted in the complaint, are subject to dismissal. But in light of Serrano's pro se status, *see Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010), the Court grants him leave to amend his complaint to assert a section 1983 claim that challenges DiPerna's or some other prosecutor's actions as an administrator or investigative officer, *see Warney*, 587 F.3d at 121, or that otherwise survives prosecutorial immunity.

### 3. Claims against Serrano's Defense Attorney

Serrano names only Justice Schiano and Assistant District Attorney DiPerna as defendants. Docket Item 1 at 1-2. But he also alleges that his defense attorney "is not doing his job." *Id.* at 10.

Criminal defense attorneys—whether public defenders, court-appointed attorneys, or privately retained counsel—are not persons acting under color of state law "when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding." *See Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *O'Donoghue v. Soc. Sec. Admin.*, 828 F. App'x 784, 787 (2d Cir. 2020) (summary order) ("Private attorneys are generally not state actors for purposes of [section] 1983." (citation and internal quotation marks omitted)); *Murdock v. Legal Aid Soc'y*, 2015 WL

94245, at \*2 (E.D.N.Y. Jan. 6, 2015) ("It is well settled that defense attorneys, even if they are court-appointed or are public defenders, do not act under color of state law when performing traditional functions of counsel."). But defense attorneys do "act 'under color of' state law for [section] 1983 purposes" when they are "willful participant[s] in joint action with the [st]tate or its agents." *See Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980) (citations omitted); *McCloud v. Jackson*, 4 F. App'x 7, 9-10 (2d Cir. 2001) (summary order) (holding that defense counsel was not liable under section 1983 "because there was no showing that he [conspired or otherwise] worked with state officials to deprive [plaintiff] of federal rights" (citation omitted)).

To the extent that Serrano asserts a claim against his defense attorney, it is only for actions the attorney allegedly took—or failed to take—during his criminal case. *See* Docket Item 1 at 10. Serrano does not allege that his defense attorney worked with Assistant District Attorney DiPerna or any other government official to deprive him of his rights. *See id.* 10. In fact, he says only that the attorney "is not doing his job." *Id.* Serrano therefore has not plausibly alleged that his defense attorney was a state actor.

For those reasons, any claims against Serrano's defense attorney are subject to dismissal. But in light of Serrano's pro se status, *see Tracy*, 623 F.3d at 101-02, he may name his defense attorney as a defendant in any amended complaint and allege facts explaining why that attorney was a state actor with respect to the challenged conduct.

### ORDER

In light of the above, IT IS HEREBY

ORDERED that Serrano's motion to proceed in forma pauperis, Docket Item 4, is GRANTED; and it is further

ORDERED that Serrano's claims for the dismissal of charges and his release; his official capacity claims; and his individual capacity claims against Justice Schiano are dismissed, and the Clerk of the Court shall terminate Justice Schiano as a defendant to this action; and it is further

ORDERED that Serrano may amend his complaint **within 45 days of the date of this order;** and it is further

**\*9** ORDERED that the Clerk of the Court shall send to Serrano with this order a copy of the original complaint, a blank section 1983 complaint form, and the instructions for preparing an amended complaint; and it is further

ORDERED that if Serrano does not file an amended complaint correcting the deficiencies noted above **within 45 days of the date of this order**, the complaint will be dismissed without further order and the Clerk of the Court shall close the case; and it is further

ORDERED that this Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith and leave to appeal to the Court of Appeals in forma pauperis is denied. *Coppedge v. United States,* 369 U.S. 438 (1962). Further requests to proceed on appeal in forma pauperis should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure; and it is further

ORDERED that Serrano shall notify the Court in writing if his address changes. The Court may dismiss the action if Serrano fails to do so.

SO ORDERED.

**All Citations**

Slip Copy, 2024 WL 5247710

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 1:24-CV-00483**<br>Serrano v. Diperna et al | — | W.D.N.Y. | May 20, 2024 | Docket |

**History**

There are no History results for this citation.

2012 WL 4370272
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Malcolm BEY, Francique Bey, Rein Bey,
Drizzle Bey, Truth Bey, and Amicus Curiae
Bey, in propia persona, sui juris, Plaintiffs,

v.

State of NEW YORK, Nassau County Inc., Nassau
County Family Court, Nassau County Child Protective
Services, Edmund Dane, Suzanne Leahey, Elizabeth
Mcgrath, rosalie fitzgerald, john Coppola, Alton
Williams, David Sullivan, Kathleen Rice, David Gotimer,
Bruce Cohen, Merry–Lou Ferro, Cheryl Kreger, Warren
Freeman, and Jane Doe/John Doe 1–100, Defendants.

No. 11–CV–3296 (JS)(WDW).
|
Sept. 21, 2012.

**Attorneys and Law Firms**

Malcolm Bey, Francique Bey, Rein Bey, Drizzle Bey, Truth
Bey, Amicus Curiae Bey, Uniondale, NY, pro se.

Ralph Pernick, Esq., N.Y.S. Attorney General's Office,
Mineola, NY, for Defendants N.Y.S. Defendants.

Liora M. Ben–Sorek, Esq., Nassau County Attorney's Office,
Mineola, NY, for Defendants County Defendants.

Adam Daniel Levine, Esq., Matthew K. Flanagan, Esq.,
Catalano, Gallardo & Petropoulous, LLP, Jericho, NY, for
Defendant Bruce Cohen, Esq.

Jessica Zimmerman, Esq., Marian C. Rice, Esq., L'Abbate,
Balkan, Colavita & Contini LLP, Garden City, NY, for
Defendant Cheryl Kreger, Esq.

*MEMORANDUM & ORDER*

SEYBERT, District Judge.

**\*1** Presently pending before the Court are the following
motions: (1) Plaintiff Malcolm Bey's ("Mr.Bey") motions
to "set aside and vacate" this Court's Order dated July 28,
2011 (Docket Entries 19, 27); (2) Mr. Bey's motion for a

default judgment (Docket Entry 39); (3) a motion to dismiss
the claims against Defendants State of New York, Nassau
County Family Court, Judge Edmund Dane, Judge David
Sullivan, Rosalie Fitzgerald, and John Coppola (the "State
Defendants") (Docket Entry 25); (4) a motion to dismiss
the claims against Bruce Cohen (Docket Entry 29); and (5)
motions to dismiss the claims against Cheryl Kreger (Docket
Entries 18, 32). [1] For the following reasons, Mr. Bey's
motions to vacate and for a default judgment are DENIED and
the motions to dismiss are GRANTED (with the exception of
Defendant Kreger's letter-motion at Docket Entry 18, which
is DENIED AS MOOT).

[1]     There is also a motion pending at Docket Entry
23. This is not a motion, however, but rather an
opposition to Plaintiffs' motion to vacate. The Clerk
of the Court is directed to terminate the motion and
amend the docket entry to reflect that it is a "Letter
in Opposition" to Docket Entry 19.

*BACKGROUND*

The Plaintiffs in this action are Mr. Bey; his wife, Francique
Bey ("Mrs.Bey"), and their minor children, Rein Bey, Drizzle
Bey, Truth Bey, and Amicus Curiae Bey (the "Bey Children").
Mr. Bey commenced this action *pro se,* on behalf of himself,
his wife, and his children against Nassau County, Inc. [sic],
Nassau County Child Protective Services ("CPS"), Suzanne
Leahey, Elizabeth McGrath, Alton Williams, Nassau County
District Attorney Kathleen Rice, David Gotimer, Merry–
Lou Ferro, and Warren Freeman (collectively, the "County
Defendants"), the State Defendants, Mr. Cohen, and Ms.
Kreger arising out of petitions for child neglect that were
filed in Nassau County Family Court in 2009 and 2010. The
Court will briefly summarize the facts as stated in the
Complaint-which are presumed to be true for the purposes of
this Memorandum and Order-that are relevant to the pending
motions.

On or around June 4, 2009, the Bey Children were questioned
at school by CPS regarding suspected child abuse occurring
in the Bey home. (Compl.¶ 26.) The Bey Children were later
taken to the police station for further questioning. (Compl.¶
26.) Mrs. Bey was arrested, and the Bey Children returned
home with their father. (Compl.¶ 26.) The following day,
however, the Bey Children were removed from the home and
placed in foster care (Compl.¶¶ 27, 31), and on or around June

9, 2009 petitions for neglect were filed with the Family Court against Mr. and Mrs. Bey. (Compl.¶ 31).

Shortly thereafter, CPS inspected the Bey home and, after finding it habitable for the Bey Children, returned them to their father. (Compl.¶ 32.) A temporary restraining order was issued against Mrs. Bey, however, and she was only allowed supervised visitation with her children. (Compl.¶ 32.) She was ordered to take parenting and anger management classes. (Compl.¶ 34.) During this time, Mr. Bey "lost work" because he could not afford daycare, and he and his family were eventually evicted from their home. (Compl.¶ 35.) In December 2009, the neglect petition against Mr. Bey was withdrawn. (Compl.¶ 36.)

**\*2** In April 2010, a new neglect petition was filed and a temporary restraining order issued against Mr. Bey. (Compl.¶ 37.) During the next few months, the Bey Children were repeatedly questioned by CPS at school and visited by CPS twice a month at home. (Compl.¶ 39.) On June 7, 2010, Mr. Bey attempted to file an "objection and counterclaim" in Family Court, but Defendant Coppola, the Family Court's Deputy Chief Clerk, refused to file it. (Compl.¶ 40.) Mr. Bey was able to successfully file it, however, a few days later. (Compl.¶ 41.)

Mr. Bey returned to Family Court several times during the next few months for appearances before Judge Dane related to the neglect petition. (Compl.¶ 42.) [2] The proceedings were repeatedly adjourned, and Mr. Bey eventually told Judge Dane that he would not be returning to court. (Compl.¶ 42.) Judge Dane warned him that failure to appear would result in a warrant being issued for his arrest. (Compl.¶ 42.)

[2]    It appears as though Judge Dane presided over Mr. Bey's neglect proceedings. It is unclear what role, if any, Judge Sullivan had in these proceedings.

On October 19, 2010, Mr. Bey went to the Family Court to file papers and bumped into his court-appointed attorney, Mr. Cohen, leaving Judge Dane's chambers. (Compl.¶ 44.) Mr. Cohen advised him that he had missed a court appearance that morning before Judge Dane and that it had been rescheduled for 2:00PM. (Compl.¶ 44.) When Mr. Bey returned that afternoon, however, he was arrested for failing to appear that morning and incarcerated. (Compl.¶ 44.)

In January 2011, Judge Dane extended the temporary restraining order issued against Mr. Bey and ordered that he

be mentally evaluated. (Compl.¶ 45.) Mr. Bey returned to court on March 15, 2011 for trial. CPS asked Mr. Bey to turn custody of the Bey Children over to CPS for one year, but Mr. Bey refused and his trial was adjourned to April 29, 2011. (Compl.¶¶ 46.48.) Around the same time, Mr. Bey requested copies of "everything in the court file." (Compl.¶ 47.) Defendants Fitzgerald, the Family Court's Chief Clerk, and Coppola gave him some documents but not others. (Compl.¶ 47.) Mr. Bey returned to court on April 29 and was asked to turn over custody of his children to CPS for six months, but he again refused. (Compl.¶ 49.) His trial was adjourned to May 13, 2011. (Compl.¶ 49.) On that date, he was again asked to give CPS custody of his children. (Compl.¶ 50.) This time, Ms. Kreger, the Bey Children's appointed law guardian, "attempt[ed] to coerce" him to agree to it, but he again refused. (Compl.¶ 50.) The trial was rescheduled to June 8, 2011 (Compl.¶ 51), and on June 15, 2011, Ms. Kreger spoke with the Bey Children at school about the alleged neglect (Compl.¶ 52.)

Mr. Bey commenced this action on July 8, 2011, asserting claims for, *inter alia,* violations of the Constitution (*e.g.,* due process and unreasonable search and seizure), various criminal statutes (*e.g.,* genocide and kidnapping), international treaties and provisions of the United Nations' Charter, as well as a claim under the Alien Tort Claims Act and claims for "breech [sic] of trust and fiduciary duty," for "use of statutes[,] ordinances, rules and policies of the corporate state of New York[,] not a rule of law against indigenous man," and fraud. He is seeking monetary, declaratory, and injunctive relief. Mr. Bey simultaneously filed an application for a temporary restraining order and preliminary injunction which was denied by this Court on July 13, 2011. [3]

[3]    The contents of Mr. Bey's application are incomprehensible; however, the Complaint asserts that he is seeking an order enjoining the Family Court proceeding and vacating any judgments issued to date.

**\*3** On July 28, 2011, this Court entered an Order that: (1) reminded Plaintiffs that pursuant to Rule 4(m) of the Federal Rules of Civil Procedure they had to serve process on Defendants by November 7, 2011 or their Complaint would be dismissed; (2) advised Plaintiffs of their duty to keep the Court informed of any change of address; and (3) warned Plaintiffs that the claims brought on behalf of the Bey Children would be dismissed without prejudice unless

counsel entered a notice of appearance on their behalf within thirty days. (Docket Entry 7.) No counsel has filed a notice of appearance on behalf of the Bey Children to date.

Presently pending before the Court are the following: (1) Mr. Bey's motions to vacate the July 28, 2011 Order, (2) motions to dismiss filed on behalf of the State Defendants, Mr. Cohen, and Ms. Kreger, and (3) Mr. Bey's motion for a default judgment against all Defendants. [4] Plaintiffs have not opposed the motions to dismiss.

[4]   The County Defendants did not move to dismiss but rather answered the Complaint on November 7, 2011 and asserted cross-claims against the other defendants for indemnification and/or contribution.

### DISCUSSION

Before discussing the merits of the pending motions, the Court must briefly address a threshold issue. Pursuant to Rule 11(a) of the Federal Rules of Civil Procedure, "[e]very pleading, written motion, and other paper shall be signed by at least one attorney of record ... or, by a party personally if the party is unrepresented." Since a non-attorney, *pro se* party may not represent another's interests, *see Iannaccone v. Law,* 142 F.3d 553, 558 (2d Cir.1998), every *pro se* plaintiff must sign a copy of the operative complaint in order to be a party to the action, *see Lynch v. DeMarco,* No. 11–CV–2602, 2011 WL 3418390, at *2 (E.D.N.Y. July 29, 2011). Here, only Mr. Bey signed the Complaint; therefore, he is the only proper plaintiff in this action. If the Court does not receive a copy of the Complaint signed by Mrs. Bey within thirty (30) days of the date of this Memorandum and Order, all of her claims will be dismissed.

### I. *Motion to Set Aside and Vacate*

On September 19, 2011, Mr. Bey filed a motion requesting that the Court "take mandatory judicial notice that the order dated July 28, 2010[sic], signed by Judge Joanna Seybert is inconsistent with Stare decisis [sic] Supreme Court Ruling [sic] *Winkleman v. Parma Central School District,* 550 U.S. 516 (2007)" and "set aside and vacate [this] void order." (Docket Entry 19.) Mr. Bey filed a similar (albeit less clear) motion to "take mandatory judicial notice" and "set aside and vacate" the July 28, 2011 Order on October 31, 2011. (Docket Entry 27.) These motions are denied for three reasons.

*First,* to the extent that Mr. Bey is seeking to vacate a "final judgment, order, or proceeding" pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, his motion is premature as the July 28, 2011 Order is not a "final" order for the purposes of Rule 60(b). *See Byrne v. Liquid Asphalt Sys., Inc.,* 250 F.Supp.2d 84, 87 (E.D.N.Y.2003) ("Courts have held that a final judgment is needed to support a Rule 60(b) motion." (citation omitted)); *Wanamaker v. Columbian Rope Co.,* 907 F.Supp. 522, 526–27 (N.D.N . Y.1995) (finding that an order "dismissing some but not all of the defendants, and dismissing some but not all of plaintiff's claims, was interlocutory and thus not 'final' for the purposes of Rule 60(b)").

**\*4** *Second,* to the extent that Mr. Bey's motion is more properly construed as one for reconsideration under Local Civil Rule 6.3, his motion is time-barred. Local Civil Rule 6.3 requires motions for reconsideration to "be served within fourteen ¶ 4) days after the entry of the Court's determination of the original motion." Here, Mr. Bey waited almost two months after the Court issued its Order to file his first motion to vacate and another six weeks to file his second motion to vacate. Thus, both motions are time-barred and are, accordingly, DENIED. [5]

[5]   Mr. Bey argues that his motion is "timely because non attorneys are not bound by the same rules as attorneys." (Docket Entry 19, at 2.) This is not true. A plaintiff's *pro se* status "does not exempt [him] from compliance with relevant rules of procedural and substantive law." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (internal quotation marks and citation omitted).

*Finally,* Mr. Bey's argument in support of reconsideration is without merit. Mr. Bey argues that he and his wife may represent the interests of their infant children *pro se.* However, while a parent may bring a lawsuit on behalf of an infant child, it is well established that the parent cannot do so *pro se. See Cheung v. Youth Orchestra Found. of Buffalo, Inc.,* 906 F.2d 59, 61 (2d Cir.1990) (holding that a father was not allowed to bring suit on behalf of his minor daughter without representation by counsel); *Berrios v. N.Y.C. Hous. Auth.,* 564 F.3d 130, 133 (2d Cir.2009) ("The fact that a minor or incompetent person must be represented by a next friend, guardian ad litem, or other fiduciary does not alter the principle ... that a non-attorney is not allowed to represent another individual in federal court litigation without the

assistance of counsel."). The Court warned Plaintiffs that the claims brought on behalf of the Bey Children would be dismissed unless counsel filed a notice of appearance by August 27, 2011. More than a year has passed and no lawyer has appeared on behalf of the Bey Children. Accordingly, their claims are DISMISSED without prejudice.

## II. *Motion for Default Judgment*

Also pending is Mr. Bey's motion for the entry of default and a default judgment against all Defendants. A party is entitled to an entry of default when the party against whom judgment is sought "has failed to plead or otherwise defend." FED. R. CIV. P. 55(a). In the present case, counsel for Defendants either filed a motion to dismiss or an answer on behalf of every Defendant (*see* Docket Entries 25, 29, 32, 34), and the Clerk of the Court noted this on December 7, 2011 when he refused to enter a certificate of default against Defendants (Docket Entry 44). Thus, there is no basis for entering a default judgment in this case, and Mr. Bey's motion is DENIED.

## III. *Motions to Dismiss*

There are three motions to dismiss pending: one filed by the State Defendants, one filed by Cheryl Kreger, and one filed by Bruce Cohen. The Court will first discuss the applicable standard of review before turning to the merits of the pending motions.

### A. *Standard of Review under Rule 12(b)(6)*

In deciding Rule 12(b)(6) motions to dismiss, the Court applies a "plausibility standard," which is guided by "[t]wo working principles." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). *First,* although the Court must accept all of a complaint's allegations as true, this "tenet" is "inapplicable to legal conclusions;" thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris,* 572 F.3d at 72 (alteration in original) (quoting *Iqbal,* 556 U.S. at 678) (internal quotation marks omitted). *Second,* only complaints that state a "plausible claim for relief" survive a motion to dismiss. *Id.* (internal quotation marks and citation omitted). Determining whether a complaint does so is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (internal quotation marks and citation omitted). While *pro se* plaintiffs enjoy a somewhat more liberal

pleading standard, *see Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) ("[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.") (internal quotation marks and citation omitted), they must still comport with the procedural and substantive rules of law. *Colo. Capital v. Owens,* 227 F.R.D. 181, 186 (E.D.N.Y.2005).

### B. *The State Defendants' Motion to Dismiss*

**\*5** For the following reasons, the Court grants the State Defendants' motion to dismiss.

### 1. *Claims against New York State and the Nassau County Family Court*

All of Mr. and Mrs. Bey's claims against the State of New York and the Nassau County Family Court are barred by sovereign immunity. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). "The Eleventh Amendment to the Constitution bars suits against a state in federal court unless that state has consented to the litigation or Congress has permissibly enacted legislation specifically overriding the state's immunity." *Russell v. Dunston,* 896 F.2d 664, 667 (2d Cir.1990) (citations omitted); *see also Bd. of Trustees of Univ. of Ala. v. Garrett,* 531 U.S. 356, 363, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). This bar precludes suits against states for both monetary and equitable relief. *See Edelman v. Jordan,* 415 U.S. 651, 667–69, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Cory v. White,* 457 U.S. 85, 90–91, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982); *see also Atl. Healthcare Benefits Trust v. Googins,* 2 F.3d 1, 4 (2d Cir.1993). Therefore, all claims against the State of New York must be dismissed with prejudice.

The Nassau County Family Court is also immune from suit under the Eleventh Amendment because it is an arm of the State of New York. *Madden v. Vt. Sup.Ct.,* 8 F. App'x 128, 129 (2d Cir.2001) (finding that claims against the Vermont Supreme Court were barred by the Eleventh Amendment); *Gollomp v. Spitzer,* 568 F.3d 355, 366 (2d Cir.2009) (finding that the New York state Unified Court System, of which a county court is a part, is an "arm of the State," and therefore entitled to Eleventh Amendment immunity); *Manko v. Steinhardt,* No. 11–CV–5430, 2012 WL 213715, at *3 (E.D.N.Y. Jan. 24, 2012) (dismissing claim against the Kings County Supreme Court of the State of New York Clerk's Office because it was barred by Eleventh Amendment immunity as an arm of the State of New York).

Accordingly, the claims against the Nassau County Family Court must also be dismissed with prejudice.

2. *Claims against Judge Dane and Judge Sullivan*
The claims for monetary relief against Judge Dane and Judge Sullivan must be dismissed because "[i]t is well settled that judges are absolutely immune from suit for any actions taken within the scope of their judicial responsibilities or within his or her jurisdiction," *Miller v. Cnty. of Nassau,* 467 F.Supp.2d 308, 312 (E.D.N.Y.2006) (citing *Mireles v.* Waco, 502 U.S. 9, 11–12, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991); *Maestri v. Jutkofsky,* 860 F.2d 50, 52–53 (2d Cir.1988)), and that such "immunity is not overcome by allegations of bad faith or malice," *Mireles,* 502 U .S. at 11 (citation omitted); *see also Pierson v. Ray,* 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) ( "[I]mmunity applies even when the judge is accused of acting maliciously and corruptly."). Here, as all of the claims against Judge Dane and Judge Sullivan arise solely out of actions they allegedly took from the bench while presiding over various proceedings involving Mr. and Mrs. Bey, their alleged wrongful conduct falls squarely within the scope of absolute judicial immunity. Accordingly, all of Mr. and Mrs. Bey's claims for monetary relief are dismissed with prejudice.

**\*6** Mr. and Mrs. Bey are also seeking declaratory and injunctive relief, which do not fall within the ambit of judicial immunity. These claims, however, fail as a matter of law. *First,* Mr. and Mrs. Bey's claims for injunctive relief under Section 1983 are barred because "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983; *see also Dorman v. Higgins,* 821 F.2d 133, 139 (2d Cir.1987). Further, to the extent that Mrs. Bey's constitutional claims arise out of the ongoing Family Court proceedings, they are barred either by the *Younger* abstention doctrine, *see Diamond "D" Const. Corp. v. McGowan,* 282 F.3d 191, 198 (2d Cir.2002) ( *"Younger* generally requires federal courts to abstain from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings." (citing *Younger v. Harris,* 401 U.S. 37, 43–44, 91 S.Ct. 746, 27 L.Ed.2d 669) (1971)); *Donkor v. N.Y.C. Human Res. Admin. Special Servs. for Children,* 673 F.Supp. 1221, 1224–27 (S.D.N.Y.1987), or the *Rooker–Feldman* doctrine, [6] *see Phifer v. City of N.Y.,* 289 F.3d 49, 57 (2d Cir.2002) ("This court may not review the family court's

determinations regarding custody, neglect and visitation" if "those issues were decided by the family court after providing [the plaintiff] with a full and fair opportunity to litigate those issues").

[6]     Although it appears as though the Family Court proceedings against Mrs. Bey are ongoing and the neglect petitions filed against Mr. Bey have been dismissed (Kreger Decl. ¶ 7 n. 1), Mr. and Mrs. Bey are also seeking, *inter alia,* vacatur of the "judgments issued by The Family Court and Nassau County Court CPS" (Compl. at 42).

*Second,* Mr. and Mrs. Bey's claim for breach of the public's trust is not a cognizable cause of action. *See Brady v. Lynes,* No. 05–CV–6540, 2008 WL 2276518, at \*6 (S.D.N.Y. June 2, 2008).

*Third,* their claim under the Alien Tort Claims Act fails because they are not "aliens" within the meaning of the statute. *See Topo v. Dhir,* 210 F.R.D. 76, 78 (S.D.N.Y.2002) (defining "alien" in the context of the Alien Tort Claims Act as a "foreign born person who has not qualified as a citizen of the country" (internal quotation marks and citation omitted)). Mr. and Mrs. Bey assert that they are "aliens" because they have declared their independence from the United States (*see* Mr. Bey's Aff. in Support of Prelim. Inj. ¶ 4 ("Indigenous Affiant declares independence from the USA and all sub-corporations thereof, and heretofore, herein and hereafter claims absolute power, authority and control over himself, without limitation, and herein states, for the record, that he is a free, sovereign indigenous political power holder ...."); *see also* Compl. at 1 (Mr. Bey describing himself as a "Free Indigenous Sovereign Political Power Holder"); *id.* at 42 (requesting a "Declaratory Judgment verifying the lawful indigenous status of The Bey Family")); however, such arguments have been uniformly rejected by courts in this Circuit and others, *see, e.g., United States v. Hilgeford,* 7 F.3d 1340, 1342 (7th Cir.1993) ("The defendant in this case apparently holds a sincere belief that he is a citizen of the mythical 'Indiana State Republic' and for that reason is an alien beyond the jurisdictional reach of the federal courts. This belief is, of course, incorrect."); *Duwenhoegger v. King,* No. 10–CV–3965, 2012 WL 1516865, at \*14 (D.Minn. Feb. 13, 2012) ("[A]ny argument by plaintiff that he is not subject to the laws of Minnesota or the United States because he is a "Sovereign Citizen" is frivolous." (collecting cases)); *M & I Marshall & Ilsley Bank v. Glavin,* No. 10–CV–0616, 2011 WL 322663, at \*1 (W.D.Wis. Jan. 31, 2011) ("This 'sovereign citizen' argument has been rejected repeatedly by courts.");

*United States v. Lumumba,* 741 F.2d 12, 14–15 (2d Cir.1984) (rejecting criminal defendant's argument that he is immune from prosecution due to his "proclaimed status" as "Vice President and Minister of Justice" of the "independent state" of "the Republic of New Afrika"—a self-created "Nation of Afrikans born in North America as a consequence of ... slavery" (alteration in original)).

**\*7** *Fourth,* any of Mr. and Mrs. Bey's claims arising under Title 18 of the United States Code necessarily fail because there is no private right of action under criminal statutes, *see, e.g., Sanchez v. Dankert,* No. 00–CV–1143, 2002 WL 529503, at *10–11 (S.D .N.Y. Feb. 22, 2002) (collecting cases), and there is similarly no private right of action under international treaties or provisions of the United Nation's Charter, *see, e.g., id.* at *11; *United States v. De La Pava,* 268 F.3d 157, 164 (2d Cir.2001) ("[T]here is a strong presumption against inferring individual rights from international treaties."); *Garza v. Lappin,* 253 F.3d 918, 924 (7th Cir.2001) ("[A]s a general rule, international agreements, even those benefitting private parties, do not create private rights enforceable in domestic courts."); RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES,,,, § 907 cmt. a. ("International agreements ... generally do not create private rights or provide for a private cause of action in domestic courts...."); *Joyner–El v. Giammarella,* No. 09–CV–3731, 2010 WL 1685957, at *3 n. 4 (S.D.N.Y. Apr. 15, 2010) (finding that the United Nations' Universal Declaration of Human Rights and Declaration on the Rights of Indigenous Peoples do not create federal causes of action (citing *Sosa v. Alvarez–Machain,* 542 U.S. 692, 734, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004))).

*Finally,* Mr. and Mrs. Bey's claim that "any Laws[,] statutes, ordinances and rules made since 1867 are unconstitutional" because Congress "ceased to exist as a lawful deliberative body" after the South seceded from the Union during the Civil War is frivolous and entirely without merit.

Accordingly, all claims against Judge Sullivan and Judge Dane are hereby dismissed with prejudice. [7]

[7] To the extent that Mr. and Mrs. Bey assert claims for declaratory relief arising under state law, the Court declines to extend supplemental jurisdiction, and those claims are dismissed without prejudice. *See Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988).

3. *Claims against Defendants Fitzgerald and Coppola*
Defendants Fitzgerald and Coppola are also entitled to immunity because it is well established that "the clerk of the court and deputy clerks are shielded by an absolute quasijudicial immunity, particularly when they 'perform tasks that are an integral part of the judicial process.' " *McGann v. Lange,* No. 96–CV–0859, 1996 WL 586798, at *2 (E.D.N.Y. Oct. 10, 1996) (quoting *Mullis v. U.S. Bankr.Ct.,* 828 F.2d 1385, 1390 (9th Cir.1987)); *see also Rodriguez v. Weprin,* 116 F.3d 62, 66 (2d Cir.1997) (finding that the "court's inherent power to control its docket is part of its function of resolving disputes between parties" and is thus "a function for which judges and their supporting staff are afforded absolute immunity"). In this case, Mr. and Mrs. Bey allege that Defendant Coppola refused to file Mr. Bey's "objection and counter claim" (Compl.¶ 40) and that Coppola and Fitzgerald did not provide him with a copy of the entire court file upon request (Compl .¶ 47). Courts have found similar actions by court clerks to be shielded by absolute quasi-judicial immunity. *See, e.g., Rodriguez,* 116 F.3d at 66 (finding that clerks were entitled to quasi-judicial immunity for, *inter alia,* refusing an inmate's request for records on appeal); *Pukulin v. Gonzalez,* No. 07–CV–0412, 2007 WL 1063353, at *2 (E.D.N.Y. Apr. 5, 2007) (finding that absolute judicial immunity extends to "the Clerk's Office['s] activities of filing and docketing legal documents"); *McKnight v. Middleton,* 699 F.Supp.2d 507, 525–26 (E.D.N.Y.2010) (granting immunity to Family Court clerk for claims arising out of his failure to process the plaintiff's motions); *Mullis,* 828 F.2d at 1390 (finding that clerk was entitled to quasi-judicial immunity for, *inter alia,* refusing to file a document with the court); *Stewart v. Minnick,* 409 F.2d 826, 826 (9th Cir.1969) (holding that quasi-judicial immunity shielded court clerk from suit arising out of his refusal to provide litigant with a portion of the trial transcript).

**\*8** Accordingly, and for the reasons discussed above, all claims against Defendants Fitzgerald and Coppola are dismissed.

C. *Defendant Cohen's Motion to Dismiss*
The only allegations in the Complaint against Defendant Cohen, who according to the Complaint was Mr. and Mrs. Bey's court-appointed attorney (Compl.¶ 19), are that on October 19, 2010, he advised Mr. Bey that he missed a court appearance and directed him to return to court at 2:00PM (Compl.¶ 44). Upon Mr. Bey's return to court later that day, he was arrested. (Compl.¶ 44 .) Defendant Cohen argues that the

claims against him must be dismissed because: (1) the Court lacks subject matter jurisdiction, (2) he was never properly served, and (3) the Complaint fails to state a claim.

The Court finds Defendant Cohen's jurisdictional arguments to be without merit as (1) the Complaint asserts claims for violations of the United States Constitution so this Court has subject matter jurisdiction, *see* 28 U.S.C. § 1331, and (2) allegations of improper service, without a sworn affidavit, are insufficient to establish improper service, *see United States v. Riser*, No. 10–CV–4550, 2011 WL 1004566, at *3 (E.D.N.Y. Mar. 16, 2011).

However, the Court finds that Mr. and Mrs. Bey have failed to state a cognizable claim for relief against Defendant Cohen. Their claims arising under Section 1983 fail because Defendant Cohen is not a state actor. *See Browdy v. Karpe*, 131 F. App'x 751, 753 (2d Cir.2005) ("[C]ourt-appointed attorneys 'performing a lawyer's traditional functions as counsel' to a defendant do not act 'under color of state law' and, therefore, are not subject to suit under 42 U.S.C. § 1983." (quoting *Rodriguez*, 116 F.3d at 65–66)). And to the extent that Mr. and Mrs. Bey attempt to cure this defect by conclusorily alleging that Defendant Cohen conspired with state officials, "[a] merely conclusory allegation that a private [party] acted in concert with a state actor does not suffice to state a § 1983 claim against [a] private [party]." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir.2002) (citation omitted); *accord Browdy*, 131 F. App'x at 753.

Accordingly, all constitutional claims (and for the reasons discussed above, all other claims) against Defendant Cohen must be dismissed.

### D. *Defendant Kreger's Motion to Dismiss*
Mr. and Mrs. Bey's claims against Defendant Kreger arise out of her appointment as the Bey Children's law guardian. Defendant Kreger argues that the claims asserted against her must be dismissed because: (1) she is protected by quasijudicial immunity; (2) Mr. and Mrs. Bey lack standing to assert claims against her; (3) Mr. and Mrs. Bey lack privity with her; (4) the claims are barred by the *Rooker–Feldman* doctrine; (5) the Complaint does not contain a short and concise statement of Plaintiffs' claims in violation of Rule 8 of the Federal Rules of Civil Procedure; and (6) the Complaint fails to state a claim upon which relief can be granted. Because the Court finds that Defendant Kreger is protected by quasi-judicial immunity, it will not address her other arguments.

**\*9** Courts in New York have consistently held that law guardians are entitled to absolute quasi-judicial immunity for actions taken within the scope of their appointment. *See Yapi v. Kondratyeva*, 340 F. App'x 683, 685 (2d Cir.2009); *Dowlah v. Dowlah*, No. 09–CV–2020, 2010 WL 889292, at *7 (E.D.N.Y. Mar. 10, 2010) (collecting cases); *see also Bluntt v. O'Connor*, 291 A.D.2d 106, 116–119, 737 N.Y.S.2d 471 (4th Dep't 2002) ("[M]ost courts that have considered suits by disgruntled parents against attorneys appointed by courts to protect children in custody disputes have granted, on public policy grounds, absolute quasijudicial immunity to the attorneys for actions taken within the scope of their appointments." (collecting cases)).

Because all of the claims against Defendant Kreger arise out of activities taken within the scope of her appointment as the Bey Children's legal guardian (*i.e.,* participating in proceedings in Family Court (Comp.¶ 50) and interviewing the Bey Children about their parents (Compl.¶ 53)), her actions are protected by quasi-judicial immunity. Therefore, for this reason and the reasons discussed above, the Court GRANTS her motion, and all claims against Defendant Kreger are dismissed. [8]

[8]    Defendant Kreger also filed a letter motion asking this Court to *sua sponte* dismiss the claims asserted against her. (Docket Entry 18.) This motion is DENIED AS MOOT.

### *CONCLUSION*

For the foregoing reasons, it is hereby ORDERED that:

(1) The pending motions to dismiss are GRANTED (Docket Entries 25, 29, 32), and all claims (including cross-claims) against Defendants Sullivan, Dane, Kreger, Fitzgerald, Coppola, and Cohen are DISMISSED; [9]

[9]    With the exception of any claims for declaratory judgment arising under state law, all claims are DISMISSED WITH PREJUDICE.

(2) Ms. Kreger's letter motion asking the Court to *sua sponte* dismiss the claims against her (Docket Entry 18) is DENIED AS MOOT;

(2) Mr. Bey's motions to vacate (Docket Entries 19, 27) are DENIED, and all claims brought on behalf of Rein, Drizzle,

Truth, and Amicus Curiae Bey are DISMISSED without prejudice; and

(3) Mr. Bey's motion for a default judgment (Docket Entry 39) is DENIED; and

4) Mrs. Bey's remaining claims will be dismissed without prejudice unless the Court receives a copy of the Complaint signed by Mrs. Bey within thirty (30) days of the date of this Memorandum and Order.

The Clerk of the Court is directed to terminate Judge Sullivan, Judge Dane, Ms. Kreger, Ms. Fitzgerald, and Mr. Cohen as Defendants and Rein, Drizzle, Truth, and Amicus Curiae Bey as Plaintiffs. The Clerk of the Court is also directed to terminate the motion at Docket Entry 23 (*see supra* page 2 n. 2) which is not a motion but rather Defendant Cohen's opposition to Plaintiff's motion to vacate. The Clerk of the Court is further directed to mail a copy of this Memorandum and Order to each of the *pro se* Plaintiffs.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4370272

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History (2)**

**Direct History (1)**

1. Bey v. New York
2012 WL 4370272 , E.D.N.Y. , Sep. 21, 2012

**Related References (1)**

2. Bey v. New York
2013 WL 3282277 , E.D.N.Y. , June 25, 2013

**Filings**

There are no Filings for this citation.

Humphrey v. Court Clerk for the Second Circuit, Not Reported in F.Supp.2d (2008)

2008 WL 1945308

KeyCite Yellow Flag

Distinguished by McKnight v. Middleton,  E.D.N.Y.,  March 29, 2010

2008 WL 1945308
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

John Jay HUMPHREY, Plaintiff,
v.
COURT CLERK FOR THE
SECOND CIRCUIT, Defendant.

No. 508-CV-0363 (DNH)(DEP).
|
May 1, 2008.

**Attorneys and Law Firms**

John Jay Humphrey, pro se.

***DECISION and ORDER***

DAVID N. HURD, District Judge.

**\*1** The Court has received plaintiff John Jay Humphrey's *pro se* complaint pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388 (1971), for review, together with an *in forma pauperis* application. [1] Dkt. Nos. 1, 2. For the reasons stated below, plaintiff's complaint is dismissed pursuant to 28 U.S.C. § 1915(e).

[1]  The Court notes that plaintiff has filed numerous actions in this District in addition to the present case. *See Humphrey v. Onondaga County Sheriff,* 5:02-CV-1524 (NPM/DEP); *Humphrey v. State of New York,* 5:03-CV-1181 (HGM/GJD); *Humphrey v. U.S. Gov't,* 5:04-CV-145 (HJM/GJD); *Humphrey v. Carni,* 5:05-CV-0253 (FJS/GHL); *Humphrey v. WIXT News Channel 9,* 5:05-CV-0636 (FJS/DEP); *Humphrey v. Rescue Mission,* 5:05-CV-0795 (NAM/GJD); *Humphrey v. Rescue Mission,* 5:05-CV-0986 (FJS/GJD); *Humphrey v. Onondaga County Dep't of Soc. Servs.,* 5:05-CV-987 (NAM/GJD); *Humphrey v. Styers,* 5:05-CV-1036 (FJS/GHL); *Humphrey v. Court Clerk, NDNY,* 5:05-

CV-1159 (NAM/GJD); *Humphrey v. Weichert,* 5:05-CV-1205 (NAM/GJD); *Humphrey v. Two Unknown Fed. Employees,* 5:06-CV-0786 (NAM/DEP); *Humphrey v. Onondaga County Sheriff's Dep't,* 5:07-CV-0721 (DNH/GJD); *Humphrey v. Onondaga County Sheriff's Dep't,* 5:07-CV-1102 (DNH/GJD).

**I.** *Background*

In his *pro se* complaint, plaintiff claims that the Clerk of the United States Court of Appeals for the Second Circuit failed to inform him until "months later" that his appeal was dismissed in three of his prior actions, *Humphrey v. WIXT News Channel 9,* 5:05-CV-0636 (FJS/DEP); *Humphrey v. Weichert,* 5:05-CV-1205 (NAM/GJD); *Humphrey v. Two Unknown Fed. Employees,* 5:06-CV-0786 (NAM/DEP). Dkt. No. 1 at ¶¶ 1, 4-7. According to plaintiff, the Clerk's failure to communicate with him hindered his ability to petition the United States Supreme Court for writs of *certiorari* in these actions. *Id.* at ¶¶ 10, 13. Plaintiff further alleges that the Clerk neglected to provide him with the status of his appeal in the action titled *Humphrey v. Styers,* 5:05-CV-1036 (FJS/GHL). *Id.* at ¶¶ 3, 8. Plaintiff seeks monetary relief in the amount of One Million Dollars. *Id.* at p. 4. For a more complete statement of plaintiff's claims, reference is made to the complaint.

**II.** *Discussion*

Turning to plaintiff's *in forma pauperis* application, the Court finds that he may properly commence this action *in forma pauperis* because he sets forth sufficient economic need. Dkt. No. 2.

Since the Court has found that plaintiff meets the financial criteria for commencing this case *in forma pauperis,* the Court must now consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915(e). Section 1915(e) directs that, when a plaintiff seeks to proceed *in forma pauperis,* "(2) ... the court shall dismiss the case at any time if the court determines that-... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." [2] 28 U.S.C. § 1915(e)(2)(B). Thus, the court has a responsibility to determine that a complaint may be properly maintained in this district before it may permit a plaintiff to proceed with an action *in forma pauperis.* [3] *See id.* Although courts have a duty to show liberality towards *pro se* litigants, *Nance v. Kelly,*

912 F.2d 605, 606 (2d Cir.1990) (per curiam), and extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir.1983), there is a responsibility placed upon the court to determine that a claim is not frivolous before permitting a plaintiff to proceed. *See Fitzgerald v. First East Seventh St. Tenants Corp.,* 221 F.3d 362, 363 (2d Cir.2000) (finding that a district court may dismiss a frivolous complaint *sua sponte* notwithstanding the fact the plaintiff has paid the statutory filing fee); *Wachtler v. Herkimer County,* 35 F.3d 77, 82 (2d Cir.1994) (finding that a district court has the power to dismiss a case *sua sponte* for failure to state a claim).

2    In determining whether an action is frivolous, the Court must determine whether the complaint lacks an arguable basis either in law or in fact. *Neitzke v. Williams,* 490 U.S. 319, 325 (1989).

3    Dismissal of frivolous actions pursuant to 28 U.S.C. § 1915(e) is appropriate to prevent abuses of the process of the court, *Harkins v. Eldredge,* 505 F.2d 802, 804 (8th Cir.1974), as well as to discourage the waste of judicial resources. *Neitzke,* 490 U.S. at 327.

**\*2** As noted, plaintiff seeks to assert claims against the defendant for the violation of his constitutional rights. *Bivens* actions, although not precisely parallel, are the federal analog to Section 1983 actions against state actors. *See Chin v. Bowen,* 833 F.2d 21, 24 (2d Cir1987) (noting that there is a "general trend in the appellate courts" to incorporate Section 1983 law into *Bivens* cases) (citation and quotations omitted).[4]

4    Section 1983 establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *German v. Fed. Home Loan Mortgage Corp.,* 885 F.Supp. 537, 573 (S.D.N.Y.1995) (citing *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)) (footnote omitted).

Plaintiff maintains that the "Court Clerk" for the Second Circuit Court of Appeals improperly failed to communicate with him regarding the status of the appeals in four of his cases. A review of the appellate dockets in *Humphrey v. Weichert, Humphrey v. Two Unknown Federal Employees,*

and *Humphrey v. WIXT News Channel 9* reveals that plaintiff indeed was immediately notified of the mandates dismissing his appeals in those actions.[5] *See Humphrey v. Weichert,* Appellate Action No. 05-6846; *Humphrey v. Two Unknown Federal Employees,* Appellate Action No. 07-0631; *Humphrey v. WIXT News Channel 9,* Appellate Action No. 05-4122. Plaintiff's appeal in *Humphrey v. Styers* remains pending, and plaintiff is free to inquire regarding the status of his case at any time. *See Humphrey v. Styers,* Appellate Action No. 05-6695.

5    It bears mentioning that in *WIXT News Channel 9,* the docket reflects that the notice sent to plaintiff regarding the issuance of a mandate dismissing his appeal for failure to comply with the scheduling order in that action was returned as undeliverable. That fact, however, is not determinative of the validity of plaintiff's claim.

The Court also notes that plaintiff does not clearly allege wrongdoing on the part of the individual who serves as the Clerk of the Court for the Second Circuit, as opposed to one or more of the individuals employed in the Clerk's Office. As with claims asserted under Section 1983, a plaintiff seeking to recover money damages in a *Bivens* action must establish that the named defendant was personally involved in the misconduct complained of.[6] *See Elmaghraby v. Ashcroft,* No. 04 CV 01809, 2005 WL 2375202, at \*11 (E.D.N.Y. Sept. 27, 2005), *reversed on other grounds, Iqbal v. Hasty,* 490 F.3d 143 (2d Cir.2007); *Richardson v. Goord,* 347 F .3d 431, 435 (2d Cir.2003) (discussing supervisory liability in context of a section 1983 claim); *see also Wilson v. Layne,* 526 U.S. 603, 609 (1999) (explaining that the qualified immunity analysis under *Bivens* is identical to the analysis under section 1983). In this case, plaintiff has not set forth sufficient facts to establish that the Clerk of the Court was personally involved in the actions complained of. In light of plaintiff's *pro se* status, the Court has considered whether plaintiff's complaint states a claim upon which relief could be granted assuming, *arguendo,* that he has properly identified the defendant and concludes that it does not.

6    A supervisory official can, however, be personally involved in a constitutional violation in one of several ways: (1) the supervisor may have directly participated in the challenged conduct; (2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; (3) the supervisor may

have created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or (5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

Courts have extended judicial immunity to court clerks for the performance of tasks "which are judicial in nature and an integral part of the judicial process." *Rodriguez v. Weprin,* 116 F.3d 62, 66 (2d Cir.1997); *see also Kampfer v. Rodriguez,* No. 97-CV-739, 1998 WL 187364, at *2 (N.D.N.Y. Apr. 15, 1998) (Pooler, D .J.). Court clerks enjoy absolute immunity even for administrative functions if the task was undertaken pursuant to the explicit direction of a judicial officer or pursuant to the established practice of the court. *Rodriguez,* 116 F.3d at 67. A court clerk, however, may not be entitled to absolute immunity in all cases, such as where the clerk's refusal to accept the papers of a litigant seeking to commence an action under a state statute results in the deprivation of the litigant's constitutional rights. *LeGrand v. Evan,* 702 F.2d 415, 418 (2d Cir.1983). In this case, plaintiff's allegations arise out of and relate to actions taken by court personnel which were in accordance with the established practice of the Second Circuit, and pursuant to the direction of a judicial officer as articulated in the relevant appellate mandates; accordingly, these actions constitute an integral part of the judicial process and are shielded from liability by judicial immunity. In any event, although plaintiff contends that the Clerk's alleged failure to communicate with him deprived him of his right to seek writs of *certiorari,* the pertinent dockets indicate that

such notification did indeed occur. Accordingly, defendant Clerk of the Court for the United States Court of Appeals for the Second Circuit is hereby dismissed with prejudice. [7]

[7]    In addition, while not deciding this matter on this basis, the Court notes that it is not clear that venue is appropriate in this District. *See* 28 U.S.C. § 1391(b).

### III. *Conclusion*

**\*3** Plaintiff's complaint, as drafted, is not sufficient to state a claim for the violation of plaintiff's constitutional rights by the named defendant. The named defendant is immune from damages on the claims asserted in this *Bivens* action and the complaint lacks an arguable basis in law or in fact. Accordingly, plaintiff's complaint is dismissed pursuant to 28 U.S.C. § 1915(e).

THEREFORE, it is hereby

ORDERED, that

1. This action is DISMISSED;

2. Plaintiff's *in forma pauperis* application is DENIED as moot; and

3. The Clerk of the Court is directed to serve a copy of this Order on plaintiff in accordance with the Local Rules.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2008 WL 1945308

---

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 5:08cv00363**<br>HUMPHREY v. COURT CLERK FOR THE SECOND CIRCUIT | — | N.D.N.Y. | Apr. 02, 2008 | Docket |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Humphrey v. Court Clerk for the Second Circuit

**History**

There are no History results for this citation.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

2020 WL 1904088

KeyCite Yellow Flag

Declined to Extend by    Broadwater v. County of Onondaga,    N.D.N.Y.,
March 11, 2024

2020 WL 1904088
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael JOYNER, Plaintiff,

v.

COUNTY OF CAYUGA; Cayuga County Sheriff's
Department; City of Auburn; Shawn I. Butler, Chief of
Auburn Police Department, as an Individual and in his
official capacity; Cayuga County District Attorney's
Office; Jon E. Budelmann, as an Individual and in
his capacity as District Attorney for Cayuga County;
and Anthony Spinelli, as an Individual and in his
capacity as an Auburn City Police Officer, Defendants.

5:20-CV-60 (MAD/TWD)
|
Signed 04/17/2020

**Attorneys and Law Firms**

OF COUNSEL: JARROD W. SMITH, ESQ., OFFICE OF
JARROD W. SMITH, 11 South Main Street, P.O. Box 173,
Jordan, New York 13080, Attorneys for Plaintiff.

OF COUNSEL: JEFFREY R. PARRY, ESQ., OFFICE OF
JEFFREY R. PARRY, 7030 East Genesee Street, Fayetteville,
New York 13066, Attorneys for Plaintiff.

OF COUNSEL: FRANK W. MILLER, ESQ., GIANCARLO
FACCIPONTE, ESQ., OFFICE OF FRANK W. MILLER,
6575 Kirkville Road, East Syracuse, New York 13057,
Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, U.S. District Judge:

**I. INTRODUCTION**

**\*1** On or about February 18, 2020, Plaintiff filed a complaint
against Defendants City of Auburn, Shawn L. Butler, County
of Cayuga, Cayuga County District Attorney's Office, Jon
E. Budelmann, and Anthony Spinelli, asserting eight claims

pursuant to 42 U.S.C. §§ 1983 and 1988, and state law.
See Dkt. No. 5. Specifically, Plaintiff's complaint alleges the
following causes of action: (1) false arrest under the Fourth
and Fourteenth Amendments; (2) malicious prosecution
under the Fourth and Fourteenth Amendments; (3) negligent
failure to train or supervise; (4) state law false arrest; (5)
state law false imprisonment; (6) intentional and negligent
infliction of emotional distress under New York State law;
(7) negligence; and (8) deliberate indifference to medical care
under the Eighth Amendment. See Dkt. No. 5 at ¶¶ 40-114.
Currently before the Court is Defendants' motion to dismiss
the complaint in its entirety. See Dkt. No. 9.

**II. BACKGROUND**

According to the complaint, on August 10, 2018, Plaintiff
was the passenger in a vehicle that was driven by 140 Wall
Street, allegedly in violation of an order of protection for
Linda Fitzsimmons and Lee Joyner, who both reside at that
address. See Dkt. No. 5 at ¶¶ 24-25. Plaintiff resides at 145
Wall Street, several houses down from 140 Wall Street, on the
opposite side of the street. See id. at ¶ 25. Plaintiff was not the
driver of the vehicle and had no control over how the driver
was delivering him to his home. See id.

On August 13, 2018, Plaintiff was arraigned on two felony
complaints charging him with two counts of Criminal
Contempt in the First Degree based on the alleged violation of
the order of protection. See id. at ¶ 22. At the conclusion of his
arraignment, Plaintiff was remanded to the Cayuga County
Jail. See id. Plaintiff claims that "Defendant police officer
lacked the requisite requirement of having probable cause to
arrest the Plaintiff; and did falsely arrest and imprison the
Plaintiff." Id. at ¶ 23.

On October 4, 2018, Defendant Jon E. Budelmann, in his
capacity as Cayuga County District Attorney, presented
Plaintiff's charges to a grand jury, which "No Billed" the case.
See id. at ¶ 26. At this point, Plaintiff was released from
custody. See id.

During the fifty-three days during which Plaintiff "was being
illegally imprisoned," he slipped and fell at the Cayuga
County Jail. See id. at ¶ 31. According to Plaintiff, on August
31, 2018, a water pipe burst at the Cayuga County Jail near
Plaintiff's cell while he was already locked in for the night
and sleeping. See id. at ¶ 32. Plaintiff was woken by a
bursting water pipe that was turned off by a Cayuga County

2020 WL 1904088

Correctional officer. *See id.* at ¶ 33. "The first burst of the water pipe [occurred] when the Cayuga County Correctional officer shut the water of" between "12:00 midnight and 2:00 a.m." *Id.* at ¶ 34. "Plaintiff was woken by a bursting water pipe; and observed and heard that the correctional officer was going to turn off the water and clean up the water spill. At that time, there was no water in Plaintiff's cell." *Id.*

**\*2** Unbeknownst to Plaintiff, water from the burst pipe went underneath his locked cell door "and flooded his room while he was in bed and asleep." *Id.* at ¶ 35. "At around 6:30 am-7:00 am, Plaintiff got out of his bed to use the toilet in his cell. Plaintiff slipped and fell on the wet floor of his cell. The water on the floor was all near the toilet in his cell. There was a huge puddle of water between Plaintiff's bunk and the toilet in his cell." *Id.* at ¶ 36. Plaintiff claims that he slipped and fell, hitting his head and neck on his bunk, and his lower back on the floor, causing severe injuries. *See id.* at ¶ 37. At the time that Plaintiff had fallen and injured himself, a second water leak had occurred in the pod in which he was being held. *See id.* at ¶ 38. Plaintiff claims that, as a result of the fall, he suffered a herniated disc in his neck and a lower lumbar strain. *See id.* at ¶ 39. Plaintiff also claims that he suffers from numbing of his toes and finger tips. *See id.*

### III. DISCUSSION

**A. Standard of Review**
A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the party's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' ' " *Id.* (quoting [*Twombly*, 550 U.S.] at 557, 127 S. Ct. 1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed[,]" *id.* at 570.

**B. Documents Considered in Deciding Motion to Dismiss**
In their reply to the motion to dismiss, Defendants submitted several documents in further support of their motion. *See* Dkt. No. 16-1. These documents include (1) the August 10, 2018 criminal complaint charging Plaintiff with Criminal Contempt in the First Degree, (2) the order of protection that Plaintiff allegedly violated, (3) the affidavit of Linda Fitzsimmons that formed the basis for Defendant's underlying criminal charge, and (4) the incident narrative report of Defendant Spinelli dated August 15, 2018 relating to the criminal complaint filed against Plaintiff. *See id.* at 1-6.

**\*3** In deciding a motion to dismiss for failure to state a claim, the court considers the complaint, materials incorporated into the complaint by reference, materials integral to the complaint, and facts that are capable of judicial notice. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

In the present matter, the Court finds that these documents are not properly considered at the motion to dismiss stage. The Court acknowledges that there are cases in which courts have considered similar police records at the pleading stage. *See Betts v. Shearman*, No. 12-cv-3195, 2013 WL 311124, *3 (S.D.N.Y. Jan. 24, 2013) (considering incident report and accusatory instrument that "provide[d] crucial details" about the plaintiff's prosecution), aff'd *on qualified immunity*

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 119 of 529

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

2020 WL 1904088

*grounds*, 751 F.3d 78 (2d Cir. 2014); *cf. Obilo v. City Univ. of City of N.Y.*, No. 01-cv-5118, 2003 WL 1809471, *4 (E.D.N.Y. Apr. 7, 2003) (considering incident report and police complaint that the plaintiff had conceded were "implicitly" incorporated into his conspiracy allegations). The better view, however, adopted by a majority of courts in our Circuit, is that these kinds of police records are not "integral" to a false arrest complaint. *See Bejaoui v. City of New York*, No. 13-CV-5667, 2015 WL 1529633, *4–5 (E.D.N.Y. Mar. 31, 2015) (noting disagreement and declining to consider extrinsic police reports); *Alvarez v. Cty. of Orange*, 95 F. Supp. 3d 385, 394-95 (S.D.N.Y. 2015) (collecting cases). A document is not "integral" simply because its contents are highly relevant to a plaintiff's allegations, but only when it is clear that the plaintiff relied on the document in preparing his complaint. *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156-57 (2d Cir. 2006); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Most typically, "the incorporated document is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but for which some reason ... was not attached to the complaint." *Global Network Commc'ns*, 458 F.3d at 157. "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

Here, there is "no indication in the record that plaintiff relied on these documents in drafting the complaint." *Allyn v. Rockland Cty.*, No. 12-cv-5022, 2013 WL 4038602, *4 (S.D.N.Y. July 30, 2013), *affirmed*, 646 Fed. Appx. 60 (2d Cir. 2016). To the contrary, Plaintiff relies on his own perceptions and recollections, while only making passing reference to the criminal complaint and order of protection. Furthermore, it is not beyond dispute that the police report and narrative are a truthful description of the police officer's basis to arrest Plaintiff. To accept the truth of the documents offered by Defendants at this stage would amount to a premature determination that the arresting officers and the alleged victim are more credible than Plaintiff. To make such a determination at this stage would not be appropriate, and therefore the Court will not consider the facts adduced in these documents. The Court will, however, take judicial notice of the existence of the criminal complaint, supporting affidavit, and order of protection. *See Williams v. City of New York*, No. 14-cv-5123, 2015 WL 4461716, *1 (S.D.N.Y. July 21, 2015) (noting that the court "may take judicial notice of the procedural history of plaintiff's criminal case, but not of the truth of the arresting officers' version of events"); *see also Ribaudo v. Desimone*,

No. 3:18-cv-1190, 2019 WL 1906269, *4 (M.D. Pa. Apr. 5, 2019) (holding that "even if judicial notice is taken of these documents, 'a court may take notice of such documents only to establish their existence and legal effect, or to determine what statements they contained ... not for the truth of the matters asserted' ") (quoting *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 223 (N.D.N.Y. 2014)) (other citation omitted).

## C. *Monell* and Supervisory Liability

 **4** "Under the standards of *Monell v. Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), a municipality can be held liable under [42 U.S.C. § 1983] if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012). Liability under Section 1983 "is imposed on the municipality [only] when it has promulgated a custom or policy that violates federal law and, pursuant to that policy, a municipal actor has tortiously injured the plaintiff." *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a *respondeat superior* basis for the tort of its employee." *Jones*, 691 F.3d at 80. Thus, for a municipality to be held liable under Section 1983 for the unconstitutional actions of its employees, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (internal quotation marks omitted).

"Supervisory liability is a concept distinct from municipal liability, and is 'imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates.' " *Kucera v. Tkac*, No. 5:12-cv-264, 2013 WL 1414441, *4 (D. Vt. Apr. 8, 2013) (quoting *Odom v. Matteo*, 772 F. Supp. 2d 377, 403 (D. Conn. 2011)). Prior to the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Second Circuit required a plaintiff to allege one of the following categories for supervisory liability under § 1983:

> (1) the defendant participated directly
> in the alleged constitutional violation,
> (2) the defendant, after being informed
> of the violation through a report or
> appeal, failed to remedy the wrong,
> (3) the defendant created a policy or

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 120 of 529

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

2020 WL 1904088

custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [persons] by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

In order to succeed on his *Monell* and supervisory liability claims, a plaintiff must first "identify obvious and severe deficiencies" in the policies of the municipal and supervisory defendants and "show a causal relationship" between those deficiencies and his alleged deprivations. *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007). However, to the extent that a plaintiff premises his claims on a failure to train or supervise, such failure "may constitute an official policy or custom [only] if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." *Wray*, 490 F.3d at 195. Similarly, a supervisory defendant is liable only for the creation or continuation of policy that leads to a pattern of unconstitutional conduct or if he demonstrated deliberate indifference in failing to act on information that a pattern of unconstitutional conduct was occurring. *See Colon*, 58 F.3d at 873.

"To establish deliberate indifference a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights." *Jones*, 691 F.3d at 81.

> A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train [or supervise because] [w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen

a training program that will cause violations of constitutional rights.

**\*5** *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)). "[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* at 61 (citation omitted). [1]

[1]   As discussed in more detail below, Plaintiff's complaint fails to set forth any facts sufficient to find either supervisory or municipal liability against any of the named Defendants for any of the listed causes of action.

### D. Cayuga County District Attorney's Office and Auburn Police Department

Plaintiff names the Cayuga County District Attorney's Office as a named Defendant in this case. The caselaw is clear, however, that a district attorney's office is not an entity subject to suit under 42 U.S.C. § 1983. *See Michels v. Greenwood Lake Police Dep't*, 387 F. Supp. 2d 361, 367 (S.D.N.Y. 2005) (citing cases); *Griffith v. Sadri*, No. 07-CV-4824, 2009 WL 2524961, *8 (E.D.N.Y. Aug. 14, 2009). Similarly, Plaintiff has listed the Auburn Police Department as an entity responsible for several of the alleged constitutional violations. *See* Dkt. No. 5 at ¶¶ 51-82. As with the District Attorney's Office, the Auburn Police Department (which is not listed as a Defendant in the caption of the complaint), the Court finds that it must be dismissed because a police department is not an independent, suable entity separate from the municipality in which the police department is located. *See Jenkins v. City of New York*, 478 F.3d 76, 93 (2d Cir. 2007) (citation omitted); *Krug v. City of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (citing cases); *Koulkina v. City of New York*, 559 F. Supp. 2d 300, 315 (S.D.N.Y. 2008) (citing cases).

Accordingly, the Court dismisses Plaintiff's claims against the Cayuga County District Attorney's Office and the Auburn Police Department.

### E. False Arrest

In their motion to dismiss, Defendants contend that, based on Plaintiff's own allegations, probable cause was present

2020 WL 1904088

to believe that he committed the offense for which he was arrested. *See* Dkt. No. 9-1 at 14-16. Defendants claim that Plaintiff "admits that he was charged with violating duly issued orders of protection issued for Linda Fitzsimmons and Lee Joyner, who reside at 140 Wall Street in the City of Auburn. *See id.* at 15 (citing Dkt. No. 5 at ¶ 24). Defendants further claim that Plaintiff "admits he was 'driven by' 140 Wall Street on August 10, 2018." *Id.* (citing Dkt. No. 5 at ¶ 25). Defendants contend that the fact that Plaintiff claims that he was not driving the vehicle "has no bearing on whether the order of protection was reasonably deemed violated by police authorities, and Plaintiff is careful not to deny that he was in fact at 140 Wall Street on the date in question, which is *a per se* violation of the order." *Id.* In response, Plaintiff argues that since he "was arrested for traveling on a public road in route to his own home and in violation of no Order, law or ordinance and, as it cannot be denied that he was 'no billed' by the Grand Jury, it would seem plausible to this writer that any court would agree to the plausibility of Plaintiff's claims." Dkt. No. 10 at 16.

**\*6** In assessing Fourth Amendment claims of false arrest brought under Section 1983, courts generally look to the law of the state in which the arrest is alleged to have occurred. *See Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007) (citation omitted). To prevail on a false arrest claim under New York law, a plaintiff has to prove the following: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (alteration and internal quotation marks omitted) (quoting *Broughton v. State*, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975)); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (outlining the elements of false arrest claims). "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.' " *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)); *see also Ackerson*, 702 F.3d at 19-20 (citing *Weyant*, 101 F.3d at 852). "A police officer has probable cause for an arrest when he has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime[.]' " *Swartz v. Insogna*, 704 F.3d 105, 111 (2d Cir. 2013) (quoting *Weyant*, 101 F.3d at 852); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (same). Such knowledge

or information can be based on information provided by an eyewitness, unless the circumstances would raise a doubt as to the eyewitness' veracity. *See Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citing *Singer*, 63 F.3d at 119). The question is whether the facts known to the arresting officer, at the time of the arrest, objectively provided probable cause to support the arrest. *See Gonzalez*, 728 F.3d at 155.

In the present matter, the Court finds that Defendants' motion to dismiss Plaintiff's false arrest claim must be denied as to Defendant Spinelli. The complaint sufficiently alleges, albeit barely, that Defendant Spinelli lacked probable cause to arrest Plaintiff for the crime of Criminal in the First Degree. Indeed, it is unclear from the complaint whether Plaintiff's conduct was, in fact, in violation of the order of protection. [2]

> [2]  Although the Court is permitting this claim against Defendant Spinelli to survive, the Court has serious doubts about whether the claim would survive a properly supported motion for summary judgment. If the Court were to consider the contents of the criminal complaint, supporting affidavit, and Defendant Spinelli's narrative, the claim would undoubtedly be dismissed. This, however, highlights why the Court believes that it is inappropriate to rely on the contents of these documents at this stage. Without the benefit of discovery, Plaintiff has been unable to question the veracity of the statements contained in those documents. That being said, the criminal complaint and affidavits paint a much less sympathetic picture than the one set out in Plaintiff's complaint.

However, to the extent that Plaintiff attempts to assert a false arrest claim against any other named Defendant, the claim must be dismissed. Plaintiff's complaint is devoid of any facts that would permit the Court to find that any other Defendant was personally involved in the alleged false arrest. Aside from conclusory allegations merely reciting the underlying law, Plaintiff fails to include any facts that plausibly allege the personal involvement of any municipal or supervisory Defendant. For example, Plaintiff alleges that "Defendant Butler, Defendant City and Defendant County have created and tolerated an atmosphere of lawlessness, and have developed and maintained long-standing, department-wide customs, law enforcement related policies, procedures, customs, practices, and/or failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference to the constitutional rights of Plaintiff and of the

Case 5:25-cv-00956-AJB-MJK Document 9 Filed 12/08/25 Page 122 of 529

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

2020 WL 1904088

public." Dkt. No. 78 at ¶ 78. While this allegation accurately reflects what is required to hold municipal and supervisory officials personally liable for the acts of other, the simple recitation of the relevant law is insufficient to withstand a motion to dismiss. Rather, Plaintiff was required to allege facts, specific to his case, demonstrating how these municipal and supervisory Defendants were personally involved in the alleged unconstitutional conduct, which he has failed to do. Simply put, the legal conclusions in Plaintiff's complaint, devoid of any supporting facts, fail to plausibly allege supervisory or municipal liability as to this claim.

**\*7** Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's false arrest claim as to Defendant Spinelli.

### F. Malicious Prosecution

In their motion to dismiss, Defendants argue that Plaintiff's malicious prosecution must be dismissed because the complaint fails to set forth facts plausibly alleging that the prosecution was initiated without probable cause or that any named Defendant acted with the requisite malice. *See* Dkt. No. 9-1 at 16-17. In response, Plaintiff states as follows: "As the plaintiff was arrested for traveling on a public road in route to his own home and in violation of no Order, law or ordinance, as it cannot be denied that he was 'no billed' by the Grand Jury and as he spent 53 days in jail for no reason whatsoever, it would seem plausible to this writer that any court would agree to the plausibility of Plaintiff's claims." Dkt. No. 10 at 17 (citing *Swierkiezicz v. Sorema*, 534 U.S. 506 (2002)). Plaintiff brings his malicious prosecution claim against the City of Auburn, Auburn Police Department, Cayuga County, and Defendant Butler. *See* Dkt. No. 5 at ¶¶ 51-82. While Plaintiff may be confident in the viability of his claim, this Court finds that Plaintiff has failed to plausibly allege facts supporting a claim for malicious prosecution. [3]

[3] Throughout his response, Plaintiff repeatedly states that "the Court is respectfully reminded that it may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *See, e.g.*, Dkt. No. 10 at 17, 18 (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73). Further, Plaintiff repeatedly contends that he "has no duty at this stage to prove his case." *Id.* These basic tenets are not in dispute. What Plaintiff fails to appreciate, however, is that a complaint must be supported by facts specific to his case,

not merely broad assertions of the relevant law poorly disguised as facts. For example, Plaintiff alleges that Defendants engaged in "extreme and outrageous conduct," but fails to explain how any of the conduct alleged could possibly be considered extreme and outrageous. Further, Plaintiff seems to be operating under the assumption that the Court is required to use its imagination to come up with a hypothetical set of facts that could have been pled that would render the claims plausible. *Iqbal* and *Twombly*, however, place no such burden on the Court. Rather, it is incumbent on the plaintiff to set forth the necessary facts specific to his or her case to render the asserted claims plausible.

To prevail on a Section 1983 claim for malicious prosecution, "a plaintiff must show a violation of his rights under the Fourth Amendment ... and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (citations omitted). Under New York law, a plaintiff must plausibly allege four elements to support a malicious prosecution claim: " '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.' " *Id.* (quotation and other citations omitted); *see also Dufort v. City of New York*, 874 F.3d 338, 350 (2d Cir. 2017) (quotation omitted). Initiating a criminal proceeding against a person without probable cause, coupled with a deprivation of liberty, is a Fourth Amendment violation. *See Murphy v. Lynn*, 118 F.3d 938, 944-45 (2d Cir. 1997) (citation omitted).

**\*8** The Second Circuit has held that although "police officers do not generally "commence or continue" criminal proceedings against defendants, a claim for malicious prosecution can still be maintained against a police officer if the officer is found to 'play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.' " *Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015) (quotations omitted). "This element might be satisfied by, for example, showing that an officer generated witness statements or was regularly in touch with the prosecutor regarding the case." *Id.* (citation omitted).

Recently, the New York Court of Appeals acknowledged that it has " 'never elaborated on how a plaintiff in a malicious prosecution case demonstrates that the defendant commenced or continued the underlying criminal proceeding.' " *Torres*

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 123 of 529

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)
2020 WL 1904088

*v. Jones*, 26 N.Y.3d 742, 760-61 (2016) (quotation omitted). "But, by suggesting that a defendant other than a public prosecutor may be liable for supplying false information to the prosecutor in substantial furtherance of a criminal action against the plaintiff, we have implicitly recognized that such conduct may, depending on the circumstances, constitute the commencement or continuation of the prosecution." *Id.* at 761 (citations omitted); *see also Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983) (noting that proof establishing "that the police witnesses" have falsified evidence may create liability for malicious prosecution); *Hopkinson v. Lehigh Val. R.R. Co.*, 249 N.Y. 296, 300-01 (1928) (noting that the falsification of evidence and presentation of that evidence to the prosecutor can constitute commencement of a prosecution).

### *1. Initiation of Criminal Prosecution*

In the present matter, the Court finds that Plaintiff's malicious prosecution claim must be dismissed. Initially, the Court finds that Plaintiff has failed to adequately allege that any named Defendant initiated that the prosecution against him. While Defendant Spinelli filed the criminal complaint against him, nothing in the complaint suggests his participation in Plaintiff's prosecution beyond that. Nearly all cases in which law enforcement officers were found to have initiated or continued a prosecution for purposes of a malicious prosecution claim involve officers who provided knowingly false and/or fabricated evidence to unwitting prosecutors. *See, e.g.*, *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *Ramos v. City of New York*, 285 A.D.2d 284, 299 (1st Dep't 2001). There is a rebuttable presumption that criminal proceedings are initiated by prosecutors, not arresting officers. *See Mitchell v. Victoria Home*, 434 F. Supp. 2d 219, 228 (S.D.N.Y. 2006) (citation omitted). "[I]n the absence of evidence that the police officer misled or pressured the official who could be expected to exercise independent judgment," a claim of malicious prosecution against the officer must fail. *See Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999) (citations omitted).

Plaintiff's complaint is devoid of any allegations that Defendant Spinelli engaged in any of the conduct identified above that would permit the Court to find that Plaintiff plausibly alleged that any party other than the District Attorney initiated the prosecution against him. As such, the Court finds that Plaintiff's malicious prosecution claim is subject to dismissal.

### *2. Malice*

Plaintiff's complaint is also devoid of any facts supporting an inference that the prosecution was instituted with malice. As Defendants correctly note, Plaintiff misconstrues the standard on a motion to dismiss. While Plaintiff is not required to "prove" that Defendants acted in a malicious manner to sustain his claim, he is certainly required to plead enough facts that would make such a conclusion plausible. Plaintiff's complaint fails to plead any facts that would support the inference that any named Defendant (or their employees) acted with the requisite malice to support a malicious prosecution claim. Rather, the complaint simply alleges that he was subjected to normal processes of law. The number of days that Plaintiff spent in jail is irrelevant to this consideration, as is the fact that he was "no billed" by the Grand Jury. Plaintiff does not allege that he had previous interactions with any of the named Defendants, or that his interactions with them during his arrest and subsequent prosecution would indicate a malicious intent. Finally, as to the supervisory and municipal Defendants, Plaintiff has failed to put forth any facts in support of this claim. Rather, the complaint contains nothing but legal conclusions without providing any basis for the Court to conclude that Plaintiff has plausibly alleged a malicious prosecution claim against these Defendants.

**\*9** Accordingly, the Court finds that Plaintiff's malicious prosecution claim is subject to dismissal on this alternative ground.

### *3. Prosecutorial Immunity*

Prosecutors sued under 42 U.S.C. § 1983 enjoy absolute immunity " 'from claims for damages arising out of prosecutorial duties that are "intimately associated with the judicial phase of the criminal process." ' " *Okongwu v. County of Erie*, No. 14CV832, 2017 WL 2686454, *3 (W.D.N.Y. June 22, 2017) (quoting *Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976))). The prosecutor enjoys this absolute immunity because he or she is acting in a quasi-judicial capacity. *See Okongwu v. County of Erie*, No. 14CV832, 2018 WL 1383233, *3 (W.D.N.Y. Mar. 19, 2018). The function performed by the prosecutor defines the scope of this immunity. *See Imbler*, 424 U.S. at 430; *Warney*, 587 F.3d at 121. Acts of advocacy before a court, or preparation to advocate, are absolutely immune, *Imbler*, 424 U.S. at 430-31; *see also Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993), while administrative duties or investigatory functions are not so immune, *Imbler*, 424 U.S. at 431 n.33; *Buckley*, 509 U.S. at 273; *Warney*, 587 F.3d at 121. "This protection encompasses

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 124 of 529

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

2020 WL 1904088

'all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation.' " *Peters*, 848 F. Supp. 2d at 385 (quoting *Barrett v. United States*, 798 F.2d 565, 571-72 (2d Cir. 1986)). As noted by the Second Circuit, "thus, to establish [absolute] immunity, the 'ultimate question' is 'whether the prosecutors have carried their burden of establishing that they were functioning as "advocates" when they engaged in the challenged conduct.' " *Warney*, 587 F.3d at 121 (quoting *Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996)).

Absolute immunity extends from the initiation of a prosecution and presenting a case at trial, *Boria v. Hicks*, No. 5:17-CV-00486, 2017 WL 2983304, *4 (N.D.N.Y. June 14, 2017), through the decision to end it, *see Okongwu*, 2017 WL 2686454, at *4, as well as post-conviction defense of proceedings and the decision whether to vacate a conviction, *Warney*, 587 F.3d at 123; *Peters*, 848 F. Supp. 2d at 387. Absolute immunity applies in the preparation for the initiation of judicial proceedings, but not to the investigative or administrative duties of a prosecutor. *See Warney*, 587 F.3d at 122. In *Peters*, the court listed activities that are investigative or administrative that do not deserve absolute immunity, such as orchestrating a sting operation, authorizing wiretaps, coercing confidential informant to consent to a wire, releasing information to the media, assisting in the execution of a warrant, or supervising and interacting with law enforcement agents to acquire evidence. *See Peters*, 848 F. Supp. 2d at 386 (citing cases).

In the present matter, the Court finds that Defendant Budelmann, as Cayuga County District Attorney is entitled to absolute prosecutorial immunity. In the complaint, Plaintiff alleges that "[o]n October 4, 2018, Defendant district attorney presented Plaintiff's criminal charges to the Grand Jury of Cayuga County where the grand jury 'No Billed' the case; and Plaintiff was released from his illegal confinement at the Cayuga County Jail." Dkt. No. 5 at ¶¶ 26, 91. Further, Plaintiff claims that "Defendant district attorney knew at the time of Plaintiff's case being presented to the Grand Jury of Cayuga County that he would not prevail due to the lack of probable cause." *Id.* at ¶ 29. These allegations make clear that Defendant Budelmann has been sued relating to his role in presenting the case to the grand jury; conduct for which he is entitled to absolute prosecutorial immunity. *See Hill v. City of New York*, 45 F.3d 653, 661-62 (2d Cir. 1995) (holding that "that prosecutors are immune from § 1983 liability for their conduct before a grand jury") (citations omitted); *Bernard v. County of Suffolk*, 356 F.3d 495, 505 (2d Cir. 2004) (citations omitted). Accordingly, Plaintiff's claim of malicious prosecution against Defendant Budelmann is subject to dismissal on this alternative ground.

**\*10** Finally, to the extent that Plaintiff seeks to impute the conduct of Defendant Budelmann to Cayuga County, the claim must necessarily be dismissed. The Second Circuit Court of Appeals has unequivocally held that "prosecutorial acts may not fairly be said to represent official policy of the County," because "[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county." *Baez v. Hennessy*, 853 F.2d 73 (2d Cir. 1988) (internal quotation omitted); *see also Doe v. Smith*, 704 F. Supp. 1177, 1184 (S.D.N.Y. 1988). Since Defendant Budelmann was acting on behalf of the State of New York, and not Cayuga County, any alleged misconduct on Defendant Budelmann's part cannot be imputed to Cayuga County.

### G. Negligent/Intentional Infliction of Emotional Distress

In his sixth cause of action, Plaintiff alleges claims of negligent and intentional infliction of emotional distress against Defendants Butler, Spinelli, and Budelmann. *See* Dkt. No. 5 at ¶¶ 96-98. Defendants contend these claims fail as a matter of law. *See* Dkt. No. 9-1 at 19-20.

As to the claim of negligent infliction of emotional distress, it is well settled that a " 'plaintiff seeking damages for an injury resulting from a wrongful arrest and detention may not recover under broad general principles of negligence ... but must proceed by way of the traditional remedies of false arrest and imprisonment.' " *Greenaway v. Cty. of Nassau*, 97 F. Supp. 3d 225, 239 (E.D.N.Y. 2015) (quoting *Secard v. Dep't of Soc. Servs. of Cnty. of Nassau*, 204 A.D.2d 445, 612 N.Y.S. 2d 167, 168 (2d Dep't 1994)). This is precisely what Plaintiff is attempting to do here. Tacking on a claim for negligent infliction of emotional distress without any other facts or assertions is insufficient under the relevant law. Moreover, even if this claim could be considered independent of Plaintiff's false arrest claim, it is still subject to dismissal because Plaintiff has not alleged any facts demonstrating that Defendants breached a duty owed to Plaintiff. As such, the Court grants Defendants' motion to dismiss as to Plaintiff's claim of negligent infliction of emotional distress.

As to the intentional infliction of emotional distress claim, it too must be dismissed. "Intentional infliction of emotional distress has four elements: '(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial

Case 5:25-cv-00956-AJB-MJK     Document 9     Filed 12/08/25     Page 125 of 529

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

2020 WL 1904088

probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.' " *Greenaway*, 97 F. Supp. 3d at 239-40 (quoting *Howell v. N.Y. Post Co., Inc.*, 81 N.Y.2d 115, 596 N.Y.S. 2d 350, 612 N.E. 2d 699, 702 (1993)). "The 'extreme and outrageous conduct' must 'go beyond all possible bounds of decency' and be 'atrocious, and utterly intolerable in a civilized community.' " *Id.* (quotation and other citation omitted).

Here, Plaintiff claims that Defendants Budelmann, Spinelli, and Butler engaged in "extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to Plaintiff." Dkt. No. 5 at ¶ 97. Notably absent from the complaint is any explanation what this "extreme and outrageous conduct" was. " 'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 302 (1983) (quotation omitted). The threadbare facts alleged by Plaintiff, which include the fact that he was arrested and eventually released after the grand jury refused to indict, fall far short of this strict standard.

**\*11** Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's claims for negligent and intentional infliction of emotional distress.

### H. Negligence

In his seventh cause of action, Plaintiff asserts a claim for negligence. *See* Dkt. No. 5 at ¶¶ 100-04. In this claim, Plaintiff argues that his arrest, Defendants' failure to "follow the criminal law of the State of New York," and Plaintiff's fifty-three days of incarceration, were the product of Defendants' negligence. *See id.*

"To prevail on a claim for negligence under New York law, a plaintiff must establish '(1) the existence of a duty on the defendant's part as to the plaintiff; (2) a breach of that duty; and (3) resultant injury to the plaintiff.' " *Frederique v. County of Nassau*, 168 F. Supp. 3d 455, 485 (E.D.N.Y. 2016) (quotation omitted). "However, '[u]nder New York law, harm predicated on an intentional act may not give rise to a claim of negligence.' " *Id.* (quotation and other citation omitted). Moreover, it is well settled that, "[u]nder New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the

appropriate degree of care in effecting an arrest or initiating a prosecution." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) (citing *Boose v. City of Rochester*, 71 A.D.2d 59, 421 N.Y.S.2d 740, 743 (4th Dept. 1979)) (other citation omitted).

In the present matter, the Court finds that Plaintiff's negligence claim must be dismissed as it is simply redundant of Plaintiff's claims of false arrest, false imprisonment, and malicious prosecution. Accordingly, the Court grants Defendants' motion to dismiss as to this claim.

### I. Deliberate Indifference to Serious Medical Needs

In his eighth cause of action, Plaintiff claims that "Defendant Medical Staff and Defendant Cayuga County Sheriff's Department" were deliberately indifferent to his medical care and treatment after he was injured when a water pipe broke outside his cell on August 31, 2018. *See* Dkt. No. 5 at ¶¶ 105-14.

A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citations omitted). A pretrial detainee's claims are evaluated under the Due Process Clause because, " '[p]retrial detainees have not been convicted of a crime and thus 'may not be punished in any manner — neither cruelly and unusually nor otherwise.' " *Id.* (quotations omitted).

"A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions." *Darnell*, 849 F.3d at 29 (citation omitted). "This means that a pretrial detainee must satisfy two prongs to prove a claim, an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a 'subjective prong' — perhaps better classified as a *'mens rea* prong' or 'mental element prong' — showing that the officer acted with at least deliberate indifference to the challenged conditions." *Id.* "The reason that the term 'subjective prong' might be a misleading description is that, as discussed below, the Supreme Court has instructed that 'deliberate indifference' roughly means 'recklessness,' but 'recklessness' can be defined subjectively (what a person actually knew, and disregarded), or objectively (what a reasonable person knew, or should have known)." *Id.* (citing

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 126 of 529

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

2020 WL 1904088

*Farmer v. Brennan*, 511 U.S. 825, 836-37, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)).

**\*12** Under both the Eighth and Fourteenth Amendments, to establish an objective deprivation, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health," which includes the risk of serious damage to "physical and mental soundness." *Id.* at 30 (citations omitted). "There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.' " *Id.* (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995) (citing *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981))). For example, the Second Circuit has " 'held that prisoners may not be deprived of their basic human needs — *e.g.*, food, clothing, shelter, medical care, and reasonable safety — and they may not be exposed to conditions that pose an unreasonable risk of serious damage to [their] future health.' " *Id.* (quoting *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)).

" '[C]onditions of confinement may be aggregated to rise to the level of a constitutional violation, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.' " *Darnell*, 849 F.3d at 30 (quotations omitted). "Unsanitary conditions, especially when coupled with other mutually enforcing conditions, such as poor ventilation and lack of hygienic items (in particular, toilet paper), can rise to the level of an objective deprivation." *Id.* (citations omitted).

The second element of a conditions of confinement claim brought under the Due Process Clause of the Fourteenth Amendment is the defendant's "deliberate indifference" to any objectively serious condition of confinement. *See Darnell*, 849 F.3d at 32. Courts have traditionally referred to this second element as the "subjective prong." "But 'deliberate indifference,' which is roughly synonymous with 'recklessness,' can be defined either 'subjectively' in a criminal sense, or 'objectively' in a civil sense." *Id.* As such, the "subjective prong" might better be described as the "*mens rea* prong" or "mental element prong." *Id.*

Under the second prong of the deliberate indifference analysis, the Court must consider whether the defendants "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even

though [they] knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. Under this standard, the plaintiff "must prove that [the defendants] acted intentionally or recklessly, and not merely negligently.' " *Id.* at 36.

In the present matter, the Court finds that Plaintiff has failed to plausibly allege a claim of deliberate indifference under the Fourteenth Amendment. Initially, the Court notes that the "medical staff" at the Cayuga County Jail were not named as defendants in this action. Rule 10(a) requires a plaintiff to "name all the parties" in the Complaint. *See* Fed. R. Civ. P. 10(a). Although the naming of pseudonymous defendants is permissible where a plaintiff requires discovery to learn the true identities of the defendants, the plaintiff subsequently must amend the complaint to reflect the discovered identities and effect service on the named parties within the 120-day time period set forth in Rule 4(m). *See Petty v. Cty. of Franklin*, 478 F.3d 341, 345–46 (6th Cir. 2007).

Here, Plaintiff has not brought suit against any pseudonymous defendants, and only makes reference to these unidentified individuals in the body of the complaint. If Plaintiff had intended to sue then-unknown members of the medical staff at the jail, he should have brought suit against "John and/or Jane Doe" defendants, who could be identified through discovery. Upon obtaining their identities, Plaintiff would then be required to amend his complaint to reflect the Doe defendants' identities. *See Simmons v. District of Columbia*, 750 F. Supp. 2d 43, 45 (D.D.C. 2011) (holding that a plaintiff "may bring an action against unknown John Doe defendants, but plaintiff must substitute named defendants for those unknown defendants after the completion of discovery") (citations omitted); *see also Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995) (holding that "[a]n action may proceed against a party whose name is unknown if the complaint makes allegations specific enough to permit the identity of the party to be ascertained after reasonable discovery"). Here, Plaintiff has not brought suit against unknown members of the medical staff at the Cayuga County Jail or providing any facts that would permit Defendants to assist in obtaining their identities. As such, the only potential deliberate indifference claim asserted in the complaint is a municipal liability claim against Defendant Cayuga County.

**\*13** In his complaint, Plaintiff has alleged that a water pipe burst outside his cell during the night, the water was turned off, and at some point during the night it pooled near his cell's

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 127 of 529

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

2020 WL 1904088

toilet. *See* Dkt. No. 5 at ¶¶ 109-13. At sometime between 6:30 a.m. and 7:00 a.m., Plaintiff claims that he got out of bed to use the toilet in his cell and slipped and fell on the wet floor. *See id.* at ¶ 110. Plaintiff alleges that, when he fell, he hit his head and neck on his bunk and his lower back on the floor, causing severe injuries, including a herniated disc in his neck and lower lumbar strain. *See id.* at ¶¶ 111-13. Plaintiff claims that, "[a]fter the injury up and until Plaintiff was released on October 4, 2018[,] Plaintiff was denied medical treatment for his injuries that he suffered inclusive of medication and treatment from a physician." *Id.* at ¶ 114.

Initially, the Court notes that nothing in the complaint indicates that Plaintiff's alleged injury was caused by a municipal custom, policy, or usage, as is required to find a plausible claim against Defendant Cayuga County. Rather, Plaintiff claims that a water pipe leaked outside his cell during the night and that a "correctional officer ... turn[ed] off the water and clean[ed] up the water spill. At that time, there was no water in Plaintiff's cell." Dkt. No. 5 at ¶ 108. When the second pipe leaked, some water entered Plaintiff's cell, which caused Plaintiff to fall. *See id.* at ¶ 109. This isolated incident, involving a bursting water pipe, is woefully insufficient to plausibly allege municipal liability for Plaintiff's alleged injury. *See* Connick, 131 S. Ct. at 1360; *see also* Plair v. City of New York, 789 F. Supp. 2d 459, 470 (S.D.N.Y. 2011) ("[I]t is well established that a single incident does not give rise to an unlawful practice by subordinate officials so permanent and well-settled as to constitute custom or usage") (internal quotation marks omitted); Giaccio v. City of New York, 308 Fed. Appx. 470, 472 (2d Cir. 2009) (finding that allegations of, at most, four prior incidents of misconduct "falls far short of establishing a practice that is 'so persistent or widespread' as to justify the imposition of municipal liability") (internal quotation marks omitted).

Even assuming that Plaintiff had asserted this claim against an individually named Defendant, the claim would still be dismissed. To satisfy the second prong of a deliberate indifference claim, Plaintiff must plausibly allege facts suggesting that a defendant "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though [they] knew, or should have known, that the condition posed an excessive risk to health or safety." Darnell, 849 F.3d at 35. At best, the facts set forth in the complaint describe negligence on the part of the correctional staff, which is insufficient to support a claim of deliberate indifference. *See* id. at 36.

Finally, to the extent that Plaintiff is basing his claim on the alleged deprivation of medical care after his accident, Plaintiff has failed to provide any factual basis in support of his conclusory assertion that he "was denied medical treatment for his injuries that he suffered inclusive of medication and treatment from a physician." Dkt. No. 5 at ¶ 114. The complaint fails to allege that he brought his alleged injuries to the attention of the correctional or medical staff at the Cayuga County jail (or even identify any such individual).

Based on the foregoing, the Court grants Defendants' motion to dismiss as to Plaintiff's deliberate indifference claim.

### IV. CONCLUSION

After carefully the entire record in this matter, parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**\*14** **ORDERS** that Defendants' motion to dismiss (Dkt. No. 9) is **GRANTED in part** and **DENIED in part**;[4] and the Court further

[4]    As a result of this Memorandum-Decision and Order, the only remaining claim is Plaintiff's false arrest claim against Defendant Spinelli.

**ORDERS** that Defendants City of Auburn, Butler, Cayuga County, Cayuga County District Attorney's Office, and Budelmann are **TERMINATED** as Defendants in this action; and the Court further

**ORDERS** that Defendants' letter motion a portion of the argument raised in their motion to dismiss (Dkt. No. 15) is **DENIED as moot**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1904088

**Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)**

2020 WL 1904088

---

**End of Document**                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 5:20-CV-00060**<br>Joyner v. Spinelli | — | N.D.N.Y. | Jan. 15, 2020 | Docket |

**History**

There are no History results for this citation.

2012 WL 2569085
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Ronald MOYE, Plaintiff,
v.
The CITY OF NEW YORK; Sgt. Nelson Caban,
P.O. Paul Jeselon, P.O. Samuel Fontanez, P.O.
Edward Simonetti, P.O. Matthew Boorman, P.O.
Frank Papa, P.O. Tawaina O'Neal, P.O. Brennan;
P.O. John; and A.D.A. Dustin Chao, Defendants.

No. 11 Civ. 316(PGG).
|
July 3, 2012.

### MEMORANDUM OPINION & ORDER

PAUL G. GARDEPHE, District Judge.

**\*1** Plaintiff Ronald Moye has brought claims against the
City of New York, former New York County Assistant
District Attorney Dustin Chao, and eight members of the New
York City Police Department ("NYPD") under 42 U.S.C.
§ 1983 and state law. Moye claims that Chao is liable for
damages under Section 1983 and state law for malicious
prosecution, abuse of process, denial of a fair trial, fabrication
of evidence, conspiracy "to inflict an unconstitutional injury,"
and intentional and negligent infliction of emotional distress.
(Am. Cmplt., Second, Third, Fourth, Fifth, Sixth, Seventh,
and Ninth Claims) Chao has moved to dismiss the Amended
Complaint on grounds of absolute immunity. For the reasons
stated below, Chao's motion to dismiss will be granted.

### BACKGROUND

For purposes of deciding Defendant Chao's motion to dismiss,
the Court has assumed that the following facts presented in
the Amended Complaint are true.

### I. MOYE'S ARREST
On or about March 12, 2002, at approximately 8:00
p.m., NYPD officers Paul Jeselson and Tawaina O'Neal
were stationed on the rooftop of an apartment building

on the south side of West 118th Street near the corner
of Morningside Avenue conducting nighttime narcotics
surveillance. (Am.Cmplt.¶¶ 19, 22) Plaintiff's car was located
on the north side of West 118th Street, near Manhattan
Avenue. (*Id.* ¶ 21) Officer Jeselson claimed that he observed
Plaintiff "extend his hand from the driver's side window and
hand a small glassine" to another individual—later arrested
—who, in turn, handed it to an unapprehended customer. (*Id.*
¶ 20) The Defendant officers moved in and arrested Moye in
the vicinity of 352 West 118th Street. (Am.Cmplt.¶¶ 12, 25)

At the time of the arrest, and later at the 28th Precinct, the
officers searched Moye and his car and found United States
currency, both in Moye's possession and inside the vehicle.
(*Id.* ¶ 27) The Defendant officers unnecessarily grabbed
Moye, pushed him, and placed excessively tight handcuffs on
him (*id.* ¶ 30), causing him to suffer bruises to and numbness
in his wrists. (*Id.* ¶ 32)

Moye was indicted on March 22, 2002, for Criminal
Possession of a Controlled Substance in the Third Degree.
(Am. Cmplt. ¶ 35; Schwartz Decl., Ex. A) Plaintiff alleges that
the police officer defendants "conspired [to give] and gave
false testimony and intentionally placed false evidence before
the grand jury." [1] (Am.Cmplt.¶ 35)

[1]     The Amended Complaint does not disclose what
false testimony or other false evidence was laid
before the grand jury. Moreover, there is no
suggestion that Chao was involved in presenting
false testimony or false evidence to the grand jury.

### II. MOYE'S FIRST TRIAL
Moye's first trial began on January 14, 2003. (Schwartz Decl.,
Ex. B) A.D.A. Chao introduced photographs at trial which
he claimed showed the position of Plaintiff s car as it was
parked on West 118th Street. (Am.Cmplt.¶ 38) Chao, Officer
Jeselson, and Officer Papa were present when a District
Attorney's office photographer took these photos in June 2002
from the March 12, 2002 observation point. (*Id.* ¶¶ 41–42,
44) Although the photographs were intended to convey the
vantage point of the officers on the night of the arrest, they did
not replicate the "nighttime conditions." (*Id.* ¶ 45) According
to Moye, these photographs nonetheless showed that the
officers could not have seen Plaintiff extend his hand from
the driver's side window and pass a small glassine to another
individual, because the driver's side could not be seen from
the vantage point of the rooftop observation post, even with
binoculars. (*Id.* ¶¶ 46, 48) At trial, Officer Jeselson admitted

2012 WL 2569085

that "he was not able to see the driver's side of the vehicles in the photographs." (*Id.* ¶ 47) Jeselson nonetheless claimed that he had been able to see Moye's hand "during the nighttime observation." (*Id.* ¶ 39) The first trial ended in a mistrial, with the jury unable to reach a verdict. (*Id.* ¶ 49)

### III. *MOYE'S SECOND TRIAL*
***2** In February 2003, A.D.A. Chao, Officers Brennan and Jeselson, and D.A's Office photographer Nancy Badger returned to West 118th Street to take more photographs. (*Id.* ¶ 53) They repositioned the car on an angle in order to make it appear that the officers would have been able to see Moye's hand outside the driver's side window on the night of his arrest. (*Id.* ¶¶ 55–60) With the car positioned in this fashion, Jeselson and Chao instructed Badger to take photographs of Officer Brennan's hand outside the driver's side window in an effort to simulate what the officers would have seen that night. (*Id.* ¶¶ 60–61) Jeselson and Chao then had Brennan move the car back to a curbside position "where additional photographs [were] taken at a wide angle to falsely give the impression that the close-ups were merely enlargements of the vehicle parked along the curb." (*Id.* ¶ 63)

At Moye's second trial, Chao introduced these new photographs and elicited testimony from Jeselson in which he used the photographs to support his claim that he was able to see Moye's hand from the rooftop observation post. (*Id.* ¶¶ 66, 74) However, Badger testified that, in taking the new photographs, "the defendants moved the vehicle to an angle where the hand could be visible." Defendants then returned the vehicle to its curbside position and took additional photographs that "falsely give the impression that the close-ups were merely enlargements of the vehicle parked along the curb." (*Id.* ¶¶ 81–84)

In summation, Moye's lawyer argued that Jeselson had lied about his observations from the roof and the positioning of the car in the photographs introduced by the prosecution.

(*Id.* ¶ 85) In response, A.D.A. Chao argued that Officer Jeselson had no opportunity to frame the defendant, because Chao had been present at the observation post:

 "[Defense counsel] spoke about people on that roof. It's in evidence. Officer Jeselson was on that roof, the photographer Laura Badger was on the roof, and I was on that roof. Now, if he is directing something improperly, that is Officer Jeselson, well, it's in front of me.

"And if he knew he was going to get away with it when I say that's the opportunity, you know [defense counsel] talked about a lot of people losing their jobs about perjuring themselves, about the integrity of Robert Morgenthau's office. Well, if Officer Jeselson thought he was going to get away with it—

"[DEFENSE counsel]: Mr. Chao is vouching for his witness.

"THE COURT: Overruled.

"[ADA] CHAO: If Officer Jeselson thought he was going to get away with it with me present, all that talk about firing, that should be me because I'm prosecuting this case, not Officer Jeselson.

"[DEFENSE counsel]: That's objectionable vouching for his witness.

"THE COURT: Overruled.

"[DEFENSE counsel]: Your Honor, he is making himself an unsworn witness for the credibility of his police officer.

***3** "THE COURT: Overruled.

"[ADA] CHAO: Ladies and gentlemen, Mr. Morgenthau should fire me if Officer Jeselson thinks he is going to be able to say that in court, lie to you, when the person who is standing right next to him on that roof is me. Well, that lies with me.

"So what's the explanation? If there's no motive, no opportunity for why Ms. Badger remembers it differently. Well, there's evidence that you heard the officer was on the roof. Evidence that you heard I was on the roof also. I have no other answer other than the fact that she is mistaken....

"[DEFENSE counsel]: He is vouching for his witness using the pronoun I.

"THE COURT: Members of the jury, you can accept his argument as to what happened on the roof. It's his argument based upon the evidence as he recalls it."

*People v. Move,* 52 A.D.3d 1, 5 (1st Dep't 2008); *see also* (Am. Cmplt. ¶¶ 87–92.

Moye was convicted at his second trial and sentenced to four-and-a-half to nine years' imprisonment. (Am.Cmplt.¶¶ 13–14)

## IV. *THE CHARGES AGAINST MOYE ARE DISMISSED*

On appeal, the First Department vacated the conviction in a 3–2 decision. *People v. Move,* 52 A.D.3d 1. The First Department found that "the prosecutor improperly vouched for his witness and interjected his personal integrity and the veracity of the District Attorney's office into his summation to support the credibility of Police Office Jeselson." *Id.* at 6. The New York Court of Appeals agreed that Chao had engaged in impermissible vouching for his witness, affirmed the reversal of the conviction, and remanded the case to Supreme Court. *People v. Move,* 12 N.Y.3d 743, 744 (2009). After remand, the New York County District Attorney's Office dismissed the case on October 21, 2009. (Am.Cmplt.¶¶ 16, 37)

### DISCUSSION

## I. *IMMUNITY*

Chao argues that the claims against him must be dismissed because his actions are protected by absolute immunity.[2]

[2]  Because Moye sues Defendant Chao in his individual capacity (Am .Cmplt.¶ 9), his claims are not barred by the Eleventh Amendment. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("To the extent that ... a [Section 1983] claim is asserted against a [state official] in his individual capacity, he may assert privileges of absolute or qualified immunity but may not assert immunity under the Eleventh Amendment.").

Section 1983 "purports to create a damages remedy against every state official for the violation of any person's federal constitutional or statutory rights." *Kalina v. Fletcher,* 522 U .S. 118, 123 (1997). In order to state a claim under Section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution. *Newton v. City of New York,* 566 F.Supp.2d 256, 269–70 (S.D.N.Y.2008) (citing *Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004)).

"Although section 1983 imposes liability upon every person who deprives another of a constitutional right under color of state law, the doctrines of absolute and qualified immunity shield prosecutors and law enforcement officers from liability related to their official acts." *Day v. Morgenthau,* 909 F.2d 75, 77 (2d Cir.1990). While Section 1983 does not explicitly provide for such immunity, the Supreme Court and Second Circuit have ruled that "Congress did not intend § 1983 to abrogate immunities 'well grounded in history and reason.' " *Pinaud v. Cnty. of Suffolk,* 52 F.3d 1139, 1147 (2d Cir.1995) (quoting *Buckley v. Fitzsimmons,* 509 U.S. 259, 268 (1993)).

**\*4**  As the Second Circuit has explained:

Such immunities are of two types: absolute and qualified. *Buckley v. Fitzsimmons,* 509 U.S. 259, 268, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). Absolute immunity is reserved for officials who perform "special functions" and deserve absolute protection from damages liability. Among these are prosecutors, and persons working under their direction, when they function as advocates for the state in circumstances "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman,* 424 U.S. at 430–31. *See also Hill v. City of New York,* 45 F.3d at 660 (extending absolute prosecutorial immunity to persons acting under the direction of prosecutors in performing functions closely tied to the judicial process).

By contrast, only qualified immunity applies to law enforcement officials, including prosecutors, when they perform investigative functions. *Buckley v. Fitzsimmons,* 509 U.S. at 273. ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.") (internal quotation marks and citations omitted); *accord Zahrey v. Coffey,* 221 F.3d 342, 349 (2d Cir.2000).

*Bernard v. Cnty. of Suffolk,* 356 F.3d 495, 502–03 (2d Cir.2004).

Absolute immunity extends only so far as necessary to protect the judicial process. *Hill v. City of New York,* 45 F.3d 653, 660 (2d Cir.1995). Nonetheless,

[t]he doctrine of absolute prosecutorial immunity creates a formidable obstacle for a plaintiff seeking to maintain a civil rights action against a district attorney, as it provides that "prosecutors are absolutely immune from liability under § 1983 for their conduct in 'initiating a prosecution and in presenting the State's case,' insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.' " *Burns v. Reed,* 500 U.S. 478, 486, 111

S.Ct. 1934, 1939, 114 L.Ed.2d 547 (1991) (quoting *Imbler,* 424 U.S. at 430–31, 96 S.Ct. at 995).

*Pinaud,* 52 F.3d at 1147. The Court addresses the parameters of absolute prosecutorial immunity below.

**A. *Legal Standard for Absolute Prosecutorial Immunity***
A prosecutor who, as here, is sued in his or her individual capacity, may assert absolute or qualified immunity as a defense. Courts may grant a Rule 12(b)(6) motion to dismiss on grounds of absolute immunity where the facts establishing the defense appear in the complaint. *Deronette v. City of New York,* No. 05 CV 5275(SJ), 2007 WL 951925, at *4 (E.D.N.Y. Mar. 27, 2007) (citing *Hill,* 45 F.3d at 663) (absolute immunity may be decided on a Rule 12(b)(6) motion where facts establishing the defense may be "gleaned from the complaint"). Moreover, district courts are encouraged to determine the applicability of an absolute immunity defense at the earliest appropriate stage, and preferably before discovery.[3] *Id.* (citing *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)); *United States v. Colbert,* No. 87 Civ. 4789, 1991 WL 183376 at *4 (S.D.N.Y. Sept. 11, 1991). This approach is appropriate given that "absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." *Imbler,* 424 U.S. at 419 n. 13. "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Buckley,* 509 U.S. at 270 (1993) (citing *Burns,* 500 U.S. at 486).

[3]     District courts likewise evaluate the applicability of absolute immunity before assessing whether a plaintiff has sufficiently alleged a constitutional violation. *Pinaud,* 52 F.3d at 1148 n. 4 (citing *Buckley,* 509 U.S. at 261).

**\*5** Prosecutorial immunity to Section 1983 claims is grounded in the immunity to tort liability that prosecutors enjoy under the common law. *Flagler v. Trainor,* 663 F.3d 543, 546 (2d Cir.2011) That immunity arises from the "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Id.* (citing *Imbler,* 424 U.S. at 423). Immunity protects the proper functioning of the prosecutor's office by insulating the exercise of prosecutorial discretion. *Kalina,* 522 U.S. at 125. Prosecutors are therefore "absolutely immune from suit only when acting as advocates and when

their conduct involves the exercise of discretion." *Flagler,* 663 F.3d at 546 (citing *Kalina,* 522 U.S. at 127).

The Supreme Court addressed the question of absolute immunity for prosecutors in *Imbler,* where it held that prosecutors are entitled to absolute immunity for damage suits under Section 1983 for all acts "intimately associated with the judicial phase of the criminal process," including "initiating a prosecution and ... presenting the State's case [at trial]." *Imbler,* 424 U.S. at 430.

Later, in *Buckley,* 509 U.S. at 273, the Supreme Court considered whether the prosecutor defendants were entitled to absolute immunity for "investigative" work they performed well before seeking an indictment, involving an effort to connect the plaintiff to a bootprint left at a murder scene. Although the Court rejected the prosecutors' claim for absolute immunity, the Court cautioned that it had

> not retreated ... from the principle
> that acts undertaken by a prosecutor
> preparing for the initiation of judicial
> proceedings or for trial, and which
> occur in the course of his role
> as an advocate for the State, are
> entitled to the protections of absolute
> immunity. Those acts must include
> the professional evaluation of the
> evidence assembled by the police
> and appropriate preparation for its
> presentation at trial or before a grand
> jury after a decision to seek an
> indictment has been made.

*Buckley,* 509 U.S. at 273 (internal citations and quotations omitted).

Whether a prosecutor has absolute immunity for a particular act thus "depends principally on the nature of the function performed, not on the office itself." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 530 (2d Cir.1993). "Such functions include the decision to bring charges against a defendant, presenting evidence to a grand jury, and the evaluation of evidence prior to trial." *Johnson v. City of New York,* No. 00 CIV 3626(SHS), 2000 WL 1335865, at *2 (S.D.N.Y. Sept. 15, 2000) (citing *Kalina,* 522 U.S. at 126). Furthermore, this "application of immunity is not limited to the duties a

prosecutor performs in the courtroom." *Dory v. Ryan,* 25 F.3d 81, 83 (2d Cir.1994) (citing *Buckley,* 509 U.S. at 272).

**\*6** "[A] district attorney is [not only] absolutely immune from civil liability for initiating a prosecution and presenting the case at trial," but also "immune for conduct in preparing for those functions; for example, evaluating and organizing evidence for presentation at trial or to a grand jury, or determining which offenses are to be charged." *Hill,* 45 F.3d at 661 (citations omitted). Prosecutorial immunity from Section 1983 damages liability is broadly defined, covering "virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate." *Dory,* 25 F.3d at 83. The Second Circuit has been "mindful of the Supreme Court's admonition that 'the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom.... Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence.' " *Barbera v. Smith,* 836 F.2d 96, 100 (2d Cir.1987) (quoting *Imbler,* 424 U.S. at 431 n. 33); *see also Barrett v. United States,* 798 F.2d 565, 571 (2d Cir.1986) ("The absolute immunity accorded to government prosecutors encompasses not only their conduct of trials but all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation....")

Because absolute immunity extends broadly to all acts committed by a prosecutor in his or her role as an advocate, it protects prosecutors against claims that they conspired to, or actually presented, fabricated evidence at trial:

> absolute immunity protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, associated with his function as an advocate. This would even include ... allegedly conspiring to present false evidence at a criminal trial. The fact that such a conspiracy is certainly not something that is properly within the role of a prosecutor is immaterial, because "[t]he immunity attaches to his function, not to the manner in which he performed it." *Barrett v. United States,* 798 F.2d 565, 573 (2d Cir.1986); *see also Daloia v. Rose,* 849 F.2d 74, 75 (2d Cir.1988) (*per curiam* ) (holding ... that prosecutor was immune from § 1983 liability for knowingly presenting false testimony). As much as the idea of a prosecutor conspiring to falsify evidence [is disturbing] ... there is a greater societal goal in protecting the judicial process by preventing perpetual suits against prosecutors for the

performance of their duties. *See Imbler,* 424 U.S. at 426–428.

*Dory,* 25 F.3d at 83.[4]

[4]    By contrast, discretionary prosecutorial actions that are not "intimately associated with the judicial phase of the criminal process" are entitled only to qualified immunity. *See Buckley,* 509 U.S. at 270–75; *Burns,* 500 U.S. at 491–95. A prosecutor is "absolutely immune from liability under section 1983 [only] for acts 'within the scope of [their] duties in initiating and pursuing a criminal prosecution.' " *Day,* 909 F.2d at 77 (quoting *Imbler,* 424 U.S. at 410). Thus, when a prosecutor acts in an investigative or administrative capacity, absolute immunity is not available. *Hill,* 45 F.3d at 661. For example, immunity is not available when a prosecutor releases information or evidence to the media, *Buckley,* 509 U.S. at 276–78; authorizes or directs the use of wiretaps, *Powers v. Coe,* 728 F.2d 97, 103 (2d Cir.1984); or performs the functions normally performed by the police, such as assisting in the execution of a search or seizure. *See Buckley,* 509 U.S. at 273. The Supreme Court has also withheld absolute immunity for conduct unrelated to advocacy, such as giving legal advice, *Burns,* 500 U.S. at 492–96, or acting as a complaining witness. *Kalina,* 522 U.S. 118, 129–31; *see also Ying Jing Gan,* 996 F.2d at 533 (finding that prosecutor was not entitled to absolute immunity where he allegedly exposed a witness to retaliation and failed to provide adequate protection for the witness).

Although courts have declined to establish a bright-line test based on the stage of a criminal proceeding, "absolute prosecutorial immunity has generally been found in cases where some type of formal proceeding had been commenced or was being commenced by the conduct at issue." *Tabor v. New York City,* No. 11 CV 0195 FB, 2012 WL 603561, at \*4 (E.D.N.Y.2012) (citing *Barbera v. Smith,* 836 F.2d at 99. In contrast, where formal proceedings have not begun and the prosecutor is acting in an investigative capacity—such as by providing the police with legal advice on investigative techniques—qualified immunity generally applies. *Id.* While the Supreme Court has noted that a prosecutor is not absolutely immune for every action taken after probable cause has been established, *see Buckley,* 509 U.S. at 274 n. 5, "the Court's treatment of the issue demonstrates that

the existence of probable cause with respect to a particular suspect is a significant factor to be used in evaluating the advocatory nature of prosecutorial conduct." *Cousin v. Small,* 325 F.3d 627, 633 (5th Cir.2003); *accord Barbera,* 836 F.2d at 99 (noting "that in each of the cases we have reviewed where absolute immunity was upheld, some type of formal proceeding had been commenced or was being commenced by the challenged acts"); *see also DiBlasio v. Novello,* 344 F.3d 292, 300–01 (2d Cir.2003) ( "In assessing whether absolute immunity should attach to a prosecutor ... we have focused on the timing of the conduct at issue....") Thus, in interpreting *Buckley,* the Second Circuit has distinguished between "preparing for the presentation of an existing case," on the one hand, and attempting to "furnish evidence on which a prosecution could be based," on the other hand, with only the former entitling a prosecutor to absolute immunity. *Smith v. Garretto,* 147 F.3d 91, 94 (2d Cir.1998).

**\*7** In assessing a prosecutor's claim of absolute immunity, the court employs a "functional approach," *see, e.g., Burns,* 500 U.S. at 486, which looks to "the nature of the function performed, not the identity of the actor who performed it." *Forrester v. White,* 484 U.S. 219, 229 (1988); *see also Van de Kamp v. Goldstein,* 555 U.S. 335, 335–336 (2009) ("To decide whether absolute immunity attaches to a particular kind of prosecutorial activity, one must take account of ... 'functional' considerations"). The court must inquire whether the actions in question are part of a prosecutor's traditional function and whether they are closely associated with the judicial process. *Blouin v. Spitzer,* 356 F.3d 348, 357 (2d Cir.2004) (a court must examine the "nature of the function performed" in assessing whether absolute immunity will attach.); *Doe v. Phillips,* 81 F.3d 1204, 1209 (2d Cir.1996).

### B. *Analysis*

#### 1. *Malicious Prosecution, Abuse of Process*

To the extent that the Amended Complaint seeks to hold Chao liable for initiating the prosecution of Moye, absolute immunity is clearly applicable. *Shmueli v. City of New York,* 424 F.3d 231, 237 (2d Cir.2005) ("[T]he prosecutor is shielded from liability for damages for commencing and pursuing the prosecution, regardless of any allegations that his actions were undertaken with an improper state of mind or improper motive."); *see also Hill,* 45 F.3d at 660–61 (holding that prosecutors and those working under their direction are absolutely immune for claims relating to the initiation of a prosecution and for conduct before a grand jury). Plaintiff s

federal and state law claims alleging malicious prosecution and abuse of process will therefore be dismissed.[5]

5    Absolute immunity is a defense not only to Section 1983 claims but to related state law claims. *See Shmueli,* 424 F.3d at 238 (dismissing Section 1983 and related state law malicious prosecution claims); *Arum v. Miller,* 331 F.Supp.2d 99, 112 (E.D.N.Y.2004) (dismissing abuse of process and civil conspiracy claims on grounds of absolute prosecutorial immunity); *Imbler,* 424 U.S. at 424 (same principles require conferral of absolute immunity for damage claims against prosecutors under Section 1983 and state law).

#### 2. *Creation of Misleading Photographs, Conspiracy to Present False Evidence at Trial*

Moye alleges that Chao, in preparation for Moye's second trial, returned to West 118th Street and instructed Nancy Badger—the District Attorney's office photographer—to take photographs that inaccurately represented the position of Moye's car on the night of his arrest. Chao then presented these photographs at the second trial. (Am.Cmplt.¶¶ 38, 40, 50, 50–54, 66–67) Moye alleges that these photographs gave the false impression that the police in the observation post would have been able to see Moye's hand outside the driver's side window. (*Id.* ¶ 60) Moye further argues that absolute immunity does not extend to Chao's role in obtaining these allegedly misleading photographs, because obtaining such evidence is "not a traditional prosecutorial function" and was "done for the purpose of misleading the second jury." (Pltf. Opp. Br. at 10–11)

Prosecutors' absolute immunity applies "not just for presentation of testimony," however, but also to preparatory conduct "relating to their advocacy." *Dory,* 24 F.3d at 83. The Supreme Court and the Second Circuit have emphasized that ' "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom.... Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence.' " *Barbera,* 836 F.2d at 100 (quoting *Imbler,* 424 U.S. at 431 n. 33); *see also Barrett,* 798 F.2d at 571 ("The absolute immunity accorded to government prosecutors encompasses not only their conduct of trials but all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation....").

**\*8** Chao obtained the photographs at issue after Moye's first trial and in preparation for Moye's second trial. Accordingly, his involvement in obtaining these photographs took place long after formal criminal proceedings had been commenced. *See Deskovic v. City of Peekskill,* Nos. 07–CV–8150 (KMK), 07–CV–9488 (KMK), 2009 WL 2475001, at \*10 (S.D.N.Y. Aug. 13, 2009) ("[i]n assessing how closely connected a prosecutor's conduct is to the judicial phase of the criminal process, the timing of the conduct is relevant") (citing *DiBlasio,* 344 F.3d at 300–01).

Furthermore, in directing that these new photographs be taken, Chao was performing in his role as a prosecutor preparing for trial: he sought to obtain these visual depictions of the crime scene in order to strengthen his case. (Am. Cmplt. ¶ 64 (purpose of second set of photographs was "to show that P.O. Jeselson could see a hand coming out of the car window on the date of plaintiff s arrest")). Although Chao was working with the police, he was acting within his role "as [an] advocate for the State." *Burns,* 500 U.S at 491. Courts have consistently found absolute immunity applicable where, as here, a Section 1983 plaintiff is relying on post-indictment misconduct by a prosecutor aimed at obtaining additional evidence to support pending charges at trial. *See, e.g., Deskovic,* 2009 WL 2475001, at \*5, \*11, \*13 (plaintiff contended that A.D.A. had, post-indictment, conspired to procure false scientific evidence that he later introduced at trial; granting A.D.A.'s motion to dismiss Section 1983 claims on absolute immunity grounds, because the A.D.A.'s alleged misconduct took place after indictment during the "judicial phase of the criminal process"); *Bertuglia v. City of New York,* No. 11 Civ. 2141(JGK), 2012 WL 906958, at \*21 (S.D.N.Y. Mar. 19, 2012) (granting motion to dismiss state law claims against A.D.A. defendant based on post-indictment evidence-gathering activities; absolute immunity applicable because "the Complaint does not allege facts that create a plausible inference that [the prosecutor] was not acting as an advocate seeking to strengthen her case against an indicted defendant"); *Zahrey v. City of New York,* No. 98–4546, 2009 WL 54495, at \*30–\*31 (S.D.N.Y. Jan. 7, 2009) (granting absolute immunity to A.D.A. alleged to have engaged in post-indictment effort to fabricate evidence); *KRL v. Moore,* 384 F.3d 1105 (9th Cir.2004) (granting A.D.A. absolute immunity for alleged misconduct related to his role in obtaining a post-indictment search warrant seeking evidence to corroborate pending charges); *Cousin v. Small,* 325 F.3d 627, 635 (5th Cir.2003) (granting absolute immunity to A.D.A. accused of fabricating evidence post-indictment; "at the time of [A.D.A.] Jordan's ...

conversations with Rowell, in which Jordan allegedly told Rowell to implicate Cousin falsely in the murder and coached him on how to testify, Jordan was acting as an advocate rather than as an investigator. The interview was intended to secure evidence that would be used in the presentation of the state's case at the pending trial of an already identified suspect, not to identify a suspect or establish probable cause. Jordan therefore is entitled to absolute immunity with respect to this claim."); *see also Peay v. Ajello,* 470 F.3d 65, 68 (2d Cir.2006) (affirming dismissal on absolute immunity grounds of Section 1983 claim brought against Assistant State's Attorney based on alleged conspiracy to present false evidence at trial); *Dory,* 25 F.3d at 83 ("absolute immunity protects a prosecutor from § 1983 liability for ... allegedly conspiring to present false evidence at a criminal trial").

**\*9** Because Chao is alleged to have obtained the misleading photographs post-indictment, in preparation for Moye's second trial, and in an effort to strengthen his case as the State's advocate, he is entitled to absolute immunity for this alleged misconduct.

### 3. *Misconduct at Trial*

Moye alleges that Chao elicited false testimony from Officer Jeselson at trial, that he buttressed Jeselson's false testimony through introduction of the misleading photographs, and that he then vouched for the truth of Jeselson's testimony in his summation.

A prosecutor's presentation of false evidence, or subornation of perjury at trial, is protected by absolute immunity. *Jones v. King,* No. 10 Civ. 0897(PKC), 2011 WL 4484360, at \*4 (S.D.N.Y. Sept. 28, 2011) ("The claim that [the prosecutor] 'conspir[ed] to present false evidence at a criminal trial' is barred.... The prosecutor enjoys absolute immunity 'despite allegations of his "knowing use of perjured testimony...." ' ") (citations omitted); *Bertuglia,* 2012 WL 906958, at \*23 (prosecutors are entitled to absolute immunity for allegations that they "coerced and harassed various witnesses into giving false testimony"); *Urrego v. United States,* No. 00 CV 1203(CBA), 2005 WL 1263291, at \*2 (E.D.N.Y.2005) ("It is settled law that when a prosecutor presents evidence to a grand jury and at trial he is acting as an advocate and entitled to absolute immunity on claims that the evidence presented was false."); *Johnson v. Scott,* No. CV–91–1467(CPS), 1993 WL 36131, at \*2 (E.D.N.Y. Feb. 5, 1993) (A.D.A. entitled to absolute immunity related to witness perjury, because this "concern[ed] ... the presentation of the State's case against the plaintiff"); *see Imbler,* 424 U.S. at

430–31 (granting prosecutors absolute immunity for their conduct "in presenting the State's case," including permitting a fingerprint expert to give false testimony, suppressing important evidence, and introducing a misleading artist's sketch into evidence.).

The analysis does not change because Plaintiff alleges a conspiracy to commit these acts. *Shmueli,* 424 F.3d at 237–38 ("principles [of absolute immunity] are not affected by allegations that improperly motivated prosecutions were commenced or continued pursuant to a conspiracy") (citing *Dory,* 25 F.3d at 83); *Bernard.* 356 F.3d at 503; *Hill,* 45 F.3d at 659 n. 2 (when the underlying activity at issue is covered by absolute immunity, the "plaintiff derives no benefit from alleging a conspiracy").

Plaintiff also argues that Chao acted outside his prosecutorial role when he vouched for Jeselson's testimony during summation. Because a prosecutor's summation is part of presenting the State's case, courts agree that a prosecutor's conduct during summation is protected by absolute immunity. *See Robinson v. Rome,* No. 11–CV–1411(NGG)(LB), 2011 WL 1541044, at *3 (E.D.N.Y.2011) (finding A.D.A.s immune from suit for claims related to, *inter alia,* an improper summation); *Johnson,* 1993 WL 36131, at *2 (granting absolute immunity to prosecutor where plaintiff alleged that A.D.A. "express [ed] to the jury her opinion as to the truth of the testimony of her witnesses during her summation").

**\*10** In sum, to the extent that Moye's claims against Chao are based on his conduct at trial, those claims are covered by absolute immunity.

\* \* \* \*

The Court concludes that Chao has absolute immunity for all of Moye's claims, whether based on federal or state law, and whether founded on theories of malicious prosecution, abuse of process, denial of a fair trial, fabricated evidence, conspiracy, or intentional or negligent infliction of emotional distress.

### *CONCLUSION*

Chao's motion to dismiss is GRANTED. The Clerk of the Court is directed to terminate the motion (Dkt. No. 23).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2569085

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (3)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  First Amended Complaint**<br>Ronald MOYE, Plaintiff, v. THE CITY OF NEW YORK; Sgt. Nelson Caban, Shield # 5131; P.O. Paul Jeselon, Shield # 24653; P.O. Samuel Fontanez, Shield # 25590; P.O. Edward Simonetti, Shield # 23722; P.O. Matthew Boorman, Shield # 28212; P.O. Frank Papa, Shield # 29209; P.O. Tawaina O'Neal, Shield # 19346; P.O. Brennan; P.O. John Does # 1-10; P.O.; and A.D.A. Dustin Chao, Defendants.<br>2011 WL 12881748 | PDF | S.D.N.Y. | July 05, 2011 | Pleading |
| **2.  Complaint**<br>Ronald MOYE, Plaintiff, v. THE CITY OF NEW YORK; Robert M. Morgenthau, New York County District Attorney's Office; Sgt. Nelson Caban, Shield # 5131; P.O. Paul Jeselon, Shield # 24653; P.O. Samuel Fontanez, Shield # 25590; P.O. Edward Simonetti, Shield # 23722; P.O. Matthew Boorman, Shield # 29209; P.O. Tawaina O'neal, Shield # 19346; P.O. Brennan; P.O. John Does # 1-10; P.O.; and A.D.A. Dustin Chao, the individual defendant (S) sued individually and in<br>2011 WL 232313 | PDF | S.D.N.Y. | Jan. 14, 2011 | Pleading |
| **3.  Docket 1:11cv00316**<br>MOYE v. THE CITY OF NEW YORK ET AL | — | S.D.N.Y. | Jan. 14, 2011 | Docket |

**WESTLAW**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History**

There are no History results for this citation.

2000 WL 1335865
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Martin JOHNSON, Plaintiff,

v.

THE CITY OF NEW YORK, Assistant District Attorney Robert Henoch, Captain of Corrections Martin, Corrections Officer Schmidt, Corrections Officer Brown and Unidentified Correction Officers, Defendants.

No. 00CIV.3626(SHS).
|
Sept. 15, 2000.

OPINION AND ORDER

STEIN, D.J.

**\*1** Martin Johnson has brought this action pursuant to 42 U.S.C. § 1983 seeking monetary damages on the grounds that the defendants—the City of New York, an Assistant District Attorney, and certain Corrections Officers—violated his constitutional rights under the Fourth, Eighth and Fourteenth Amendments to the U.S. Constitution by failing to protect him from an attack by fellow inmates against whom he had arranged to testify. Johnson also asserts two tort claims. The Assistant District Attorney moves to dismiss the complaint as it pertains to him pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted and pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction. For the following reasons, the motion is granted and the complaint is dismissed as to ADA Henoch.

BACKGROUND

The facts are taken from plaintiff's complaint and are assumed to be true for purpose of this motion. In May of 1998 Johnson was arrested for allegedly selling crack cocaine. Complaint at 4. Shortly after his arrest, he entered into a cooperation agreement with ADA Henoch to testify against several of his co-defendants. [1] *Id.* ADA Henoch allegedly "assured" plaintiff at that time that he "would protect him[ ]" from possible retaliation by his co-defendants. *Id.* Johnson claims that he was being held in Beacon, a housing area on Rikers Island, which was in "the same general area" as where the

people against whom he was to testify were held and that he alerted ADA Henoch of this fact. *Id.* ADA Henoch "explicitly assured [him] that he would be safe" and that "he would be placed in protective custody." *Id.* at 4–5. Plaintiff also alerted defendant Corrections Officers Martin, Schmidt, Brown and "Unidentified Correction Officers" to his danger. *Id.* at 5.

[1]     The complaint states that plaintiff entered into the cooperation agreement with ADA Henoch on June 18, 1999. Complaint at 4. Plaintiff's opposition, however, states the cooperation agreement was entered into in "June of 1998". Opposition at 2. In addition, plaintiff has recently sought—successfully—to amend the complaint to allege that the agreement was made in June of 1998. Accordingly, this Court will assume that plaintiff entered into the cooperation agreement with defendant in June, 1998.

On February 24, 1999, plaintiff was attacked by fellow inmates "who called him a snitch as they beat and kicked him." *Id.* As a result of the beating, Johnson suffered a fractured ankle, injuries to his head, neck and legs, and damage to his retina that required surgery. *Id.* ADA Henoch, after learning of the attack on plaintiff, "acknowledged [his] prior request for protection." *Id.*

As noted above, Johnson has filed this action against the City of New York, Correction Officers Martin, Schmidt, Brown, and ADA Henoch and the ADA has moved to dismiss the complaint on the grounds that it fails to state a constitutional claim for which relief may be granted and that he is entitled to either absolute or qualified prosecutorial immunity.

DISCUSSION

When reviewing a motion to dismiss, a court must accept as true the factual allegations of the complaint and must view the pleadings in the light most favorable to and draw all reasonable inferences in favor of the non-moving party. *See Jamison v. Dee,* 2000 WL 502871 (S.D.N.Y. April 27, 2000) (citing *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993)). Dismissal of the complaint is only proper when "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957).

I. *Absolute Immunity*

2000 WL 1335865

**\*2** It is well-established that prosecutors are absolutely immune from suits for damages arising from actions which are "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman,* 424 U.S. 409, 430–31, 96 S.Ct. 984, 994–95, 47 L.Ed.2d 128 (1976); *see Buckley v. Fitzsimmons,* 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). Whether a prosecutor has absolute immunity "depends principally on the nature of the function performed, not on the office itself." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 530 (2d Cir.1993). Such functions include the decision to bring charges against a defendant, *see Gan,* 996 F.2d at 530, presenting evidence to a grand jury, *see Barret v. United States,* 789 F.2d 565, 571–72 (2d Cir.1986), and the evaluation of evidence prior to trial. *See Kalina v. Fletcher,* 522 U.S. 118, 126, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997). Absolute immunity is not available, however, when a prosecutor "undertakes conduct that is beyond the scope of his litigation-related duties." *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987).

*Barbera v. Smith,* 836 F.2d 96, 100, is closely analogous to this action. In *Barbera,* the Second Circuit held that a prosecutor was not entitled to absolute immunity where he twice refused to provide a cooperating witness with police protection. *Id.* at 98. The witness had agreed to testify in return for a more lenient sentence and was murdered by a contract killer hired by the target of the prosecutor's investigation. *Id.* The Court found that "the government was still seeking evidence, including testimony from [the victim], that would enable it to prosecute ..." and that "this task [providing protection] was [not] so intimately associated with the judicial phase of the criminal process ..." as to entitle the prosecutor to absolute immunity. *Id.*

Here, as in *Barbera,* defendant's activities were not "so intimately associated with the judicial phase of the criminal process" as to entitle him to absolute immunity from suit. *See Gan,* 996 F.2d at 531 ("the claim that [the prosecutor] failed to protect [plaintiff] asserts conduct that plainly is not integral either to a decision of whether or not to institute a prosecution or to the conduct of judicial proceedings. Accordingly, if [defendant] is to be accorded immunity ... it can only be qualified immunity ."). Therefore absolute immunity is not available to the district attorney in this action.

## II. *Qualified Immunity*

In general, "the defense of qualified immunity cannot support the grant of a ... 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio,* 722

F.2d 1013, 1018 (2d Cir.1983). Qualified immunity is an affirmative defense that must be pleaded by the official claiming it. *See Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 72 L.Ed .2d 396 (1982)). Dismissal for failure to state a claim is thus appropriate where the complaint itself presents the qualified immunity defense. *See, e.g., Green,* 722 F.2d at 1019. The United States Supreme Court has also held that "unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *See also Robison v. Via,* 821 F.2d 913, 920 (2d Cir.1987) (citing *Procunier v. Navarette,* 434 U.S. 555, 565 (1978) (prison officials entitled to dismissal of claims of violating prisoner's First and Fourteenth Amendment rights by interfering with mail where such rights had not been clearly established)). Even when viewed in the light most favorable to plaintiff and drawing all reasonable inferences in his favor, *Mills,* 12 F.3d at 1174, Johnson's allegations regarding the District Attorney do not state a violation of a clearly established constitutional right. Thus, dismissal pursuant to Fed.R.Civ.P. 12(b)(6) is appropriate. *See, e.g., Molinelli v. Tucker,* 901 F.2d 13, 16 (2d Cir.1990).

**\*3** Qualified immunity shields government actors performing discretionary functions from " 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." ' *Lennon v. Miller,* 66 F.3d 416, 420 (2nd Cir.1995) (quoting *Harlow,* 457 U.S. at 818.) To determine whether a right was clearly established at the time defendant acted, the Court must consider: "(1) whether the right in question was defined 'with reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Gan,* 996 F.2d at 532 (quoting *Jermosen v.. Smith,* 945 F.2d 547, 550 (2d Cir.1992)).

The District Attorney claims that he is entitled to qualified immunity because, even if he had a constitutional duty to protect Johnson, it was not a clearly established duty. The Due Process Clause itself does not require the State to protect "the life, liberty, [or] property of its citizens against invasion by private actors." *Deshaney v. Winnebago County Dep't of Soc. Serves.* 489 U.S. 189, 195, 109 S.Ct. 998, 1002, 103 L.Ed.2d

249 (1989). Therefore, as a general rule, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197, 109 S.Ct. at 1004. The only judicially recognized exceptions to this rule are custodial relationships where "the State takes a person into its custody and holds him there against his will," *Id.* at 199–200, 109 S.Ct. at 1005 (the "special relationship" exception), or when the government affirmatively creates or increases the danger an individual is placed in. *See Dwares v. City of N.Y.,* 985 F.2d 94, 98–99 (2d Cir.1993) (the "state-created danger" exception).

Special relationships that have given rise to a governmental duty to protect against third-person attacks include "custodial relationships such as a prison and inmate or a mental institution and involuntarily committed patient, and the relationship between a social service agency and foster child." *Gan,* 996 F.2d at 532 (citing cases).

The Second Circuit has also recognized the state-created danger exception to *DeShaney's* general rule. *See Dwares,* 985 F.2d at 99 (police officers agreed in advance with members of a group to allow the group to assault the plaintiff, did not interfere during the beating and did not arrest those who assaulted the plaintiff); *Hemphill v. Schott,* 141 F.3d 412, 418 (2d Cir.1998) (arresting officers returned gun to robbery victim and drove him to the scene of suspect's arrest, where the victim shot the suspect); *see also Freeman v. Ferguson,* 911 F.2d 52, 54 (8th Cir.1990) (reversing dismissal on qualified immunity grounds against police chief who instructed subordinates to ignore victim's request for protection from her husband, who was the chief's friend).

**\*4** Johnson contends that the District Attorney's proffer of the cooperation agreement and assurance that he would protect plaintiff conferred upon the District Attorney a constitutional duty to protect Johnson. [2] Plaintiff claims that the prosecutor's duty to protect him was clearly established by *DeShaney* and by *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (prison officials may be held liable under Eighth Amendment for denying humane conditions of confinement only if they know that inmates face substantial risk of serious harm and disregard that risk by failing to take reasonable measures to abate it). However, neither *DeShaney* nor *Farmer* clearly establish the law regarding plaintiff's allegations. While the very action in question need not have been previously held unlawful for a constitutional right to be clearly established, *Duncan v. Kean,* 1995 WL 649931, \*3 (S.D.N.Y. Nov. 6, 1995)

(citing *Aveni v. Mottola,* 35 F.3d 680, 686 (2d Cir.1994)), it must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 639 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

[2]    Johnson does not specify whether he is claiming defendant Henoch owed a duty to protect him based on the special relationship or state-created danger exception to the *DeShaney* rule. For the purpose of this motion, both arguments will be addressed.

The Second Circuit has twice considered and rejected claims against prosecutors for failure to protect a witness from attack by a third party. *See Barbera,* 836 F.2d at 100–01; *Gan,* 996 F.2d at 533–34. In *Gan,* a panel of the Second Circuit wrote that

> "[p]laintiffs have not called to our attention any case before or since [*Barbera* ] ... in which the lodging of a complaint with law enforcement officials, or the complainant's compliance with a request to identify suspects, either singly or in combination, has been held (a) to create a relationship that gives the complaining witness a constitutional right to protection, or (b) to impose a corresponding duty on a prosecutor."

*Id.* at 533–34.

Here, as in *Gan,* plaintiff points to no case, and the Court is aware of none, where it has been held that a prosecutor's alleged promise to protect an inmate who agrees to testify creates a special relationship that gives rise to a constitutional right to protection from a third party. Nor is the Court aware of any decision which has held that the mere proffer of a cooperation agreement by a prosecutor so increases the danger to an inmate that it creates a constitutional duty for the prosecutor to protect the inmate from potential attacks by third persons. A *prison official's* willful failure to protect an inmate from another inmate's violent actions violates the Constitution if the officer was "deliberate[ly] indifferen[t] to the consequences of his conduct for those under his control

2000 WL 1335865

and dependent upon him," *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988). However, no corresponding duty has been found to exist between an inmate and prosecutor.

Based on the limited caselaw in existence at the time of the alleged attack, and particularly because of the absence of any caselaw which holds that any state actor other than a prison official owes a duty to protect an inmate from another inmate's violent actions, it cannot be said that it was clearly established that defendant ADA Henoch had created or assumed a special relationship with Johnson imbuing him with a constitutional duty to protect him. Therefore, this Court "need not decide whether [it] would hold that these circumstances create such a right and corresponding duty, for in the absence of any such holdings and in the face of the general rule articulated in *DeShaney,* it could not have been clear to a reasonable prosecutor that his failure to provide protection ... would have violated [plaintiff's] rights under the Constitution." *Gan,* 996 F.2d at 534. Defendant Henoch is therefore entitled to qualified immunity.

### III. *The Pendent State Claims*

**\*5** The ADA's motion to dismiss plaintiff's pendent state law claims is likewise granted. The Court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3). Accordingly, the state law claims against ADA Henoch are dismissed without prejudice. *See United Mine Workers of America v. Gibbs,* 338 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 350 n. 7, 98 L.Ed.2d 720 (1988); *Mayer v. Oil Field Systems Corp.,* 803 F.2d 749, 757 (2d Cir.1986).

### IV. *CONCLUSION*

For the reasons set forth above, the prosecutor's motion to dismiss is granted and the complaint is dismissed as against the assistant district attorney.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 1335865

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 1:00cv03626**<br>JOHNSON v. THE CITY OF NEW YORK, ET AL | — | S.D.N.Y. | May 15, 2000 | Docket |

**History**

There are no History results for this citation.

O'Callaghan v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 7177509

2016 WL 7177509
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

James O'CALLAGHAN, Plaintiff,
v.
The CITY OF NEW YORK, Defendant.

16 CIV. 1139 (ER)
|
Signed 12/08/2016

**Attorneys and Law Firms**

James O' Callaghan, New York, NY, pro se.

Erin Teresa Ryan, New York City Law Department, New York, NY, for Defendant.

### OPINION AND ORDER

Ramos, D.J.:

**\*1** Plaintiff James O'Callaghan ("Plaintiff"), proceeding *pro se*, brings this action against the City of New York (the "City") [1] alleging violations of his civil rights. [2] Specifically, Plaintiff asserts claims of conspiracy, age and race discrimination, fraud, and negligence in connection with the police investigation of an assault committed against him. *See* Compl., Doc. 1 at 1. The City now moves to dismiss the Complaint with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Doc. 10.

[1]     The caption of the Complaint only lists the City of New York as a Defendant, although the Complaint purports to also list as "Defendants" Detective Brian O'Leary, Sergeant James Fox, Police Officer Edward Guzik, Corporation Counsel for the City of New York Zachary W, Carter, and Assistant Corporation Counsel Yael Barbabay by listing them on the first page. *See* Doc. 1. These individuals are not listed as Defendants on the docket nor have summonses been issued by the Clerk of the Court as to these individuals. *See* Doc. 2 (Summons as to City of New York). However, as discussed more fully within, because the Plaintiff is proceeding *pro se*, the Court assumes that Plaintiff

would seek the opportunity to amend to join these individuals as Defendants.

[2]     While Plaintiff did not specifically reference 42 U.S.C. § 1983 in his Complaint, submissions from a *pro se* litigant must be construed liberally and interpreted "to raise the strongest arguments that they suggest." *Triestman v. Federal Bureau of Prison*, 470 F.3d 471, 474 (2d Cir. 2006). The court therefore construes Plaintiff's action as one arising under 42 U.S.C. § 1983.

For the reasons discussed below, the City's motion is GRANTED.

## I. BACKGROUND

### A. Factual Background

The following facts, which are taken from the Complaint, are assumed to be true for purposes of the instant motion. [3]

[3]     As is required on a motion pursuant to Rule 12(b)(6), the factual allegations in the Complaint are accepted to be true for purposes of this motion, and all reasonable inferences are drawn therefrom in favor of Plaintiff. *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010). The facts recited herein do not constitute findings of fact by this Court.

On February 19, 2014, Plaintiff, a senior citizen, was working as a driver for Uber when he was assaulted by a New York City yellow cab driver, who threw him to the ground and punched him several times in the face. Compl. ¶¶ 1, 10. Two people witnessed this altercation, one of whom took pictures of the incident. *Id.* ¶¶ 1, 2. The taxi driver then fled the scene, and the police arrived shortly thereafter. *Id.* Police officers spoke with the witnesses at the scene and collected evidence from one of the witnesses, including photographs of the incident, the taxi driver, and the taxi. *Id.* ¶ 2. Police Officer Guzik took the witness information and told the Plaintiff that the taxi driver would be easy to locate. *Id.* The Police Report, which Plaintiff attached to his Complaint, notes the taxi plate number reported at the scene. Doc. 1 at 13-14 ("Police Report"). An ambulance arrived and members of the fire department bandaged the Plaintiff's cuts. Compl. ¶ 2. As a result of the attack, Plaintiff currently suffers from painful headaches and constant shaking of his hands. *Id.* ¶ 13. Plaintiff's neurosurgeon at New York Presbyterian Hospital concluded that Plaintiff suffered a severe concussion. *Id.*

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 148 of 529

O'Callaghan v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 7177509

**\*2** After the incident, Detective Brian O'Leary was assigned to the case. *Id.* ¶ 3. In a series of texts between Detective O'Leary and the Plaintiff, Detective O'Leary stated that the taxi driver was arrested for assault on June 7, 2014 and the police did not need any additional information from Plaintiff because the arrestee admitted his actions. *Id.*; *see also* Doc. 1 at 9-10 (text messages from Det. Brian O'Leary). However, Plaintiff claims that almost four months after the incident, no arrest had been made in the case, despite the fact that Detective O'Leary knew the name of the assailant. Compl. ¶¶ 3, 12.[4] Although Plaintiff continued to attempt to get information from Detective O'Leary about the progress of the investigation, the telephone number that Plaintiff used to text message Detective O'Leary is now disconnected. *Id.* ¶ 12.

[4]     Plaintiff has further stated in his submissions to the Court that Detective O'Leary "lied about the assailant being arrest for assault." Doc. 8 at 2.

Plaintiff attempted to obtain information through a number of other avenues, including various divisions at the District Attorney's Office, the New York Police Department ("NYPD") 17th Precinct, and the Taxi and Limousine Commission. *Id.* ¶¶ 4-7. The District Attorney's Office told Plaintiff that they could not do anything unless an arrest was made in the case, and the other departments he contacted similarly offered no assistance. *Id.* In November 2014, nine months after the incident, Sergeant Fox called the Plaintiff and said the police could not contact the witness. *Id.* ¶ 5.

At the time of the incident, Plaintiff alleges that the City was attempting to restrict Uber's activity, so the City attempted to conceal the fact that he had been assaulted by a cab driver. *Id.* ¶ 6.

**B. Procedural History**

Plaintiff filed a claim with the City regarding the incident. *Id.* ¶¶ 8-9.[5] He was informed by the Clerk that he could not pursue the claim because he did not bring his claim within 90 days of the occurrence. *Id.* Subsequently, on March 23, 2015, Plaintiff filed a lawsuit against the City in New York State Supreme Court. Doc. 11-3. Plaintiff's complaint detailed the events that took place on and after February 19, 2014, including the altercation with the cab driver and Plaintiff's interactions with NYPD officials during the investigation that followed. *Id.* at 6-7. The complaint alleged that the City violated his federal and state rights by not adhering to its own

rules, federal and state Constitutions, and laws prohibiting age discrimination and civil rights violations. *Id.* at 2. Assistant Corporation Counsel ("ACC") Yael Barbabay filed a motion to dismiss on behalf of the City on the grounds that the complaint did not state a cause of action. *See* Doc. 11-2 at 1.

[5]     Although the Complaint does not state when Plaintiff filed this claim, Plaintiff's reply brief does attach as an exhibit a letter dated February 17, 2015 from the City of New York Office of the Comptroller acknowledging receipt of Plaintiff's claim. Doc. 16 at 5. Defendant first argues that Plaintiff did not file a notice of claim with the City, *see* Doc. 13 at 16, and then that Plaintiff's claim was untimely based on this February 17, 2015 acknowledgement of receipt. *See* Doc. 17 at 4. For purposes of this motion, the Court need not determine whether Plaintiff's notice of claim was timely under New York law.

On February 4, 2016, Justice Margaret A. Chan of the Supreme Court of New York granted the City's motion to dismiss. *Id.* at 4-5. Justice Chan dismissed the action in its entirety for failure to state a claim on the basis that a claim sounding in negligent police investigation was not viable in New York, and that Plaintiff failed to state a claim against the City for municipal liability. *Id.* Specifically, the Court held that because Plaintiff did not claim that the "actions or inactions ... were the result ... of an official policy or custom of the Police Department or the City of New York," he did not state a claim pursuant to *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978). *Id.* at 4-5. The decision was dated February 4, 2016 and filed by the New York County Clerk's Office on February 11, 2016. *Id.* at 1.

**\*3** Plaintiff filed the instant lawsuit in the U.S. District Court for the Southern District of New York on February 16, 2016. *See* Compl. Like his state court complaint, the Complaint detailed the events with the cab driver and his attempt to obtain information about the investigation that followed. *Id.* The federal Complaint provides more details regarding the incident and subsequent investigation, and also includes additional allegations regarding the Corporation Counsel's alleged wrongdoing related to the state litigation. Specifically, Plaintiff alleges that in the City's motion to dismiss, ACC Barbabay included "facts and procedural history that were completely false." *Id.* ¶¶ 10-11. Plaintiff further alleges that the City's motion was a cover-up based on race and age discrimination. *Id.* ¶ 12.

2016 WL 7177509

The City has moved to dismiss the Complaint in its entirety. Doc. 10; *see also* Doc. 13 at 2.

## II. LEGAL STANDARDS

### A. 12(b)(6) Motion to Dismiss Standard

On a motion to dismiss pursuant to Rule 12(b)(6), district courts are required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in the plaintiff's favor. *Gonzalez v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008). However, this requirement does not apply to legal conclusions, bare assertions or conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In order to satisfy the pleading standard set forth in Rule 8 of the Federal Rules of Civil Procedure, a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. *Id.* at 678 (citing *Twombly*, 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Accordingly, a plaintiff is required to support his claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

Though a plaintiff may plead facts alleged upon information and belief, "where the belief is based on factual information that makes the inference of culpability plausible," *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010), such allegations must be " 'accompanied by a statement of the facts upon which the belief is founded.' " *Navarra v. Marlborough Gallery, Inc.*, 820 F. Supp. 2d 477, 485 (S.D.N.Y. 2011) (quoting *Prince v. Madison Square Garden*, 427 F. Supp. 2d 372, 385 (S.D.N.Y. 2006)); *see also Williams v. Calderoni*, No. 11 Civ. 3020 (CM), 2012 WL 691832, at *7-8 (S.D.N.Y. Mar. 1, 2012) (finding pleadings on information and belief insufficient where plaintiff pointed to no information that would render his statements anything more than speculative claims or conclusory assertions). A complaint that "tenders naked assertions devoid of further factual enhancement" will not survive a motion to dismiss under Rule 12(b)(6). *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted) (brackets omitted).

### B. *Pro Se* Plaintiff

In the case of a *pro se* plaintiff, the Court is obligated to construe the complaint liberally, *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011), and to interpret the claims as raising the strongest arguments that they suggest. *Triestman*, 470 F.3d at 474; *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (citing *Harris v. City of New York*, 607 F.3d 18, 24 (2d Cir. 2010)). The obligation to read a *pro se* litigant's pleadings leniently "applies with particular force when the plaintiff's civil rights are at issue." *Jackson v. NYS Dep't of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)). "However, even *pro se* plaintiffs asserting civil right claims cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a 'right to relief above the speculative level.' " *Id.* (quoting *Twombly*, 550 U.S. at 555).

### C. Additional Standards Regarding Section 1983

**\*4** In light of Plaintiff's *pro se* status, the Court liberally construes his claims as arising under 42 U.S.C. § 1983 ("Section 1983"), which provides a cause of action against "any person who, acting under color of state law, deprives another of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). To state a claim under Section 1983, a plaintiff must allege that: (1) defendants were state actors or were acting under color of state law at the time of the alleged wrongful action; and (2) the action deprived the plaintiff of a right secured by the Constitution or federal law. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). "Section 1983 is only a grant of a right of action; the substantive right giving rise to the action must come from another source." *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970)). Thus, a civil rights action brought under § 1983 will stand only insofar as the plaintiff can prove an actual violation of his rights under the Constitution or federal law. *Id.*

### D. Extrinsic Materials Considered For a Rule 12(b)(6) Motion to Dismiss

"When presented with a motion to dismiss pursuant to Rule 12(b)(6), the court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit,

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 150 of 529

O'Callaghan v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 7177509

or matters of which judicial notice may be taken." *Silas v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)). Similarly, a court may consider a *res judicata* or collateral estoppel defense on a Rule 12(b)(6) motion to dismiss "when the court's inquiry is limited to the plaintiff's complaint, documents attached or incorporated therein, and materials appropriate for judicial notice." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 498-99 (2d Cir. 2014) (citing *Day v. Moscow*, 955 F.2d 807, 811 (2d Cir. 1992) ("[W]hen all relevant facts are shown by the court's record, of which the court takes notice, the defense [of res judicata] may be upheld on a Rule 12(b)(6) motion.")); *Lefkowitz v. McGraw-Hill Glob. Educ. Holdings, LLC*, 23 F. Supp. 3d 344, 360 (S.D.N.Y. 2014) (noting that in a 12(b)(6) motion where collateral estoppel or *res judicata* is an issue, "dismissal is appropriate when it is clear from the face of the complaint, and consideration of matters which the court may take judicial notice of, that the plaintiff's claims are barred as a matter of law") (internal citations omitted).

Local Civil Rule 12.1 of the Southern District of New York directs represented parties who move to dismiss by referring to matters outside the pleadings to provide notice to a *pro se* party that the matter may be treated as a motion for summary judgment and to further explain what the plaintiff must do to oppose summary judgment. *See* S.D.N.Y. Civil Local Rule 12.1; *see also Hernandez v. Coffey*, 582 F.3d 303, 308 n.2 (2d Cir. 2009). Here, Defendant has served the requisite notice on Plaintiff. However, the Court need not convert the motion to one for summary judgment because the Court can take judicial notice of the extrinsic materials relied upon by Defendant.

Specifically, Defendant attaches the following documents to the declaration submitted in support of the motion: (1) the complaint filed by Plaintiff in the Supreme Court, Index No. 100523/15, dated March 23, 2015, Doc. 11-3; (2) the decision by Justice Chan dismissing the case dated February 4, 2016, Doc. 11-2;[6] and (3) a copy of the Civil Docket Sheet in this matter, Doc. 11-4.[7] Accordingly, in considering Defendant's motion, the Court takes judicial notice of public documents filed in connection with the state court proceedings and the Civil Docket Sheet filed in this federal matter, "not for the truth of the matters asserted ... but rather to establish the fact of such litigation and related filings." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *see also Greenwich Life Settlements, Inc. v. ViaSource Funding Grp., LLC*, 742 F. Supp. 2d 446, 452 (S.D.N.Y. 2010) (taking judicial notice of

state court documents); *Tokio Marine & Nichido Fire Ins. Co. v. Canter*, No. 07 Civ. 5599 (PKL), 2009 WL 2461048, at *4 (S.D.N.Y. Aug. 11, 2009) (same).

[6]    Plaintiff argues, mistakenly, that this decision "has nothing to do with [his] case" and ought not be considered. Doc. 16 at 4.

[7]    Defendant also attached the Complaint in this matter, which does not constitute extrinsic evidence for purposes of a motion to dismiss.

### III. PRECLUSION

**\*5** Defendant argues that Plaintiff's claims are barred both by the doctrines of *res judicata* and collateral estoppel. Doc. 18 at 6-9.

Under the doctrine of *res judicata*, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Burgos v. Hopkins*, 14 F.3d 787, 789 (2d Cir. 1994) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)). Collateral estoppel, or issue preclusion, is a corollary to the doctrine of *res judicata* that prohibits re-litigating decided issues of fact or law. *McCurry*, 449 U.S. at 94. Both collateral estoppel and *res judicata* apply to actions under 42 U.S.C.A. § 1983. *Univ. of Tennessee v. Elliott*, 478 U.S. 788, 797 (1986). Congress has directed federal courts to accord state judicial proceedings the same full faith and credit that state courts provide them, and this policy applies in § 1983 litigation. *McCurry*, 449 U.S. at 98; *Golino v. City of New Haven*, 950 F.2d 864, 869 (2d Cir. 1991).

#### A. Res Judicata

The doctrine of *res judicata* "precludes a party from litigating a claim where a judgment on the merits exists from a prior action between the same parties involving the same subject matter." *Josey v. Goord*, 9 N.Y.3d 386, 389-390, 880 N.E.2d 18 (N.Y. 2007) (internal quotation marks and citation omitted). "To determine the effect of a state court judgment, federal courts, including those sitting in diversity, are required to apply the preclusion law of the rendering state." *Conopco, Inc. v Roll Int'l*, 231 F.3d 82, 87 (2d Cir. 2000). Because the basis for the *res judicata* arises from a New York state court action, the preclusive effect in federal court of the state-court judgment is determined by New York law and the Court's analysis is governed by "New York's transactional approach

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 151 of 529

O'Callaghan v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 7177509

to *res judicata*." *Jacobson v. Fireman's Fund Ins. Co*, 111 F.3d 261, 265 (2d Cir. 1997).

Under New York's "transactional approach," a claim is barred by the prior judgment, "where the same foundation [sic] facts serve as a predicate for each proceeding." *Hasenstab v. City of New York*, 664 F. Supp. 95, 98 (S.D.N.Y. 1987) (internal quotation marks and citation omitted). "This includes all claims that were litigated or could have been litigated at that time." *Id.* (internal quotation marks and citation omitted). "[O]nce a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy." *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 357, 429 N.E.2d 1158 (N.Y. 1981); *see also Josey*, 9 N.Y.3d at 389-390 (quoting *O'Brien*). In determining what constitutes the same transaction, the court should look to: how the facts are related in time, space, origin or motivation; whether they form a convenient trial unit; and whether treating them as a unit conforms to the parties' expectations. *Marinelli Associates v. Helmsley-Noyes Co.*, 265 A.D.2d 1, 5, 705 N.Y.S.2d 571, 575-76 (1st Dept. 2000). Even if there are variations in the facts alleged or different relief is sought, if the actions are grounded on the same gravamen of the wrong, *res judicata* applies. *Id.*; *see also Green v. Kadilac Mortgage Bankers, Ltd.*, 936 F.Supp. 108, 114 (S.D.N.Y. 1996) (holding plaintiffs could not relitigate issues already determined in a foreclosure action by recasting their assertions as § 1983 violations).

**\*6** Plaintiff's claims in the instant case can be divided into two categories: (1) claims related to the investigation of the February 19 [th] incident; and (2) claims related to the Corporation Counsel's defense of the City during the litigation of Plaintiff's state case. As to the latter, Plaintiff alleges that ACC Barbabay included false information in the City's motion to dismiss as part of a greater conspiracy to protect the taxi cab industry in New York from inroads being made by Uber. Compl. ¶¶ 10-11. Additionally, Plaintiff asserts that Corporation Counsel Zachary Carter further engaged in a cover-up "based on racial and age discrimination." *Id.* ¶ 12.

Defendant argues that both lawsuits involve the same claims and operative facts and assert identical allegations. Doc. 13 at 6. The Court agrees. A review of the New York action makes clear that the claims presented here are virtually identical to the claims already decided by the state court. Under New York's transactional approach, his claims, except the claims as to the Corporation Counsel's litigation-related actions,

undeniably arise out of the same subject matter he advanced in state court: the City's investigation of the February 19 [th] incident. In both the state and federal action, Plaintiff notes that he was attacked and injured by a taxi driver and alleges that the NYPD failed to properly handle his case. *See* Doc. 11-3. Additionally, Plaintiff described the nature of his claims in state court in nearly identical terms to his claims in the instant action. *Id.* at 3. [8] The New York Supreme Court's dismissal of Plaintiff's lawsuit constitutes a "judgment on the merits" because the court considered the substance of Plaintiff's claims. *See* Doc. 11-2 at 4-5.

[8]    While Plaintiff did not allege race discrimination in his state court complaint, this additional allegation does not alter the Court's analysis that *res judicata* applies because it could have been asserted in the state court. Plaintiff's allegations, including those related to race discrimination, are grounded on the same "gravamen of the wrong." *See Marinelli*, 705 N.Y.S.2d at 575-76.

Here, the state court proceedings have *res judicata* effect and preclude the majority of Plaintiff's claims. Applying these principles, except as to Plaintiff's claim regarding the Corporation Counsel's litigation-related actions, the Court concludes that the doctrine of *res judicata* precludes the remainder of Plaintiff's claims. Thus, Plaintiff's claims concerning conspiracy, age discrimination, racial discrimination, fraud, negligent investigation and concealment of the identity of the cab driver, and the violation of Police rules are precluded because they were actually brought or could have been brought in the state proceeding. The Court finds that the claim regarding the Corporation Counsel's actions could not have been asserted in the underlying state court action because these allegations necessarily arise from Counsel's later participation in the litigation.

Furthermore, although Plaintiff argues that both the state and federal cases were proceeding at the same time, *see* Doc. 8, the record before the Court shows that the state court decision was a prior decision for purposes of preclusion doctrines. On February 4, 2016 Justice Chan granted the City's motion to dismiss, and the Opinion was filed with the County Clerk's office on February 11, 2016. Doc. 11-2 at 4-5. The instant lawsuit was not filed in this Court until February 16, 2016, almost a week after Justice Chan dismissed the state suit. *See* Compl. [9] As is clear from the face of the Complaint itself, *see* Doc. 1 at 1, the Complaint was stamped

Case 5:25-cv-00956-AJB-MJK     Document 9     Filed 12/08/25     Page 152 of 529

O'Callaghan v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 7177509

on February 16, 2016 and filed that same day. In any event, the state court decision would have preclusive effect even if the cases were proceeding simultaneously. The general rule of concurrent jurisdiction allows lawsuits to proceed in state and federal court in parallel. *Noel v. Hall*, 341 F.3d 1148, 1163 (9th Cir. 2003); *see also Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005) (citing with approval *Noel*, 341 F.3d at 1163-64 ("Disposition of the federal action, once the state-court adjudication is complete, would be governed by preclusion law.")); *United States v. Northrop*, 147 F.3d 905, 909 (9th Cir. 1998) ("The date of rendition of the judgment is controlling for purposes of *res judicata*, not the dates of commencement of the action ...") (citing Restatement (Second) of Judgments § 14 (1980); *Unger v. Consolidated Foods Corp.*, 693 F.2d 703, 705 (7th Cir. 1982) ("As between two actions pending at the same time, the first of two judgments has preclusive effect on the second.") (citing, as to *res judicata*, Restatement (Second) of Judgments § 14)). Here, the state lawsuit was decided first and this Court "must respect the state court's judgment on those merits." *See Merritt v. Countrywide Fin. Corp.*, No. 09 Civ. 01179-(BLF), 2015 WL 5542992, at *9 (N.D. Cal. Sept. 17, 2015).

9      The Court notes that the federal Complaint was dated and signed on January 22, 2016—before Justice Chan's dismissal—but Plaintiff did not file it with the Clerk's office until February 16, 2016. *See* Compl.

**\*7** Thus, the Court finds that the doctrine of *res judicata* applies, except as to the claim regarding the Corporation Counsel's actions. If Plaintiff was unhappy with the result of that proceeding, the proper recourse was to file an appeal, not to commence a federal action on the same facts.

### B. Collateral Estoppel

The same result is compelled by application of the separate doctrine of collateral estoppel. The "fundamental notion" of the doctrine of collateral estoppel, or issue preclusion, "is that an issue of law or fact actually litigated and decided by a court of competent jurisdiction in a prior action may not be relitigated in a subsequent suit between the same parties or their privies." *Ali v. Mukasey*, 529 F.3d 478, 489 (2d Cir. 2008) (internal quotations and citation omitted). Under New York law, "collateral estoppel prevents a party from relitigating an issue decided against that party in a prior adjudication" where that issue (1) is identical to an issue already decided (2) in a previous proceeding in which that party had a full

and fair opportunity to litigate. *Fuchsberg & Fuchsberg v. Galizia*, 300 F.3d 105, 109 (2d Cir. 2002) (internal quotations and citations omitted). The litigant seeking the benefit of collateral estoppel must demonstrate the identicality and decisiveness of the issue, and the party to be precluded bears the burden of demonstrating the absence of a full and fair opportunity to litigate the issue in the prior action. *Buechel v. Bain*, 97 N.Y.2d 295, 304, 766 N.E.2d 914, 919 (N.Y. 2001). "New York requires only that the issue have been properly raised by the pleadings or otherwise placed in issue and actually determined in the prior proceeding." *Coveal v. Consumer Home Mortgage, Inc.*, No. 04 Civ. 4755 (ILG), 2005 WL 2708388, at *5 (E.D.N.Y. Oct. 21, 2005) (internal quotation marks and citation omitted). Moreover, "federal district courts are obliged to accord due recognition to the preclusive effect of state court judgments that adjudicate federal rights after full and fair consideration, even if the state court's decision may have been erroneous." *Harris v. N.Y. State Dep't of Health*, 202 F. Supp. 2d 143, 157 (S.D.N.Y. 2002).

Examining the facts raised and issues determined by the New York Supreme Court, the Court concludes that there is sufficient identity of issue between the allegations in state court action and those presented here. The New York Supreme Court has already held Plaintiff's allegations are without merit, finding that negligent investigation was not a viable claim in New York, and that Plaintiff failed to state a viable claim against the City for municipal liability. Doc. 11-2 at 4-5.

Additionally, Plaintiff has not contested that he had a full and fair opportunity to litigate the issues in the prior action, and the Court sees nothing in the record to suggest he lacked this opportunity, despite his *pro se* status. Under New York law, an inquiry into whether a party had a full and fair opportunity to litigate a prior determination must concentrate on "the various elements which make up the realities of litigation," including "the forum for the prior litigation, the competence and experience of counsel, the foreseeability of future litigation, and the context and circumstances surrounding the prior litigation that may have deterred the party from fully litigating the matter." *Conte v. Justice*, 996 F.2d 1398, 1401 (2d Cir. 1993) (citations omitted). A plaintiff's status as a *pro se* litigant does not, by itself, preclude barring a claim under the doctrine of collateral estoppel, but it is relevant to a determination of the fairness of his prior opportunity to be heard. *Cruz v. Root*, 932 F. Supp. 66, 69 (W.D.N.Y. 1996). Here, the Court finds no circumstances to suggest that Plaintiff was deterred from fully litigating the matter in

O'Callaghan v. City of New York, Not Reported in Fed. Supp. (2016)
2016 WL 7177509

state court, nor does the Plaintiff assert otherwise. Justice Chan's decision notes that Plaintiff submitted an opposition to the City's motion to dismiss. Doc. 11-2 at 1 ("Defendant made the instant motion to dismiss ... and plaintiff submitted opposition."); *see also* Doc. 8 at 1 (noting that counsel for the City told Plaintiff "that [he] must submit a reply to the City's motion [to dismiss], which [he] did").

**\*8** Accordingly, Plaintiff's claims, except for the claim arising from the Corporation Counsel's actions in defending the lawsuit, are also barred under the doctrine of collateral estoppel.

## IV. MUNICIPAL LIABILITY PURSUANT TO 42 U.S.C. § 1983 ("*MONELL* CLAIM")

The sole remaining claim is asserted against the City for the actions of the Corporation Counsel in defending the state case. Specifically, Plaintiff alleges that the City's motion to dismiss was dishonest and fraudulent and part of a greater conspiracy to protect the taxi cab industry in New York. Compl. ¶¶ 10-11. Additionally, Plaintiff asserts that Corporation Counsel Zachary Carter engaged in a cover-up "based on racial and age discrimination." *Id.* ¶ 12.

"Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). A municipality cannot be held liable under § 1983 on a theory of *respondeat superior. Id.* "[T]o prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citing *Monell*, 436 U.S. at 690-91). "The fifth element reflects the notion that 'a municipality may not be held liable under § 1983 solely because it employs a tortfeasor.' " *Hayes v. Cnty. of Sullivan*, 853 F. Supp. 2d 400, 438-39 (S.D.N.Y. 2012) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997)). Thus, a plaintiff must allege that such a municipal policy or custom is responsible for his injury. *Brown*, 520 U.S. at 403-04; *see also Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011) ("A municipality or other local government may be liable under [§ 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.") (quoting *Monell*, 436 U.S. at 692).

Courts in this Circuit apply a two prong test for § 1983 claims brought against a municipality. *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) (citation omitted). First, the plaintiff must "prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving [employee]." *Id.* (citation omitted). Second, the plaintiff must establish a " 'direct causal link between a municipal policy or custom and the alleged constitutional deprivation.' " *Hayes*, 853 F.Supp.2d at 439 (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). To satisfy the first requirement, a plaintiff must prove the existence of:

> (1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of the plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policy-making officials; or (4) a failure by official policy-makers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.

**\*9** *Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996) (internal citations and quotation marks omitted); *see also Brandon v. City of New York*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010) (quoting *Moray* and updating citations to cases). Although a plaintiff is not required to identify an express rule or regulation to establish a claim for municipal liability, proof of "a single incident alleged in a complaint, especially if it involved only actors below the policymaking level, does not suffice to show a municipal policy." *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) (quoting *Ricciuti v. N.Y. City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)) (internal quotation marks omitted); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 127 (1988) (plurality opinion) (explaining that only municipal officials who have "final policymaking authority" concerning the particular activities

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 154 of 529

O'Callaghan v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 7177509

giving rise to a plaintiff's claims "may by their actions subject the government to § 1983 liability" (citation omitted)). "In the end, therefore, a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury." *Hayes*, 853 F. Supp. 2d at 439 (quoting *Roe*, 542 F.3d at 37) (internal quotation marks omitted).

As to Plaintiff's claim arising from the Corporation Counsel's alleged fraudulent and discriminatory actions, Plaintiff has not satisfactorily alleged the adoption of a widespread custom, but instead only offers conclusory allegations of wrongdoing at the City-level. Plaintiff alleges that these actions were driven by the City's desire to avoid "bad publicity for an attack by a yellow cab driver against a senior citizen Uber driver." Compl. ¶¶ 11. Plaintiff further avers that the City, "starting from the top," protected the yellow cab industry because "the Mayor was working against Uber saying they were causing congestion...." *Id.* ¶ 6.

Such conclusory allegations must be disregarded. *Tieman v. City of Newburgh*, No. 13 Civ. 4178 (KMK), 2015 WL 1379652, at *14 (S.D.N.Y. Mar. 26, 2015) (listing cases and finding conclusory allegations inadequate where plaintiff alleged, *inter alia*, that the City had "a policy or practice of using excessive force when effectuating arrests, and fail[ed] to train and/or discipline its employees to prevent violations of arrestee's [sic] constitutional rights."); *see also Missel v. Cty. of Monroe*, 351 Fed.Appx. 543, 545 (2d Cir. 2009) ("To allege the existence of an affirmative municipal policy, a plaintiff must make factual allegations that support a plausible inference that the constitutional violation took place pursuant either to a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policymaking authority for the municipality."); *Duncan v. City of New York*, No. 11 Civ. 3826 (CBA), 2012 WL 1672929, at *3 (E.D.N.Y. May 14, 2012) (holding that "boilerplate statements" claiming that New York City had a custom of making and tolerating false arrests and of using excessive force "[were] insufficient to state a claim of municipal liability under *Monell*"). At no point does Plaintiff allege any details of the policy that purportedly guided the conspiracy and cover-up. Because Plaintiff fails to point to any non-conclusory plausible factual allegations concerning the policy that resulted in the deprivation of his rights, the remaining claim must also be dismissed.[10]

---

[10]   Plaintiff's memorandum in response also alleges that the taxi industry donated over $500,000 to

the Mayor's election campaign and that these contributions are under federal investigation. Doc. 16 at 2-3. These allegations were not included in the Complaint, but would not alter the Court's decision even if they were.

**V. LEAVE TO AMEND**

The Second Circuit has explained that "[a] *pro se* complaint is to be read liberally. Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citations and internal quotation marks omitted). Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, the "court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2).

**\*10** However, even under this liberal standard, this Court finds that any attempt to amend the pleading to include the additional individual defendants referenced in this case would be futile. It is clear from the Complaint that Plaintiff does not have any possibility of asserting plausible claims against these individuals. *See Cuoco*, 222 F.3d at 112 ("The problem with [plaintiff's] cause[ ] of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied.") (citing *Hunt v. Alliance N. Am. Gov't Income Trust*, 159 F.3d 723, 728 (2d Cir. 1998)); *see also Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 58 (2d Cir. 2002) (explaining that "[w]here it appears that granting leave to amend is unlikely to be productive ... it is not an abuse of discretion to deny leave to amend.... [and that] [a]n amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)") (citations omitted). Additionally, the Court has already taken into account Plaintiff's opposition papers and statements at the pre-motion conference, in which Plaintiff attempted to provide additional support for his claims.

Construing the Complaint liberally, Plaintiff references potential claims against the following additional individuals: Detective O'Leary, Sergeant Fox, Police Officer Guzik, Zachary W. Carter, and Yael Barbabay. For the following reasons, allowing Plaintiff an attempt to amend and serve these individual defendants would be futile. Therefore, Plaintiff's claims are dismissed with prejudice. *See Hobson v. Fischer*, No. 10 Civ. 5512 (SAS), 2011 WL 891314, at *6 (S.D.N.Y. Mar. 14, 2011).

O'Callaghan v. City of New York, Not Reported in Fed. Supp. (2016)
2016 WL 7177509

#### A. Leave to Amend as to Individual NYPD Officers is Futile.

Throughout his Complaint and brief, Plaintiff references the actions of Detective O'Leary, Sergeant Fox, and Police Officer Guzik, broadly asserting a cover-up, inadequate investigation, and concerted effort to conceal his assault. Doc. 16 at 2-3; Doc. 1 ¶¶ 2-7. Plaintiff further claims that Detective O'Leary committed age discrimination and obstruction of justice when he failed to provide Plaintiff with information regarding his attacker and "lied about the assailant being arrest for assault." *See* Doc. 16 at 2; Doc. 8 at 2. As for Police Officer Guzik and Sergeant Fox, Plaintiff does not allege any specific claims against them, but merely notes that Police Officer Guzik was the responding officer at the incident and Sergeant Fox later called him to indicate that no arrest had been made. *See* Compl. ¶¶ 2, 5.

For the same reasons as discussed above, any claims against the individual officers involved in the investigation of Plaintiff's case also fail under the doctrines of *res judicata* and collateral estoppel. Even if the Court were to read Plaintiff's Complaint as including the officers as defendants, Plaintiff cannot relitigate the same issues merely because the individual defendants were not parties to the case. "Under the modern doctrine of collateral estoppel, a party who has had a full and fair opportunity to litigate an issue and lost in prior litigation may be foreclosed from relitigating that issue in subsequent cases, even where the opposing party is different in each case." *Cliff v. Internal Revenue Service*, 496 F.Supp. 568, 576 (S.D.N.Y. 1980). Similarly, the doctrine of *res judicata* also bars claims "where the party against whom *res judicata* is asserted has a substantial identity with a party in a prior litigation where his interests were represented in the prior action." *Grossman v. Axelrod*, 466 F. Supp. 770, 775 (S.D.N.Y. 1979), aff'd, 646 F.2d 768 (2d Cir. 1981). Here, there is a substantial identity of interest between the City and the individual NYPD employees that Plaintiff identifies.

Defendant also argues that Plaintiff fails to state a claim against Detective O'Leary, Sergeant Fox, and Officer Guzik for the additional reason that there is no cause of action in the State of New York for negligent prosecution or investigation. Doc. 13 at 11-12. If the Court were to allow Plaintiff to amend his Complaint to include the individual NYPD officers, Plaintiff's claims related to the alleged negligent investigation would also be futile. *See Pandolfo v. U.A. Cable Sys. of Watertown*, 568 N.Y.S.2d 981, 982 (4th Dept. 1991) ("As a matter of public policy, there is no cause of action in the State of New York for negligent prosecution or investigation");

*see also Wright v. Orleans Cty.*, No. 14 Civ. 00622A (LF), 2015 WL 5316410, at *21 (W.D.N.Y. Sept. 10, 2015) (noting "negligent investigation ... is not recognized under New York law"). Similarly, "negligent investigation [is not] a basis for § 1983 liability in the absence of some special relationship creating an affirmative duty." *Wright*, 2015 WL 5316410 at *21. "Cases finding a special relationship typically involve a clear promise to take specific action on behalf of the plaintiff, such as a promise to arrest a violent neighbor 'first thing in the morning.' " *Damato v. City of N.Y.*, No. 06 Civ. 3030 (DC), 2008 WL 2019122, at *3 (S.D.N.Y. May 12, 2008). Additionally, "[a]n assurance to perform a basic police function, without more, does not amount to a promise to act affirmatively on behalf of plaintiffs." *Id.* Plaintiff here has not claimed any duty, nor pleaded any facts consistent with a special relationship.

**\*11** Therefore, Plaintiff's claims against the individual officers would likewise not be sufficient to overcome a motion to dismiss. [11]

[11]    Similarly, Defendant argues that to the extent any claims may be read to assert claims under New York state law, these claims must be dismissed because Plaintiff did not file a Notice of Claim within ninety days after the incident. *Id.* at 15-16. The Court need not consider this issue because it finds that these claims would be barred under the doctrines of *res judicata* and collateral estoppel.

#### B. Leave to Amend to Add the City's Lawyers is Futile Because They Are Entitled to Absolute Immunity.

The sole claim that the Court does not dismiss on the basis of collateral estoppel or *res judicata* is Plaintiff's claim regarding actions taken by Corporation Counsel Carter and ACC Barbabay. The Court finds that any attempt to sue the City's lawyers in their individual capacities would be futile because they are protected by the doctrine of absolute immunity.

"In determining immunity, [courts] accept the allegations of [the plaintiff's] complaint as true." *Kalina v. Fletcher*, 522 U.S. 118, 122 (1997); *see also Shmueli v. City of New York*, 424 F.3d 231, 233 (2d Cir. 2005). Courts construe Section 1983 "in harmony with general principles of tort immunities and defenses." *Filarsky v. Delia*, 132 S. Ct. 1657, 1665 (2012) (quotations and citation omitted). "City attorneys acting in their official capacity in defense of civil suits are afforded absolute immunity against § 1983 actions seeking damages."

Case 5:25-cv-00956-AJB-MJK   Document 9   Filed 12/08/25   Page 156 of 529

O'Callaghan v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 7177509

*Zbryski v. Bd. of Trustees of N.Y. Fire Dep't Pension Fund*, No. 01 Civ. 4801 (RCC), 2004 WL 2238503, at *6 (S.D.N.Y. Oct. 4, 2004) (citations omitted); *see also Spear v. Town of W. Hartford*, 954 F.2d 63, 66 (2d Cir. 1992); *Barrett v. United States*, 798 F.2d 565, 572-73 (2d Cir. 1986). "[O]nce a court determines that challenged conduct involves a function covered by absolute immunity, the actor is shielded from liability for damages regardless of the wrongfulness of his motive or the degree of injury caused." *Bernard v. Cnty. of Suffolk*, 356 F.3d 495, 503 (2d Cir. 2004).

Plaintiff's claim against the two attorneys stems entirely from their actions in defending the City against Plaintiff's lawsuits. Plaintiff alleges that ACC Barbabay acted dishonestly and fraudulently in the state court proceeding and that Carter further engaged in a cover-up "based on racial and age discrimination." Compl. ¶¶ 10-12. Absolute immunity thus bars suit for damages against them and any attempts to amend would be futile. *Karris v. Varulo*, No. 14 Civ. 1077 (SJF), 2014 WL 1414483, at *4 (E.D.N.Y. Apr. 10, 2014) (concluding that granting *pro se* prisoner leave to amend would be futile because defendants were entitled to absolute immunity, and collecting cases). Therefore the Court does not grant leave to amend as to Carter [12] and ACC Barbabay.

[12]     Defendant also argues that all of Plaintiff's claims against Carter also fail because Carter had no personal involvement in the alleged constitutional deprivations. Doc. 13 at 14-15. Because the Court finds that Carter is entitled to absolute immunity, the Court need not consider whether Plaintiff's claim against Carter would be barred for a lack of personal involvement.

## VI. CONCLUSION

 **\*12**  For the reasons set forth above, Defendant's motion to dismiss is GRANTED with prejudice. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 10, close the case, and mail a copy of this Order to Plaintiff.

It is SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2016 WL 7177509

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (2)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Reply Memorandum of Law in Further Support of Defendant City of New York's Motion to Dismiss the Complaint** <br> James O'CALLAGHAN, Plaintiff, v. CITY OF NEW YORK, Defendant. <br> 2016 WL 8117476 | — | S.D.N.Y. | July 13, 2016 | Motion |
| **2. Defendant City of New York's Memorandum of Law in Support of Its Motion to Dismiss the Complaint** <br> James O'CALLAGHAN, Plaintiff, v. CITY OF NEW YORK, Defendant. <br> 2016 WL 8117477 | — | S.D.N.Y. | May 09, 2016 | Motion |

**WESTLAW**   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History**

There are no History results for this citation.

2024 WL 4870495
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Matthew H. COLE, Plaintiff,
v.
Honorable Michael W. SMRTIC, et al. Defendants.

No. 1:24-CV-00847 (MAD/CFH)
|
Signed November 21, 2024

**Attorneys and Law Firms**

MATTHEW H. COLE, 271 Market Street, Amsterdam, New York 12010, Plaintiff pro se

**REPORT-RECOMMENDATION & ORDER**

CHRISTIAN F. HUMMEL, United States Magistrate Judge

**I. In Forma Pauperis**

**\*1** Plaintiff pro se Matthew H. Cole ("plaintiff") commenced this action (No. 1:24-CV-00623) on May 6, 2024, by filing a complaint. See Dkt. No. 1 ("Compl."). On September 26, 2024, plaintiff submitted what the Court construes to be a supplement to the complaint. [1] See Dkt. No. 7. In lieu of paying this Court's filing fees, he submitted an application for leave to proceed in forma pauperis ("IFP"). See Dkt. No. 2. The undersigned has reviewed plaintiff's IFP application and determines that he financially qualifies to proceed IFP. [2] Thus, the Court proceeds to its review of the complaint pursuant to 28 U.S.C. § 1915. Plaintiff has also submitted for the Court's review a Pro Se Application for Permission to File Electronically and a Motion to Appoint Counsel. See Dkt. Nos. 4, 5.

[1]     The submission includes a letter addressed to District Judge D'Agostino, titled, "Requirements for Cases Removed From State Court," Dkt. No. 7; a receipt from Montgomery County Clerk dated December 8, 2022; and a "Notice of Claim" with the caption of Cole v. County of Montgomery, dated December 7, 2022. See Dkt. No. 7. The undersigned has reviewed this submission in connection with the initial review of plaintiff's

complaint. See Sira v. Morton, 380 F. 3d 57, 67 (2d Cir. 2004).

[2]     Plaintiff is advised that, although he has been granted IFP status, he is still required to pay all fees and costs he may incur in this action, including, but not limited to, copying fees, transcript fees, and witness fees.

**II. Initial Review**

**A. Legal Standards**

Section 1915 of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). Thus, it is a court's responsibility to determine that a plaintiff may properly maintain his complaint before permitting him to proceed with his action.

Where, as here, the plaintiff proceeds pro se, "the court must construe his submissions liberally and interpret them to raise the strongest arguments that they suggest." Kirkland v. Cablevision Sys., 760 F.3d 223, 224 (2d Cir. 2014) (per curiam) (internal quotation marks omitted); see also Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir. 1994). As the Second Circuit stated,

There are many cases in which we have said that a pro se litigant is entitled to "special solicitude," that a pro se litigant's submissions must be construed "liberally," and that such submissions must be read to raise the strongest arguments that they "suggest[.]" At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, or arguments that the submissions themselves do not "suggest," that we should not "excuse frivolous or vexatious filings by pro se litigants," and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law[.]"

**\*2** Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006) (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

Cole v. Smith, Slip Copy (2024)

2024 WL 4870495

"The [Second Circuit]'s 'special solicitude' for pro se pleadings has its limits, because pro se pleadings still must comply with ... the Federal Rules of Civil Procedure [('Fed. R. Civ. P.')]." Kastner v. Tri State Eye, No. 19-CV-10668 (CM), 2019 WL 6841952, at *2 (S.D.N.Y. Dec. 13, 2019) (quoting Ruotolo v. IRS, 28 F.3d 6, 8 (2d Cir. 1994)). Pleading guidelines are provided in the Federal Rules of Civil Procedure. Specifically, Rule 8 requires the pleading to include:

> (1) a short and plain statement of the grounds for the court's jurisdiction ...;
>
> (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and
>
> (3) a demand for the relief sought...

FED. R. CIV. P. 8(a). Although "[n]o technical form is required," the Federal Rules make clear that each allegation contained in the pleading "must be simple, concise, and direct." Id. at 8(d). "The purpose ... is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." Flores v. Graphtex, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (internal quotation marks and citations omitted). Allegations that "are so vague as to fail to give the defendants adequate notice of the claims against them" are subject to dismissal. Sheehy v. Brown, 335 F. App'x 102, 104 (2d Cir. 2009) (summary order).

Further, Fed. R. Civ. P. 10 provides:

> [a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence – and each defense other than a denial – must be stated in a separate count or defense.

FED. R. CIV. P. 10(b). This serves the purpose of "provid[ing] an easy mode of identification for referring to a particular paragraph in a prior pleading[.]" Flores, 189 F.R.D. at 54 (internal quotation marks and citations omitted). A complaint that fails to comply with the pleading requirements "presents far too a heavy burden in terms of a defendant's duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims." Gonzales v. Wing, 167 F.R.D. 352, 355 (N.D.N.Y. 1996). As the Second Circuit has held, "[w]hen a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative ... to dismiss the complaint." Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (citations omitted). However, "[d]ismissal ... is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Id. (citations omitted).

**\*3** This Court also has an overarching obligation to determine that a claim is not legally frivolous before permitting a pro se plaintiff's complaint to proceed. See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp., 221 F.3d 362, 363 (2d Cir. 2000). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint.' " Aguilar v. United States, Nos. 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) [3] (quoting Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437 (2d Cir. 1998)); see also Neitzke v. Williams, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis.").

[3]　　Any unpublished cases cited within this Report-Recommendation & Order have been provided to plaintiff.

### B. Complaint

Plaintiff's civil cover sheet indicates that he seeks to bring this action pursuant to "Title U.S.C. 18 Section 241, Conspiracy Against Rights & Title U.S.C. 18 Section 242 Deprivation of rights Under Color of Law." Dkt. No. 1-1 at 1. The civil cover sheet further provides that his cause of action involves, "Violation of Due process, Speedy Trial Rights, Ineffective Assistance of Counsel. I feel I am being targeted for being black and gay." Id.

Plaintiff's form complaint checks the box indicating that he seeks to bring this case pursuant to 42 U.S.C. § 1983.

2024 WL 4870495

See Compl. at 3. In response to the question in the form complaint asking in "what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials," plaintiff responds, "Due Process, 30.30 Speedy Trial Violation, Ineffective Assistance of counsel."[4] Id. In response to a question asking him to explain "how each defendant acted under color of state or local law," plaintiff states "Each judge deliberately denied me due process, and refused to look into the paperwork to see that i was improperly denied my speedy trial rights. It was a tean [sic] effort. The ADA/Special Prosecutor withheld potential exculpatory material which was usd [sic] against me. All mentioned actions were done and upheld even after I showed federal law with supportive case law as a pro se litigant." Id.

[4]    Although plaintiff generally references ineffective assistance of counsel, Compl. at 4, he does not name any attorney who may have represented him. Any claims against the prosecutor would not be considered ineffective assistance of counsel because Mr. Maxwell, as the prosecutor, was not plaintiff's attorney.

Plaintiff provides that his "case is still on appeakl [sic] in Appellate Court Third Department. I feel they are guilty, or part of what I call a scandal. I went to them from the very start with a complaint to the grievance committee, where they denied any wrongdoing. It must be ok to violate Constitutional rights there. This is from March 2019 to present" Id.

In response to a question that asks plaintiff to state the facts underlying his claims, plaintiff states, "Please see attached Article 78 that is attached. It was dismissed being in the wrong court, but is on point." Id. at 4. Plaintiff did not provide the Court with any such attachment and has not submitted any Article 78 materials. See Compl., Dkt. No. 7.

In response to the form complaint's question asking about any injuries suffered as a result of the conduct he complains of, plaintiff states, "Sever [sic] depression over 20 years, irreperable [sic] harm, defamation of charcter [sic] by arguments not legally allowed to give. Loss of income, inability to gain and keep employment, mental trauma, instilled disbelief in justice in the legal system, familial traumam [sic] due to my legal battles." Id. Indicating the relief sought, plaintiff states

**\*4** Petitioner seeks reinstatement of driving priveldges [sic], and 10 million dollars for damages caused by conflict of interest, deliberate violation of Due Process, Speedy Trial rights, Ineffective assistance of counsel, malice, Brady Violation, Petitioner claims deliberate misconduct and malice in Montgomery County Court, the Saratoga Disrict Attorney's Office, and the Supreme Court Appellate Division Third department. ** This is subject to change if an attorney agrees to represent.

Compl. at 5. Although he typed his name, plaintiff does not sign the complaint where a signature is indicated. See id. at 8.

Plaintiff provides in his supplement that he "removed this action to district court asserting jurisdiction pursuant to 42 U.S.C. 1983, and § 1441." Dkt. No. 7. at 1. Plaintiff states that he removed this case from Montgomery County Supreme Court. See id. He states that he seeks or sought the removal because he was told he was "not guarantee counsel" at the state, but that "[i]n Federal Court, there is that option, pending qualification, and I am told, if a lawyer agrees to take it, then I really have something. I am in dire need of counsel." Id.

Plaintiff states, "[t]he ineffective assistance of counsel and The County Court are a matter already mentioned in the appeal." Dkt. No. 7 at 2. Plaintiff states that "[t]o get my conviction, I allege judicial and prosecutorial misconduct, and ineffective assistance of counsel × 4. That is why I am pro se. I had to protect myself when appointed counsel did not. It also went through a couple judges which is why they are mentioned in the preliminary complaint/paperwork, and why I mention bias." Id. Plaintiff states he can "prove each thing I saw not just with my words, but with transcripts[5] from the County Court, and the Adult Drug Court." Id. Plaintiff refers to being drug free for four and a half years and having academic success in college. Id. at 3. He states that he wishes this Court to hear his case because he believes he will not "see bias" in federal court "like I saw in others." Id. Plaintiff states that he "also put in a Notice of Removal in the Federal Court for those criminal charges that led to the Complaint. I do not trust the assigned appellate attorney. That case too has

Constitutional violations. That case number is 1:24-CR-301 (AMN)." Id.

5    Plaintiff did not provide any transcripts.

## C. Discussion [6]

6    As a courtesy, the Court has provided plaintiff with copies of any unpublished cases cited within this Report-Recommendation & Order.

### 1. Rule 8

As a threshold issue, plaintiff's complaint fails to meet the requirements of Rule 8. See FED. R. CIV. P. 8(a)(2). He does not provide a short and plain statement of the claim demonstrating why he is entitled to relief. Although he makes general references to both an Article 78 proceeding and a criminal proceeding and unexplained references to "Due Process, 30.30 Speedy Trial Violation, Ineffective of Counsel," he does not provide factual support or context. Thus, his complaint does not provide "fair notice" to defendants of the claims against them. See FED. R. CIV. P. 8(a)(2).

### 2. Heck v. Humphrey

However, there are several substantive concerns that further lead the undersigned to recommend dismissal. First, in referencing to "Due Process, 30.30 Speedy Trial Violation, Ineffective of Counsel" and explicitly referencing a criminal conviction, it is clear that plaintiff is attempting to seek some kind of review of a criminal proceeding or conviction. See Compl. at 3. Plaintiff also accuses all named judges of denying him due process and contends that an unnamed "ADA/Special Prosecutor withheld potential exculpatory material which was usd [sic] against me." Compl. at 4. Plaintiff also references a conviction. See Dkt. No. 7 at 4. Such claims would be barred by Heck v. Humphrey.

**\*5**  As this Court, citing the District of Connecticut, has set forth:

In Heck, the Supreme Court held that in order for a plaintiff "to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." Id. at 486-87. The court further held that "[a] claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983." Id. at 487 (emphasis in original).

[ ]

Thus, under Heck and its progeny, if a conviction has not been invalidated previously, a "§ 1983 action is barred ... no matter the target of the prisoner's suit ... if success in that action would necessarily demonstrate the invalidity of confinement or its duration." Wilkinson v. Dotson, 544 U.S. 74, 81-82 (2005) (emphasis in original).

Ali v. Shattuck, No. 8:24-CV-0128 (DNH/CFH), 2024 WL 2747619, at *3 (N.D.N.Y. May 29, 2024), report-recommendation adopted sub nom. Ali v. Dow, No. 8:24-CV-128, 2024 WL 3460745 (N.D.N.Y. July 18, 2024) (quoting Zografidis v. Richards, No. 3:22-CV-00631 (AVC), 2022 WL 21756775, at *7 (D. Conn. July 6, 2022), report and recommendation adopted (Oct. 7, 2022), aff'd, No. 22-3197, 2023 WL 7538211 (2d Cir. Nov. 14, 2023)).

Plaintiff has failed to demonstrate that any criminal charge(s), conviction, or sentence has been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." Zografidis, 2022 WL 21756775, at *7. Although plaintiff's complaint wants for detail, the undersigned can clearly determine that plaintiff seeks review of his criminal proceedings, conviction, and/or sentence. The claims plaintiff seeks to pursue relate to allegations that he was denied due process, denied speedy trial rights, and experienced ineffective assistance of counsel. Accordingly, plaintiff's claims are barred by Heck unless and until he can demonstrate favorable termination of his criminal conviction. [7]

7    The undersigned recognizes that claims that are determined to be barred by Heck are dismissed without prejudice. However, the undersigned has recommended dismissal with prejudice because

2024 WL 4870495

plaintiff has only named defendants who are immune from relief. Accordingly, the undersigned is recommending dismissal of the claims based on these immunities, rather than a Heck dismissal. The undersigned has included the Heck review for sake of completeness.

### 3. Immunities

Plaintiff names as defendants several defendants who are immune from suit. Insofar as plaintiff names Hon. Michael W. Smrtic, Interim Montgomery County Judge and Tatiana N. Coffinger, "County/Family/Surrogate's Court Judge"[8] such claims would be barred by judicial immunity.

[8]     Although plaintiff provides no facts regarding any family court proceedings, that he named a family court judge and makes general reference to that he seeks review over actions taken by a family court judge. Even if plaintiff were to amend his complaint to provide facts about any possible family court proceedings and details about any alleged violations of his rights that he believes he faced in that Court, if plaintiff seeks this Court's review of an order of the family court, such review would be barred by Rooker-Feldman, and if plaintiff seeks this Court's review or intervention of a currently pending/ongoing Family Court proceeding, such review would be barred by Younger. See Porter v. Nasci, No. 5:24-CV-0033 (GTS/TWD), 2024 WL 1142144, at *4 (N.D.N.Y. Mar. 15, 2024) (citations omitted), report and recommendation adopted, 2024 WL 3158645 (N.D.N.Y. June 25, 2024) ("Under the Rooker-Feldman doctrine, a federal district court lacks authority to review a final state court order or judgment where a litigant seeks relief that invites the federal district court to reject or overturn such a final state court order or judgment."); see also Diamond "D" Constr. Corp. v. McGowan, 282 F.3d 191, 198 (2d Cir. 2002) ("[F]ederal courts [must] abstain from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings.").

**\*6** "With minor exceptions, judges are entitled to absolute immunity for actions relating to the exercise of their judicial functions." Zavalidroga v. Girouard, No. 6:17-CV-682 (BKS/ATB), 2017 WL 8777370, at *8 (N.D.N.Y. July 7, 2017)

(citing Mireles v. Waco, 502 U.S. 9, 9-10 (1991) (per curiam)). "Judicial immunity has been created for the public interest in having judges who are 'at liberty to exercise their functions with independence and without fear of consequences.' " Id. (quoting Huminski v. Corsones, 396 F.3d 53, 74 (2d Cir. 2004)). "Judicial immunity applies even when the judge is accused of acting maliciously or corruptly." Id. (citation omitted); see Positano v. New York, No. 12-CV-2288 (ADS/AKT), 2013 WL 880329, at *4 (E.D.N.Y. Mar. 7, 2013) (explaining that the plaintiff may not bring action against a judge for actions taken in his judicial capacity, even when the actions violated the ADA).

"Judicial immunity is immunity from suit, not just immunity from the assessment of damages." Zavalidroga, 2017 WL 8777370, at *8 (citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). "The only two circumstances in which judicial immunity does not apply is when he or she takes action 'outside' his or her judicial capacity and when the judge takes action that, although judicial in nature, is taken 'in absence of jurisdiction.' " Id. (quoting Mireles, 502 U.S. at 11-12). "In determining whether or not a judge acted in the clear absence of all jurisdiction, the judge's jurisdiction is 'to be construed broadly, and the asserted immunity will only be overcome when the judge clearly lacks jurisdiction over the subject matter.' " Pacherille v. Burns, 30 F. Supp. 3d 159, 163 (N.D.N.Y. 2014) (quoting Ceparano v. Southampton Just. Ct., 404 F. App'x 537, 539 (2d Cir. 2011) (summary order)). "Whether a judge acted in a judicial capacity depends on the nature of the act [complained of] itself, i.e., whether it is a function normally performed by a judge, and [on] the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity." Ceparano, 404 F. App'x at 539 (internal quotation marks and citation omitted). "Further, if the judge is performing in his judicial capacity," he " 'will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction.' " Ceparano, 404 F. App'x at 539 (quoting Stump v. Sparkman, 435 U.S. 349, 362 (1978)). "Judges are not, however, absolutely 'immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity.' " Bliven v. Hunt, 579 F.3d 204, 209 (2d Cir. 2009) (quoting Mireles, 502 U.S. at 11).

Thus, as plaintiff names the judicial defendants in relation to actions or omissions that they took in their roles as judges, their actions are protected by absolute judicial immunity. To the extent plaintiff names Hon. Felix Catena, "Retired

Administrative Law Judge," Judge Catena is also protected by absolute judicial immunity as a judge's retirement, "does not impact [his or] her immunity for acts taken in [his or] her official capacity before her retirement." McCray v. Lewis, No. 16-CV-3855 (WFK/VMS), 2016 WL 4579081, at *2 (E.D.N.Y. Aug. 31, 2016). To the extent plaintiff may seek to sue the judges their official capacities, the suit is barred by the Eleventh Amendment. See Pacherille v. Burns, 30 F. Supp. 3d 159, 163 n.5 (N.D.N.Y. 2014) ("The Eleventh Amendment shields judges from suit to the extent that they are sued in their official capacities.").

**\*7** In addition, plaintiff also references, exclusively in his "relief" section of the form complaint, "the Supreme Court Appellate Division, Third Department" when stating that he experienced "deliberate misconduct and malice." Compl. at 7. He does not name this Court as a defendant anywhere in the complaint. However, even if plaintiff were to have named the Appellate Division, Third Department as a defendant, such defendant would also need to be dismissed based on Eleventh Amendment immunity as the Appellate Division "is merely an agency or arm of New York State." Benyi v. New York, No. 3:20-CV-1463 (DNH/ML), 2021 WL 1406649, at *5 (N.D.N.Y. Mar. 23, 2021), report and recommendation adopted, No. 3:20-CV-1463, 2021 WL 1404555 (N.D.N.Y. Apr. 13, 2021) (citation omitted). Accordingly, to the extent a liberal reading of the complaint may suggest that plaintiff seeks to name the Appellate Division as a defendant, such claims are barred by Eleventh Amendment immunity. See Compl.

Finally, insofar as plaintiff seeks to sue Prosecutor Samuel V. Maxwell, Esq., Assistant District Attorney, in addition to the Heck issues noted above, he would be protected by absolute prosecutorial immunity. As this Court has recently reiterated,

Prosecutors enjoy "absolute immunity from § 1983 liability for those prosecutorial activities 'intimately associated with the judicial phase of the criminal process.' " Barr v. Abrams, 810 F.2d 358, 360-61 (2d Cir. 1987) (citing Imbler v. Pachtman, 424 U.S. 409, 430 (1976)). This immunity encompasses "virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate." Hill v. City of New York, 45 F.3d 653, 661 (2d Cir. 1995) (internal quotations and citation omitted). Absolute immunity applies when a prosecutor's conduct, acting as an advocate during the judicial phase of the criminal process, "involves the exercise of discretion." Flagler v. Trainor, 663 F.3d 543, 547 (2d Cir. 2011) (citing Kalina v. Fletcher, 522 U.S. 118, 127 (1997)).

Accordingly, absolute immunity extends to functions such as "deciding whether to bring charges and presenting a case to a grand jury or a court, along with the tasks generally considered adjunct to those functions, such as witness preparation, witness selection, and issuing subpoenas." Simon v. City of New York, 727 F.3d 167, 171 (2d Cir. 2013) (citing Imbler, 424 U.S. at 431 n.33); see also Flagler, 663 F.3d at 547 (explaining, "the Supreme Court has found prosecutors absolutely immune from suit for alleged misconduct during a probable cause hearing, in initiating a prosecution, and in presenting the State's case ... [but] withheld absolute immunity for conduct unrelated to advocacy, such as giving legal advice, holding a press conference, or acting as a complaining witness."). "[O]nce a court determines that challenged conduct involves a function covered by absolute immunity, the actor is shielded from liability for damages regardless of the wrongfulness of his motive or the degree of injury caused ...." Bernard v. Cnty. of Suffolk, 356 F.3d 495, 503 (2d Cir. 2004) (citing Cleavinger v. Saxner, 474 U.S. 193, 199-200 (1985)).

Williams v. Atkins, No. 5:24-CV-0573 (DNH/TWD), 2024 WL 3649849, at *5 (N.D.N.Y. June 11, 2024), report and recommendation adopted, No. 5:24-CV-573, 2024 WL 3548760 (N.D.N.Y. July 26, 2024).

Plaintiff appears to suggest that Mr. Maxwell "withheld potentially exculpatory material" that was used against him. Compl. at 4. Beyond the Heck barriers already discussed, even if plaintiff could amend to provide greater detail, absolute immunity would extent to even this alleged misconduct as such allegations clearly fall within the scope of prosecutorial immunity. Accordingly, it is recommended that any claims against ADA Samuel V. Maxwell be dismissed for absolute prosecutorial immunity. "Furthermore, because the District Attorney's prosecutorial immunity is substantive and not something that can be corrected by a better pleading, I recommend that the dismissal be with prejudice." Phillips v. New York, No. 5:13-CV-927, 2013 WL 5703629, at *5 (N.D.N.Y. Oct. 17, 2013) (quoting Cuoco v. Moritsugu, 222 F.3d 99, 223 (2d Cir. 2000)). [9]

9    Plaintiff appears to characterize his submissions as a purported removal to federal court or suggests that he seeks to remove his case from Montgomery County Court to this Court. See Dkt. No. 7 (citing 28 U.S.C. § 1441). However, in addition

to the infirmities mentioned above, plaintiff has not demonstrated that any proceeding related to this complaint has been properly removed to, or is subject to removal to, this Court. See, e.g., 28 U.S.C. § 1446. Indeed, plaintiff's submissions appear to indicate that plaintiff is the plaintiff in the County Court action. See id. § 1446(a).

### III. Conclusion

**\*8** It is **ORDERED**, that plaintiff's in forma pauperis application (dkt. no. 2) be **GRANTED**; and it is

**RECOMMENDED**, that plaintiff's section 1983 claims against Honorable Michael W. Smrtic; Tatiana N. Coffinger, County/Family/Surrogate's Court Judge; and Felix Catena, Retired Administrative Law Judge (Dkt. Nos. 1, 7) be **DISMISSED WITH PREJUDICE** as follows: (1) claims brought against them in their personal/individual capacities for judicial immunity, and (2) claims brought against them in their official capacities for Eleventh Amendment immunity; and it is further

**RECOMMENDED**, that plaintiff's section 1983 claims against Assistant District Attorney Samuel V. Maxwell (Dkt. Nos. 1, 7) be **DISMISSED WITH PREJUDICE** due to absolute prosecutorial immunity; and it is further

**RECOMMENDED**, that, to the extent a liberal reading of the complaint may suggest that plaintiff seeks to name the Appellate Division, Third Department, as a defendant (Dkt. Nos. 1, 7), such claims be **DISMISSED WITH PREJUDICE** as barred by Eleventh Amendment immunity, and it is

**RECOMMENDED**, that plaintiff's pro se motion for permission to file electronically (dkt. no. 4) and motion to appoint counsel [10] (dkt. no. 5) be **DISMISSED AS MOOT** based on the above recommendations, and it is

[10]    The undersigned also notes that plaintiff did not contend that he made any efforts to obtain counsel on his own, show proof of any attorneys he contacted. See Terminate Control Corp v. Horowitz, 28 F.3d 1335 (2d Cir. 1994). See Dkt. No. 5.

**ORDERED**, that the Clerk serve this Report-Recommendation & Order on plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1), parties have **FOURTEEN (14)** days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 72. [11]

[11]    If you are proceeding pro se and are served with this Report-Recommendation and Order by mail, three (3) additional days will be added to the fourteen (14) day period, meaning that you have seventeen (17) days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(c).

**All Citations**

Slip Copy, 2024 WL 4870495

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **1.  Docket 1:24-CV-00847**<br>Cole v. Smrtic et al | — | N.D.N.Y. | July 08, 2024 | Docket |

**History (2)**

**Direct History (2)**

1. Cole v. Smrtic 🐾
   2024 WL 4870495 , N.D.N.Y. , Nov. 21, 2024

*Report and Recommendation Adopted by*

2. Cole v. Smrtic
   2025 WL 247901 , N.D.N.Y. , Jan. 21, 2025

**WESTLAW**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 145297
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Maureen E. SCOTT, Plaintiff,

v.

Heather DJECK; Doug Campbell; Desiree Golden; Town
of Forestport Judge Mark Ritter; Town of Forestport
Court Clerk; Brian Miga, Town of Forestport Supervisor;
Kathy Schmelzle, Forestport Town Clerk '07; Mr.
Smith, Forestport Town Codes Officer; Ms. Paschke,
Forestport Town Receiver of Taxes; Scott McNamara,
Dist. Atty., Oneida County; Grant Garramone, Assist.
Dist. Atty., Oneida County; Oneida County Psychiatric
Ctr.; Dr. Krishnappa, Oneida County Psychiatric Ctr.;
Dr. Mallick, Oneida County Psychiatric Ctr.; Dr.
Thesee, Oneida County Psychiatric Ctr.; Dr. Mendolez,
Oneida County Psychiatric Ctr.; Cathy Totaro, Nurse
Pract., Oneida County Psychiatric Ctr.; York St. Clinic;
Ms. Lemon, Social Worker, York St. Clinic; Mr.
Mills, R.N., York Street Clinic; Dr. Smith, York St.
Clinic; Samuel Giacona, Atty.; William Stevens, Atty.;
Bernabei & Wachtel, PLLC; Kati Daffan, Bernabei &
Wachtel; Patricia Branch, Office Manager, Bernabei
& Wachtel; Smith, Sovik, Kendrick & Sugnet, P.C.;
Christopher S. Ciaccio, Atty.; Olinsky & Shurtliff, LLC;
Silberstein, Awad & Miklos, P.C.; Carroll & Carroll
Lawyers, P.C.; Kenny & Kenny, PLLC; U.S. Comm'n
of Civ. Rights; Green & Foushee; Richard N. Bach;
the Nbhd. Ctr., c/o Linda Parker; Kehoe and Nesbuth,
Pub. Def. Office, Utica, N.Y.; Judge James Tormey,
Supreme Ct., Oneida County; Judge Hester, Supreme
Ct., Oneida County; Trace, Assis. N.Y.S. Atty. Gen.;
M.H.L.S. Michael McCormick, Atty., Oneida County
Psychiatric Ctr.; Oneida County Health Dept.; Daniel W.
Gilmore, Dir. of Envtl. Health, Oneida County; Town
of Booneville Judge Esciac; N.Y.S. Police; Oneida
County Sheriff's Dept.; Sheriff, Oneida County; N.Y.S.
Atty. Gen.; N.Y.S. Court Sys.; U.S.Ct. Sys.; N.Y.S.
Health Dept.; and N.Y.S. Governor's Office, Defendants.

No. 5:09–CV–1122 (GTS/GHL).
|
Jan. 11, 2010.

**Attorneys and Law Firms**

Maureen E. Scott, Auburn, NY, pro se.

### DECISION and ORDER

HON. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court in this *pro se* civil rights action is a Report–Recommendation, filed by United States Magistrate Judge George H. Lowe on November 11, 2009, recommending, *inter alia,* that a number of Defendants be dismissed from this action, and that the Court dismiss Plaintiff's entire Complaint if she fails to file an Amended Complaint within thirty (30) days of the filing date of this Decision and Order. (Dkt.Nos.2, 5.) Plaintiff has not filed an Objection to the Report–Recommendation. For the reasons set forth below, Magistrate Judge Lowe's Report–Recommendation is accepted and adopted in its entirety; forty-four (44) Defendants are dismissed from this action; and the remainder of Plaintiff's Complaint is conditionally dismissed unless, within thirty (30) days of the filing date of this Decision and Order, Plaintiff files an Amended Complaint that states a claim upon which relief can be granted (with respect to her remaining causes of action).

### I. STANDARD OF REVIEW

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C). [1] When only general objections are made to a magistrate judge's report-recommendation (or the objecting party merely repeats the allegations of his pleading), the Court reviews for clear error or manifest injustice. *See Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at \*2–3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999). [2] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94–CV2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

[1]  On *de novo* review, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse discretion in denying plaintiff's request to present additional testimony where he "offered no justification for not offering the testimony at the hearing before the magistrate").

[2]  *See also Vargas v. Keane,* 93–CV–7852, 1994 WL 693885, at \*1 (S.D.N.Y. Dec.12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

### II. DISCUSSION

After carefully reviewing all of the papers in this action, including Magistrate Judge Lowe's thorough Report–Recommendation, the Court can find no error in the Report–Recommendation, clear or otherwise. As a result, the Report–Recommendation is accepted and adopted in its entirety.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Lowe's Report–Recommendation (Dkt. No. 5) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that the Clerk of the Court remove the words "and children" after Plaintiff's name on the docket sheet; and it is further

**ORDERED** that the Clerk of the Court add the following entities as named Defendants to the docket: "Sheriff, Oneida

County"; "New York State Attorney General"; "New York State Court System"; "United States Court System"; "New York State Health Department"; and "New York State Governor's Office"; and it is further

**\*2 ORDERED** that the Clerk of the Court further amend the docket so as to (1) delete the words "Oneida Co. Psychiatric Dietary" and replace them with the words "Oneida County Psychiatric Center", (2) delete the words "Bernabei and (Katz) Wachtel, PLLC," and replace them with the words "Bernabei & Wachtel, PLLC", and (3) delete the words "N.Y.S. Atty Gen. RE. Asst. Atty Gen. Trace" and replace them with the words "Trace, Assistant New York State Attorney General"; and it is further

**ORDERED** that Plaintiff's claims against the following forty-four (44) named Defendants are **DISMISSED** from this action: (1) Heather Djeck; (2) Doug Campbell; (3) Desiree Golden; (4) Michael McCormick; (5) Judge Hester; (6) Judge Mark Ritter; (7) Judge James Tormey; (8) Judge Escziac; (9) Grant Garramone; (10) New York State Attorney General; (11) Assistant New York State Attorney General Trace; (12) U.S. Commission of Civil Rights; (13) "U.S. Court System"; (14) New York State Police; (15) "New York State Court System"; (16) New York State Health Department; (17) Scott McNamara; (18) Brian Miga; (19) Mr. Smith, Town Codes Officer; (20) Kathy Schmelzle; (21) Town of Forestport Court Clerk; (22) Ms. Paschke, Town Receiver of Taxes; (23) Oneida County Psychiatric Center; (24) Dr. Mendolez, Oneida County Psychiatric Center; (25) Cathy Totaro; (26) Mr. Mills, R.N., Oneida County Psychiatric Center; (27) Dr. Smith, Oneida County Psychiatric Center; (28) Samuel Giacona, Esq.; (29) William Stevens, Esq.; (30) Bernabei & Wachtel, PLLC; (31) Kati Daffan; (32) Patricia Branch; (33) Smith, Sovik, Kendrick & Sugnet, P.C.; (34) Christopher S. Ciaccio, Esq.; (35) Olinsky and Shurtliff, LLC; (36) Silberstein, Awad & Miklos, P.C.; (37) Carroll & Carroll Lawyers, P.C.; (38) Kenny & Kenny, PLLC; (39) Green & Foushee; (40) Richard N. Bach; (41) Public Defender Kehoe; (42) Public Defender Nesbuth; (43) Oneida County Health Department; and (44) Daniel W. Gilmore; and it is further

**ORDERED** that, to the extent that Plaintiff claims that the Sheriff of Oneida County "molested" her, that claim is **DISMISSED;** and it is further

**ORDERED** that the remainder of the claims in Plaintiff's Complaint (Dkt. No. 1) will be *sua sponte* **DISMISSED** in their entirety, without prejudice, and without further Order of

this Court, unless, within **THIRTY (30) DAYS** of the filing date of this Decision and Order, Plaintiff files an Amended Complaint that states a claim upon which relief may be granted (with regard to the causes of action not dismissed above in this Decision and Order).

### *REPORT–RECOMMENDATION AND ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

The Clerk has sent to the Court a *pro se* civil rights complaint submitted by Maureen E. Scott [1] ("Plaintiff"). Dkt. No. 1. Plaintiff also submitted an application to proceed *in forma pauperis.* Dkt. No. 2. Based on the following, I recommend that Plaintiff file an amended complaint should Plaintiff wish to avoid dismissal of this action.

[1]    Plaintiff previously filed two actions in this District: *Scott v. U.S. Supreme Court, et al.,* 5:98–CV–1142 (TJM/GJD) (transferred to W.D.N.Y.) and *Scott v. Eden Park Nursing,* 5:98–CV–1143 (TJM/GJD) (dismissed).

### I. The Complaint

#### A. Plaintiff and Children

**\*3** Plaintiff seeks to bring the complaint on behalf of herself and her children. Dkt. No. 1, at p. 1. [2] The complaint indicates that the children are now adults. *Id.* However, Plaintiff, who is a non-attorney, may not represent the claims of any other person, including her adult offspring. *Chase v. Czajka,* No. 1:05–CV–0779, 2007 WL 680741, at \*1, n. 2 (N.D.N.Y. Feb. 28, 2007) (citing *Tindall v. Poultney High Sch. Dist.,* 414 F.3d 281 (2d Cir.2005)). Moreover, the complaint does not identify the children by name and is signed only by Plaintiff. [3] Dkt. No. 1. Therefore, Plaintiff may not represent her children. Accordingly, the Clerk should be directed to remove the party text "and children" from Plaintiff's name on the docket.

[2]    Page numbers refer to those assigned by the Court's electronic filing system.

[3]    In addition, it appears that Plaintiff is unaware of the location and well-being of her children. Dkt. No. 2, at p.

#### B. Additional Defendants

A review of the complaint and the docket reveals that six entities that were named as defendants in the complaint are not included as defendants on the docket. *See* Dkt. No. 1, at p. 1 (caption). Accordingly, the Clerk should be directed to add the following as defendants: Sheriff of Oneida County; "N.Y.S. Atty Gen.;" "N.Y.S. Court System;" U.S. Court System; "N.Y.S. Health Dept.;" and "N.Y.S. Gov. Office." *See id.*

### C. 28 U.S.C. § 1915(e)(2)(B)

Section 1915(e) directs that, when a plaintiff seeks to proceed *in forma pauperis,* "(2) ... the court shall dismiss the case at any time if the court determines that—... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). Thus, the court has a responsibility to determine whether a complaint may be properly maintained in this district before it may permit a plaintiff to proceed with an action *in forma pauperis. See id.* The court also has the duty to show liberality towards *pro se* litigants, *Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir.1990) (per curiam), and extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond. *Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir.1983).

Generally, Plaintiff alleges that she was wrongfully arrested and detained, and that her property and life were endangered. [4] Dkt. No. 1 at pp. 2, 9. Plaintiff was detained at Oneida County Correctional Facility and later at Oneida County Psychiatric Center. *Id.* at pp. 11–12. Plaintiff named over fifty defendants, which will discussed in more detail as follows. Plaintiff seeks monetary and injunctive relief.

[4]    The Court notes that the allegations in the complaint are rambling and disjointed in contravention of Fed.R.Civ.P. 8(a) (2), which requires that the complaint contain a short and plain statement of the claim.

### 1. Defendants Campbell, Golden, and Djeck

Plaintiff alleges that her neighbors, Defendants Doug Campbell, Desiree Golden, and Heather Djeck, violated her civil rights by, *inter alia,* providing false information to the New York State Police, physically assaulting her, trespassing on her property, committing vandalism and arson, and impeding her ability to file complaints. Dkt. No. 1 at pp. 9–10, 25–26. Plaintiff also summarily claims that these defendants "molested" her. *Id.* at p. 28.

**\*4**   First, a plaintiff cannot hold a defendant liable under § 1983 unless he or she can establish that the defendant acted under color of state law. *See* 42 U.S.C. § 1983; *see also Rounseville v. Zahl,* 13 F.3d 625, 628 (2d Cir.1994) (noting state action requirement under § 1983). It is the plaintiff's duty to allege that the defendant acted under color of state law, and if a plaintiff fails to plead that element of his claim, a court may dismiss an action under 28 U.S.C. § 1915(e). *See, e.g., Carollo–Gardner v. Diners Club,* 628 F.Supp. 1253, 1256 (E.D.N.Y.1986) (dismissing as frivolous *pro se* complaint in which the plaintiff failed to allege state action by defendants) (citations omitted).

Here, Plaintiff has not alleged any state action by Doug Campbell, Desiree Golden, and Heather Djeck. The complaint indicates that these defendants are private individuals, who are Plaintiff's neighbors. Therefore, the complaint fails to state a claim upon which relief may be granted against these defendants.

Second, regarding the conclusory allegation that she was "molested" by these defendants, "[t]he Second Circuit has held that 'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.' " *Jemzura v. Public Serv. Com'n,* 961 F.Supp. 406, 413 (N.D.N.Y.1997) (quoting *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987)).

Here, Plaintiff has provided a one-sentence conclusory allegation that she was "molested." Plaintiff provides absolutely no specific allegations of fact to support this allegation. Therefore, Plaintiff has failed to state a claim upon which relief may be granted. Accordingly, I recommend that Defendants Campbell, Golden, and Djeck be dismissed as defendants.

### 2. Defendant McCormick

Plaintiff claims that she provided a "Notice of Claim" to Defendant Michael McCormick, an attorney for Mental Hygiene Legal Services ("M.H.L.S."). Dkt. No. 1 at p. 15.

An attorney employed by M.H.L.S. is not a state actor for purposes of § 1983. *Pecou v. Hirschfeld,* Case No. 07–cv–5449, 2008 WL 957919, at \*2 (E.D.N.Y. Apr.3, 2008)

(dismissing all claims against M.H.L.S. attorneys) (citing *Fisk v. Letterman,* 401 F.Supp.2d 362, 378 (S.D.N.Y.2005) (holding that a court-appointed attorney is not a state actor, even if employed by the M.H.L.S., a state-funded legal services agency under the direction of the New York State Office of Court Administration)).

Here, the complaint indicates that Defendant McCormick is an attorney for M.H.L.S. Therefore, he is not a state actor for purposes of § 1983. Accordingly, I recommend that Defendant McCormick be dismissed because the complaint fails to state a claim upon which relief may be granted against this defendant.

### 3. Defendant Kehoe
Plaintiff claims that she was represented by Defendant Kehoe, a public defender, during a court proceeding on October 7, 2008. Dkt. No. 1 at pp. 14–15. Plaintiff summarily claims that this attorney lied during the proceeding. *Id.* at p. 23.

**\*5** As noted, section 1983 creates a cause of action only against persons acting under color of state law. *See, e.g., Rodriguez v. Phillips,* 66 F.3d 470, 473 (2d Cir.1995). A "public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding." *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *accord Rodriguez v. Weprin,* 116 F.3d 62, 65–66 (2d Cir.1997).

Here, Plaintiff's conclusory allegation is insufficient to establish that this defendant was acting under color of state law. Accordingly, I recommend that Defendant Kehoe be dismissed because the complaint fails to state a claim upon which relief may be granted against this defendant.

### 4. Defendant Hester
Plaintiff claims that Judge Hester of the Oneida County Supreme Court ordered that Plaintiff be returned to the psychiatric facility. Dkt. No. 1 at p. 16.

Judges are entitled to absolute immunity for actions relating to the exercise of their judicial functions. *Mireless v. Waco,* 502 U.S. 9, 9–10, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991). Judicial immunity has been created for the public interest in having judges who are " 'at liberty to exercise their functions with independence and without fear of consequences.' " *Huminski v. Corsones,* 396 F.3d 53, 74 (2d Cir.2004) (quoting

*Pierson v. Ray,* 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)). Judicial immunity applies even when the judge is accused of acting maliciously or corruptly. *Imbler v. Pachtman,* 424 U.S. 409, 419 n. 12, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (citing *Pierson,* 386 U.S. at 554). Judicial immunity is immunity from suit, not just immunity from the assessment of damages. *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). However, there are two circumstances in which judicial immunity does not apply: when he or she takes action "outside" his or her judicial capacity and when the judge takes action that, although judicial in nature, is taken "in absence of jurisdiction." *Mireles,* 502 U.S. at 11–12.

Here, Plaintiff claims that Judge Hester ordered that Plaintiff be returned to the psychiatric facility. Plaintiff is clearly referring to a judicial act. However, Plaintiff does not claim that Judge Hester somehow acted "outside" of his judicial capacity, or that Judge Hester acted in the absence of jurisdiction. Therefore, judicial immunity should apply. Accordingly, Judge Hester should be dismissed as a defendant.

### 5. Defendant Ritter
Plaintiff alleges that Judge Mark Ritter, Town Judge of Forestport, New York, failed to render a decision regarding her claim that her neighbors vandalized her property even though Judge Ritter stated that he mailed a decision to her. Dkt. No. 1 at p. 12. Plaintiff also summarily claims that Judge Ritter violated her civil rights and that Judge Ritter "molested" her. *Id.* at pp. 24, 28. Plaintiff seeks the "dismis[sal]" of Judge Ritter and an award from his malpractice insurance carrier. *Id.* at p. 29.

**\*6** First, Plaintiff's allegation regarding the rendering of a decision clearly refers to a judicial act. However, Plaintiff does not claim that Judge Ritter somehow acted "outside" of his judicial capacity, or that Judge Ritter acted in the absence of jurisdiction. Therefore, judicial immunity should apply.

Second, Plaintiff's allegations that Judge Ritter violated her civil rights and that he "molested" her are conclusory and insufficient to state a claim. Accordingly, Judge Ritter should be dismissed as a defendant.

### 6. Defendant Tormey
Plaintiff alleges that Judge James Tormey, a Supreme Court Justice, "refused" numerous "Notices of Complaints" that

2010 WL 145297

Plaintiff sent to him. Dkt. No. 1, at p. 3. She also summarily alleges that Judge Tormey violated her civil rights and that Judge Tormey "molested" her. *Id.* at pp. 24, 28.

First, Plaintiff's allegation regarding Judge Tormey's handling of her complaints refers to a judicial act. However, Plaintiff does not claim that Judge Tormey somehow acted "outside" of his judicial capacity, or that Judge Tormey acted in the absence of jurisdiction. Therefore, judicial immunity should apply.

Second, Plaintiff's allegations that Judge Tormey violated her civil rights and "molested" her are conclusory and insufficient to state a claim. Accordingly, Judge Tormey should be dismissed as a defendant.

### 7. Defendant Escziac

Plaintiff alleges that she "never saw charges" from Judge Escziac, Town Judge of Booneville, New York. Dkt. No. 1, at p. 20. She also appears to claim that she never received "a hearing" and was never sentenced by Judge Escziac. *Id.* She further summarily alleges that Judge Escziac violated her civil rights, and that Judge Escziac "molested" her. *Id.* at pp. 24, 28. Plaintiff seeks the "dismis[sal]" of Judge Escziac and an award from his malpractice insurance carrier. *Id.* at p. 29.

First, Plaintiff's allegations regarding Judge Escziac's handling of a criminal matter refer to judicial acts. However, Plaintiff does not claim that Judge Escziac somehow acted "outside" of his judicial capacity, or that Judge Escziac acted in the absence of jurisdiction. Therefore, judicial immunity should apply.

Second, Plaintiff's allegations that Judge Escziac violated her civil rights and molested her are conclusory and insufficient to state a claim. Accordingly, Judge Escziac should be dismissed as a defendant.

### 8. Defendant Garramone

Plaintiff alleges that she "refiled" numerous "Notice of Complaints" with Defendant Grant Garramone, an Assistant District Attorney in Oneida County. Dkt. No. 1 at p. 3. Plaintiff appears to allege that this defendant failed to take action. *Id.* at p. 11. Plaintiff also summarily asserts that this defendant "molested" her. *Id.* at p. 28.

First, " '[p]rosecutors are absolutely immune from liability under § 1983 for their conduct in initiating a prosecution

and in presenting the State's case.' " *Lindsey v. DeAngelis,* No. 1:07–CV–0753, 2007 WL 2261587, at *2 (N.D.N.Y. Aug. 2, 2007) (quoting *Pinaud v. County of Suffolk,* 52 F.3d 1139, 1147 (2d Cir.1995) (internal quotations and citations omitted); *Dory v. Ryan,* 25 F.3d 81, 83 (2d Cir.1994) (prosecutorial immunity covers virtually all acts, regardless of motivation, associated with the prosecutor's function, including conspiracies to present false evidence)). "This immunity applies to individual district attorneys for claims arising out of acts 'within the scope of their duties in initiating and pursuing criminal prosecution.' " *Lindsey,* 2007 WL 2261587, at *2 (citing *Pinaud,* 52 F.3d at 1147 (internal quotations and citations omitted)).

**\*7** The allegations in the complaint relate to Defendant Garramone's handling of Plaintiff's complaints. Accordingly, he should be held absolutely immune. Therefore, the complaint fails to state a claim upon which relief may be granted against this defendant.

Second, Plaintiff's allegation that Defendant Garramone "molested" her is conclusory and insufficient to state a claim. Accordingly, Grant Garramone should be dismissed as a defendant.

### 9. Defendants New York State Attorney General and Assistant Attorney General Trace [5]

[5]     Plaintiff named the latter defendant as "N.Y.S. Atty Gen. RE [:] Asst. Atty Gen. Trace." Dkt. No. 1, at p. 8.

Plaintiff claims that she sent notices of claims to the New York State Attorney General's Office in "as early as May [of] 2008." Dkt. No. 1 at p. 16. She also asserts that in late February of 2009, a hearing was held at which Defendant Trace, an Assistant Attorney General, "entered" a brief that he knew was based on hearsay. *Id.* at p. 15.

A prosecutor may not be held liable under § 1983 in his or her individual capacity for acts in performance of official duties. *Imbler v. Paachtman,* 424 U.S. 409, 430–31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). The doctrine of *Imbler* has been extended to government attorneys handling administrative proceedings, *Butz v. Econoou,* 438 U.S. 478, 512–17, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), and to their initiation of civil litigation in federal and state courts, *Barrett v. United States,* 798 F.2d 565, 572 (2d Cir.1986); *see also Barr v. Abrams,* 810 F.2d 358, 361 (2d Cir.1987) (holding assistant attorney generals immune from suit based on their actions in filing a

2010 WL 145297

criminal information and procuring arrest warrant); *see also Cohen v. Bane,* 853 F.Supp. 620, 627 (E.D.N.Y.1994) (noting that "absolute immunity has been extended to government attorneys handling administrative proceedings and to the initiation of civil litigation").

Accordingly, the New York State Attorney General should be held absolutely immune with regard to the handling of Plaintiff's notices; and Assistant Attorney General Trace should be held immune with regard to the alleged brief. Accordingly, I recommend that Defendants New York State Attorney General and Assistant Attorney General Trace be dismissed.

### 10. Defendant U.S. Commission of Civil Rights

Plaintiff named the U.S. Commission of Civil Rights as a defendant. She claims that she sent a "Notice of Claim" to the U.S. Commission of Civil Rights. Dkt. No. 1, at p. 15.

Plaintiff is advised that because an action against a federal agency or federal officers in their official capacities is essentially a suit against the United States, such suits are barred under the doctrine of sovereign immunity, unless such immunity is waived. *Federal Deposit Ins. Corp. v. Meyer,* 510 U.S. 471, 484–86, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994); *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 510 (2d Cir.1994) ("Because an action against a federal agency or federal officers in their official capacities is essentially a suit against the United States, such suits are also barred under the doctrine of sovereign immunity, unless such immunity is waived.") (citations omitted).

**\*8** Plaintiff has not established that sovereign immunity has been waived for this defendant. Accordingly, I recommend that the U.S. Commission of Civil Rights be dismissed as a defendant.

### 11. Defendant U.S. Court System

Plaintiff named the "U.S. Court System" as a defendant. Dkt. No. 1, at p. 1. However, Plaintiff has not established that sovereign immunity has been waived for this defendant. Accordingly, I recommend that the U.S. Court System be dismissed as a defendant.

### 12. Defendant New York State Police

Plaintiff named the New York State Police as a defendant. Dkt. No. 1, at p. 1. However, the New York State Police is a division of the State of New York, which is entitled to Eleventh Amendment immunity from suits brought pursuant to 42 U.S.C. § 1983. *Pollock v. Daniels,* No. 3:07–CV– 0637, 2007 WL 4232700, at \*1 (N.D.N.Y. Nov.28, 2007) (citing, *inter alia, Dunn v. Carrier,* 137 Fed. Appx. 387 (2d Cir.2005)). Accordingly, I recommend that the New York State Police be dismissed as a defendant.

### 13. Defendant New York State Court System

Plaintiff named the "N.Y. S. Court System" as a defendant. Dkt. No. 2. It appears that Plaintiff is referring to the New York State Unified Court System. However, the New York State Unified Court System "is unquestionably an 'arm of the State' and is entitled to Eleventh Amendment sovereign immunity." *Gollomp v. Spitzer,* 568 F.3d 355, 368 (2d Cir.2009) (citation omitted). Accordingly, I recommend that the "N.Y.S. Court System" be dismissed as a defendant.

### 14. Defendant New York State Health Department

Plaintiff named the "N.Y.S. Health Dept." as a defendant. Dkt. No. 1, at p. 1. However, any claim against the New York Department of Health is barred by the State's sovereign immunity. *Six Nations of Iroquois (Confederacy) of North America v. Niagara Mohawk Power Corp.,* No. 98–CV0112, 1999 WL 528822, at \*3 (W.D.N.Y. July 22, 1999) (citing *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979)). Accordingly, I recommend that the "N.Y.S. Health Dept." be dismissed as a defendant.

### 15. Defendants McNamara, Miga, Smith, Schmelzle, and the Town of Forestport Court Clerk

Plaintiff alleges in one sentence that she was "molested" by the following defendants: Scott McNamara (District Attorney of Oneida County); Brian Miga (Supervisor of Forestport Town Hall); Mr. Smith (Codes Officer of Forestport Town Hall); Kathy Schmelzle (Clerk of Forestport Town Hall in 2007); and the Town of Forestport Court Clerk. Dkt. No. 1 at p. 28.

Plaintiff's conclusory allegation is completely unsupported by specific allegations of fact and is insufficient to state a claim. Accordingly, Defendants McNamara, Miga, Smith, Schmelzle, and the Town of Forestport Court Clerk should be dismissed as defendants.

**16. Defendants Paschke; Oneida County Psychiatric Dietary; Mendolez; Totaro; Mills; Dr. Smith; Giacona; Stevens; "Bernabi and (Katz) Wachtel, PLLC;" Daffan; Branch; Smith, Sovik, Kendrick and Sugnet; Ciaccio; Olinsky and Shurtliff; Silberstein, Awad and Miklos; Carroll and Carroll; Kenny and Kenny; Green and Foushee; Bach; Nesbuth; Oneida County Health Department; and Gilmore**

**\*9** The complaint fails to allege any act or omission by Defendants Paschke (Receiver of Taxes); Oneida County Psychiatric Dietary; Dr. Mendolez; Nurse Practitioner Cathy Totaro; Mills, R.N.; Dr. Smith; Samuel Giacona (Previously Retained Attorney); William Stevens (Previously Retained Attorney); "Bernabi and (Katz) Wachtel, PLLC;" Katti Daffan; Patricia Branch (Officer Manager); Smith, Sovik, Kendrick and Sugnet, Attorneys; Christopher S. Ciaccio, Attorney; Olinsky and Shurtliff, Attorneys; Silberstein, Awad and Miklos, Attorneys; Carroll and Carroll, Attorneys; Kenny and Kenny, Attorneys; Green and Foushee, Attorneys; Richard N. Bach; Nesbuth (Public Defender); Oneida County Health Department; and Daniel W. Gilmore (Director of Environmental Health), or any involvement by these Defendants in the violation of Plaintiff's rights. Where a defendant is listed in the caption but the body of the complaint fails to indicate what the defendant did to the plaintiff, dismissal is appropriate. *Gonzalez v. City of N. Y.,* No. 97 CIV. 2246, 1998 WL 382055, at \*2 (S.D.N.Y. July 9, 1998) (citing *Crown v. Wagenstein,* No. 96 CIV. 3895, 1998 WL 118169, at \*1 (S.D.N.Y. Mar.16, 1998) (mere inclusion of warden's name in complaint insufficient to allege personal involvement); *Taylor v. City of New York,* 953 F.Supp. 95, 99 (S.D.N.Y.1997) (same)).

Plaintiff has failed to allege any personal involvement on the part of these defendants. Therefore, they should be dismissed from this action.

**17. Defendant Sheriff of Oneida County**

First, Plaintiff vaguely claims that the Oneida County Sheriff never showed her charges that were brought against her, and never showed her arrest or search warrants. Dkt. No. 1 at p. 20. It is unclear what Plaintiff is alleging. Accordingly, Plaintiff's complaint, as drafted, fails to state a claim upon which relief may be granted against this defendant. If Plaintiff wishes to avoid dismissal of this defendant, she must set forth a sufficient claim in her amended complaint.

Second, Plaintiff summarily asserts that the Sheriff "molested" her. Dkt. No. 1 at p. 28. Plaintiff's conclusory allegation is completely unsupported by specific allegations of fact and is insufficient to state a claim. Accordingly, to the extent that Plaintiff alleges that the Sheriff molested her, this claim should be dismissed.

**18. Defendant Oneida County Sheriff's Department**

Plaintiff named the Oneida County Sheriff's Department as a defendant. Dkt. No. 1. To the extent that Plaintiff named this entity as a defendant because she asserts allegations involving the Oneida County Sheriff, "[a] municipality or municipal entity cannot be held liable under Section 1983 on a respondeat superior theory." *Bliven v. Hunt,* 478 F.Supp.2d 332, 336 (E.D.N.Y.2007) (citing *Monell v. Department of Soc. Servs. of City of New York,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). "Rather, to establish municipal liability under § 1983 for unconstitutional acts by a municipality's employees, a plaintiff must show that the violation of [his or] her constitutional rights resulted from a municipal custom or policy." [6] "Thus, to hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to ... prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." [7]

[6]     *Powell,* 2005 WL 3244193, at \*5; *Monell,* 436 U.S. at 690–691 ("[L]ocal governments ... may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."); *Batista,* 702 F.2d at 397 ("[M]unicipalities may be sued directly under § 1983 for constitutional deprivations inflicted upon private individuals pursuant to a governmental custom, policy, ordinance, regulation, or decision."); *Smith v. City of New York,* 290 F.Supp.2d 317, 321 (S.D.N.Y.2003) ("In order to establish the liability of [municipal] defendants in an action under § 1983 for unconstitutional acts by [its] employees, a plaintiff must show that the violation of [his or] her constitutional rights resulted from a municipal custom or policy.").

[7]     *Batista,* 702 F.2d at 397, *accord, Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995), *McKeon*

*v. Daley,* 101 F.Supp.2d 79, 92 (N.D.N.Y.2000) (Hurd, J.), *Merriman v. Town of Colonie, NY,* 934 F.Supp. 501, 508 (N.D.N.Y.1996) (Homer, M.J.); *Douglas v. County of Tompkins,* 90–CV–0841, 1995 WL 105993, at *12 (N.D.N.Y. March 2, 1995) (McCurn, J.), *Keyes v. County of Albany,* 594 F.Supp. 1147, 1156 (N.D.N.Y.1984) (Miner, J.).

**\*10** Plaintiff fails to set forth allegations of municipal custom or policy sufficient to state a claim. Accordingly, if Plaintiff wishes to avoid dismissal of this defendant, she must set forth a sufficient claim in her amended complaint.

### 19. Defendants Krishnappa, Mallick, and Thesee

Plaintiff appears to complain of the treatment provided by Drs. Krishnappa, Mallick, and Thesee while she was at Oneida County Psychiatric Center. Dkt. No. 1 at pp. 18–19. Plaintiff seeks awards from their malpractice insurance carriers. *Id.* at p. 29.

Claims of malpractice or disagreement with treatment are not actionable under section 1983. *Murphy v. Grabo,* No. 94–CV–1684, 1998 WL 166840, at *4 (N.D.N.Y. Apr. 9, 1998) (internal citation omitted). Rather, to establish an Eighth Amendment claim arising out of inadequate medical care, a plaintiff must prove "deliberate indifference to [her] serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The standard of deliberate indifference includes both subjective and objective components. "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quotation and other citation omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.* (citation omitted). An official acts with the requisite deliberate indifference when that official " 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.* (quotation omitted).

Here, Plaintiff's allegations are vague, confusing, and disjointed. She asserts, *inter alia,* that no doctor at the Psychiatric Center "took their own [blood pressure;]" Dr. Krishnappa prescribed several medications, but she was never prescribed Cogentin while at the center, but "doubt[s] it would had done any good;" and "Dr. Mallick had been an acting psychiatrist yet Dr. Thesee encouraged injections but he claimed [Plaintiff] had a left sided mastectomy." Dkt.

No. 1 at p. 19. She then states, "They are all ridiculous and criminal." *Id.* It is unclear what Plaintiff is alleging regarding Defendants Krishnappa, Mallick, and Thesee. Accordingly, Plaintiff's complaint, as drafted, fails to state a claim upon which relief may be granted against these defendants. If Plaintiff wishes to avoid dismissal of these defendants, she must set forth a sufficient claim in her amended complaint.

### 20. Defendant New York State Governor's Office

Plaintiff named the New York State Governor's Office as a defendant. Dkt. No. 1, at p. 1. Plaintiff alleges that she sent notices of claims to this defendant. *Id.* at p. 16. Plaintiff also summarily claims that this defendant breached her civil rights. *Id.* at p. 24. Regarding the former allegation, it is unclear what Plaintiff is alleging, since she failed to include relevant information such as descriptions of the notices and when she sent the notices. Regarding the latter allegation, this allegation is conclusory and insufficient to state a claim. Therefore, the complaint, as drafted, fails to state a claim upon which relief may be granted against this defendant. Accordingly, if Plaintiff wishes to avoid dismissal of this defendant, she must set forth a sufficient claim in her amended complaint.

### 21. Defendants Lemon, York St. Clinic, and Neighborhood Center

**\*11** Plaintiff alleges she reported to Defendant Lemon, a social worker, and to Defendant York St. Clinic that she had no electricity, food, or functioning vehicle. Dkt. No. 1 at p. 17. Plaintiff also states that she was "harassed" by Defendant York St. Clinic and Defendant Neighborhood Center. *Id.* at pp. 16–17. It appears that Plaintiff is seeking the termination of Defendant Lemon, and an award from her malpractice insurance carrier. *Id.* at pp. 29–30.

The complaint fails to clearly indicate how or when these defendants violated Plaintiff's rights. Accordingly, the complaint fails to state a claim on which relief may be granted against these defendants. If Plaintiff wishes to avoid dismissal of these defendants, she must set forth a sufficient claim in her amended complaint.

### D. Amended Complaint

In light of the special solicitude afforded to *pro se* litigants in the Second Circuit, I recommend that Plaintiff may file an amended complaint *within thirty (30) days of the filing date of any Order adopting this Report and Recommendation* should she wish to avoid dismissal of the action. Any

amended complaint, which shall supersede and replace in its entirety Plaintiff's original complaint (Docket No. 1), **must contain a** *short and plain statement* of the claim showing that she is entitled to relief with all averments of claim set forth in numbered paragraphs. *See* Fed.R.Civ.P. 8(a)(2) & Fed.R.Civ.P. 10(b). The amended complaint must also allege claims of misconduct or wrongdoing against defendants which Plaintiff has a legal right to pursue, and over which this Court may properly exercise jurisdiction. ***Plaintiff is advised that all claims must be set forth in the amended complaint. Claims may not be set forth solely in exhibits.***

**II. Application to proceed** *in forma pauperis*

Plaintiff submitted an application to proceed *in forma pauperis.* Dkt. No. 2. A review of the application indicates that Plaintiff may proceed *in forma pauperis.*

**WHEREFORE,** it is hereby

**RECOMMENDED,** that the Clerk remove the party text "and children" from Plaintiff Maureen E. Scott's name on the docket; and it is further

**RECOMMENDED,** that the Clerk add the following entities as defendants to the docket: Sheriff of Oneida County; "N.Y.S. Atty Gen.;" "N.Y.S. Court System;" U.S. Court System; "N.Y.S. Health Dept.;" and "N.Y.S. Gov. Office;" and it is further

**RECOMMENDED,** that the following defendants be dismissed: Doug Campbell; Desiree Golden; Heather Djeck; Kehoe; Michael McCormick; Judge Hester; Judge Mark Ritter; Judge James Tormey; Judge Escziac; Grant Garramone; "N.Y.S. Atty Gen.;" "N.Y.S. Atty Gen. RE[:] Asst. Atty Gen. Trace;" U.S. Commission of Civil Rights; U.S. Court System; New York State Police; "N.Y.S. Court System;" "N.Y.S. Health Dept.;" Scott McNamara; Brian Miga; Mr. Smith; Kathy Schmelzle; Town of Forestport Court Clerk; Paschke; Oneida County Psychiatric Dietary; Dr. Mendolez; Cathy Totaro; Mills, R.N.; Dr. Smith; Samuel Giacona; William Stevens; "Bernabi and (Katz) Wachtel, PLLC;" Katti Daffan; Patricia Branch; Smith, Sovik, Kendrick and Sugnet; Christopher S. Ciaccio; Olinsky and

Shurtliff; Silberstein, Awad and Miklos; Carroll and Carroll; Kenny and Kenny; Green and Foushee; Richard N. Bach; Nesbuth; Oneida County Health Department; and Daniel W. Gilmore; and it is further

**\*12 RECOMMENDED,** that to the extent that Plaintiff summarily alleges that the Sheriff of Oneida County molested her, this claim be dismissed; and it is further

**RECOMMENDED,** that Plaintiff may file an amended complaint ***within thirty (30) days*** of the filing date of any Order adopting this Report and Recommendation; and it is further

**RECOMMENDED,** that if Plaintiff fails to timely file an amended complaint, the Clerk shall enter judgment dismissing this case **without prejudice** without further Order of the Court due to Plaintiff's failure to comply with the terms of any Order adopting this Report and Recommendation; and it is further

**RECOMMENDED,** that upon the filing of an amended complaint, the file be returned to the Court for further review; and it is further

**ORDERED,** that the *in forma pauperis* application (Dkt. No. 2) is **GRANTED;** and it is further

**ORDERED,** that the Clerk serve copies of this Report–Recommendation and Order on Plaintiff by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec 'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 145297

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **1.  Docket 5:09cv01122**<br>SCOTT v. DJECK ET AL | — | N.D.N.Y. | Oct. 06, 2009 | Docket |

**History**

There are no History results for this citation.

🏴 KeyCite Blue-Striped Flag

Appeal Filed by *Stevenson v. Schiano Jr.*, 2nd Cir., July 8, 2025

2025 WL 1895830
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Nathan Randell STEVENSON, Plaintiff,

v.

Charles A. SCHIANO, Jr., Acting Supreme Court Judge, Jennifer Kennedy, Officer of the Court/Assistant District Attorney, Joseph Damelio, Officer of the Court/Attorney, John Laclair, Rochester Police Officer, Cody Mandale, Rochester Police Officer, Sino Seng, Rochester Police Officer, J. Wallace, Monroe County Jail Deputy, Donald Scott Young, Officer of the Court/Attorney, Joony Odenbach, Court Stenographer, Leticia Astacio, Officer of the Court/Attorney, Todd Baxter, Monroe County Sheriff, Sandra Doorley, Monroe County District Attorney, James Riatto, Officer of the Court/Attorney, William Swiff, Officer of the Court/Assistant Attorney, Rochester Police Department, Monroe County District Attorney Office, Monroe County Jail, Avangelista, Monroe County Jail/Deputy, Merolla, Monroe County Jail/Deputy, Hahn, Monroe County Jail/Corporal, Gertin, Monroe County Jail/Sergeant, Department of Corrections, Elmira Correctional Facility, and State of New York, Defendants.

23-CV-205 (JLS)
|
Signed March 19, 2025

**Attorneys and Law Firms**

Nathan Randell Stevenson, Stormville, NY, Pro Se.

### DECISION AND ORDER

JOHN L. SINATRA, JR., UNITED STATES DISTRICT JUDGE

**\*1** *Pro se* Plaintiff, Nathan Randall Stevenson ("Stevenson" or "Plaintiff"), is a prisoner currently confined at the Green Haven Correctional Facility. He filed a Complaint asserting violations of his rights under the Fourth, Fifth, Sixth, Seventh, Ninth, and Tenth Amendments to the United States Constitution in relation to his arrest, detention, prosecution, and conviction in Monroe County, New York. He also asserts claims under 42 U.S.C. §§ 1985 and 1986, and 18 U.S.C. §§ 241, 242, and 2382. Dkt. 1.[1] Plaintiff has paid the filing and administrative fees. Plaintiff had moved for service of the summons and Complaint by the United States Marshals Service ("USMS"), Dkt. 12, but has moved to withdraw that motion asserting that he would locate a process server to serve the summons and Complaint, Dkt. 13.[2] Plaintiff's motion to withdraw, Dkt. 13, is granted, and the motion for service by the United States Marshals Service, Dkt. 12, is withdrawn. Because of this, Plaintiff's other motion for service by the United States Marshals Service, Dkt. 6, is also withdrawn.

[1]  As addressed further below, while Stevenson states that he did not file this Complaint under 42 U.S.C. § 1983, and has moved to correct the "title" of this action as reflected on the docket report, Dkt. 12, which he claims incorrectly reflects that this action is brought under 42 U.S.C. § 1983, the Court construes this Complaint as also asserting claims under section 1983 because to bring suit for a violation of his constitutional rights, it must be brought under section 1983, *see Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). Section 1983 is "the enabling civil rights statute for a cause of action alleging a deprivation of constitutional rights." *Weaver v. State of New York*, No. CIV-89-83E, 1989 WL 98776, at \*1 (W.D.N.Y. Aug. 23, 1989); *see also Marisol A. By Forbes v. Giuliani*, 929 F. Supp. 662, 673 (S.D.N.Y. 1996), *aff'd*, 126 F.3d 372 (2d Cir. 1997) ("[section] 1983 is ... a vehicle through which a private plaintiff may pursue a claim for an alleged constitutional violation by a person acting under color of state law.") (citing *Golden State Transit Corp. V. City of L.A.*, 493 U.S. 103, 105 (1989); *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980)).

[2]  Plaintiff's motion to withdraw his motion for service by the USMS states that he spoke with someone from the Clerk of Court's Office who advised him that he was not entitled to service by the USMS. Dkt. 13. The Court obviously was not privy to that conversation but notes that a *pro se* litigant who pays the filing fee *may* request and obtain service by the USMS. Fed. R. Civ. 4(c)(3) ("At the plaintiff's request, the court may

order that service be made by a United States Marshal or deputy or by a person specifically appointed by the court."). "The granting of such an order is discretionary with the Court." *Johnson v. DHS/ICE*, 13-CV-0288A(Sr), 2013 WL 6669232, at \*3 (W.D.N.Y. Dec. 18, 2013); *see Elleby v. Martucello*, No. 9:16-CV-1335 (MAD/DEP), 2017 WL 11319492, at \*3 (N.D.N.Y. Apr. 5, 2017) ("In light of the fact that plaintiff is incarcerated and proceeding *pro se*, and in order to advance the disposition of this action, plaintiff may request ... service by the U.S. Marshal, provided that plaintiff pays the service fee to the U.S. Marshal in full in advance ...."); *Abreu v. Travers*, No. 9:15-CV-0540(MAD)(ATB), 2016 WL 6127510, at \*18 (N.D.N.Y. Oct. 20, 2016) (same).

If Plaintiff files an amended complaint as directed herein and if some of the claims asserted in the amended complaint survive screening under 28 U.S.C. § 1915A, he may refile this motion, if he wishes. Otherwise, Plaintiff will be responsible for serving the summons and amended complaint, *see* Fed. R. Civ. P. 4(c)–(m), if any of the claims asserted in an amended complaint survive screening and the Court directs the Clerk of Court to issue summonses for service.

**\*2** For the reasons that follow: (1) Stevenson's motion to correct the title of his action is denied; (2) his motion to withdraw his motion for service by the Marshals Service is granted; (3) his motions for service are withdrawn; (4) the First, Twenty-First, and Thirty-Second Claims are dismissed under section 1915A, with leave to amend; and (5) Plaintiff's remaining claims are dismissed under 28 U.S.C. § 1915A, without leave to amend.

## DISCUSSION

Because Stevenson is a prisoner, 28 U.S.C. § 1915(h), and has paid the filing fee, this Court must screen his Complaint under section 1915A(b).

Section 1915 "provide[s] an efficient means by which a court can screen for and dismiss legally insufficient claims." *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (citing *Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004)). The court shall dismiss a complaint in a civil action in which a prisoner seeks redress from a governmental entity, or an officer or employee of a governmental entity, if the court determines that the

action: (1) fails to state a claim upon which relief may be granted, or (2) seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915A(b)(1)–(2).

Generally, the court will afford a *pro se* plaintiff an opportunity to amend or to be heard prior to dismissal "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim." *Abbas*, 480 F.3d at 639 (internal quotation marks omitted). But leave to amend may be denied when any amendment would be futile. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## I. THE COMPLAINT

In evaluating a complaint, the court must accept all factual allegations as true and must draw all inferences in the plaintiff's favor. *See Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003) (per curiam); *King v. Simpson*, 189 F.3d 284, 287 (2d Cir. 1999). "Specific facts are not necessary," and the plaintiff "need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Boykin v. Keycorp*, 521 F.3d 202, 216 (2d Cir. 2008) ("[E]ven after *Twombly*, dismissal of a *pro se* claim as insufficiently pleaded is appropriate only in the most unsustainable of cases."). Although "a court is obliged to construe [*pro se*] pleadings liberally, particularly when they allege civil rights violations," *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004), even pleadings submitted *pro se* must meet the notice requirements of Rule 8 of the Federal Rules of Civil Procedure. *Wynder v. McMahon*, 360 F.3d 73, 79 n.11 (2d Cir. 2004).

Stevenson has sued over twenty (20) Defendants in what best can be described as a rambling, repetitive, illogical, and generally meritless Complaint. The Complaint raises thirty-two (32) separate claims related to his arrest, prosecution, pretrial detention, and post-conviction incarceration. Dkt. 1. He sues the state court judge who presided over his state court criminal matter ("Judge Schiano"); the Monroe County District Attorney's Office ("DA's Office"), the District Attorney ("DA Doorley") and Assistant District Attorney ("ADA Kennedy") who prosecuted him; several assigned and retained criminal defense attorneys who represented him ("Damelio," "Young," "Astacio," "Riatto," and "Swift"); the court stenographer ("Odenbach"); the City of Rochester Police Department ("RPD") and the RPD Officers who arrested him or filed criminal complaints and other documents

against him ("Laclair," "Mandale," and "Seng"); the Sheriff of Monroe County ("Sheriff Baxter"); the Monroe County Jail ("MCJ"), where he was detained pending trial; a number of Sheriff's Deputies at MCJ ("Wallace," "Avangelista," "Merolla," "Hahn," and "Gertin"); the New York State Department of Corrections of Community Supervision ("DOCCS"); and the Elmira Correctional Facility ("Elmira") where he was incarcerated following his conviction; and the State of New York ("New York"). *Id.* at 1–7. [3]

[3]     Page references are to those generated by the Court's Case Management and Electronic Files System (CM/ECF).

**\*3** The primary basis of Stevenson's Complaint—as best this Court can discern—is that at each appearance in state court during his prosecution, Judge Schiano, ADA Kennedy, and one of Stevenson's several attorneys illegally used his "name/trust/estate" without his permission. Dkt. 1, at 12–19, 22–28, 39. He also alleges, *inter alia*, that the RPD Officers, Sheriff's Deputies, and other Defendants who filed various criminal complaints and other documents, also used his name/trust/estate illegally, *id.* at 8–9, 31, 41, and that he has been illegally detained at MCJ and Elmira since his arrest.

Liberally construed, the Complaint alleges the following. On August 27, 2019, Stevenson was arrested by RPD Officers Laclair, Mandale, and Seng. These officers, without probable cause, surrounded him, prevented him from moving, and "assault[ed]" him. Mandale searched his pockets and took his cash. After being placed in the patrol car, Stevenson tried to flee. He was chased and again assaulted by these officers and others. Seng threatened to shoot him. He suffered "damage" to his face, neck, shoulders, back, and wrists. *Id.* at 9–11 (First Claim). After the arrest, Seng filed a false criminal complaint and another document using Stevenson's name/trust/estate without his authorization. *Id.* at 9 (Second Claim).

After his arrest and throughout his prosecution between August 19, 2019 and December 16, 2022, Stevenson appeared in court before Judge Schiano. Judge Schiano, along with ADA Kennedy, DA Doorley, Damelio, Young, Astacio, Riatto, Swiff, Odenbach, and other Defendants, including the RPD Officers, New York, DA's Office, and MCJ, illegally used Stevenson's name/trust/estate, "while depriving [him] of life and liberty without [d]ue [p]rocess, during their process." *Id.* at 18 (Seventh Claim); *see, e.g.*, *id.* at 9, 12–19, 22–28, 34–35, and 39 (Second through Eighth, Tenth through Sixteenth, Nineteenth, Twenty-Second through Twenty-Third, Twenty-

Seventh, and Twenty-Ninth Claims). DA Doorley used his name/trust/estate on her Facebook page and made false and negative remarks about his character. *Id.* at 31 (Nineteenth Claim). Damelio sent several letters to Stevenson further "conspiring" to commit "the illegal acts [, *i.e.*, using his name/trust/estate,] being taken against [him]." *Id.* at 16 (Fifth Claim). Riatto and Swiff were retained by Stevenson's family and made numerous promises to assist Stevenson but neglected to assist him "with the illegal conspiracy that was taking place against [his] living soul and also [his] name/trust/estate." *Id.* at 36–37 (Twenty-Fourth through Twentieth-Fifth Claims).

On September 19, 2019, DA Doorley signed off on an indictment (No. 2019-0590) that illegally used Stevenson's name/trust/estate. He further alleges that Judge Schiano, Doorley, ADA Kennedy, DA's Office, and New York used the indictment to deprive Stevenson of his "life and liberty during the process." *Id.* at 32 (Twentieth Claim).

On October 3, 2022, Stevenson alleges that Judge Schiano dismissed the indictment (No. 2021-0353) on which he was being held and "opened" a new charge the next day under a different indictment (No. 71070-21/001), without releasing Stevenson on the dismissed indictment (No. 2021-0353). He claims that ADA Kennedy, DA Doorley, and Young conspired with Judge Schiano to change the indictment. *Id.* at 21 (Ninth Claim), 30 (Eighteenth Claim).

Stevenson also alleges that since his arrest he has been illegally detained and incarcerated at MCJ and Elmira by Sheriff Baxter, the DA's Office, DOCCS, and the State of New York upon the orders of Judge Schiano. *Id.* at 29 (Seventeenth Claim), 40 (Twenty-Eighth Claim), and 42 (Thirtieth Claim).

**\*4** On October 30, 2019, unidentified Sheriff's Deputies at MCJ illegally terminated a visit and put Stevenson in SHU without explanation. He received a ticket charging him with possession of contraband. He received a sentence of 30 days in SHU, a deduction from his inmate account, his girlfriend was barred from visiting him, and, between October 30, 2019 and March 5, 2020, his visits were non-contact only. *Id.* at 44 (Thirty-Second Claim).

On or around January 2, 2023, Stevenson alleges that Sheriff's Deputies Merolla, Hahn, and Gertin used "physical force" to handcuff him and move him to another location at MCJ, and that his neck, back, and wrist "were damaged." *Id.* at 33 (Twenty-First Claim). On January 12, 2023, his cell at Elmira

was searched and "flipped" outside of his presence. *Id.* at 43 (Thirty-First).

Stevenson asserts, in wholly conclusory terms, claims under the Fourth, Fifth, Sixth, Seventh, Ninth, and Tenth Amendments, 42 U.S.C. §§ 1985 and 1986, and 18 U.S.C. §§ 241, 242, and 2382. Dkt. 1, at 1. He requests monetary relief according to his "fee schedule," removal of his name/trust/estate from all databases, and release from physical custody. *Id.* at 9–10.

## II. SECTION 1983 CLAIMS

As noted above, Stevenson has moved to correct both the "title" of this action and the "Nature of Suit," which are reflected on the docket report as 42 U.S.C. § 1983 and "550 Prisoner Civil Rights," respectively. Dkt. 12. He wants the title changed to "42 U.S.C. § 1985" and the Nature of Suit changed to "Common Law Action." *Id.*

Initially, the Court notes that neither the title nor Nature of Suit reflected on the docket sheet affects how his claims are construed. *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017) ("As we have repeatedly stated, [w]e liberally construe pleadings and briefs submitted by *pro se* litigants, reading such submissions to raise the strongest arguments they suggest.") (quotation marks and brackets omitted). They are merely administrative remarks for record-keeping purposes. Thus, to the extent Stevenson's motion asks the Clerk of Court to amend the title and Nature of Suit it is denied.

More importantly, however, for Stevenson to base his claims on violations of the numerous constitutional amendments remunerated in the Complaint, he can only do so by bringing any such violations under 42 U.S.C. § 1983. In other words, the basis for his constitutional claims is section 1983. *See supra* at n.1; *see, e.g.*, *Weaver*, 1989 WL 98776, at *1 (Section 1983 is "the enabling civil rights statute for a cause of action alleging a deprivation of constitutional rights."). Thus, if Stevenson asserts violations of his constitutional rights by "persons" acting under color of law, he can only do so by bringing those claims under section 1983. The Court, therefore, construes Stevenson Complaint as being brought under section 1983, and the other statutes asserted therein—42 U.S.C. §§ 1985 and 1986, and 18 U.S.C. §§ 241, 242, and 2382. [4]

[4]    To the extent Stevenson asserts claims under 18 U.S.C. §§ 241, 242, and 2382, they are dismissed because these criminal statues do not provide private causes of action. *See, e.g.*, *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 511 (2d Cir. 1994) (holding that 18 U.S.C. § 242 is a criminal statute and does not provide a private cause of action); *Jones v. Papa*, 21-CV-1099 (JMA) (ST), 2021 WL 4123056, at 5 n.3 (E.D.N.Y. Sept. 8, 2021) ("It is well-established that there is no private right of action under [18 U.S.C. §§ 241, 242, and 2382].") (internal quotation marks omitted); *Tsabbar v. Booth*, 293 F. Supp. 2d 328, 335 (S.D.N.Y. 2003) (finding that the civil rights provisions of Title 18 of the United States Code do not allow private rights of action); *Ammann v. Connecticut*, No. 3:04CV1647, 2005 WL 465401, at *5 (D. Conn. 2005) (holding that no private cause of action exists under 18 U.S.C. §§ 241 and 242).

**\*5**  To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct: "(1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875–76 (2d Cir. 1994)). Section 1983 itself "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes*, 13 F.3d at 519.

To establish liability against an official under section 1983, a plaintiff must allege that individual's personal involvement in the alleged constitutional violation; it is not enough to assert that the defendant is a link in the chain of command. See *McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004). Moreover, the theory of *respondeat superior* is not available in a section 1983 action. See *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003). "[T]here is no special rule for supervisory liability. Instead, a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (internal quotation marks omitted).

## III. DEFENDANTS ENTITLED TO IMMUNITY

The true nature or basis of Stevenson's claims is difficult to decipher and understand—*e.g.*, illegally used his name/trust/estate during numerous court appearances and on

various charging and other documents in the state court criminal proceedings. However, whether Stevenson's claims are construed under section 1983 or sections 1985 and 1986, and whether they have any merit, several Defendants sued are entitled to immunity from suit or monetary relief on these claims. Additionally, as addressed below, these claims do not allege a plausible claim for relief regardless of how they are construed.

### A. Eleventh Amendment

Stevenson sues New York, DOCCS, and Elmira and seeks monetary damages against them. Any claims for damages against these Defendants are barred by the Eleventh Amendment. The Eleventh Amendment bars federal court claims against states, absent their consent to such suit or an express statutory waiver of immunity. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–100 (1984). This also extends to agencies and officials sued in their official capacities. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). An "official arm of the state," such as DOCCS or Elmira, "enjoys the same Eleventh Amendment immunity from suit in federal court as is enjoyed by the state itself." *Posr v. Ct. Officer Shield No. 207*, 180 F.3d 409, 414 (2d Cir. 1999); *see also Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) (Eleventh Amendment immunity extends to "state agents and state instrumentalities that are, effectively, arms of a state.") (internal quotation marks omitted); *Rother v. N.Y. State Dep't of Corr. and Cmty. Supervision*, 970 F. Supp. 2d 78, 89–90 (N.D.N.Y. 2013) ("DOCCS and its facilities are state agencies for purposes of the Eleventh Amendment."). Accordingly, Stevenson's claims against New York, DOCCS, and Elmira are dismissed without leave to amend. [5]

[5]    Stevenson alleges that, on January 12, 2023, unidentified Elmira corrections officers searched his cell in his absence. Dkt. 1, at 43 (Thirty-First). He brings this claim against New York, DOCCS, and Elmira. Even if the Court were to grant him leave to amend to assert this claim against the individual corrections officers who searched his cell, the claim would be dismissed because inmates do not have a reasonable expectation of privacy in their cells. *Hudson v. Palmer*, 468 U.S. 517, 526 (1984) (holding that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell");

*see also Willis v. Artuz*, 301 F.3d 65, 69 (2d Cir. 2002) (holding that "society is not prepared to recognize as legitimate any subjective expectation of privacy that a [convict] might have in his prison cell.") (quoting *Hudson*, 468 U.S. at 526).

### B. Absolute Judicial and Prosecutorial Immunity

**\*6**  Plaintiff sues Judge Schiano, DA Doorley, and ADA Kennedy alleging, *inter alia*, that during the numerous court proceedings in Stevenson's criminal prosecution these Defendants and others illegally used his name/trust/estate without his authorization. Dkt. 1, at 9, 12–19, 22–28, 34–35, and 39 (Second through Eighth, Tenth through Sixteenth, Nineteenth, Twenty-Second through Twenty-Third, Twenty-Seventh, and Twenty-Ninth Claims). He also alleges: (1) DA Doorley signed off on an indictment (No. 2019-0590) that illegally used Stevenson's name/trust/estate, *id.* at 32 (Twentieth Claim); (2) Judge Schiano dismissed the indictment (No. 2021-0353) on which he was being held and "opened" a new charge the next day under a different indictment (No. 71070-21/001), without releasing Stevenson on the dismissed indictment (No. 2021-0353); and (3) ADA Kennedy, DA Doorley, and Young conspired with Judge Schiano to change the indictment. *Id.* at 21 (Ninth Claim), 30 (Eighteenth Claim). Stevenson also alleges that DA Doorley used his name/trust/estate on her Facebook page illegally and made false and negative remarks about his character. *Id.* at 31 (Nineteenth Claim).

#### 1. Judicial Immunity

It is well settled that judges are absolutely immune from suit for any actions taken within the scope of their judicial responsibilities. *See, e.g.*, *Mireles v. Waco*, 502 U.S. 9, 10 (1991).

> Although unfairness and injustice to a litigant may result on occasion, "it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself."

*Id.* at 10 (quoting *Bradley v. Fisher*, 80 U.S. 335, 347 (1871)).

The protection of immunity is not pierced by allegations that the judge acted in bad faith or with malice, *Pierson v. Ray*, 386 U.S. 547, 554 (1967), even though "unfairness and injustice to a litigant may result on occasion," *Mireles*, 502 U.S. at 10.

The United States Supreme Court has expressly applied the doctrine of judicial immunity to actions brought pursuant to 42 U.S.C. § 1983. *See* Pierson, 386 U.S. at 553–54. The doctrine of judicial immunity also applies to actions brought under sections 1985 and 1986. See *Turner v. Boyle*, 116 F. Supp. 3d 58, 81–82 (D. Conn. 2015) ("[A]bsolute immunity extends to all civil suits, including suits brought under Section 1983 and section 1985."); *see also* *Emerick v. Connecticut*, No. 3:18-cv-01766 (SRU), 2021 WL 965680, at *1 (D. Conn. Mar. 15, 2021) (denying motion for reconsideration of dismissal of section 1985 claim because "judges are entitled to absolute immunity for actions undertaken in the performance of their duties as judges, regardless of the underlying cause of action") (internal quotation marks omitted).

Because the allegations against Judge Schiano all involve actions taken in his role as the judge presiding over Stevenson's criminal proceeding, Judge Schiano is entitled to absolute judicial immunity from all claims made against him.

   2. Prosecutorial Immunity

Similarly, "absolute immunity protects a prosecutor from ... liability for virtually all acts, regardless of motivation, associated with his function as an advocate." *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994). In *Imbler*, the Supreme Court "defined the scope of prosecutorial immunity not by the identity of the actor, but by reference to the 'function' performed." *Warney v. Monroe County*, 587 F.3d 113, 121 (2d Cir. 2009) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). Under this functional approach, prosecutors are immune from liability for acts that are "intimately associated with the judicial phase of the criminal process ...." *Imbler*, 424 U.S. at 430. By contrast, "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).

 **7** Here, the allegations against DA Doorley and ADA Kennedy—except arguably the allegation regarding a posting on Doorley's Facebook page—involve acts "intimately associated with the judicial phase of the criminal process ...." *Imbler*, 424 U.S. at 430. Kennedy allegedly made numerous court appearances on behalf of the District Attorney's Office and Doorley allegedly signed and filed an indictment charging Stevenson with criminal offenses. These acts clearly all occurred within their roles as advocates on behalf of the county prosecutor's office. *See, e.g.*, *Ogunkoya v. Monaghan*,

913 F.3d 64, 72 (2d Cir. 2019) (Prosecutors have absolute immunity for decisions and acts which "constituted an exercise of their prosecutorial discretion in preparing a case for indictment and deciding when, where, and how to prosecute.").[6]

[6]   Stevenson also names the District Attorney's Office as a defendant based on the acts of Doorley and Kennedy. Because the District Attorney's Office is merely an administrative arm of the County, and not a separate entity capable of being sued, any claims against it are dismissed. *See, e.g.*, *Conte v. County of Nassau*, No. 06-CV-4746 (JFB)(ETB), 2008 WL 905879, at 1 n.2 (E.D.N.Y. Mar. 31, 2008) (dismissing claims against Nassau County District Attorney's Office and New York City Police Department because "[u]nder New York law, departments which are merely administrative arms of a municipality, do not have a legal identity separate and apart from the municipality and cannot sue or be sued.") (internal quotation marks omitted) (quoting *Hill v. City of White Plains*, 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002)).

Additionally, even if the Court were to construe the claims against the District Attorney's Office as ones against the County of Monroe and substitute the County as a defendant, said claims would nonetheless be dismissed because under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), a municipality is liable under section 1983 only if a plaintiff can show that "he suffered the denial of a constitutional right that was caused by an official municipal policy or custom." *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 257 (2d Cir. 2020) (internal quotation marks omitted); *see also* *Lucente v. County of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020). Moreover, there can be no liability against the municipality under *Monell* unless there is an underlying unconstitutional act by an employee of the municipality. See *Claudio v. Sawyer*, 675 F. Supp. 2d 403, 408 (S.D.N.Y. 2009) ("Under Second Circuit case law ... a prerequisite to municipal liability under *Monell* is an underlying constitutional violation by a state actor."). Here, Stevenson has not plausibly alleged any unconstitutional acts by Doorley or Kennedy. Additionally, "the actions of county prosecutors in New York are generally controlled by municipal policymakers for purposes of *Monell*, with a

narrow exception ... being the decision of whether, and on what charges, to prosecute." *Bellamy v. City of New York*, 914 F.3d 727, 759 (2d Cir. 2019); *see also Anilao v. Spota*, 27 F.4th 855, 874 (2d Cir. 1993) ("Under the narrow exception that we noted in *Bellamy*, a district attorney in New York is not an officer or employee of the municipality but is instead a quasi-judicial officer acting for the state in criminal matters.") (internal quotation marks and citation omitted). Thus, to the extent Stevenson is basing his claims against the DA's Office and the County on Doorley's and Kennedy's prosecution of him, Doorley and Kennedy were not employees of the County for purposes of *Monell* liability.

The one alleged act that may fall outside DA Doorley's role as an advocate is the allegation that she posted something false on her Facebook page that illegally used Stevenson's name/trust/estate and made "negative remarks about [Stevenson] and [his] character." Dkt. 1, at 31 (Nineteenth Claim). As addressed further below, to the extent Stevenson is asserting a constitutional right to privacy or a claim under N.Y. Civ. Rights Law §§ 50–51, he fails to state a claim, and that claim is dismissed without leave to amend. Similarly, to the extent he is alleging a defamation claim under 42 U.S.C. § 1983, he fails to state a claim, and that claim must be dismissed.

**\*8** Defamation by a state actor "does not amount to a deprivation of 'liberty' or 'property' within the meaning of the Fourteenth Amendment, unless accompanied by some interest other than mere loss of reputation." *Balentine v. Tremblay*, 554 F. App'x 58, 60 (2d Cir. 2014) (summary order) (affirming dismissal of section 1983 due process claim based on defamation) (citing *Paul v. Davis*, 424 U.S. 693, 711 (1976)); *see also Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004) ("Defamation ... is an issue of state law, not of federal constitutional law, and therefore provides an insufficient basis to maintain a [section] 1983 action."). Thus, to allege a claim under section 1983 "predicated upon an act of defamation, a plaintiff must allege what is colloquially referred to as 'stigma-plus' claim: 'a stigmatizing statement plus a deprivation of a tangible interest' without due process of law." *Balentine*, 554 F. App'x at 60 (quoting *Algarin v. Town of Wallkill*, 421 F.3d 137, 138 (2d Cir. 2005)).

A "stigma-plus" claim requires that a plaintiff show: "(1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's

status or rights." *Sadallah*, 383 F.3d at 38 (internal quotation marks omitted). In other words, the "defamatory statement must be sufficiently public to create or threaten a stigma" and the "plaintiff must also allege that the statement was made without due process of law." *Kennedy v. Caruso*, No. 3:19-CV-260 (VLB), 2020 WL 1515672, at \*3 (D. Conn. Mar. 30, 2020) (internal citations and quotations omitted).

Stevenson does not allege the statement that Doorley made or posted, let alone any facts to support a stigma-plus claim in violation of the Fourteenth Amendment. *See, e.g.*, *Williams v. Carpenter*, 214 F. Supp. 3d 197, 202 (W.D.N.Y. 2016) (dismissing plaintiff's stigma-plus claim based on police officer's statement that plaintiff was the "key suspect" in a hit-and-run accident, which led to the violation of plaintiff's parole). Thus, to the extent Stevenson is alleging a stigma-plus claim, it is dismissed without leave to amend because any amendment would be futile.

Accordingly, the claims against Doorley and Kennedy are dismissed without leave to amend. *See Cuoco*, 222 F.3d at 112.

## IV. CLAIMS AGAINST DEFENSE ATTORNEYS

Plaintiff sues several attorneys who represented him during his criminal prosecution: Damelio, Young, Astacio, Riatto, and Swiff. He alleges that they participated in numerous court proceedings where his name/trust/estate was used illegally and without his authorization, that they wrote letters to him at MCJ, and that two of them, Riatto and Swiff, failed to follow through on their promises to assist him. Dkt. 1, at 12–30, 36–37 (Third through Eighth, Tenth through Sixteenth, Eighteenth, and Twenty-Fourth through Twenty-Fifth Claims). These claims are dismissed without leave to amend because criminal defense attorneys, who represent a client during criminal proceedings, are not "persons" acting under color of state law for purposes of liability under section 1983. *See Polk County v. Dodson*, 454 U.S. 312, 325 (1981).

To support a section 1983 claim, the defendant must be acting under "color of state law." It is well established, however, that an attorney representing a client in a criminal trial, whether that attorney is a public defender, legal aid attorney, or court-appointed counsel, is not acting under the color of state law. See *Polk County*, 454 U.S. at 325; *see also Rodriguez v. Weprin*, 116 F.3d 62, 65–66 (2d Cir. 1997) (stating that it is well established that private attorneys—even if the attorney was court appointed—are not state actors for the purposes

of section 1983 claims.). Stevenson's attorneys, therefore, are not state actors under section 1983.

**\*9** Stevenson has also not asserted any plausible allegations that his attorneys conspired with the prosecutors or court in any way. *See, e.g.*, *Tower v. Glover*, 467 U.S. 914, 923 (1984) (public defender who conspired with state officials held liable under section 1983); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970) ("[A] private party involved in a ... conspiracy [to violate the Fourteenth Amendment], even though not an official of the State, can be liable under [section] 1983."). His only allegations are that his attorneys, Judge Schiano, DA Doorely, and ADA Kennedy "aided and abetted one another in a conspiracy" to use his name/trust/estate. Dkt. 1, at 12 (Third Claim). These allegations are simply too conclusory to state a claim that his attorneys conspired with state officials to violate his constitutional rights. *See, e.g.*, *Ciambriello v. County of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) ("A merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a [section] 1983 claim against the private entity."). Moreover, as addressed below, Stevenson fails to state a claim that his attorneys used his name/trust/estate. [7]

[7]    Stevenson's allegations that Riatto and Swiff were retained to assist him and failed to do so asserts only a state common law legal malpractice claim, which is not actionable under section 1983. *See, e.g.*, *Daniels v. Williams*, 474 U.S. 327, 330–31 (1986) (mere negligence is not actionable under section 1983). Further, even if these allegations are construed as a legal malpractice claim and the Court had supplemental jurisdiction over them, *see* 28 U.S.C. § 1367(c), they fail to state a claim under state law. *See Abuhouran v. Lans*, 269 F. App'x 134, 135 (2d Cir. 2008) (summary order) ("Under New York law, '[t]o state a cause of action for legal malpractice arising from negligent representation in a criminal proceeding, plaintiff must allege his innocence or a colorable claim of innocence of the underlying offense, for so long as the determination of his guilt of that offense remains undisturbed, no cause of action will lie.' ") (quoting *Carmel v. Lunney*, 511 N.E.2d 1126, 1128 (N.Y. 1987) (internal citation omitted)). Stevenson has not alleged that his conviction is not intact currently or that he has a colorable claim of innocence. He

alleges only that his name/trust/estate has been used without his authorization.

## V. RIGHT TO PRIVACY CLAIM

As stated above, the primary (and oft-repeated) basis of Stevenson's claims is that during numerous state court proceedings and on documents filed in relation to his underlying criminal prosecution and pre-trial and post-conviction detention, Defendants illegally used his name/trust/estate without his authorization. Dkt. 1, at 9, 12–19, 22–28, 34–36, and 39 (Second through Eighth, Tenth through Sixteenth, Nineteenth, Twenty-Second through Twenty-Fourth, Twenty-Seventh, and Twenty-Ninth Claims). The true nature of these claims is unclear and has no merit. It simply cannot be unlawful or unconstitutional to use a defendant's name in a criminal prosecution or on documents initiating that prosecution. The Court, however, must liberally construe the Complaint to raise the strongest arguments it suggests. *McCleod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017). Accordingly, the Court construes the Complaint as alleging either that Defendants used his name for commercial purposes in violation of New York Civil Rights Law §§ 50–51, or in violation of his right to privacy. Construed either way, these claims are dismissed.

First, assuming the Court has supplemental jurisdiction over the N.Y. Civ. Rights Law, §§ 50–51 claim, *see* 28 U.S.C. § 1367(c), it must be dismissed because there are no allegations that Defendants used, misappropriated, and exploited Stevenson's name for commercial purposes. See N.Y. Civ. Rights Law §§ 50–51; *Rafter v. Bank of Am.*, 04 Civ. 3341 (JSR) (KNF), 2009 WL 691929, at \*10 (S.D.N.Y. Mar. 12, 2009), *subsequently aff'd sub nom. Rafter v. Fleet Bos. Fin. Corp.*, 523 F. App'x 79 (2d Cir. 2013) (dismissing right to privacy claims and claims under N.Y. Civ. Rights Law §§ 50–51, because there is no common-law right to privacy recognized in New York, and there are no allegations that defendant "misappropriated and exploited, for a commercial purpose, [plaintiff's] name, portrait or picture.").

**\*10** Second, to the extent Stevenson may be asserting a right to privacy claim under section 1983, it fails. Aside from Fourth Amendment issues, the Supreme Court has found that the right to privacy encompasses other matters. See *Paul v. Davis*, 424 U.S. 693, 712–13 (1976). But Stevenson does not allege any privacy interests recognized as being entitled to protection by the Supreme Court. *Id.* at 713 (affirming dismissal of plaintiff's right to privacy claim based

on allegation that defendant created police records containing false information and distributed the false information).

Accordingly, all claims alleging that Defendants illegally used Stevenson's name/trust/estate without authorization are dismissed in their entirety without leave to amend. *See Cuoco, 222 F.3d at 112* (affirming denial of leave to amend complaint because leave would be futile).

## VI. EXCESSIVE FORCE AND FALSE ARREST

Stevenson alleges that on August 27, 2019, he was "surrounded" without probable cause and "assaulted" to the ground. He also alleges that Seng threatened to shoot him. Dkt. 1, at 8–9 (First Claim). He was assaulted to the ground a second time when he tried to run and an officer sprayed something in his face, which caused vision and breathing difficulties. One officer placed his knee on Stevenson's neck. The officers removed his shoes, walked him over to another car, and drove him to the police station. *Id.* at 8–9, 11. Stevenson also alleges that Seng filed a false criminal complaint. *Id.* at 9 (Second Claim).

The Court construes these allegation as asserting: (1) the use of excessive force during an arrest, and (2) false arrest—both in violation of the Fourth Amendment. These claims, however, are time-barred under the applicable statute of limitations.

### A. Excessive Force

Section 1983 claims brought in New York State have a three-year statute of limitations. *Owens v. Okure, 488 U.S. 235, 251 (1989)* (holding that New York's three-year residual personal injury statute of limitations applies to section 1983 actions); *Jewell v. County of Nassau, 917 F.2d 738, 740 (2d Cir. 1990)*. Federal courts are required to borrow New York's rules for tolling the statute of limitations unless the rules are inconsistent with federal law. *Bd. of Regents of Univ. of State of N.Y. v. Tomanio, 446 U.S. 478, 487–491 (1980)*. Federal law controls when a claim accrues, however. *Kronisch v. United States, 150 F.3d 112, 123 (2d Cir. 1998)*.

A claim for excessive force during an arrest accrues when the use of force occurred. *Singleton v. City of New York, 632 F.2d 185, 191 (2d Cir. 1980)*; *Wharton v. County of Nassau, No. 07-CV-2137 (RRM) (ETB), 2010 WL 3749077, at *8 (E.D.N.Y. Sept. 20, 2010)*. Stevenson's claim, thus, accrued on August 27, 2019, which is more than three years before he filed his Complaint. Dkt. 1.[8]

[8]

Stevenson filed his Complaint at the earliest on February 2, 2023, when he signed the Complaint. Dkt. 1, at 5. The Complaint was not received by the Clerk of Court and filed until March 7, 2023. *Id.* at 1. "The prison mailbox rule provides that a *pro se* prisoner's [pleading] is deemed filed at the moment he gives it to prison officials." *Hardy v. Conway, 162 F. App'x 61, 62 (2d Cir. 2006)* (summary order) (citing *Noble v. Kelly, 246 F.3d 93, 97 (2d Cir. 2001)* (per curiam); *Walker v. Jastremski, 430 F.3d 560 (2d Cir. 2005)*). "[I]n the absence of contrary evidence, district courts in this circuit have tended to assume that prisoners' papers were given to prison officials on the date of their signing." *Hardy, 162 F. App'x at 62.*

**\*11** The excessive force claim should be dismissed because Stevenson filed his Complaint more than three years after the use of excessive force allegedly occurred and there is no basis for either statutory tolling, *see N.Y. C.P.L.R. §§ 206–209* (setting forth statutory bases for tolling statute of limitations), or equitable tolling of the statute of limitations, *Menominee Indian Tribe of Wis. v. United States, 577 U.S. 250, 255 (2016)* (setting forth criteria for equitably tolling of statute of limitations: "(1) that [the plaintiff] has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing."). Before dismissing this claim, however, Stevenson must first be provided notice and opportunity to address why the Complaint should not be dismissed as time barred. *See Abbas, 480 F.3d at 640* (district court erred in dismissing *pro se* complaint as time-barred *sua sponte* and without notice and an opportunity to be heard). Stevenson, therefore, is granted leave to file an amended complaint and assert why his excessive force claim is not barred by the statute of limitations or why he is entitled to either statutory or equitable tolling of the statute of limitations.

### B. False Arrest

While the Court notes that the Complaint does not expressly allege a claim of false arrest, Stevenson does allege that on August 27, 2019, Laclair, Mandale, and Seng surrounded him, prevented his movement, and placed him in a patrol car without probable cause or a warrant. Thus, the Court construes these allegations as asserting false arrest in violation of the Fourth Amendment. This claim, however, is untimely and, even if it was timely, it calls into question the validity of

Plaintiff's conviction and would, therefore, be barred by *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994).

### 1. Statute of Limitations

A claim for false arrest accrues at the time the plaintiff is arraigned. *Wallace v. Kato*, 549 U.S. 384, 397 (2007) ("[T]he statute of limitations upon a [section] 1983 claim seeking damages for a false arrest in violation of the Fourth Amendment, where the arrest is followed by criminal proceedings, begins to run at the time the claimant becomes detained to legal process."); *see also Swinton v. City of New York*, 785 F. Supp. 2d 3, 12 (E.D.N.Y. 2011) (limitations period for false arrest begins to run "when [the defendant] is bound over by a magistrate or arraigned on charges") (citation omitted). While the Complaint does not allege when Stevenson was arraigned, it does allege that following his arrest on August 27, 2019, Seng filed a false criminal complaint against him. Dkt. 1, at 9, 11. The Court presumes, therefore, that Stevenson was arraigned on or around August 27, 2019, which is more than three years before he filed the Complaint.

The false arrest claim is untimely and there are no allegations supporting tolling of the limitations period. While Stevenson generally would be granted leave to file an amended complaint addressing why this claim should not be dismissed as untimely or why the limitations period is subject to tolling, *see Abbas*, 480 F.3d at 640, the false arrest claim, even if timely or subject to tolling, would nonetheless be barred under *Heck*, 512 U.S. at 486–87. Thus, leave to amend is denied with respect to the false arrest claim.

### 2. *Heck v. Humphrey*

Assuming *arguendo* that the false arrest claim is timely, it would then be barred by *Heck*, wherein the Supreme Court held that

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a [section] 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized

> to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under [section] 1983.

**\*12** *Heck*, 512 U.S. at 486–87.

Because Stevenson does not allege that his conviction has been reversed or overturned, [9] his false arrest claim, if timely, is barred under *Heck*. [10] *See Wallace*, 549 U.S. at 393–94 ("If the plaintiff is ultimately convicted, and ... the civil suit would impugn that conviction, *Heck* will require dismissal.")

[9]      The DOCCS website, https://nysdoccslookup.doccs.ny.gov/, indicates that Stevenson is incarcerated upon convictions from Monroe County of Criminal Possession of a Weapon, Second Degree, Criminal Possession of a Controlled Substance, Third Degree, and Criminal Possession of a Controlled Substance, Fourth Degree. *See Simmonds v. Family Dollar Store*, No. 18-CV-01241, 2018 WL 5447046, at \*1 n.1 (E.D.N.Y. Oct. 25, 2018) ("The Court may take judicial notice of Plaintiff's DOCCS inmate lookup information.")

[10]      To the extent the Complaint can be construed as alleging a malicious prosecution claim, it too is barred under *Heck* because success on such a claim would necessarily imply the invalidity of Stevenson's conviction arising from the arrest and prosecution at issue and because Stevenson has not alleged that his conviction has been reversed, overturned, or invalidated in any way. *See Heck*, 512 U.S. at 486–87; *see, e.g., McFadden v. New York*, No. 10-CV-141 (RRM)(CLP), 2011 WL 6813194, at \*4 (E.D.N.Y. Dec. 28, 2011) ("Courts in this Circuit routinely dismiss [false arrest and malicious prosecution] claims where the plaintiff's conviction has not been overturned or otherwise invalidated.") (collecting cases).
Similarly, to the extent Stevenson claims he is and has been illegally detained and requests

release from his detention, Dkt. 1, at 11, 42 (Thirtieth Claim), success on any such claims would necessarily imply the invalidity of his conviction and is barred under *Heck.* Any claims requesting release from detention based on an unlawful conviction or sentence must be brought in a habeas corpus proceeding under 28 U.S.C. § 2254. See *Preiser v. Rodriguez,* 411 U.S. 475, 500 (973) (holding that "when a state prisoner is challenging the very fact or duration of his physical confinement, and the relief he seeks is a determination that he is entitled to immediate release ..., his sole federal remedy is a writ of habeas corpus.").

Accordingly, even if the false arrest claim is timely or subject to tolling, it would nonetheless be barred by *Heck.* The Court, therefore, denies Stevenson leave to amend the Complaint to address why the false arrest claim is timely or subject to tolling and dismisses the false arrest claim without prejudice. *See Amaker v. Weiner,* 179 F.3d 48, 52 (2d Cir. 1999) (dismissal under *Heck* must be without prejudice).

**VII. CLAIMS ARISING AT MONROE COUNTY JAIL**

**A. Excessive Force**

Stevenson alleges that on or about January 21, 2023, MCJ Deputies Merolla, Hahn, and Gertin used "physical force" to handcuff him and move him to another location at MCJ. He suffered "damages" to his neck, back, and wrist. Dkt. 1, at 33 (Twenty-First Claim). Assuming Stevenson was a pretrial detainee at this time, the excessive force claim is analyzed under the Fourteenth Amendment's Due Process Clause. See *Darnell v. Pineiro,* 849 F.3d 17, 29 (2d Cir. 2017).

**\*13** A pretrial detainee's claims are evaluated under the Due Process Clause because "[p]retrial detainees have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." *Id.* (internal quotation marks and citations omitted); *see, e.g., Barnes v. Harling,* 368 F. Supp. 3d 573, 596 (W.D.N.Y. 2019) (noting that pretrial detainees' [section] 1983 claims alleging deliberate indifference are analyzed under the Fourteenth Amendment using the standard set forth in *Darnell).*

To prevail on an excessive force claim, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley,* 576

U.S. at 396–97. Whether force was objectively unreasonable depends on:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* at 397 (noting that the above factors are illustrative).

Here, Stevenson fails to allege that the deputies used force that was objectively unreasonable. He only asserts that the deputies used "physical force" to handcuff him, and he suffered some unspecified injuries to his neck, back, and wrist. This is insufficient to plausibly allege an excessive force claim in violation of the Fourteenth Amendment, but Stevenson is granted leave to amend.

Moreover, to the extent that Plaintiff's claim is based on an allegation that the handcuffs were too tight, the courts consider whether: "(1) the handcuffs were unreasonably tight; (2) the defendants ignored the [plaintiff's] pleas that the handcuffs were too tight; and (3) the degree *of injury to the wrists*.' " *Ali v. Ramos,* No. 16-CV-01994 (ALC), 2018 WL 1353210, at \*5 (S.D.N.Y. Mar. 14, 2018) (quoting *Lynch ex rel. Lynch v. City of Mount Vernon,* 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008)).

Again, Stevenson alleges only that corrections officers at MCJ used "physical force" to handcuff him and move him to another location at MCJ and that he suffered "damages" to his neck, back, and wrist. Dkt. 1, at 33. He alleges nothing related to the tightness of the handcuffs, whether he complained about the tightness of the handcuffs and his complaints were ignored, or anything related to the degree of injury to his wrist. He alleges only that he suffered "damages" to his wrist. Based on the lack of any allegations to plausibly allege an excessive force claim based on tight handcuffing, this claim is dismissed.

Stevenson, however, is granted leave to amend this claim. [11]

11    Stevenson also names MCJ as a defendant on this claim. To the extent Stevenson asserts this claim against MCJ, it must be dismissed without leave to amend because: (1) under New York law, MCJ is not an entity separate and apart from the County and thus cannot be sued or sue, and (2) there are no allegations that use of excessive force occurred pursuant to a policy or custom. *See supra* at n.6. Because the Court finds that an amended claim against the County would be futile, leave to amend the Complaint to assert a *Monell* claim against the County is denied. *Id.*; *see* *Swinton v. Livingston County*, No. 21-1434, 2023 WL 2317838, at *1 n.1 (2d Cir. Mar. 2, 2023) (summary order) (affirming district court's *sua sponte* dismissal of claim against County without leave to amend because "complaint gives no indication that [the plaintiff] could plausibly allege a *Monell* claim against the Counties and the Jails").

**B. Due Process**

**\*14**  Stevenson alleges that on or about October 30, 2019, unidentified deputies at MCJ terminated a visit and placed him in SHU "without telling him why." Dkt. 1, at 44 (Thirty-Second Claim). He later received a ticket stating he was "penalized" for possessing contraband. He was never told what the contraband was. He was in SHU for thirty days, and MCJ banned his girlfriend from visiting him, prohibited contact visits for over four months, and took money from his account. *Id.* At its essence, Stevenson alleges that he was denied procedural due process before he was sentenced to SHU for thirty days and denied contact visits, and visits with his girlfriend, based on a finding that he possessed contraband during a prison visit. This claim is both barred by the statute of limitations and fails to state a claim upon which relief can be granted, but Plaintiff will be granted leave to file an amended complaint to address why this claim is not time-barred and allege facts establishing a plausible due process claim.

1. Statute of Limitations

A procedural due process claim related to a disciplinary hearing accrues "either at the date of the disciplinary hearing or at the date the prisoner's final administrative appeal is decided." *See* *Tafari v. Rock*, No. 11-CV-0057, 2012 WL 1424725, at *2 (W.D.N.Y. April 24, 2012) (quoting *Williams v. Roberts*, No. 9:11-CV-29 (GTS/RFT), 2011 WL 7468636, at *5 (N.D.N.Y. Dec. 15, 2011); *see also* *Best v. Newton*,

No. 15-CV-4316, 2016 WL 5416505, at *5 (S.D.N.Y. Sept. 28, 2016) ("For procedural due process actions related to disciplinary hearings, courts in the Second Circuit generally set the accrual date at the date of the disciplinary hearing.") (collecting cases)).

Plaintiff alleges that after a visit was terminated on October 30, 2019, he was issued a ticket for possession of contraband, sentenced to thirty days in SHU, and denied contact visits. While he does not allege the date of his hearing, it can safely be presumed that it occurred shortly after October 30, 2019. The Complaint was not filed until, at the earliest, February 2, 2023, *see supra* at n.8, which is more than three months after the alleged denial of due process. Plaintiff's due process claim thus appears time barred and subject to dismissal, but he will be provided an opportunity to file an amended complaint alleging that his due process claim is not time barred or that he is subject to tolling of the statute of limitations.

2. Failure to State Claim

Under the Due Process Clause of the Fourteenth Amendment, a pretrial detainee "may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). [12] Not every restriction of confinement "imposed during pretrial detention amounts to 'punishment' in the constitutional sense, however." *Id.* at 537. The Court must determine whether a condition or restriction placed upon a pretrial detainee "is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538. Absent a showing of an "expressed intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].' " *Id.* (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-169 (1963)). When a particular condition or restriction of pretrial detention "is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' " *Id.* at 539.

12    *Sandin v. Conner*, 515 U.S. 472 (1995) "does not apply to pretrial detainees and ... accordingly, pretrial detainees need not show that an imposed restraint imposes atypical and significant hardships to state deprivation of a liberty interest protected by procedural due process." *Iqbal v. Hasty*, 490

F.3d 143, 163 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *see also Richardson v. Vermont*, No. 1:15-cv-120, 2015 WL 9921313, at *7 (D. Vt., Dec. 23, 2015) (Sandin's "atypical and significant hardship" standard does not apply to pretrial detainees) (citation omitted).

**\*15** In *Wolff*, the Supreme Court held that "prison disciplinary proceedings must follow specific procedures in order to satisfy due process." *Richardson v. Vermont*, No. 1:15–cv–120, 2015 WL 9921313, at *7 (D. Vt. Dec. 23, 2015) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 564–66 (1974)). The *Wolff* procedures include "written notice, adequate time to prepare a defense, a written statement of the reasons for action taken, and a limited ability to present witnesses and evidence." *Benjamin v. Fraser*, 264 F.3d 175, 190 (2d Cir. 2001). These procedures apply if "the restraint on liberty is imposed for disciplinary reasons; if the restraint is for 'administrative' purposes, the minimal procedures outlined in *Hewitt [v. Helms*, 459 U.S. 460 (1983)] are all that is required." [13] *Id.* Procedural due process requires that "pretrial detainees can only be subjected to segregation or other heightened restraints if a pre-deprivation hearing is held to determine whether any rule has been violated." *Johnston v. Maha*, 606 F.3d 39, 41 (2d Cir. 2010) (citing *Benjamin*, 264 F.3d at 190); *see also Muhmmaud v. Murphy*, No. 08–CV–1199, 2009 WL 4041404, at *6 (D. Conn. Nov. 19, 2009) ("Before a pretrial detainee may be punished, he must be afforded the procedural protections set forth in *Wolff* .... The detainee cannot be punished until after the hearing is held.").

[13]    Under *Hewitt*, " '[a]n inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison **official** charged with deciding whether to transfer him to administrative segregation,' and the 'proceeding must occur within a reasonable time following an inmate's transfer.' " *Taylor v. Comm'r of N.Y.C. Dep't of Corr.*, 317 F. App'x 80, 82 (2d Cir. 2009) (summary order) (quoting *Hewitt*, 459 U.S. at 476 n.8).

Stevenson alleges that he received a ticket, following a prison visit, charging him with possessing contraband. As a result, he claims he was sentenced to SHU for thirty days and denied contact visits for four months. These allegations alone are insufficient to state a plausible due process claim.

Assuming Stevenson's SHU confinement was punitive, *see Shine v. Hofmann*, No. 06–CV–237, 2009 WL 2179969, at *5 (D. Vt. July 22, 2009) (stating that "special confinement based upon a disciplinary violation rings of punishment); *see also Benjamin*, 264 F.3d at 190 ("[T]he procedures required by *Wolff* apply if the restraint on liberty is imposed for disciplinary reasons."); *Mitchell v. Dep't of Corr.*, No. 05-CV5792, 2008 WL 744041, at *13 (S.D.N.Y. Feb. 20, 2008) ("The ... Second Circuit has held that a pretrial detainee subject to discipline for an infraction is entitled to the due process protections set forth in *Wolff* ...."), the Complaint is silent regarding what procedural protections Stevenson was denied. *See Wolff*, 418 U.S. at 564-66; *cf. Best*, 14 F. Supp. 3d at 351 (denying motion to dismiss because the plaintiff plausibly alleged that his placement in segregated confinement was punitive and not administrative in nature, and that he was denied one of the procedural protections guaranteed under *Wolff*—the right to call witnesses). In the absence of any such allegations, Stevenson fails to state a plausible claim for relief. Stevenson, however, will be granted leave to amend this claim to allege what protections guaranteed under *Wolff he* was denied. Any amended complaint must also name the deputies at MCJ whom he claims disciplined him without due process—*e.g.*, the hearing officer or deputies involved in his discipline. [14] If Stevenson does not know the names of the deputies, he can name them as John Doe Defendants and provide identifying information, including a physical description, their title or position, the area at MCJ where the incident occurred, and any other information that would assist in identifying them.

[14]    To the extent this claim is brought against MCJ, it is dismissed with prejudice because, as stated above, MCJ cannot be sued and even if the County was substituted in MCJ's place there are no allegations suggesting that Stevenson was disciplined without due process pursuant to a policy or custom of the County. *See supra* at n.6 and n.11.

**VIII. SECTIONS 1985 AND 1986**

**\*16** As addressed above, Stevenson lists 42 U.S.C. §§ 1985 and 1986 as a basis for his claims. Dkt. 1, at 1. In his motion, he also requests that the Court correct the title of this action to section 1985, not section 1983. Dkt. 12. Stevenson's claims under sections 1985 and 1986 are dismissed because Stevenson fails to state plausible claims for relief.

To state a plausible claim for relief under section 1985, a plaintiff must allege: "[i] a conspiracy, [ii] for the purpose

of depriving any person ... of the equal protection of the laws ..., [iii] an act in furtherance of the conspiracy, and [iv] whereby a person is injured in his person or property or deprived of a right or privilege of a citizen." *Benzinger v. NYSARC, Inc. N.Y.C. Chapter*, 385 F. Supp. 3d 224, 236 (S.D.N.Y. 2019) (quoting *Iqbal v. Hasty*, 490 F.3d 143, 176 (2d Cir. 2007), *rev'd on other grounds by Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). To succeed, a plaintiff must also show that "there was 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.' " *Benzinger*, 385 F. Supp. 3d at 236 (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)).

A plaintiff must show that "defendants entered into an agreement, express or tacit, to achieve the unlawful end, augmented by some details of time and place and the alleged effects of the conspiracy." *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 208 (S.D.N.Y. 2013) (internal quotation marks omitted). Significantly, "vague and unsupported assertions of conspiracy ... do not suffice." *Reid v. City of New York*, No. 20 Civ. 9243 (KPF), 2022 WL 2967359, at *20 (S.D.N.Y. July 27, 2022). Complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights may properly be dismissed. *See, e.g., Roundtree v. NYC*, No. 19-CV-2475 (JMF), 2021 WL 1667193, at *6 (S.D.N.Y. Apr. 28, 2021) (finding plaintiff's "bare allegations" that defendants engaged in a conspiracy insufficient to state a claim under Section 1985(3)) (collecting cases); *see also Doe v. Fenchel*, 837 F. App'x 67, 68 (2d Cir. 2021) (summary order) (affirming dismissal of Section 1985(3) claim where plaintiff's "naked assertion[s]" that defendants engaged in impermissible conspiracy were "devoid of further factual enhancement") (citation and internal quotation marks omitted).

Here, the Complaint is devoid of any allegations sufficient to allege a conspiracy to deprive Stevenson of his constitutional rights and that the conspiracy was based on some racial or other class-based invidious discriminatory animus. Throughout the Complaint, Stevenson simply alleges that Defendants conspired to illegally use his name/trust/estate without his authorization. These conclusory and naked assertions of a conspiracy fail to state a plausible claim under section 1985(3), and this claim must be dismissed without leave to amend. See *Cuoco*, 222 F.3d at 112.

Similarly, because the claim under section 1986, which "imposes liability on an individual who has knowledge

of discrimination prohibited under [section] 1985," is "contingent on a valid [section] 1985 claim[,]" *Graham v. Henderson*, 89 F.3d 75, 82 (2d Cir. 1996); *see also Johnson v. City of New York*, 669 F. Supp. 2d 444, 452 (S.D.N.Y. 2009) (dismissing section 1986 claims because such claim "is contingent on the existence of a valid section 1985 claim"), Stevenson's claim under section 1986 is dismissed without leave to amend.

## CONCLUSION

**\*17** For the reasons set forth above, each of the claims set forth in the Complaint are dismissed, without leave to amend, under 28 U.S.C. § 1915A(b)(1)–(2), except the following claims which will be dismissed, with leave to amend, under section 1915A(b)(1)–(2), unless Stevenson files an amended complaint **no later than May 5, 2025**, in which he includes the necessary allegations as directed above and in a manner that complies with Rules 8 and 10 of the Federal Rules of Civil Procedure: (1) the excessive force claim during the course of Stevenson's arrest against Defendants Laclair, Mandale, and Seng, Dkt. 1, at 8–9, 11 (First Claim); (2) the excessive force claim at MCJ against Defendants Merolla, Hahn, and Gertin, *id.* at 32 (Twenty-First Claim); and (3) the procedural due process claim at MCJ, *id.* at 44 (Thirty-Second Claim).

Stevenson is forewarned that the amended complaint may contain only the three claims he is granted leave to amend. If he raises any other claims in the amended complaint beyond these three claims, those other claims will be dismissed. See *Palm Beach Strategic Income, LP v. Salzman*, 457 F. App'x 40, 43 (2d Cir. 2012) (summary order) (collecting cases) ("District courts in this Circuit have routinely dismissed claims in amended complaints where the court granted leave to amend for a limited purpose and the plaintiff filed an amended complaint exceeding the scope of the permission granted."). Plaintiff is also forewarned that if he fails to file an amended complaint as directed, the Complaint will be dismissed with prejudice pursuant to 28 U.S.C. § 1915A.

## ORDER

In light of the above,

IT IS HEREBY ORDERED that Plaintiff's motion to correct the title of this action is DENIED (Dkt. 12), and the motion to withdraw the motion for service by the United States

Marshals Service (Dkt. 13) is GRANTED, and the motions for service by United States Marshals Service (Dkt. 6 and 12) are withdrawn without prejudice to refiling until Stevenson files an amended complaint, and the Court screens it under 28 U.S.C. § 1915A; and it is further

ORDERED that each of the claims set forth in the Complaint are dismissed without leave to amend under 28 U.S.C. § 1915A(b)(1)–(2), except the following, which are dismissed with leave to amend: (1) the excessive force claim during the course of Stevenson's arrest against Defendants Laclair, Mandale, and Seng, Dkt. 1, at 8–9, 11 (First Claim); (2) the excessive force claim at MCJ against Defendants Merolla, Hahn, and Gertin, *id.* at 32 (Twenty-First Claim); and (3) the procedural due process claim at MCJ, *id.* at 44 (Thirty-Second Claim); and is further

ORDERED that Plaintiff is granted leave to file an amended complaint as directed above **no later than May 5, 2025** with respect to only these three claims; and it is further

ORDERED that the Clerk of Court shall terminate Defendants Charles A. Schiano, Jr., Jennifer Kennedy, Joseph Damelio, J. Wallace, Donald Scott Young, Joony Odenbach, Leticia Stacio, Todd Baxter, Sandra Doorley, James Riatto, William Swiff, Rochester Police Department, Monroe County District Attorney's Office, Monroe County Jail, Avangelista, Department of Corrections, Elmira Correctional Facility, and State of New York as parties to this action; and it is further

ORDERED that the Clerk of Court is directed to send to Stevenson with this Decision and Order a copy of the original complaint, a blank section 1983 complaint form, and the instructions for preparing an amended complaint; and it is further

ORDERED that if Plaintiff does not file an amended complaint as directed above, the Complaint shall be dismissed pursuant to 28 U.S.C. § 1915A(b)(1)–(2) with prejudice and the Clerk of Court shall take all steps necessary to close this case without further order; and it is further

 **\*18** ORDERED that in the event the Complaint is dismissed because Plaintiff has failed to file an amended complaint, this Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

SO ORDERED.

**All Citations**

Slip Copy, 2025 WL 1895830

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 1:23-CV-00205**<br>Stevenson v. Schiano Jr. et al | — | W.D.N.Y. | Mar. 07, 2023 | Docket |

**History (2)**

**Direct History (2)**

⚑ 1. Stevenson v. Schiano
2025 WL 1895830 , W.D.N.Y. , Mar. 19, 2025

*Appeal Filed by*

2. Stevenson v. Schiano Jr.
, 2nd Cir. , July 08, 2025

**WESTLAW**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Lawrence v. Sherman, Not Reported in Fed. Supp. (2020)

2020 WL 7029171

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 199 of 529

2020 WL 7029171
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Deon LAWRENCE, Plaintiff,
v.
Derrick SHERMAN, et al., Defendants.

1:20-CV-694 (MAD/DJS)
|
Signed 07/28/2020

**Attorneys and Law Firms**

DEON LAWRENCE, Plaintiff, Pro Se, Schenectady County Jail, 320 Veeder Avenue, Schenectady, New York 12307.

**REPORT-RECOMMENDATION and ORDER**

DANIEL J. STEWART, United States Magistrate Judge

**\*1** The Clerk has sent to the Court for review a Complaint submitted by *pro se* Plaintiff Deon Lawrence, asserting claims pursuant to 42 U.S.C. § 1983, together with an application to proceed *in forma pauperis* ("IFP"). Dkt. No. 1 ("Compl."); Dkt. No. 2 ("IFP Application"). By separate order, the Court approved Plaintiff's IFP Application.

**I. SUFFICIENCY OF THE COMPLAINT**

**A. Governing Legal Standard**

Section 1915(e) directs that, when a plaintiff seeks to proceed in *forma pauperis*, "(2) ... the court shall dismiss the case at any time if the court determines that – ... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [1] Thus, even if a plaintiff meets the financial criteria to commence an action in *forma pauperis*, it is the court's responsibility to determine whether the plaintiff may properly maintain the complaint that he filed in this District before the court may permit the plaintiff to proceed with this action in *forma pauperis*. *See id.*

[1] To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

Likewise, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A; *see also Carr v. Dvorin, 171* F.3d 115, 116 (2d Cir. 1999) (*per curiam*) (explaining that section 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee); *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (stating that both sections 1915 and 1915A are available to evaluate *pro se* prisoner complaints).

In reviewing a *pro se* complaint, the court has a duty to show liberality toward *pro se* litigants, see *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (*per curiam*), and should exercise "extreme caution ... in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted). Therefore, a court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. at 556).

**\*2** Although a court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." *Id.* at 679 (quoting FED. R. CIV. P. 8(a)(2)). Rule 8 of the Federal Rules of Civil Procedure "demands

Case 5:25-cv-00956-AJB-MJK   Document 9   Filed 12/08/25   Page 200 of 529

Lawrence v. Sherman, Not Reported in Fed. Supp. (2020)

2020 WL 7029171

more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. at 555). Thus, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id.* (internal quotation marks and alterations omitted).

## B. Summary of the Complaint

Plaintiff's allegations relate to an April 2018 arrest of Plaintiff in Schenectady, New York. Compl. at p. 1. According to the Complaint, Plaintiff was arrested by Defendant Sherman for failure to timely notify the New York State Division of Criminal Justice Services of an address change. *Id.* at p. 7. Plaintiff alleges that the arrest was unlawful because Sherman "should have known that plaintiff provided his correct registered address" as a result of his interrogation of Plaintiff. *Id.* Plaintiff was subsequently indicted by a Grand Jury. *Id.* He alleges the charges were ultimately dismissed in December 2018. *Id.*

Plaintiff further alleges that Assistant District Attorney Tracey Brunez of the Schenectady County District Attorney's Office withheld exculpatory evidence related to the charges pending against him. *Id.* at p. 8. Specifically, Plaintiff alleges that an order directing production of *Brady* material was deliberately ignored by Defendant Brunez. *Id.* Plaintiff claims that the prosecutor, Defendant Brunez, purposely withheld exculpatory material that would have exonerated him "from the onset." *Id.* at p. 1.

The remaining allegations in the Complaint reference the supervisory roles of Defendants Eric Clifford, Robert Carney, and Gary McCarthy [2] over either Defendant Sherman or Defendant Brunez. *Id.* at pp. 9-13. Plaintiff alleges that these defendants had an obligation to properly supervise and train and that the failure to do so resulted in the injuries alleged. *Id.*

---

[2]     The Complaint alternatively refers to McCarthy, who is the Mayor of the City of Schenectady, and the City itself as Defendants. The Court's docket identifies McCarthy as the Defendant. The Court notes that the ensuing analysis applies the same regardless of whether McCarthy or the City of Schenectady was the Defendant Plaintiff wished to name.

The Complaint asserts claims for unlawful arrest, false imprisonment, Fourth, Eighth, and Fourteenth Amendment violations, defamation, and emotional distress. *Id.* at pp. 7-8 & 15. Plaintiff claims that the prosecutor, Defendant Brunez, purposely withheld exculpatory material that would have exonerated him "from the onset." *Id.* at p. 1.

## C. Analysis of the Complaint

### 1. Claim Against Defendant Sherman

Plaintiff specifically alleges that Defendant Sherman is liable for false arrest and false imprisonment. Compl. at p. 15. The Complaint concedes that following his arrest by Sherman, Plaintiff was indicted by a Schenectady County Grand Jury. *Id.* at p. 4.

"In New York, the fact that the Grand Jury returned an indictment against [Plaintiff] creates a presumption that his arrest and indictment were procured with probable cause." *Bernard v. United States*, 25 F.3d 98, 104 (2d Cir. 1994). "Probable cause is a complete defense to a constitutional claim of false arrest, *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995), and false imprisonment, *Zanghi v. Vill. of Old Brookville*, 752 F.2d 42, 45 (2d Cir. 1985)." *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014); *see also Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996); *Trombley v. O'Neill*, 929 F. Supp. 2d 81, 95 (N.D.N.Y. 2013); *Rivas v. Suffolk Cty.*, 326 F. Supp. 2d 355, 361 (E.D.N.Y. 2004). "The plaintiff can overcome the presumption only by a showing that the indictment was procured through fraud, perjury, the suppression of evidence or other bad faith police conduct." *Campanaro v. City of Rome*, 999 F. Supp. 277, 281 (N.D.N.Y. 1998) (citing *Bernard v. United States*, 25 F.3d at 104). The Complaint makes no allegations regarding the circumstances of the indictment that would be sufficient to overcome this presumption at this juncture. As a result, Plaintiff's claims related to his arrest should be dismissed.

**\*3** "Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once 'when a liberal reading of the complaint gives any indication that a valid claim might be stated.' " *Bruce v. Tompkins Cty. Dep't of Soc. Servs. ex rel. Kephart*, 2015 WL 151029, at \*4 (N.D.N.Y. Jan. 7, 2015) (quoting *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991)). In light of this standard, the Court recommends that Plaintiff be afforded an opportunity to amend the Complaint as to his claims against

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 201 of 529

Lawrence v. Sherman, Not Reported in Fed. Supp. (2020)

2020 WL 7029171

Defendant Sherman in the event that Plaintiff believes he can allege facts that would overcome the presumption of probable cause created by the Grand Jury's indictment.

*2. Claims Against Defendants Brunez and Carney*

Plaintiff claims that Brunez withheld exculpatory material which would have established his innocence. Compl. at pp. 8-9. Prosecutors are absolutely immune from liability for Section 1983 claims in matters involving the prosecution of individuals. *Ochoa v. Arcuri,* 2005 WL 2407522, at *1 (N.D.N.Y. Sept. 29, 2005) (citing *Dory v. Ryan,* 25 F.3d 81, 83 (2d Cir. 1994)). "Because a prosecutor is acting as an advocate in a judicial proceeding, the solicitation and subornation of perjured testimony, the withholding of evidence, or the introduction of illegally-seized evidence at trial does not create liability in damages." *Rudaj v. Treanor,* 2011 WL 13128215, at *2 (S.D.N.Y. Dec. 7, 2011) (quoting *Taylor v. Kavanagh,* 640 F.2d 450, 452 (2d Cir. 1981)) (claim seeking monetary damages against an Assistant United States Attorney for withholding evidence was dismissed because the prosecutor was entitled to absolute immunity).

In the present case, Brunez is shielded by absolute prosecutorial immunity for all claims against her in her prosecutorial capacity and from claims for damages in her official capacity. *See Fonvil v. Cty. of Rockland,* 2018 WL 357309, at *2 (S.D.N.Y. Jan. 9, 2018); *see also Rudaj v. Treanor,* 2011 WL 13128215, at *2. Therefore, the Court recommends Plaintiff's claims against Brunez be dismissed. Where the grounds for dismissal offer no basis for curing the defects in the pleading, dismissal with prejudice is appropriate. *Kunz v. Brazill,* 2015 WL 792096, at *3 (N.D.N.Y. Feb. 25, 2015). Plaintiff cannot cure the deficiencies identified above as to Plaintiff's claim against Brunez and so those claims should be dismissed with prejudice.

Defendant Carney is the Schenectady County District Attorney and is sued for his alleged failure to properly supervise and train Defendant Brunez. *Id.* at pp. 2 & 9-11.

Under certain circumstances a civil rights plaintiff may be able to establish supervisory liability for constitutional violations. "A necessary factor, however, of this supervisory liability is that a constitutional violation have occurred." *Alston v. Bendheim,* 672 F. Supp. 2d 378, 388 (S.D.N.Y. 2009); *see also Jackson v. Yando,* 2016 WL 756540, at *5 n. 5

(N.D.N.Y. Feb. 23, 2016). Because Plaintiff cannot establish a constitutional claim against Defendant Brunez, his claim against Defendant Carney for failing to properly train and supervise her "must be dismissed ... because as explained above, there is no underlying [constitutional] violation in the first place." *Lawrence v. Evans,* 136 F. Supp. 3d 486, 491 (W.D.N.Y. 2015); *see also Delaney v. Zaki,* 2014 WL 4966914, at *8 (N.D.N.Y. Sept. 30, 2014) ("A complaint that fails to state a claim for underlying unlawful conduct also fails to state a claim against any supervisory officials named as defendants.").

*3. Claims Against Defendants Clifford and McCarthy*

**\*4** The remaining Defendants similarly appear to be sued in their supervisory capacities for an alleged failure to properly train Defendants Sherman and Brunez. Defendant Clifford is alleged to be the Schenectady Police Chief. Compl. at p. 6. Defendant McCarthy is the Mayor of the City of Schenectady. *Id.* Both are alleged to have failed to properly train and/or supervise Sherman. *Id.* at pp. 9-11.

As noted above, supervisory officials can under some circumstances be liable for failure to properly train and supervise subordinates. Given the recommendation that claims against Defendant Sherman be dismissed with leave to replead, the Court similarly recommends that the claims against Defendants Clifford and McCarthy be dismissed with leave to amend. If Plaintiff fails to allege facts in an amended complaint that would overcome the presumption of probable cause, claims against these supervisory defendants would be subject to dismissal based on the failure to establish any constitutional violation. *Lawrence v. Evans,* 136 F. Supp. 3d at 491. If sufficient allegations to overcome that presumption are made, Plaintiff has likely made sufficiently specific allegations here to require a response from Defendants.

Plaintiff also alleges a claim against these Defendants under the Eighth Amendment. Compl. at p. 15. Plaintiff specifically alleges, however, that the charges at issue in this case were dismissed. *Id.* at p. 7. Courts have consistently recognized that "the Eighth Amendment does not apply 'until after conviction and sentence.' " *Wright v. New York City,* 2012 WL 4057958, at *3 (E.D.N.Y. Sept. 14, 2012) (quoting *United States v. Walsh,* 194 F.3d 37, 47 (2d Cir. 1999)); *see also Lindsey v. Butler,* 43 F. Supp. 3d 317, 325 (S.D.N.Y. 2014) ("the Eighth Amendment attaches only after conviction"). Plaintiff's allegations regarding the insufficiency of the

Lawrence v. Sherman, Not Reported in Fed. Supp. (2020)
2020 WL 7029171

investigation and prosecution, therefore, do not implicate the Eighth Amendment and those claims should be dismissed with prejudice.

Accordingly, the Court recommends dismissing the remaining claims against Defendants Clifford and McCarthy without prejudice.

## II. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Plaintiff's Complaint be **DISMISSED with prejudice** pursuant to 28 U.S.C. §§ 1915(e) & 1915(A) for failure to state a claim upon which relief may be granted as to claims against Defendants Brunez and Carney and as to any claim under the Eighth Amendment; and it is further

**RECOMMENDED**, that the claims against Defendants Sherman, Clifford, and McCarthy be **DISMISSED without prejudice** and that Plaintiff be granted leave to amend; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [3] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

[3]    If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2020 WL 7029171

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

**Filings (1)**

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **1. Docket 1:20-CV-00694**<br>Lawrence v. Sherman et al | — | N.D.N.Y. | June 22, 2020 | Docket |

**History (3)**

**Direct History (2)**

1. Lawrence v. Sherman
   2020 WL 7029171 , N.D.N.Y. , July 28, 2020

*Report and Recommendation Adopted by*

2. Lawrence v. Sherman
   2020 WL 5904789 , N.D.N.Y. , Oct. 06, 2020

**Related References (1)**

3. DEON LAWRENCE, Plaintiff, v. DERRICK SHERMAN, ERIC CLIFFORD, and MAYOR GARY MCCARTHY, City of Schenectady, Defendants.
   2022 WL 2817882 , N.D.N.Y. , July 18, 2022

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 205 of 529

Everett v. Dean, Not Reported in Fed. Supp. (2023)
2023 WL 5452753

2023 WL 5452753
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jahmier A. EVERETT, Plaintiff,

v.

Shawn DEAN and Ronald Lussi, Defendants.

3:20-CV-01260 (AMN/ML)
|
Signed August 24, 2023

**Attorneys and Law Firms**

JAHMIER A. EVERETT, 22-B-1079, Green Haven
Correctional Facility, P.O. Box 4000, Stormville, NY 12582,
Plaintiff, Pro Se.

HON. LETITIA JAMES, New York State Attorney General,
KOSTAS D. LERIS, ESQ., Assistant Attorney General, The
Capitol, Albany, NY 12224, Attorney for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Anne M. Nardacci, United States District Judge:

**I. INTRODUCTION**

**\*1** On October 13, 2020, Plaintiff *pro se* Jahmier Everett
("Plaintiff") commenced this action pursuant to 42 U.S.C.
§ 1983 ("Section 1983"), alleging various constitutional,
statutory, and common law claims stemming from an
investigation and criminal charge by New York State Police
("NYSP") Investigator Shawn Dean and NYSP Senior
Investigator Ronald Lussi (collectively "Defendants"). *See*
Dkt. No. 1. This case was referred to United States
Magistrate Judge Miroslav Lovric, who, on February
26, 2021, issued an Order and Report-Recommendation
("Report-Recommendation"), granting Plaintiff's application
*in forma pauperis* ("IFP") application, Dkt. No. 5,[1] and
recommending that Plaintiff's Fourth Amendment false
arrest and malicious prosecution claims proceed against
Defendants. *See* Dkt. No. 7. On March 30, 2021, the Court
adopted the Report-Recommendation in its entirety. *See* Dkt.
No. 10.

[1]    Plaintiff's initial IFP application was denied as
incomplete, and the case was administratively
closed. *See* Dkt. Nos. 2, 4.

On March 22, 2021, Plaintiff filed an Amended Complaint.
Dkt. No. 9. Magistrate Judge Lovric conducted a *sua
sponte* review and recommended that the following four
claims proceed: (1) fabrication of evidence against Defendant
Dean; (2) defamation against Defendant Dean; (3) Fourth
Amendment false arrest against Defendants; and (4) Fourth
Amendment malicious prosecution against Defendants. *See*
Dkt. No. 12.[2] On July 19, 2021, the Court adopted the
Report-Recommendation in its entirety, *see* Dkt. No. 13, and
on September 20, 2021, Defendants filed an Answer to the
Amended Complaint. *See* Dkt. No. 22.

[2]    Magistrate Judge Lovric also recommended
dismissing, with leave to replead, Plaintiff's
claim of supervisory liability against Defendant
Lussi and dismissing, without leave to replead,
Plaintiff's Amended Complaint to the extent it
alleged claims for (1) *respondeat superior* against
Defendant Lussi, (2) due process violations against
Defendants, (3) fabrication of evidence against
Defendant Lussi, (4) all claims against Defendants
in their official capacities, and (5) harassment
pursuant to New York state common law against
Defendants. *See* Dkt. No. 12 at 16.

On August 19, 2022, Defendants filed a motion for summary
judgment ("Motion"), Dkt. No. 39, and on October 20, 2022,
Plaintiff filed a Cross-Motion for summary judgment ("Cross-
Motion") and an Opposition. Dkt. No. 50.[3] On November
4, 2022, Defendants filed an Opposition to the Cross-Motion
and a Reply to Plaintiff's Opposition. *See* Dkt. No. 51. For the
reasons set forth below, Defendants' Motion is granted in its
entirety and Plaintiff's Cross-Motion is denied.

[3]    The Court is mindful that due to Plaintiff's
*pro se* status, his submissions are held "to less
stringent standards than formal pleadings drafted
by lawyers." *See Hughes v. Rowe*, 449 U.S. 5, 9
(1980) (citations omitted). Therefore, the Court has
construed Plaintiff's Cross-Motion for summary
judgment as also including his Opposition to the
Motion. *See* Dkt. No. 50.

**II. BACKGROUND**[4]

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 206 of 529

Everett v. Dean, Not Reported in Fed. Supp. (2023)
2023 WL 5452753

4      The Court has drawn the facts stated herein from the Amended Complaint and the parties' submissions and the attached exhibits. *See* Dkt. Nos. 9, 39, 50, 51. The Court construes the facts relevant to each party's motion in the light most favorable to the non-moving party.

**\*2** This action arises out of Plaintiff Jahmier Everett's August 28, 2019 arrest, as a result of which he was charged with criminal sale of a controlled substance ("CSCS") in the third degree under New York Penal Law § 220.39(1).[5] Dkt. No. 9 at 4.[6] Plaintiff alleges that he "was falsely arrested and unlawfully imprisoned" on the basis of an "illusionary drug sale" fabricated by Defendants[7] in order to implicate him in an unrelated homicide that occurred in Tioga County, New York. *Id.* Plaintiff alleges that as a result of Defendants' actions, he suffered "loss of wages[,] mental anguish[,] humiliation [and] anxiety[,] and [was] displaced from his children and loved ones." Dkt. No. 9 at 6.

5      "A person is guilty of criminal sale of a controlled substance in the third degree when he knowingly and unlawfully sells ... a narcotic drug." *Reeder v. Vine,* No. 6:20-CV-06026 (EAW), 2023 WL 2044126, at \*3 n.2 (W.D.N.Y. Feb. 16, 2023) (quoting N.Y. Penal Law § 220.39(1)). This crime is classified as a Class B felony. *Id.*

6      Citations to court documents, including deposition transcripts, utilize the pagination generated by CM/ECF, the Court's electronic filing system.

7      During the relevant time period, Defendant Dean was employed as an Investigator, and Defendant Lussi as a Senior Investigator, for the NYSP on the New York State Violent Gangs and Narcotics Enforcement Team ("VGNET"). Dkt. No. 39-5 at ¶¶ 2-3.

In May 2019, the NYSP Troop C Major Crimes Unit ("Major Crimes") contacted Troop C VGNET requesting that they conduct a controlled purchase ("Controlled Purchase"). Dkt. No. 39-5 at ¶ 4.[8] The subject of the Controlled Purchase was Plaintiff, who also goes by the street name "Jah Diggz." Dkt. No. 39-2 at ¶ 7. Major Crimes contacted VGNET to conduct the Controlled Purchase because "Plaintiff was a known drug dealer in the Greater Binghamton Area" and the "NYSP ha[d] information that Plaintiff has been selling narcotics in the Greater Binghamton Area dating back to the mid-2000s."

Dkt. No. 39-2 at ¶ 7; Dkt. No. 39-5 at ¶ 5. Defendant Dean was the lead agent assigned to the Controlled Purchase, and Defendant Lussi's role was to "oversee the controlled purchase and supervise [Defendant] Dean's handling of the case." Dkt. No. 39-3 at ¶ 8.

8      A controlled purchase is "an undercover drug-type operation" which typically uses a confidential informant to complete the purchase. Dkt. No. 39-2 at ¶ 6.

At the time Major Crimes contacted VGNET, Plaintiff was being investigated by Major Crimes for a homicide which occurred in May 2019 in Tioga County, New York. Dkt. No. 39-5 at ¶¶ 4, 7. Major Crimes obtained a telephone number, (607) 232-7303 ("the telephone number"), which was allegedly connected to the homicide, and requested that VGNET contact this number as part of the Controlled Purchase and verify that the telephone number belonged to Plaintiff. *Id.* at ¶¶ 6-7.[9]

9      Plaintiff asserts that he "never owned nor used any device registered to (607) 232-7303." Dkt. No. 50 at 101.

The NYSP Special Investigations Unit provided VGNET with a confidential informant ("CI") who "was known to have knowledge of" Plaintiff, to conduct the Controlled Purchase. *Id.* at ¶¶ 11-12.[10] In May 2019, Defendant Dean requested that the CI contact the telephone number and arrange to purchase crack cocaine from Plaintiff. *Id.* at ¶ 13. The CI contacted the telephone number in the presence of Defendants and arranged for a purchase of narcotics. *Id.* at ¶¶ 15-16.[11] The CI was searched prior to the purchase to confirm that the CI was not in possession of any contraband, and the CI was supplied with a recording device and cash. *Id.* at ¶ 18. The CI then went with an undercover officer in an unmarked patrol vehicle to meet Plaintiff. *Id.* at ¶ 19. Defendants followed the unmarked vehicle and parked in a location where they could not visually see the alleged transaction between the CI and Plaintiff but could hear the entire conversation through the recording device provided to the CI. *Id.* at ¶¶ 20-22.[12] After a short period of time, the CI returned to the NYSP undercover vehicle without the cash and with drugs, which later field tested positive for the presence of cocaine. *Id.* at ¶¶ 23, 25-26.[13]

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 207 of 529

Everett v. Dean, Not Reported in Fed. Supp. (2023)

2023 WL 5452753

10    Plaintiff asserts that Defendants produced no affirmative evidence that a CI existed and even assuming that a CI did exist, Defendants have not shown that the CI was credible. Dkt. No. 50 at 101.

11    Defendants submitted an unredacted photograph of the CI's telephone for *in camera* inspection. Dkt. No. 39-2 at ¶ 11 & n.2. Plaintiff submitted as an exhibit a partially redacted photograph of the CI's telephone, contacting "Jay" at the telephone number to arrange for the Controlled Purchase. Dkt. No. 50 at 97-99. While Plaintiff testified that he also goes by the name "Jah Diggs," *see* Dkt. No. 39-1 at 69:21-70:4, Plaintiff asserts that "there is no admissible evidence to support that Plaintiff goes by the name 'Jay.' This shows that this call log is not the plaintiff." Dkt. No. 50 at 8, 102.

12    A copy of the audio recording of the conversation between the CI and allegedly Plaintiff was provided to the Court for *in camera* inspection. *See* Dkt. No. 39-2 at ¶ 12.

13    Plaintiff alleges that the drug sale never occurred and was "fabricated by [Defendant] Dean due to the fact that [he] could not be charged with the homicide," and because Defendant Dean only "listened to the conversation" instead of visually observing it, there is no direct proof that Plaintiff is the person on the recording. Dkt. No 50 at 3, 5, 8, 101-03.

**\*3** The CI was interviewed in the presence of Defendants and provided a supporting deposition which Defendant Dean transcribed by hand. *Id.* at ¶¶ 27-28. 14 The CI reviewed the statement and signed it "verifying its authenticity." *Id.* at ¶ 29. 15 VGNET then alerted Major Crimes that the Controlled Purchase was completed. *Id.* at ¶ 30. Major Crimes requested that VGNET "wait to arrest [Plaintiff] until the homicide investigation was complete," which VGNET agreed to. *Id.* at ¶¶ 31-32. 16 On August 28, 2019, Plaintiff was arrested and charged with CSCS in the Third Degree. Dkt. No. 39-4 at ¶¶ 41, 45. Defendants were not present when Plaintiff was arrested, processed, and interviewed. *Id.* at ¶¶ 42, 44. Plaintiff alleges that while he was questioned about allegations related to being a drug dealer, he was mostly questioned about a homicide case. Dkt. No. 50 at 2.

14    The CI's supporting deposition describes the Controlled Purchase, including that the NYSP asked the CI to "[b]uy crack cocaine from Jay Diggs," and the CI "called Jay" at the telephone number and purchased drugs. *See* Dkt. No. 9 at 11-12. Plaintiff argues that Defendant Dean's handwritten transcription and redaction of the CI's signature makes it "impossible to verify" that the CI existed. Dkt. No. 50 at 6. Defendant Dean declared that it is common practice for an officer to transcribe a CI's statement by hand so that the CI does not inadvertently produce a handwriting sample that could be later used for identification. Dkt No. 39-2 at ¶ 15.

15    Defendant Dean also "logged the drugs seized from Plaintiff after the May 2019 controlled purchase in an NYSP evidence log," (the "Evidence Log") indicating the date and time of the sale, as well as the quantity of crack cocaine seized. Dkt. No. 39-5 at ¶¶ 33-35. Those specific details were redacted before the Evidence Log was disclosed to Plaintiff to protect the identity of the CI. *Id.* at ¶ 36.

16    In their Declarations, Defendants assert that they agreed to wait to arrest Plaintiff because the "statute of limitations to commence a criminal action against Plaintiff for the May 2019 controlled purchase was not set to expire until May of 2024." Dkt No. 39-2 at ¶ 18; Dkt. No. 39-3 at ¶ 16 (citing New York Criminal Procedure Law ("N.Y. CPL") § 30.10(2)(b)).

Defendant Dean, as lead agent, prepared and signed a Felony Complaint with respect to the CSCS charge. Dkt. No. 9 at 8; Dkt. No. 39-5 at ¶ 46. 17 Additionally, an Arrest Report was prepared and Defendants reviewed and signed the Report. Dkt. No. 39-5 at ¶¶ 47-49. 18 Plaintiff was arraigned in Binghamton City Court and remanded to the Broome County Jail. *Id.* at ¶ 51.

17    Defendant Lussi did not prepare or sign the Felony Complaint. Dkt. No. 39-3 at ¶ 20.

18    Plaintiff points out that the Arrest Report contained errors, including incorrectly indicating that Plaintiff is Hispanic and was arraigned in the Town of Union Court, when he was arraigned in

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 208 of 529

Everett v. Dean, Not Reported in Fed. Supp. (2023)

2023 WL 5452753

Binghamton City Court. Dkt. No. 39-2 at ¶ 26; Dkt. No. 50 at 5-6, 15-16.

On September 12, 2019, Defendant Dean testified before a Grand Jury in Tioga County regarding Plaintiff's homicide case. *Id.* at ¶ 53. In the course of his testimony, Defendant Dean testified regarding the May 2019 Controlled Purchase and stated that the CI contacted Plaintiff using the telephone number and subsequently purchased narcotics from Plaintiff. *Id.* at ¶ 54. [19]

> [19]  Plaintiff was indicted on the homicide in Tioga County and convicted after a jury trial of the following charges: Murder in the Second Degree, Burglary in the First Degree, and two counts of Criminal Possession of a Weapon in the Second Degree. Dkt. No. 39-5 at ¶ 56. Plaintiff was sentenced to a term of imprisonment of twenty-five years to life and is currently in the custody of the Department of Corrections and Community Supervision. *Id.* at ¶ 57.

**\*4**  On March 17, 2020, Senior Assistant District Attorney Anthony Frank ("Senior ADA Frank") [20] dismissed Plaintiff's CSCS charge related to the May 2019 Controlled Purchase. Dkt. No. 39-5 at ¶ 59. Senior ADA Frank asserts that he dismissed Plaintiff's charge for two reasons, judicial economy and lack of a speedy trial. Dkt. No. 39-5 at ¶ 60. [21] Senior ADA Frank had received information that Plaintiff was indicted for "charges of murder, burglary, and weapons possession" in Tioga County, which carried significantly greater sentences than the CSCS charge, and believed "it was no longer in the best interest of judicial economy to reveal the [CI] who made the controlled purchase in order to proceed with grand jury and ultimately trial." *Id.* at ¶¶ 61-63. [22] Defendants were not involved in the decision to dismiss the CSCS charge against Plaintiff. Dkt. No. 39-2 at ¶ 29; Dkt. No. 39-3 at ¶ 24.

> [20]  ADA Frank, a Senior ADA in the Broome County District Attorney's Office Violent Crimes Bureau, was assigned to prosecute the CSCS charge against Plaintiff. Dkt. No. 39-5 at ¶ 58.

> [21]  On April 19, 2021, Senior ADA Frank testified at a pretrial suppression hearing for Plaintiff's murder and related charges, before the Hon. Gerald A. Keene about the reasons he dismissed the CSCS charge against Plaintiff. Dkt. No. 39-4 at 5-9.

> [22]  Plaintiff alleges that the charge was dropped, *see* Dkt. No. 50 at 24, because the District Attorney's Office was not able to "sustain a burden of proof at trial ... meaning there was nothing factual to support the allegations." *Id.* at 3.

### III. STANDARD OF REVIEW

Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993). A court first determines "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.' " *Galeotti v. Cianbro Corp.*, No. 5:12-cv-00900 (MAD/TWD), 2013 WL 3207312, at \*4 (N.D.N.Y. June 24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36-37 (2d Cir. 1994)).

The party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [their] right to judgment as a matter of law." *Rodriguez v. City of N.Y.*, 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citation omitted). To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *accord Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002). A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir. 1997). The Court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." *Schwimmer v. Kaladjian*, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing, *inter alia, Anderson*, 477 U.S. at 249-50).

Here, both the Plaintiff and Defendants have moved for summary judgment, but that phenomenon "does not mean

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 209 of 529
Everett v. Dean, Not Reported in Fed. Supp. (2023)
2023 WL 5452753

that the court must grant judgment as a matter of law for one side or the other." *Schwabenbauer v. Bd. of Ed. of City Sch. Dist. of City of Olean*, 667 F.2d 305, 313 (2d Cir. 1981); *see also Residential Mgmt. (N.Y.) Inc. v. Fed. Ins. Co.*, 884 F. Supp. 2d 3, 7 (E.D.N.Y. 2012) ("Cross-motions for summary judgment do not alter the basic standard, but simply require the court to determine whether either of the parties deserves judgment as a matter of law on facts that are not in dispute.") (citations omitted). Rather, the court "must consider each motion separately and on its own merits and draw all reasonable inferences against the party whose motion is under consideration." *Abreu v. Romero*, No. 08 CIV. 10129 (LAP), 2010 WL 4615879, at *3 (S.D.N.Y. Nov. 9, 2010), *aff'd*, 466 F. App'x 24 (2d Cir. 2012).

 **\*5**  Additionally, because Plaintiff is proceeding *pro se*, the Court must "read the pleadings ... liberally and interpret them to raise the strongest arguments they suggest." *Corcoran v. New York Power Auth.*, 202 F.3d 530, 536 (2d Cir. 1999) (citation omitted). Nevertheless, "proceeding *pro se* does not otherwise relieve [a party] from the usual requirements of summary judgment." *Skinner v. Chapman*, 680 F. Supp. 2d 470, 475 (W.D.N.Y. 2010) (quoting *Fitzpatrick v. N.Y. Cornell Hosp.*, No. 00 CIV. 8594 (LAP), 2003 WL 102853 at *5 (S.D.N.Y. Jan. 9, 2003)). "Those requirements include the obligation not to rest upon mere conclusory allegations or denials, but instead to set forth 'concrete particulars' showing that a trial is needed." *Id.* (quoting *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984)).

## IV. DISCUSSION [23]

[23]    The Court finds that Plaintiff's Cross-Motion is procedurally deficient. *See* Dkt. No. 43 (deadline for Plaintiff's response to Defendants' Motion); NDNY Local Rules 7.1(c) (setting filing deadlines for a party's cross-motion), 56.1(a) (requiring a short and concise statement of each material fact in numbered paragraphs). However, in light of Plaintiff's *pro se* status, the Court will consider the merits of his Cross-Motion.

### A. False Arrest

A Section 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law. *Jenkins v. City of N.Y.*, 478 F.3d 76, 84 (2d Cir. 2007). To establish a cause of action for false arrest under New York law, a plaintiff must show that: (1) the defendant intended to confine plaintiff; (2) plaintiff was conscious of the confinement; (3) plaintiff did

not consent to the confinement; and (4) the confinement was not otherwise privileged. *Morales v. United States*, No. 18-CV-4247 (CBA) (RER), 2023 WL 2129580, at *4 (E.D.N.Y. Feb. 17, 2023) (citing *Broughton v. State*, 37 N.Y.2d 451, 456 (1975)). [24]

[24]    Defendants, for the purpose of this Motion only, do not dispute that Plaintiff was intentionally confined and that Plaintiff was conscious of and did not consent to the confinement. Dkt. No. 39-6 at 13 n.7.

### 1. Probable Cause

### a. Defendants' Motion

Defendants argue that they are entitled to summary judgment on Plaintiff's false arrest claim because "Plaintiff's [August 28, 2019] arrest was supported by probable cause." Dkt. No. 39-6 at 5. "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under [Section] 1983." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citations omitted). "Probable cause to arrest exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007).

In "assessing probable cause, a court 'must consider [only] those facts available to the officer at the time of the arrest and immediately before it,' " *Sagy v. City of N.Y.*, No. 18-CV-1975 (HG), 2022 WL 6777602, at *3 (E.D.N.Y. Oct. 11, 2022) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)) (alteration in original), and make "an objective rather than subjective inquiry as to the 'reasonable conclusion to be drawn from the facts known to the arresting officer at the time of arrest,' " *Jenkins v. City of NY*, No. 10 CIV. 4535 (AJN), 2013 WL 870258, at *6 (S.D.N.Y. Mar. 6, 2013) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). Even when an officer does not have a warrant when making an arrest, "[s]uch an arrest comports with the Fourth Amendment if the officer has 'probable cause to believe that a criminal offense has been or is being committed.' " *Marcavage v. City of N.Y.*, 689 F.3d 98, 109 (2d Cir. 2012) (quoting *Devenpeck*, 543 U.S. at 152).

Case 5:25-cv-00956-AJB-MJK Document 9 Filed 12/08/25 Page 210 of 529

Everett v. Dean, Not Reported in Fed. Supp. (2023)

2023 WL 5452753

**\*6** "Officers may rely on hearsay to establish probable cause, and a court 'may properly consider such hearsay' at summary judgment." *Dorsey v. Gannon*, No. 20-CV-1525 (PK/CPK), 2022 WL 4660555, at \*3 (E.D.N.Y. Sept. 30, 2022) (quoting *Martinez v. City of N.Y.*, 564 F. Supp. 3d 88, 99 (E.D.N.Y. 2021)). Additionally, information from a CI "can be sufficient to justify the existence of probable cause" unless "the circumstances raise doubt as to the person's veracity." *Panetta*, 460 F.3d at 395 (citations omitted).

Here, Major Crimes had information that Plaintiff was a known drug dealer in the Binghamton Area dating back to the mid-2000s. Dkt. No. 39-2 at ¶ 7. Additionally, Defendants were present when the CI spoke with Plaintiff using the telephone number and arranged to purchase narcotics from him. Dkt. No. 39-5 at ¶¶ 15-16. Defendants searched the CI to ensure the CI was not in possession of narcotics before the Controlled Purchase and listened to the entire conversation between the CI and Plaintiff through the recording device provided to the CI. *Id.* at ¶¶ 18, 21-22. [25] After the Controlled Purchase, the CI returned to Defendants without money and provided the drugs purchased, which field tested positive for the presence of cocaine. *Id.* at ¶¶ 23-26. The CI was also interviewed in the presence of Defendants and reviewed and signed a statement verifying its authenticity. *Id.* at ¶¶ 27-29.

[25]     The Court also listened to the recording of the transaction which was submitted for *in camera* review. *See supra* n. 12.

The Court finds based on the totality of the circumstances that Defendants had reasonably trustworthy information to believe that Plaintiff knowingly and unlawfully sold narcotics, *see* N.Y. Penal Law § 220.39(1), and therefore that they had probable cause to arrest Plaintiff.

**b. Plaintiff's Cross-Motion**

Plaintiff in his Cross-Motion argues that he is entitled to summary judgment on the false arrest claim because there was no probable cause for his August 28, 2019 arrest. Each of Plaintiff's arguments is unavailing.

Plaintiff argues that Defendants have refused to comply with Plaintiff's "several attempts through discovery" requests to identify the CI, and therefore Defendants are unable to "prove that they acted on reasonable, trustworthy information." Dkt. No. 50 at 110. [26] Generally, the government is "entitled to

withhold the identities of its confidential informants under the 'informer privilege.' " [27] *United States v. Wilson*, No. 5:14-CR-0273 (GTS), 2015 WL 13215023, at \*4 (N.D.N.Y. Sept. 23, 2015). Plaintiff "bears the burden of showing the need for disclosure of [the] informant's identity, and to do so must establish that, absent such disclosure, he will be deprived of his right to a fair trial." *United States v. Cobb*, 544 F. Supp. 3d 310, 333 (W.D.N.Y. 2021) (quoting *United States v. Fields*, 113 F.3d 313, 324 (2d Cir. 1997)).

[26]     Plaintiff also argues that Defendants' failure to "produce the alleged informant" violates his right to Confrontation under the Sixth Amendment. Dkt. No. 50 at 110. However, this argument fails because the Confrontation Clause does not apply in civil cases. *See* *Marquez-Ortiz v. United States*, No. 20-CV-5793 (JPO), 2023 WL 3568806, at \*3 (S.D.N.Y. May 18, 2023).

[27]     "The law-enforcement privilege (or the informer's privilege) permits the government 'to withhold from disclosure the identity of persons who furnish information of violations of law to officers charge[d] with enforcement of that law.' " *Goodloe v. City of N.Y.*, 136 F. Supp. 3d 283, 293 (E.D.N.Y. 2015) (quoting *Roviaro v. U.S.*, 353 U.S. 53, 59 (1957)). The purpose is to "prevent disclosure of law-enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law-enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *Id.* (quoting *In re City of N.Y.*, 607 F.3d 923, 941 (2d Cir. 2010)).

**\*7** Here, Defendants produced evidence sufficient to demonstrate that they obtained reliable and trustworthy information from the CI. *See supra* § IV(A)(1)(a). Additionally, the Court has determined that the safety needs of protecting the identity of the CI outweigh any of Plaintiff's potential due process concerns. [28] *See* *Goodloe*, 136 F. Supp. 3d at 295 (finding that the law enforcement privilege applied to disclosing information which would compromise "the CI's safety and the continuing availability of confidential-informant-based investigations").

[28]     On September 2, 2022, Plaintiff filed a letter-request requesting that Defendants disclose to him a copy of the CI's telephone and audio

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 211 of 529

Everett v. Dean, Not Reported in Fed. Supp. (2023)

2023 WL 5452753

recording of the alleged transaction with the CI, which were submitted to the Court for *in camera* inspection. *See* Dkt. No. 42. On October 12, 2022, United States District Judge Glenn T. Suddaby found "[b]ased on the Court's *in camera* inspection" and "for the reasons in Defendants' letter-brief," *see* Dkt. No. 44, that disclosure "would be inappropriate (in that safety needs significantly outweigh any potential due process concerns) and that, in any event, the Court may decide Defendants' motion for summary judgment without relying on those records." *See* Dkt. No. 47.

Plaintiff next argues that Defendants are unable to identify him "as the person on the recording" of the alleged drug sale because Defendants did not observe "the alleged drug buy" and "there is nothing in the record to establish [that Defendants] knew [Plaintiff's] voice." Dkt. No. 50 at 111. Information from a CI, even without officers directly overseeing the drug sale, can support a finding of probable cause if "it is corroborated in material respects by independent evidence." *See United States v. Wagner*, 989 F.2d 69, 72-73 (2d Cir. 1993) (noting that "[a]n informant's participation in supervised drug purchases [was] powerful corroborative evidence for purposes of determining probable cause."); *United States v. Salazar*, 945 F.2d 47, 50-51 (2d Cir. 1991) (noting that a "face-to-face informant" is more reliable than an anonymous telephone tipster); *Bancroft v. City of Mount Vernon*, 672 F. Supp. 2d 391, 402 (S.D.N.Y. 2009) (finding that "information from a single confidential informant" was sufficient to establish probable cause when there was no indication or evidence that the CI was not credible). Here, there was corroborating evidence to support Defendants' finding of probable cause, including that Defendants were present when the CI contacted the telephone number and arranged to buy drugs from Plaintiff, the CI subsequently met with Plaintiff to purchase narcotics, there was an audio recording of the Controlled Purchase, the narcotics field tested positive for cocaine, and the CI signed and verified the authenticity of the transcribed statement. *See* Dkt. No. 39-5 at ¶¶ 15-26, 29. [29]

[29]    While the Court can decide Defendants' Motion without reliance on the records submitted to the Court for *in camera* inspection, *see* Dkt. No. 47, the Court also notes that the photographs and recording contradict Plaintiff's arguments that the CI did not exist and the Controlled Purchase did not occur.

Plaintiff also argues that because the charge related to the drug sale was dismissed, it was a "sham arrest" which was "maliciously carried out to incriminate [Plaintiff] in a separate offense." Dkt. No. 50 at 111. Here, Senior ADA Frank's decision to dismiss Plaintiff's CSCS charge was based on judicial economy and speedy trial grounds, not whether probable cause existed at the time of Plaintiff's arrest. Dkt. No. 39-4 at ¶ 5; Dkt. No. 39-5 at ¶ 60. The fact that Plaintiff's case was dismissed is insufficient to establish the absence of probable cause for his arrest. *See Marshall v. Port Auth. of New York & New Jersey*, No. 19-CV2-168, 2020 WL 5633155, at *7 (S.D.N.Y. Sept. 21, 2020) ("[T]his Court agrees with other district judges in this Circuit who have held that dismissal of a plaintiff's case on speedy trial grounds 'does not affirmatively indicate his innocence, as required under Section 1983.' ") (quoting *Thompson v. City of N.Y.*, 2019 WL 162662, at *4 (S.D.N.Y. Jan. 10, 2019) and collecting cases); *see also Drummond v. Castro*, 522 F. Supp. 2d 667, 678 (S.D.N.Y. 2007) (noting that prosecutors' "failure to seek a grand jury indictment does not serve as evidence against a finding that probable cause existed to arrest and prosecute" a plaintiff). [30]

[30]    Plaintiff also argues that Judge Keene ruled in the Tioga County homicide case that Defendant Dean's grand jury testimony about the drug sale was hearsay, which is further evidence of his "frivolous and false arrest." Dkt. No. 50 at 111. However, this argument is misguided because Judge Keene's October 9, 2020 Decision and Order, *see id.* at 78-79, found that although the prosecutor introduced some hearsay through Defendant Dean's grand jury testimony regarding the telephone number used in the Controlled Purchase, the prosecutor gave the grand jury a proper limiting instruction. *Id.* at 78-79. Additionally, Judge Keene's October 1, 2021 Decision and Order, *see id.* at 70-76, precluded the People from presenting evidence concerning the May 2019 Controlled Purchase because the "prejudicial effect outweigh[ed] the probative value." *Id.* at 74.

## 2. Qualified Immunity

**\*8** Defendants further argue that even if the Court were to find that there was not actual probable cause to arrest Plaintiff, they are nonetheless entitled to qualified immunity on

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 212 of 529
Everett v. Dean, Not Reported in Fed. Supp. (2023)
2023 WL 5452753

Plaintiff's false arrest claim. Dkt. No. 39-6 at 25-26. Plaintiff argues in his Cross-Motion that Defendants are not entitled to qualified immunity because they acted based on pure speculation that Plaintiff was a drug dealer, Defendants did not directly observe the Controlled Purchase, and Defendants have not proven the reliability of the CI. Dkt. No. 50 at 124-27.

Qualified immunity shields government officials from liability for money damages for violation of a right under federal law if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It allows government officials to make reasonable judgments and is said to protect "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"Even where actual probable cause does not exist, an officer may be entitled to qualified immunity on a [Section] 1983 false arrest claim if his actions were objectively reasonable or if 'arguable probable cause' existed at the time of the arrest." *Triolo v. Nassau Cnty.*, 24 F.4th 98, 107 (2d Cir. 2022) (citing *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016)). An officer has arguable probable cause "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Wilson v. Town of Cheektowaga*, No. 1:18-CV-01255 (EAW), 2023 WL 1784673, at *6 (W.D.N.Y. Feb. 6, 2023) (citation omitted).

"Arguable probable cause is an 'analytically distinct test for qualified immunity' that 'is more favorable to the officers than the one for probable cause.' " *Reeder*, 2023 WL 2044126, at *7 (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004)). Whether "an officer's conduct was 'objectively reasonable' " depends on "the information possessed by the officer at the time of the arrest," not "the subjective intent, motives, or beliefs of the officer." *Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010) (citation omitted). "Put another way, an arresting officer will find protection under the defense of qualified immunity unless 'no reasonably competent officer' could have concluded, based on the facts known at the time of arrest, that probable cause existed." *Rodriguez v. City of N.Y.*, 291 F. Supp. 3d 396, 409 (S.D.N.Y. 2018) (quoting *Figueroa*, 825 F.3d at 100).

Here, as discussed above, the Court finds that it was objectively reasonable for Defendants to believe that probable cause existed to arrest Plaintiff on August 28, 2019, or at the very least for officers of reasonable competence to disagree on whether probable cause existed to arrest Plaintiff. Therefore, the Court finds that Defendants are entitled to qualified immunity on Plaintiff's false arrest claim. *See, e.g.*, *Smith v. City of N.Y.*, No. 04 CIV. 3286 (TPG), 2010 WL 3397683, at *16 (S.D.N.Y. Aug. 27, 2010) (finding that a defendant was entitled to qualified immunity for a false arrest claim because it was objectively reasonable for defendant to arrest the plaintiff based on a "radio communication from [another police officer] that plaintiff had engaged in a suspected drug transaction") (internal citations omitted), *aff'd sub nom. Smith v. Tobon*, 529 F. App'x 36 (2d Cir. 2013). Accordingly, Defendants' Motion as to the false arrest claim is granted and Plaintiff's Cross-Motion is denied.

**B. Malicious Prosecution**

***9** Defendants next argue that Plaintiff's malicious prosecution claim should be dismissed because there "was probable cause to arrest Plaintiff on August 28, 2019," and the criminal proceeding against Plaintiff "was not instituted with malice." Dkt. No. 39-6 at 15. Defendants also argue that the malicious prosecution claim should be dismissed against Defendant Lussi because he did not commence a criminal proceeding against Plaintiff. *Id.* Finally, Defendants argue that they are entitled to qualified immunity. *Id.* at 25-26.

To state a claim for malicious prosecution pursuant to Section 1983,[31] a plaintiff must allege facts plausibly suggesting the following four elements: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as motivation for defendant's actions." *Thomas v. City of Troy*, 293 F. Supp. 3d 282, 294 (N.D.N.Y. 2018) (citations omitted). Additionally, "a plaintiff must allege a violation of rights pursuant to the Fourth Amendment that resulted in a sufficient 'post-arraignment deprivation[ ] of liberty.' " *Id.* (quoting *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 117 (2d Cir. 1995)).[32]

31    A malicious prosecution claim arising under Section 1983 is "governed by the same standard applied under state law." *Frederique v. Cnty. of Nassau*, 168 F. Supp. 3d 455, 477 (E.D.N.Y. 2016)

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 213 of 529

Everett v. Dean, Not Reported in Fed. Supp. (2023)

2023 WL 5452753

(citing *Russell v. Smith,* 68 F.3d 33, 36 (2d Cir. 1995)).

32    Defendants, for purposes of this motion only, do not dispute that Plaintiff has satisfied the following elements of his malicious prosecution claim: (1) Investigator Dean commenced a criminal proceeding against him; and (2) the criminal proceeding was terminated in Plaintiff's favor. Dkt. No. 51 at 8 n.1.

### 1. Probable Cause

As with a false arrest claim, the existence of probable cause is a complete defense to a claim of malicious prosecution. *Borges v. City of N.Y.,* 621 F. Supp. 3d 362, 372 (E.D.N.Y. 2022) (citing *Delamota v. City of N.Y.,* 683 F. App'x 65, 66 (2d Cir. 2017)). "The probable cause determination relevant to a malicious prosecution claim differs from that of a false arrest claim only insofar as 'the existence, or lack, of probable cause is measured as of the time the judicial proceeding is commenced ... not the time of the preceding warrantless arrest.' " *Peterson v. Regina,* 935 F. Supp. 2d 628, 642 (S.D.N.Y. 2013) (quoting *Mejia v. City of N.Y.,* 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000)). "Probable cause, in the context of malicious prosecution, has also been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Boyd v. City of N.Y.,* 336 F.3d 72, 76 (2d Cir. 2003) (citing *Colon v. City of N.Y.,* 60 N.Y.2d 78, 82 (1983)).

Here, as discussed above, *supra* § IV(A)(1), there was probable cause to arrest Plaintiff on August 28, 2019. "Once probable cause to arrest has been established, claims of malicious prosecution survive only if, between the arrest and the initiation of the prosecution, 'the groundless nature of the charges [is] made apparent by the discovery of some intervening fact.' " *Soomro v. City of N.Y.,* 174 F. Supp. 3d 806, 814 (S.D.N.Y. 2016) (quoting *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 569 (2d Cir. 1996)).

Plaintiff has not presented any facts subsequent to his arrest which would negate that there was probable cause for his arrest. Additionally, a reasonably prudent person could believe that Plaintiff knowingly and unlawfully sold narcotics. *See Smith,* 2010 WL 3397683, at *9 (finding that there was probable cause to prosecute plaintiff when he did not present facts after his arrest to "negate probable cause"

and a "a reasonably prudent person would likely believe the plaintiff to be guilty"). 33

33    The parties have made the same arguments regarding qualified immunity for the malicious prosecution claim as with the false arrest claim. *See supra* § IV(A)(2); Dkt. No. 39-6 at 25-26; Dkt. No. 50 at 124-27; Dkt. No. 51 at 12. A police officer is entitled to qualified immunity on a malicious prosecution claim if he possesses arguable probable cause to charge the Plaintiff. *See Flores v. Cnty. of Suffolk,* No. 2:16-CV-02502 (ADS) (ARL), 2018 WL 3966246, at *10 (E.D.N.Y. Aug. 17, 2018). Arguable probable cause for a malicious prosecution claim exists "where, accounting for any new information learned subsequent to an arrest, 'it was not manifestly unreasonable for [the officer] to charge [the plaintiff]' with the crime in question." *Id.* (quoting *Jean v. Montina,* 412 F. App'x 352, 354 (2d Cir. 2011)). The Court finds that Defendants are entitled to qualified immunity on the malicious prosecution claim because there was arguable probable cause to charge Plaintiff with CSCS in the third degree.

### 2. Malice

**\*10**  Plaintiff argues that Defendants initiated or continued the prosecution against him with malice "in an effort to link him to a cell phone that would hold him for an investigation" in a homicide in Tioga County in order to gain "incriminating information/evidence" against him. Dkt. No. 50 at 113. In a malicious prosecution claim, malice "can be demonstrated 'by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff.' " *Aguirre v. City of N.Y.,* No. 15-CV-6043 (PKC), 2017 WL 4236552, at *9 n.11 (E.D.N.Y. Sept. 22, 2017) (quoting *Pinsky v. Duncan,* 79 F.3d 306, 313 (2d Cir. 1996)). Malice "does not have to be actual spite or hatred but means only 'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.' " *Guillen v. City of N.Y.,* 625 F. Supp. 3d 139, 156 (S.D.N.Y. 2022) (quoting *Nardelli v. Stamberg,* 44 N.Y.2d 500, 502-03 (1978)). 34

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 214 of 529
Everett v. Dean, Not Reported in Fed. Supp. (2023)
2023 WL 5452753

34    While "actual malice and lack of probable cause are independent elements of a malicious prosecution claim, they do relate to one another." *Landon v. Cnty. of Orange*, No. 08-CV-8048 (CS) (LMS), 2009 WL 2191335, at *9 (S.D.N.Y. July 23, 2009); *see also Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) (holding that, "[i]n most cases, the lack of probable cause—while not dispositive—tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause") (internal quotation omitted).

Here, Plaintiff has not presented any evidence from which a reasonable jury could conclude that Defendants acted with improper motives in initiating a criminal proceeding against him. Regardless that Major Crimes' desire to verify that the telephone number belonged to Plaintiff, Dkt. No. 39-2 at ¶ 8, there was probable cause to believe Plaintiff knowingly and unlawfully sold crack cocaine to the CI in a Controlled Purchase that Plaintiff arranged on the telephone number. *See supra* § IV(A)(1); N.Y. Penal Law § 220.39(1). Therefore, Plaintiff is unable to establish that Defendants initiated the prosecution against him with malice. *See, e.g., Guillen*, 625 F. Supp. 3d at 156 (finding that Plaintiff's malicious prosecution claim failed because there was probable cause and "no evidence that the Officer Defendants had any personal animus toward Plaintiff or that they were motivated by something other than a desire to see the ends of justice served") (internal quotation marks and citation omitted). [35]

35    Defendants also argue that Plaintiff is unable to establish that Defendant Lussi commenced a criminal proceeding against Plaintiff because he "did not swear to or sign the felony complaint," *see Cameron v. City of N.Y.*, 598 F.3d 50, 63 (2d Cir. 2010) (Police Officers "initiate [a] prosecution by filing charges or other accusatory instruments.") (citation omitted). Dkt. No. 39-6 at 16. Even assuming the Court were to find that Defendant Lussi initiated the criminal proceeding against Plaintiff, Plaintiff's malicious prosecution claim still fails because, as discussed above, *see supra* § IV(B)(1), (2), there was probable cause to arrest Plaintiff on August 28, 2019 and Plaintiff has not established that Defendants acted with malice when commencing a criminal proceeding against him.

Accordingly, Defendants' Motion as to Plaintiff's malicious prosecution claim is granted and Plaintiff's Cross-Motion is denied.

### C. Fabrication of Evidence

Individuals have a constitutional "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity." *Maldonado v. City of N.Y.*, No. 11 CIV. 3514 (RA), 2014 WL 787814, at *9 (S.D.N.Y. Feb. 26, 2014) (quoting *Zahrey v. Coffey*, 221 F.3d 342, 344, 349 (2d Cir. 2000)). "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under [Section 1983]." *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (citations omitted). The "right to a fair trial can be violated even if the fabricated evidence that was supplied to the prosecutor was not ultimately used at trial." *Moroughan v. Cnty. of Suffolk*, 514 F. Supp. 3d 479, 535 (E.D.N.Y. 2021) (citing *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 250 (2d Cir. 2020)).

 *11  To succeed on a Section 1983 claim alleging a violation of an accused person's right to a fair trial based on fabrication of evidence, a plaintiff must prove that "an (1) investigating official (2) fabricated information (3) that is likely to influence a jury's verdict, (4) forwarded that information to prosecutors, and (5) the plaintiff suffered a deprivation of life, liberty, or property as a result." *Aguirre*, 2017 WL 4236552, at *10 (brackets omitted) (quoting *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016)). [36]  A Section 1983 claim based on the right to a fair trial does not require that a criminal charge proceed to trial. *Snead v. City of N.Y.*, 463 F. Supp. 3d 386, 392 (S.D.N.Y. 2020); *see also Ricciuti*, 124 F.3d at 127 (considering a Section 1983 claim for right to a fair trial where the plaintiffs' criminal charges were dismissed pre-trial). "Rather, the allegedly false information must be material such that it 'would likely influence the jury if it arrived at a jury.' " *Snead*, 463 F. Supp. 3d at 392 (quoting *Garnett v. Undercover Officer C0039*, 2015 WL 1539044, at *8 (S.D.N.Y. Apr. 6, 2015)).

36    Unlike false arrest and malicious prosecution claims, the "existence of probable cause to arrest is not a defense to a fair trial right claim." *Cunningham v. City of N.Y.*, No. 17-CV-5124

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 215 of 529
Everett v. Dean, Not Reported in Fed. Supp. (2023)

2023 WL 5452753

(DLC), 2018 WL 4168964, at *5 (S.D.N.Y. Aug. 30, 2018) (citation omitted).

Defendants argue that there is no "admissible evidence in the record" to support Plaintiff's allegations that Defendant Dean fabricated the following evidence after Plaintiff's arrest: (1) the Evidence Log; (2) the Felony Complaint; (3) the CI's supporting deposition; (4) the Incident Report; (5) the Arrest Report; and (6) the VGNET Southern Tier Report Routing Slip ("Report Routing Slip"). Dkt. No. 39-6 at 18 (citing Dkt. No. 9 at 4-5); Dkt. No. 51 at 116-17. [37]

[37]    Plaintiff further argues in his Cross-Motion that Senior ADA Frank's charges pursuant to N.Y. CPL § 160.50 shows that reports which were written or signed by Defendants were fabricated. See Dkt. No. 50 at 115-16. Plaintiff's argument lacks merit as the dismissal of Plaintiff's charge was based on judicial economy and lack of a speedy trial, not whether there was probable cause to arrest Plaintiff. See Dkt. No. 39-4 at ¶ 5.

Plaintiff argues that the Evidence Log, see Dkt. No. 9 at 15, was fabricated because it omitted the date and time of the sale and the amount of crack cocaine seized, see id. at 5, and the Felony Complaint, see id. at 8, was fabricated because it does not state the exact date or time of the alleged sale, see id. at 4. [38] Plaintiff also argues that the CI's supporting deposition, see id. at 11-12, was fabricated because it was handwritten by Defendant Dean and the signature was redacted. Id. at 4; Dkt. No. 50 at 6, 118.

[38]    Defendants also point out that there is no requirement in New York's Criminal Procedure Law for the Felony Complaint to state the exact date or time of the drug sale. Dkt. No. 39-6 at 18-19 (citing N.Y. CPL §§ 100.15, 100.40(4)).

Defendant Dean explained in his Declaration that the date and time and quantity of crack cocaine seized was redacted from the Evidence Log, and the exact date and time of the Controlled Purchase was not included in the Felony Complaint, to protect the identity of the CI. Dkt. No. 39-2 at ¶¶ 11 n.2, 20. Defendant Dean further explained, regarding the handwritten deposition of the CI's statement, that it "is common practice for an officer to transcribe the CI's statement" in order to protect a CI's identity, and the CI signed and verified the authenticity of the statement. Id. at ¶¶ 15-17.

As discussed above, see supra § IV(A)(1)(b), Defendants were not obligated to disclose to Plaintiff information which could identify the CI. Additionally, Plaintiff has not provided any evidence to show that the information in the Evidence Log, Felony Complaint, or the CI's supporting deposition was fabricated because information was omitted or redacted to protect the identity of the CI. See Greene v. City of N.Y., No. 08 Civ. 00243 (AMD) (CLP), 2017 WL 1030707, at *25 (E.D.N.Y. Mar. 15, 2017) (granting summary judgment on plaintiff's fair trial claim because plaintiff's claim that a defendant falsified evidence was "sheer speculation, and [did] not create a material issue of fact for trial"); Demosthene v. City of N.Y., No. 14-CIV-816 (SJ) (VMS), 2018 WL 10072931, at *7 (E.D.N.Y. July 20, 2018) (finding plaintiff did not "offer any affirmative evidence of fabrication" by "simply point[ing] to the lack of" papers signed by the complaining victim), report and recommendation adopted, No. 14-CV-816 (SJ) (VMS), 2019 WL 3992868 (E.D.N.Y. Aug. 16, 2019), aff'd, 831 F. App'x 530 (2d Cir. 2020); Culpepper v. City of N.Y., No. 14-CV-6585 (ALC), 2016 WL 5334978, at *6 (S.D.N.Y. Sept. 21, 2016) (granting summary judgment on fair trial claim because plaintiff presented "only conclusory allegations to establish [that the NYPD Detective] fabricated evidence and forwarded that information to prosecutors").

*12    Plaintiff argues that Defendant Dean's Incident Report, see Dkt. No. 50 at 26-28, was fabricated because it was written weeks after the alleged drug sale occurred, and the Incident Report incorrectly states that Plaintiff was "arraigned in the City of Binghamton City Court and remanded to the Broome County Jail" on August 28, 2019, when he was actually "remanded without bail" on August 29, 2019. Id. at 109-10, 117. Plaintiff further argues that the Arrest Report, see Dkt. No. 9 at 13-14, and Incident Report, were fabricated because they contained errors, including that he is Hispanic, was arraigned in the Town of Union Court, and listed a different cell phone number than the telephone number. Id. at 4-5; Dkt. No. 50 at 5-6, 15, 26. Additionally, Plaintiff argues that the Evidence Log was fabricated because it did not contain a lab number. Dkt. No. 9 at 5; Dkt. No. 39-1 at 79:4-9. [39]

[39]    Defendant Dean in his Declaration stated that a "lab number was not required." Dkt. No. 39-2 at ¶ 20. Plaintiff argues that it "is false" that a lab number is not required because without a lab number "it would be impossible to keep track of evidence collected in the process of an investigation." Dkt. No. 50 at 10. Plaintiff does not offer any evidence

2023 WL 5452753

to support this assertion. *See Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (to survive a motion for summary judgment, a plaintiff "may not rely on conclusory allegations or unsubstantiated speculation").

The Court finds that Plaintiff has not provided any evidence that there was a requirement for the Incident Report to be written on the date the alleged incident occurred. *See Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) ("The non-moving party may not rely on conclusory allegations or unsubstantiated speculation .... Instead, 'the non-movant must produce specific facts indicating' that a genuine factual issue exists."). Additionally, given the totality of evidence, Plaintiff has failed to show that the typographical and/or clerical errors in the Arrest Report and Incident Report, and the exclusion of the lab number in the Evidence Log, would influence a jury's decision in finding that Plaintiff knowingly and unlawfully sold narcotics under N.Y. Penal Law § 220.39(1). *See Hoyos v. City of N.Y.*, 999 F. Supp. 2d 375, 394 (E.D.N.Y. 2013) (finding plaintiff's "assertion that defendants falsified evidence" of the location where he was arrested was "not likely [to] influence a reasonable jury's decision as to whether he [was] driving while intoxicated"); *see also Snead*, 463 F. Supp. 3d at 393 (finding that even though an officer fabricated information in the criminal complaint, the fabrication was not likely to influence a jury's verdict).

Finally, Plaintiff argues that the Report Routing Slip, *see* Dkt. No. 50 at 63, shows that the drug sale was fabricated because it was written fifteen days after his August 28, 2019 arrest. Dkt. No. 50 at 118-19. Plaintiff also argues that the Report Routing Slip left the sections "Buy Sheet Packet" and "CI Package" completely blank, which shows that "there was no drug sale" with "an informant." *Id.* at 119. Defendants in their Reply submitted as an exhibit, a Report Routing Slip, prepared in May 2019 after the Controlled Purchase, showing the "CI Package" checklist as completed, which is further evidence that a CI existed. *See* Dkt. No. 51-1 at 4-5.

In sum, Plaintiff has not presented sufficient evidence to substantiate his claim that Defendant Dean fabricated evidence. Accordingly, Defendants' Motion as to the fabrication of evidence claim is granted and Plaintiff's Cross-Motion is denied.

### D. Defamation

Plaintiff's state law defamation claim against Defendant Dean alleges that Dean provided false testimony to the grand jury in

Plaintiff's homicide case in Tioga County regarding the drug sale, which "did not occur," and a "non-existent informant" who contacted Plaintiff at the phone number, which was not Plaintiff's. Dkt. No. 39-6 at 20-21 (citing Dkt. No. 9 at 5-6; Dkt. No. 39-1 at 83-84). [40] Defendants argue that Plaintiff's defamation claim should be dismissed for four reasons: "(1) it is time barred; (2) Investigator Dean is entitled to absolute immunity; (3) Plaintiff's claims are barred by the *Heck* doctrine; [41] and (4) there is no admissible evidence to support Plaintiff's defamation claim." *Id.* at 21.

[40]    Plaintiff in his Opposition and Cross-Motion also argues for the first time that Defendant Dean defamed him by fabricating evidence in order to institute a criminal action against Plaintiff. *Compare* Dkt. No. 9 at 5-6; *with* Dkt. No. 50 at 120-21. The Court agrees with Defendants that Plaintiff cannot use his Cross-Motion to amend his Complaint, and therefore, the Court will not consider this argument. *See* Dkt. No. 51 at 11; *see also Feliz v. City of N.Y.*, No. 19-CV-6305 (DLC), 2023 WL 2601111, at *4 (S.D.N.Y. Mar. 22, 2023) (noting that a plaintiff may not amend a complaint in opposing a dispositive motion). Even if the Court were to consider Plaintiff's argument, it is time-barred because Plaintiff concedes that the alleged "libel" of Defendant Dean forwarding the felony complaint "occurred weeks" before Defendant Dean's September 12, 2019 grand jury testimony. Dkt. No. 50 at 123. Plaintiff did not initiate this action until October 13, 2020, more than one year later. *See* Dkt. No. 1; *see also Etheredge-Brown v. Am. Media, Inc.*, 13 F. Supp. 3d 303, 305 (S.D.N.Y. 2014) (New York imposes a one-year statute of limitations on defamation claims) (citing N.Y. CPLR § 215(3)).

[41]    *See Heck v. Humphrey*, 512 U.S. 477 (1994).

**\*13**  Defendants' primary argument is that Defendant Dean is entitled to absolute immunity for his grand jury testimony. Dkt. No. 39-6 at 21-22. Plaintiff, in his Cross-Motion, concedes that Defendant Dean's grand jury testimony was "absolutely immune." Dkt. No. 50 at 123. Witnesses " 'testifying before a Grand Jury are protected by an absolute immunity,' just as they would if giving testimony in court." *Stega v. New York Downtown Hosp.*, 31 N.Y.3d 661, 670 (2018) (quoting *Toker v. Pollak*, 44 N.Y.2d 211, 219-20 (1978)). The New York Court of Appeals has explained:

Case 5:25-cv-00956-AJB-MJK     Document 9     Filed 12/08/25     Page 217 of 529

Everett v. Dean, Not Reported in Fed. Supp. (2023)
2023 WL 5452753

[W]e have recognized the need to shield grand jury witnesses from liability for defamation based on their testimony, and we have generally observed that public officials would be unduly deterred from the full and frank discharge of their duties were their false statements, made in the course of their official functions or in judicial proceedings, to become the source of civil liability.

*De Lourdes Torres v. Jones,* 26 N.Y.3d 742, 770 (2016); *see also Rehberg v. Paulk,* 566 U.S. 356, 369-74 (2012) (holding, in the context of Section 1983, that "grand jury witnesses should enjoy the same immunity as witnesses at trial" because the "proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings"). Accordingly, the Court finds that Defendant Dean's grand jury testimony was entitled to absolute immunity.

Defendants also argue that, assuming *arguendo* Defendant Dean's grand jury testimony was not entitled to absolute immunity, Plaintiff's defamation claim fails on the merits because "Plaintiff cannot establish that [Defendant] Dean's [grand jury] testimony was substantially false." Dkt. No. 39-6 at 24. "Under New York law, establishing a claim for defamation requires a plaintiff to allege: (1) the making of a false defamatory statement of fact; (2) that the statement was published to a third party; (3) that the statement concerned the plaintiff; (4) that the defendant was responsible for making the statement; and (5) that the statement was *per se* defamatory, or caused special damages." *Lader v. Delgado,* 941 F. Supp. 2d 267, 271 (E.D.N.Y. 2013) (citations omitted). Truth "provides a complete defense to defamation claims." *Cain v. Atelier Esthetique Inst. of Esthetics Inc.,* 733 F. App'x 8, 11 (2d Cir. 2018) (citing *Dillon v. City of N.Y.,* 261 A.D.2d 34, 39 (1st Dep't 1999)); *see also Printers II, Inc. v. Professionals Publishing, Inc.,* 784 F.2d 141, 146 (2d Cir. 1986) ("[I]t is not necessary to demonstrate complete accuracy to defeat a charge of [defamation]. It is only necessary that the gist or substance of the challenged statements be true.").

Here, Plaintiff has not produced evidence sufficient to demonstrate that Defendant Dean provided false grand jury testimony. Defendant Dean testified about the May 2019 Controlled Purchase, including that the CI contacted Plaintiff using the telephone number. Dkt. No. 39-2 at ¶ 27. Defendant Dean also declared that his testimony was "true and accurate based on [his] own personal knowledge." *Id.* Defendants further submitted to the Court for *in camera* inspection a photograph of the CI's telephone call log and an audio recording of the Controlled Purchase. *Id.* at ¶¶ 11-12. Accordingly, the Court finds that Defendants are entitled to summary judgment on Plaintiff's defamation claim.[42]

[42]     Because the Court finds that Defendant Dean's testimony is entitled to absolute immunity and Plaintiff's defamation claim fails on the merits, the Court does not need to address the parties' arguments related to the Statute of Limitations and the *Heck* Doctrine. Dkt. No. 39-6 at 21-23; Dkt. No. 50 at 120-23.

**V. CONCLUSION**

**\*14**  Accordingly, the Court hereby

**ORDERS** that Plaintiff's Cross-Motion for Summary Judgment, Dkt. No. 50, is **DENIED** in its entirety; and the Court further

**ORDERS** that Defendants' Motion for Summary Judgment dismissing the Amended Complaint in its entirety, Dkt. No. 39, is **GRANTED**; and the Court further

**ORDERS** that Plaintiff's Amended Complaint, Dkt. No. 9, be **DISIMISSED** in its entirety; and the Court further

**ORDERS** that the Clerk shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 5452753

**Everett v. Dean, Not Reported in Fed. Supp. (2023)**

2023 WL 5452753

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 3:20-CV-01260**<br>Everett v. Dean et al | — | N.D.N.Y. | Oct. 13, 2020 | Docket |

**History (5)**

**Direct History (1)**

1. Everett v. Dean 👓
   2023 WL 5452753 , N.D.N.Y. , Aug. 24, 2023 , appeal dismissed (2d Cir. 23-1343) ( Apr 04, 2024 )

**Related References (4)**

2. Everett v. Dean
   2021 WL 765762 , N.D.N.Y. , Feb. 26, 2021

   *Report and Recommendation Adopted by*

3. Everett v. Dean
   2021 WL 3046801 , N.D.N.Y. , Mar. 30, 2021

4. Everett v. Dean
   2021 WL 3038390 , N.D.N.Y. , June 02, 2021

   *Report and Recommendation Adopted by*

5. Everett v. Dean
   2021 WL 3032690 , N.D.N.Y. , July 19, 2021

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 221 of 529

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

KeyCite Yellow Flag

Distinguished by  Sankara v. City of New York,  S.D.N.Y.,  February 22, 2018

2017 WL 4179855
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Carlos VILLAFANE, Pro Se Plaintiff,

v.

Michael SPOSATO, Nassau County Sheriff, and
Armor Correctional Health Service, Defendants.

CV 16-3674 (JFB) (AKT)
|
Signed 08/22/2017

**Attorneys and Law Firms**

Carlos Villafane, New York, NY, pro se.

John J. Doody, Dale Nicholson McLaren, Lewis Brisbois Bisgaard & Smith, LLP, New York, NY, Liora M. Ben-Sorek, Nassau County Attorney's Office, Mineola, NY, for Defendants.

**REPORT AND RECOMMENDATION**

A. KATHLEEN TOMLINSON, U.S. Magistrate Judge

**I. PRELIMINARY STATEMENT**

**\*1**  *Pro se* Plaintiff Carlos Villafane ("Villafane" or "Plaintiff") brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging violations of the Fifth, Eighth and Fourteenth Amendments, as well as the Prison Litigation Reform Act. *See generally* Complaint ("Compl.") [DE 1]. Defendants Michael Sposato and Armor Correctional Health Services of New York s/h/a Armor Correctional Health Service (collectively, "Defendants") have moved to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). Notice of Motion [DE 19]. Judge Bianco referred Defendants' Motion to Dismiss to this Court for a Report and Recommendation as to whether the motion should be granted. DE 33.

**II. BACKGROUND**

**A. Factual Background**

The following factual allegations have been taken from Plaintiff's Complaint and the Plaintiff's Opposition to Defendants' motion to dismiss. Because Plaintiff is proceeding *pro se*, the Court is obligated to construe his pleadings liberally "to raise the strongest arguments that they suggest." *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir. 2006) (per curiam) (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d. Cir. 2006)) (collecting cases) (internal quotation marks omitted). [1] All facts alleged by Plaintiff are assumed to be true for purposes of deciding the motion to dismiss and are construed in a light most favorable to Plaintiff as the non-moving party. *See, e.g., LaFaro v. N.Y. Cardiothoracic Grp.*, 570 F.3d 471, 475 (2d Cir. 2009) (quoting *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003)); *Matthews v. City of N.Y.*, 889 F.Supp.2d 418, 425 (E.D.N.Y. 2012) (citing *LaFaro*, 570 F.3d at 475–76).

[1]     In construing a *pro se* plaintiff's pleadings liberally, "the Court may 'consider factual allegations in the plaintiff's opposition papers to supplement the allegations in the complaint.' " *Williams v. Wellness Med. Care, P.C.*, No. 11-5566, 2013 WL 5420985, at \*1 n.1 (S.D.N.Y. Sept. 27, 2013) (quoting *Salvatierra v. Connolly,* No. 09-3722, 2010 WL 5480756 at \*25 n. 3 (S.D.N.Y. Sept. 1, 2010) (internal quotation marks omitted)) (citing *Frith v. Hill*, No. 07-CV-5899, 2009 WL 3073716, at \*19 n. 1 (S.D.N.Y. Sept. 23, 2009)), *report and recommendation adopted*, 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011); *see Smolen v. Fischer*, No. 12-1856, 2012 WL 3609089, at \*1 (S.D.N.Y. Aug. 23, 2012) (citing *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007)) ("Although certain factual allegations in Smolen's opposition affidavit are not contained in the complaint, this Court will deem the complaint amended to include those allegations since Smolen is a pro se plaintiff."); *Sommersett v. City of New York*, 09-5916, 2011 WL 2565301, at \*3 (S.D.N.Y. 2011); *Green v. City of N.Y. Dep't of Corr.*, No. 6-4978, 2008 WL 2485402, at \*4 (S.D.N.Y. June 19, 2008); *Ibok v. Sector*, No. 05-6584, 2006 WL 302336, at \* 1, n.1 (S.D.N.Y. Feb. 9, 2006) (citing *Fox v. Fischer*, No. 04-6718, 2005 WL 1423580 at \*2 n.1 (S.D.N.Y. June 14, 2005), *aff'd*, 242 Fed.Appx. 759 (2d Cir. 2007);

Case 5:25-cv-00956-AJB-MJK   Document 9   Filed 12/08/25   Page 222 of 529

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

*Verley v. Goord*, No. 02 Civ. 1182, 2004 WL 526740, at \*4–5, 2004 U.S. Dist. LEXIS 857, at \*15-17 (S.D.N.Y. Jan. 22, 2004)) ("The Court may consider the factual allegations in plaintiff's Response to supplement those in his complaint because of the liberal standard afforded to the pleadings of pro se litigants.").

### 1. Plaintiff's Medical Issues

**\*2**  On or about September 11, 2013, Plaintiff was taken to the Nassau County Correctional Center ("NCCC"), referred to by Plaintiff in his Complaint as the "Nassau County Jail." *See* Compl. § III.B. At that time, Plaintiff had a broken left forearm. *Id.* § III.C. Despite informing the "medical department" about his condition, Plaintiff was "neglected intentionally without pain medication." *Id.* On September 14, 2013, Plaintiff was taken to the "Nassau County University Hospital, where the doctor had [Plaintiff] x-rayed set [his] arm in a soft cast." *Id.* A doctor advised Plaintiff that he needed surgery and told "the officials" to bring Plaintiff back to the hospital for surgery on September 17, 2013. *Id.* The NCCC did not produce Plaintiff for the surgery on that date and "still refused to give [Plaintiff] the said prescribed ... pain medication." *Id.*

On September 24, 2013, Plaintiff was examined at the NCCC by a visiting orthopedist "who expressed shock" that Plaintiff "had not received any surgery." *Id.* According to Plaintiff, the orthopedist "entered an order on my medical chart by directing a nurse to write down that it was extremely urgent that I have surgery." *Id.* Once again, however, the NCCC "knowingly ignored, and intentionally denied [sic] [Plaintiff] the proper medical procedures and also continued to deny ... the pain medication or any type of medication to aliviate [sic] the pain." *Id.* On October 9, 2013, Plaintiff was transported to Nassau University Medical Center where his arm was again x-rayed. *Id.* The doctor told him that his arm was in fact broken. *Id.* The doctor also told him that because he had not received surgery, his arm would have to be rebroken "and that the surgery cost too much money and the facility wouldn't pay." *See id.* Plaintiff's arm was then set in a hard cast and Plaintiff complained again about the pain. *Id.*

Around the end of October 2013, Plaintiff appeared before Judge Hurley in connection with his criminal case. *See id.* Plaintiff complained to his lawyer about the NCCC's treatment of him. *Id.* Plaintiff states that his lawyer spoke to Judge Hurley and that Judge Hurley recommended that

Plaintiff "be transferred to the Metropolitan Detention Center in Brooklyn, New York." *Id.*

On November 5, 2013, Plaintiff was transferred to the Metropolitan Detention Center ("MDC"). *Id.* Sometime thereafter, MDC officials transported Plaintiff to the "[B]rooklyn Medical Center and Kingsbrook Hospital from 2014 through 2015." *Id.* At the Brooklyn Medical Center, Plaintiff underwent the surgery that he needed—his arm was rebroken and set with two metal plates and metal screws. *Id.* According to Plaintiff, "my arm is not the same I don't have 100% use of my left wrist and my left hand and I am in constant pain." *See id.*

### 2. Grievances

In his Opposition to the Defendants' Motion to Dismiss, Plaintiff states that while detained at the NCCC, he lodged numerous complaints about his left arm as well as other issues, through grievance forms and sick-call requests. *See* Plaintiff's Opposition ("Pl's. Opp'n") [DE 30] at 4-5. Plaintiff represents that he could not tell what the officer wrote on most of the complaint forms and that there were times when the officer informed Plaintiff that he "had to sign the form because soon [he would] be taken to the Hospital." *Id.* at 4. Plaintiff further maintains that on "some of the forms the officer wrote that the Plaintiff Refuse [sic] to sign while writing a later date." *Id.* Plaintiff asserts that those statements are not true because he had, in fact, signed the form on an earlier date. *Id.* Plaintiff points out that defendants' counsel referred to the Prison Litigation Reform Act ("PLRA") in the motion papers. *Id.* According to Plaintiff, the PLRA "makes it harder for prisoners to file lawsuits in federal court." *Id.* Plaintiff adds that

> the fact is that the Plaintiff was Transferred from a county holding facility to a Federal Transcient [sic] facility which is A different jurisdiction, with different Rules and Regulation, to wit your complaints go to Washington D.C. besides your Honor the Plaintiff was Released, he was Free when he submitted this Law Suits so I am Asking your Honor to

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 223 of 529

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

Please don't dismiss my lawsuit Please
Allow a jury to decide.

**\*3**  *Id.* at 6.


### 3. Claims Set forth in the Instant Action and Relief Sought

Plaintiff represents that he has filed the instant action
against Armor Correctional Health Services of New York
("Armor") for intentionally failing to provide him with
"prop[ ]er medical care" and against Sheriff Michael Sposato
for "allowing [Armor] to do so" and for not "monitoring
[the] medical department." Compl. § II.D. According to
Plaintiff, Defendants' conduct constitutes violations of the
Eighth and Fifth Amendments of the Constitution, the Equal
Protection Clause and the Prison Litigation Reform Act. *Id.*
§ II.B. Plaintiff seeks $5,000,000 in monetary damages to
compensate him for his pain and suffering, mental anguish
and inability to have full use of his left hand. *Id.* § IV.


### B. Procedural History

*Pro se* Plaintiff Villafane commenced this action by filing a
Complaint on June 24, 2016. *See* DE 1. By Order entered July
6, 2016, Judge Bianco who was assigned to this civil case,
granted Plaintiff's Motion for Leave to Proceed *in Forma
Pauperis.* DE 5. The Nassau County Attorney's Office, on
behalf of Nassau County Sheriff Michael Sposato, filed an
Answer to the Complaint on September 9, 2016. DE 12. On
October 6, 2016, the law firm of Lewis Brisbois Bisgaard
and Lewis ("Lewis Brisbois") filed a letter application to
Judge Bianco seeking a pre-motion conference for purposes
of moving to dismiss the Complaint against Armor. DE
15. On October 12, 2016, Judge Bianco issued an Order
waiving the pre-motion conference requirement and setting a
briefing schedule on Armor's motion to dismiss. DE 16. Lewis
Brisbois filed the motion to dismiss on November 14, 2016 on
behalf of both defendants. DE 19. Pursuant to Judge Bianco's
Scheduling Order, Plaintiff's Opposition to the motion was
due to be filed by December 28, 2016, and Defendants' Reply,
by January 11, 2017. DE 16.

On December 19, 2016, Plaintiff notified the Court of a
change in his address. DE 22. Judge Bianco posted an
Electronic Order on December 23, 2017 stating that due to
Plaintiff's address change, Defendants were unable to serve
him with a copy of their motion. *See* 12/23/2016 Electronic

Order. Judge Bianco set a revised briefing schedule, directing
Plaintiff to file his Opposition by January 25, 2017 and
Defendants to file their Reply by February 8, 2017. *Id.*

On January 9, 2017, Plaintiff filed a motion for extension of
time to file his Opposition, which Judge Bianco granted. DE
26, 27. The deadline for Plaintiff to submit his Opposition
was extended to February 24, 2017. The filing date for the
Reply was extended to March 10, 2017. DE 27. On March
3, 2017, Judge Bianco issued an Order directing Plaintiff to
file his Opposition by March 20, 2017, or alternatively, to
send a letter communicating to the Court why no Opposition
had been filed. DE 28. The Court warned Plaintiff that a
failure to respond may result in dismissal of his case, with
prejudice, for failure to prosecute his claims. *Id.* On March
17, 2017, Plaintiff filed a letter explaining that he mailed a
copy of his Opposition to Defendants via Fedex on February
24, 2017. DE 29. Plaintiff further stated that he requested
additional time to respond to Defendants' motion so that he
could obtain medical records from two hospitals where he
received treatment. *Id.* Plaintiff's Opposition was filed with
the Clerk's Office on March 23, 2017. DE 30. In addition to
arguing the merits of his case, Plaintiff informed the Court
that the 87 pages of unpublished opinions provided to him by
the Defendants were not legible. *Id.* Plaintiff also requested
more time to respond to Defendants' Motion to Dismiss. *Id.*

**\*4**  Judge Bianco issued an Order on March 23, 2017
(1) informing Plaintiff that the Court was in receipt of his
Opposition and (2) directing Defendants to file their Reply
by April 7, 2017. *See* DE 31. Defendants' Reply was filed on
April 3, 2017. DE 32. By Order dated April 6, 2017, Judge
Bianco referred Defendants' Motion to Dismiss to this Court
for a Report and Recommendation as to whether the motion
should be granted. DE 33.

On April 12, 2017, the Court received a letter from Plaintiff
requesting additional time to research, gather further evidence
and respond to Defendants' motion to dismiss. DE 34. The
Court directed counsel for Defendants to promptly serve
Plaintiff with new, legible copies of the unpublished opinions,
and/or opinions exclusively on computerized databases,
in accordance with Local Civil Rule 7.2. *See* 4/19/2017
Electronic Order. Those opinions were mailed to Plaintiff at
400-430 30th Street, Room 3028, New York, NY 10016. *See*
April 28, 2017 Affidavit of Service [DE 35].

In light of Plaintiff's asserted efforts to obtain his medical
records, as set forth in his requests for additional time

2017 WL 4179855

to respond to Defendants' motion, the Court issued an Order on May 1, 2017 directing Defendants to furnish the Court and Plaintiff with copies of various medical records concerning the care/treatment of Plaintiff by Armor, the NCCC, Nassau University Medical Center, the Metropolitan Detention Center, and the Brooklyn Medical Center and/or Kingsbrook Hospital. *See* DE 36.

On May 8, 2017, counsel for Defendants filed a letter explaining that the unpublished opinions which were previously mailed to Plaintiff had been returned to their office by the postal service. DE 38. A copy of the envelope in which the opinions were sent reflects two stamps—"Return to Sender" and "Unable to Forward." DE 38. In response to this filing, efforts were made to set up a conference call between counsel for the Defendants, Plaintiff and the Court. Defendants' counsel tried reaching Plaintiff via telephone using the number listed on the docket: (516) 244-7329. *See* DE 22. Counsel was transferred to Plaintiff's voicemail. Subsequently, on May 15, 2017, this Court's Law Clerk called Plaintiff at the same number and was also forwarded to Plaintiff's voicemail. At the Court's direction, the Law Clerk left a message advising Plaintiff to contact Chambers immediately or risk having his case dismissed. When the Court did not receive a return call from Plaintiff, the undersigned, along with the Law Clerk, personally called Plaintiff on June 1, 2017 and was forced to leave a voicemail directing Plaintiff to call Chambers immediately. By Order dated June 19, 2017, the Court issued an Order to Show Cause directing Plaintiff to appear on July 11, 2017 and show cause why this case should not be dismissed for his failure to prosecute his claims and failure to comply with the Court's Orders. DE 39.

Plaintiff appeared before the Court at the July 11, 2017 Show Cause Hearing and provided the Court with an updated telephone number and a corrected address. *See* DE 45. During that conference, Plaintiff reiterated his request for additional time to respond to Defendants' motion. *Id.* He explained to the Court that he was in the process of obtaining medical records from St. Barnabas Hospital as well as the minutes from a 2013 appearance before Magistrate Judge Brown in his criminal case. *Id.* The Court directed Plaintiff to send a letter to the Court within one week of the Court's conference (1) setting forth why he should be permitted to add information to his response at this time, and (2) identifying the particular documents he wishes to use and why those documents support his claims. *Id.*

**\*5** Counsel for the defendants filed an Affidavit of Service on July 11, 2017 stating that Plaintiff had been served by mail with copies of the unpublished opinions at Plaintiff's corrected address. DE 44. By letter dated July 19, 2017, Plaintiff confirmed that he had received copies of the medical records from the Defendants. *See* DE 48. In addition to arguing the merits of his case, Plaintiff responded to the directives given during the July 11, 2017 Show Cause Hearing. *See id.* Plaintiff stated that he is once again requesting an extension of time to supplement his Opposition so that he may gather all of his medical records. *Id.* According to Plaintiff, this process is taking him a long time because he is representing himself and is still searching for an attorney to assist him with his case. *Id.* Plaintiff referred to certain records from St. Barnabas Hospital and explained that they demonstrate that the injury to his left forearm occurred sometime in "June/July or August 6th 2013." *Id.* at 2. In addition, Plaintiff is still attempting to get a copy of the minutes from his September 11, 2013 arraignment before Judge Brown. *Id.* According to Plaintiff, Judge Brown told him "don't worry Mr. Villafane we are sending you to a facility to [immediately] take care of your injuries." *Id.* Defendants initially providing him with illegible copies of the unpublished opinions slowed his ability to read and research Defendants' motion. *Id.* at 3

In the balance of DE 48, Plaintiff stated that (1) the seriousness of the surgery he had on his wrist now "interferes with the movement of his left elbow and inner forearm"; (2) he has played the drums since age 8 or 9 and now it is impossible for him "to play music, keep a beat or roll, my wrist constantly goes numb and I have to keep moving it as to get blood flow"; (3) the size of the Defendants' motions "would take years because I have the right to read and research every cited or uncited case ..."; (4) he has continued to look for a lawyer and feels that "as a pro se litigant, I have been stripped of my own defense. I am praying that this court would allow me to continue to fight this case. My body's been Reconstructed, I have screws on my Right knee because I don't have no Right Knee Caps"; (5) "I also have movement problems because of all the metal rods and screws, then I don't have any balance or else I'll fall I just had 2 eye surgery it isn't easy for me to run around and do all this work because I need help going down and up the stairs. Then I had to beg for money to get copies remember so I could put all these legal arguments and papers together with the defendants motion to dismiss because I didn't know the law and I had no one to help me...." *Id.* at 3-5. According to the Plaintiff, the only thing he

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 225 of 529

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

was still missing were the minutes of his arraignment before Magistrate Judge Brown. *Id.* at 5.

On August 2, 2017, Defendants filed their Opposition to Plaintiff's request. DE 52. Counsel urges the Court to deny Plaintiff's request to supplement his Opposition at this time. *Id.* Counsel points out that although Plaintiff alleges Defendants are asserting that his broken left forearm originated from a 2004 motor vehicle accident, Defendants make no such allegation in their motion papers. *Id.* Instead, Defendants state that Plaintiff arrived at the NCCC **with** the broken left forearm, which Plaintiff himself concedes in his Complaint. *Id.* According to Defendants, establishing that Plaintiff's injury occurred in 2013 as opposed to during a motor vehicle accident in 2004 "does absolutely nothing to bolster his claim as to whether or not Armor provided him with inadequate medical treatment." *Id.* Defendants maintain that Plaintiff is "simply employing a delay tactic to prolong the action for as long as possible until he either finds an attorney or the Armor defendants settle." *Id.*

Having reviewed and considered Plaintiff's July 19, 2017 request, as well as Defendants' opposition, the Court is denying Plaintiff's application to further supplement his Opposition at this time. Plaintiff is free to continue to seek his records from St. Barnabas Hospital. However, the Court will not further delay the progress of this case waiting for them. The St. Barnabas records, even assuming they show that Plaintiff's injury originated in 2013, do not impact the issues underlying Defendants' Motion to Dismiss.

With respect to Plaintiff's reference to the unpublished opinions, the Court had Defendants mail legible copies to Plaintiff on April 19, 2017. *See* 4/19/2017 Electronic Order. The mailing was done on April 28, 2017. DE 35. On May 8, 2017, Defendants notified the Court that those opinions had been returned as undeliverable. *See* DE 38. First the Defendants and then the Court itself attempted to contact Plaintiff over the course of several weeks to ensure that he had received copies of the opinions. *See* DE 39. As noted, it was not until the July 11, 2017 Show Cause Hearing that Plaintiff provided the Court with his updated telephone number and correct address. DE 45. Defendants mailed the unpublished opinions to the corrected address that same day. *See* DE 44.

 **\*6** In his most recent request for additional time, however, Plaintiff fails to substantively discuss anything from those cases which would convince the Court to further extend the time to oppose Defendants' motion. Given all of these factors, there is no justification for further delay. The Court is terminating the outstanding requests that Plaintiff be provided still more time to oppose Defendants' motion to dismiss. *See* DE 29, 34, 41, 50.

### III. STANDARD OF REVIEW

Defendants move for dismissal pursuant to Rule 12(b)(6). Defendant Sposato, however, filed an Answer to Plaintiff's Complaint on September 8, 2016, prior to filing the instant motion. The pleadings with respect to Defendant Sposato are therefore closed and as such his motion should have been brought as a Motion for Judgment on the Pleadings, pursuant to Rule 12(c). Fed. R. Civ. P. 12(c). However, the Court applies the same standard of review when analyzing a motion to dismiss pursuant to Rule 12(b)(6) as it does when reviewing a motion for judgment on the pleadings pursuant to Rule 12(c). *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006) (citing *Karedes v. Ackerley Group, Inc.*, 423 F.3d 107, 113 (2d Cir. 2005)); *Stern v. City of New York*, No. 12-5210, 2015 WL 918754, at *2 (E.D.N.Y. Mar. 3, 2015) (citing *Ziemba v. Wezner*, 366 F.3d 161, 163 (2d Cir. 2004)) ("The same legal standard applies to a Rule 12(b)(6) motion as a Rule 12(c) motion."); *Rubino v. Town of Babylon*, No. 09-5187, 2012 WL 928252, at *1 (E.D.N.Y. Mar. 19, 2012) (citing *Livant v. Clifton*, 272 Fed.Appx. 113, 115 (2d Cir. Apr. 7, 2008); *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir. 1999)) (finding that although the County filed a motion for judgment on the pleadings pursuant to Rule 12(c) when it had not answered the Complaint, the Court "need not decide the issue" since the standard for Rule 12(c) and Rule 12(b) (6) motions are the same); *Transamerica Fin. Life Ins. Co. v. Session*, No. 10-1328, 2010 WL 4273294, at *2 (S.D.N.Y. Oct. 28, 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)) (citing *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010)) ("To survive a motion under Rule 12(c) or Rule 12(b)(6), 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' "); *Scott v. J. Anthony Cambece Law Office, P.C.*, 600 F.Supp.2d 479, 481 (E.D.N.Y. 2009) (citing *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126–27 (2d Cir. 2001)) (noting that "the standard for granting a Rule 12(c) motion is identical to that employed when analyzing a Rule 12(b)(6) motion."). Notwithstanding Defendant Sposato's filing of his motion under Rule 12(b) instead of Rule 12(c), the Court will review the motion on its merits.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 226 of 529

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, L.P., 737 F.3d 166, 176 (2d Cir. 2013) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)) (internal quotation marks omitted); *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (quoting *Chase Group Alliance LLC v. City of New York Department of Finance*, 620 F.3d 146, 148 (2d Cir. 2010); *Harris v. City of New York*, 607 F.3d 18, 24 (2d Cir. 2010)) (citing *Sims v. Blot*, 534 F.3d 117, 133 (2d Cir. 2008)). The plaintiff must satisfy "a flexible 'plausibility standard.' " *Iqbal v. Hasty*, 490 F.3d 143, 157-158 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Court, therefore, does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955; *see Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955) (citing *Ashcroft*, 556 U.S. 662, 129 S.Ct. 1937, 1949-50, 173 L.Ed.2d 868) (holding that a complaint must set forth "a plausible set of facts sufficient 'to raise a right to relief above the speculative level[ ]' ").

**\*7** The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), in which the court set forth a two-pronged approach to be utilized in analyzing a motion to dismiss. District courts are to first "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679, 129 S.Ct. 1937, 1949; *see id.* at 678, 129 S.Ct. 1937, 1949 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955) ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' "). Though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679, 129 S.Ct. 1937, 1949. Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer

possibility that a defendant has acted unlawfully." *Id.* at 678, 129 S.Ct. 1937, 1949 (citing *Twombly*, 550 U.S. at 556-57, 127 S.Ct. 1955) (internal citations omitted).

In adjudicating a Rule 12(b)(6) motion to dismiss, the Court must limit itself to facts alleged in the complaint, which are accepted as true; to documents attached to the complaint as exhibits or incorporated in the complaint by reference; to matters of which judicial notice may be taken; or to documents whose terms and effect are relied heavily upon in the complaint and, thus, are rendered "integral" to the complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (quoting *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)); *see also ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014) (quoting *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013), *certified question accepted sub nom. Thelen LLP. v. Seyfarth Shaw LLP*, 22 N.Y.3d 1017, 4 N.E.3d 359, 981 N.Y.S.2d 349 (2013), *and certified question answered*, 24 N.Y.3d 16, 20 N.E.3d 264, 995 N.Y.S.2d 534 (2014)).

In addition, where, as here, a plaintiff is proceeding *pro se*, the complaint must be considered under a more lenient standard than that accorded "formal pleadings drafted by lawyers." *Bellamy v. Mt. Vernon Hosp.*, No. 07 Civ. 1801, 2009 WL 1835939, at \*3 (S.D.N.Y. June 26, 2009) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)), *aff'd*, 387 Fed.Appx. 55 (2d Cir. 2010). Therefore, a court must construe a *pro se* plaintiff's pleading broadly and interpret it to raise the strongest arguments that it suggests. *See Hughes v. Rowe*, 449 (U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 1980) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972)); *see also Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (quoting *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004); *Boykin v. KeyCorp*, 521 F.3d 202, 216 (2d Cir. 2008)) (holding that when a plaintiff proceeds pro se, the district court "is obliged to construe his pleadings liberally" and noting that "the dismissal of a pro se claim as insufficiently pleaded is appropriate only in the most unsustainable of cases."). "However, mere conclusions of law or unwarranted deductions need not be accepted." *Alston v. Sebelius*, No. 13-4537, 2014 WL 4374644, at \*5 (E.D.N.Y. Sept. 2, 2014) (quoting *Bobrowsky v. Yonkers Courthouse*, 777 F.Supp.2d 692, 703 (S.D.N.Y. 2011)).

Although "courts generally will not accept factual allegations raised for the first time in opposition to a motion to dismiss, some courts have construed the mandate to read a pro se

2017 WL 4179855

plaintiff's papers liberally as allowing for consideration of such allegations." *Rolle v. Educ. Bus Transp., Inc.*, No. 13-1729, 2014 WL 4662256, at \*9 (E.D.N.Y. Aug. 8, 2014) (collecting cases), *report and recommendation adopted by*, 2014 WL 4662267 (E.D.N.Y. Sept. 17, 2014); *Ibok*, 2006 WL 302336, at \* 1, n.1 (citing *Fox v. Fischer*, No. 04-6718, 2005 WL 1423580 at \*2, n.1 (S.D.N.Y. June 14, 2005) *aff'd*, 242 Fed.Appx. 759 (2d Cir. 2007); *Verley v. Goord*, No. 02-1182, 2004 WL 526740, at \*5 (S.D.N.Y. Jan. 22, 2004)) ("The Court may consider the factual allegations in plaintiff's Response to supplement those in his complaint because of the liberal standard afforded to the pleadings of pro se litigants."). In the instant case, the Court, in furtherance of its obligation to construe *pro se* pleadings liberally, will consider the factual allegations set forth in Plaintiff's opposition papers to the extent such facts are related to and consistent with his Complaint. *Rosario v. New York City*, No. 12-4795, 2013 WL 2099254, at \*1-2 n.1 (S.D.N.Y. May 15, 2013) (citing *Braxton v. Nichols*, No. 08-8568, 2010 WL 1010001, at \* 1 (S.D.N.Y. Mar. 18, 2010); *Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987)) ("[B]ecause [the plaintiff] is proceeding *pro se*, the Court also considers factual allegations contained in [his] two submissions in opposition to defendants' motion to dismiss, to the extent consistent with the Complaint."); *see Harris v. NYU Langone Med. Ctr.*, No. 12-0454, 2013 WL 3487032, at \*2 n.6 (S.D.N.Y. July 9, 2013) ("[B]ecause Harris is proceeding pro se, the Court may consider factual allegations contained in her submissions in opposition to Defendants' motions to dismiss, to the extent they are consistent with the [Complaint]."), *report and recommendation adopted as modified*, 2013 WL 5425336 (S.D.N.Y. Sept. 27, 2013); *see also Malik v. City of New York*, No. 11-6062, 2012 WL 3345317, at \*5 (S.D.N.Y. Aug. 15, 2012) (collecting cases) ("The mandate to read a *pro se* plaintiff's papers liberally, however, makes it appropriate to consider factual allegations in [the plaintiff's] opposition papers, in addition to those in his Complaint, in resolving the motion to dismiss."); *Aponte v. Buono*, No. 11-1077, 2011 WL 6812924, at \*3 (E.D.N.Y. Dec. 28, 2011) (citing *Cusamano v. Sobek*, 604 F.Supp.2d 416, 461 (N.D.N.Y. 2009); *Sommersett*, 2011 WL 2565301, at \*3 (quoting *Milano v. Astrue*, No. 05 Civ. 6527, 2007 WL 2668511, at \*2 (S.D.N.Y. Sept. 7, 2007)) (" '[W]here a *pro se* plaintiff has submitted other papers to the Court, such as legal memoranda, the Court may consider statements in such papers to supplement or clarify the plaintiff's pleaded allegations.' ").

**\*8** Here, the *pro se* Plaintiff raises certain allegations for the first time in his Opposition to Defendants' motion, which the Court will nonetheless consider since they are related to the Complaint. However, in connection with those allegations, Plaintiff seeks to introduce certain documents for the Court to consider. The Court must therefore determine whether, pursuant to Rule 12(d), Defendants' motions should be converted to motions for summary judgment under Rule 56. *See* Fed. R. Civ. P. 12(d). "The district court's conversion of a Rule 12(b)(6) motion into one for summary judgment is governed by principles of substance rather than form." *M.J.M. Exhibitors, Inc. v. Stern (In re G. & A. Books, Inc.)*, 770 F.2d 288, 295 (2d Cir. 1985). "The essential inquiry in determining whether it is appropriate to convert a motion [to dismiss] into a motion for summary judgment is 'whether the non-movant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings.' " *Costor v. Sanders*, No. 07-11311, 2009 WL 1834374, at \*2 (S.D.N.Y. June 16, 2009) (quoting *Krijn v. Pogue Simone Real Estate Co.*, 896 F.2d 687, 689 (2d Cir. 1990)); accord *Glover v. Greenman*, No. 11-9122, 2013 WL 1294698, at \*3 (S.D.N.Y. Apr. 1, 2013). "Resolution of this issue will necessarily depend largely on the facts and circumstances of each case." *M.J.M. Exhibitors*, 770 F.2d at 295 (citing *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 393 (6th Cir. 1975))

"Ordinarily, formal notice is not required where a party should reasonably have recognized the possibility that the motion might be converted into one for summary judgment and was neither taken by surprise nor deprived of a reasonable opportunity to meet facts outside the pleadings." *Hernández v. Coffey*, 582 F.3d 303, 307 (2d Cir. 2009) (quoting *Villante v. Dep't of Corrections of City of New York*, 786 F.2d 516, 521 (2d Cir. 1986)) (brackets and quotation marks omitted); *see Sira v. Morton*, 380 F.3d 57, 68 (2d Cir. 2004) (quoting *Gurary v. Winehouse*, 190 F.3d 37, 43 (2d Cir. 1999)) ("A party is deemed to have notice that a motion may be converted into one for summary judgment if that party 'should reasonably have recognized the possibility' that such a conversion would occur."). However, where, as here, the non-movant is proceeding *pro-se*, "[n]otice is particularly important because the *pro se* litigant may be unaware of the consequences of his failure to offer evidence bearing on triable issues. Accordingly, *pro se* parties must have unequivocal notice of the meaning and consequences of conversion to summary judgment." *Hernández*, 582 F.3d at 307-08 (quoting *Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 767 (2d Cir. 1983)); accord *Parada v. Banco Indus.*

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 228 of 529

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

*De Venezuela, C.A.*, 753 F.3d 62, 68 (2d Cir. 2014) (citing *Hernández*, 582 F.3d at 307).

Rule 12.1 of the Local Civil Rules of the United States District Courts for the Eastern and Southern Districts of New York ("Local Civil Rule 12.1") provides, in relevant part, as follows:

> A represented party moving ... for judgment on the pleadings against a party proceeding pro se, who refers in support of the motion to matters outside the pleadings as described in Fed. R. Civ. P. 12(b) or 12(c), shall serve and file the ... notice [provided therein] with the full text of Fed. R. Civ. P. 56 attached at the time the motion is served. If the Court rules that a motion to dismiss or for judgment on the pleadings will be treated as one for summary judgment pursuant to Fed. R. Civ. P. 56, and the movant has not previously served and filed the notice required by this rule, the movant shall amend the form notice to reflect that fact and shall serve and file the amended notice within fourteen days of the Court's ruling.

Local Civil Rule 12.1. Courts in this district have held that notice pursuant to Local Civil Rule 12.1 provides sufficient notice to *pro se* parties that a motion to dismiss may be converted to a motion for summary judgment. *See Wiggins v. Figueroa*, No. 13-1731, 2015 WL 729730, at *1 (E.D.N.Y. Feb. 18, 2015) (citing *Hernández*, 582 F.3d at 308 n.2); *Lawrence v. Sharkey*, No. 13-173, 2015 WL 2213274, at *3 (E.D.N.Y. May 8, 2015); accord *Locciento v. City of New York*, No. 10-8319, 2012 WL 5278553, at *3 (S.D.N.Y. Oct. 22, 2012) (citing *Goodwin v. Solil Mgmt. LLC*, 10-5546, 2012 WL 1883473, at *2 (S.D.N.Y. May 22, 2012)) ("Courts in this district have concluded that a notice pursuant to Local Civil Rule 12.1 suffices to satisfy the requirement that parties be afforded a chance to offer affidavits and other evidence.").

**\*9** Ultimately, "[a] party cannot complain of lack of a reasonable opportunity to present all material relevant to a motion for summary judgment when both parties have filed exhibits, affidavits, counter-affidavits, depositions, etc. in support of and in opposition to a motion to dismiss [or for judgment on the pleadings]...." *M.J.M. Exhibitors*, 770 F.2d at 295 (citation omitted); *see also Reliance Ins. Co. v. Polwision Corp.*, 474 F.3d 54, 57 (2d Cir. 2007) (finding that it was not error for the district court to consider evidence outside of the complaint in resolving a Rule 12(c) motion "without explicitly giving notice that it was converting the Rule 12 motion to a Rule 56 motion[,]" because it was "clear from the record ... that [the non-moving party] knew additional factual considerations were being considered and, in fact, responded with its own evidentiary submissions"); *Sira*, 380 F.3d at 68 ("By attaching to their motion extensive materials that were not included in the pleadings, defendants plainly should have been aware of the likelihood of such a conversion."). Thus, a party who relies on extrinsic material to oppose the motion cannot later claim "that they were deprived of an adequate opportunity to provide the materials they deemed necessary to support or respond to the motion." *Soller*, 2015 WL 500492, at *8 (citing *Sira*, 380 F.3d at 68).

Here, Defendants have not requested that their motion be converted to one for summary judgment and thus have not provided the Plaintiff with a Local Civil Rule 12.1, which is unnecessary here. Since Plaintiff is proceeding *pro se*, the Court will not assume that his submission of extrinsic materials constitutes proof that Plaintiff is aware of the summary judgment process and the potential consequences of conversion. *See Hernández*, 582 F.3d at 307-308 (citing *Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 767 (2d Cir. 1983)) (declining to convert the defendants' motion to dismiss to one for summary judgment where the plaintiff submitted "extensive affidavits with supporting documents addressing exhaustion."). For these reasons, the Court declines to convert Defendants' motion to one for summary judgment. *See Environmental Servs., Inc. v. Recycle Green Servs.*, 7 F.Supp.3d 260, 270 (E.D.N.Y. 2014) (quoting *Carione v. United States*, 368 F.Supp.2d 186, 191 (E.D.N.Y. 2005) (citations omitted)) ("Federal courts have 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings' offered in conjunction with a Rule 12(b)(6) motion, and thus complete discretion in determining whether to convert the motion to one for summary judgment.") (internal quotation marks omitted). For purposes of judicial economy, and in fairness to the Plaintiff, the Court will treat the motion to dismiss brought by Defendants as a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

## IV. DISCUSSION

### A. Exhaustion of Administrative Remedies

#### 1. Legal Standard Under the PLRA

The PLRA provides in relevant part that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures." *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009) (citation omitted) (quoting *Booth v. Churner*, 532 U.S. 731, 741, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)).

In finding that the PLRA applies to all inmate actions concerning prison life, *see Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), the Supreme Court "did not distinguish between pretrial and post-trial detainees." *United States v. Khan*, 540 F.Supp.2d 344, 349 (E.D.N.Y. 2007) (citing *Porter*, 534 U.S. at 532, 122 S.Ct. 983; *George v. Morrisson-Warden*, No. 6-3188, 2007 WL 1686321 (S.D.N.Y. 2007)); *Baez v. Parks*, No. 02-5821, 2004 WL 1052779, at *5 (S.D.N.Y. May 11, 2004) (citing *United States v. Al–Marri*, 239 F.Supp.2d 366, 367–68 (S.D.N.Y. 2002); *Rivera v. State of New York*, No. 96 Civ. 7697, 1999 WL 13240, at *4–5 (S.D.N.Y. Jan. 12, 1999); *Samuels v. Jackson*, No. 97 Civ. 2420, 1999 WL 92617, at *2 n.3 (S.D.N.Y. Feb. 22, 1999)) ("[T]he PLRA's strict exhaustion requirement does indeed apply in actions brought by pretrial detainees."). As such, similar to a convicted prisoner, a pre-trial detainee is generally required to exhaust his administrative remedies prior to filing an action in federal court. *See Baez*, 2004 WL 1052779, at *5 (citing *Porter*, 534 U.S. at 532, 122 S.Ct. 983).

*10 Although the language of Section 1997(e)(a) is mandatory, the "edict contains one significant qualifier: the remedies must indeed be 'available' to the prisoner." *Ross v. Blake*, ––– U.S. ––––, 136 S.Ct. 1850, 1856, 195 L.Ed. 2d 117 (2016); *Riles v. Buchanan*, 656 Fed.Appx. 577, 580 (2d Cir. 2016) ("As the Supreme Court recently made clear in holding that courts may not excuse a prisoner's failure to exhaust because of 'special circumstances,' 'mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' "). "[A]side from that exception, the PLRA's text suggests no limits on an inmate's obligation to exhaust—irrespective of any 'special circumstances.' " *Ross*, 136 S.Ct. at 1856. The Second Circuit has held that "[a]n administrative procedure is unavailable when: (1) 'it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates'; (2) it is 'so opaque that it becomes, practically speaking, incapable of use'; or (3) 'prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.' " *Riles*, 656 Fed.Appx. at 580 (quoting *Ross*, 136 S.Ct. at 1859-60).

Despite the PLRA's strict application, the Supreme Court has made clear that prisoners "are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). Rather, "failure to exhaust is an affirmative defense under the PLRA" that must be raised and proven by defendants. *Id.* "Dismissal under Rule 12(b)(6) for failure to exhaust is thus appropriate only where nonexhaustion is apparent from the face of the complaint." *Roland III v. Smith*, 907 F.Supp.2d 385, 388 (S.D.N.Y. 2012) (citing *McCoy v. Goord*, 255 F.Supp.2d 233, 251 (S.D.N.Y. 2003)); *see Jandres v. Armor Health Care Inc.*, No. 12-3132, 2014 WL 1330655, at *4 (E.D.N.Y. Mar. 31, 2014); *see also Barrett v. Armor Corr. Health, Inc.*, No. 13-1063, 2014 WL 1220756, at *5 (E.D.N.Y. Mar. 20, 2014) (quoting *Rivera v. Anna M. Kross Ctr.*, No. 10-8696, 2012 WL 383941, at *2 (S.D.N.Y. Feb. 7, 2012)) (citing *Butler v. Suffolk Cnty.*, 289 F.R.D. 80, 92 (E.D.N.Y. 2013)).

#### 2. Application to the Facts

Defendants argue that the Complaint must be dismissed on the grounds that "there is no allegation or any indication that [Plaintiff] brought his complaints to the attention of NCCC officials that would have afforded them the time and opportunity to address them." Armor Correctional Health Services of New York, Inc. and Sheriff Michel Sposato's Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Defs.' Mem.") [DE 19-2] at 10. In opposing the motion, Plaintiff states that while at the NCCC, he filed grievance forms and sick call requests in which he

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 230 of 529

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

complained about his arm as well as other issues. Pl's. Opp'n at 4. Plaintiff explained that he could not figure out what the officer wrote on most of the complaint forms and there were times when the officer informed Plaintiff that he "had to sign the form because soon [he would] be taken to the Hospital." *Id.* at 3. Sometimes the officer would write on the form a note that Plaintiff refused to sign it when, in fact, Plaintiff had signed the form on an earlier date. *Id.* Moreover, in connection with his discussion of the PLRA and his efforts to comply with it, Plaintiff stated that he was transferred from a "county holding facility" to a "federal trans[ ]ient facility, which is a different jurisdiction, with different rules and regulations." *Id.*

In their Reply, Defendants argue that Plaintiff's Opposition fails to set forth a "meaningful rebuttal to the Defendants' position." Reply Memorandum of Law in Further Support of the Defendant's Motion to Dismiss the Complaint ("Defs.' Reply") [DE 32] at 2. Defendants reject what they characterize as Plaintiff's attempt to attribute any deficiencies under the PLRA to his being transferred to a different facility. *See id.* at 2. They point out that Plaintiff, by his own "admission," arrived at the NCCC on September 11, 2013, and was not transferred to another facility until November 5, 2013. *Id.* Based on this timeline, Defendants argue that Plaintiff had approximately two months to file a grievance and any subsequent appeal. *Id.* They further note that Plaintiff does not challenge the three-tiered prisoner grievance procedure utilized by the NCCC which is set out in detail in Defendants' opening papers. *Id.* at 3.

**\*11** As discussed above, Plaintiff is not required to plead specific facts in the Complaint setting forth exhaustion. *Jones,* 549 U.S. at 216, 127 S.Ct. 910; *Roland v. Smith,* 907 F.Supp.2d 385, 388 (S.D.N.Y. 2012) ("inmates are not required to specially plead or demonstrate exhaustion in their complaints."). Therefore, to the extent Defendants seek dismissal on the grounds that Plaintiff does not allege that he exhausted the administrative remedies available to him, that argument is unavailing. Dismissal is "appropriate only where nonexhaustion is apparent from the face of the complaint." *Zamani v. Nassau Cty.,* No. 14-5606, 2015 WL 9943257, at \*3 (E.D.N.Y. Dec. 16, 2015) (quoting *Roland v. Smith,* 907 F.Supp.2d 385, 388 (S.D.N.Y. 2012)) (citing *Cephas v. Nassau Cty. Corr. Ctr.,* No. 12-CV-1445, 2014 WL 537576, at \*4 (E.D.N.Y. Feb. 10, 2014)) (rejecting defendants' argument that the plaintiff "failed to exhaust his administrative remedies in that there is no indication or allegation that plaintiff undertook any further action to complain of or appeal any dissatisfaction with any of

[his grievances]....") (internal quotation marks omitted), *report and recommendation adopted,* No. 14-5606, 2016 WL 393934 (E.D.N.Y. Jan. 28, 2016). Non-exhaustion has been deemed to be apparent from the face of a Complaint where, for example, the plaintiff explicitly alleged that his grievance was under review by Internal Affairs at the time the Complaint was filed, *Joseph v. Nassau Cty. Corr. Facility,* No. 15-7010, 2016 WL 3033725, at \*4 (E.D.N.Y. May 26, 2016), or where the Court determined, through a review of exhibits attached to the plaintiff's Complaint, that the plaintiff failed to properly appeal the outcome of his grievances in accordance with the facility's protocol—the "plaintiff either accepted the grievance coordinator's decision and did not appeal, or refused to sign the reviewed grievance forms and did not appeal." *Young v. Sposato,* No. 12-2850, 2014 WL 109083, at \*7 (E.D.N.Y. Jan. 13, 2014).

Unlike the circumstances in *Joseph* and *Young,* the Court finds here that here non-exhaustion is not apparent from the face of Plaintiff's Complaint. At no point does Plaintiff affirmatively state in any of his submissions "that he failed to follow all the required grievance procedures." *Randolph v. N.Y.C. Dep't of Corr.,* No. 05-8820, 2007 WL 2660282, at \*7 (S.D.N.Y. Sept. 7, 2007), *report and recommendation adopted,* No. 14-06468, 2016 WL 680822 (S.D.N.Y. Feb. 18, 2016); *see, e.g., Groenow v. Deputy Warden of OBCC Williams,* No. 13-3961, 2014 WL 941276, at \*4 (S.D.N.Y. March 11, 2014). In fact, Plaintiff makes no mention in his Complaint of the NCCC's grievance procedure or his compliance with it, likely because the standardized 42 U.S.C. Section 1983 complaint form utilized by *pro se* plaintiffs like Mr. Villafane do not prompt the individual to discuss his efforts to exhaust administrative remedies. It is not until his Opposition that Plaintiff asserts he filed grievance forms and sick call requests while detained at the NCCC. Pl's. Opp'n at 4. Plaintiff states that (1) he often could not read what the officers wrote on the forms, (2) officers told him he had to sign the forms since he would be taken to a hospital, and (3) officers sometimes indicated on the form that Plaintiff refused to sign when, according to Plaintiff, he actually did. *Id.* "Where a prisoner indicates that he has taken some steps toward exhaustion, district courts will normally not infer from his silence that he failed to take the remaining steps that full exhaustion would require." *Huggins v. Schriro,* No. 14-6468, 2015 WL 7345750, at \*3 (S.D.N.Y. Nov. 19, 2015) (citing *Rodriguez v. Warden, Metropolitan Correctional Facility,* No. 13-3643, 2015 WL 857817 at \*3–4 (S.D.N.Y. Feb. 27, 2015); *Randolph,* 2007 WL 2660282, at \*8; *Groenow,* 2014 WL 941276, at \*3 (S.D.N.Y. March 11, 2014)); *id.* (quoting

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 231 of 529

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

*Wesley v. Muhammad*, No. 05-5833, 2008 WL 123812, at *3 (S.D.N.Y. Jan. 10, 2008)), *report and recommendation adopted*, 2008 WL 236974 (S.D.N.Y. Jan. 28, 2008)(" [A] pro se plaintiff's pleading references to various efforts that he has made to bring alleged prison violations to the attention of the prison authorities can be treated as tantamount to an admission that he had not exhausted his remedies.' "); *but see Ghee v. Warden Ramos*, No. 13-632, 2013 WL 7018543, at *1–2 (S.D.N.Y. Dec. 4, 2013) (dismissing the plaintiff's complaint where he left blank a section of the form complaint that set forth the following: "[w]hat steps, if any, did you take to appeal that decision? Describe all appeals to the highest level of the grievance process[ ]").

 **\*12**  Moreover, according to Plaintiff, he was instructed to sign a complaint form so that he would be taken to a hospital. Accepting this allegation as true, which the Court must do at this juncture, it is not unreasonable to infer that Plaintiff's request to be taken to a hospital was accepted. Where a grievance is decided in an inmate's favor, but the facility fails to implement the administrative decision and there is no means of appealing that failure, then the inmate is deemed to have fully exhausted his or her remedies for purposes of the PLRA. *See Abney v. McGinnis*, 380 F.3d 663, 669 (2d Cir. 2004) (collecting cases). Plaintiff's allegations raise questions that cannot be answered at this stage with an undeveloped record. *See Cephas*, 2014 WL 537576, at *4 (quoting *Gaines v. Armor Health Care, Inc.*, No. 12-5663, 2013 WL 6410311, at *3 (E.D.N.Y. Dec. 9, 2013)) ("Inquiries regarding exhaustion ... 'typically cannot be determined on an undeveloped record.' "). In light of the foregoing analysis, the Court finds that dismissal on the grounds of non-exhaustion is inappropriate at this time. *See Jandres*, 2014 WL 1330655, at *4; *Joseph*, 2016 WL 3033725, at *4 (citing *McCoy v. Goord*, 255 F.Supp.2d 233, 249 (S.D.N.Y. 2003)) ("Where non-exhaustion is not clear from the face of the complaint, a defendant's motion to dismiss pursuant to 12(b)(6) is not an appropriate vehicle.")

### B. Plaintiff's Claims Arising Under 42 U.S.C. Section 1983

Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of

the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ...

42 U.S.C. § 1983. To state a claim under Section 1983, a plaintiff must " 'allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States.' " *Rae v. Cty. of Suffolk*, 693 F.Supp.2d 217, 223 (E.D.N.Y. 2010) (quoting *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999)); *see Corneio v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)). Section 1983 does not create any independent substantive rights but rather is a vehicle to "redress ... the deprivation of [federal] rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), *abrogated on other grounds recognized by Collins v. City of San Diego*, 841 F.2d 337 (9th Cir. 1988); *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993)). In addition, as discussed in greater detail below, it is well-settled in this Circuit "that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)); *see Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d Cir. 2009).

### 1. Section 1983 Claims against Defendant Sposato in his Individual Capacity

Plaintiff sets forth a single allegation concerning Defendant Michael Sposato, the Nassau County Sheriff. In the section of Plaintiff's form Complaint entitled "Basis for Jurisdiction," when prompted to discuss how each defendant acted under color of state or local law, Plaintiff responded "Armor by denying me prop[ ]er medical care intentionally the sheriff by allowing them to do so, and by not monitoring its medical Dept." Compl. § II.D. Plaintiff does not mention Defendant Sposato in either his "Statement of Claim," *see id.* § III, or his Opposition papers. *See generally*, Pl's. Opp'n.

At the outset, the Court notes that a supervisory official like Sheriff Sposato will not be found liable under Section 1983 simply by virtue of his "high position of authority."

Case 5:25-cv-00956-AJB-MJK   Document 9   Filed 12/08/25   Page 232 of 529

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

*Whitenack v. Armor Med.*, No. 13-2071, 2014 WL 5502300, at *5 (E.D.N.Y. Oct. 30, 2014) (quoting *Al–Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065 (2d Cir. 1989)) (citing *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004)) (internal quotation marks omitted); *see Morgan v. Dzurenda*, No. 14-966, 2015 WL 5722723, at *6 (D. Conn. Sept. 19, 2015) (citing *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)) ("Supervisory officials cannot be held liable under section 1983 solely for the acts of their subordinates."). Rather, liability may generally only be predicated upon the individual defendant's personal involvement in the purported constitutional violation. *See Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004) (citing *Back v. Hastings on Hudson Union Free School District*, 365 F.3d 107, 122 (2d Cir. 2004)); *Morgan*, 2015 WL 5722723, at *6 (citing *Colon*, 58 F.3d at 873). A complaint asserting a § 1983 claim which does not allege facts establishing the requisite personal involvement "fails as a matter of law." *Gaines*, 2013 WL 6410311, at *3 (citing *Costello v. City of Burlington*, 632 F.3d 41, 48–49 (2d Cir. 2011)).

**\*13** According to the Second Circuit in *Colon v. Coughlin*, personal involvement may be found when:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d at 873 (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)); *Donohue v. Manetti*, No. 15-636, 2016 WL 740439, at *3 (E.D.N.Y. Feb. 24, 2016) (quoting *Colon*, 58 F.3d at 873); *Barrett*, 2014 WL 1220756, at *4 (quoting

*Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996)). Some courts have questioned the continuing applicability of these factors based upon the heightened pleading requirements set forth in *Iqbal*. *See Bellamy v. Mount Vernon Hosp.*, No. 07-1801, 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) ("Only the first and part of the third *Colon* categories pass *Iqbal's* muster—a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred."), *aff'd* 387 Fed.Appx. 55 (2d Cir. 2010); *Newton v. City of New York*, 640 F.Supp.2d 426, 448 (S.D.N.Y. 2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived" post-*Iqbal*.). However, the Second Circuit has not yet ruled on the issue. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations," but declining to resolve the issue); *see also Marom v. City of New York*, No. 15-2017, 2016 WL 916424, at *15 (S.D.N.Y. Mar. 7, 2016) (citing *Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012) (acknowledging that *Iqbal* has "engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon v. Coughlin*")); *Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014) (declining to decide the "contours of the supervisory liability test" post *Iqbal*), *on reconsideration in part,* No. 15-CV-2017, 2016 WL 5900217 (S.D.N.Y. July 29, 2016). Notwithstanding the Second Circuit's silence, the majority of courts considering the issue have determined that "even after the U.S. Supreme Court's decision in *Iqbal*, these 'categories supporting personal liability of supervisors still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated.' " *Hernandez v. Goord*, No. 01-9585, 2013 WL 2355448, at *7 (S.D.N.Y. May 29, 2013) (quoting *Qasem v. Toro*, 737 F.Supp.2d 147, 152 (S.D.N.Y. 2010)) (citing *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937); *see Ramey v. Perez*, No. 13-00017, 2014 WL 407097, at *4 (S.D.N.Y. Jan. 31, 2014) ("*Colon* remains the standard in this Circuit for deciding whether personal involvement by supervisory officials is sufficiently alleged in the context of the Eighth Amendment."); *see also Morgan v. Comm'r Dzurenda*, No. 14-966, 2015 WL 5722723, at *7 (D. Conn. Sept. 29, 2015) ("Because it is unclear as to whether *Iqbal* overrules or limits *Colon*, the Court will continue to apply the categories for supervisory liability set forth by the Second Circuit."); *Mercier v. Kelly*, No. 10-7951, 2013 WL 4452486, at *6 (S.D.N.Y. Aug. 19, 2013) ("[T]he majority view is where

Case 5:25-cv-00956-AJB-MJK   Document 9   Filed 12/08/25   Page 233 of 529

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

'the constitutional claim does not require a showing of discriminatory intent ... the personal involvement analysis set forth in *Colon v. Coughlin* may still apply.' ") (quoting *Shepherd v. Powers*, No. 11 Civ. 6860, 2012 WL 4477241, at *10 (S.D.N.Y. Sept. 27, 2012)) (internal quotation marks omitted) (citing *Bertuglia v. City of New York*, 839 F.Supp.2d 703, 720–23 (S.D.N.Y. 2012); *Malik v. City of New York*, No. 11-6062, 2012 WL 3345317, at *14–15 (S.D.N.Y. Aug. 15, 2012)); *Martinez v. Perilli*, No. 09-6470, 2012 WL 75249, at *4 (S.D.N.Y. Jan. 5, 2012) ("[T]he five *Colon* categories still apply after *Iqbal*.") (citing *Qasem*, 737 F.Supp.2d at 151; *D'Olimpio v. Crisafi*, 718 F.Supp.2d 340, 345–48 (S.D.N.Y. 2010), *aff'd*, 462 Fed.Appx. 79 (2d Cir. 2012); *Sash v. United States*, 674 F.Supp.2d 531, 544 (S.D.N.Y. 2009)). Using the principles set forth above, the Court will now consider whether Plaintiff has established the requisite personal involvement of Defendant Sposato in the underlying circumstances.

**\*14** Plaintiff alleges that Defendant Sposato allowed Armor to deny him medical care and failed to monitor the "medical department." *See* Compl. § II.D. As to the first and second *Colon* factors set forth above, Plaintiff does not allege that Defendant Sposato was directly involved in the alleged constitutional violations or that he failed to remedy the constitutional violations "after being informed of the violation through a report or appeal." Plaintiff may still satisfy the personal involvement requirement by establishing that the defendant was responsible for creating a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, as set forth in the third *Colon* factor. "As currently drafted, the Complaint merely discusses the constitutional violations against Plaintiffs, which is insufficient to assert a policy or custom." *See Tretola v. D'Amico*, No. 13-5705, 2014 WL 2957523, at *8 (E.D.N.Y. July 1, 2014); *see also, e.g.*, *Youngblood v. City of N.Y.*, No. 15-3541, 2016 WL 3919650, at *5 (S.D.N.Y. June 27, 2016) (holding that the pro se "Plaintiff's bare allegations of the existence of a custom and policy and his conclusory assertion that the policy was linked to his constitutional injuries are insufficient to state a *Monell* claim[ ]"); *Carpinone v. City of New York*, No. 11-2074, 2012 WL 760073, at *2 (S.D.N.Y. Mar. 9, 2012) ("Plaintiff offers no facts which would render plausible his allegations of a policy or custom within the New York City Police Department that was affirmatively linked to the purported constitutional violations he suffered."). Here, Plaintiff Villafane has therefore failed to establish personal involvement of Defendant Sposato through the third *Colon* factor.

Turning to the fourth *Colon* factor—which appears to be the factor most directly implicated by Plaintiff's allegations—Plaintiff claims that "the defendant was grossly negligent in supervising subordinates who committed the wrongful acts." *Samuels v. Fischer*, 168 F.Supp.3d 625, 638 (S.D.N.Y. 2016) (*quoting Colon*, 58 F.3d at 873). Courts have held that in order to establish personal involvement in this context, a plaintiff must demonstrate that the defendant "knew or should have known that there was a high degree of risk that his subordinates would behave inappropriately, but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury to Plaintiff." *Samuels*, 168 F.Supp.3d at 638 (quoting *Frederick v. Sheahan*, No. 10-6527, 2014 WL 3748587, at *8 (W.D.N.Y. July 29, 2014)) (citing *Kucera v. Tkac*, No. 12-264, 2013 WL 1414441, at *6 (D. Vt. Apr. 8, 2013)) (explaining that the defendants' alleged failure to supervise will satisfy the fourth *Colon* factor if the defendants "knew or should have known that there was a high degree of risk that his subordinates would behave inappropriately ... but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable officer would find necessary to prevent such a risk[.]"); *Brooks v. Prack*, 77 F.Supp.3d 301, 313 (W.D.N.Y. 2014) (quoting *Frederick*, 2014 WL 3748587, at *8).

Plaintiff has not provided any salient facts regarding Defendant Sposato's state of mind—whether he knew or should have known that his subordinates were engaging in conduct which violated Plaintiff's or other inmate's constitutional rights. Plaintiff merely makes the conclusory allegation that Defendant Sposato "allowed" Armor to engage in the purportedly unconstitutional conduct. Moreover, even if Plaintiff had alleged that Sheriff Sposato was aware of Armor's inaction through his receipt of complaints and failed to act on those complaints, Plaintiff's allegations might still fail to establish the requisite personal involvement. *See Tafari v. McCarthy*, 714 F.Supp.2d 317, 359 (N.D.N.Y. 2010) (quoting *Rivera v. Goord*, 119 F.Supp.2d 327, 344–45 (S.D.N.Y. 2000)) (citing *Watson v. McGinnis*, 964 F.Supp. 127, 130 (S.D.N.Y. 1997)) ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official 'failed to remedy the violation after learning of it through a report or appeal' or 'allowed the custom or policy to continue after learning of

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 234 of 529

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

it.' "). As an example, in *Whitenack v. Armor Medical*, No. 13-2071, 2014 WL 5502300 (E.D.N.Y. Oct. 30, 2014), the incarcerated *pro se* plaintiff filed a civil rights Complaint in the Eastern District of New York under 42 U.S.C. § 1983 against Armor, Sheriff Sposato, Nassau County and "the Clerk of the Court of the Nassau County D.A.'s office." *Id.* at *1. As to Sheriff Sposato, plaintiff Whitenack alleged that Sposato failed to "provid[e] medical needs, even after they learned, through grievances, that Armor was not providing proper medical care" and that he "allows Armor to continue practicing [ ] in the [NCCC] * * *." *Id.* at *6 (alterations in original). The court in *Whitenack* held that "such allegations are insufficient to impose Section 1983 liability upon Sheriff Sposato in a supervisory capacity." *Id.* (collecting cases). The court added that "[s]ince plaintiff 'has pled no facts, beyond [Sheriff Sposato's] presumed receipt of [grievances] and [his] * * *position[ ] atop the [NCCC], implicating [him] in any violation described in [his] [amended] complaint [,] [he] has * * * failed to plausibly plead [Sheriff Sposato's] personal involvement in any infringement of [his] constitutional rights.' " *Id.* at *6 (alterations in original) (quoting *Vogelfang v. Capra, 889 F.Supp.2d 489,* 502 (S.D.N.Y. 2012)). On these grounds, the court granted the defendants' motion seeking dismissal of the plaintiff's Section 1983 claim against Sheriff Sposato. *Id.*

**\*15** The Court also notes that Plaintiff fails to set forth any detail regarding how Defendant Sposato failed to supervise his subordinates or which subordinates he failed to supervise. *See Brooks,* 77 F.Supp.3d at 313. "[T]he mere failure to supervise would not be sufficient to establish liability under § 1983." *Tyler v. Dalsheim,* No. 82-2467, 1985 WL 554, at *1 (S.D.N.Y. Apr. 24, 1985); *McRae v. Gentile,* No. 914-00783, 2015 WL 7292875, at *5 (N.D.N.Y. Oct. 20, 2015) (quoting *White v. Fischer,* No. 09-240, 2010 WL 624081, at *6, 2010 U.S. Dist. LEXIS 15492, at *19 (N.D.N.Y. Feb. 18, 2010)) (citing *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir. 2009)) (" 'Vague and conclusory allegations that a supervisor' negligently failed to [ ] supervise subordinate employees do not suffice to establish personal involvement so as to give rise to personal liability."), *report and recommendation adopted*, No. 914-783, 2015 WL 7300540 (N.D.N.Y. Nov. 18, 2015).

The Court finds that Plaintiff's claims against Defendant Sposato fare no better under the fifth *Colon* factor: "the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873. For example, in *Holland v. City of New York*, the

*pro se* plaintiff alleged that two individual defendants, Commissioner Schriro and Warden Perrino, " 'pursued a policy and custom of deliberate indifference' in the 'hiring, training and supervision of' Jennings and the correction officer defendants." *See Holland v. City of New York*, 197 F. Supp. 529, 551 (2016). The court determined that plaintiff Holland's claims failed to satisfy the third, fourth and fifth *Colon* factors. *Id.* In doing so, the court explained that "[t]o the extent that the complaint attempts to assert a failure-to-supervise claim, moreover, it lacks any hint that [Schriro and Perrino] acted with deliberate indifference to the possibility that [their] subordinates would violate [Holland's] constitutional rights." *Holland*, 197 F.Supp. at 551 (quoting *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir. 2009)). Likewise, in *Erdogan v. Nassau County,* this Court found the following allegations to be conclusory:

> Specifically, Plaintiff alleges that the "Defendant supervisors," including the Proposed Defendants, "were personally involved in both the deprivation of Ms. Erdogan's constitutional rights and in creating or condoning the policy or custom of failing to take preventative and remedial measures to guard against such constitutional deprivations." PAC ¶ 54. Plaintiff further maintains that (i) the Defendant supervisors were reckless in their failure to supervise Mark Barber, and knew or should have known that Barber was sexually abusing female inmates and that the conduct against Plaintiff was likely to occur; and (ii) the failure of the supervisory defendants to train, supervise, and discipline Barber amounted to gross negligence. *Id.* ¶¶ 55–57.

No. 10-5837, 2014 WL 1236679, *16 (E.D.N.Y. March 25, 2014). As a result, this Court held the plaintiff failed to establish that the defendants were deliberately indifferent or grossly negligent in supervising subordinates. *Id.* In addition, the plaintiff in *Erdogan* failed to set forth "sufficient factual averments as required under *Iqbal*." *Id.* at 16 (collecting cases). Here, too, Plaintiff fails to set forth "sufficient factual averments" to support a claim for deliberate indifference. Plaintiff "must do more than plead '[c]onclusory allegations or legal conclusions masquerading as factual conclusions[.]' " *Andino v. Fischer,* 698 F.Supp.2d 362, 376 (quoting *Gebhardt v. Allspect, Inc.,* 96 F.Supp.2d 331, 333 (S.D.N.Y. 2000)) (second alteration added). Since Plaintiff has failed to meet this standard, the Complaint, as currently drafted, fails to allege Defendant Sposato's personal involvement—a deficiency that is fatal to Plaintiff's claim. *Huggins*, 2015 WL 7345750, at *5.

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

### 2. *Section 1983 Claims against Defendant Sposato in his Official Capacity*

**\*16** Since Plaintiff did not explicitly state that he is suing Defendant Sposato in his individual capacity, the Court will also consider whether Plaintiff has stated a claim against Defendant Sposato in his official capacity as Sheriff of Nassau County. In this regard, the Court points out that "an official-capacity suit is, in all respects other than name, to be treated as a suit against the [governmental] entity [of which the officer is an agent]." *Stancati v. Cty. of Nassau*, No. 14-2694, 2015 WL 1529859, at \*2 (E.D.N.Y. Mar. 31, 2015) (citing *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985) (alterations in original); *Castana v. Town of Brookhaven*, 700 F.Supp.2d 277, 283–84 (E.D.N.Y. 2010)). Therefore, a suit against Defendant Sposato in his official capacity is a suit against the Nassau County Sheriff's Department. It is well established, however, that as an "administrative arm of a municipality," the Nassau County Sheriff's Department is not a suable entity. *Campbell v. Sposato*, No. 15-1958, 2015 WL 9267222, at \*4 (E.D.N.Y. Nov. 17, 2015) (citing Nassau County Charter, DE [14–2], art. XX, §§ 2001, 2003), *report and recommendation adopted*, No. 15-1958, 2015 WL 9273951 (E.D.N.Y. Dec. 16, 2015). Unlike the Nassau County Sheriff's Department, Nassau County itself is a suable entity. However, for the same reasons that Plaintiff has failed to set forth a claim against Armor, which is discussed in greater detail below, Plaintiff's Complaint fails to establish a claim for municipal liability.

### 3. *Section 1983 Claims against Armor*

"Armor is a private company that provides medical services for inmates at the [NCCC] pursuant to a contract with the Nassau County Sheriff's Department." Declaration of John J. Doody in Support of Defendant Armor's Motion to Dismiss ("Doody Decl.") [19-1] ¶ 3. Generally, to state a claim under Section 1983, the challenged conduct must be attributable at least in part to a person who was acting under color of state law. *Zamani v. Nassau Cty.*, No. 14-5606L, 2015 WL 9943257, at \*4 (E.D.N.Y. Dec. 16, 2015) (quoting *Hawkins v. Nassau Cty. Corr. Facility*, 781 F.Supp.2d 107, 111 (E.D.N.Y. 2011)), *report and recommendation adopted*, No. 14-5606, 2016 WL 393934 (E.D.N.Y. Jan. 28, 2016). However, "a private employer such as Armor may be held liable under Section 1983 for the acts of its employees where the unconstitutional act was authorized or undertaken

pursuant to the official policy of the private entity employer and the employer was jointly engaged with state officials or its conduct is chargeable to the state." *Gaines*, 2013 WL 6410311, at \*3; *see Hollander v. Copacabana Nightclub*, 624 F.3d 30, 33 (2d Cir. 2010); *see generally Filarsky v. Delia*, 566 U.S. 377, 389-90, 132 S.Ct. 1657, 1661-65, 182 L.Ed.2d 662 (2012); *see also Zamani*, 2015 WL 9943257, at \*5 (citing *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408 (2d Cir. 1990)); *Cephas*, 2014 WL 537576, at \*4 (quoting *Gaines*, 2012 WL 5438931, at \*3) (" 'Thus, a private employer acting under color of state law may be held liable under Section 1983 for the acts of its employees where the unconstitutional act was authorized or undertaken pursuant to the official policy of the private entity employer and the employer was jointly engaged with state officials or its conduct is chargeable to the state.' "); *Briel v. Sposato*, No. 12-2868, 2012 WL 3697806, at \*5 (E.D.N.Y. Aug. 21, 2012).

In the instant case, Armor is the "medical arm" of the NCCC where Plaintiff was detained. *See Cephas*, 2014 WL 537576, at \*5. The Court will therefore assume for purposes of deciding the instant motion that Armor was acting under color of state law in rendering medical services to Plaintiff at the NCCC. *Cherry v. Spoato [sic]*, No. 15-1832, 2015 WL 2089588, at \*3 (E.D.N.Y. May 5, 2015); *Feder v. Sposato*, No. 11-193, 2014 WL 1801137, at \* 6 (E.D.N.Y. May 7, 2014) (quoting *West v. Atkins*, 487 U.S. 42, 54, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)) ("Because Armor was hired to fulfill the state's constitutional obligation to provide necessary medical care for its inmates, [it][was] 'acting under the color of state law' for purposes of Section 1983").

**\*17** As referenced above, there is no *respondeat superior* liability for § 1983 claims. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Southerland v. City of N.Y.*, 681 F.3d 122, 137 (2d Cir. 2012) (quoting *Monell*, 436 U.S. at 691-94, 98 S.Ct. 2018). Since Plaintiff does not assert claims against any individual employee or official of Armor, Armor may be liable under § 1983 only if Plaintiff "proves that action pursuant to official ... policy of some nature caused a constitutional tort." *Grafton v. Cty. of Nassau*, No. 15 CV 4564, 2016 WL 8711072, at \*9 (E.D.N.Y. July 15, 2016) (emphasis in original) (citing *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408-09 (2d Cir. 1990); *Green v. City of New York*, 465 F.3d 65, 82 (2d Cir. 2006); *Cofield v. Armor Correctional Health Inc.*, No. 12-1394, 2013 WL 2416318, at \*4 (E.D.N.Y. May 31, 2013) (citing *Rojas*, 924 F.3d 408). "Although *Monell* dealt with municipal employers, its rationale has been extended

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 236 of 529

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

to private businesses [acting under color of state law]." *Rojas*, 924 F.2d at 409; *see also Bektic–Marrero v. Goldberg*, 850 F.Supp.2d 418, 432 (S.D.N.Y. 2012) (collecting cases) (holding that *Monell* has been extended to private Section 1983 defendants acting under color of state law).

Here, Plaintiff has not plausibly alleged facts showing that the constitutional deprivations he alleges resulted from an official policy or custom of Armor. In particular,

> Plaintiff has not alleged facts from which to reasonably infer: (1) the existence of a formal policy to deny inmates at the NCCC, including himself, their 'basic medical needs' which is officially endorsed by Armor; (2) actions taken or decisions made by Armor policymaking officials which caused the alleged violation of his civil rights ...; (3) an Armor practice so persistent and widespread as to practically have the force of law; or (4) a failure by Armor policymakers to properly train or supervise their subordinates, amounting to 'deliberate indifference' to the rights of those who come in contact with their employees.

*Whitenack*, 2014 WL 5502300, at \*9; *see, e.g.*, *Barrett*, 2014 WL 1220756, at \*5 (dismissing claims against Armor where the plaintiff "neither alleged that an Armor employee violated his constitutional rights, nor ... alleged a single fact to support an inference that any action resulted from an official policy or custom").

The Court turns to prevailing Second Circuit case law involving civil rights complaints to demonstrate the factual averments and evidentiary support needed to satisfy the pleading requirements set forth in *Iqbal*. In *Kucharczyk v. Westchester County*, the *pro se* plaintiff alleged in his complaint "a *Monell* claim for [a] pattern due to the fact that there [are] several claims pending in this court based on the same facts [he] allege[s] in [the instant] [C]omplaint." 95 F.Supp.3d 529, 543 (S.D.N.Y. 2015) (alterations in original). In support of his claim, the plaintiff attached to his complaint a copy of a report issued by the Civil Rights Division of the United States Department of Justice which memorialized the department's findings resulting from an investigation of the correctional facility where the plaintiff was detained.

The court in *Kucharczyk* explained that "[t]he Second Circuit and the district courts within the Second Circuit have held that a plaintiff's citation to a few lawsuits involving claims of alleged [constitutional violations] is not probative of the existence of an underlying policy by a municipality ... or department of corrections." *Id.* (quoting *Ameduri v. Village of Frankfort*, 10 F.Supp.3d 320, 341 (N.D.N.Y. 2014)) (collecting cases). "Some courts, however, have found that other lawsuits identified by a plaintiff that concern the same practice and policy at issue in the complaint permit a plausible inference of deliberate indifference." *Id.* (collecting cases). In *Kucharczyk*, the court concluded that regardless of which approach it adopted, the plaintiff's failure to name the cases and indicate how many were pending rendered his statement conclusory and the court would have to disregard it on that grounds. *Id.* Notwithstanding this deficiency, the court determined that the plaintiff had sufficiently alleged a custom or practice by virtue of the DOJ Report appended to his complaint. *Id.* According to the report, the facility " 'ha[d] a pattern of failing to ... provide inmates with adequate medical ... care," which "violate[d] WCJ inmates' constitutional rights.' " *Id.* The report further stated that " '[a]lthough WCJ has instituted a policy for submitting grievances, it is not consistently implemented or effectively publicized,' which posed a risk to inmates that perceived that their serious health needs were being unmet." *Id.* Moreover, the court noted, the report was released several years prior to the commencement of the suit, so the facility's policymakers were well aware of the deficiencies. *Id.* at 544-545. The court held that based on this information, the plaintiff adequately alleged "a widespread practice or policy of which Defendants were aware to survive Defendants' Motion to Dismiss his *Monell* claim." *Id.* at 544.

**\*18** Although the DOJ report persuaded the court in *Kucharczyk* that the plaintiff had successfully pleaded a *Monell* claim, this Court notes that submission of such a report is not necessarily required to satisfy the *Iqbal* pleading standard. For example, in *Donohue v. Manetti*, No. 15-636, 2016 WL 740439, at \*1 (E.D.N.Y. 2016), the *pro se* plaintiff filed a Section 1983 action against Armor, two individual medical professionals and Sheriff Sposato for failing to provide the plaintiff with adequate medical care in violation of the Eighth and Fourteenth Amendments. More specifically, the plaintiff there alleged that he was denied previously prescribed psychotropic medication, and instead of giving

Case 5:25-cv-00956-AJB-MJK   Document 9   Filed 12/08/25   Page 237 of 529

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

him his prescribed pain medication, the defendant nurse deliberately gave him medication to which he was allergic. *Id.* at *1-2. The defendants in *Donohue* argued that "two isolated incidents are insufficient to be deemed a policy or custom for the purpose of § 1983 liability." *Id.* at *5. The court rejected the defendants' argument, finding that these incidents, in combination with the comments alleged to have been made to the plaintiff by Armor staff (*i.e.* "things are different now and we don't hand out pills anymore—deal with it," it is "Armor's 'policy' not to 'write' (prescribe) pain medication other than N.S.A.I.D.S." and "I wish you would have died") "support[ed] an inference of a policy or custom to deny inmates adequate medical care." *Id.* at *6.

Here, Plaintiff's complaint "concerns only allegedly unconstitutional conduct to which he was subjected." *Joseph v. Nassau County Correctional Facility*, No. 15-7010, 2016 WL 3033725 (E.D.N.Y. May 26, 2016). Moreover, Plaintiff does not set forth any facts which could give rise to an inference that the constitutional deprivations suffered by Plaintiff arose from an official policy or custom. On this basis, and for the foregoing reasons, this Court respectfully recommends to Judge Bianco that Defendants' motion to dismiss be GRANTED to the extent it seeks dismissal of Plaintiff's § 1983 claim against Defendant Sposato and Defendant Armor.

### C. Plaintiff's Claim for Deliberate Indifference to Medical Needs

Because the Court is recommending to Judge Bianco that the Amended Complaint be dismissed based on Plaintiff's failure to state a valid § 1983 claim against the Defendants, the Court would not normally address whether Plaintiff has adequately stated a claim that Defendants violated his constitutional rights by acting with deliberate indifference to his serious medical needs. However, this Court is also recommending to Judge Bianco that Plaintiff be granted leave to amend his pleadings. Therefore, the Court will now assess Plaintiff's deliberate indifference claim.

#### *1. Legal Standard for Deliberate Indifference*

Plaintiff asserts that at the time of his arrest and arrival at NCCC he had a broken left forearm. Compl. § III.C. Despite repeatedly notifying Defendants of his painful condition, Plaintiff contends that Defendants failed to produce him for the necessary surgery and failed to provide him with

prescribed pain medication. *Id.* Plaintiff does not specify in his Complaint whether he was a pre-trial detainee or convicted inmate during the time at issue. Given the temporal proximity between Plaintiff's arrest and the purported unconstitutional conduct, the Court finds it is not unreasonable to assume that Plaintiff was a pre-trial detainee for at least some portion of the time at issue. *See generally* Compl. The Eighth Amendment, which prohibits cruel and unusual punishment, governs a convicted prisoner's claims of inadequate medical care. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citing *Benjamin v. Fraser*, 343 F.3d 35, 49 (2d Cir. 2003), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63, 70 (2d Cir. 2009); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983)); U.S. Const. amend. XIV (No "State [shall] deprive any person of life, liberty, or property, without due process of law[.]"). However, a pretrial detainee's claim for inadequate medical care is governed by the Fourteenth Amendment's Due Process Clause. *Id.* Since a pre-trial detainee has not been convicted of any crime, the standard applied is different. *Swanson v. City of New York*, No. 16-3231, 2017 WL 3130322, at *6 (E.D.N.Y. July 21, 2017) (quoting *Darnell*, 849 F.3d at 29); *see City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) ("The Due Process Clause ... require[s] the responsible government or governmental agency to provide medical care to [pretrial arrestees] ... who have been injured while being apprehended by the police."). "[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner." *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (citing *City of Revere*, 463 U.S. at 244, 103 S.Ct. 2979; *Bryant v. Maffucci*, 923 F.2d 979, 983 (2d Cir. 1991)) ("[T]he due process rights of a ... [pretrial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner[.]"). Accordingly, irrespective of which Amendment is utilized to analyze a plaintiff's claim for inadequate medical care, the plaintiff must show that the defendants were deliberately indifferent to his or her serious medical needs, which involves a two-pronged analysis. *Grimmett v. Corizon Med. Assocs. of New York*, No. 15-7351, 2017 WL 2274485, at *3 (S.D.N.Y. May 24, 2017). First, "the alleged deprivation of adequate medical care must be 'sufficiently serious.' " *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832, 844, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013)

Case 5:25-cv-00956-AJB-MJK   Document 9   Filed 12/08/25   Page 238 of 529

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

(quoting *Salahuddin*, 467 F.3d at 279). Second, the plaintiff must show that the defendant acted with a "sufficiently culpable state of mind." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)); *see Salahuddin*, 467 F.3d at 279-81.

**\*19** Prior to the Second Circuit's decision in *Darnell v. Pineiro*, 849 F.3d 17, 21 n.3, 29 (2d Cir. 2017), the analysis under the second prong was deemed to be identical to the first regardless of whether the plaintiff's claim was brought under the Eighth Amendment or the Fourteenth Amendment: the plaintiff had to prove that the defendant official was subjectively aware of the harms associated with the constitutional deprivation. *Darnell*, 849 F.3d at 32 (citing *Farmer v. Brennan*, 511 U.S. 825, 836-37, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). However, in *Darnell*, the Second Circuit altered the analysis in light of the Supreme Court's decision in *Kingsley v. Hendrickson*, ___ U.S. ___, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015). In *Kingsley*, the Supreme Court held that "for excessive force claims brought under the Due Process Clause of the Fourteenth Amendment, 'a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable,' " *Darnell*, 849 F.3d at 21 (citing *Kingsley*, 135 S.Ct. at 2473), "reject[ing] the requirement that ... a pretrial detainee establish a state of mind component to the effect that the official applied the force against the pretrial detainee 'maliciously and sadistically to cause harm.' " *Id.* at 21 (citing *Kingsley*, ___ U.S. ___, 135 S.Ct. 2466, 2475, 192 L.Ed.2d 416). In other words, after *Kingsley*, "rather than ask whether the charged official 'kn[ew]' of and disregard[ed] an excessive risk to inmate health or safety,' courts are to instead determine whether the official 'knew, or should have known' that his or her conduct 'posed an excessive risk to health or safety.' " *Lloyd v. City of New York*, 246 F.Supp.3d 704, 718 (S.D.N.Y. 2017). The court in *Darnell* explained that the second prong, which had been referred to as the "subjective prong," is more appropriately described as the "mens rea prong" or "mental element prong." *Darnell*, 849 F.3d at 32 (internal quotation marks omitted).

The Second Circuit has held that *Kingsley* is applicable beyond the context of excessive force claims. *Id.* at 35-36 (citing *Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc)). District Courts in this circuit have applied *Kingsley* to claims for deliberate indifference to medical needs. *See e.g.*, *Grimmett v. Corizon Med. Assocs. of New York*, No. 15-7351, 2017 WL 2274485, at \*4 (S.D.N.Y. May 24, 2017); *Narvaez v. City of New York*, No. 16-1980, 2017 WL 1535386, at \*2 (S.D.N.Y. Apr. 17, 2017); *Lloyd*

*v. City of New York*, 246 F.Supp.3d 704, 718 (S.D.N.Y. 2017) ("The reasoning of *Darnell* applies equally to claims of deliberate indifference to serious medical needs under the Fourteenth Amendment."); *Feliciano v. Anderson*, No. 15-4106, 2017 WL 1189747, at \*8 (S.D.N.Y. Mar. 30, 2017); *Gonzalez-Torres v. Newson*, No. 17-00455, 2017 WL 2369369, at \*3 (D. Conn. May 31, 2017).

The Court notes that "not every lapse in medical care is a constitutional wrong." *Salahuddin*, 467 F.3d at 279. Thus, if the plaintiff fails to satisfy either prong as set forth in *Darnell*, his or her deliberate indifference claim must be dismissed. *See Grimmett*, 2017 WL 2274485, at \*3; *Narvaez*, 2017 WL 1535386, at \*5. "Moreover [ ] not every lapse in prison medical care will rise to the level of a constitutional violation.' " *Ruiz v. Homerighouse*, No. 01-0266, 2003 WL 21382896, at \*2 (W.D.N.Y. Feb. 13, 2003) (alterations in original) (quoting *Smith v. Carpenter*, 316 F.3d 178, 2003 WL 115223, at \*4 (2d Cir. 2003)). "[N]egligence alone is insufficient to make out a deliberate indifference claim" under either the Eighth Amendment or the Fourteenth Amendment. *Grimmett*, 2017 WL 2274485, at \*5 (S.D.N.Y. May 24, 2017) (citing *Darnell*, 849 F.3d at 36).

### b. Objective Prong

Generally, to satisfy the objective prong of the deliberate indifference standard, a plaintiff must show "that the alleged deprivation of medical treatment is, in objective terms, 'sufficiently serious'—that is, the prisoner must prove that his medical need was 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (quoting *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998)); *see Salahuddin*, 467 F.3d at 279. However, where, as here, "a prisoner receives some care, but allegedly inadequate care, the analysis of whether there was a sufficiently serious medical condition is more complex." *Hardy v. City of New York*, 732 F.Supp.2d 112, 128 (E.D.N.Y. 2010) (*Salahuddin*, 467 F.3d at 280). In such cases, "the court must focus on whether '*the alleged deprivation* of adequate medical care was sufficiently serious.' " *Id.* (quoting *Salahuddin*, 467 F.3d at 280) (emphasis in original and alteration omitted); *see, e.g.*, *Ferguson v. Cai*, No. 11-6181, 2012 WL 2865474, at \*4 (S.D.N.Y. July 12, 2012) (quoting *Edmonds v. Central N.Y. Psychiatric Ctr.*, No. 10-5810, 2011 WL 3809913, at \*4 (S.D.N.Y. Aug. 25, 2011)) (collecting cases); *DiChiara v. Wright*, No. 06-6123, 2011 WL 1303867, at \*6 (E.D.N.Y. Mar. 31, 2011). "[I]f the prisoner is receiving on-going treatment and the offending conduct is an unreasonable

Case 5:25-cv-00956-AJB-MJK   Document 9   Filed 12/08/25   Page 239 of 529

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

delay or interruption in that treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Salahuddin*, 467 F.3d at 280 (quoting *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003)) (internal quotation marks and alterations omitted). In other words, "it's the particular risk of harm faced by the prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant" for purposes of establishing a deliberate indifference claim. *Smith*, 316 F.3d at 186 (citing *Chance*, 143 F.3d at 702–03); *see Hardy*, 732 F.Supp.2d at 128 (quoting *Salahuddin*, 467 F.3d at 280) ("In effect, a court must determine 'whether the inadequacy in medical care [was] sufficiently serious' by examining the harm plaintiff was exposed to as a result of defendant's conduct."). "A defendant's delay in treating an ordinarily insignificant medical condition can become a constitutional violation if the condition worsens and creates a substantial risk of injury. Conversely, delay in treating a life-threatening condition may not violate the Eighth [or Fourteenth] Amendment if the lapse does not cause any further harm beyond that which would occur even with complete medical attention." *DiChiara*, 2011 WL 1303867, at *7 (citing *Graham v. Wright*, No. 01–9613, 2004 WL 1794503, at *4, 2004 U.S. Dist. LEXIS 15738, at *13 (S.D.N.Y. Aug. 9, 2004)) (internal quotation marks omitted).

 **\*20**  To determine whether a delay in treatment is objectively serious, the court must "look to 'all relevant facts and circumstances.' " *Id.* (quoting *Smith*, 316 F.3d at 187). In general, "[w]here temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." *Ferguson v. Cai*, No. 11-6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) (citing *Salahuddin*, 467 F.3d at 281; *Chance*, 143 F.3d at 702; *Hathaway*, 37 F.3d at 65, 67). Although "the actual medical consequences that flow from the alleged denial of care" will often "be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm," a deliberate indifference claim "may be based on a defendant's conduct in exposing an inmate to an unreasonable risk of future harm." *Smith*, 316 F.3d at 187-88 (citing *Helling v. McKinney*, 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)) (internal citations omitted). However, "the absence of present physical injury will often be probative in assessing the risk of future

harm." *Id.* at 188; *see DiChiara*, 2011 WL 1303867, at *7 (citing *Smith*, 316 F.3d at 187).

Here, as discussed earlier in this Report and Recommendation, Plaintiff alleges that despite the directives of outside medical professionals that he be immediately produced for surgery to repair his broken left forearm, it appears that Defendants were delayed in getting Plaintiff the requisite medical care. Because of this delay, doctors were forced to rebreak Plaintiff's arm and install metal plates and screws. Plaintiff alleges that he is in constant pain and does not have full use of his left wrist. Considering Plaintiff's broken left forearm in the abstract, the Court finds that it constitutes a sufficiently serious medical condition. *See Mendez v. Acting Sheriff, Nassau Cty. Corr. Ctr.*, No. 10-1960, 2010 WL 2629781, at *2 (E.D.N.Y. June 28, 2010) (citing *Henderson v. Doe*, No. 98-5011, 1999 WL 378333 (S.D.N.Y. June 10, 1999) (broken finger does not rise constitute a serious injury); *Neitzke v. Williams*, 4910 U.S. 319, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (broken hip constitutes a serious injury); *Bryan v. Endell*, 141 F.3d 1290, 1293 (8th Cir. 1998) (broken hand constitutes a serious injury); *Durham v. Nu' Man*, 97 F.3d 862, 869 (6th Cir. 1996) (broken arm constitutes an "undeniably serious" injury); *Benning v. Ehrits*, No. 08-CV-0815, 2009 WL 2982973, at *1 (N.D.N.Y. Sept. 14, 2009) (broken arm constitutes a serious injury); *Hernandez v. Harrison*, No. 07-7489(JVS)(JC), 2008 WL 4836046, at *13 (C.D. Cal. Oct. 29, 2008) (broken leg constitutes a serious injury)) (broken knee rises to the level of "sufficiently serious"); *see Vining v. Dep't of Correction*, No. 12-3267, 2013 WL 2036325, at *4 (S.D.N.Y. Apr. 5, 2013) ("Indeed, numerous courts have found objectively serious injury in cases involving injury to the hand, including broken bones.") (collecting cases).

Moreover, a serious medical condition has been deemed to include " 'condition[s] of urgency, [ ] that may produce death, degeneration, or extreme pain[.]' " *Hathaway*, 99 F.3d at 553 (quoting *Schermerhorn v. Local 100, Transp. Workers Union of Am., AFL-CIO*, 91 F.3d 316, 320 (2d Cir. 1996)) (quotation marks and citation omitted). "[I]t has also been interpreted to include 'less serious denials [of medical attention] which cause or perpetuate pain.' " *Vining v. Dep't of Correction*, No. 12-3267, 2013 WL 2036325, at *3 (S.D.N.Y. Apr. 5, 2013) (quoting *Brock v. Wright*, 315 F.3d 158, 163 (2d Cir. 2003) (citation omitted)). However, the fact that Plaintiff suffers from a serious medical condition is not sufficient, by itself, to sustain his deliberate indifference claim based on the

2017 WL 4179855

delay of his surgery; instead, Plaintiff must allege facts which plausibly show that the delay was objectively serious.

**\*21** Viewing the facts in the light most favorable to Plaintiff and drawing every reasonable inference in his favor, the Court cannot, at this stage in the litigation and on this record, determine as a matter of law whether the delay in Plaintiff's surgical procedure was objectively serious. Although Plaintiff does not set forth the exact date upon which he ultimately had the surgery, the Court makes the assumption based on the information contained in the pleading that the surgery was delayed for approximately two months.

### c. *Mens Rea* **Prong**

The Court finds that Plaintiff's allegations state enough information to satisfy the second prong of the deliberate indifference pleading standard, which requires that Defendants acted with a sufficiently culpable state of mind. *See Darnell,* 849 F.3d at 35; *see also Grimmett,* 2017 WL 2274485 (quoting *Chance,* 143 F.3d at 702) ("Second, the defendant must have acted with deliberate indifference, or a 'sufficiently culpable state of mind.' "); *Hathaway,* 37 F.3d at 66. "Deliberate indifference requires more than negligence." *Hathaway,* 99 F.3d at 66 (quoting *Farmer,* 114 S.Ct. at 1978). As noted, the Second Circuit in *Darnell* explained that in order for a pre-trial detainee to establish a claim for deliberate indifference under the Fourteenth Amendment's Due Process Clause,

> the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.

It follows that the defendant official need not "have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." *Narvaez,* 2017 WL 1535386, at \*6 (citing *Darnell,* 849 F.3d at 35). The Court must ask "whether the official 'knew, or should have known' that his or her conduct 'posed an excessive

risk to health or safety.' " *Lloyd,* 246 F.Supp.3d at 718; *Darnell,* 849 F.3d at 35. A pre-trial detainee may establish a violation of the Fourteenth Amendment where "officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years.' " *Ford v. Rodriguez,* No. 15-4909, 2016 WL 6776345, at \*4-5 (S.D.N.Y. Nov. 16, 2016) (quoting *Frith v. City of New York,* 203 F.Supp.3d 386, 390 (S.D.N.Y. 2016)), *report and recommendation adopted,* No. 15-4909, 2017 WL 58843 (S.D.N.Y. Jan. 5, 2017). Finally, it is well-established that "negligence, even if it amounts to medical malpractice, does not constitute a constitutional violation." *Thomas v. Nassau County Correctional Center,* 288 F.Supp.2d 333, 338 (E.D.N.Y. 2003) (citing *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed. 2d 251 (1976)).

Here, Plaintiff alleges that on September 14, 2013, the examining physician at Nassau University Medical Center advised that Plaintiff would need to be returned three days later—on September 17, 2013—for surgery. *See* Compl. § III.C. According to Plaintiff, defendants failed to do so and also failed to give Plaintiff the prescribed pain medication. *Id.* Plaintiff further contends that on September 24, 2013, a visiting orthopedist expressed shock that Plaintiff had not received any surgery and noted on Plaintiff's chart that it was extremely urgent that he receive surgery. *Id.* On October 9, 2013, plaintiff was transported to the Nassau University Medical Center where he was advised that his arm was in fact broken and that because he had not received the necessary care his arm would have to be rebroken. *Id.* Plaintiff further alleges that on November 5, 2013, he was transferred to the Metropolitan Detention Center. *Id.* Officials transferred Plaintiff to Brooklyn Medical Center and Kingsbrook Hospital "from 2014 through 2015." *Id.* It was the Brooklyn Medical Center where Plaintiff ultimately received the surgery he needed. *Id.* Doctors rebroke Plaintiff's arm and installed two metal plates along with metal screws in his arm. Plaintiff represented that he is in constant pain and does not have 100% use of his left wrist. *Id.*

**\*22** Taking all of Plaintiff's allegations as true, as the Court is required to do, and drawing all reasonable inferences in Plaintiff's favor, the Court finds Plaintiff has sufficiently pleaded that Defendants were fully aware Plaintiff's left forearm was broken and that he required surgery right away. Moreover, Defendants were notified that because they delayed Plaintiff's treatment, Plaintiff's arm would have to be rebroken. Yet Defendants still did not produce Plaintiff

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 241 of 529

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)
2017 WL 4179855

for surgery. Further, throughout this period of time, Plaintiff repeatedly complained of pain but defendants refused to provide him with the prescribed pain medication. The Court finds that Armor knew, or should have known that its conduct "posed an excessive risk to health or safety." *Lloyd,* 246 F.Supp.3d at 718; *Darnell,* 849 F.3d at 35

### D. Plaintiff's Fifth Amendment Claim

Because the Court recommends to Judge Bianco that the Amended Complaint be dismissed based on Plaintiff's failure to state a valid § 1983 claim against the Defendants, the Court generally would not need to address whether Plaintiff adequately alleged a violation of Plaintiff's Fifth Amendment rights. However, in light of the fact that the Court also recommends that Plaintiff be granted leave to amend his pleadings, the Court will undertake a brief analysis of Plaintiff's Fifth Amendment claim.

The Fifth Amendment states as follows:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

U.S. Const. amend. V. "The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.' " *Dusenbery v. United States,* 534 U.S. 161, 167, 122 S.Ct. 694, 699, 151 L.Ed. 2d 597 (2002). Here, Plaintiff's Complaint has been filed against a state official and a private contractor acting under color of state law, not the federal government. As a court in the Second Circuit has observed,

in such circumstances, "[Plaintiff's] appeal to rights secured under the Fifth Amendment is misplaced and dismissed." *Molina v. New York,* 697 F.Supp.2d 276, 284 (N.D.N.Y. 2010). Here, Plaintiff's Fifth Amendment claim must be dismissed, and no amount of re-pleading will cure this problem.

### E. Plaintiff's PLRA Claim and Equal Protection Claim

Plaintiff further alleges that Defendants' conduct constitutes a violation of the PLRA. Compl. § II.B. Plaintiff does not specify which provision of the PLRA his claim arises under. Since Plaintiff also asserts a violation of the Equal Protection Clause, which prohibits discriminatory treatment, the Court will interpret the instant claim as one under 42 U.S.C. § 1997(d), which sets forth the following prohibition: "No person reporting conditions which may constitute a violation under this subchapter shall be subjected to retaliation in any manner for so reporting." *See Mumin v. Johnson,* No. 07-4973, 2008 WL 976268, at *3 (E.D.N.Y. Apr. 9, 2008). However, Section 1997(d) does not provide a plaintiff with a private cause of action. *Id.* Therefore, the Court will construe this claim as one arising under the Equal Protection Clause.

As stated in the context of Plaintiff's Fifth Amendment claim above, the Fourteenth Amendment to the United States Constitution sets forth prohibitions applicable to the States. The Equal Protection Clause of the Fourteenth Amendment states:

> **\*23** All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV (emphasis added). "[T]he Fourteenth Amendment prohibits the selective adverse treatment of individuals by government actors 'compared with others

Case 5:25-cv-00956-AJB-MJK   Document 9   Filed 12/08/25   Page 242 of 529

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

similarly situated' if such selective treatment is based on 'impermissible considerations such as race ... or malicious or bad faith intent to injure a person.' " *Castro-Sanchez v. N.Y.S. Dep't of Corr. Servs.*, No. 10-8314, 2012 WL 4474154, at *3 (S.D.N.Y. Sept. 28, 2012) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)). Here, Plaintiff has not alleged that he was treated differently from other similarly situated individuals, whether by virtue of his race, or the fact that he filed a grievance or sick call request, or on any other grounds. *See generally*, Compl. Plaintiff's PLRA/ Equal Protection Clause claim must therefore be dismissed and this Court respectfully makes that recommendation to Judge Bianco. *See id.* (quoting *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005)) ("If a prisoner claims that he received different treatment by prison officials because of a protected characteristic, he must plead 'that he was treated differently than others similarly situated' and that the differential treatment was 'a result of intentional or purposeful discrimination.' ")

## V. LEAVE TO RE-PLEAD

"When addressing a *pro se* complaint, a district court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Aquino v. Prudential Life & Cas. Ins. Co.*, 419 F.Supp.2d 259, 278 (E.D.N.Y. 2005) (citing *Thompson v. Carter*, 284 F.3d 411, 419 (2d Cir. 2002) ("The liberal pleading standards applicable to *pro se* civil rights complaints in this circuit require that the district court give [plaintiff] an opportunity to flesh out his somewhat skeletal complaints before dismissing them")). The Second Circuit has stated that "[w]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999) (citing *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990)), *overruled on other grounds by Gonzaga v. Doe*, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002); *see* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). The Court should generally not dismiss a *pro se* complaint without granting the plaintiff leave to amend if a valid claim could be stated. *Clifton v. Hra Nyc Govt*, No. 16-1753, 2016 WL 4203486, at *1 (E.D.N.Y. Aug. 9, 2016) (citing *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)).

Even under this liberal standard, however, the court may decline to provide the plaintiff with an opportunity to re-plead if the court finds that the plaintiff "cannot correct the defects in his federal claims" and therefore "any attempt to amend the pleading ... would be futile." *Shorter v. Rice*, No. 12-0111, 2012 WL 1340088, at *5 (E.D.N.Y. Apr. 10, 2012); *see Cuoco*, 222 F.3d at 112 (citing *Hunt v. Alliance N. Am. Gov't Income Trust*, 159 F.3d 723, 728 (2d Cir. 1998)) ("The problem with [the plaintiff's] causes of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied.").

**\*24** Based on the foregoing case law, the arguments contained in all the motion papers, and the Court's analysis of Plaintiff's claims set forth *supra* in this Report and Recommendation, the Court recommends to Judge Bianco that although the current allegations are deficient, there is some "indication that a valid claim might be stated" against Defendants Sposato and Armor. *Cuoco*, 222 F.3d at 112 (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999)) (internal quotation marks omitted). The Court further notes that Plaintiff did not have access to his medical records at the time he filed the Complaint, and those records have since been provided to Plaintiff pursuant to this Court's May 1, 2017 Order. *See* DE 36. Accordingly, the Court respectfully recommends to Judge Bianco that Plaintiff be granted leave to re-plead his claim for individual liability against Defendant Sposato and his *Monell* claim against Armor, as well as his claim for deliberate indifference to serious medical needs against those defendants.

Since Plaintiff is now in possession of his medical records and legible copies of Defendants' uncited opinions, Plaintiff can utilize the information contained in these documents in redrafting his Complaint. [2]

[2]      In light of Plaintiff Villafane's continued assertion of his need to obtain the transcript of his September 2013 arraignment before Magistrate Judge Brown, this Court secured the transcript and is attaching a copy to this Report and Recommendation to be served upon Plaintiff.

## VI. CONCLUSION

Based on the foregoing findings, the Court respectfully recommends to Judge Bianco that Defendants' motion to dismiss be GRANTED, in part, and DENIED, in part. In particular, the Court recommends that the motion be DENIED insofar as it seeks dismissal based on Plaintiff's failure to exhaust his administrative remedies, and that the motion otherwise be GRANTED. The Court further recommends that Plaintiff's Complaint be DISMISSED, without prejudice, and with leave to amend.

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 243 of 529

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

## VII. OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See also* Fed. R. Civ. P. 6(a), (e). Such objections by an attorney of record shall be filed with the Clerk of the Court via ECF. **A courtesy copy of any objections filed is to be sent to the Chambers of the Honorable Joseph F. Bianco, and to the Chambers of the undersigned. Any requests for an extension of time for filing objections must be directed to Judge Bianco prior to the expiration of the fourteen (14) day period for filing objections.** Failure to file objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *see also Johnson v. Woods*, 426 Fed.Appx. 10, 11 (2d Cir. 2011) (citing *Cephas*, 328 F.3d at 107) ("A litigant's failure to file objections to a magistrate judge's report and recommendation, even when that litigant is proceeding pro se, waives any challenge to the report on appeal."); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996) (citing *McCarthy v. Manson*, 714 F.2d 234, 237 n.2 (2d Cir. 1983)).

**Defendants' counsel is directed to serve a copy of this Report and Recommendation upon the *pro se* Plaintiff forthwith by overnight mail and first class mail and to file proof of such service on ECF.**

**SO ORDERED.**

Attachment

UNITED STATES OF AMERICA,

v.

CARLOS VILLAFANE, Defendant.

13-MJ-00445 (DRH)

September 13, 2013

Central Islip, New York

TRANSCRIPT OF CRIMINAL CAUSE FOR INITIAL APPEARANCE BEFORE THE HONORABLE GARY R. BROWN UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government: UNITED STATES ATTORNEY BY: LARA TREINIS GATZ, ESQ. ASSISTANT U.S. ATTORNEY

For the Defendant: GLENN OBEDIN, ESQ. 320 Carleton Avenue #2500 Central Islip, New York 11722

**\*25** Court Transcriber: SHARI RIEMER, CET-805 TypeWrite Word Processing Service 211 N. Milton Road Saratoga Springs, New York 12866

Proceedings recorded by electronic sound recording, transcript produced by transcription service

(Proceedings began at 3:56 p.m.)

THE CLERK: Calling Case 13-MJ-445, U.S. v. Carlos Villafane.

Counsel, please state your appearances.

MS. GATZ: Good afternoon, Your Honor. Lara Treinis Gatz for the United States.

THE COURT: Good to see you, Ms. Gatz.

MS. GATZ: You too, Your Honor.

MR. OBEDIN: Good afternoon, Your Honor. Glenn Obedin for Mr. Villafane.

THE COURT: Mr. Obedin, how are you, sir?

MR. OBEDIN: I'm fine. Thank you.

THE COURT: Ms. Gatz, we're here on initial appearance; is that right?

MS. GATZ: Yes, Your Honor.

THE COURT: All right. Good. So, Mr. Villafane, I understand we're here to go through some of your rights, talk about the complaint, talk about the propriety of bail if any. But the first question I have for you is have you spoken to your attorney, have you had enough time to talk to Mr. Obedin about what's going on here?

THE DEFENDANT: Yes, sir.

2017 WL 4179855

THE COURT: Do you understand what's going on?

THE DEFENDANT: Yes, sir.

THE COURT: Good. So you've been charged in a complaint with conspiring to distribute oxycodone. Without telling me whether or not you did it, just tell me whether or not that you understand that that's what the charge is.

THE DEFENDANT: Yes, sir, I understand, Judge.

THE COURT: So let's talk about statements. First of all, you have the right to be represented by counsel. I find that you do not have sufficient assets to afford counsel. So we appointed Mr. Obedin, a fine member of the bar to defend you in this action and the court will pay for his services. Do you understand that?

THE DEFENDANT: Yes, sir, I do.

THE COURT: He remains your attorney even though the court is paying. Do you understand?

THE DEFENDANT: Yes, sir.

THE COURT: If at any time you happen to come into some money and you want to hire your own attorney, you have that right too. Do you understand that?

THE DEFENDANT: Yes, sir, I do.

THE COURT: Very good. So let's go back to statements. So you're not required to make any statements about the matters charged in the complaint to anyone. If you've made a statement in the past you have the right—you don't have to continue that. If you start one in the future you don't have to —you can stop at any time. You simply put up your hand and say I don't want to talk about this. Do you understand that?

THE DEFENDANT: Yes, sir, I do.

THE COURT: The reason we make a big deal about statements is because the statements that you make can be used against you in the trial of this matter. Do you understand?

THE DEFENDANT: Yes, sir, I do.

THE COURT: And of course the fact that I say don't talk to anybody doesn't mean don't talk to Mr. Obedin. You should talk to your attorney. You understand that, right?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Good. Very good. Ms. Gatz, what is the Government's position on bail?

MS. GATZ: Your Honor, the Government is asking for a permanent order of detention in this matter. The defendant has what I can only describe as a very lengthy criminal history. He also is a chronic substance abuser. He currently is attending a methadone maintenance program. His heroin problem extends back it looks like over a ten-year period.

**\*26** Given a combination of the instant offense, his prior arrests and convictions, his substance abuse history and his history of failing to comply with court directives, specifically violations of probation and parole and release, the Government is asking for a permanent order of detention.

I just note this is a presumption case.

THE COURT: That was my next question, Ms. Gatz. You predicted that very well.

Mr. Obedin, what do you have to say?

MR. OBEDIN: Yes. Thank you, Your Honor. I had an opportunity to speak to Mr. Villafane. We do not have any type of bail package to present at this time. So I will just ask that we retain our right to present a package if one becomes available.

THE COURT: All right. Very good. I find that the defendant has not rebutted the presumption in this case. I also find that I agree with Pretrial Services that no condition or combination of conditions that have been presented to the court would assure the defendant's return and the safety of the community.

However, I note that this is without prejudice to presenting a bail package should one become available.

MS. GATZ: Your Honor, I ask that you note to the jail that he continued to receive methadone as necessary or at least be screened to see if that's necessary given that he's regularly taking methadone.

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)
2017 WL 4179855

THE COURT: That's an excellent idea and while we're on that subject and I'm doing a medical order anyway, Mr. Obedin, is there any other medical conditions that I should alert the jail to?

MR. OBEDIN: Yes. Thank you, Judge. Ms. Gatz jumped in before I had an opportunity and I thank her. Mr. Villafane also has a series of medical issues. He has various metal plates and screws within his body that still give him trouble. He indicates that his left wrist is broken.

THE COURT: Currently broken?

MR. OBEDIN: Currently broken he indicates. I'd certainly like that checked when he gets to the facility.

THE COURT: I'm going to note there's a wrist injury because I—

MR. OBEDIN: Yes, thank you. And whatever medication along with the methadone would be appropriate for Mr. Villafane given his various physical conditions.

THE COURT: Any other medications?

MS. GATZ: It appears he's still taking oxycodone.

MR. OBEDIN: Well, Mr. Villafane does have diabetes. He does take medicine for that.

THE COURT: All right. So I'll note diabetes. I'm not going to suggest that they give him oxycodone. I don't think that may be the recommended course but that's just my guess.

So I'll send over a medical evaluation order which will alert the jail authorities to those various issues.

What is your preference concerning a preliminary hearing?

MR. OBEDIN: We will waive that, Your Honor.

THE COURT: All right. Mr. Villafane, just to make sure you understand. The Government is required to go to what's called a preliminary hearing to present certain evidence. Your attorney is suggesting that you're willing to waive that. Is that right, sir?

THE DEFENDANT: Yes, sir.

THE COURT: Very good. So that will be waived.

Was there any property seized at the time of arrest?

MS. GATZ: My understanding, Your Honor, is that the officers arrested him in his apartment. So I don't believe there was any property on his person and I'll confirm that.

Just his belt, Your Honor.

THE COURT: Okay. Mr. Villafane, did they take anything from you when they arrested you?

**\*27**  THE DEFENDANT: No, sir.

THE COURT: Very good. Anything else we need to do today, Ms. Gatz?

MS. GATZ: Nothing from the Government, Your Honor. Thank you.

MR. OBEDIN: Nothing further, Your Honor. Thank you.

THE COURT: Good luck to you, sir. We're adjourned. (Proceedings concluded at 4:02 p.m.)

* * * * *

I certify that the foregoing is a court transcript from an electronic sound recording of the proceedings in the above-entitled matter.

_____

Shari Riemer, CET-805

Dated: August 1, 2017

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4179855

---

End of Document                © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.** **Docket 2:16-CV-03674**<br>Villafane v. Sposato et al | — | E.D.N.Y. | June 24, 2016 | Docket |

**History (2)**

**Direct History (2)**

⚑  1.  Villafane v. Sposato
2017 WL 4179855 , E.D.N.Y. , Aug. 22, 2017

*Report and Recommendation Adopted by*

2.  Villafane v. Sposato
2017 WL 4157220 , E.D.N.Y. , Sep. 15, 2017

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 249 of 529

McRae v. Gentile, Not Reported in Fed. Supp. (2015)

2015 WL 7292875

KeyCite Overruling Risk

Overruling Risk  Darnell v. Pineiro,  2nd Cir.,  February 21, 2017

2015 WL 7292875
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Troy MCRAE, Plaintiff,
v.
C.O. GENTILE, et al., Defendants.

9:14–CV–00783 (GLS/TWD)
|
Signed October 20, 2015

**Attorneys and Law Firms**

Troy McRae, 06–A–3212, Southport Correctional Facility, P.O. Box 2000, Pine City, NY 14871, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Cathy Y. Sheehan, Esq., of Counsel, The Capitol, Albany, NY 12224, for Defendants

*ORDER AND REPORT–RECOMMENDATION*

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**\*1** This *pro se* prisoner civil rights action, commenced by Plaintiff Troy McRae pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff claims that Defendants have violated his Eighth Amendment right to be free from cruel and unusual punishment by subjecting him to excessive force, failing to intervene in the use of excessive force, and deliberate indifference to his serious medical needs. (Dkt. No. 37.) Currently pending before the Court is a motion to dismiss Plaintiff's Amended Complaint (Dkt. No. 43) for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), as to Defendants Peters, Gifford, McConnell, and Graham.[1] Plaintiff opposes the motion. (Dkt. No. 47.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

[1] Plaintiff's Amended Complaint names eleven Defendants, including the four moving to dismiss here. Defendant Gentile has not moved to dismiss the excessive force claim that Plaintiff alleges in the Amended Complaint. The remaining six Defendants in the Amended Complaint are other Corrections Officers who have not yet been served. (Dkt. No. 37 at ¶ 1.)

**I. BACKGROUND**
The following facts are derived from the face of the Plaintiff's Amended Complaint (Dkt. No. 37) and are accepted as true for the purposes of deciding the pending motion to dismiss. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007).

Plaintiff alleges that on May 2, 2012, Defendant Corrections Officer Gentile ("CO Gentile") pinned his hands against the iron bars of a cell and repeatedly punched him. (Dkt. No. 37 at ¶ 13.) CO Gentile, along with Corrections Officers Peters ("CO Peters") and Gifford ("CO Gifford") and other unidentified Corrections Officers, then brought Plaintiff to a single room. *Id.* at ¶ 14. There, CO Gentile battered Plaintiff for fifteen minutes while CO Peters and CO Gifford "looked on ... with delight." *Id.* at ¶ 15–16. Plaintiff immediately made Defendant Corrections Officer McConnell ("CO McConnell") aware of the injuries he sustained as a result of the incident while CO McConnell was on duty near Plaintiff's cell. *Id.* at ¶ 20. However, CO McConnell ignored Plaintiff's request for medical attention. *Id.* Plaintiff made Defendant Superintendent Graham ("Graham") aware of the incident through the prison's administrative grievance procedure, but to no avail. *Id.* at ¶ 18.

In Plaintiff's memorandum in opposition to the present motion, Plaintiff adds the allegation that Defendant Graham failed to "properly train and supervise his subordinate officers," and that if the Corrections Officers who committed the constitutional violations had been properly trained to handle prisoners, then the alleged assault would not have happened. (Dkt. No. 47–1 at 9.)

**II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM**
A defendant may move to dismiss a complaint on the ground that the complaint fails to state a claim on which relief can be granted. Fed.R.Civ.P. 12(b)(6). In order to state a claim on which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing

2015 WL 7292875

that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

**\*2** "In reviewing a complaint for dismissal under Rule 12(b) (6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir.2009) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994); *see also Harris*, 572 F.3d at 72 (courts remain obligated to construe *pro se* complaints liberally even after *Twombly* ). Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir.2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Id.* (citation omitted).

## III. ANALYSIS

### A. CO Peters and CO Gifford

Plaintiff claims that CO Peters and CO Gifford violated his Eighth Amendment right to be free from excessive force by their failure to intervene while he was being beaten by CO

Gentile and an unnamed Corrections Officer. (Dkt. No. 37 at ¶ 28.)

"The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dept. of Corrs.*, 84 F.3d 614, 620 (2d Cir.1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Law enforcement officials, including prison officials, can be held liable under § 1983 for failing to intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in their presence. *Curley v. Vill.of Suffern*, 268 F.3d 65, 72 (2d Cir.2001); *see also Anderson v. Branen* 17 F.3d 552, 557 (2d Cir.1994) (prison officials' Eighth Amendment duty to take reasonable measures to guarantee the safety of inmates in their custody includes a duty to protect inmates from harm threatened by other officers). A state actor can be held liable for failure to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean Laurent v. Wilkinson*, 540 F.Supp.2d 501, 512 (S.D.N.Y.2008), *aff'd*, 461 Fed.Appx. 18 (2012).

The reasonable opportunity element is an issue of fact to be decided by the jury, unless there is only one possible reasonable conclusion from the evidence. *Anderson*, 17 F.3d at 557. Generally, a reasonable opportunity on the part of the corrections officer will not be found if the alleged constitutional violation was sudden or brief. *Tafari v. McCarthy*, 714 F.Supp.2d 317, 342 (N.D.N.Y.2010). Courts in this District have found the reasonable knowledge element present in cases involving beatings by other corrections officers. *Cusamano v. Sobek*, 604 F.Supp.2d 416, 428 (N.D.N.Y.2009).

**\*3** Defendant contends that Plaintiff has only alleged "conclusory facts as to CO Peters and CO Gifford" (Dkt. No. 43–1 at 3), referring to the allegation in the Amended Complaint that the two "looked on ... with delight" (Dkt. No. 37 at ¶ 16), while CO Gentile and another Corrections Officer beat him. *Id.* at ¶ 15. The Court disagrees. If all facts that Plaintiff has alleged in the Amended Complaint are assumed true for the purposes of the present motion, then CO Peters and CO Gifford stood by for fifteen minutes and chose to do nothing while Plaintiff was dragged to a room. *Id.* at ¶ 15– 16 There, Plaintiff was continuously punched, kicked, and

2015 WL 7292875

choked by two other corrections officers, in violation of his Eighth Amendment right to be free from excessive force. *Id.* at ¶ 15. Therefore, the Amended Complaint alleges sufficient facts that, taken as true, give rise to the reasonable inference that Defendants CO Peters and CO Gifford failed to intervene under § 1983. Accordingly, I recommend that Defendants' Rule 12(b)(6) motion to dismiss be denied as to Defendants CO Peters and CO Gifford.

**B. CO McConnell**

Plaintiff alleges that Defendant CO McConnell, by denying him medical care, showed deliberate indifference to his serious medical needs in violation of his Eighth Amendment right to be free from cruel and unusual punishment. (Dkt. No. 37 at ¶ 29.) *See Farmer,* 511 U.S. at 832 (1994).

A claim that prison officials have intentionally disregarded an inmate's serious medical needs has both objective and subjective elements. *See Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009). "The plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Id.* at 72 (citation and internal quotation marks omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003) (citations omitted).

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt J. dissenting) (citations omitted), *accord Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03.

Under the subjective element, medical mistreatment rises to the level of deliberate indifference only when it 'involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' '" *Id.* at 703 (quoting *Hathaway,* 99 F.3d at 553). "Non-medical personnel engage in deliberate indifference where they intentionally delay access to medical care when the inmate was in extreme pain and had made his personal problem known to the attendant prison personnel." *Bauman v. Walsh,* 36 F.Supp.2d 508, 512 (N.D.N.Y.1999) (citation and internal quotation marks omitted).

Defendant contends that Plaintiff's claim should be dismissed as to CO McConnell. (Dkt. No. 43–1 at 3.) In support of this argument, Defendant points out that the Amended Complaint merely recites the elements of a § 1983 claim of this category, and does not "describe the events with nearly enough specificity" to support the claim. *Id.* at 4. The Court agrees. The Amended Complaint is devoid of facts plausibly showing that Plaintiff had an objectively serious medical condition as required to satisfy the objective prong of the Eighth Amendment inquiry. (Dkt. No. 37 at ¶ 4.) In fact, the Amended Complaint includes no factual allegations describing injuries allegedly sustained as a result of the beating. (*See* Dkt. No. 37.) As for the subjective element, Plaintiff's Amended Complaint alleges only that CO McConnell was "made aware of plaintiff's situation, but refused to assist plaintiff, in receiving emergency medical help," and that CO McConnell "ignored [Plaintiff's] request for [emergency medical help.]" *Id.* at ¶ 20. Plaintiff has not set forth facts plausibly showing that CO McConnell acted with a "conscious disregard of a substantial risk of serious harm." *Chance,* 143 F.3d at 702–03. Plaintiff has failed to assert factual allegations plausibly showing serious injury and CO McConnell's awareness of the serious injury. *Id.* Accordingly, I recommend that Defendant's Rule 12(b)(6) motion to dismiss be granted with leave to amend as to Defendant CO McConnell.

**C. Superintendent Graham**

*1. Personal Capacity*

**\*4** Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some "tangible connection" between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere linkage to the unlawful conduct through the prison chain of command (i.e., under the doctrine

McRae v. Gentile, Not Reported in Fed. Supp. (2015)

2015 WL 7292875

of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk Cnty. v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (per curiam); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (per curiam). In other words, supervisory officials may not be held liable merely because they held positions of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996) (citations omitted). Rather, supervisory personnel may be considered personally involved if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted). Here, Plaintiff alleges the second and fifth *Colon* categories, both of which turn on Defendant Graham's denial of Plaintiff's grievance.

District courts in the Second Circuit are split on whether a prison superintendent's review and denial of a prisoner's grievance supports a finding of personal involvement. *See Burton v. Lynch,* 664 F.Supp.2d 349, 360 (S.D.N.Y.2009). Some courts have held that merely affirming the denial of a grievance does not constitute personal involvement. *Id.* (citing *Warren v. Goord,* 476 F.Supp.2d 407, 413 (S.D.N.Y.2007)). Those courts require that the supervisor undertake an investigation into the alleged constitutional violation in order for a finding of personal involvement to be proper. *Burton,* 664 F.Supp.2d at 360 (citing *Warren,* 476 F.Supp.2d at 413). Other courts have found that a "detailed and specific" response to the allegations in a grievance is necessary to warrant a finding of personal involvement. *Burton,* 664 F.Supp.2d at 360 (quoting *Brooks v. Chappius,* 450 F.Supp.2d 220, 226 (W.D.N.Y.2006)). Finally, some courts have held that the constitutional violation that is the subject of the grievance must be ongoing, rather than a single isolated incident, such that the supervisor is capable of directly remedying the violation. *Burton,* 664 F.Supp.2d at 360 (citing *Vega v. Artus,* 610 F.Supp.2d 185, 198 (N.D.N.Y.2009)).

In this case, the Court does not need to adopt a particular position, because the Amended Complaint does not sufficiently allege any of the above requirements for a finding of personal involvement. The Amended Complaint alleges that Defendant Graham is the warden of Auburn Correctional Facility, that he "is responsible for receiving all grievances" filed at Auburn (Dkt. No. 37 at ¶ 8), and that he failed to discipline the individuals who allegedly participated in the constitutional violations of which Plaintiff complained through the grievance process. *Id.* at ¶¶ 18, 30. There is no allegation in the Amended Complaint that Defendant Graham undertook an investigation into the alleged violations of Plaintiff's constitutional rights or that Defendant Graham provided a detailed response to any grievance Plaintiff filed.

Plaintiff has similarly failed to allege an ongoing violation of his constitutional rights by prison employees. Plaintiff only refers to one isolated incident as the basis for Defendant Graham's personal involvement in the alleged violation of his constitutional rights. (Dkt. No. 37 at ¶ 30.) Defendant Graham had no ability to directly remedy the alleged violation at the time Plaintiff submitted his grievance. *See Burton,* 664 F.Supp.2d at 362 (holding that a grievance alleging one beating with no reference to a continued threat of injury failed to allege an ongoing constitutional violation); *Young,* 15 F.Supp.3d at 193 (holding that a grievance alleging one incident of deliberate indifference to serious medical needs failed to allege an ongoing constitutional violation). Accordingly, I recommend that Defendant's motion to dismiss the complaint pursuant to Rule 12(b)(6) should be granted with leave to amend as to Defendant Graham in his personal capacity.

**\*5** In his memorandum in opposition to the present motion to dismiss, Plaintiff adds the allegation that Defendant Graham's negligent training and supervision of the Defendant Corrections Officers caused the Plaintiff's injuries. (Dkt. No. 47–1 at 9.) Aside from this conclusory allegation about the training and supervision of the Corrections Officer Defendants, Plaintiff provides no facts to support Defendant Graham's personal involvement in the alleged assault. "Vague and conclusory allegations that a supervisor" negligently failed to train or supervise "subordinate employees" are not sufficient to establish personal involvement so as to give rise to personal liability. *White v. Fischer,* No. 9:09–CV–240 (DNH/DEP), 2010 WL 624081, at \*6, 2010 U.S. Dist. LEXIS 15492, at \*19 (N.D.N.Y. Feb. 18, 2010)[2]; *see also Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) (vague and conclusory allegations that a supervisor failed to properly monitor the actions of subordinate employees do not suffice to establish the requisite personal involvement and support a finding of liability).

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 253 of 529
McRae v. Gentile, Not Reported in Fed. Supp. (2015)
2015 WL 7292875

2

The Court will provide a copy of the unpublished decision to Plaintiff pursuant to *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

Due to the absence of factual allegations by Plaintiff to make a facially plausible showing of personal involvement by Defendant Graham related to the alleged assault, I recommend that the motion to dismiss the Amended Complaint be granted as to this claim as well. However, in deference to Plaintiff's *pro se* status and to the fact that he has not had the opportunity to make this allegation in a formal complaint, I also recommend that the dismissal be without prejudice, and that Plaintiff be granted leave to amend.

### 2. *Official Capacity*

The Eleventh Amendment bars suits for damages against state officials acting in their official capacities. *See Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ("[I]t is clear that the Eleventh Amendment does not permit suit ... for money damages against state officials in their official capacities."). Moreover, the Eleventh Amendment bars official capacity suits for declaratory relief where the declaratory relief requested would serve only to declare a past action a violation of the law. *Green v. Mansour,* 474 U.S. 64, 74, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985). All DOCCS employees are state officials for the purposes of the Eleventh Amendment. *See, e.g., Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002).

Graham is a DOCCS employee, and Plaintiff has requested both declaratory judgment and monetary damages against him. (Dkt. No. 37 at pp. 7–8.) Specifically, Plaintiff asks the Court to issue a declaratory judgment stating that Graham violated Plaintiff's constitutional rights through his failure to prevent prison employees from physically abusing the prisoners. *Id.* at p. 7. Because Graham is a DOCCS employee, and because of the retroactive nature of the relief Plaintiff requests, I recommend Defendants' motion to dismiss under Rule 12(b)(6) for failure to state a claim be granted with prejudice as to Plaintiff's claim for money damages and declaratory relief under § 1983 against Graham in his official capacity. While leave to amend should ordinarily be freely given, in these circumstances "better pleading will not cure" Plaintiff's substantive problem with the cause of action against Graham in his official capacity. *Cuoco,* 222 F.3d at 112 (citation omitted).

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion to dismiss (Dkt. No. 43) for failure to state a claim be **GRANTED** with leave to amend as to Defendant CO McConnell and Defendant Superintendent Graham in his personal capacity; and it is further

**RECOMMENDED** that Defendants' motion to dismiss (Dkt. No. 43) for failure to state a claim be **GRANTED** without leave to amend as to Defendant Superintendent Graham in his official capacity; and it is further

**\*6 RECOMMENDED** that Defendants' motion to dismiss (Dkt. No. 43) for failure to state a claim be **DENIED** as to Defendant CO Peters and Defendant CO Gifford; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of the unpublished decision in *White v. Fischer,* No. 9:09–CV–240 (DNH/DEP), 2010 WL 624081 (N.D.N.Y. Feb. 18, 2010).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW****. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp.2013); Fed.R.Civ.P. 72, 6(a).

White v. Fischer, Not Reported in F.Supp.2d (2010)
2010 WL 824081

2010 WL 824081
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jason R. WHITE, Plaintiff,
v.
Brian FISCHER, Commissioner, Dept.
of Correctional Services; Theresa A.
Knapp–David, Director, Classification and
Movement; and R. Woods, Superintendent,
Upstate Correctional Facility, Defendants.

No. 9:09–CV–240. | Feb. 18, 2010.

**Attorneys and Law Firms**

Jason R. White, Elmira, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Brian I. O'Donnell, Esq., Asst. Attorney General, of Counsel, Albany, NY, for Defendants.

*DECISION and ORDER*

DAVID N. HURD, District Judge.

*1 Plaintiff, Jason R. White, commenced this civil rights action in February 2009, pursuant to 42 U.S.C. § 1983. By Report–Recommendation dated January 25, 2009, the Honorable David E. Peebles, United States Magistrate Judge, recommended that defendant's motion to dismiss (Dkt. No. 10) be granted, and that plaintiff's complaint in this action be dismissed without leave to replead. No objections to the Report–Recommendation have been filed.

Based upon a careful review of the entire file and the recommendations of Magistrate Judge Peebles, the Report–Recommendation is accepted and adopted in all respects. See 28 U.S.C. § 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendant's motion to dismiss (Dkt. No. 10) is GRANTED;

2. Plaintiff's complaint in this action is DISMISSED without leave to replead; and

3. The Clerk is directed to file judgment accordingly and close the file.

IT IS SO ORDERED

JASON R. WHITE,

Plaintiff,

—v—

BRIAN FISCHER, THERESA A. KNAPP–DAVID, and R. WOODS,

Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Jason R. White, a New York State prison inmate who is proceeding pro se and in forma pauperis, has commenced this action pursuant to 42 U.S.C. § 1983, alleging deprivation of his civil rights. In his complaint, plaintiff asserts that his transfer into special housing unit ("SHU") disciplinary confinement at the Upstate Correctional Facility, to serve what was originally intended to be a three-month disciplinary sentence of less restrictive keeplock confinement imposed while at another facility, represented a deprivation of a liberty interest without the requisite procedural due process. As relief for the violation, plaintiff's complaint seeks an award of compensatory damages in the amount of $25,000.

In response to plaintiff's complaint, defendants have moved seeking its dismissal for failure to state a cause of action upon which relief may be granted. In their motion, defendants argue that plaintiff's allegations do not demonstrate the existence of a meritorious due process claim since, at best, it implicates a failure of prison officials to comply with governing regulations regarding transfers into an SHU unit, a matter not of constitutional concern, noting further that plaintiff has no constitutional right to be designated to a particular correctional facility or to a desired security classification. Defendants also seek dismissal of plaintiff's claims against them based upon lack of personal involvement, and additionally assert their entitlement to qualified immunity from suit as a basis for their dismissal motion.

**I. BACKGROUND[1]**

*2 Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"). See generally Complaint (Dkt. No. 1). At the times relevant to his claims plaintiff was designated first to the Auburn Correctional Facility ("Auburn"), located in Auburn, New York, and later to the Upstate Correctional Facility ("Upstate"), located in Malone, New York. Id. § 6.

On March 28, 2007, while confined at Auburn, plaintiff was found guilty following a Tier I II disciplinary hearing of engaging in violent conduct and refusing a direct order, in violation of disciplinary rules 104.11 and 106.10, respectively. [2] See Plaintiff's Memorandum (Dkt. No. 1-1) Exh. A.[3] As a result of that determination plaintiff was sentenced to serve three months of keeplock confinement, with a corresponding loss of package, commissary, and telephone privileges. See id.

On April 11, 2007, while serving his keeplock sentence at Auburn, White was processed out of that facility and, following completion of an inter-prison transfer process which included a stop at another facility, was transferred into Upstate on or about April 11, 2007. Complaint (Dkt. No. 1) § 6. At Upstate, plaintiff was assigned to a two-person cell in the facility's SHU to serve the balance of his disciplinary confinement sentence.[4] Id.

On April 23, 2007 plaintiff filed a grievance with prison authorities, arguing that his transfer into the SHU at Upstate was not authorized by DOCS directives. Complaint (Dkt. No. 1) § 6 at p. 4B; Plaintiff's Memorandum (Dkt. No. 1-1) Exh. C. The grievance was denied by the facility's Inmate Grievance Review Committee ("IGRC"). Complaint (Dkt. No. 1) § 6 at p. 4B; Plaintiff's Memorandum (Dkt. No. 1-1) Exh. D. Plaintiff appealed the denial to defendant Woods,

the Superintendent at Upstate, who upheld the IGRC's unfavorable determination by decision dated May 15, 2007. Complaint (Dkt. No. 1) § 6 at p. 4B; Plaintiff's Memorandum (Dkt. No. 1-1) Exh. D. Plaintiff's further appeal of the matter to the DOCS Central Office Review Committee ("CORC") was likewise unsuccessful. Id. Exh. E.

Also on April 23, 2007, plaintiff sent a letter to the DOCS Commissioner Brian Fischer, complaining of the SHU designation. Plaintiff's Memorandum (Dkt. No. 1-1) Exh. F. That letter was referred by Commissioner Fischer to defendant Theresa A. Knapp–David, the DOCS Director of Classification and Movement. Complaint (Dkt. No. 1) § 6 at pp. 4B-4C. In response, defendant Knapp–David wrote to the plaintiff on May 7, 2007, advising that his SHU assignment was in accordance with established DOCS procedures. Plaintiff's Memorandum at (Dkt. No. 1-1) Exh. G.

**II. PROCEDURAL HISTORY**

Plaintiff commenced this action on February 27, 2009, and was thereafter granted leave to proceed in forma pauperis. Dkt. Nos. 1, 4. Named as defendants in plaintiff's complaint are Commissioner Fischer, Director Knapp–David, and Upstate Superintendent R. Woods. Complaint (Dkt. No. 1) § 3. Plaintiff's complaint asserts a single cause of action for deprivation of procedural due process. Id. § 7.

*3 Following service, in lieu of answering plaintiff's complaint, defendants filed a motion to dismiss asserting a variety of grounds for the relief sought. Dkt No. 10. In their motion defendants argue, inter alia, that plaintiff's complaint 1) does not implicate a cognizable due process violation; 2) plaintiff fails to establish their personal involvement in the deprivation alleged; and 3) in any event they are entitled to qualified immunity.[5] Plaintiff has since responded in opposition to defendants' motion, Dkt. No. 13, which is now fully briefed and ripe for determination, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). See also Fed.R.Civ.P. 72(b).

**III. DISCUSSION**

**A. Dismissal Motion Standard**

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that

McRae v. Gentile, Not Reported in Fed. Supp. (2015)

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 255 of 529

2015 WL 7292875

White v. Fischer, Not Reported in F.Supp.2d (2010)
2010 WL 624081

pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an understood: the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal, —— U.S. ——, ——, 129 S.Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 555, 127 S.Ct. 1955, (2007)); Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2).* Id While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft, —— U.S. ——, 129 S.Ct. at 1950.*

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face, *Bonilla v. City of New York, 514 F.3d 184, 188 (2d Cir.2008) (citing Twombly, 550 U.S. at 570, 127 S.Ct. at 1974).* As the Second Circuit has observed, "[w]hile Twombly does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir.2007) (quoting Twombly, 550 U.S. at 570 127 S.Ct. at 1974).* When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a pro se litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson v. Pardus, 551 U.S. 89, 94, 127 S.Ct. 2197, 2200 (2007)* (" '[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers' ") (quoting Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292 (1976)) (internal quotations omitted)).

**B. Procedural Due Process**

*4 In their motion, defendants assert that because plaintiff's due process claim rests on alleged violations of DOCS regulations, his complaint in fact fails to assert a cognizable due process claim.

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields, 260 F.3d 69, 79–80 (2d Cir.2000) (citations

omitted; *Hynes, 143 F.3d at 658; Bedoya v. Coughlin, 91 F.3d 349, 351–52 (2d Cir.1996).* Inmates' liberty interests may arise out of the Due Process Clause of the Fourteenth Amendment, or state statute or regulation. *Arce v. Walker, 139 F.3d 329, 333 (2d Cir.1998) (citing Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460, 109 S.Ct. 1904, 1908 (1989)).*

Recognizing that lawful imprisonment necessarily restricts the rights and privileges of inmates, the Supreme Court has narrowly circumscribed the scope of liberty interests arising out of the Due Process Clause to protect only the most basic liberty interests of prisoners. *Hewitt v. Helms, 459 U.S. 460, 467, 103 S.Ct. 864, 869 (1983).* Accordingly, the Due Process Clause does not guard against every change in the conditions of confinement having a substantial adverse impact on inmates, but only those conditions or restraints that "exceed[ ] the sentence in ... an unexpected manner." *Arce, 139 F.3d at 333 (quoting Sandin v. Conner, 515 U.S. 472, 484, 115 S.Ct. 2293, 2300 (1995)).*

In this instance plaintiff does not claim that he was denied procedural due process in connection with the disciplinary hearing that led to the imposition of a three-month period of keeplock confinement as a sanction. Instead, he argues that his due process rights were abridged after the sanction was imposed when, in violation of DOCS Directive No. 4933,[5] he was transferred from keeplock confinement at Auburn to an SHU cell at Upstate, and as a result required to endure a more restrictive confinement. Unfortunately for plaintiff, neither the Due Process Clause nor state statute or regulation give rise to a liberty interest in these circumstances.

Preliminarily, it is well recognized that an inmate has no constitutional right to be incarcerated in a particular correctional facility, "and transfers among facilities do not need to be preceded by any particular due process procedure." *Holloway v. Goord, No. 9:03–CV01524, 2007 WL 2789499, at * 5 (N.D.N.Y. Sept. 24, 2007) (Kahn, J. and Treece, J.)* (citing *Wilkinson v. Austin, 545 U.S. 209, 221–22 (2005)) (other citation omitted); see also, Johnson v. Rowley, 569 F.3d 40, 43 (2d Cir.2009) (per curiam); Davis v. Kelly, 160 F.3d 917, 920 (2d Cir.1998).* As a result, the constitution did not present any impediment to plaintiff's transfer to Upstate.

*8 Additionally, it is equally well established, as defendants now argue, that state regulations, including DOCS Directives, do not ordinarily confer constitutional rights sufficient to

give rise to a due process claim. *Soto v. Dylag, 188 F.3d 51, 53 (2d Cir.1999) (citing Doscon v. City of New York, 985 F.2d 94, 98 (2d Cir.1993)); Cusamano v. Sobek, 604 F.Supp.2d 416, 482 (N.D.N.Y.2009).* A state can, however, by statute or regulation confer a liberty interest which cannot be abridged without due process. *Black v. Lunsberg, No. 9:06–CV–1243, 2009 WL 3181111, at *3 (Sept. 29, 2009) (Suddaby, J., adopting Report and Recommendation of Lowe M.J.).* Nonetheless, contrary to plaintiff's contention, DOCS Directive No. 4933 does not give rise to a cognizable liberty interest.

It should be noted that on at least four separate occasions addressing the same issues raised by the plaintiff in this case this court has held that an inmate's transfer from keeplock to SHU after being sentenced to serve time in keeplock does not implicate a cognizable liberty interest. *McFaerhin v. Goord, No. 9:06–CV–1192, 2009 WL 1788440 (N.D.N.Y. Apr. 17, 2009) (Hurd, J. and Treece, M.J.) (dismissing complaint alleging that plaintiff was unlawfully transferred from keeplock to SHU while serving disciplinary sentence), Holloway, 2007 WL 2789499* (granting summary judgment dismissing claim that plaintiff should have received hearing before transfer to Upstate after sentenced to keeplock at Elmira Correctional Facility), *Cordele v. Goord, No. 9:03–CV–296, 2007 WL 2769366, at *2 n. 1 (N.D.N.Y. Sept. 21, 2007) (Scullin, S.J., adopting Report and Recommendation of Lowe, M.J.) (granting summary judgment finding that "an inmate has no liberty interest in not having his sentence of keeplock confinement at one prison converted to a sentence of SHU confinement at another facility without receiving a hearing regarding the conversion."); and, Chavis v. Kienert, 9:03–CV–0039, 2005 WL 2452350, at *9–10 (N.D.N.Y Sept. 30, 2005) (Scullin, C.J.) (finding that transfer from keeplock at Coxsackie Correctional Facility to SHU at Upstate did not implicate a liberty interest); See also, Holmes v. Grant, No. 03–Civ. 3426, 2006 WL 851753, at *18–19 (S.D.N.Y. mar. 31, 2006 (dismissing claim plaintiff's claim that disciplinary sentence was improperly converted from keeplock sentence to SHU).* These decisions are premised upon the court's conclusion that a transfer from keeplock in one facility to SHU in another does not implicate a constitutionally protected liberty interest and that "New York has not created, by regulation or statute, any liberty interest in remaining in one particular prison[,]" noting that "the DOCS ... possesses wide discretion to determine 'where a [state] inmate will be housed.' " *Holloway, 2007 WL 2789499, at *5 (quoting Giblias v. Reid, No. 97 CIV. 7616 1999 WL 436457, at *10 (S.D.N.Y. Jan. 24, 1999)) (other

citations omitted). These cases are indistinguishable from the case presently before the court.

*6 Moreover, contrary to the interpretation offered by the plaintiff, the court has read section 301.6 of DOCS Directive No. 4933 as "explicitly permit[ing] keeplock sentences to be served in SHU and subject to the same restrictions and amenities ..." *McFeehin, 2009 WL 1788440, at *4; see also, Holloway, 2007 WL 278499, at * 5* ("[N]ot only do New York State Regulations permit keeplock sentences to be served in SHU, but further contemplate that assignments to SHU will be subject to the same ... limitations.") and *Holmes, 2006 WL 851753, at * 19* ("Section 301.6... relat[es] to keeplock admissions and authorizes placement of inmates in SHU "at a medium or minimum security correctional facility or Upstate Correctional Facility... for confinement pursuant to disposition of a disciplinary (Tier II) or superintendent's (Tier II) hearing.' ") (emphasis in original).

In view of the foregoing, it is clear that plaintiff's transfer from Auburn, where he was keeplocked, to SHU confinement at Upstate does not implicate a liberty interest arising out of either Due Process Clause, or state statute or regulation. According to plaintiff's complaint, he was sentenced to keeplock after a Tier III disciplinary hearing; he does not allege that he was denied due process in connection with that hearing. The Tier II hearing that he was provided was all that was required by the constitution before he was sentenced to disciplinary confinement. *Holmes 2006 WL 851753, at *19.* Plaintiff was entitled to no further procedure at the time of transfer to Upstate, and therefore cannot show that he was deprived of a protected liberty interest without due process of law.[8] Id Accordingly, I recommend that plaintiff's complaint be dismissed for failure to state a cause of action.

**C. Personal Involvement**

In their motion, defendants also challenge the sufficiency of plaintiff's allegations regarding their personal involvement in the constitutional deprivations alleged. Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994) (citing Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir.1991) and McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977), cert. denied 434 U.S. 1087, 98 S.Ct. 1282 (1978)).* In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and

McRae v. Gentile, Not Reported in Fed. Supp. (2015)

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 256 of 529

2015 WL 7292875

White v. Fischer, Not Reported in F.Supp.2d (2010)
2010 WL 624081

that particular defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir.1986).

Two of the three defendants, Brian Fischer and Robert Woods, appear to be named as defendants in their supervisory capacities, based solely upon their positions in the DOCS Commissioner and the Superintendent at Upstate, respectively. As supervisors, neither of those individuals can be liable for damages under section 1983 solely by virtue of their respective positions as supervisor; there is no *respondeat superior* liability under section 1983 *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir.2001); *Wright*, 21 F.3d at 501. Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability. *Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights."). Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were recurring. *Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir.2007), *rev'd on other grounds, sub nom.*, *Ashcroft v. Iqbal*, — U.S. —, 129 S.Ct. 1937 ; *see also Richardson*, 347 F.3d at 435; *Wright*, 21 F.3d at 501; *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir.1986).

**1. Commissioner Fischer**

*7 Aside from allegations centering upon his role as the DOCS Commissioner, which are clearly insufficient in and of themselves to establish his liability, plaintiff's claims against defendant Fischer appear to revolve around the letter written by him to the Commissioner on or about April 23, 2007, complaining of his SHU confinement at Upstate. That letter, it appears from the limited materials now before the court, was referred to defendant Knapp–David for response. It is well established that when the Commissioner receives a letter and forwards it on to another individual for investigation and a response, his or her involvement

in the constitutional violation cannot be predicated solely upon those circumstances. *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir.1997); *Rivera v. Fischer*, No. 08–CV–6301L, 2009 WL 2981876, at *2 (W.D.N.Y. Sept. 18, 2009). I therefore recommend dismissal of plaintiff's claims against Commissioner Fischer on the basis of lack of his personal involvement.

**2. Superintendent Woods**

Plaintiff's claims against Superintendent Woods stand on slightly different footing. It is alleged that Superintendent Woods processed and affirmed the determination of the Upstate IGRC denying plaintiff's grievance regarding the relevant occurrences. His review of plaintiff's grievance arguably placed Superintendent Woods on notice of a constitutional violation, which was ongoing, at a time when he was potentially positioned to end the violation. On that basis I conclude that plaintiff has sufficiently alleged Superintendent Woods' personal involvement in the violation alleged to withstand defendants' dismissal motion. *See Charles v. New York State Dept. of Corr. Services No. 9:07–CV–1274, 2009 WL 890548, at *5–9 (N.D.N.Y. Mar. 21, 2009) (Hurd, J. and DiBianco, M.J.).

**3. Director Knapp–David**

Plaintiff's complaint alleges that in her position as the DOCS Director of Classification and Movement, defendant Knapp–David would have reviewed and approved his transfer from Auburn into Upstate. That allegation is buttressed by both her position with the DOCS and the fact that plaintiff's letter regarding the matter was referred to defendant Knapp–David for response explaining why the transfer was proper under DOCS regulations. On this basis, I conclude that plaintiff has stated a plausible claim against defendant Knapp–David and her personal involvement in the constitutional deprivations alleged.

**D. Qualified Immunity**

In their motion, defendants also assert entitlement to qualified immunity from suit. Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982) (citations omitted)." In assessing an officer's eligibility for the shield, "the appropriate question is the objective inquiry whether

a reasonable officer could have believed that [his actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie*, 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. ——, 129 S.Ct. 808, 815 (2009).

*8 In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson*, 555 U.S. ——, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right.[9] *Kelsey*, 567 F.3d at 61. The second step being whether the right is clearly established." *Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577 F.3d 415, 430 n. 9 (citing *Saucier*).[10] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently concluded in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand".[11] *Pearson*, 555 U.S. ——, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so as." *Kelsey*, 567 F.3d at 61 (citing *Pearson*, 129 S.Ct. at 821) (emphasis in original).

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin*, 577 F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be 'appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional

violation at all ...' " *Kelsey*, 567 F.3d at 61 (quoting *Pearson*, 129 S.Ct. at 818).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted). When deciding whether a right was clearly established at the relevant time, a court should consider

(i) whether the right in question was defined with "reasonable specificity", (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question, and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*9 *Wright v. Smith*, 21 F.3d 496, 500 (2d Cir.1994) (quoting *Benitez v. Wolff*, 985 F.2d 662, 666 (2d Cir.1993)). The objective reasonableness test will be met, and qualified immunity enjoyed, where government officers of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin*, 577 F.3d at 433 (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092 (1986)) "If, on the other hand, no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." *Okin*, 577 F.3d at 433 (citing *Lennon v. Miller*, 66 F.3d 416, 420–21 (2d Cir.1995)).

Applying the *Saucier* two-step inquiry here, I have already determined that plaintiff has failed to state a plausible constitutional violation. Moreover, even if plaintiff were able to distinguish the existing precedent in this district and allege a protected liberty interest that required that plaintiff be provided with additional due process before his transfer to Upstate, I conclude that any such right was far from a clearly established and that a reasonable person in the circumstances of defendant Woods and defendant Knapp–David would not have appreciated that the transfer of plaintiff into SHU confinement at Upstate represented a potential deprivation of plaintiff's procedural due process rights beyond those addressed by the hearing officer. Accordingly, as an additional basis for dismissal, I recommend that both

McRae v. Gentile, Not Reported in Fed. Supp. (2015)
2015 WL 7292875

White v. Fischer, Not Reported in F.Supp.2d (2010)
2010 WL 624081

defendants Woods and Knapp-David be granted qualified immunity from suit

IV. *SUMMARY AND RECOMMENDATION*

At the heart of plaintiff's complaint in this action is his contention that his due process rights and DOCS regulations were violated when he was transferred from keeplock confinement at Auburn into an SHU cell at Upstate. Since such a claim, it is well established in this district, is not constitutionally cognizable, White has therefore failed to state a claim upon which relief may be granted. While plaintiff has failed to establish personal involvement on the part of Commissioner Fischer in an alleged deprivation and the claims against him should be dismissed on this additional basis, plaintiff has sufficiently alleged personal involvement on the part of defendant Knapp-David and it should. Nonetheless, I find that those two defendants are entitled to qualified immunity from suit, providing an additional basis for dismissal of plaintiff's claims against them. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 10) be GRANTED, and that plaintiff's complaint in this

action be DISMISSED, without leave to replead, and it is further

ORDERED that pending a final determination on defendants' dismissal motion, discovery in this action be and hereby is STAYED

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; Roldan v. Racette, 984 F.2d 85 (2d Cir.1993)

*10 It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

All Citations

Not Reported in F.Supp.2d, 2010 WL 624081

Footnotes

1   In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion. See Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007)); see also Cooper v. Pate, 378 U.S. 546, 546, 84 S.Ct. 1733, 1734 (1964). I have also considered the exhibits attached to plaintiff's memorandum, which accompanied his complaint, to the extent that they are consistent with the allegations of his complaint. See Donhauser v. Goord, 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.).

2   The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. See Hynes v. Squillace, 143 F.3d 653, 655 (2d Cir.), cert. denied, 525 U.S. 907, 119 S.Ct. 245 (1998).

3   Plaintiff filed what he labeled as a "memorandum of law", with exhibits attached, in conjunction with his complaint. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of pro se litigants generously makes it appropriate to consider plaintiff's additional materials, such as his ... memorandum." Rivera v. Selsky, No. 9:05-CV-0967, 2007 WL 956908, at *1 n. 2 (N.D.N.Y. Jan. 5, 2007) (quoting Gadson v. Goord, 96 Civ. 7544, 1997 WL 714878, at *1 n. 2 (S.D.N.Y. Nov. 17, 1997)).

4   Upstate is a maximum security prison comprised exclusively of SHU cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. See Samuels v. Selsky, No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).

5   Defendant's also seek a protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure staying discovery in this matter pending final determination of their dismissal motion. Discerning no basis to conclude that plaintiff would be unduly prejudiced by such a stay, that application will be granted.

6   Section 301.6(a) of DOCS Directive No. 4933 permits an inmate confined in a medium or minimum security facility, or at Upstate, to be admitted into an SHU for various reasons, which can include confinement pursuant to a Tier II or III hearing.

disposition. Plaintiff asserts that because he was transferred from Auburn, a maximum security facility, into an SHU unit, that section does not apply. Interestingly, a prior version of DOCS Directive No. 4933 provided, in relevant part, that

[a]n inmate who is assigned to keeplock status and who is transferred to a maximum security facility shall not be assigned to the special housing unit at the receiving facility. Such inmate shall be assigned to keeplock within general population and shall have the same rights and responsibilities as other keeplock inmate in that facility.

Lee v. Coughlin, 26 F.Supp.2d 615, 628 (S.D.N.Y.1998) (quoting prior version of 7 NYCRR § 301.6(h))

7   Copies of all unreported decisions cited in this document have been appended for the convenience of the pro se plaintiff. [Editor's Note: Appended decisions deleted for Westlaw purposes.]

8   Plaintiff alleges a litany of differences between the conditions experienced while in keeplock at Auburn and those in SHU at Upstate asserting, for example, that with regard to visits, he was required to travel to and from them in handcuffs, had to remain in handcuffs if he needed to use the restroom, and was not permitted to take photographs, and also that he did not have the same opportunities for social interaction with other prisoners and had to sleep with a light on. Plaintiff's Memorandum (Dkt.1–1) at pp. 11–12.As a matter of law, these alleged conditions can hardly be characterized as "exceed[ing] his sentence in an unexpected manner" or as imposing an "atypical and substantial hardship upon the [plaintiff] in relation to the ordinary incidents of prison life" Sandin, 515 U.S. at 484, 115 S.Ct. at 2300. "[T] fact that 'life in one prison is much more disagreeable than another does not itself signify that a Fourteenth Amendment liberty interest is implicated...' Hathway, 2007 WL 2789499, at *7 (quoting Meachum v. Fano, 427 U.S. 215, 225 (1976)) Moreover, even if a liberty interest were alleged, plaintiff was afforded all the process he was due, by way of a disciplinary proceeding, before the alleged deprivation. Carlisle, 2007 WL 2789566, at *3.

9   If no constitutional right would have been violated were the allegations established, no further inquiry regarding qualified immunity is necessary. Kansey, 667 F.3d at 61 (quoting Saucier ).

10  In Okin, the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry', also noting that 'once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred. It is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." Okin, 577 F.3d at 433 n. 11 (citation omitted).

11  Indeed, because qualified immunity is 'an immunity from suit rather than a mere defense to liability ...' Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." Pearson, ––– U.S. ––––, 129 S.Ct. at 815 (quoting Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534 (1991) (per curiam))

End of Document    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 7292875

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 9:14cv00783**<br>MCRAE v. GENTILE ET AL | — | N.D.N.Y. | June 27, 2014 | Docket |

**History (2)**

**Direct History (2)**

🔺 1. McRae v. Gentile
2015 WL 7292875 , N.D.N.Y. , Oct. 20, 2015

*Report and Recommendation Adopted by*

2. McRae v. Gentile
2015 WL 7300540 , N.D.N.Y. , Nov. 18, 2015

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 4442812

2021 WL 4442812
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Constantino KOSMIDIS, Plaintiff,
v.
PORT AUTHORITY OF NEW YORK
AND NEW JERSEY, et al., Defendants.

18-cv-8413 (AJN)
|
Signed 09/28/2021

**Attorneys and Law Firms**

Jeffrey Adam Rothman, Jeffrey A. Rothman, Attorney at
Law, New York, NY, for Plaintiff.

Cheryl Nancy Alterman, Law Office of James M. Begley,
Natalie Deneen Russell, The Port Authority of NY & NJ, New
York, NY, for Defendants The Port Authority of New York
and New Jersey, Bernard Buckner, Steven O'Shea, Alexander
Velez, Jr., Joseph Riccardi, Jr.

MEMORANDUM OPINION & ORDER

ALISON J. NATHAN, District Judge:

 **\*1**  This action arises out of an arrest that took place
on September 15, 2017. Plaintiff Constantino Kosmidis
sues Defendants the Port Authority of New York and New
Jersey, Port Authority Police Sergeant Bernard Buckner,
Port Authority Police Officer Steven O'Shea, Port Authority
Police Officer Alexander Velez, Jr., and Port Authority Police
Officer Joseph Riccardi, Jr. alleging violations of state and
federal law. Presently before the Court is Defendants' motion
for summary judgment. For the reasons that follow, the
motion is GRANTED in part and DENIED in part.

**I. Background**
The following facts are drawn from the parties' statements
made pursuant to Local Civil Rule 56.1 and are undisputed
unless otherwise noted.

On September 15, 2017, Kosmidis and his wife boarded a
flight from Athens, Greece, to the John F. Kennedy Airport
in New York City. Dkt. No. 98, Pl.'s 56.1 Resp., ¶ 7.
Konstantinos Atsalis was the captain, and Carmen Dunphy

and Sharon Dugan were flight attendants on the flight. *Id.* ¶¶
13–15.

While on that flight, Kosmidis got in a verbal altercation with
another passenger. *Id.* ¶ 11. [1] He also walked around with an
unlit cigarette in his mouth, and at various points he attempted
to enter the first-class area. *Id.* ¶¶ 19–24. Certain details of
what occurred on the flight are disputed, but as relevant here,
Captain Atsalis, having been informed of Kosmidis's behavior
on the flight, opted to request that Port Authority Police meet
the flight upon arrival. *Id.* ¶¶ 40–42; *see also id.* ¶¶ 25–39.

[1]     Kosmidis objects that whatever happened on the
flight is immaterial, but he otherwise admits that an
altercation occurred.

Defendants O'Shea and Riccardi were called to respond.
*Id.* ¶ 47. Defendant Velez also responded, having heard a
radio transmission regarding a "disorderly passenger" on the
flight. *Id.* ¶ 48. After the flight landed, Captain Atsalis, along
with Dunphy and Dugan, met with Port Authority officers
to provide more information regarding the situation. *Id.* ¶
49. According to the Defendants, after arriving at the gate,
O'Shea observed Defendant Buckner on the scene and was
told to remove Kosmidis from the flight. *Id.* ¶ 53. O'Shea and
Riccardi then boarded the plane and escorted Kosmidis from
the flight. *Id.* ¶ 54.

The parties disagree as to what happened next. According to
Kosmidis, he was "attacked" by four or five police officers
*immediately* upon exiting the "accordion-like jetbridge" that
led from the plane, and he claims that he was stepped on, hit,
and rear-handcuffed. *Id.* ¶¶ 55–57. The Defendants contend,
though, that Kosmidis was yelling, cursing, and moving
his arms around at the officers when they approached him,
that he attempted to light a cigarette as officers asked for
his information and travel documents, and that he appeared
intoxicated. *Id.* ¶¶ 55–68. Kosmidis does not deny that he
was speaking loudly, but he asserts that he was not yelling,
instead attributing his loud voice to his hearing disability, and
he denies that he attempted to light a cigarette or that he was
intoxicated. *Id.* The Defendants contend that Kosmidis was
cursing at them, and that he resisted when they instructed
him that he could not smoke; Kosmidis counters that he only
cursed at the officer after they cursed at him, and that the
arrest took place before he started cursing. The Defendants
also claim that as he was exiting the jetbridge, Kosmidis tried
to walk up the ramp past Officer O'Shea. Kosmidis denies
this, as well. *Id.* ¶ 65.

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 262 of 529

Kosmidis v. Port Authority of New York and New Jersey, Not Reported in Fed. Supp....

2021 WL 4442812

**\*2** The circumstances of the arrest are also contested. According to the Defendants, Sergeant Buckner was debriefed by the Delta crew before returning to Kosmidis, and when he returned and ordered Kosmidis not to light a cigarette, Kosmidis "lunged" at Buckner. *Id.* ¶ 69. And they claim that Officer Velez grabbed Kosmidis's arm in response after believing Kosmidis was going to attack Buckner, explaining that Velez handcuffed Kosmidis in order to avoid such an attack. *Id.* ¶¶ 69–72. Following this, the officers restrained Kosmidis as Kosmidis resisted arrest, with O'Shea and Velez falling to the ground in the process. *Id.* ¶¶ 73–77. After sitting Kosmidis upright, the Defendants claim, Velez noted that Kosmidis was bleeding and had a red bruise on his face. *Id.* ¶¶ 78–79. They then claim that Velez tended to Kosmidis's wounds and asked if Kosmidis needed medical attention. *Id.* ¶¶ 80–81. The Defendants claim that Kosmidis declined help and continued to resist and insult them. *Id.* ¶¶ 82–84.

According to Kosmidis, he never lunged toward or made any aggressive move toward any police officers. He asserts instead that he was not resisting and that the officers attacked him unprompted. *Id.* ¶¶ 69–84. While Kosmidis concedes that he cursed at the officers, he denies ever physically resisting. *Id.* Kosmidis also contends that the injuries were far more serious than Defendants' description, and he denies that any officers ever tended to him or offered him any help; he instead claims that he requested an ambulance but that it was ignored. *Id.* ¶¶ 78–82, 86.

After the arrest, Officer O'Shea was instructed to write a summons for disorderly conduct. *Id.* ¶ 85. Kosmidis then spoke to Sergeant Buckner, who opted to discard the summons by tearing it up in front of Plaintiff. According to the Defendants, Buckner exercised his discretion to do so because Kosmidis calmed down and began following the officers' instructions. *Id.* ¶¶ 88–89. Kosmidis's handcuffs were then removed. *Id.* ¶ 90. All told, Kosmidis was in the custody of the Defendants for around 45 minutes to an hour. *Id.* ¶ 91.

Kosmidis asserts that on the date of the incident, he was afflicted by a hearing impairment that made it difficult for him to understand what he was being told by the officers. He claims that for over a decade prior to 2011, he wore hearing aids due to this impairment. Around 2011, however, Kosmidis stopped wearing hearing aids because he could no longer afford them. Dkt. No. 99, Pl.'s 56.1 Statement, ¶¶ 103–111. Thus, he was not wearing hearing aids on the date of the

incident. *Id.* The Defendants object to Kosmidis's testimony that his hearing was impaired on the date of the incident, and they more generally claim that Kosmidis's testimony regarding his hearing issues is irrelevant to the case. Dkt. No. 106, Def. 56.1 Opp'n, ¶¶ 103–111.

## II. Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must "construe the facts in the light most favorable to the non-moving party and resolve all ambiguities and draw all reasonable inferences against the movant." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (internal quotation marks and alterations omitted). If the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial" and summary judgment should be granted to the moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).

The movant bears the initial burden of presenting evidence on each material element of its claim or defense and demonstrate that he is entitled to relief as a matter of law. *See Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). But when the burden of proof at trial would fall on the non-moving party, the moving party may meet its burden by "point[ing] to a lack of evidence ... on an essential element" of the non-moving party's claim. *Simsbury-Avon Preservation Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). There is a genuine issue of material fact if a reasonable jury could decide in the non-moving party's favor. *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 45 (2d Cir. 2000). The Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks omitted). To survive a summary judgment motion, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). In doing so, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts ... and may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (internal quotation marks and citation omitted).

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 263 of 529
Kosmidis v. Port Authority of New York and New Jersey, Not Reported in Fed. Supp....
2021 WL 4442812

### III. Discussion

**\*3** Defendants move for summary judgment on all counts. For the reasons that follow, that motion is GRANTED in part and DENIED in part.

### A. False Arrest

The Court first addresses Kosmidis's federal and state false arrest or false imprisonment claims. "A Section 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir. 1996) (citations omitted); *see also Davis v. Rodriguez,* 364 F.3d 424, 433 (2d Cir. 2004). Moreover, "false arrest is a species of false imprisonment, such that the two share the same elements under New York law." *See Shaeed v. City of New York,* 287 F.Supp.3d 438, 448 (S.D.N.Y. 2018). The elements of a false imprisonment claim are: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Curry v. City of Syracuse,* 316 F.3d 324, 335 (2d Cir. 2003) (quoting *Weyant,* 101 F.3d at 853).

An arrest of a criminal suspect by a law enforcement officer with probable cause constitutes a "privileged" confinement for purposes of that analysis. *Decker v. Campus,* 981 F. Supp. 851, 856 (S.D.N.Y. 1997). Thus, the existence of probable cause to arrest is a complete defense to an action for false arrest when the arrest is conducted by a law enforcement officer. *Weyant,* 101 F.3d at 852. Probable cause exists when at the time of the arrest the officers have "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant,* 101 F.3d at 852. The standard is objective, and the officers' subjective beliefs and motivations are irrelevant to that analysis. *Whren v. United States,* 517 U.S. 806, 813 (1996). The existence of probable cause "must be determined on the basis of the information reasonably available to the arresting officer at the time of the arrest." *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 570 (2d Cir. 1996).

The Defendants claim that the officers had probable cause to arrest Kosmidis for disorderly conduct. As the Defendants argue, in New York, a person may be found guilty of disorderly conduct under a number of different subsections, including when "with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof: (1) He engages in fighting, tumultuous, or threatening behavior, or ... (3) In a public place, he uses abusive or obscene language, or makes an obscene gesture." *See* New York Penal Law, Section 240.20. In the alternative, the Defendants argue that there is no genuine dispute of material fact that they are entitled to qualified immunity. The purpose of qualified immunity is to "give government officials breathing room to make reasonable but mistaken judgments." *Stanton v. Sims,* 571 U.S. 3, 6 (2013) (per curiam) (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 743 (2011)). In the context of false arrest claims, "an arresting officer will ... be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest." *Escalera v. Lunn,* 361 F.3d 737, 743 (2d Cir. 2004). "Arguable probable cause" exists "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id.* (quoting *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir. 1991)). "Qualified immunity from suit for false arrest is in part, therefore, a matter of second-order reasonableness: an officer is immune if it was *reasonable* for him to believe, *reasonably,* that the plaintiff was breaking the law." *Posr v. Court Officer Shield No. 207,* 180 F.3d 409, 416 (2d Cir. 1999).

**\*4** Genuine issues of material fact preclude summary judgment on these claims. Namely, the Defendants' argument that probable cause existed hinges on their version of the facts. If the Defendants are correct that Kosmidis lunged at Sergeant Buckner, threatened the officers with violence, or used abusive or obscene language before being arrested, a reasonable jury could find that probable cause existed to arrest him. But Kosmidis's testimony, which is part of the record, disputes that he ever acted aggressively, threatened the officers, or physically resisted arrest. Indeed, Kosmidis contends that he was arrested without provocation and that he was attacked by the officers from behind. And while Kosmidis concedes that he cursed at the officers, according to his testimony he only did so *after* he was arrested. *See Fernandez v. City of N.Y.,* 457 F. Supp. 3d 364, 386–87 (S.D.N.Y. 2020) ("Because the brothers' verbal altercation on the sidewalk happened after David's arrest, that altercation did not provide probable cause for that arrest."). All of the

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 264 of 529

Kosmidis v. Port Authority of New York and New Jersey, Not Reported in Fed. Supp....

2021 WL 4442812

Defendants' probable cause arguments, that is, rely on the Court's adoption of contested facts.

The Court's role at the summary judgment stage is not to step into the factfinding role and to determine how best to resolve conflicting interpretations about material facts. Rather, "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). There is a limited exception to the rule that courts may not assess credibility at the summary judgment stage in "the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete." *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005); *see also id.* at 555 (affirming grant of summary judgment dismissing excessive force suit brought under 42 U.S.C. § 1983 where the plaintiff relied exclusively on his own testimony, which was "replete with inconsistencies and improbabilities") (internal quotation marks omitted). The record is clear that Kosmidis relies primarily on his own testimony to contest the Defendants' evidence of the facts. Still, the exception described in *Jeffreys* is inapplicable here because Kosmidis's testimony is not internally contradictory or so rife with inconsistencies as to be facially implausible. *See Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) ("Adhering to the ordinary rule that when the defendant moves for summary judgment, we construe the evidence in the light most favorable to the plaintiff and draw all reasonable inferences in her favor, we decline to conclude at this stage of the proceedings that Fincher's testimony may be deemed discredited." (citation omitted)). In light of this, the Court cannot agree with the Defendants that they are entitled to summary judgment. The motion is DENIED as to Kosmidis's federal and state false arrest and false imprisonment claims.

For the same reason, the Court also cannot determine at this juncture whether the officers are entitled to qualified immunity. As noted above, even if probable cause did not ultimately exist, the individual defendants could still be entitled to qualified immunity on the basis of "arguable probable cause," which turns on whether "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law." *Cerrone v. Brown*, 246 F.3d 194, 202–03 (2d Cir. 2001) (internal quotation marks omitted) (citation omitted). The same genuine issues of material fact that preclude a finding of probable cause govern the arguable

probable cause analysis. If the factfinder ultimately credits Kosmidis's version of the facts—in which the officers arrested Kosmidis without prior provocation or warning—the jury may also conclude that there was no *arguable* probable cause. Thus, issues of fact preclude granting summary judgment to the individual defendants on the false arrest claim on immunity grounds.

**\*5** The motion is accordingly DENIED as to the false arrest and false imprisonment claims.

### B. Assault, Battery, and Excessive Force Claims

The Court turns next to the Defendants' contention that they are entitled to summary judgment on Kosmidis's § 1983 excessive force claim and his state law assault and battery claims. Here, too, genuine issues of material fact preclude summary judgment.

The Supreme Court has held that "claims that law enforcement officers have used excessive force ... in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). To determine whether the amount of force used is reasonable, a reviewing court must take into consideration the "totality of the circumstances faced by the officer on the scene," *Lennon v. Miller*, 66 F.3d 416, 425 (2d Cir. 1995), and assess whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Graham*, 490 U.S. at 397. New York law regarding assault and battery parallels this standard. *See Randolph v. Metropolitan Transportation Authority*, 2018 WL 2943744, *6 (S.D.N.Y. June 12, 2018).

Not all uses of force in the context of an arrest are actionable, since it is well-settled that "[t]he right to make a lawful arrest carries with it the right to use reasonable force to effectuate that arrest." *Lieberman v. City of Rochester*, No. 07-CV-6316, 2011 WL 13110345, at *4 (W.D.N.Y. Apr. 29, 2011), *aff'd*, 558 F. App'x 38 (2d Cir. 2014). Indeed, *some* degree of force in the context of a lawful arrest is to be expected, particularly if the person being arrested resists or attempts to do so. *Sullivan v. Gagnier*, 225 F.3d 161, 165–66 (2d Cir. 2000). But officers do not get *carte blanche* in such circumstances to use force; rather, "[t]he force used by the officer must be reasonably related to the nature of the resistance and the force

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 265 of 529

Kosmidis v. Port Authority of New York and New Jersey, Not Reported in Fed. Supp....

2021 WL 4442812

used, threatened, or reasonably perceived to be threatened, against the officer." *Id.*

A number of genuine issues of material fact exists. Most notably, and as discussed above, there are considerable issues of material fact regarding the circumstances of the arrest and whether Kosmidis was acting aggressively or in a threatening fashion. How the factfinder resolves that question may ultimately be determinative regarding whether the use of force, and the amount of force, was proper or excessive. The Defendants' contention that Kosmidis "lunged" at Sergeant Buckner figures prominently in their argument that the use of force, and the amount of force used, was proper. But that fact, like other relevant facts (including whether Kosmidis was threatening the officers and whether he was acting aggressively in other ways), is contested. And in light of that, summary judgment is improper.

In addition, the Court rejects the Defendants' contention that they are entitled to judgment as a matter of law because Kosmidis's injuries were *de minimis.* First, Kosmidis's testimony asserts that his head was covered in blood, he had scrapes and bruises on his forehead, nose, eye, and arms, and that he suffered longer-term injuries including ongoing pain and dizziness. A reasonable jury could conclude that Kosmidis's injuries were more than *de minimis.* In any event, the Defendants rely on Eighth Amendment jurisprudence for the rule that *de minimis* injuries preclude excessive force liability. [2] But this is not an Eighth Amendment case. Where plaintiffs allege excessive use in the course of an arrest or attempted arrest, the excessive force claims are based on the Fourth Amendment. *See Tierney v. Davidson,* 133 F.3d 189, 199 (2d Cir. 1998). The Second Circuit has not definitively resolved the question of whether excessive force claims brought under the Fourth Amendment are assessed under that same rubric, but other circuits have concluded that there is no *de minimis* injury requirement in Fourth Amendment excessive force claims; district courts, meanwhile, are split on this issue. *See Rizk v. City of New York,* 462 F. Supp. 3d 203, 222–24 (E.D.N.Y. 2020) (collecting cases). The Court need not resolve this question, since genuine issues of material fact preclude summary judgment.

[2]    Even in the Eighth Amendment context, courts have typically distinguished between *de minimis* use of force and *de minimis* injuries; while "a de minimis use of force will rarely suffice to state a constitutional claim," *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir. 1993), an Eighth Amendment claim of excessive force "may be established even if the victim does not suffer serious or significant injury, provided that the amount of force used is more than *de minimis.*" *United States v. Walsh,* 194 F.3d 37, 47–48 (2d Cir. 1999) (cleaned up).

**\*6**    For these reasons, the motion is DENIED as to the excessive force, assault, and battery claims.

### C. Punitive damages

The Defendants next assert that Kosmidis's claim for punitive damages as directed to the Port Authority must also be dismissed because the Port Authority as a government entity is immune from such damages. Kosmidis does not respond to that section of the Defendants' brief. But in any event, the Defendants are correct that as a matter of law, punitive damages cannot be assessed against the Port Authority. "As a government entity, the Port Authority is immune from punitive damages." *Rose v. Port Auth. of New York & New Jersey,* 13 F. Supp. 2d 516, 524 (S.D.N.Y. 1998) (collecting cases). This is so because the general rule that municipalities are not subject to punitive damages applies with equal force to bistate entities like the Port Authority. *See Rose,* 13 F. Supp. 2d at 524; *see also City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 261 (1981).

Accordingly, summary judgment is GRANTED as to any claim for punitive damages directed at the Port Authority.

### D. *Monell* claim

The Defendants have moved for summary judgment on Kosmidis's Section 1983 claims against the Port Authority. For purposes of § 1983 liability, the Port Authority is treated as a municipal entity. *Mack v. Port Auth. of N.Y. & N.J.,* 225 F. Supp. 2d 376, 382 & n.7 (S.D.N.Y. 2002). "[M]unicipalities may be sued directly under [Section] 1983 for constitutional deprivations inflicted upon private individuals pursuant to a governmental custom, policy, ordinance, regulation, or decision." *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir. 1983) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690–91 (1978)). Under *Monell* and its progeny, "municipalities are subject to liability for Section 1983 claims, not under a theory of *respondeat superior,* but rather on the basis that their policies or customs inflicted the alleged injuries." *Holden v. Port Auth. of New York & New Jersey,*

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 266 of 529

Kosmidis v. Port Authority of New York and New Jersey, Not Reported in Fed. Supp....

2021 WL 4442812

No. 17-CV-2192 (JGK), 2021 WL 681040, at *7 (S.D.N.Y. Feb. 22, 2021).

To state a *Monell* claim for municipal liability under Section 1983, a plaintiff must plausibly allege "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008). The fifth element has two separate requirements: a plaintiff must plausibly allege both the existence of a municipal policy and that the policy caused (*i.e.*, was the "moving force" behind) plaintiff's injury. *Id.* at 37–38. The "moving force" requirement is the equivalent of proximate cause, *Cash v. County of Erie*, 654 F.3d 324, 341–42 (2d Cir. 2011), and is generally a question of fact, *Jeffes v. Barnes*, 208 F.3d 49, 61 (2d Cir. 2000). The official policy requirement, meanwhile, may be met by showing "a practice so persistent and widespread, or permanent and well settled[,] as to constitute a custom or usage with the force of law and to imply the constructive knowledge of policymaking officials," or by "a failure to train or supervise subordinates amount[ing] to deliberate indifference to the rights of those with whom [the municipality's employees] come into contact."*Felix v. City of New York*, 344 F. Supp. 3d 644, 653 (S.D.N.Y. 2018) (collecting cases).

*7 As the Defendants note, Kosmidis has not shown, or attempted to show, that there was a written policy condoning the kind of behavior that Kosmidis alleges took place. Nor does Kosmidis seek to establish that the practices alleged in his Amended Complaint are so persistent or widespread as to constitute custom or usage with the force of law. Those theories, that is, are inapplicable here. Instead, for purposes of the official policy requirement, Kosmidis argues that the Port Authority is liable for failing to supervise, discipline, and train the officers in question. *See* Pl. Opp'n Br. at 17–21. His failure to supervise and discipline claims are predicated on his factual allegations relating to the use of excessive force. His failure to train claim, meanwhile, is predicated on two separate factual bases: The first relates to the use of excessive force during the arrest, and the second relates to the failure to train officers to interact with hard-of-hearing individuals.

While there is some difference between failure to train claims and other kinds of supervisory liability claims, all of the claims require a showing of "deliberate indifference" to prevail. *SeeTieman v. City of Newburgh*, No. 13-CV-4178 (KMK), 2015 WL 1379652, at *19 (S.D.N.Y. Mar. 26, 2015).

Thus, to succeed on a theory of liability based on a failure to supervise, discipline, or train, a plaintiff must establish the requisite "deliberate indifference" by (1) "offer[ing] evidence from which a reasonable jury could conclude that a policy-maker knows to a moral certainty that her employees will confront a given situation;" (2) "show[ing] that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation;" and (3) "show[ing] that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Green v. City of N.Y.*, 465 F.3d 65, 80–81 (2d Cir. 2006) (cleaned up); *see alsoWalker v. City of New York*, 974 F.2d 293, 297–99 (2d Cir. 1992). This standard is by design stringent, "requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (internal quotation marks and citation omitted). That is, a plaintiff must show that the municipality had notice, actual or constructive, that the inadequacy or failure to supervise was causing civil rights violations. *Id.*

The Court turns first to Kosmidis's claim that the Port Authority is liable for failing to supervise or discipline the officers, which posits that such a failure to supervise or discipline caused the incident in question. Kosmidis bases this claim on a prior civil rights case brought against Sergeant Buckner in which a jury found Buckner liable for excessive force and assessed $71,000 against him in compensatory damages and $33,000 in punitive damages. *See* Dkt. No. 99, Pl.'s 56.1 Statement, ¶¶ 147–158. Kosmidis claims that despite that case being brought against Buckner, the Port Authority failed to take any disciplinary action against him— and that they paid the damages assessed against him. From there, he claims that failing to discipline Buckner emboldened him to continue committing constitutional violations. The parties dispute whether evidence from that prior litigation is admissible, but the Court need not reach that question because even assuming that Kosmidis can rely on that evidence and drawing all reasonable inferences in his favor, the Port Authority is entitled to judgment as a matter of law. Specifically, it is not the case that "a municipality is required to discipline every officer upon a finding of wrongdoing." *Posr v. City of New York*, 835 F. Supp. 120, 125 (S.D.N.Y. 1993), *aff'd*, 22 F.3d 1091 (2d Cir. 1994); *see alsoButler v. City of Norman*, 992 F.2d 1053, 1056 (10th Cir. 1993) ("[W]e cannot hold that the failure of a police department to discipline in a specific instance is an adequate basis for municipal liability under *Monell*."). Indeed, ordinarily "allegation[s]

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 267 of 529

Kosmidis v. Port Authority of New York and New Jersey, Not Reported in Fed. Supp....

2021 WL 4442812

of numerous claims of excessive force" are insufficient to sustain an inference of deliberate indifference due to failure to supervise absent a showing that "meaningful attempts to investigate repeated claims of excessive force are absent." *Tieman v. City of Newburgh*, No. 13-CV-4178 (KMK), 2015 WL 1379652, at *21 (S.D.N.Y. Mar. 26, 2015). Other than the evidence relating to the prior litigation involving Buckner, Kosmidis has not provided any evidence that would plausibly support the proposition that the supervisors knew "to a moral certainty" that Buckner would act in similar fashion in the future. In addition, Kosmidis has not provided any evidence regarding whether the Port Authority investigated the claim or otherwise took preventative steps, instead relying exclusively on Buckner's deposition testimony that he was not disciplined in relation to the incident. Even drawing all inferences in Kosmidis's favor, the Court concludes that on this record, no reasonable jury could conclude that the Port Authority acted with deliberate indifference in light of a single incident in which Buckner was charged with excessive force.

**\*8** The Court turns next to Kosmidis's claim that the Port Authority is liable for failing to train Buckner and the other officers to interact with hard-of-hearing individuals. In addition to the three elements listed above, a plaintiff bringing a failure to train claim at the summary judgment stage must "identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) (internal quotation marks omitted). With respect to this claim, Kosmidis charges that Buckner was never trained to interact with hard-of-hearing individuals. The Defendants do not dispute this. *See* Dkt. No. 99, Def. 56.1 Resp., ¶ 157.

The record in this case is far too deficient to sustain a claim that the Port Authority acted with deliberate indifference. Ordinarily, a plaintiff bringing a failure to train claim must show "[a] pattern of similar constitutional violations by untrained employees." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997)). This is because "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* It is possible to prevail without showing a pattern of constitutional violations only when "the unconstitutional consequences of failing to train [are] so patently obvious that a city could be liable under [Section] 1983 without proof of a pre-existing pattern of

violations." *Id.* at 64; *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (1989) (noting that the need to train officers in the constitutional limitations on the use of deadly force "can be said to be so obvious" that "failure to do so could properly be characterized as deliberate indifference to constitutional rights.").

Kosmidis provides no evidence from which a reasonable jury could conclude that any policymakers knew "to a moral certainty" that his employees would confront such a situation. *Green*, 465 F.3d at 80–81. He also does not present evidence that might support the proposition that failure to provide this training is so obvious as to warrant departure from the ordinary rule that a pattern of constitutional violations is necessary to prevail on such a claim. Furthermore, Kosmidis does not provide any evidence to support the proposing that the situation would be one in which employees would face difficult choices such that training or supervision would have helped. *Id.* And Kosmidis also fails to furnish any evidence to show that the wrong choice by a Port Authority officer will "frequently cause the deprivation of a citizen's constitutional rights." *Id.* Rather than introducing such evidence, as would be necessary for the claim to survive summary judgment, Kosmidis asks the Court to assume the truth of those claims. At this stage, that is insufficient. On this record, given Kosmidis's lack of evidence to establish those necessary elements, no reasonable jury could conclude that any policymakers acted with deliberate indifference.

For the reasons stated above, the Court concludes that the Defendants are entitled to summary judgment on the *Monell* claim.

### E. Negligent Hiring

Kosmidis initially brought a negligent hiring claim under New York state law. The Defendants do not dispute that at the time of the arrest, the officers involved were acting within the scope of their employment. Under state law, "where an employee is acting within the scope of his or her employment, thereby rendering the employer liable for any damages caused by the employee's negligence under a theory of respondeat superior, no claim may proceed against the employer for negligent hiring or retention." *Karoon v. New York City Transit Auth.*, 241 A.D.2d 323, 324, 659 N.Y.S.2d 27, 29 (1997); *see also Schoolcraft v. City of N.Y.*, 103 F. Supp. 3d 465, 521 (S.D.N.Y. 2015) (collecting cases).

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 268 of 529

Kosmidis v. Port Authority of New York and New Jersey, Not Reported in Fed. Supp....

2021 WL 4442812

**\*9** After the Defendants moved for summary judgment on the claim, Kosmidis indicated that he would "withdraw[ ] his claim for negligent hiring, screening, retention, supervision, and training." Dkt. No. 100, Pl.'s Opp'n Br., at 2 n.1.

The Defendants' motion is therefore GRANTED as to the negligent hiring claim.

### F. Failure to intervene

The Defendants also move for summary judgment on Kosmidis's failure to intervene claim. Their sole argument is that they are entitled to summary judgment because there was probable cause for Kosmidis's arrest. *See* Def. Br. at 15 (citing *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014)). Because the Court concludes that genuine issues of material fact as to probable cause, *see infra*, and because the Defendants have advanced no other theory as to why they are entitled to summary judgment on this claim, the motion for summary judgment is DENIED as to Kosmidis's failure to intervene claim.

### G. ADA and Rehabilitation Act claims

The Court turns next to Kosmidis's claims under the ADA and the Rehabilitation Act, which are asserted only against the Port Authority. The standards provided by § 504 of the Rehabilitation Act and Title II of the ADA are nearly identical, and courts typically consider claims under the two statutes together. *McElwee v. Cty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012). To establish such a claim, a plaintiff must demonstrate that "(1) he is a qualified individual with a disability;" (2) "the defendant is subject to one of the [a]cts;" and (3) "he was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant because of his disability." *Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 196–97 (2d Cir. 2014) (internal quotation marks and citation omitted). It is undisputed that the Port Authority is subject to the acts. But the Defendants claim that Kosmidis cannot establish the first or third elements of the analysis.

The Court turns first to whether Kosmidis is a "qualified individual with a disability." To demonstrate that he has a disability, a plaintiff "must first show that she suffers from a physical or mental impairment," then "identify

the activity claimed to be impaired and establish that it constitutes a major life activity," and finally "show that her impairment substantially limits the major life activity previously identified." *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 147 (2d Cir. 2002) (cleaned up). The Court assumes that Kosmidis has shown that he suffers from a physical impairment related to his hearing. In addition, the ADA includes "hearing" in its definition of "major life activities." 42 U.S.C. § 12102(2)(A).

Nonetheless, Kosmidis's ADA and Rehabilitation Act claims fail because he has not adduced evidence to show that the impairment is "substantially limit[ing]." To determine whether a major life activity is substantially limited by an impairment, courts in this circuit consider "the nature and severity of the impairment; its duration or expected duration; and the existence of any actual or expected permanent or long term impact." *Capobianco v. City of New York*, 422 F.3d 47, 57 (2d Cir. 2005). In the context of an employment discrimination case, the Second Circuit has counseled that the inquiry "must focus primarily on whether the claimant is unable to perform the variety of tasks central to most people's daily lives." *Id.* at 59 (internal quotations omitted). Even those impairments that affect major life activities may be insufficient if a plaintiff fails to show that the impairment is substantially limiting. *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 160 (2d Cir. 2016). To be sure, the ADA expressly directs courts to construe the definition of disability "in favor of broad coverage." 42 U.S.C. § 12102(4)(A); *see also Grullon v. Admin. for Children's Servs.*, No. 18-CV-3129 (LJL), 2021 WL 981848, at *12 (S.D.N.Y. Mar. 16, 2021). To that end, the question of whether an impairment is a "disability" under the ADA typically "should not demand extensive analysis." *Glaser v. Gap Inc.*, 994 F. Supp. 2d 569, 574 (S.D.N.Y. 2014) (citing Pub.L. 110–325, § 2(b)(5), 122 Stat. at 3553–54).

**\*10** But even drawing all inferences in Kosmidis's favor, and despite the leniency of the applicable standard, the record is devoid of evidence that could even plausibly establish that Kosmidis's impairment "substantially limits" his hearing as defined by the statute. Kosmidis relies on his own testimony regarding his hearing issues. As already noted, in his testimony he claimed that he wore hearing aids for about ten or fifteen years prior to 2011, and that he had seen a doctor about his hearing issues. *See* Dkt. No. 99, Pl.'s 56.1 Statement, ¶¶ 107–08. He stopped wearing the hearing aids in 2011, in part due to cost; in 2019, he resumed wearing hearing aids. *Id.* ¶¶ 109–11. Kosmidis also points to the fact that on the date of

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 269 of 529
Kosmidis v. Port Authority of New York and New Jersey, Not Reported in Fed. Supp....
2021 WL 4442812

his deposition, his translator said that Kosmidis had difficulty hearing her. *Id.* ¶ 104.

Even assuming those facts are true, no reasonable jury could conclude that Kosmidis's impairment fits the "substantially limit[ing]" mold. He presents no evidence, for instance, as to the severity of his hearing issues, other than conclusory testimony that his impairment was severe. Indeed, Kosmidis's testimony does not address how the lack of hearing aids impacted his ability to function; the conclusory nature of his testimony provides no evidence regarding the severity of the impairment or the effect the impairment had on his ability to function on the date of the incident. It is, at most, a generalized complaint of hearing issues with no context that would allow the factfinder to determine its nature or its severity. Given this, and considering the lack of any other corroborating evidence, even drawing all reasonable inferences in Kosmidis's favor, no reasonable jury could conclude that, based on that evidence, the impairment is substantially limiting. *Cf.Boghossian v. Hudson Meridian Constr. Grp., LLC*, No. 09 CIV. 8893 (AKH), 2011 WL 13176012, at *3 (S.D.N.Y. June 20, 2011), *aff'd sub nom.Boghossian v. Hudson Meridian Const. Grp., LLC*, 475 F. App'x 806 (2d Cir. 2012) (noting that even though the plaintiff had vision issues, "[a] generalized complaint of blurred vision, without any evidence to show its nature or severity, its duration, or the existence of any impediment or long-term impact, is insufficient to demonstrate a substantial limitation."). As a result, Kosmidis cannot establish the first necessary element of his ADA and Rehabilitation Act claims, and the claims fail.

For these reasons, Defendants' motion is GRANTED as to these claims.

### H. Intentional Infliction of Emotional Distress

The Defendants next move for summary judgment on Kosmidis's claim for intentional infliction of emotional distress. The motion is GRANTED as to that claim.

To sustain a claim for intentional infliction of emotional distress under New York Law, a plaintiff must demonstrate: (1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress. *SeeDruschke v. Banana Republic, Inc.*, 359 F. Supp. 2d 308, 314 (S.D.N.Y. 2005). "In New York, recovery of an intentional infliction of emotional distress claim is allowed only as a last resort, when traditional tort remedies are unavailable." *Sepulveda v. City of New York*, No. 01-CV-3054 (DC), 2003 WL 21673626, at *6 (S.D.N.Y. July 17, 2003) (Chin, J.) (cleaned up). Thus, "[n]o intentional infliction of emotional distress claim will lie where the conduct underlying the claim falls within the ambit of traditional tort liability.' " *Id.* (cleaned up).

The conduct underlying Kosmidis's claim for intentional infliction of emotional distress is entirely encompassed by his false arrest and excessive force claims. Kosmidis points to no other conduct that might sustain the claim, and as a result the claim is legally insufficient. Thus, the Defendants are entitled to summary judgment, and the motion is GRANTED as to this claim.

### I. Negligence

**\*11**  The Court turns next to Defendants' argument that they are entitled to summary judgment on Kosmidis's negligence claim; for the reasons that follow, the motion is GRANTED as to this cause of action.

It is well-settled that when a plaintiff asserts excessive force and assault claims which are premised upon defendants' allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie. *See, e.g., Dineen ex rel. Dineen v. Stramka*, 228 F. Supp. 2d 447, 454 (S.D.N.Y. 2002); *Mazurkiewicz v. New York City Transit Auth.,* 810 F.Supp. 563, 570–71 (S.D.N.Y. 1993) (holding that a "[p]laintiff cannot argue that defendants engaged in intentional conduct that forms the basis of an assault and § 1983 excessive force claim and also argue that defendants were negligent towards plaintiff"). Kosmidis provides no authority for the proposition that he can argue negligence in the alternative where the crux of his other claims require intentionality. *See* Pl. Opp'n Br. at 25. And since Kosmidis's claims against the Defendants are all premised on intentional conduct, his claim for negligence must be dismissed. *SeeDineen*, 228 F. Supp. 2d at 454.

Thus, summary judgment is GRANTED as to this claim.

### J. First Amendment

The Defendants next move for summary judgment on Kosmidis's First Amendment retaliation claim. To prevail on

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 270 of 529

Kosmidis v. Port Authority of New York and New Jersey, Not Reported in Fed. Supp....

2021 WL 4442812

such a claim, a plaintiff must show that "(1) he has an interest protected by the First Amendment; (2) the Defendant[s'] actions were motivated or substantially caused by his exercise of that right; and (3) the Defendant[s'] actions effectively chilled the exercise of the Plaintiff's First Amendment rights." See *Galarza v. Monti*, 327 F. Supp. 3d 594, 603 (S.D.N.Y. 2018).

The Defendants rest their argument on the basis that probable cause defeats any First Amendment retaliation claim. See *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir. 1998). As already noted, however, genuine issues of material fact preclude a finding of probable cause. Because the Defendants advance no other argument in favor of their summary judgment motion on this point, the motion is DENIED.

### K. Fourteenth Amendment

The Defendants next move to dismiss Kosmidis's Fourteenth Amendment claims, arguing that any Fourteenth Amendment allegations brought in the Amended Complaint are both unidentifiable and duplicative. Dkt. No. 90, Def's Br., at 22. It is true that "[a] § 1983 claim for false arrest implicates both Amendments because the Fourth Amendment applies to the States pursuant to the Fourteenth Amendment." *Micalizzi v. Ciamarra*, 206 F. Supp. 2d 564, 579 (S.D.N.Y. 2002). But the gravamen of the alleged constitutional violations in this case is found in the Fourth Amendment. The Amended Complaint does not articulate a theory of a Fourteenth Amendment violation, and Kosmidis does not respond to Defendants' arguments in his opposition brief to the present motion. Furthermore, the Court cannot discern any attempt by Kosmidis to assert a standalone Fourteenth Amendment. "Federal courts may deem a claim abandoned when a party opposing summary judgment fails to address the [movant's] argument in any way." *Collins v. City of New York*, 295 F. Supp. 3d 350, 361 (S.D.N.Y. 2018) (citing *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) (alterations in original)). In line with this, and in light of Kosmidis's failure to address the Defendants' arguments, the Court concludes that he has abandoned any such Fourteenth Amendment claim.

**\*12** Thus, to the extent that Kosmidis sought to assert such a separate Fourteenth Amendment claim, the Defendants' motion is GRANTED.

### L. New York state constitutional claims

Finally, Kosmidis initially brought claims predicated on the New York state constitution. After the Defendants moved for summary judgment on the claim, Kosmidis indicated that he "withdraws his New York State Constitutional claims." Dkt. No. 100, Pl.'s Opp'n Br., at 2 n.1. The Defendants' motion is therefore GRANTED as to those claims.

### IV. Conclusion

For the reasons stated above, the Defendants' motion for summary judgment is GRANTED in part and DENIED in part. It is granted as to any claims brought for punitive damages against the Port Authority; Plaintiff's *Monell* claim against the Port Authority; Plaintiff's negligent hiring claim; the standalone negligence claim; the intentional infliction of emotional distress claim; the ADA and Rehabilitation Act claims; any standalone Fourteenth Amendment claim; and any New York state constitutional claims. Those claims are accordingly dismissed. The Defendants' motion is denied as to all other claims.

The Court hereby schedules a pre-trial conference for October 25, 2021 at 1:00 p.m. By October 18, 2021, the parties are ORDERED to meet and confer and submit a joint letter proposing approximate trial dates and a schedule for the submission of the pre-trial materials identified in Rule 6 of the Court's Individual Practices in Civil Cases. Due to the COVID rules for centralized jury trial scheduling in this district and the Court's current schedule (including its heavy criminal docket), the Court is not available for a jury trial until April 2022. The parties must bear this in mind in their discussions. The parties may consider whether they wish to consent to the Magistrate Judge for all purposes as the Magistrate Judge will likely be able to try the case sooner. The parties shall also indicate if they seek a referral to the Mediation Program or to the Magistrate Judge for settlement discussions.

This resolves Dkt. No. 88.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2021 WL 4442812

---

**End of Document**                                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 1:18-CV-08413**<br>Kosmidis v. The Port Authority of New York and New Jersey et al | — | S.D.N.Y. | Sep. 14, 2018 | Docket |

**History (3)**

**Direct History (1)**

1. Kosmidis v. Port Authority of New York and New Jersey
   2021 WL 4442812 , S.D.N.Y. , Sep. 28, 2021

**Related References (2)**

2. Kosmidis v. Port Authority of New York and New Jersey
   2020 WL 5754605 , S.D.N.Y. , Aug. 27, 2020

   *Report and Recommendation Adopted by*

3. Kosmidis v. Port Authority of New York and New Jersey
   2020 WL 7022479 , S.D.N.Y. , Nov. 30, 2020

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 275 of 529

Bird v. County of Westchester, Not Reported in Fed. Supp. (2022)

2022 WL 2263794

2022 WL 2263794
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Darren BIRD, Plaintiff,
v.
COUNTY OF WESTCHESTER, et al., Defendants.

No. 20-CV-10076 (NSR)
|
Signed 06/23/2022

**Attorneys and Law Firms**

Michael Kevin Pinkard, Samuel Christopher DePaola, Sim &
DePaola, L.L.P., Bayside, NY, for Plaintiff.

Giacomo Gaspare Micciche, Irma Wheatfield Cosgriff,
Westchester County Attorney's Office, White Plains, NY, for
Defendants.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

 **\*1**  Plaintiff Darren Bird ("Plaintiff") brings this action
pursuant to 42 U.S.C. § 1981, 1983 1985, 1986, and 1988
alleging violation of the Fourth and Fourteenth Amendments
against the County of Westchester ("Westchester"), B. Pectol,
Sgt. McWilliams (together, the "County Defendants"), Frank
Oliveri [1], and John or Jane Doe 1-10 (all together, the
"Defendants"). (ECF No. 11.) Before the Court is the County
Defendants' motion to dismiss. (ECF No. 24.) For the
following reasons, the motion is GRANTED in part and
DENIED in part.

---

[1]    Defendant Oliveri has not been served and has
therefore not appeared in this action. Pursuant
to Federal Rule of Civil Procedure 4(m), "[i]f a
defendant is not served within 90 days after the
complaint is filed, the court—on motion or on its
own after notice to the plaintiff—must dismiss the
action without prejudice against that defendant or
order that service be made within a specified time."
Fed. R. Civ. P. 4(m). Therefore, the Amended
Complaint is dismissed as against Oliveri.

**BACKGROUND**

The following facts are taken from the Amended Complaint
("AC") and are construed in the light most favorable to
Plaintiff, the non-movant, and accepted as true for purposes
of this motion.

Plaintiff is an African American male who resides in Bronx
County. (AC ¶ 8.) On February 7, 2019 at approximately
6:40 PM, Plaintiff was an inmate inside the vicinity of the
Westchester County Jail (the "Jail"). (*Id.* ¶ 35.) Plaintiff
had returned from court with several other inmates and was
taken to the intake area of the Jail. (*Id.* ¶ 36.) Plaintiff
and the other inmates were ordered to disrobe, squat down
while naked, and cough, and Pectol, McWilliams, and John
or Jane Doe 1-10 visually examined them for contraband.
(*Id.* ¶ 37.) No contraband was discovered on Plaintiff's
person. (*Id.* ¶ 39.) However, contraband was found secreted
into the rectum of an inmate named "Stevens". (*Id.*) The
contraband was misattributed to Plaintiff, and he was given
an infraction for Promoting Prison Contraband. (*Id.* ¶ 40.)
Plaintiff alleges that Defendants searched Plaintiff and falsely
arrested him due to their discriminatory prejudices, desire to
meet an arrest quota, and to benefit from increased overtime
compensation. (*Id.* ¶ 54.) The matter was turned over to
Defendants Oliveri and John or Jane Doe 1-10 to determine
charges and initiate prosecution. (*Id.* ¶ 40.) Plaintiff was
placed into an "administrative segregation" housing cell in
which he was confined to his cell, denied recreation, exercise,
and leave to obtain meals. (*Id.* ¶ 41.)

On February 18, 2019, the matter was administratively
dismissed, and "Stevens" was indicated as the actual
possessor of the contraband. (*Id.* ¶ 42.) The Westchester
County Department of Corrections ("WCDOC") Disciplinary
Report indicated that "Stevens" was the possessor of the
contraband. (*Id.*) However, despite this dismissal, Defendants
continued the prosecution of Plaintiff. (*Id.* ¶ 43.) A Criminal
Court Complaint was signed by Defendant Oliveri affirming
that Plaintiff was the possessor of the contraband. (*Id.* ¶
44.) Defendants Pectol, McWilliams, Oliveri, and John or
Jane Doe 1-10 provided false, misleading, or incomplete
information to the District Attorney's Office, namely that
Plaintiff had promoted prison contraband so that he may be
prosecuted. (*Id.* ¶ 45.) The case was ultimately dismissed on
December 5, 2019. (*Id.* ¶ 47.) Plaintiff alleges Westchester
has a policy, custom, or pattern and practice of searching
and arresting ethnic minorities without probable cause or

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 276 of 529

Bird v. County of Westchester, Not Reported in Fed. Supp. (2022)

2022 WL 2263794

reasonable suspicion, and for searching individuals without justification. (*Id.* ¶¶ 51-52.) Plaintiff further alleges that, upon information and belief, the personnel files, records, and disciplinary histories of the Defendants will reveal a history of constitutional violations, and that Westchester has failed to correct this behavior. (*Id.* ¶ 67-69.) Plaintiff suffered loss of his liberty, reputational harm, loss of earnings and potential earnings, physical injury, and emotional distress. (*Id.* ¶ 71.)

**\*2** Plaintiff filed suit on December 1, 2020. (ECF No. 1.) The County Defendants filed a motion to dismiss on September 8, 2021. (ECF No. 26.) Plaintiff did not file an opposition.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555. A motion to dismiss will be denied where the allegations "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Where a motion to dismiss is unopposed, a court should nevertheless "assume the truth of a pleading's factual allegations and test only its legal sufficiency." *McCall v. Pataki*, 232 F.3d 321, 322 (2d Cir. 2000). While the Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 662, 678 (quoting *Twombly*, 550 U.S. at 555). The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555. A motion to dismiss will be denied where the allegations "allow[ ] the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

Plaintiff brings federal causes of action for unlawful search and seizure, false arrest and false imprisonment, excessive force, malicious prosecution, malicious abuse of process, denial of his right to fair trial and due process, deprivation of rights and denial of equal protection of the laws, conspiracy to interfere with civil rights and failure to prevent the conspiracy, and failure to intervene. (ECF No. 11.) Plaintiff also brings state law claims for unlawful search and seizure, false arrest and false imprisonment, assault and battery, malicious prosecution, malicious abuse of process, denial of his right to fair trial and due process, deprivation of rights and denial of equal protection of the laws, failure to intervene, and negligent hiring, training, retention and supervision. (*Id.*) The County Defendants aver that (1) Plaintiff fails to allege plausible claims of constitutional violations committed by the County Defendants; (2) Plaintiff fails to plead a plausible claim for *Monell* liability by Westchester; and (3) the Court should dismiss Plaintiff's state law claims. (Memorandum of Law ("Mem.") ECF No. 26 at 8-24.) The Court will address each argument below.

### I. Federal Claims

**\*3** All of Plaintiff's federal causes of action are brought pursuant to Section 1983. Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ...." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see also Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) ("Section 1983 ... is not itself a source of substantive rights ... [i]t merely provides a method for vindicating federal rights elsewhere conferred.") (internal quotation marks omitted). To state a claim under Section 1983, a plaintiff must allege "(1) the challenged conduct was attributable to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed by the U.S. Constitution."

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 277 of 529
**Bird v. County of Westchester, Not Reported in Fed. Supp. (2022)**
2022 WL 2263794

*Castilla v. City of New York*, No. 09 Civ. 5446(SHS), 2013 WL 1803896, at *2 (S.D.N.Y. Apr. 25, 2013).

### a. Unlawful Search and Seizure

Plaintiff avers his Fourth Amendment right to be free from unreasonable searches and seizures was violated by the County Defendants. (AC ¶ 85.) The Fourth Amendment protects citizens' "persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. This requires that searches of prison inmates be "reasonably related to legitimate security interests." *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 328 (2012) (quoting *Bell v. Wolfish*, 441 U.S. 520, 548 (1979)). Where a plaintiff is challenging an "isolated search" courts "typically apply the standard set forth in *Bell v. Wolfish*, 441 U.S. 520 (1979)." *Harris v. Miller*, 818 F.3d 49, 58 (2d Cir. 2016). This test requires courts to consider "[1] the scope of the particular intrusion, [2] the manner in which it is conducted, [3] the justification for initiating it, and [4] the place in which it is conducted" to balance "the need for the particular search against the invasion of personal rights that the search entails." *Bell*, 441 U.S. at 559.

For a claim related to the infringement of the right to bodily privacy, "a plaintiff must show that he had an actual, subjective expectation of bodily privacy, and that officials lacked a sufficient justification to intrude on the plaintiff's expectation of bodily privacy." *Lopez v. Phipps*, No. 18-CV-3605 (MKB), 2019 WL 2504097, at *4 (E.D.N.Y. June 17, 2019). Strip searches do not violate the Fourth Amendment even in the absence of reasonable suspicion if they are performed pursuant to policies that are "reasonably related to legitimate penological interests." *Florence*, 566 U.S. at 326; 330 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). This includes strip searching an inmate on the way to and from court appearances. *See Smith v. City of N.Y.*, No. 14 Civ. 5934 (JCF), 2015 WL 3929621, at *2–3 (S.D.N.Y. June 17, 2015) ("[T]he policy of strip searching inmates after contact visits or upon departing for court appearances does not, in itself, violate the Constitution.").

Here, Plaintiff alleges he and other inmates were strip searched after returning from court to ensure they were not carrying contraband. Conducting strip searches to determine whether inmates are carrying contraband before being let back into the Jail is a legitimate penological interest that has been upheld by courts within this Circuit. *See Crawford*

*v. Cuomo*, 796 F.3d 252, 258 (2d Cir. 2015) (holding that "prison officials looking for contraband may subject inmates to reasonable strip searches and cavity searches"); *Thomas v. Martin-Gibbons*, No. 19 Civ. 7695 (ER), 19 Civ. 7887 (ER), 2020 WL 5026884, at *9 (S.D.N.Y. Aug. 25, 2020) ("The Supreme Court has held that jails may require all inmates entering a correctional institution to undergo a strip search requiring them to expose their body and lift parts of their anatomy during the search—irrespective of the severity of their alleged offense."); *Thompson v. City of N.Y.*, No. 16 Civ. 824 (PKC), 2017 WL 1929552, at *2 (S.D.N.Y. May 9, 2017) (holding that strip searches conducted upon entering and leaving the New York City Department of Correction facilities and during searches of the inmate's housing area "serve the legitimate penological purpose of preventing contraband from coming into and out of prisons and jails"). Therefore, Plaintiff has failed to include factual allegations showing any violation of the Fourth Amendment.

**\*4** Accordingly, the County Defendants' motion to dismiss the unlawful search and seizure claim is granted.

### b. False Arrest and Imprisonment

When analyzing a claim under Section 1983 for false arrest and imprisonment, the Court looks to New York law. *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007). "A false imprisonment claim under New York law is identical to a false arrest claim." *Rebenstorf v. City of N.Y.*, No. 15 Civ. 5784(BMC), 2015 WL 6438765, at *2 (E.D.N.Y. Oct. 21, 2015) (citing *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991)). To state a claim under Section 1983 for false arrest or false imprisonment, a plaintiff must show that "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (quoting *Broughton v. State of New York*, 37 N.Y.2d 451, 456 (1975)). In other words, "[t]o establish a claim for false arrest under 42 U.S.C. § 1983, a plaintiff must show that 'the defendant intentionally confined him without his consent and without justification.' " *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). Further, "while prison custody is an entirely reasonable 'seizure' of a convicted felon, 'it may fairly be argued that the constitutional right to be free from unreasonable seizures ... embraces the inmate[']s entitlement not to be subjected to a major further limitation

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 278 of 529

**Bird v. County of Westchester, Not Reported in Fed. Supp. (2022)**

2022 WL 2263794

on his liberty ... on the mere whim of a correctional officer (for no penological purpose at all).' " *Miller v. Herbert*, No. No. 95–CV–360H, 1997 WL 626404, at *3 (W.D.N.Y. Sept. 24, 1997) (quoting *Leslie v. Doyle*, 868 F. Supp. 1039, 1044 (N.D. Ill. 1994)).

"The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' ... whether that action is brought under state law or under § 1983." *Weyant*, 101 F.3d at 852 (citation omitted); *see also Kent v. Katz*, 312 F.3d 568, 573 (2d Cir. 2002) ("A § 1983 claim of false arrest based on the Fourth Amendment right to be free from unreasonable seizures may not be maintained if there was probable cause for the arrest.")). Probable cause "requires an officer to have 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.' " *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (quoting *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000)). Probable cause may exist "even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) (citation omitted).

Here, after the contraband was misattributed to Plaintiff, he was placed into an "administrative segregation" housing cell until the claim was dismissed. Plaintiff has demonstrated that due to the County Defendants' actions, he was subjected to further limitation on his liberty, namely being confined to his cell, denied recreation, exercise, and leave to obtain meals. (AC ¶ 41.) The County Defendants aver that they had probable cause to charge Plaintiff with possessing the contraband and therefore segregate him as it was misattributed to Plaintiff, and that Plaintiff has failed to provide facts showing bad faith on the part of the Defendants. (Mem. at 9-11.) However, Plaintiff does not have to show bad faith as "the defendant bears the burden of proving that probable cause existed." *Doe v. City of N.Y.*, No. 18-cv-670 (ARR) (JO), 2018 WL 3824133, at *4 (E.D.N.Y. Aug. 9, 2018). Further, the Amended Complaint alleges that the matter was administratively dismissed on February 18, 2019, when the WCDOC Disciplinary Report indicated that "Stevens" possessed the contraband, not Plaintiff. (AC ¶ 42.) The Amended Complaint further alleges that Defendants continued the prosecution of Plaintiff, and he was segregated until the charge was dismissed in December of 2019. (AC ¶ 43; 47; 49.) Even if the County Defendants first made a mistake in good faith when segregating Plaintiff, Plaintiff's

allegations indicate that even when this mistake was rectified, they continued to prosecute and confine him in segregated housing. Therefore, the County Defendants did not have probable cause, and, at this stage, Plaintiff has satisfied the standard for false arrest and imprisonment.

**\*5** Accordingly, the Court denies the County Defendants' motion to dismiss the false arrest and imprisonment claim.

### c. Excessive Force

Plaintiff next alleges excessive force under both the Fourth and Fourteenth Amendments.

#### i. Fourth Amendment

" 'The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer' in the course of an arrest. *Graham v. City of N.Y.*, 928 F. Supp. 2d 610, 617 (E.D.N.Y. 2013) (quoting *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010)). "When excessive force is alleged, a court must determine 'whether the officers' actions are "objectively reasonable" ' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.' " *Wims v. N.Y.C. Police Dep't*, No. 10-CV-6128(PKC), 2011 WL 2946369, at *4 (S.D.N.Y. July 20, 2011) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). When determining whether excessive force was used against a plaintiff, a court balances "the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Tracy*, 623 F.3d at 96. In doing so, a court looks to: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id.*

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, ... violates the Fourth Amendment" as officers must use some degree of force when arresting an individual. *Id.* at 396–97 (internal citation omitted). "Instead, the force used by the law enforcement officer must generally be more

2022 WL 2263794

de minimis for a claim to be actionable." *Antic v. City of N.Y.*, 273 F. Supp. 3d 445, 458 (S.D.N.Y. 2017) (citing *Romano v. Howarth*, 998 F.2d 101, 105 (2d. Cir. 1993)).

### ii. Fourteenth Amendment

A pretrial detainee's claims "are evaluated under the Due Process Clause because, '[p]retrial detainees have not been convicted of a crime and thus may not be punished in any manner - neither cruelly and unusually nor otherwise.' " *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (quoting *Iqbal v. Hasty*, 490 F.3d 143, 168 (2d Cir. 2007) *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). Under *Kingsley v. Hendrickson*, any time a prison guard engages in excessive force against a pretrial detainee, even if there is no evidence of serious injury, there is always a constitutional violation because "pretrial detainees (unlike convicted prisoners) cannot be punished at all[.]" 576 U.S. 389, 400 (2015). In other words, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396–97.

A factfinder must apply an "objective reasonableness" standard that "turns on the facts and circumstances of each particular case." *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 252 (2d Cir. 2020) (quoting *Kingsley*, 576 U.S. at 397). Important factors to consider include:

> **\*6** the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Kingsley*, 576 U.S. at 397. The factfinder must also "take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." *Id.* at 399–400. Balancing those needs, force which "is not rationally related to a legitimate governmental objective or

that it is excessive in relation to that purpose" fails the test. *Id.* at 398.

Here, Plaintiff's claim fails under both standards. Plaintiff merely alleges that the County Defendants perpetrated "assaults" and "batteries" against him and caused him "physical injury." (AC ¶¶ 57; 71.) Plaintiff fails to include any facts showing that any of the County Defendants used excessive force, or any force, on him. In fact, Plaintiff's allegations state that the Defendants "visually examined Plaintiff and the other inmates" (AC ¶ 37), there is no indication that any Defendant ever laid a hand on Plaintiff or any other inmate during the search. Therefore, his claim fails.

Accordingly, Plaintiff's excessive force claim is dismissed.

### d. Malicious Prosecution

Plaintiff next alleges that his Fourteenth Amendment rights were violated due to malicious prosecution. (AC ¶¶ 116-121.) However, "[t]he Supreme Court and Second Circuit have held that a claim for malicious prosecution, if brought under the Constitution, must be brought under the Fourth Amendment rather than under the substantive due process provisions of the Fourteenth Amendment." *Diaz-Bernal v. Myers*, 758 F. Supp. 2d 106, 133 (D. Conn. 2010) (citing *Albright v. Oliver*, 510 U.S. 266, 271–75 (1994). Therefore, the Court will evaluate Plaintiff's claim under the Fourth Amendment.

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment ... and establish the elements of a malicious prosecution claim under state law." *Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002) (internal citations omitted). In order to establish a malicious prosecution claim under New York law, "a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff [by the defendant]; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello v. City of N.Y.*, 612 F.3d 149, 161 (2d Cir. 2010) (citations omitted).

The probable cause standard in a malicious prosecution claim is "slightly higher" than that required in a false arrest case. *Stansbury v. Wertman*,721 F.3d 84, 95 (2d Cir. 2013). New York law requires "such facts and circumstances

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 280 of 529
Bird v. County of Westchester, Not Reported in Fed. Supp. (2022)
2022 WL 2263794

that would lead a reasonably prudent person to believe the plaintiff guilty." *Id.* To hold a police officer liable for malicious prosecution, an officer "must do more than report the crime or give testimony," he must "be found to have initiated the prosecution." *Culpepper v. City of N.Y.*, No. 14-CV-6585(ALC), 2016 WL 5334978, at *5 (S.D.N.Y. Sept. 21, 2016) (internal quotation marks omitted) (quoting *Manganiello*, 612 F.3d at 163). When analyzing such a claim, there is a presumption that the "prosecutor exercises independent judgment in deciding whether to initiate and continue a criminal proceeding." *Alcantara v. City of N.Y.*, 646 F. Supp 2d 449, 457 (S.D.N.Y. 2009) (quoting *Crenshaw v. City of Mount Vernon*, No. 06-CV-2722, 2008 WL 445223, at *8 (S.D.N.Y. Sept. 30, 2008)). The presumption may be rebutted where an officer "play[s] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act", *Manganiello*, 612 F.3d at 163 (internal quotation marks omitted) (quoting *Rohman v. N.Y. City Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2010)), or "provid[ing] false information to a prosecutor." *Cameron v. City of N.Y.*, 598 F.3d 50, 63–64 (2d Cir. 2010).

**\*7** Here, the County Defendants aver that Plaintiff has failed to provide facts to support the element of malice. (Mem. at 12.) "Under New York law, malice does not have to be actual spite or hatred, but means only 'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.' " *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996). The Amended Complaint conclusively alleges that Plaintiff was "maliciously prosecuted" due to Defendants' "racially discriminatory prejudices, their desire to meet an arrest quota and to benefit from increased overtime compensation." (AC ¶ 54.) As the County Defendants argue, Plaintiff fails to include any facts to support these allegations. *See Nieves v. Cnty. of Monroe*, 761 F. Supp. 2d 48, 52 (W.D.N.Y. 2011) ("Conclusory or speculative allegations are insufficient: plaintiff must *specifically* allege that the named defendants acted with malice.") (emphasis in original).

However, "in most cases, the lack of probable cause—while not dispositive—tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause." *Crews v. Cnty. of Nassau*, 996 F. Supp. 2d 186, 207–08 (E.D.N.Y. 2014) (internal quotation marks omitted); *see also Boyd v. City of N.Y.*, 336 F.3d 72, 78 (2d Cir. 2003) ("[a] lack of probable cause generally creates an inference of malice."). While at one point the County

Defendants may have had facts and circumstances that would lead a reasonably prudent person to believe Plaintiff owned the contraband, this was debunked when "Stevens" was found to be the actual owner. The Court therefore holds that the County Defendants did not have probable cause while continuing the prosecution of Plaintiff, and therefore malice may be inferred. [2]

[2]    Defendants also aver that Plaintiff has failed to satisfy the "favorable termination" element as just alleging the charges were dismissed is insufficient. (Mem. at 12-13.) However, in *Thompson v. Clark*, 142 S. Ct. 1332, 1341 (2022), the Supreme Court held that "a Fourth Amendment claim under § 1983 for malicious prosecution does not require the plaintiff to show that the criminal prosecution ended with some affirmative indication of innocence. A plaintiff need only show that the criminal prosecution ended without a conviction." Therefore, Plaintiff has satisfied the favorable termination element.

Accordingly, the Court denies the County Defendants' motion to dismiss the malicious prosecution claim.

### e. Malicious Abuse of Process

To make out a claim for malicious abuse of process under Section 1983, a plaintiff must plausibly allege that he was denied a federal right. *See Hoffman v. Town of Southampton*, 523 F. App'x 770, 771 (2d Cir. 2013) (summary order). The Second Circuit has held that "where the process alleged to have been abused is criminal in nature, an adequately pled claim for malicious abuse of process is 'by definition a denial of procedural due process.' " *Id.* (quoting *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)).

Federal courts look to state law to determine the elements of an abuse of process claim. *See Cook*, 41 F.3d at 80. In New York, a malicious abuse of process claim lies against a defendant who "(1) employs regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino v. City of N.Y.*, 331 F.3d 63, 69–70 (2d Cir. 2003) (internal quotation marks omitted). To plead a collateral objective, a plaintiff must plausibly plead "not that defendant acted with an improper motive, but

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 281 of 529

Bird v. County of Westchester, Not Reported in Fed. Supp. (2022)

2022 WL 2263794

rather an improper purpose—that is, 'he must claim that [the defendant] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution.' " *Douglas v. City of N.Y.*, 595 F. Supp. 333, 344 (S.D.N.Y. 2009) (quoting *Savino*, 331 F.3d at 77). Although malicious prosecution and malicious abuse of process are similar, malicious prosecution is the improper issuance of process, while malicious abuse of process is improper use of process after it has been legally issued. *Cook*, 41 F.3d at 80.

**\*8** Here, the County Defendants aver that Plaintiff failed to allege that they used the criminal process against him in an improper fashion after it was issued. (Mem. at 14-15.) The Court agrees. *See Rodriguez v. City of New York*, No. 17-cv-12 (KBF), 2018 WL 2371719, at * (S.D.N.Y. May 24, 2018) (dismissing abuse of process claim where "plaintiff has <u>not</u> alleged that Officer Gale, notwithstanding his motivation in issuing criminal process, has subsequently <u>used</u> that process in an improper fashion—<u>e.g.</u>, to extort money or to coerce some action.") (emphasis in original). Plaintiff merely alleges that he was criminally prosecuted due to the County Defendants' discriminatory prejudices, desire to meet a quota, and to benefit from overtime compensation. He includes no allegations reflecting any wrongdoing undertaken after the prosecution was issued.

Accordingly, the County Defendants' motion to dismiss the malicious abuse of process claim is granted.

### f. Denial of Right to a Fair Trial

Plaintiff next alleges the County Defendants violated his right to a fair trial pursuant to the Sixth and Fourteenth Amendments. (AC ¶ 147.) "[W]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under" Section 1983. *Lewis v. City of N.Y.*, 591 F. App'x 21, 22 (2d Cir. 2015) (summary order) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997)). Such an action is warranted when "the allegedly fabricated evidence 'is the officer's own account of his or her observations of alleged criminal activity, which he ... then conveys to a prosecutor.' " *Lauderdale v. City of N.Y.*, No. 15-CV-1486 (JGK), 2018 WL 1413066, at *8 (S.D.N.Y. Mar. 19, 2018) (quoting *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 274 (2d Cir. 2016)).

"To state a claim for lack of a fair trial due to the fabrication of evidence, Plaintiff must show that an '(1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result.' " *Barnes v. City of N.Y.*, No. 18-cv-7119 (AJN), 2020 WL 6947424, at *4 (S.D.N.Y. Nov. 25, 2020) (citing *Jovanovic v. City of N.Y.*, 486 F. App'x 149, 152 (2d Cir. 2012)). The "manufacture of false evidence, in and of itself ... does not impair anyone's liberty," *Zahrey v. Coffey*, 221 F.3d 342, 348 (2d Cir. 2000) (internal quotation marks omitted), and therefore "in order to state a legally sufficient claim ... a plaintiff must colorably allege that this evidence ... cause[d] a constitutional injury," *Rolon v. Henneman*, 517 F.3d 140, 148 (2d Cir. 2008).

Here, Plaintiff alleges the County Defendants "gave false, misleading, or incomplete information to the District Attorney's Office, namely that [Plaintiff] had promoted prison contraband, so that a criminal prosecution would be initiated against [him]." (AC ¶ 45.) However, Plaintiff fails to allege that the County Defendants actually fabricated evidence. "For fabrication, Plaintiff must show that the officers knew the statements were false and made them anyway." *Barnes*, 2020 WL 6947424, at *4. In the Amended Complaint, Plaintiff merely alleges in a conclusory fashion that the County Defendants "knowingly and intentionally" gave false information (AC ¶ 45), he provides no facts to support this conclusion. Based on the allegations in the Amended Complaint, the contraband was "misattributed" to Plaintiff (AC ¶ 40), and therefore it follows that the County Defendants genuinely believed that Plaintiff was the owner of the contraband at the time they provided this information to the District Attorney's Office.

**\*9** Accordingly, the County Defendants' motion to dismiss Plaintiff's denial of a right to fair trial claim is granted.

### g. Deprivation of Rights and Denial of Equal Protection

Plaintiff next brings a claim for the deprivation of rights and denial of equal protection pursuant to Sections 1981 and 1983. (AC ¶¶ 159-167.) As "plaintiffs must meet the same pleading standard for their § 1981 claims as for their § 1983 claims under the Equal Protection Clause", *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 1999), the Court will evaluate these claims together.

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 282 of 529

Bird v. County of Westchester, Not Reported in Fed. Supp. (2022)

2022 WL 2263794

The Fourteenth Amendment declares that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The Equal Protection Clause 'is essentially a direction that all persons similarly situated should be treated alike.' " Brown, 221 F.3d at 337 (quoting City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985)). "To state a violation of the Equal Protection Clause, a plaintiff must allege 'that he [or she] was treated differently than others similarly situated as a result of intentional or purposeful discrimination.' " Lopez v. Cipolini, 136 F. Supp. 3d 570, 590–91 (S.D.N.Y. 2015) (quoting Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005)).

Here, Plaintiff alleges that the County Defendants "subjected Plaintiff to disparate treatment compared to other individuals similarly situated, because Defendants did not pull over any white inmates, who were actually promoting prison contraband in the Defendants' view." (AC ¶ 60.) However, this contravenes Plaintiff's allegations that he and "several other inmates" who "returned from court ... were ordered to completely disrobe, squat down while naked and cough" and that the County Defendants "visually examined Plaintiff and the other inmates ...." (Id. ¶ 36-37.) Plaintiff does not allege that he was treated differently from any of the other inmates that returned from court. Plaintiff further does not specify a time where he was treated differently from any white inmate, or where white inmates who were promoting contraband were not prosecuted by the Defendants. Therefore, Plaintiff's claim fails.

Accordingly, the County Defendants' motion to dismiss Plaintiff's deprivation of rights and denial of equal protection claim is granted.

### h. Conspiracy

Plaintiff next alleges a conspiracy to interfere with civil rights or failure to prevent the conspiracy pursuant to Sections 1981, 1983, 1985, and 1986. As an initial matter, a plaintiff may not bring a conspiracy claim under Section 1981. See Dilworth v. Goldberg, 914 F. Supp. 2d 433, 465 (S.D.N.Y. 2012) ("Although § 1981 may serve as the predicate for a conspiracy claim under 42 U.S.C. § 1985, § 1981 does not itself provide a mechanism for recovering upon a claim of conspiring to violate § 1981."). The Court will examine Plaintiff's claims brought under Sections 1983, 1985, and 1986 below.

### iii. Section 1983

To plead a conspiracy under Section 1983, a plaintiff must allege "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999). "[T]he pleadings must present facts tending to show agreement and concerted action" and therefore conclusory allegations are insufficient. Banks v. City of White Plains Police, No. 14 CV 670 (VB), 2014 WL 6642360, at *3 (S.D.N.Y. Oct. 17, 2014). Moreover, "a civil conspiracy claim does not set forth an independent cause of action but rather is sustainable only after an underlying claim has been established." Gonzalez v. City of N.Y., No. 1:18-cv-2197-GHW, 2020 WL 158432, at *4 (S.D.N.Y. Jan. 13, 2020) (quoting DeMartino v. N.Y.S. Dep't of Labor, 167 F. Supp. 3d 342, 373 (E.D.N.Y. 2016)).

**\*10** Here, Plaintiff alleges that "Defendants engaged in a conspiracy against Plaintiff to deprive Plaintiff of the equal protection of the laws, or of the privileges and immunities under the laws" and that they were "motivated by some racial, or otherwise class-based, invidious discriminatory animus." (AC ¶¶ 169; 172.) This allegation is related to Plaintiff's deprivation of rights and denial of equal protection claim. As already detailed in this Opinion, that claim fails as it is not adequately pled. Because there is no underlying claim to support Plaintiff's conspiracy allegations, the Court grants the County Defendants' motion to dismiss Plaintiff's Section 1983 conspiracy claim.

### iv. Section 1985

As Plaintiff is "not a federal official and his claims are not related to the participation of witnesses in judicial proceedings," Sections 1985(1) and 1985(2) do not apply. Morgan v. Dzurenda, No. 3:14-cv-966(VAB), 2016 WL 6826156, at *4 (D. Conn. Nov. 18, 2016). To state a conspiracy under Section 1985(3), a plaintiff must allege "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States." Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085,

Bird v. County of Westchester, Not Reported in Fed. Supp. (2022)

2022 WL 2263794

1087 (2d Cir. 1993). Critically, "the conspiracy must also be motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.' " *Id.* (quoting *United Bhd. of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825, 829 (1983)).

Here, as discussed above, Plaintiff has failed to allege any facts showing any of the County Defendants acted with discriminatory motivation. Plaintiff merely alleges in a conclusory fashion that the County Defendants acted with "racially discriminatory prejudices" when searching him. (AC ¶ 54.) That is insufficient. The Court therefore grants the County Defendants' motion to dismiss the Section 1985 conspiracy claim.

## *v. Section 1986*

Section 1986 provides that any "person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do" shall be liable to the injured party. 42 U.S.C. § 1986; *see also Secard v. Wells Fargo Bank, N.A., No CV-15-499 (JS) (ARL)*, 2015 WL 6442563, at *4 (E.D.N.Y. Sept. 9, 2015) (construing Plaintiff's Section 1983 "refusing or neglecting to prevent" claim as brought under Section 1986), *report & recommendation adopted*, 2015 WL 6442346 (E.D.N.Y. Oct. 23, 2015). A Section 1986 claim "must be predicated on a valid Section 1985 claim and, in the absence of such a predicate claim, must be dismissed." *Cater v. N.Y.*, 316 F. Supp. 3d 660, 672 (S.D.N.Y. 2018) (citing *Brown*, 221 F.3d at 341).

Here, as Plaintiff has failed to plead a valid Section 1985 claim, his claim brought under Section 1986 must also be dismissed. Accordingly, the County Defendants' motion to dismiss Plaintiff's conspiracy claims brought under Sections 1981, 1983, 1985, and 1986 is granted.

## i. Failure to Intervene

Plaintiff's last federal claim is for failure to intervene. (AC ¶¶ 180-182.) "[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552,

557 (2d Cir. 1994). Liability may attach where an officer observes or has reason to know: (1) "that excessive force is being used"; (2) "that a citizen has been unjustifiably arrested"; or (3) "that any constitutional violation has been committed by a law enforcement official." *Id.* For an officer to be held liable, he or she must have had "a realistic opportunity to intervene" to prevent the violation from happening. *Id.* (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir. 1988)). However, "there can be no failure to intervene claim without a primary constitutional violation." *Forney v. Forney*, 96 F. Supp. 3d 7, 13 (E.D.N.Y. 2015). Further, where the officer is a direct participant in the allegedly unlawful conduct, the failure to intervene theory of liability is inapplicable. *Simon v City of N.Y.*, No. 09 Cv. 1302 (ENV) (RER), 2011 WL 317975, at *12 (E.D.N.Y. Jan. 3, 2011) (dismissing plaintiff's failure to intervene claim "because these same officers actually arrested her.").

**\*11** Here, Plaintiff brings a failure to intervene claim as "[t]hose Defendants that were present but did not actively participate in the ... unlawful conduct observed such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct, and failed to intervene." (AC ¶ 180.) However, Plaintiff fails to allege facts showing any of the Defendants committed a constitutional violation in the presence of the County Defendants. Instead, the Amended Complaint alleges broadly that the County Defendants directly participated in the claimed constitutional violations.

Accordingly, the County Defendants' motion to dismiss Plaintiff's failure to intervene claim is granted.

## II. *Monell* Liability

The claims in the Amended Complaint are also brought against Westchester and Pectol and McWilliams in their official capacities. For municipalities and officers acting in their official capacities, liability under Section 1983 may not be found on a *respondeat superior* theory solely because the municipality or officer employs the actor who commits the wrongdoing or violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Under *Monell*, a plaintiff must allege "that the municipality itself caused or is implicated in the constitutional violation." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004).

The Second Circuit uses a two-prong approach in determining *Monell* liability for Section 1983 claims. *Vippolis v. Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985). First, the

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 284 of 529

Bird v. County of Westchester, Not Reported in Fed. Supp. (2022)

2022 WL 2263794

plaintiff must plead "the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer." *Id.* Second, the plaintiff must allege a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Hayes v. Cnty. of Sullivan*, 853 F.Supp.2d 400, 439 (S.D.N.Y. 2012) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

To plead an official custom or policy, a plaintiff must allege one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of N.Y.*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (internal citations omitted). If a plaintiff alleges *Monell* liability for a municipality or official based on an unofficial policy or custom, then the practice, custom, or usage must be so widespread and persistent that it has the force of law. *Goode v. Westchester Cnty.*, No. 18-cv-2963 (NSR), 2019 WL 2250278, at *3 (S.D.N.Y. May 24, 2019). However, "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 122 (2d Cir. 1991) (internal quotation marks omitted)).

Alternatively, where municipal liability is based on a failure to train employees, the inadequate training itself must "reflect[ ] deliberate indifference to ... constitutional rights." *City of Canton*, 489 U.S. at 392. To allege deliberate indifference, a plaintiff must properly plead (1) "that a policymaker knows to a moral certainty that [his or] her employees will confront a given situation"; (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "that the wrong choice by the ... employee will frequently cause the deprivation of a citizen's constitutional rights." *Okin v. Village of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009).

**\*12** Here, the Amended Complaint alleges broadly that Westchester "has engaged in a policy, custom, or pattern and practice of searching and arresting ethnic minorities without probable cause or reasonable suspicion" and "illegally searching unlawfully individuals without any justification to do so." (AC ¶¶ 51-52.) The Amended Complaint also alleges that Defendants "are part of a larger pattern and practice of similar misconduct, which was so widespread, pervasive, and consistent" that the constitutionally violative behavior is "tantamount to an official policy or custom." (AC ¶ 61.) Plaintiff's claims are insufficient as they are purely conclusory. *See Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 536 (2d Cir. 1993) (affirming dismissal of *Monell* claim where "[t]he complaint contained only conclusory and speculative assertions" that the alleged conduct occurred "pursuant to the practice, custom, policy and particular direction of" the supervisory official); *Yaa-Lengi Ngemi v. Cnty. of Nassau*, 87 F. Supp. 3d 413, 419 n.6 (E.D.N.Y. 2015) ("the Court holds that the conclusory allegations of a policy and practice, and a lack of training/supervision, are insufficient to state a plausible *Monell* claim")

Further, Plaintiff fails to allege the existence of any other similar incident, which "dooms Plaintiff's claim because a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality." *Dumel v. Westchester Cnty.*, No. 19-CV-2161 (KMK), 2021 WL 738365, at *5 (S.D.N.Y. Feb. 25, 2021) (quoting *Ruiz v. Westchester Cnty.*, No. 18-CV-7007, 2020 WL 4340788, at *7 (S.D.N.Y. July 28, 2020)); *see also Pittman v. City of N.Y.*, No. 14-CV-4140, 2014 WL 7399308, at *7 (E.D.N.Y. Dec. 30, 2014) ("A Monell claim cannot go forward based on conclusory claims regarding a single incident without more evidence that connects th[e] incident to a municipal policy or practice.")

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 285 of 529

Bird v. County of Westchester, Not Reported in Fed. Supp. (2022)

2022 WL 2263794

Next, the Amended Complaint alleges that "policymakers or supervisors have failed to provide adequate training regarding the identification of probable cause, reasonable suspicion or the appropriate amount of force to be used." (AC ¶ 64.) A failure to train or supervise constitutes a policy or custom that is actionable under Section 1983 only where "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390. Without any further factual allegations, Plaintiff's claim that Westchester was aware of these issues and failed to train, supervise, or discipline their employees is a legal conclusion rather than a factual allegation sufficient to state a *Monell* claim. *See Quick v. Westchester Cnty.*, No. 18-CV-243 (KMK), 2019 WL 1083784, at *5 (S.D.N.Y. Mar. 7, 2019) (dismissing *Monell* claim where a plaintiff alleged the failure to supervise kitchen workers who did not wear hair nets because the complaint was "devoid of any detailed factual allegations" that the defendant lacked "a relevant training or supervisory program" or that it "was otherwise deliberately indifferent to food preparation problems"); *Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 539–40 (S.D.N.Y. 2012) (dismissing *Monell* claim where the plaintiff "merely alleged that the [t]own failed to train its employees, without providing any supporting factual detail about alleged deficiencies in the training program"). Plaintiff has not cited any deficiencies in Westchester's training or supervision protocols.

Accordingly, the federal claims against Westchester, as well as Pectol and McWilliams in their official capacities are dismissed.

### III. State Law Claims

Lastly, the County Defendants avers that Plaintiff's state law claims are precluded due to his failure to comply with General Municipal Law § 50-h. (Mem. at 24-25.) Section 50-h states:

> [w]herever a notice of claim is filed against a city, county, town, village, fire district, ambulance district or school district the city, county, town, village, fire district, ambulance district or school district shall have the right to demand an examination of the claimant relative to the occurrence and extent of the injuries or damages for which claim is made, which examination shall be upon oral questions unless the parties otherwise stipulate ... The action ... may not be commenced until compliance with the demand for examination if the claimant fails to appear at the hearing or requests an adjournment or postponement beyond the ninety day period.

**\*13** N.Y. Gen. Mun. Law § 50-h(1); (5). In federal court, "a 'plaintiff's failure to attend a 50-h [h]earing—*no matter the reason*—is a complete bar to his state law claims[.]' " *Foy v. City of N.Y.*, No. 1:17-CV-0406, 2019 WL 3717317, at *9 (E.D.N.Y. Aug. 7, 2019) (emphasis in original) (quoting *Duncan v. City of N.Y.*, No. 11-CV-3901 (ENV) (JO), 2018 WL 3421312, at *3 (E.D.N.Y. July 13, 2018)).

Here, the County Defendants aver the Court must dismiss Plaintiff's state law claims for failure to comply with the oral examination requirement of 50-h as he failed to attend the scheduled examination. (Mem. at 24-25.) However, the claims may only be dismissed against Westchester and the other County Defendants in their official capacities. As "§ 50-h does not refer to claims filed against 'officers, appointees and employees' of municipal corporations ... [it] does not bar these claims after Plaintiff's failure to attend a municipally scheduled hearing." *Bradley v. Golphin*, No. 14-CV-4289 (NGG) (RML), 2018 WL 480754, at *4 (E.D.N.Y. Jan. 18, 2018) (holding § 50-h did not bar the plaintiff's claim against defendants sued in their individual capacities); *see also Nolan v. Cnty. of Erie*, No. 1:19-cv-01245, 2020 WL 1969329, at *6 (W.D.N.Y. Apr. 24, 2020) (dismissing state law claims against the County Defendant only as the claims brought against the defendants in their individual capacities "are not subject to dismissal for failure to comply with a demand for examination").

Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's state law claims against Westchester, as well as against Pectol and McWilliams in their official capacities only. [3]

3      Defendants also argue the Court should dismiss Plaintiff's state law claims as "retaining jurisdiction

Bird v. County of Westchester, Not Reported in Fed. Supp. (2022)

2022 WL 2263794

over state law claims is unwarranted where federal claims do not survive." (Mem. at 24.) As at least one of Plaintiff's federal claims has survived, the Court will not address this argument.

### CONCLUSION

For the foregoing reasons, the County Defendants' motion to dismiss is GRANTED in part and DENIED in part. Plaintiff's claims against the County of Westchester and Frank Oliveri, as well as his claims against B. Pectol and Sgt. McWilliams in their official capacities are dismissed without prejudice. Plaintiff's federal causes of action for unlawful search and seizure, excessive force, malicious abuse of process, denial of his right to fair trial and due process, deprivation of rights and denial of equal protection of the laws, conspiracy to interfere with civil rights and failure to prevent the conspiracy, and failure to intervene are also dismissed without prejudice.

Plaintiff's remaining claims include his Section 1983 claims for false arrest and imprisonment and malicious prosecution, and his state law claims against Defendants B. Pectol and Sgt. McWilliams in their individual capacities only. Plaintiff is granted leave to file a Second Amended Complaint in accordance with this Opinion and Order by July 8, 2022. Defendants are then directed to answer or otherwise respond by July 29, 2022.

The Clerk of Court is kindly directed to terminate the motion at ECF No. 24, and to terminate the Westchester County Department of Corrections and Westchester County Police Department as Defendants.

### All Citations

Not Reported in Fed. Supp., 2022 WL 2263794

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **1.  Docket 7:20-CV-10076**<br>Bird v. County Of Westchester et al | — | S.D.N.Y. | Dec. 01, 2020 | Docket |

**History**

There are no History results for this citation.

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 289 of 529

Fantozzi v. City of New York, Not Reported in Fed. Supp. (2023)

2023 WL 4472305

2023 WL 4472305
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Stephen Joseph FANTOZZI, Plaintiff,
v.
CITY OF NEW YORK, Defendant.

1:21-cv-4439-GHW
|
Signed July 11, 2023

**Attorneys and Law Firms**

Joseph Michael Stancati, Law Office of Joe Stancati, New York, NY, for Plaintiff.

<u>MEMORANDUM OPINION AND ORDER</u>

GREGORY H. WOODS, District Judge:

**I. INTRODUCTION**

 *1  This opinion addresses a second motion to dismiss Plaintiff Stephen Fantozzi's complaint alleging that in May 2018, New York Police Department ("NYPD") officers brutally assaulted him while effectuating an arrest without probable cause. In the first opinion, the Court noted that because procedural rules have consequences, Plaintiff's failure to timely serve the individual officers required that they be dismissed from the case. And that opinion further detailed the factual inadequacy of Plaintiff's municipal-liability claim against Defendant City of New York, although it granted Plaintiff leave to amend that claim.

The City now moves to dismiss Plaintiff's amended complaint, arguing that it still fails to state a claim on which relief can be granted. Because Plaintiff's amended complaint does not contain sufficient allegations to give rise to a plausible inference that the NYPD's training, supervisory, or disciplinary procedures were so faulty that they represented an official policy or custom, the Court agrees. So Defendant's motion to dismiss is GRANTED.

**II. BACKGROUND** [1]

[1]    Unless otherwise noted, the facts are taken from the amended complaint, and are accepted as true for the purposes of this Rule 12(b)(6) motion. *See, e.g.*,

Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

**A. Facts Concerning the Alleged Assault**

On May 18, 2018, Plaintiff was seated on a bench at 50 Battery Place in Manhattan. Dkt. No. 36 ("Am. Compl.") ¶¶ 11–12. Without provocation or probable cause, Officer Anthony Sclafani approached him and shouted at Plaintiff to stand up and turn around. *Id.* ¶ 13. Sclafani repeatedly "swipe-kicked" Plaintiff's leg, then pulled Plaintiff's leg out from under him and shoved Plaintiff into the ground. *Id.* ¶¶ 14–15. Then, Sclafani stomped on Plaintiff's lower back and right hand, which caused severe injury to both body parts. *Id.* ¶¶ 16–18.

Sclafani then placed Plaintiff in tight handcuffs and ignored Plaintiff's plea to loosen them; Plaintiff would later experience "handcuff neuropathy" related to the handcuffing. *Id.* ¶¶ 19–20. While still on the ground and handcuffed, Plaintiff asked Sclafani not to pull him up by his arms because he had preexisting shoulder injuries. *Id.* ¶ 22. But Sclafani did so anyway, which exacerbated those injuries. *Id.* ¶ 23. A supervising officer, whom Plaintiff believes to be Officer Angel L. Figueroa, Jr., and ten other unnamed officers observed all of this but never intervened. *Id.* ¶¶ 24–27.

Plaintiff, with the handcuffs still on, was put into an ambulance. *Id.* ¶ 21, 28. The ambulance took him to Mount Sinai Morningside Hospital, where he received treatment for the injuries he sustained from this attack. *Id.* ¶ 28. Plaintiff's injuries from the arrest are ongoing and permanent. *Id.* ¶ 29. Despite his arrest and alleged mistreatment, no charges were ever brought against him. *Id.* ¶ 30.

**B. Procedural History**

 *2  Plaintiff's original complaint, filed in May 2021, brought claims against Officers Sclafani and Figueroa, Jr., John and Jane Doe officers, and the City of New York. Dkt. No. 1. On June 1, 2022, the Defendants jointly moved to dismiss the complaint, Dkt. No. 29, and the Court granted the motion through an order and opinion issued on October 20, 2022. Dkt. No. 34. In that opinion, the Court dismissed Plaintiff's claims against the individual defendants—Sclafani, Figueroa,

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 290 of 529

Fantozzi v. City of New York, Not Reported in Fed. Supp. (2023)

2023 WL 4472305

Jr., and the John and Jane Doe defendants—because Plaintiff's counsel had failed to serve those defendants, had additionally failed to show good cause for the failure, and because no discretionary extension of time was warranted on the facts presented to the Court. *Id.* at 8–19. The Court also dismissed Plaintiff's municipal liability claim against the City of New York as insufficiently pleaded and abandoned for the purposes of the motion. *Id.* at 19–20.

Considering whether Plaintiff should be granted leave to amend his complaint, the Court noted that any amendment with respect to the individual defendants would be futile because the statute of limitations had run on those claims. *Id.* at 21. So the Court denied leave to amend concerning the individual defendants, and dismissed those defendants from the case. *Id.* at 21–22. Because it was unclear from the complaint whether the statute of limitations would bar Plaintiff's municipal liability claim against the City of New York, however, the Court granted Plaintiff leave to replead that claim. *Id.* Plaintiff did so by filing an amended complaint on November 4, 2022. Dkt. No. 36 ("Am. Compl."). The City of New York, as the lone remaining Defendant, moved to dismiss that complaint under Federal Rule of Civil Procedure 12(b)(6) on December 29, 2022. Dkt. No. 43 (motion); Dkt. No. 44 (memorandum in support, or "Def's Mem."). That motion is fully briefed. Dkt. No. 48 (Plaintiff's opposition, or "Pl's Opp."); Dkt. No. 49 (Defendant's reply, or "Reply").

### C. Contextual Facts About the New York Police Department

In his amended complaint, Plaintiff pleads a set of "contextual facts" about the NYPD that he did not raise in his original complaint. Am. Compl. ¶¶ 31–44. The majority of these facts are drawn from an October 1, 2015 report issued by the New York City Department of Investigation's Office of the Inspector General (the "OIG Report," or the "Report"). *Id.* ¶¶ 31–41.[2] Plaintiff highlights a number of facts included in the Report, including that:

- As of the publication of the Report, the NYPD had no definitions for the terms "force" or "excessive force" in its Patrol Guide, *id.* ¶ 32;

- From 2010–2014, the Civilian Complaint Review Board (the "CCRB") received over 10,000 complaints alleging excessive force by the NYPD, *id.* ¶ 33;

- 207 of these complaints were "substantiated" during that time, *id.* ¶ 34;

- In 35.6% of substantiated cases investigated by the OIG, no discipline was imposed on the subject officer, and in 67.4% of substantiated and investigated cases, discipline was either not imposed or reduced from the CCRB's recommendation, *id.* ¶¶ 35–36;

- In half of the substantiated cases that resulted in an arrest, the officer completing the arrest report affirmatively reported that an arrest was not used, *id.* ¶ 39; and

- At the time the Report was issued, it was "impossible to accurately and comprehensively track the use of force by NYPD officers." *Id.* ¶ 41.

2    Plaintiff has incorporated the full OIG Report by reference into his complaint. *See* Am. Compl. ¶ 31 n.1 (citing New York City Department of Investigation, Office of the Inspector General for the NYPD (OIG-NYPD), *Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices* (2015), https://www.nyc.gov/html/oignypd/assets/downloads/pdf/oig_nypd_use_of_force_report_-_oct_1_2015.pdf.); *see also DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir. 2010) (the Court may consider documents incorporated by reference into the complaint).

**\*3** In addition to these facts pulled from the OIG Report, the Amended Complaint cites three additional facts from three additional sources. First, citing to a NYPD Misconduct Complaint Database maintained by the American Civil Liberties Union ("ACLU") of New York, Plaintiff notes that 494 substantiated force allegations had been made against active NYPD officers as of April 2021. *Id.* ¶ 42. Second, citing to an additional database, Plaintiff notes that Officer Sclafani is one such active officer with a substantiated force allegation against him. *Id.* ¶ 43. And finally, referencing yet another database, Plaintiff notes that 577 excessive force lawsuits were filed against NYPD officers between 2016 and 2020. *Id.* ¶ 44.[3]

3    Plaintiff has incorporated each of these databases by reference into his complaint. Am. Compl. ¶¶ 42–44 & nn. 2–4. Plaintiff, however, has also attempted to submit an additional declaration

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 291 of 529

Fantozzi v. City of New York, Not Reported in Fed. Supp. (2023)

2023 WL 4472305

and additional attachments through his opposition briefing. Dkt. No. 47. To the extent that those documents are distinct from those incorporated through Plaintiff's complaint, they cannot be considered. *See Chambers*, 282 F.3d at 153 (limiting the documents that a court may consider on a motion to dismiss to the complaint, written instruments attached to the complaint, documents incorporated by reference, or documents integral to the complaint); *In re Agape*, 773 F. Supp. 2d 298, 316 (E.D.N.Y. 2011) ("It is well-settled that a plaintiff cannot amend the complaint through briefs and affidavits, and 'such facts are thus irrelevant for purposes of determining whether [the Plaintiff's] [c]omplaint should be dismissed for failure to state a claim.' ") (quoting *Pollio v. MF Global, Ltd.*, 608 F. Supp. 2d 564, 568 n.1 (S.D.N.Y. 2009)). As the Court noted in its prior opinion, "there are rules in litigation, and consequences flow from parties' failure to follow them." Dkt. No. 34 at 22 n.4.

## III. LEGAL STANDARD

Under Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 110–11 (2d Cir. 2010). To avoid dismissal, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A formulaic recitation of the elements of a cause of action, devoid of supporting facts, does not suffice. *Id.* To satisfy the "plausibility" requirement, the plaintiff must plead facts that permit the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). However,

> "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." A complaint must therefore contain more than "naked assertion[s] devoid of further factual enhancement."

Pleadings that contain "no more than conclusions ... are not entitled to the assumption of truth" otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87–88 (2d Cir. 2013) (alterations in original) (quoting *Iqbal*, 556 U.S. at 678–79). Thus, a complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555, 557).

**\*4** On a motion to dismiss, a court must generally "limit itself to the facts stated in the complaint." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006) (quoting *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)). A court may also consider "documents attached to the complaint as exhibits, ... documents incorporated by reference in the complaint ... [and] document[s] integral to the complaint." *DiFolco*, 622 F.3d at 111 (internal quotation marks and citation omitted). In the Rule 12(b)(6) context, "[a] court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). "The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits. The Rule thus assesses the legal feasibility of the complaint, but does not weigh the evidence that might be offered to support it." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006).

## IV. DISCUSSION

Plaintiff brings two municipal-liability claims against the City under 42 U.S.C. § 1983: (1) a failure to train claim, Am. Compl. ¶¶ 45–51, and (2) a failure to supervise or discipline claim, *id.* ¶¶ 52–63. A municipality is not vicariously liable for its employees' actions under Section 1983. *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). Municipalities are, however, liable for "their *own* illegal acts." *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)). Plaintiffs seeking to hold a municipality liable under Section 1983, through what is sometimes called a "*Monell*" claim, must plead "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Rodriguez v. Winski*, 973 F. Supp. 2d 411, 425 (S.D.N.Y. 2013) (citing *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)); *see Monell*, 436 U.S. at 694 (stating

Case 5:25-cv-00956-AJB-MJK Document 9 Filed 12/08/25 Page 292 of 529

Fantozzi v. City of New York, Not Reported in Fed. Supp. (2023)

2023 WL 4472305

that "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts [an] injury," then "the government as an entity is responsible under § 1983").

The parties dispute only whether Plaintiff has adequately alleged an official policy or custom. *See* Def's Mem. at 3–8; Pl's Opp. at 2–4. "A plaintiff may satisfy [this] prong[ ] in one of four ways: by alleging the existence of (1) a formal policy, (2) action taken or decisions made by policymakers that caused the violation of plaintiff's rights, (3) a practice so persistent and widespread that it constitutes a 'custom or usage,' or (4) a failure to properly train or supervise municipal employees." *Boddie v. City of New York*, No. 15-cv-4275, 2016 WL 1466555, at *2 (S.D.N.Y. Apr. 13, 2016) (quoting *Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996)).

Here, both of Plaintiff's theories—failure to train and failure to supervise or discipline—fall into the final category. But because Plaintiff has failed to plead facts plausibly suggesting the existence of an official policy or custom through either theory, Defendant's motion to dismiss will be granted.

### A. Failure to Train

Plaintiff has not plausibly stated a failure-to-train claim. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. In order for municipal liability to attach under Section 1983 in this context, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.' " *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "[D]eliberate indifference may be inferred where the need for more or better supervision to protect against constitutional violations was obvious, ... but the policymaker fail[ed] to make meaningful efforts to address the risk of harm to plaintiffs." *Cash v. Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011). In addition, "[t]o allege deliberate indifference in the context of a failure-to-train claim, a plaintiff must plead facts giving rise to a plausible inference that (1) the municipality knows 'to a moral certainty' that its employees will confront a given situation, (2) either the situation presents the employees with a difficult choice of the sort that training will make less difficult, or there is a history of employees mishandling the situation, and (3) the wrong choice by the employee will

frequently cause a constitutional deprivation. *Boddie*, 2016 WL 1466555, at *4 (quoting *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992)).

**\*5** Plaintiff's claim cannot proceed because it relies on the 2015 OIG Report, which does not raise any plausible inferences about the NYPD's training practices at the time of the alleged incident in 2018. [4] For instance, the OIG Report states that, in 2015, the "NYPD training [did] not adequately focus on de-escalation." OIG Report at 4; *see also* Am. Compl. ¶ 32 (noting that the OIG Report "found that the NYPD had no definitions for the terms 'force' or 'excessive force' in its Patrol Guide"). But this and other statements in the OIG Report about the NYPD's practices in 2015 say nothing about whether the NYPD had made changes from 2015 to 2018 to implement changes to address this issue. *See* OIG Report at 4 (suggesting that the NYPD add courses on de-escalation). Put differently, Plaintiff has failed to allege deliberate indifference because, by failing to include any information about the NYPD's training within the three-year window before he was arrested, he has not alleged that "the policymaker fail[ed] to make meaningful efforts to address the risk of harm to plaintiffs." *Cash*, 654 F.3d at 334. So Defendant's motion to dismiss will be granted as to Plaintiff's failure-to-train claim.

[4]    None of the other documents incorporated by reference into Plaintiff's Amended Complaint— the ACLU misconduct database, the database of officers with substantiated force allegations against them, and the database tracking the number of excessive force lawsuits—discuss NYPD training policies; as a result, they cannot support Plaintiff's failure-to-train claim.

### B. Failure to Supervise or Discipline

Plaintiff's claim for failure to supervise or discipline will likewise be dismissed. A " 'persistent failure to discipline subordinates who violate civil rights' ... can 'give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell*.' " *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 298 (2d Cir. 2020) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)). "Such inaction rises to the level of a municipal policy 'where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 293 of 529

Fantozzi v. City of New York, Not Reported in Fed. Supp. (2023)

2023 WL 4472305

its subordinates' unlawful actions.' " *Boddie*, 2016 WL 1466555, at *3 (quoting *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007)).

Plaintiff's allegations do not satisfy this standard. As an initial matter, several of Plaintiff's statistics from both the OIG Report and other sources concern allegations or complaints made against the NYPD, but do not connect those complaints to disciplinary decisions or a failure to supervise. *See* Am. Compl. ¶ 33 (noting that from 2010 to 2014, there were over 10,000 excessive-force complaints filed with the CCRB); *id.* ¶ 44 (noting that from 2016 to 2020, 557 lawsuits were filed against NYPD officers for excessive force). Numbers of allegations, standing alone, say little about the merits of those allegations. The statistics show that most of the reports of misconduct were not ultimately substantiated. *See Fabian v. City of New York*, No. 16-cv-5296, 2018 WL 2138619, at *7 (S.D.N.Y. May 9, 2018) (noting that the total number of substantiated allegations—207—"represents a mere two percent of the approximately 10,000 complaints of force lodged with the CCRB between 2010 and 2014"); OIG Report at 1 (describing the 207 substantiated allegations of force as "a notably modest number, given the size of NYPD"). And even statistics about substantiated use of force allegations, decoupled from any assertion of how the NYPD responded to those substantiated cases, cannot speak to (or plausibly allege) any failure to discipline. *See* Am. Compl. ¶ 34 (noting the 207 substantiated use of force allegations in the OIG Report); *id.* ¶ 42 (noting 494 substantiated use of force allegations against current NYPD officers as of April 2021); *see Boddie*, 2016 WL 1466555, at *3 (noting that complaints of excessive force do not plausibly "allege persistent failure to discipline officers for using excessive force during the relevant time period" (internal quotation marks omitted)); *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (noting that an inference of indifference arises only where "complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents").

**\*6** Plaintiff does provide some statistics that connect substantiated force allegations to discipline imposed as a result, but they are likewise insufficient to sustain his failure-to-discipline claim. He notes that, over the period studied in the OIG Report (2010–2014), the NYPD imposed no discipline on officers in 35.6% of cases involving substantiated force allegations, and either imposed no discipline or departed downward from the CCRB's recommendations in 67.4% of such cases. Am. Compl. ¶¶ 35–36. To be sure, these statistics suggest that—as of 2015—

there was significant room for improvement in the NYPD's supervision and discipline of officers who used excessive force. But taking the inverse of Plaintiff's cited statistics, they also show that discipline was imposed in 64.4% of substantiated force cases during the 2010–2014 period, and that discipline at or above the CCRB's recommendations was imposed 32.6% of the time. *See also Delorbe-Bell v. City of New York*, No. 15-cv-2344, 2016 WL 1451581, at *3 (S.D.N.Y. Apr. 12, 2016) (noting that the data from the OIG Report "shows that the NYPD imposed discipline in the majority of cases where allegations of excessive force were substantiated," and that in approximately one-third of such cases, the officer received "the most serious disciplinary measure [that] can be filed against an officer"). These statistics, therefore, do not show that the NYPD was "faced with a pattern of misconduct and [did] nothing," as is necessary for disciplinary or supervisory inaction to rise to the level of municipal policy. *Reynolds*, 506 F.3d at 192.

Plaintiff's lead case, *McCants v. City of Newburgh*, No. 14-cv-556, 2014 WL 6645987 (S.D.N.Y. Nov. 21, 2014), is readily distinguishable. *See* Pl's Opp. at 3–4. In *McCants*, Judge Vincent Briccetti declined to dismiss a *Monell* claim where the plaintiff, in addition to alleging that the City failed to monitor or properly train NYPD officers, "detail[ed] seventeen excessive force claims made against the City" prior to the incident in question that were apparently "similar violations" to the ones alleged by the plaintiff in *McCants*. *McCants*, 2014 WL 6645987, at *4 (quoting *Simms v. City of New York*, 480 F. App'x 627, 630 (2d Cir. 2012) (summary order)). Plaintiff's pleadings here, by contrast, point generically to use of force allegations against the City, without connecting any specific allegations (substantiated or not) to his case. *See* Am. Compl. ¶¶ 31–44. So they do not raise the same inference of deliberate indifference that Judge Briccetti found adequate to sustain the claim in *McCants*, or that other judges have similarly found sufficient to state a plausible *Monell* claim. *See Marlin v. City of New York*, No. 15-cv-2235, 2016 WL 4939371, at *20–21 (S.D.N.Y. Sept. 7, 2016) (permitting a *Monell* claim brought by an Occupy Wall Street protestor to proceed, in part because the plaintiff alleged that the NYPD had a pattern of using excessive force "particularly against Occupy Wall Street protestors"); *Osterhoudt v. City of New York*, No. 10-cv-3173, 2012 WL 4481927, at *2 (E.D.N.Y. Sept. 27, 2012) (permitting a *Monell* claim to proceed where the plaintiff connected "his Monell theory with the particulars of his own arrest," and distinguishing dismissed cases where plaintiffs had not done so). Instead, because Plaintiff's claim

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 294 of 529

Fantozzi v. City of New York, Not Reported in Fed. Supp. (2023)

2023 WL 4472305

is supported only by general statistics about the NYPD without connecting those statistics to the specific allegations of excessive force here, it is similar to *Monell* claims that have been dismissed pursuant to Rule 12(b)(6) motions. *See, e.g.*, *Boddie*, 2016 WL 1466555, at *3 (dismissing a failure-to-discipline claim that did not point to "other similar occasions" in the pleadings); *Delorbe-Bell*, 2016 WL 1451581, at *3 (dismissing a failure-to-discipline claim that relied solely on the OIG Report).

Finally, and perhaps most dispositively, Plaintiff's failure-to-discipline claim cannot proceed because it contains *no* allegations about the NYPD's supervisory or disciplinary practices at the time that he was allegedly assaulted in 2018. Instead, the allegations about failure to discipline come solely from the OIG Report. *See* Am. Compl. ¶¶ 35–36.[5] As discussed above in connection with the failure-to-train claim, that means that the amended complaint has nothing to say about whether the NYPD's practices concerning supervision or discipline changed or improved after the release of the OIG Report in 2015. *Cf. Boddie*, 2016 WL 1466555, at *3 (noting that even for the last two years assessed by the OIG Report, "the number of incidents in which a complaint of excessive force was substantiated and the offending officer was not disciplined was 'trending downward' " (quoting OIG Report at 4)). Put simply, a complaint devoid of allegations about the NYPD's supervisory or disciplinary process when the alleged deprivation of constitutional rights occurred does not show any "inaction" relevant to the *Monell* inquiry—let alone "inaction ris[ing] to the level of a municipal policy" because the government was "faced with a pattern of misconduct and [did] nothing." *Id.* at *3 (quoting *Reynolds*, 506 F.3d at 192). As a result, Defendant's motion to dismiss will be granted as to Plaintiff's second claim also.

[5]  Plaintiff's facts about the time period in which the alleged assault occurred, by contrast, do not allege anything about supervision or discipline. *See* Am. Compl. ¶ 42 ("As of April of 2021, 494 substantiated force allegations had been found against individuals who remained active NYPD officers."); *id.* ¶ 44 ("From 2016 through 2020, 577 lawsuits were filed against NYPD officers for allegedly using excessive force against civilians.").

## V. LEAVE TO AMEND

**\*7**  Plaintiff is denied leave to amend is complaint a second time. The decision to grant or deny leave to amend lies within the Court's discretion. *Lobatto v. Berney*, No. 98-cv-1984, 1999 WL 672994, at *10 (S.D.N.Y. Aug. 26, 1999) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Although Fed. R. Civ. P. 15(a)(2) requires the Court to "freely give leave [to amend] when justice so requires," this rule must also "be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

In granting the first motion to dismiss, the Court rejected Plaintiff's municipal liability claim as insufficiently pleaded, *see* Dkt. No. 34 at 19–20, and gave Plaintiff the opportunity to amend his complaint to respond to its opinion. But Plaintiff's amended complaint has failed to cure the deficient pleadings. In that circumstance, courts routinely deny leave to amend, and the Court does so here. *See, e.g.*, *Rubenstein v. Knight-Swift Transp. Holdings, Inc.*, No. 19-cv-7802, 2021 WL 3855863, at *4 (S.D.N.Y. Aug. 27, 2021) ("To grant Plaintiffs leave to amend would be allowing them a 'third bite at the apple,' which courts in this district routinely deny.") (quoting *Binn v. Bernstein*, No. 19-cv-6122, 2020 WL 4550312, at *34 (S.D.N.Y. July 13, 2020), *report and recommendation adopted*, 2020 WL 4547167 (S.D.N.Y. Aug. 6, 2020)); *Steadman v. Mayo*, No. 09-cv-5154, 2012 WL 1948804, at *6 (S.D.N.Y. Mar. 27, 2012) (denying plaintiff leave to replead and dismissing claims with prejudice where he failed to state adequate factual allegations after the court had dismissed a prior complaint and explained that plaintiff failed to allege adequate facts).

## VI. CONCLUSION

For the reasons outlined above, Defendant's motion to dismiss is GRANTED WITH PREJUDICE.

SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2023 WL 4472305

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

## Filings (7)

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **1. Appellant's Reply Brief**<br>Stephen Joseph FANTOZZI, Plaintiff-Appellant, v. CITY OF NEW YORK, Defendant-Appellee, John and Jane Doe 1 through 10, NYPD Officers, in their individual and official capacities (the names John and Jane Doe being fictitious, as their true names are presently unknown), Anthony P. Sclafani, NYPD Police Officer, in his individual and official capacity; and Angel L. Figueroa, Jr., NYPD 1st Precinct Commanding Officer, in his individual and official capacity, Defendants.<br>2024 WL 549947 | — | C.A.2 | Feb. 05, 2024 | Brief |
| **2. Brief for Appellees**<br>Stephen Joseph FANTOZZI, Plaintiff-Appellant, v. CITY OF NEW YORK, Defendant-Appellee, John and Jane Doe 1 through 10, NYPD Officers, in their individual and official capacities (the names John and Jane Doe being fictitious, as their true names are presently unknown), Anthony P. Sclafani, NYPD Police Officer, in his individual and official capacity, and Angel L. Figueroa, Jr., NYPD 1st Precinct Commanding Officer, in his individual and official capacity, Defendants.<br>2023 WL 9017726 | — | C.A.2 | Dec. 27, 2023 | Brief |
| **3. Brief for Plaintiff-Appellant**<br>Stephen Joseph FANTOZZI, Plaintiff-Appellant, v. CITY OF NEW YORK, Defendant-Appellee, John and Jane Doe 1 through 10, NYPD Officers, in their individual and official capacities (the names John and Jane Doe being fictitious, as their true names are presently unknown), Anthony P. Sclafani, NYPD Police Officer, in his individual and official capacity; and Angel L. Figueroa, Jr., NYPD 1st Precinct Commanding Officer, in his individual and official capacity, Defendants.<br>2023 WL 8433957 | — | C.A.2 | Nov. 30, 2023 | Brief |
| **4. Brief for Plaintiff-Appellant**<br>Stephen Joseph FANTOZZI, Plaintiff-Appellant, v. CITY OF NEW YORK, Defendant-Appellee.<br>2023 WL 8276138 | — | C.A.2 | Nov. 27, 2023 | Brief |
| **5. Brief for Plaintiff-Appellant**<br>Stephen Joseph FANTOZZI, Plaintiff-Appellant, v. CITY OF NEW YORK; NYPD Police Officer Anthony P. Sclafani; NYPD 1st Precinct Commanding Officer Angel L. Figueroa, Jr.; and NYPD Officers John and Jane Doe 1 through 10, individually and in their official capacities (the names John and Jane Doe being fictitious, as their true names are presently unknown), Defendants-Appellees.<br>2023 WL 8187411 | — | C.A.2 | Nov. 21, 2023 | Brief |
| **6. Docket 23-1111**<br>Fantozzi v. City of New York | — | C.A.2 | Aug. 03, 2023 | Docket |
| **7. Docket 1:21-CV-04439**<br>Fantozzi v. City of New York et al | — | S.D.N.Y. | May 17, 2021 | Docket |

**History (3)**

**Direct History (2)**

1. Fantozzi v. City of New York 🖙
   2023 WL 4472305 , S.D.N.Y. , July 11, 2023

*Affirmed by*

2. Fantozzi v. City of New York
   2024 WL 1597745 , 2nd Cir.(N.Y.) , Apr. 12, 2024

**Related References (1)**

3. Fantozzi v. City of New York
   343 F.R.D. 19 , S.D.N.Y. , Oct. 20, 2022

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 297 of 529

Stalter v. County of Orange, Not Reported in Fed. Supp. (2016)

2016 WL 8711397

2016 WL 8711397
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Charles STALTER, Plaintiff,
v.
COUNTY OF ORANGE, Kenneth
Jones, and Dennis Barry, Defendants.

No. 15-cv-5274 (NSR)
|
Signed 08/05/2016

**Attorneys and Law Firms**

Michael Howard Sussman, Sussman & Watkins, Goshen, NY, for Plaintiff.

Sharon Kay Worthy-Spiegl, County Attorney, Goshen, NY, for Defendants.

OPINION & ORDER

NELSON S. ROMÁN, Unites States District Judge

**\*1** Plaintiff Charles Stalter brings this action against Defendants the County of Orange ("County of Orange"), Kenneth Jones, and Dennis Barry (collectively, "Defendants") alleging violations of his rights under the First Amendment. Presently before the Court is Defendants' motion to dismiss the Complaint (ECF No. 1) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (ECF No. 19.) For the following reasons, Defendants' motion is GRANTED in part and DENIED in part.

**BACKGROUND**

The following facts are taken from the Complaint unless otherwise noted, and are accepted as true for purposes of this motion.

In 2006, the County of Orange hired Plaintiff as a Corrections Officer in the Orange County Jail. (Compl. ¶ 11.) In 2010, Plaintiff transferred to the Criminal Division of the County of Orange as a Deputy Sheriff. (*Id.* ¶ 14.) Plaintiff was placed on a probationary term for that position and was granted permanent status in January 2012. (*Id.* ¶¶ 15–18.)

In or about October 2012, Plaintiff was estranged and separated from his then pregnant wife and had moved out of their marital residence. (*Id.* ¶ 21.) Also in or about October 2012, Plaintiff met another Deputy Sheriff, Janine Johnson, who was hired in March 2012 and still completing her probationary term. (*Id.* ¶¶ 19–20.) In January 2013, Plaintiff became romantically involved with Johnson. (*Id.* ¶ 19.) In or about March 2013, Plaintiff and Johnson began living together and have since resided together. (*Id.* ¶ 23.) Also in March 2013, Plaintiff's spouse filed for divorce, an action that was still pending when this case was commenced. (*Id.* ¶ 22.)

In early February 2013, Plaintiff's mother-in-law advised Plaintiff that she had spoken to Defendant Barry, who at the time served as a captain in the Orange County Sheriff's office and now is the Chief Deputy Sheriff. (*Id.* ¶¶ 6, 26.) Plaintiff's mother-in-law told Plaintiff that she informed Barry of rumors that Plaintiff was romantically involved with a female deputy. (*Id.* ¶ 26.) When Plaintiff confronted Barry, he denied having spoken with Plaintiff's mother-in-law. (*Id.* ¶¶ 28–29.) During that conversation, Plaintiff disclosed to Barry that he was romantically involved with Johnson. (*Id.* ¶ 27.) Barry responded by telling Plaintiff that he should limit his contact with Johnson, but did not formally order him to do so. (*Id.* ¶ 30.) On or about February 7, 2013, Barry told Johnson that he was aware of her relationship with Plaintiff and that they were in violation of the office's non-formal "anti-fraternization policy." (*Id.* ¶ 31.) Barry told Johnson that she should end her relationship with Plaintiff, but did not formally order her to do so. (*Id.* ¶ 34.) At the time Barry spoke to Johnson, there was no formal policy prohibiting romantic relationships between equal ranking officers; however, Barry maintained that the Sheriff's Office prohibited casual romantic relationships. (*Id.* ¶¶ 31–33.) On or about February 15, 2013, Plaintiff and Johnson exchanged several text messages while riding together as passengers in the back seat of a county vehicle to and from a meeting in White Plains. (*Id.* ¶ 35.) After discovering that Plaintiff and Johnson had been texting, Barry informally reprimanded both of them and officially separated them at work. (*Id.* ¶ 36.)

**\*2** On or about February 22, 2013, Plaintiff learned that his estranged spouse had withdrawn all of the money from his bank account and exhausted his credit cards. (*Id.* ¶ 37.) On that same day, while both were off duty, Plaintiff visited Johnson's residence to access her internet. (*Id.* ¶ 37.) While he was at Johnson's residence, Plaintiff's wife and mother-in-law arrived and unlawfully entered Johnson's residence. (*Id.*

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 298 of 529

Stalter v. County of Orange, Not Reported in Fed. Supp. (2016)

2016 WL 8711397

¶ 38.) An altercation ensued in which Plaintiff's mother-in-law assaulted Johnson, which prompted Plaintiff to call the police. (*Id.* ¶¶ 38–39.) When the police arrived, they took statements and ultimately charged Plaintiff's mother-in-law with, *inter alia*, assault. (*Id.* ¶ 39.) During the altercation, Plaintiff's wife called Barry and told him that her mother was being arrested for assault. (*Id.* ¶ 41.) Barry then told Jones, the Undersheriff of Orange County, and Investigator Gorelick, who was dispatched to the scene, to direct both Plaintiff and Johnson to report to him after the police cleared the scene. (*Id.* ¶ 42.)

Plaintiff and Johnson later reported to Barry, who assigned them to desk duty on different shifts and confiscated their weapons. (*Id.* ¶ 43.) Barry then officially ordered Plaintiff to cease all contact, including off-duty contact, with Johnson. (*Id.* ¶ 44.) Jones ordered Johnson to cease all contact, including off-duty contact, with Plaintiff. (*Id.* ¶ 44.) Plaintiff and Johnson spent the night together on February 23, 2013 but had no further contact until on or about March 18, 2013. (*Id.* ¶ 47.)

On or about February 26, 2013, Jones ordered Johnson to draft a memo to him detailing her contact with the Plaintiff during the preceding eight weeks. (*Id.* ¶ 48.) Johnson submitted a memorandum to Jones, which included the night of February 23, 2013 (one day after Jones's order to cease contact with Plaintiff). (*Id.* ¶ 49.) On March 18, 2013, the Sheriff's Office, through then-Chief Richard P. Onorati, charged Johnson with misconduct. (*Id.*) Johnson was suspended without pay for two weeks and sanctioned with a six month extension of her probationary term. (*Id.* ¶ 59.) Additionally on March 18, 2013, the Sheriff's Office charged Plaintiff with misconduct. (*Id.* ¶ 52.) The charges against Plaintiff sought his termination; however, Plaintiff challenged the charges and was suspended pending resolution of the charges by arbitration. (*Id.* ¶¶ 54, 61.) During Plaintiff's suspension, he and Johnson continued their relationship while both were off-duty. (*Id.* ¶ 62.)

On May 6, 2013 Barry ordered Johnson to provide him with a memorandum detailing all contact she had with Plaintiff since returning to work. (*Id.* ¶ 63.) On May 8, 2013, Johnson responded that she regularly had contact with Plaintiff while off duty and at her private residence in Sullivan County. (Compl. ¶ 64.) On May 10, 2013, Johnson was notified that her employment was terminated for "failure to complete your probationary term." (*Id.* ¶ 65.) About a week later at a meeting with the Appointing Authority, Johnson was advised that her

employment was terminated because of her relationship with Plaintiff, and not her job performance. (*Id.* ¶ 66.)

On or about September 6, 2013, Johnson commenced an action in New York State Supreme Court, County of Orange, and named the County of Orange itself and Carl Dubois, the elected Sheriff of Orange County, as respondents. (*Id.* ¶¶ 9, 67-68.) Johnson claimed that her termination was arbitrary, capricious, and in violation of her constitutional right to intimate association because her termination was premised upon her romantic relationship with Plaintiff. (*Id.* ¶ 67.) Additionally on September 6, 2013, Plaintiff provided a sworn affidavit in support of Johnson's petition (the "Affidavit"). (*Id.* ¶ 69.) In the Affidavit, Plaintiff provided testimony that was critical of Barry and the Sheriff's Office, and supported Johnson's contention that her termination was improper and unlawful. (*Id.* ¶ 70.) The Affidavit also included testimony that the Sheriff's Office had knowledge of other intra-office romances in the past, and officers in these relationships had not been similarly punished. (*Id.* ¶ 72.) Plaintiff provided three, specific examples of other intra-office romances in which the participants were not subject to the same punishment. (*Id.* ¶ 73.) Jones was aware of the Affidavit, as he provided an affidavit in support of the county's motion to dismiss Johnson's petition. (*Id.* ¶ 74.) Plaintiff also claims that Barry was aware of the Affidavit, because of Barry's high rank and substantial involvement in the events leading to Johnson's termination. (*Id.* ¶ 75.)

**\*3** On September 3, 2013, Plaintiff was charged with possession of stolen property. (*Id.* ¶ 78.) The stolen property was his old Sheriff's ID, which Plaintiff was required to have turned in when he obtained a new ID. (*Id.* ¶ 78.) Plaintiff claims that when he obtained the new ID, nobody ever advised him that he needed to return the old one. (*Id.* ¶ 79.) The Sheriff's Office learned that Plaintiff still had the ID and charged him with improperly possessing it. (*Id.* ¶ 81.) On September 12, 2013, Plaintiff's arbitration commenced. (*Id.* ¶ 77.) Plaintiff entered in a settlement agreement with the Sheriff's Office in resolution of both the March 18, 2013 charge and the September 3, 2013 charge. (*Id.* ¶ 82.) Plaintiff agreed to a 120 day suspension without pay as a result of the charges. (*Id.* ¶ 83.)

On December 2, 2013, Plaintiff returned to work. (*Id.* ¶ 84.) Upon his return, he was ordered to complete 30 days of field training ("FTO"), which entails riding with another deputy and completing FTO sheets indicating his performance in certain areas. (*Id.* ¶ 85.) Approximately 45 days after his

2016 WL 8711397

return, Plaintiff handed in the FTO sheets to his direct supervisor, Sergeant Marron. (*Id.* ¶ 86.) Sergeant Marron approved the FTO sheets and passed them on to Lt. Dreyer, who approved them and passed them on to Lt. Hamil, who approved them and passed them on to Captain Barry. (*Id.* ¶ 87-89.) Barry rejected the FTO sheets as inadequate, claiming that none of the deputies completing Plaintiff's FTO sheets other than Deputies Bell and Monahan were authorized to do so. (*Id.* ¶ 90.) Plaintiff was ordered to re-complete his FTO. (*Id.* ¶ 93.) Plaintiff claims that all of the deputies that approved his FTO sheets had been allowed to sign off on FTO sheets for other deputies without incident. (*Id.* ¶ 91.) Plaintiff also claims that nobody had ever advised him that when he began his FTO that only Bell and Monahan could sign off on his FTO sheets, and that he was led to believe that all of the deputies he rode with were allowed to sign off for him. (*Id.* ¶¶ 91–92.)

On or about February 19, 2014, Plaintiff received an email from the FTO sergeant, Sgt. Butterfield, stating that he was only allowed to FTO with Deputy Bell or Deputy Monahan, and if neither were available, that he was to remain at the station. (*Id.* ¶ 94.) That day, Plaintiff contacted his PBA [1] representatives and complained that the Sheriff's Office was acting unreasonably with respect to his FTO. (*Id.* ¶ 95.) Approximately two weeks later, the PBA contacted Jones and advised him that the Sheriff's Office could only require Plaintiff to complete "refresher training," not FTO. (*Id.* ¶¶ 96–97.) Subsequently, Jones and Barry still required Plaintiff to report to Sgt. Butterfield, complete FTO Sheets, and only ride with Sgt. Bell or Sgt. Monahan. (*Id.* ¶ 97.)

[1]    The PBA that Plaintiff references throughout the Complaint stands for Police Benevolent Association of the County of Orange. They are a labor union that represents the County of Orange Sheriff's Department and represented Plaintiff during the time the allegations occurred.

About two weeks later, Plaintiff submitted another packet of completed FTO sheets to his supervisor Sgt. Marron. (*Id.* ¶ 98.) Sgt. Marron approved the sheets and advised Plaintiff to submit them to Lt. Dreyer. (*Id.* ¶ 99.) Lt. Dreyer told Plaintiff that the FTO sheets "looked good," but that his current status would continue until he heard otherwise. (*Id.* ¶ 100.) About three or four days later, with 24 hours' notice, Plaintiff was transferred from the A-Line shift to the B-Line day shift, in violation of the collective bargaining agreement, which requires that a deputy have at least 28 days' notice prior to a transfer. (*Id.* ¶ 101.) Plaintiff was advised on his transfer

that he "did not need to worry about FTO," but that he was only permitted to ride with one of the seven deputies on that shift, or not at all. (*Id.* ¶ 102.) Plaintiff claims that Lt. Hamil and Sgt. Pallen, two higher ranking officers, met with four of the deputies assigned to ride with Plaintiff and directed them to find violations so that they could write Plaintiff up. (*Id.* ¶ 103.) Plaintiff claims Deputy Galipani told Plaintiff about that meeting and cautioned him that "they were coming for you." (*Id.* ¶ 104.) Plaintiff understood this to be reference to Barry and Jones, from whom all the orders regarding his discipline had originated. (*Id.* ¶ 104.) Plaintiff remained on the B-line shift for about a week, and then was abruptly transferred back to the A-line shift. (*Id.* ¶ 105.) He was also again advised to only ride with Deputy Bell or Deputy Monahan. (*Id.* ¶ 105.) Sgt. Marron also advised Plaintiff that if neither Bell nor Monahan were available, that he could ride by himself in the case of an arrestee pickup or to respond to a 911 poll. (*Id.* ¶ 106.)

 **\*4**  On or about April 8, 2014, at about 12:15 a.m., Plaintiff was at the station and heard an emergency call for an officer needing assistance at the Town of Goshen courthouse. (*Id.* ¶ 108.) Plaintiff and Deputy Brandon Edwards responded to the call, and Plaintiff drove Edwards to the courthouse. (*Id.* ¶ 109–15.) It had been raining and the roads were wet, so on the way to the courthouse, as Plaintiff was making a right turn, the car fishtailed and the rear side clipped a guardrail, leaving a scratch on the car. (*Id.* ¶ 116.) Once Plaintiff and Edwards arrived at the courthouse, the situation had de-escalated and their assistance was no longer needed, so they returned to the station. (*Id.* ¶ 117.) Once he returned to the station, Plaintiff reported the accident and damage to the car. (*Id.* ¶ 118.) On May 12, 2014, Barry, having been promoted to Chief, issued a Personnel Order that charged Plaintiff with responding with poor judgment, driving recklessly, leaving the scene of an accident, and damaging a department vehicle. (*Id.* ¶ 119.) The charge sought Plaintiff's termination. (*Id.* ¶ 120.)

Plaintiff was suspended pending resolution of the charges by arbitration. (*Id.* ¶ 123.) Plaintiff claims that the Sheriff's Office has not sought the termination of other deputies alleged to have engaged in similar misconduct. (*Id.* ¶ 124.) In particular, Deputy Pagnillo, who had a prior disciplinary record for damaging department vehicles, ran a red light and was broadsided by a car as he drove through the intersection. (*Id.* ¶ 125, 127.) The vehicle in that instance was demolished and his passenger claimed she was injured, and consequently sued Deputy Pagnillo. (*Id.* ¶ 126.) Deputy Pagnillo was offered a

30 day suspension following that incident, and eventually was able to negotiate that to a three week suspension. (*Id.* ¶ 127.)

Plaintiff's arbitration commenced in June 2014, and after one hearing day, the second day was scheduled for October 10, 2014. (*Id.* ¶ 129.) Plaintiff claims that after the first day of the hearing, Jones told the PBA President Lopez that he was going to call Plaintiff back to work, stick him in a small room with no windows where he could "count the ceiling tiles" all day and that, if Plaintiff "so much as broke a pencil," Jones would propound further disciplinary charges. (*Id.* ¶ 130.) Following this conversation, Jones ordered Plaintiff to return to work on July 30, 2014. (*Id.* ¶ 131.)

Prior to his return to work, Plaintiff became "fed up" with being singled out for mistreatment by Barry and Jones for no reason other than his romantic relationship with Johnson and his participation in her litigation against the County, and as a result, Plaintiff decided that he would resign. (*Id.* ¶ 132.) He reported back to work on July 30, 2014, met with his two captains, and offered them a formal resignation letter. (*Id.* ¶ 133.) The letter contained 4 terms: (1) that he would be placed on full administrative leave until October 10, 2014; (2) that all discipline and related charges be removed from his personnel file; (3) that the Sheriff's Office would not pursue any further disciplinary charges against him; and (4) that the Sheriff's Office would not make any unfavorable remarks about him to other agencies with which he might seek employment. (*Id.* ¶ 133.) The captains seemed receptive, and Captain Hamil indicated that he needed to call "the Number 2," and left the room to do so. (*Id.* ¶¶ 134, 136.) Plaintiff claims "Number 2" is a reference to Jones, who, as Undersheriff, is the second in command. Further, according to Sheriff's Office policy, Jones is the appropriate person that Captain Hamil would speak to in seeking approval for the proposed conditions in the resignation letter. (*Id.* ¶ 136.)

A few minutes later, Captain Hamil returned to the room and stated that the Sheriff's Office would agree to all terms except the last one. (*Id.* ¶ 135.) Plaintiff advised Captain Hamil that was unacceptable and that the last term was necessary. (*Id.* ¶ 137.) Plaintiff stated that he needed to step out to call his union attorney to advise him of the negotiation process and to get advice. (*Id.* ¶ 138.) Hamil assented and told Plaintiff to do so, knowing that Plaintiff would not get cell phone service in the building and would have to leave the premises to make the call. (*Id.* ¶ 139.) Plaintiff left the premises to call the union attorney from the gas station. (*Id.* ¶ 140.) The union attorney did not answer, so Plaintiff left him a message. (*Id.* ¶ 141.) A

few minutes later, the PBA vice president, Jeremy Yela, called Plaintiff and told him that Chief Barry was ordering him back to the premises. (*Id.* ¶ 142.) When he returned, he was ordered to go to the Chief's office. (*Id.* ¶ 144.) Once he entered the Chief's office, Barry then slid a letter of resignation across the table to Plaintiff and told him to sign it. (*Id.* ¶ 144.) The letter did not contain any of the terms in Plaintiff's proposed letter except for the administrative leave until October 10, 2014, the effective date of his resignation. (*Id.* ¶ 145.) Captain Hamil then entered the room and told Plaintiff he had two minutes to sign the letter. (*Id.* ¶ 146.) Hamil told him that if he did not sign the letter within two minutes, he would be brought up on charges of leaving his post without authorization and dereliction of duty for having left the premises to call his union attorney. (*Id.* ¶ 147.) Feeling coerced, Plaintiff signed the letter and left the premises. (*Id.* ¶ 148.)

### STANDARD ON A MOTION TO DISMISS

**\*5** To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

"When there are well-pleaded factual allegations [in the complaint], a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. The court must "take all well-plead factual allegations as true, and all reasonable inferences are drawn and viewed in a light most favorable to the plaintiff." *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996). However, the presumption of truth does not extend to "legal conclusions, and threadbare recitals of the elements of the cause of action." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. 662) (internal quotation marks omitted). A plaintiff must provide "more than labels and conclusions" to show he is entitled to relief. *Twombly*, 550 U.S. at 555.

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 301 of 529

Stalter v. County of Orange, Not Reported in Fed. Supp. (2016)
2016 WL 8711397

## DISCUSSION [2]

[2]
While the Complaint asserts an Equal Protection claim, Plaintiff withdraws that claim in his opposition papers. (Plaintiff's Memorandum in Opposition to the Defendants' Motion to Dismiss ("Pl.'s Opp."), ECF No. 23, at 5.) Courts permit parties to withdraw claims via responses to a motion to dismiss. *See, e.g., Colliton v. Donnelly,* No. 07-cv-1922 (LTS) (THK), 2008 WL 1910175, at *1 (S.D.N.Y. Apr. 30, 2008) (holding that the plaintiff withdrew two of their seven claims by stating so in their memorandum of law opposing the defendants' motion to dismiss). Therefore, the Court dismisses the Equal Protection claim.

### I. First Amendment Retaliation Claim

"A plaintiff asserting a First Amendment retaliation claim must establish that: '(1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech.' " *Matthews v. City of New York,* 779 F.3d 167, 172 (2d Cir. 2015) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.,* 654 F.3d 267, 272 (2d Cir. 2011)). Though Defendants do not dispute that Plaintiff has satisfied the first two prongs of a First Amendment retaliation claim,[3] they assert that he has not alleged sufficiently a causal connection between the protected speech and adverse action.

[3]
The Affidavit easily satisfies the first prong of a First Amendment retaliation claim. *See Local 621, S.E.I.U., AFL-CIO v. City of New York,* No. 99 CIV.9025, 2002 WL 31151355, at *16 (S.D.N.Y. Sept. 26, 2002) (holding that testifying truthfully is constitutionally protected from retaliation). With respect to the second prong, once Plaintiff returned to work on December 2, 2013, Defendants Barry and Jones commenced an ongoing course of retaliation. This course of adverse action included requiring Plaintiff to complete unnecessary FTO and "refresher training," changing his shifts from A-shift to B-shift without proper notice, propounding charges that sought his termination for damaging a department vehicle, and ultimately coercing him into resigning.

**\*6** " '[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.' " *Hicks v. Baines,* 593 F.3d 159, 170 (2d Cir. 2010) (quoting *Gordon v. N.Y. City Bd. of Educ.,* 232 F.3d 111, 117 (2d. Cir. 2000)). In the present case, Plaintiff alleges only an *indirect* causal connection between the Affidavit and the adverse treatment at work.

### A. Temporal Proximity

Defendants argue that the temporal proximity between the Affidavit of September 6, 2013 and the adverse treatment that occurred is too attenuated to establish a causal connection. The Second Circuit has held that there is no " 'bright line to define the outer limits' " of causation inferred from temporal proximity and encourages district courts to exercise their judgment with respect to permissible inferences that may be made regarding the sufficiency of temporal proximity. *Summa v. Hofstra Univ.,* 708 F.3d 115, 128 (2d Cir. 2013) (quoting *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir. 2009)). Notably, in analyzing the temporal relationship between protected activity and adverse action, courts focus on whether "the adverse action occurred at the first actual opportunity to retaliate." *Summa,* 708 F.3d at 128.

In this case, when Plaintiff drafted the Affidavit, Plaintiff was suspended from work. Plaintiff alleges that upon his return to work, Defendants Barry and Jones commenced an ongoing course of adverse treatment of Plaintiff. In particular, Barry forced Plaintiff to conduct FTO training, only to reject his FTO sheets even though they were previously approved by other officers. (Compl. ¶ 90.) Plaintiff was only relieved of the FTO training requirement when the PBA President informed Jones that he could only require Plaintiff to undergo refresher training, not FTO. (*Id.* ¶¶ 96–97.) Next, Plaintiff faced disciplinary charges that sought his resignation. (*Id.* ¶ 120.) Finally, Plaintiff was coerced to sign a resignation letter on unfavorable terms. (*Id.* ¶ 148.) Even though the allegedly adverse treatment occurred between 3 to 10 months after Plaintiff provided his sworn statement in the Affidavit, it appears that Defendants retaliated against Plaintiff at the first opportunity they had following the end of his suspension. Accordingly, though Plaintiff's resignation did not occur until 10 months after the Affidavit, the Complaint plausibly alleges a close temporal relationship in light of Plaintiff's allegations

2016 WL 8711397

that the adverse treatment commenced almost immediately upon his return to work.

**B. Disparate Treatment**

In support of his causation argument, Plaintiff also argues that he was subject to disparate treatment. In particular, Plaintiff asserts that he was treated differently than other employees with respect to his FTO training and the discipline he faced following the April 2014 automobile accident. With respect to FTO, Plaintiff alleges that Barry told him that only officers Bell and Monahan could sign off on his FTO sheets. However, Plaintiff alleges that other officers undergoing such training were allowed to seek approval from additional officers. (Compl. ¶ 91.) Plaintiff also claims that he was treated differently from other officers involved in automobile accidents with department vehicles. Specifically, Plaintiff alleges that Deputy Pagnillo, who had a prior disciplinary record, ran a red light and collided with another vehicle that injured another officer in the passenger seat. Deputy Pagnillo's charges sought a 30 day suspension, which was subsequently negotiated down to a 21 day suspension, whereas Plaintiff, who also was involved in an automobile accident, received charges that sought his termination. (Compl. ¶¶ 119–128.) In light of this alleged disparate treatment, as well as Plaintiff's temporal proximity argument, Plaintiff sufficiently alleges a causal connection between assisting Johnson in her case and his adverse treatment. Therefore, the Court declines to dismiss Plaintiff's First Amendment retaliation claim.[4]

[4]    The Court is not persuaded by Defendants' additional defenses to Plaintiff's retaliation claim. First, with respect to Defendant Barry, Defendants assert that he is not liable because he did not know about the Affidavit. While lack of knowledge of protected activities on the part of particular individual defendants may defeat an allegation of a causal connection (*Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)) (citing *Alston v. New York City Transit Auth.*, 14 F. Supp. 2d 308, 312-13 (S.D.N.Y. 1998)), the Complaint specifically alleges that Barry knew about the Affidavit. In particular, Plaintiff alleges that because he mentioned Barry at several points in his sworn statement, it is plausible that the County of Orange's attorneys shared this testimony with Barry. Second, with respect to Defendant Jones, Defendants contend that Jones should not be held

liable for the adverse treatment of Plaintiff (i.e., the FTO training and coerced resignation) because Jones did not participate in or facilitate those adverse actions. Those arguments are refuted by the well-pled allegations in the Complaint. First, the Complaint alleges Jones was notified by the PBA President that he and Barry were not permitted to force Plaintiff to undergo FTO training. Second, the Complaint alleges that Captain Hamil told Plaintiff he had to consult with the "number 2" regarding Plaintiff's resignation, which Plaintiff understood to be a reference to Jones. Taken as true, Plaintiff's allegations are sufficient to state a claim against Jones.

**II. First Amendment Intimate Association Claim**

 *7  Plaintiff next contends that Defendants violated his constitutional right to intimate association by retaliating against him at work for his relationship with Johnson. In *Roberts v. U.S. Jaycees*, the Supreme Court explained that the Constitution protects "certain kinds of highly personal relationships ... from unjustified interference by the State." 468 U.S. 609, 618 (1984). While the Supreme Court has not established "precise boundaries" as to which "highly personal relationships" are entitled to constitutional protections, *Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987), the Court in *Roberts* described them as "involving deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experience, and beliefs, but also distinctively personal aspects of one's life." 468 U.S. at 619. In that vein, the Supreme Court noted that "[d]etermining the limits of state authority over an individual's freedom to enter into a particular association therefore unavoidably entails a careful assessment of where the relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." *Id.* at 620. Those "objective characteristics" include the "size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent." *Id.* In the present case, Defendants argue that Plaintiff's extramarital relationship is not the type of "highly personal relationship" protected by the Constitution, and, in any event, Defendants Barry and Jones are shielded from liability by qualified immunity.

In *Bates v. Bigger*, a court from this District was confronted with an intimate association claim for a relationship that

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 303 of 529

Stalter v. County of Orange, Not Reported in Fed. Supp. (2016)

2016 WL 8711397

closely resembles the relationship between Plaintiff and Johnson. 192 F. Supp. 2d 160 (S.D.N.Y.), *aff'd*, 56 Fed.Appx. 527 (2d Cir. 2002). In that case, the plaintiffs were two officers in the Orange County Sheriff's Department that alleged they were retaliated against by senior officers in the department for their extramarital affair, in violation of their right to intimate association. While Judge Conner noted "that the precise nature of their relationship is difficult to define," he concluded that, in light of the fact that the plaintiffs were still living with their spouses when the relationship commenced and that they did not reside together or finalize their divorces until a later date, the "plaintiffs' association during the relevant time frame could therefore be defined as a dating relationship, albeit an extra-marital, adulterous one." *Id.* Judge Conner continued that the

> Plaintiffs' relationship may have been "highly personal," and displayed attributes of "relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." However, in the time frame that the complained of events occurred, their association plainly failed to exemplify the considerations that "attend the creation and sustenance of a family."

*Id.* (quoting *Roberts*, 468 U.S. at 620). Ultimately, Judge Conner concluded that it was "open to debate" as to "whether [the] plaintiffs' relationship was constitutionally protected." *Id.* Judge Conner declined to resolve that debate, as he concluded that the individual defendant was entitled to qualified immunity because to the extent the plaintiffs enjoyed a right to intimate association, it was not a clearly established one. *Id.* In a summary order, the Second Circuit affirmed Judge Conner's opinion, noting that the Circuit has "not decided whether [the right to intimate association under the First Amendment] applies to persons whose intimate relationship is adulterous." 56 Fed.Appx. 527, 529 (2d Cir. 2002).

The Sixth Circuit also has addressed a similar factual scenario. *See Marcum v. McWhorter*, 308 F.3d 635 (6th Cir. 2002). In *Marcum*, the plaintiff, a deputy sheriff, separated from his wife and met a woman, Rena Abbott, through work. *Id.* at 637. The plaintiff and Ms. Abbott did not discuss cohabitation prior to moving together, and Ms. Abbott described their relationship as a roommate-like relationship. *Id.* The district court determined that the relationship between the plaintiff and Ms. Abbott was not entitled to constitutional protection. *Id.* at 638. The Sixth Circuit affirmed, finding "that the adulterous nature of the relationship does not portray a

relationship of the most intimate variety afforded protection under the Constitution." *Id.* at 640.

**\*8** The Sixth Circuit relied upon the Supreme Court's decision in *Bowers v. Hardwick,* 478 U.S. 186 (1986). In *Bowers*, the Supreme Court held that there was no fundamental right of "homosexuals to engage in acts of consensual sodomy," noting that "[p]roscriptions against that conduct have ancient roots." *Id.* at 192. Though the Supreme Court in *Bowers* was analyzing the right to privacy, the Sixth Circuit nevertheless found the case instructive in analyzing the right to intimate association. Drawing upon *Bowers'* reasoning, the Sixth Circuit noted that "proscriptions against adultery have ancient roots." 308 F.3d at 641-42. The court continued that "[b]ased on the historical treatment of adultery, a right to engage in an intimate sexual relationship with the spouse of another cannot be said to be either deeply rooted in this Nation's history and tradition or implicit in the concept of ordered liberty." *Id.* at 642. In light of the fact that *Bowers* was subsequently overruled by the Supreme Court in *Lawrence v. Texas,* 539 U.S. 558 (2003), this Court is not persuaded by the Sixth Circuit's holding in *Marcum*.

As the Supreme Court stated in *Roberts,* a determination of whether a relationship falls within the ambit of the constitutional protections for intimate association requires a "careful assessment of [ ] the relationship's objective characteristics...." 468 U.S. at 620. At the motion to dismiss stage, that assessment is necessarily premised upon the description of the relationship in the operative pleadings. Accordingly, the Court looks to the Complaint's description of the relationship between Plaintiff and Johnson to determine whether it is the sort of highly personal relationship afforded constitutional protection. First, with respect to size, the Court notes that the relationship is solely between Plaintiff and Johnson. Second, Plaintiff's relationship with Johnson is of a romantic nature. While much of Plaintiff and Johnson's relationship occurred while Plaintiff was still married to his wife, Plaintiff had already filed for divorce in March 2013 and was separated from his wife when he began his relationship with Johnson. Plaintiff and Johnson have remained exclusive with each other, and continue to maintain a relationship to this day. Additionally, Plaintiff and Johnson are currently engaged[5] and are soon to be married. From March 2013 to July 2014 while Plaintiff suffered the alleged adverse actions at work, Plaintiff and Johnson maintained their long-term relationship. In light of the fact that the Court must take the allegations in the Complaint as true at this stage of the litigation, and "[a]bsent binding authority

Case 5:25-cv-00956-AJB-MJK Document 9 Filed 12/08/25 Page 304 of 529

Stalter v. County of Orange, Not Reported in Fed. Supp. (2016)

2016 WL 8711397

holding that the 'extramarital' nature of the relationship categorically excludes it from protection," the Court cannot say that, as a matter of law, Plaintiff's relationship with Johnson is not entitled to constitutional protection under the First Amendment. *Fetchick v. Eslinger*, No. 6:15-CV-96-ORL-28TBS, 2016 WL 3030168, at \*3 (M.D. Fla. May 25, 2016).

[5] As Plaintiff and Johnson were not engaged at the time the Complaint was filed, Plaintiff references this for the first time in his Memorandum in Opposition to Defendant's Motion to Dismiss the Complaint. (Pl.'s Opp. at 13, n.7.)

## III. Qualified Immunity Defense to Intimate Association Claim

Defendants Barry and Jones argue that they are entitled to qualified immunity with respect to Plaintiff's intimate association claim. "A defendant enjoys qualified immunity if he can show that either '(a) [his] action did not violate clearly established law, or (b) it was objectively reasonable for [him] to believe that his action did not violate such law.' " *Savino v. Town of Southeast*, 983 F. Supp. 2d 293, 308 (S.D.N.Y. 2013), *aff'd*, 572 Fed.Appx. 15 (2d Cir. 2014) (quoting *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (internal quotation marks and citations omitted)). In order for a constitutional right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 635 (1987). This ensures that a reasonable officer has "fair warning" that his/her conduct violated the plaintiff's rights. *Hope v. Pelzer*, 536 U.S. 730, 740 (2002). In analyzing whether or not a reasonable officer would have received a "fair warning," the court considers " '(1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his acts were unlawful.' " *Matusick*, 757 F.3d at 60 (quoting *Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 532 (2d Cir. 1993)).

\*9 Neither the Second Circuit nor the Supreme Court has resolved the issue of whether extramarital relationships are entitled to constitutional protection. Accordingly, for the same reasons as discussed by Judge Conner in *Bates*, as affirmed by the Second Circuit, [6] the Court finds that to the extent Plaintiff enjoys a constitutional protection for his relationship with Johnson, that right is not clearly established and therefore Defendants Barry and Jones are entitled to qualified immunity on Plaintiff's intimate association claim. [7]

[6] "Although we have recognized a right to intimate association under the First Amendment, we have not decided whether this right applies to persons whose intimate relationship is adulterous. Nor has the Supreme Court ruled on the question." 56 Fed.Appx. at 529 (citing *City of N. Muskegon v. Briggs*, 473 U.S. 909, 910 (1985)) (White, J., dissenting from denial of certiorari) (observing a split among courts "over whether extra-marital sexual activity, including allegedly unlawful adulterous activity, is constitutionally protected in a way that forbids public employers to discipline employees who engage in such activity.").

[7] While Plaintiff endeavors to argue his right to intimate association is clearly established, the cases he relies upon are not binding upon this Court. *See, e.g.*, *Silverstein v. Lawrence Union Free Sch. Dist. No. 15*, No. 10-cv-993 (SJF) (WDW), 2011 WL 1261122, at \*6 (E.D.N.Y. Feb. 15, 2011), *report and recommendation adopted*, No. 10-cv-0993 (SJF) (WDW), 2011 WL 1261114 (E.D.N.Y. Mar. 30, 2011); *Berrios v. State Univ. of New York at Stony Brook*, 518 F. Supp. 2d 409, 421 (E.D.N.Y. 2007); *and Briggs v. North Muskegon Police Department*, 563 F. Supp. 585 (W.D. Mich. 1983), *aff'd*, 746 F.2d 1475 (6th Cir. 1984), *cert. denied by, City of North Muskegon v. Briggs*, 473 U.S. 909 (1985).

## IV. *Monell* Liability

The Court now turns to Plaintiff's claims against the County of Orange. [8] It is well settled that "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*" *Iqbal*, 556 U.S. at 676. Rather, a municipal entity can only be held vicariously liable under § 1983 if the "execution of a government's policy or custom ... inflicts the injury...." *Monell v. Dep't of Social Servs. of the City of N.Y.*, 436 U.S. 658, 694 (1978). Thus, *Monell* dictates that any § 1983 claim against a municipal entity must be premised on the theory that the municipal actor's allegedly unconstitutional "acts were performed pursuant to a municipal policy or custom." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004); *see generally Monell*, 436 U.S. at 692-94.

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 305 of 529

Stalter v. County of Orange, Not Reported in Fed. Supp. (2016)

2016 WL 8711397

8    Though the Court dismissed Plaintiff's First Amendment intimate association claim against the individual Defendants on qualified immunity grounds, the County of Orange is not entitled to assert that defense. *See Curley v. Vill. of Suffern*, 268 F.3d 65, 71 (2d Cir. 2001). Accordingly, the Court addresses the validity of both the retaliation and intimate association claims against the County of Orange.

Courts in this Circuit apply a two prong test for § 1983 claims brought against a municipal entity. *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) (internal citation omitted). First, the plaintiff must "prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer." *Id.* "Second, the plaintiff must establish a causal connection—an 'affirmative link'—between the policy and the deprivation of his constitutional rights." *Id.* (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 836, n.8 (1985)).

**\*10** To satisfy the first requirement, a plaintiff must allege the existence of:

> (1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of the plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policy-making officials; or (4) a failure by official policy-makers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.

*Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996)(internal citations and quotation marks omitted); *see also Brandon v. City of New York*, 705 F. Supp. 2d 261, 276-77

(S.D.N.Y. 2010) (quoting *Moray* and updating citations to cases). A plaintiff is not required to identify an express rule or regulation in order to establish a *Monell* claim, and a court may infer a municipal policy from acts or omissions of the municipality's policy makers, [9] but in the absence of other evidence, a "single incident of errant behavior is an insufficient basis for finding that a municipal policy caused plaintiff's injury." *Sarus v. Rotundo*, 831 F.2d 397, 402-03 (2d Cir. 1987); *see also DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) ("[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy.") (quoting *Ricciuti v. N.Y. City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)) (internal quotation marks omitted); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 125 (1988) (plurality opinion) (explaining that only municipal officials with "final policymaking authority" concerning particular activities giving rise to plaintiff's claims "may by their actions subject the government to § 1983 liability") (internal citation omitted). "In the end, therefore, a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury." *Hayes*, 853 F. Supp. 2d at 439 (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008)) (internal quotation marks omitted).

9    In *Pembaur v. City of Cincinnati*, the Supreme Court stated that municipal liability under § 1983 may be established by even the single act of a municipal policymaker whose acts represent official policy. 475 U.S. 469, 480 (1986).

In the present case, Plaintiff propounds two, alternative theories of *Monell* liability. First, Plaintiff claims that the final policymaker of the County of Orange, Sheriff Dubois, was aware of the actions of Defendants Barry and Jones, and, by not intervening, acquiesced in his subordinates' actions, rendering their actions official municipal policy. These allegations, however, do not support any of the cognizable theories of *Monell* liability. "[R]ubber-stamp[ing]" or "turn[ing] a blind eye" to subordinate decision-making is not sufficient to establish either a municipal policy or the delegation of policymaking authority. *Baity v. Kralik*, 51 F. Supp. 3d 414, 442 (S.D.N.Y. 2014) (citing *Praprotnik*, 485 U.S. at 130). Plaintiff cannot assert *Monell* liability simply by alleging Sheriff Dubois, who is not named as a defendant, knew of the actions of his employees. Plaintiff must demonstrate that the final policymaker *himself* caused the deprivation of rights at issue. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 306 of 529

Stalter v. County of Orange, Not Reported in Fed. Supp. (2016)

2016 WL 8711397

Alternatively, Plaintiff contends that Sheriff Dubois delegated all final, disciplinary authority to Defendant Jones, and that Jones' actions constitute municipal policy. Authority to make municipal policy may be granted either directly by legislative enactment or may be delegated by an official who possesses such authority. *Pembaur*, 475 U.S. at 483. The official need not possess broad, policymaking authority; rather, the inquiry for the court is whether the official "had final policymaking authority in the particular area involved." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (citing *Jett*, 491 U.S. at 737; *Praprotnik*, 485 U.S. at 123-25).

**\*11** Plaintiff's counsel asserted a nearly identical theory of *Monell* liability in *Baity*. In that case, Plaintiff's counsel "argued that [the sheriff] delegated his hiring authority to the undersheriff [ ], thus making [the undersheriff] the official policymaker for the County with respect to employment policy in the Sheriff's Office and rendering [the undersheriff] the 'policymaker' for *Monell* purposes." 51 F. Supp. 3d at 441–42. Judge Karas rejected this argument on a number of grounds: (1) there was no evidence in the record to support the plaintiff's theory; (2) the plaintiff failed to provide the court with any supporting case law; and (3) the plaintiff did not name the undersheriff as a defendant. *Id.* at 442.

Notably, the court in *Baity* considered that theory of *Monell* liability at the summary judgment stage. Accordingly, Judge Karas' first basis for rejecting the plaintiff's argument in *Baity* is irrelevant to the Court's present analysis. On a motion to dismiss, all Plaintiff is required to do is plead facts that plausibly give rise to an entitlement to relief. *See Iqbal*, 556 U.S. at 679. The court must "take all well-plead factual allegations as true, and all reasonable inferences are drawn and viewed in a light most favorable to the plaintiff." *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996). The Complaint alleges that Sheriff DuBois "delegated all final policy-making authority as to disciplinary matters to defendant Jones." (Compl. ¶¶ 160, 173.) That assertion is bolstered by the allegation that Captain Hamil told Plaintiff he would have to seek approval of Plaintiff's proposed resignation letter from the Number 2, which Plaintiff contends is a reference to Defendant Jones. (*Id.* ¶ 136.) With respect to Judge Karas' second basis for rejecting the plaintiff's theory in *Baity,* the Supreme Court was clear in *Pembaur* that "[a]uthority to

make municipal policy ... may be delegated by an official who possesses such authority...." 475 U.S. at 483. Finally, Judge Karas' third basis for rejecting the plaintiff's argument in *Baity* is inapplicable here because Plaintiff names Defendant Jones —the Undersheriff of the County of Orange—as a defendant.

While the Court is skeptical that Plaintiff will prevail on his claims against the County of Orange as the case progresses, at this stage of the litigation, Plaintiff sufficiently alleges *Monell* liability on the basis that Defendant Jones was delegated final policy-making authority. *See Deloughery v. City of Chicago*, No. 02C-2722, 2002 WL 31654942, at \*3 (N.D. Ill. Nov. 25, 2002) (expressing skepticism regarding the plaintiff's ability to prove his delegation *Monell* claim, yet denying defendants' motion to dismiss). The Court cautions Plaintiff that as the case progresses, to prove such a claim, Plaintiff must marshal sufficient evidence that Sheriff Dubois delegated final policymaking authority as to disciplinary matters to Defendant Jones. Sheriff Dubois' non-involvement in Plaintiff's termination, absent additional evidence of delegation of policymaking authority to Defendant Jones, cannot substantiate *Monell* liability.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. The Court dismisses Plaintiff's Equal Protection claims and the intimate association claim against Defendants Barry and Jones. The remaining claims are the First Amendment intimate association claim against the County of Orange and the First Amendment retaliation claim against all Defendants. Defendants are directed to file an answer to the remaining claims within 30 days hereof. The parties are directed to appear for an in-person conference on September 28, 2016 at 11:00 a.m. The parties are further directed to submit a completed case management plan. The Court respectfully directs the Clerk to terminate the motion at ECF No. 19.

**\*12** SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2016 WL 8711397

---

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 7:15-CV-05274**<br>Stalter v. County of Orange et al | — | S.D.N.Y. | July 08, 2015 | Docket |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History (2)**

**Direct History (1)**

1. Stalter v. County of Orange 🐾
   2016 WL 8711397 , S.D.N.Y. , Aug. 05, 2016

**Related References (1)**

2. Stalter v. County of Orange
   345 F.Supp.3d 378 , S.D.N.Y. , Nov. 05, 2018

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 309 of 529

Damon v. New York, Not Reported in Fed. Supp. (2023)

2023 WL 11965130

2023 WL 11965130
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

David O. DAMON, Plaintiff,

v.

State of NEW YORK, et al., Defendants.

No. 8:23-CV-74 (GLS/CFH)
|
Signed March 28, 2023

**Attorneys and Law Firms**

David O. Damon, 24282, Franklin County Jail, 45 Bare Hill
Road, Malone, New York 12953, Plaintiff pro se.

**REPORT-RECOMMENDATION AND ORDER**

Christian F. Hummel, United States Magistrate Judge

**I. Background**

 **\*1** Plaintiff pro se David O. Damon ("plaintiff") purported
to commence this action on December 19, 2022, by filing a
complaint in the U.S. District Court of the Southern District
of New York. See Dkt. No. 2 ("Compl."). In lieu of paying
the court's filing fee, he submitted a motion to proceed in
forma pauperis ("IFP"). See Dkt. No. 1. On January 19,
2023, the case was transferred to the U.S. District Court
for the Northern District of New York. See Dkt. Nos. 4, 5.
This Court subsequently administratively closed the action
because plaintiff's IFP application was not certified. See Dkt.
No. 6. The Court ordered plaintiff to either pay the full
$402.00 filing fee or to submit a completed and signed IFP
application. See id. at 2. Plaintiff filed a completed IFP motion
on January 30, 2023, and the Court reopened the case. See
Dkt. Nos. 8, 9, 10. The undersigned has reviewed plaintiff's
IFP motion and determines that he financially qualifies to
proceed IFP for the purpose of filing. [1]

[1] Plaintiff is advised that although he has been
granted IFP status, he is still required to pay any
fees and costs he may incur in this action.

**II. Initial Review**

**A. Legal Standard**

Section 1915 [2] of Title 28 of the United States Code directs
that, when a plaintiff seeks to proceed IFP, "the court shall
dismiss the case at any time if the court determines that ... the
action or appeal (i) is frivolous or malicious; (ii) fails to state a
claim on which relief may be granted; or (iii) seeks monetary
relief against a defendant who is immune from such relief."
28 U.S.C. § 1915(e)(2)(B). It is a court's responsibility to
determine that a plaintiff may properly maintain his complaint
before permitting him to proceed with his action.

[2] The language of 1915 suggests an intent to
limit availability of IFP status to prison inmates.
See 28 U.S.C. § 1915(a)(1) (authorizing the
commencement of an action without prepayment
of fees "by a person who submits an affidavit that
includes a statement of all assets such prisoner
possesses"). The courts have construed that section,
however, as making IFP status available to any
litigant who can meet the governing financial
criteria. See, e.g., Fridman v. City of N.Y., 195 F.
Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

Where, as here, the plaintiff proceeds pro se, "the court
must construe his [or her] submissions liberally and interpret
them to raise the strongest arguments that they suggest."
Kirkland v. Cablevision Sys., 760 F.3d 223, 224 (2d Cir.
2014) (per curiam) (citation and internal quotation marks
omitted). This does not mean the Court is required to accept
unsupported allegations that are devoid of sufficient facts
or claims. Although detailed allegations are not required at
the pleading stage, the complaint must still include enough
facts to provide the defendants with notice of the claims
against them and the grounds on which these claims are
based. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell
Atlantic v. Twombly, 550 U.S. 544, 555-56 (2007). Pro se
litigants are "not exempt ... from compliance with relevant
rules of procedural and substantive law[.]" Traguth v. Zuck,
710 F.2d 90, 95 (2d Cir. 1983) (citation omitted). Ultimately,
the plaintiff must plead "enough facts to state a claim to relief
that is plausible on its face." Twombly, 550 U.S. at 570. "A
claim has facial plausibility when the plaintiff pleads factual
content that allows the court to draw the reasonable inference
that the defendant is liable for the misconduct alleged." Iqbal,
556 U.S. at 678 (citation omitted).

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 310 of 529

Damon v. New York, Not Reported in Fed. Supp. (2023)

2023 WL 11965130

**\*2**  Pleading guidelines are set forth in the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Specifically, Rule 8 provides that a pleading which sets forth a claim for relief shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "The purpose ... is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." Flores v. Graphtex, 189 F.R.D. 54, 55 (N.D.N.Y. 1999) (internal quotation marks and citations omitted). Rule 8 also requires the pleading to include "a short and plain statement of the grounds for the court's jurisdiction" and "a demand for the relief sought ...." FED. R. CIV. P. 8(a)(1), (3). Although "[n]o technical form is required," the Federal Rules make clear that each allegation contained in the pleading "must be simple, concise, and direct." Id. at 8(d)(1).

Further, Rule 10 provides in pertinent part that:

> [a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence – and each defense other than a denial – must be stated in a separate count or defense.

FED. R. CIV. P. 10(b). This serves the purpose of "provid[ing] an easy mode of identification for referring to a particular paragraph in a prior pleading[.]" Flores, 189 F.R.D. at 55 (internal quotation marks and citations omitted). A complaint that fails to comply with the pleading requirements "presents far too [ ] heavy [a] burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims." Gonzales v. Wing, 167 F.R.D. 352, 355 (N.D.N.Y. 1996). The Second Circuit has held that "[w]here a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative ... to dismiss the complaint." Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (citation omitted). However, "[d]ismissal ... is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Id. (citation omitted). If dismissal is warranted and the plaintiff is pro se, the court generally affords the plaintiff leave to amend the complaint. See Simmons v. Abruzzo, 49 F.3d 83, 86-87 (2d Cir. 1995).

### B. Plaintiff's Complaint

Plaintiff seeks to bring this action against the Franklin County District Attorney's Office; Kelly Poupore, an Assistant District Attorney; New York State Troopers; Michael Perry, Investigator with New York State Troopers; Franklin County Jail; "Franklin County Child Support Court"; Franklin County Public Defender's Office; Thomas Soucia, Franklin County Public Defender; Anson Rhodes, Franklin County Conflict Defender; the Franklin County Conflict Defender's Office; Tammy Gordon, Law Guardian; and the Saint Lawrence County District Attorney's Office. See Compl. at 2. Following the filing of his complaint, plaintiff wrote a letter to the Court, alleging new facts and claims against Franklin County Jail and Franklin County Sherriff J. Cook. See Dkt. No. 7 at 2-4. [3] Plaintiff alleges violations of his constitutional rights pursuant to 42 U.S.C. § 1983 and a conspiracy among the named defendants pursuant to 42 U.S.C. § 1985. See generally Compl; Dkt. No. 7.

[3]   Plaintiff originally filed his complaint on or about December 19, 2022. See Compl. He filed his letter seeking to add claims and a defendant on or about January 30, 2023. See Dkt. No. 7. On March 13, 2023, plaintiff filed another letter with the Court, asserting new information and asking about the status of his case. See Dkt. No. 11. At this early stage of the case, and in deference to plaintiff's pro se status, the undersigned will treat the letters as supplements to the complaint and consider them as a single pleading for purposes of initial review. The Clerk of Court is directed to add Franklin County Sherriff J. Cook as a defendant on the docket.

#### 1. Factual Allegations

**\*3**  Plaintiff alleges that on February 14, 2022, State Trooper Michael Perry and Child Protective Services ("CPS") Investigator Marcell Almond questioned plaintiff about "the background of the alleged victim including possible trauma,

Damon v. New York, Not Reported in Fed. Supp. (2023)

2023 WL 11965130

home life." Compl. at 9. It appears that the alleged victim is plaintiff's daughter. See id. at 8-9. Plaintiff explained the victim's background including her mother being arrested for assault and moving out of the state, and the victim accusing others of sexual assault. See id. at 9. Perry and Almond asked plaintiff to consent to a polygraph test, which he declined. See id. at 10. Plaintiff then invoked his right to counsel. See id.

The next day, on February 15, 2022, plaintiff "arrived home ... to find that [his] house was occupied by the New York State Troopers, led by Mr. Perry." Compl. at 10. After plaintiff got out of his vehicle he "was [f]risked and placed in the back of a patrol car." Id. Plaintiff alleged that a search warrant was not produced until after the search of his home, and that during the search, investigators unplugged a lamp which resulted in his pet snake dying. See id. Plaintiff states, "[a]s mentioned in pre-trial motions filed to the Franklin County Court by Attorney Peter Dumas, the warrant was not a 'no-knock' warrant and it was executed without giving any notice to me or my counsel." Id. at 10-11. Plaintiff alleges that the warrant was overly broad and the evidence seized "was used to prejudice the grand jury." Id. Plaintiff also contends that his attorney has requested a copy of the grand jury minutes, which have been denied. See id.

Plaintiff asserts that "[b]etween February 15 and Feb. 17, the alleged victim was interviewed alone by Mr. Perry and Assistant District Attorney Kelly Poupore[ ]" and that the interviews "were witnessed by Stephen Damon[.]" Compl. at 11. Plaintiff alleges that the interview resulted in an argument at which time someone stated "that there was insufficient evidence to substantiate charges[.]" Id. However, following the interview, and a grand jury proceeding, three indictments were handed down. See id. at 11-12.

Plaintiff states that he believes some of what was presented to the grand jury, because he "was accused of such in a Huntly [sic] hearing[,]" was that he "allegedly used child pornography to groom the alleged victim." Compl. at 12. He contends that a search of his electronics revealed no such information. See id. He asserts that Perry committed perjury by testifying under oath that plaintiff berated the child and blamed her for their family problems. See id. at 12-13. Plaintiff also states that his request for an attorney when being questioned by Perry was "used to prejudice a grand jury in the [government's] favor." Id. at 13.

Plaintiff contends that he was arrested at his home on February 18, 2022. See Compl. at 13. He was then "taken to the Franklin County Jail where [he has] been ever since." Id. He was arraigned and made aware of the three charges against him on February 22, 2022. See id. Plaintiff was denied bail, "although [he has] no prior convictions, made no attempt to interfere with the investigation and made no attempt to evade police or contact the alleged victim." Id. Plaintiff states that following his arraignment, his former fiancée and "[a]nother former paramour," were interviewed by investigators but their statements have not been turned over to plaintiff or his attorney. Id. at 14. Plaintiff contends that he was offered a plea deal but that "[t]he deal itself seems to be a punishment that is excessive compared to the typical sentence of similar crimes." Id. at 15. His trial was originally scheduled for July 11, 2022, but the government sought extensions. See id. at 16. Plaintiff alleges that the government told the victim that if she did not testify at trial, plaintiff would be released, and she would be forced to live with him. See id.

**\*4** Next, plaintiff states that he was "re-arrested and arraigned on 8 more charges[ ]" on July 11, 2022. Compl. at 16. He alleges, "[t]he ADA told my father that the reason for the additional charges was that I would not take the deal and the probability of the charges standing a jury trial were low and she wanted more time." Id. At a discovery conference on August 23, 2022, evidence was discussed that has never been provided to him. See id. at 17. The trial judge was asked to recuse himself from the case after being accused of showing favoritism to plaintiff and plaintiff's case was transferred to St. Lawrence County Court where he was arraigned on September 7, 2022. See id. During his arraignment, plaintiff was not allowed to speak to his attorney without a trooper being present. See id. at 17-18.

On September 25, 2022, plaintiff's attorney filed twenty-nine pre-trial motions concerning the search of his home, exculpatory evidence that had not been produced, and dismissal of the indictment. See Compl. at 18. Oral argument on the motions was scheduled for October 11, 2022, but the government "refused to go to court and the hearing did not happen." Id. Plaintiff alleges that as of December 2022, a new date had not been scheduled. See id.

Plaintiff had sole custody of his children, but because he was in jail, his father applied for custody. See Compl. at 23. Plaintiff alleges that legal guardian Tammy Gordon asked his children where they wanted to live, and they each stated that they wanted to live with plaintiff. See id. Plaintiff states that "the attorneys chose not to share that information with the court." Id. "The attorneys from that point

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 312 of 529

Damon v. New York, Not Reported in Fed. Supp. (2023)

2023 WL 11965130

attempted to make the executive decision that [plaintiff had] no rights to [his] daughter whatsoever." Id. at 24. Anson Rhodes, plaintiff's family court attorney, "refused to address" plaintiff's concerns. Id. Plaintiff contends that Tammy Gordon sought to have plaintiff's parental rights revoked, but the court denied the request. See id.

On September 21, 2022, "at a pre-trial conference, Anson Rhodes told [plaintiff] that [his] daughter wanted nothing to do with [him] because of what [he had] done and that the rest of the attorneys were angry with [him] because he was holding up the process." Compl. at 24-25. Plaintiff requested to have the family court proceedings adjourned pending resolution of the criminal case, but Anson Rhodes refused to make a motion to adjourn. See id. at 25. Plaintiff contends that the children's mother filed to have child support adjusted and for plaintiff's father to be designated at the payee. See id. at 26. A summons was issued to plaintiff's house, although he was in jail, and plaintiff's father was never served with a summons. See id. The matter was rescheduled, and plaintiff was produced for the hearing. See id. The family court determined that Stephen Damon would be the payee and "when [plaintiff] stated that support had not been paid ... [he] was told to file [his] own petition." Id. When he asked for the appropriate forms, he "was refused and told to get them from the jail. When [he] requested them at the jail, [he] was told they were not available." Id.

On February 7, 2023, plaintiff was informed by his attorney Peter Dumas that three charges were dismissed from the indictment; Kelly Poupore was no longer working at the Franklin County District Attorney's Office; and the new District Attorney assigned to his case, Elizabeth Crawford, "was not eager to try the case herself and offered to reduce the plea offer." Dkt. No. 11 at 1. Plaintiff also subsequently received the grand jury minutes. See id. His trial was then postponed from March 6, 2023, to May 1, 2023, because "one witness had tested positive with COVID (which would generally be a 5-day quarantine)." Id. at 2. Plaintiff asserts that he has "heard nothing from St. Lawrence County DA's Office[.]" Id.

 *5  While in Franklin County jail, "[i]n the spring of 2022," plaintiff alleges that he complained to medical staff about chest pains. See Compl. at 19. Plaintiff states that his "blood pressure and sugar were monitored[ ]" and his levels were normal but there were no follow-up visits with medical personnel. Id. He contends that his "chest pains continued untreated." Id. He asserts that he had bloody stools, but

"[b]y the time [he] was seen a week later, the bleeding had stopped." Id. at 19-20. He also requested a new password to commissary and to order a jigsaw puzzle. See id. at 20. His requests were denied, and he wrote to the Department of Corrections and Community Supervision ("DOCCS"). See id. The Franklin County Jail informed plaintiff that he was not to contact DOCCS. See id. Plaintiff also tried to contact the American Civil Liberties Union, but they informed the jail that they do not take collect calls. See id. Afterwards, the jail's Warden spoke with plaintiff and told plaintiff to speak with him directly for any future problems. See id. at 20-21.

In November 2022, plaintiff "began taking Buspar for anxiety to relieve the chest pains[.]" Compl. at 21. Plaintiff alleges that on November 14, 2022, his blood pressure was high, and he was given medication "and almost immediately experienced what was later defined as a brain shock. The shock went through [his] entire body and was immediately followed by [his] entire left side going numb and tingling for about 30 minutes." Id. Plaintiff put in a sick call and after there was no follow-up from the jail, he wrote a grievance and a letter to the Warden. See id. On November 17, 2022, he received an electrocardiogram ("EKG") from a nurse which was normal. See id. He then saw a doctor on November 21, 2022. See id. Plaintiff alleges that his blood pressure was high on November 27, 2022, "and there was no follow-up. [He] returned to [his] bunk, lay flat on [his] back, and blacked out." Id. On December 3, 2022, plaintiff was given medication that tasted different than the Buspar. See id. at 22. He began feeling nauseous and dizzy and "was taken to the nurse after between 30 and 45 minutes." Id. The nurse stated that a mix-up with medication was impossible, and plaintiff filed a grievance. See id. at 22-23. The doctor then stated that it was possible that the wrong medication was "administered, but it was only one dose so it was okay." Id. at 23.

Plaintiff alleges that he was threatened by an inmate on November 14, 2022. See Compl. at 22. After complaining to the jail, Sergeant Hanse read the complaint to the inmate who threatened plaintiff and the inmate again threatened plaintiff. See id. The inmate told plaintiff that if plaintiff "snitched again, he would beat the brakes off" plaintiff. Id. Then, on December 25, 2022, after three or four requests to repair a shower, the shower stopped working and was unavailable for four days. See Dkt. No. 7 at 2. On January 15 and 18, 2023, plaintiff's "[r]outine semi-weekly blood pressure checks were ignored. [He] continues to have chest pains and headaches with increasing frequency and intensity but am allowed no follow-up or explanation." Id. On January 22, 2023, "the staff

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 313 of 529

Damon v. New York, Not Reported in Fed. Supp. (2023)

2023 WL 11965130

at the Franklin County Jail raided the entire jail starting with dorms, per order of [Franklin County Sheriff] J. Cook." Id. Plaintiff alleges that the inmates were told to keep their hands on the wall for forty-five minutes and when they returned to their dorms, "most of our belonging were strewn all over the floor. [His] bible lay open, pages down, on the floor." Id.

## 2. Requests for Relief

Plaintiff seeks "immediate relief from the violations cited in this petition and for unconstitutional actions to stop immediately and reverse actions committed in violation of the 4th, 5th, 6th, 8th, and 14th, amendments as well as decisions in violation of these amendments." Compl. at 31. Specifically, plaintiff asks the Court to "charge [the children's mother] with disobeying child support order"; reverse the Franklin County Family Court's September 21, ruling; "[a]ddress the actions of Thomas Soucia in this matter with a counseling memorandum and ninety day leave of absence"; "[a]ddress the actions and inactions of Anson Rhodes by dismissing him from employment with Franklin County"; terminate Tammy Gordon's "law guardian status" and forbid her from having contact with plaintiff's family; and to "[b]ring disciplinary action upon": "the nurse responsible for administering the wrong medication", "the Facility doctor for deliberately neglecting medical needs", and "all sergeants for ignoring their own protocols and ignoring request forms[.]" Id. at 33-34. Plaintiff also asks the Court to implement a policy requiring carbon-copies of forms and requests so documents are not lost; and to implement a system to allow requests to be completed on a tablet. See id. at 34. He also asks that the Court "[e]nsure jail administrators have the ability and training to manage tablet applications" and to "[a]llow inmates in good standing to attend court unshackled and in clothes appropriate for the occasion." Id. Plaintiff asks for the law library and a word processor to be made available. See id.

**\*6** Plaintiff seeks dismissal of the pending felony and misdemeanor charges and the order of protection, and expungement of these charges "[f]rom the record as well as any evidence or testimony used in these proceedings." Compl. at 35. He also asks that Kelly Poupore to be dismissed and for the Court to "[l]ift sovereign immunity so that monetary damages can be recovered in the amount of $10,000.00." Id. Plaintiff requests that all evidence seized by the New York State Troopers be returned, that Michael Perry be dismissed, for the release of a "memorandum to all Troopers that defendants are not to be denied private

conversations with their attorneys", for an order of protection from Perry concerning plaintiff's family and a "[s]tay away order preventing Troopers from harassing" plaintiff and his family, and to "[l]ift sovereign immunity so that damages can be sought in the amount of $2,000,000." Id. at 36.

In his original complaint, plaintiff requested only "policy changes" against the Franklin County Jail. Dkt. No. 7 at 4; see also Compl. at 34. In his January 2023 letter to the Court, he added a demand for $500,000 from the Franklin County Jail. Dkt. No. 7 at 4.

Finally, plaintiff asserts that "[a]s things have developed, code enforcement officers in the towns of Waverly and Lisbon have been used in an attempt to take my property from me." Compl. at 36. Plaintiff asks for "them to be advised by higher courts to allow one year [f]rom the date this issue is resolved to conduct cleaning, maint[e]nance, and repairs to the properties without being constantly harassed. Building permits will be obtained where necessary." Id.

## C. Analysis

### 1. Claims Against the State of New York

Plaintiff names the State of New York in the case caption on the first page of his complaint but does not assert any claims against it or state the specific relief he seeks from the State. See Compl. at 1. Regardless, "[a]s a general rule, state governments and their agencies may not be sued in federal court unless they have waived their Eleventh Amendment immunity or there has been a valid abrogation of that immunity by Congress." Kisembo v. N.Y.S. Office of Children & Family Servs., 285 F. Supp. 3d 509, 519 (N.D.N.Y. 2018) (quoting Jackson v. Battaglia, 63 F. Supp. 3d 214, 219-20 (N.D.N.Y. 2014)). "This jurisdictional bar applies regardless of the nature of the relief sought." Murawski v. N.Y. State Bd. of Elections, 285 F. Supp. 3d 691, 695 (S.D.N.Y. 2018) (quoting Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984)). "Importantly for present purposes, the State of New York has not waived its sovereign immunity from § 1983 claims in federal court." Kisembo, 285 F. Supp. 3d at 519 (citation omitted). "Nor has Congress validly abrogated New York's sovereign immunity from these claims." Id. Accordingly, plaintiff cannot bring this action against the State of New York, and it is recommended that any potential claims against it be dismissed.

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 314 of 529

Damon v. New York, Not Reported in Fed. Supp. (2023)

2023 WL 11965130

**2. Claims Concerning State Court Proceedings**

To the extent plaintiff challenges a search and seizure of his property, evidence not produced in discovery, the sufficiency of the evidence supporting the indictments, his ability to speak with counsel, and the time it has taken to proceed to trial, the Court must abstain from addressing such matters as they all concern ongoing state court criminal proceedings.

The Younger abstention doctrine, established by the Supreme Court in Younger v. Harris, 401 U.S. 37, (1971), "generally requires federal courts to abstain from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings." Diamond "D" Const. Corp. v. McGowan, 282 F.3d 191, 198 (2d Cir. 2002). "This doctrine of federal abstention rests foursquare on the notion that, in the ordinary course, 'a state proceeding provides an adequate forum for the vindication of federal constitutional rights.' " Id. (quoting Cullen v. Fliegner, 18 F.3d 96, 103 (2d Cir. 1994)). "Younger abstention is required when three conditions are met: (1) there is an ongoing state proceeding; (2) an important state interest is implicated in that proceeding; and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of the federal constitutional claims." Id. (citing Grieve v. Tamerin, 269 F.3d 149, 152 (2d Cir. 2001)).

**\*7** "Despite the strong policy in favor of abstention, a federal court may nevertheless intervene in a state proceeding upon a showing of 'bad faith, harassment or any other unusual circumstance that would call for equitable relief.' " Diamond D. Const. Corp., 282 F.3d at 198 (quoting Younger, 401 U.S. at 54). Further, "[t]he Supreme Court has noted that 'the extent to which the Younger doctrine applies to a federal action seeking only monetary relief' is an open question." Jones v. County of Westchester, 678 F. App'x 48, 50 (2d Cir. 2017) (summary order) (quoting Deakins v. Monaghan, 484 U.S. 193, 202 (1988)). [4] "But because Younger abstention focuses primarily on federal courts interfering with and disrupting ongoing state proceedings, [the Second Circuit has] in the past held that abstaining from cases involving efforts only to obtain money damages is inappropriate." Id. (citing Kirschner v. Klemons, 225 F.3d 227, 238 (2d Cir. 2000) ("[W]e hold that Younger abstention is not appropriate with respect to [the plaintiff's] claim for money damages under § 1983 ... because it is a claim for money damages and not for declaratory or injunctive relief."); Rivers v.

McLeod, 252 F.3d 99, 101-02 (2d Cir. 2001) (per curiam) ("[A]pplication of the Younger doctrine is inappropriate where the litigant seeks money damages for an alleged violation of § 1983.")).

[4]    All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff. In light of the number of unpublished cases that have been cited, the Court will not provide plaintiff with copies of the Orders that adopt cited Report-Recommendations and Orders.

The Court is required to abstain from reviewing plaintiff's claims stemming from his Franklin and St. Lawrence County Court criminal proceedings as he seeks injunctive and declaratory relief including dismissal of the pending indictments and the return of seized evidence. His state proceedings are ongoing, the prosecutions implicate important state interests, and the state court system provides adequate opportunity for review through pre-trial motions, post-conviction motions, and direct appeals. See Hansel v. Town Ct. for the Town of Springfield, 56 F.3d 391, 393 (2d Cir. 1995) ("[I]t is axiomatic that a state's interest in the administration of criminal justice within its borders is an important one."); Burke v. Reid-Cherry, No. 20-CV-1835 (PGG/GWG), 2021 WL 2092669, at \*5 (S.D.N.Y. May 24, 2021) (citations omitted) ("[C]ourts in this Circuit have repeatedly found that New York state courts afford a plaintiff an adequate opportunity for judicial review of constitutional claims."), report and recommendation adopted, 2021 WL 4272350 (S.D.N.Y. Sept. 20, 2021). As all three of the Younger conditions are met, the Court is required to abstain from reviewing the claims stemming from plaintiff's Franklin and St. Lawrence County Court proceedings.

Similarly, plaintiff challenges proceedings from Franklin County Family Court. See Compl. at 23-26. Courts have routinely applied Younger abstention to family court proceedings. See Walker v. Rivera, No. 1:22-CV-560 (DNH/TWD), 2022 WL 2341544, at \*6 (N.D.N.Y. June 29, 2022) (discussing extension of Younger abstention to family court proceedings), report and recommendation adopted, 2022 WL 2805477 (N.D.N.Y. July 18, 2022). This is because "[i]t is well-settled that a custody dispute raises important state interests." Walker v. O'Connor, No. 1:22-CV-581 (DNH/TWD), 2022 WL 2341420, at \*6 (N.D.N.Y. June 29, 2022) (quoting Stumpf v. Maywalt, No. 21-CV-06248 (EAW), 2022 WL 2062613, at \*3 (W.D.N.Y. June 6, 2022) (collecting cases)), report and recommendation adopted, 2022 WL

Damon v. New York, Not Reported in Fed. Supp. (2023)

2023 WL 11965130

2805462 (N.D.N.Y. July 18, 2022). As plaintiff's family court proceedings appear to still be ongoing, the Court should abstain from interfering at this juncture. See O'Connor, 2022 WL 2341420, at *6 (citing *Stumpf*, 2022 WL 2062613, at *3 (applying *Younger* abstention in an action stemming from an ongoing child custody dispute); see also Walker v. Fam. Ct. Judge Catherine Cholakis, No. 1:19-CV-1288 (LEK/CFH), 2020 WL 3503158, at *4 (N.D.N.Y. June 29, 2020) (applying *Younger* abstention in an action seeking declaratory relief over a child custody dispute); Graham v. N.Y. Ctr. for Interpersonal Dev., No. 15-CV-00459 (PKC), 2015 WL 1120120, at *3 (E.D.N.Y. Mar. 12, 2015) (applying *Younger* abstention in an action seeking injunctive relief over a child custody dispute).

**\*8** However, "[e]ven if the three factors for abstention are satisfied, *Younger* established a clear exception that federal abstention is not warranted if the state court proceeding is brought in bad faith." Dorsett-Felicelli, Inc. v. County of Clinton, 349 F. Supp. 2d 355, 364 (N.D.N.Y. 2004) (citing Younger, 401 U.S. at 54). "[A]bstention may be inappropriate 'in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction ....' " Diamon D. Constr. Corp., 282 F.3d at 198 (quoting Perez v. Ledesma, 401 U.S. 82, 85 (1971)). "To establish the 'bad faith' exception, the federal plaintiff must show that 'the party bringing the state action must have no reasonable expectation of obtaining a favorable outcome' ... or that the proceeding '[was] brought to retaliate for or to deter constitutionally protected conduct' or otherwise 'for the purpose to harass.' " Trump v. James, No. 1:21-CV-1352 (BKS/CFH), 2022 WL 1718951, at *12 (N.D.N.Y. May 27, 2022) (quoting Cullen, 18 F.3d at 103-04). Although plaintiff asserts that there was insufficient evidence to indict him, and that the prosecutors allegedly stated that they do not have enough evidence to try him, he has not put forth facts that suggest that the prosecutions were initiated in bad faith or to be retaliatory or harassing. See Compl. at 11, 16. Plaintiff acknowledges the Younger doctrine but states that "the parties listed in the original petitioner have acted in bad faith and created an extraordinary set of circumstances." Dkt. No. 11 at 2. Plaintiff has not alleged facts that indicate that "the party bringing the state action [has] no reasonable expectation of obtaining a favorable outcome[.]" Cullen, 18 F.3d at 103. Although he asserts that "[i]t seems awfully coincidental that such a delay [in his trial] would occur right at the time the defense comes forward with evidence that the allegations are false as well as a mention of missing evidence[,]" this does not sufficiently allege that there was "no legitimate purpose"

in the state proceeding. Diamond "D" Const. Corp., 282 F.3d at 200. Finally, plaintiff has failed to allege that the family court proceedings were initiated in bad faith or to harass him. See id. at 23-26. Thus, the undersigned concludes that an exception to Younger abstention is not warranted under these circumstances.

Insofar as plaintiff seeks the Court's intervention into a past Family Court decision, see Compl. at 33, "[t]he *Younger* doctrine is as applicable to suits for declaratory relief as it is to those for injunctive relief; the Supreme Court held in a companion case to *Younger* that *Younger's* policy would 'be frustrated as much by a declaratory judgment as it would be by an injunction.' " Kirschner, 225 F.3d at 235 (quoting Samuels v. Mackell, 401 U.S. 66, 73 (1971)). Additionally, the Court lacks jurisdiction to review prior state court orders under the Rooker-Feldman doctrine insofar as plaintiff lost in the state court. See Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923); District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983). "The *Rooker-Feldman* doctrine bars federal district courts from hearing cases that in effect are appeals from state court judgments, because the Supreme Court is the only federal court with jurisdiction over such cases." Dorce v. City of New York, 2 F.4th 82, 101 (2d Cir. 2021). "The [ ] doctrine applies where the federal court plaintiff: (1) lost in state court, (2) complains of injuries caused by the state court judgment, (3) invites the district court to review and reject the state court judgment, and (4) commenced the district court proceedings after the state court judgment was rendered." O'Connor, 2022 WL 2341420, at *6 (citation omitted). Plaintiff asks the court to "[r]everse September 21 [Franklin County Family Court] ruling and dismiss with prejudice[.]" Compl. at 33. Such relief is barred by the Rooker-Feldman doctrine. See O'Connor, 2022 WL 2341420, at *6 (citing Phifer v. City of New York, 289 F.3d 49, 57 (2d Cir. 2002)) ("There is no question that *Rooker-Feldman* bars [ ] challenges to the family court's decisions regarding custody, neglect, and visitation."); Fernandez v. Turetsky, No. 12-CV-4092 (SLT/MDG), 2014 WL 5823116, at *4 (E.D.N.Y. Nov. 7, 2014) (collecting cases) ("Courts have repeatedly invoked the *[Rooker-Feldman]* doctrine in cases, like the one currently before the Court, in which plaintiffs challenge family court decrees setting child support arrears."), aff'd, 645 F. App'x 103 (2d Cir. 2016) (summary order).

Finally, in addition to the Younger and Rooker-Feldman doctrines, the Franklin County "Child Support Court" or Family Court is immune from suit. The Second Circuit has held that "the New York State Unified Court System

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 316 of 529
Damon v. New York, Not Reported in Fed. Supp. (2023)
2023 WL 11965130

is unquestionably an 'arm of the State' and is entitled to Eleventh Amendment sovereign immunity." Gollomp v. Spitzer, 568 F.3d 355, 368 (2d Cir. 2009) (internal citation omitted). The Franklin County Family Court is "a part of the New York State Unified Court system and is, therefore, also protected by the State's sovereign immunity for suit in federal court." McKnight v. Middleton, 699 F. Supp. 2d 507, 521 (E.D.N.Y. 2010); see also Davis v. Westchester Cnty. Fam. Ct., No. 16-CV-9487 (KMK), 2017 WL 4311039, at *6 (S.D.N.Y. Sept. 26, 2017). Thus, it is recommended that claims against the Franklin County Family Court be dismissed. [5]

[5]    Plaintiff challenges his being forced to wear jail garb to various pre-trial hearings. See Compl. at 25, 34. In Estelle, the Supreme Court of the United States held that "the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes[.]" Estelle v. Williams, 425 U.S. 501, 512 (1976). However, research has not revealed a case that states that an inmate cannot be required to wear prison garb to pre-trial hearings outside the presence of a jury. Thus, plaintiff has not alleged a plausible constitutional claim for relief.

### 3. Claims Against Prosecutors, District Attorney's Offices, and Legal Guardian

**\*9** In addition to the Court being barred from reviewing plaintiff's claims under the Younger and Rooker-Feldman doctrines, numerous individual defendants are immune from suit. Plaintiff seeks to bring claims against Assistant District Attorney Kelly Poupore, [6] the Franklin County and St. Lawrence County District Attorney's Offices, and law guardian Tammy Gordon. See Compl. at 5-6. Plaintiff seeks monetary damages and asks the Court to dismiss pending charges against him, terminate Tammy Gordon as the children's law guardian, "expunge all evidence from the record", and prosecute his children's mother. Compl. at 35.

[6]    In his March 13, 2023, letter to the Court, plaintiff asserts that Kelly Poupore is no longer employed with the Franklin County District Attorney's Office. See Dkt. No. 11 at 1. However, he does not state that he no longer wishes to bring the action

against her. See id. As such, the undersigned will proceed to analyze the purported claims against her.

To the extent plaintiff seeks monetary damages, "[t]he doctrine of absolute immunity applies broadly to shield a prosecutor from liability for money damages (but not injunctive relief) in a § 1983 lawsuit, even when the result may be that a wronged plaintiff is left without an immediate remedy." Anilao v. Spota, 27 F.4th 855, 863 (2d Cir. 2022), pet. for cert. filed (Dec. 13, 2022). "[P]rosecutors enjoy 'absolute immunity from § 1983 liability for those prosecutorial activities intimately associated with the judicial phase of the criminal process.' " Id. at 864 (quoting Barr v. Abrams, 810 F.2d 358, 361 (2d Cir. 1987)). "[A]bsolute immunity extends even to a prosecutor who 'conspir[es] to present false evidence at a criminal trial ... because the immunity attaches to his function, not to the manner in which he performed it.' " Id. (quoting Dory v. Ryan, 25 F.3d 81, 83 (2d Cir. 1994)). "A narrow limitation to the scope of absolute immunity in § 1983 actions [ ] exists where the defect is jurisdictional — that is, where the prosecutor acted well outside the scope of authority, rather than where the defect relates ... to the prosecutor's motivation or the reasonableness of his official action." Id.

Plaintiff challenges Kelly Poupore's actions in relation to her prosecution of plaintiff for criminal charges such as speaking with the victim, opposing bail, plea bargaining, seeking extensions of time for hearings and trial, and presenting evidence to a grand jury. See Compl. at 11-12, 28-29. This is precisely the function of prosecutors that absolutely immunity protects. See Anilao, 27 F.4th at 864 ("[A] prosecutor enjoys absolute immunity when determining which offenses to charge, initiating a prosecution, presenting a case to a grand jury, and preparing for trial."). Thus, the claims against Kelly Poupore are barred by absolute prosecutorial immunity.

As to the two District Attorney's offices, Franklin County and St. Lawrence County, "the Eleventh Amendment prohibits individuals from suing the District Attorney's Office, an arm of the state, for damages under 42 U.S.C. § 1983 arising from prosecutorial decisions." Quiles v. City of New York, No. 01-CV-10934 (LTS/THK), 2002 WL 31886117, at *2 (S.D.N.Y. Dec. 27, 2002) (citing Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100 (1984) (explaining that in absence of consent, suit against a state or one of its agencies is proscribed by the Eleventh Amendment)). This is because "[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county." Ying Jing Gan v. City

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 317 of 529

Damon v. New York, Not Reported in Fed. Supp. (2023)

2023 WL 11965130

of New York, 996 F.2d 522, 536 (2d Cir. 1993) (citation omitted). Accordingly, plaintiff's claims against the Franklin County and St. Lawrence County District Attorney's Offices for damages are barred. See id.; see also Pierre v. People of the State of New York, No. 15-CV-3577(JS/ARL), 2016 WL 324978, at *3 (E.D.N.Y. Jan. 26, 2016) ("[The p]laintiff seeks to hold the Nassau County District Attorney's Office liable for bringing a criminal case against her. The Eleventh Amendment therefore bars [the p]laintiff's claims against the Nassau County District Attorney's Office."); Lefevre v. Cnty. of Albany, No. 1:14-CV-155 (GLS/RFT), 2015 WL 1626005, at *3 (N.D.N.Y. Apr. 13, 2015) ("[T]he court is satisfied that the District Attorney's Office is immune from liability here, as [the] claims appear to stem only from the decision to prosecute him, and there are no allegations that any employees of the office were acting in anything other than a prosecutorial capacity.").

**\*10** As to the law guardian, Tammy Gordon, "[a] plaintiff pressing a claim of [a] violation of his constitutional rights under § 1983 is thus required to show state action." Meadows v. United Servs., Inc., 963 F.3d 240, 243 (2d Cir. 2020) (per curiam) (citation omitted). "[A]lthough appointed by the state, an attorney for [a] children or law guardian is not a state actor because he or she must exercise independent professional judgment on behalf of the clients they represent." Parent v. New York, 786 F. Supp. 2d 516, 538 (N.D.N.Y. 2011), aff'd, 485 F. App'x 500 (2d Cir. 2012) (summary order); see DeRouseau v. Fam. Ct., Westchester Cnty., No. 21-CV-8716 (LTS), 2022 WL 1747859, at *3 (S.D.N.Y. May 31, 2022) (citing Parent, 786 F. Supp. 2d at 538, in support of dismissing claims against legal guardian); Curcio v. Grossman, No. 21-CV-4452 (LTS), 2021 WL 2453547, at *3 (S.D.N.Y. June 15, 2021) (same); cf. Polk County v. Dodson, 454 U.S. 312, 318 (1981) (explaining that "a lawyer representing a client is not, by virtue of being an officer of the court, a state actor 'under color of state law' within the meaning of § 1983.").

Some courts have dismissed claims against a law guardian solely because a law guardian is not a state actor, while others have dismissed such claims under a theory of quasi-judicial immunity. "Absolute immunity may attach to a non-judicial officer where that individual serves as an arm of the court, or acts as an integral part[ ] of the judicial process." Miller Ex v. Primo, No. 5:22-CV-0680 (BKS/ML), 2022 WL 16556060, at *5 (N.D.N.Y. Sept. 29, 2022) (quotation marks omitted) (citations omitted), report and recommendation adopted, 2022 WL 16551700 (N.D.N.Y. Oct. 31, 2022). "In New York, courts have regularly found that attorneys for children in custody proceedings (called 'law guardians' until 2010, N.Y. Fam. Ct. Act § 242) enjoy quasi-judicial immunity." Id. (citation omitted); see also Phillips v. Wagner, No. 1:22-CV-0833 (DNH/ML), 2022 WL 17406092, at *4-5 (N.D.N.Y. Nov. 4, 2022) (dismissing claims on quasi-judicial immunity grounds), report and recommendation adopted, 2022 WL 17403441 (N.D.N.Y. Dec. 2, 2022); Kramer v. Dane, No. 17-CV-5253 (JFB/SIL), 2018 WL 5077164, at *7-8 (E.D.N.Y. July 26, 2018) (same), report and recommendation adopted, 2018 WL 4489284 (E.D.N.Y. Sept. 19, 2018).

As law guardians are not state actors and are entitled to quasi-judicial immunity, plaintiff cannot state a claim against law guardian, Tammy Gordon. Thus, it is recommended that the claims against her be dismissed.

### 4. Claims Against Public Defenders and Conflict Defender's Office

"State action is an essential element of any section 1983 claim." Bonilla v. Connerton, No. 3:15-CV-1276 (LEK/DEP), 2016 WL 2765287, at *4 (N.D.N.Y. Apr. 14, 2016) (citations omitted) report and recommendation adopted, 2016 WL 2760373 (N.D.N.Y. May 12, 2016); see also Meadows, 963 F.3d at 243. "To survive scrutiny under section 1915(e) where a plaintiff has asserted a section 1983 claim, the complaint must allege facts that plausibly suggest state action on the part of the named defendants." Id. (citing DeMatteis v. Eastman Kodak Co., 511 F.2d 306, 311 (2d Cir. 1975)). "[I]t is well-established that court-appointed attorneys performing a lawyer's traditional functions as counsel to defendant do not act 'under color of state law' and therefore are not subject to suit under 42 U.S.C. § 1983." Rodriguez v. Weprin, 116 F.3d 62, 65-66 (2d Cir. 1997); see also Bonilla, 2016 WL 2765287, at *4 ("While it is unclear whether [the] defendant [ ] was retained or assigned by the court to represent [the] plaintiff, even assuming the latter, the assignment of an attorney to represent a plaintiff does not rise to a level of state action sufficient to support a claim under section 1983."); Moore v. Reittinger, No. 6:22-CV-1083 (LEK/ATB), 2022 WL 19003387, at *2 (N.D.N.Y. Nov. 8, 2022) ("[The] plaintiff's claims against his former attorney fail as a matter of law, and these claims are dismissed."), report and recommendation adopted as modified, 2023 WL 1500801 (N.D.N.Y. Feb. 3, 2023).

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 318 of 529

Damon v. New York, Not Reported in Fed. Supp. (2023)

2023 WL 11965130

**\*11** The Franklin County Conflict Defender's Office receives assignments for representation when individuals have cases pending in Franklin County and they cannot be assigned to the Franklin County Public Defender's Office because of a conflict of interest. [7] Plaintiff alleges that he was represented by public defender Thomas Soucia and conflict defender Anson Rhodes. See Compl. at 24. As assigned or retained counsel, the attorneys were not acting under the color of state law, and plaintiff cannot state an ineffective assistance of counsel claim against them under Section 1983; thus, it is recommended that those claims be dismissed. See Strong v. New York, No. 1:19-CV-63 (MAD/CFH), 2019 WL 1763010, at \*7 (N.D.N.Y. Apr. 22, 2019) (citations omitted) (" 'Private attorneys, whether court appointed or privately retained, are generally not liable under § 1983.' ... Because [the public defender] was performing his 'traditional functions as counsel to defendant' during the alleged violation, he cannot be held liable pursuant to § 1983."), report and recommendation adopted, 2019 WL 2723372 (N.D.N.Y. July 1, 2019).

[7]    Franklin County Public Defender, https://www.franklincountyny.gov/departments/public_safety/public_defender/index.php (last visited Mar. 17, 2023).

Insofar as plaintiff seeks to sue the Franklin County Conflict Defender's Office and Public Defender's Office, plaintiff has not stated any facts concerning either Office or set forth allegations "to support the inference" that any constitutional violations "resulted from an official custom or policy." Green v. Dep't of Educ. of City of New York, 16 F.4th 1070, 1077 (2d Cir. 2021) (per curiam). "A municipality or municipal entity cannot be held liable under Section 1983 on a respondeat superior theory." Bliven v. Hunt, 478 F. Supp. 2d 332, 336 (E.D.N.Y. 2007) (citing Monell v. Department of Soc. Servs. of City of New York, 436 U.S. 658, 691 (1978)). Rather, Monell "extends liability to a municipal organization where that organization's [policy, practice, or custom] led to an independent constitutional violation." Benacquista v. Spratt, 217 F. Supp. 3d 588, 599 (N.D.N.Y. 2016) (quoting Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006)). As plaintiff has not set forth any allegations concerning a policy or custom, he has not sufficiently alleged a claim against the Franklin County Conflict Defender's Office or Public Defender's Office. Thus, it is recommended that any purported claims be dismissed.

### 5. Claims Concerning Plaintiff's Confinement in Franklin County Jail

#### a. Medical Deliberate Indifference Claims

As plaintiff was a pretrial detainee at the time of the alleged conduct, his claims arise under the Fourteenth Amendment. See Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017). "A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions." Id. (citing Benjamin v. Fraser, 343 F.3d 35, 49 (2d Cir. 2003), overruled on other grounds by Caiozzo v. Koreman, 581 F.3d 63, 70 (2d Cir. 2009)). To state a claim for deliberate indifference, a pretrial detainee must allege an objective and subjective prong "showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and ... that the officer acted with at least deliberate indifference to the challenged conditions." Id.

"[A]n injury is 'sufficiently serious' when it involves 'the existence of an injury that a reasonable doctor would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.' " Trapani v. Dagostino, No. 9:18-CV-0805 (DNH/CFH), 2019 WL 5149795, at \*4 (N.D.N.Y. June 10, 2019) (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d. Cir. 1998)). Put another way, the objective prong can be analyzed by asking (1) "whether the plaintiff was actually deprived of adequate medical care[ ]" and (2) "whether the purported inadequacy in the medical care is 'sufficiently serious.' " Versney v. Touron, et al., No. 9:20-CV-992 (DNH/ATB), 2023 WL 2346366, at \*3 (N.D.N.Y. Feb. 8, 2023) (quoting Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir. 2006)), report and recommendation adopted, 2023 WL 2346281 (N.D.N.Y. Mar. 3, 2023). To determine whether the inadequacy of medical care was "sufficiently serious" "[t]he court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff." Id. (citations omitted).

**\*12** As to the subjective element, "[u]ntil very recently, the second, or mens rea, prong—the defendant's 'sufficiently culpable state of mind'—was assessed subjectively in claims brought under both the Eighth and the Fourteenth Amendments." Trapani, 2019 WL 5149795, at \*4 (quoting

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 319 of 529

Damon v. New York, Not Reported in Fed. Supp. (2023)

2023 WL 11965130

Davis v. McCready, 283 F. Supp. 3d 108, 116 (S.D.N.Y. 2017)). "However, in light of the Supreme Court's ruling in *Kingsley v. Hendrickson,* [576 U.S. 389] (2015), 'the mens rea prong of a deliberate indifference claim brought by a pretrial detainee is now to be assessed objectively.' " *Id.* (citation omitted). To determine the subjective prong, courts look to "whether the official knew, or should have known that his or her conduct posed an excessive risk to health or safety." *Id.* (quotation marks omitted) (quoting Lloyd v. City of New York, 246 F. Supp. 3d 704, 719 (S.D.N.Y. 2017)).

"Non-medical personnel engage in deliberate indifference where they 'intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to attendant prison personnel.' " Baumann v. Walsh, 36 F. Supp. 2d 508, 512 (N.D.N.Y. 1999) (citation omitted). "At a minimum, there must be at least some allegations of a conscious or callous indifference to a[n individual's] rights." Dumel v. Westchester County, No. 19-CV-2161 (KMK), 2021 WL 738365, at *10 (S.D.N.Y. Feb. 25, 2021) (citation omitted). "The serious medical needs standard contemplates a condition of urgency such as one that may produce death, degeneration, or extreme pain." Charles v. Orange County, 925 F.3d 73, 86 (2d Cir. 2019).

Plaintiff alleges that "the nurse" at Franklin County jail administered the wrong medication to him, "the doctor" neglected his medical needs, and the officers ignored his requests for medical attention. Compl. at 34; 19-23. He contends that his blood pressure and sugar were monitored" and when his levels were "normal [ ] there was no follow-up." *Id.* at 19. He also asserts that after he complained that he had bloody stools, he was seen a week later, but by the time he was seen by medical personnel the issue had stopped. See *id.* at 19-20. Then, he alleges that when his blood pressure was high, he "was immediately given a pill for blood pressure[.]" *Id.* at 21. He alleges that the medication made his body "numb and tingling for about 30 minutes." *Id.* When he was seen three days later, he received an EKG, and the results were normal. See *id.* Plaintiff was given a medication to "alleviate the chest pains[.]". *Id.* Plaintiff alleges that on one occasion he was given a medication that tasted differently than the Buspar and that caused him chest and head pain, dizziness, and nausea. See *id.* at 22. He was taken to the nurse within thirty to forty-five minutes. See *id.* Plaintiff alleges that he "also filed a grievance over the stroke symptoms going unaddressed for a week." *Id.* at 23.

It appears the plaintiff has likely sufficiently plead a serious medical condition. He alleges that he had consistently high blood pressure, chest pains, anxiety, dizzy spells, nausea, and black outs. See Compl. at 19-23; see also Amberslie v. Prisoner Transp. Serv. of Am., LLC, No. 9:17-CV-0564 (TJM/DEP), 2019 WL 1024183, at *13 (N.D.N.Y. Mar. 4, 2019) ("At this juncture, I am unable—given the paucity of factual allegations in his amended complaint— to determine whether plaintiff's medical condition constitutes a "sufficiently serious" condition.") (citing Araujo v. City of New York, No. 08-CV-3715, 2010 WL 1049583, at *7 (E.D.N.Y. Mar. 19, 2010) (stating that "[a]lthough the Second Circuit has articulated factors that are relevant to whether a medical condition is 'sufficiently serious,' ... the [c]ourt cannot make a conclusive determination on that issue in this case at the motion to dismiss stage, based upon the allegations in the complaint" where the plaintiff alleged he needed various medications for his diabetes, high blood pressure, and post-traumatic stress disorder)), report and recommendation adopted, 2019 WL 1368860 (N.D.N.Y. Mar. 26, 2019).

**\*13** However, even assuming he has satisfied the objective prong, plaintiff has not sufficiently alleged the subjective prong of a medical indifference claim. Plaintiff has not alleged any facts to indicate that the nurse, doctor, or guards acted intentionally or with reckless disregard for plaintiff's health. Rather, he alleges that he received blood pressure checks, medication to help his chest pain and anxiety, and after he believed he was given the wrong medication, he was seen by medical personnel within thirty to forty-five minutes. See Compl. at 19-23; cf. Martinez v. United States, No. 20-CV-7275 (VEC), 2021 WL 4224955, at *10 (S.D.N.Y. Sept. 16, 2021) (emphasis added) (denying motion to dismiss where the doctor defendant "was aware of [the p]laintiff's repeated complaints of hematuria and accompanying pain over the course of many months and was aware that [the p]laintiff had not yet seen a urologist despite [the doctor's] repeated referrals[.]"); Baptiste v. New York State Dep't of Corr. & Cmty. Supervision, No. 9:22-CV-1326 (BKS/TWD), 2023 WL 2185989, at *2 (N.D.N.Y. Feb. 23, 2023) (determining that the plaintiff sufficiently alleged an Eighth Amendment medical indifference claim where he did not have a follow up appointment for two months and received no diagnoses for four years).

"It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a [pre-trial detainee] might prefer a different treatment does not give rise

Case 5:25-cv-00956-AJB-MJK   Document 9   Filed 12/08/25   Page 320 of 529

Damon v. New York, Not Reported in Fed. Supp. (2023)

2023 WL 11965130

to a [Fourteenth] Amendment violation." Chance, 143 F.3d at 703; see also Barnes v. Correct Care Sols., LLC, No. 18-CV-12288 (VB), 2020 WL 3498265, at *4 (S.D.N.Y. June 29, 2020) (applying the standard in Fourteenth Amendment context); Swinton v. Livingston County, No. 21-1434, 2023 WL 2317838, at *2 (2d Cir. Mar. 2, 2023) (summary order) (reiterating the relevant standard in the context of a Fourteenth Amendment claim). Additionally, "mere negligence is not actionable, nor is mere medical malpractice ... tantamount to deliberate indifference." Vail v. City of New York, 68 F. Supp. 3d 412, 424 (S.D.N.Y. 2014) (citation omitted); see Charles v. Orange County, 925 F.3d 73, 87 (2d Cir. 2019) (citations omitted) ("A plaintiff must show 'something more than mere negligence' to establish deliberate indifference in the Fourteenth Amendment context. Thus, 'mere medical malpractice is not tantamount to deliberate indifference, but it may rise to the level of deliberate indifference when it involves culpable recklessness, i.e., an act or a failure to act ... that evinces a conscious disregard of a substantial risk of serious harm.' ").

"Cases have consistently held that the mistaken/negligent administration of incorrect medication is insufficient to support a claim of deliberate indifference under the Eighth Amendment." Revels v. Corr. Med. Care, Inc., No. 17-CV-88 (MAD/TWD), 2022 WL 1224407, at *9 (N.D.N.Y. Apr. 26, 2022) (collecting cases); see also Vail, 68 F. Supp. 3d at 425 (collecting cases) (citations omitted) (dismissing claim where the "[p]laintiff alleges that the [ ] Defendants both thought that [the nurse] had given [the p]laintiff the correct medication. Even if, as the [p]laintiff suggests, the [ ] Defendants should have known that without checking identification, their conduct posed a great risk to [the p]laintiff, a 'belief that ... conduct poses no risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is sincere.' "); Long v. Lafko, 254 F. Supp. 2d 444, 447 (S.D.N.Y. 2003) (dismissing deliberate indifference claim based on medication error where [the] defendant's conduct was "merely negligent or unprofessional in failing to check the medication before administering it"). In the context of the Fourteenth Amendment, courts have dismissed medical indifference claims for failing to provide medication because the alleged conduct was "merely negligent[.]" Dumel, 2021 WL 738365, at *9-10 (citation omitted) ("Even when construed liberally, the Amended Complaint suggests, at most, that Medical Defendants were 'merely negligent[ ]' in failing to ensure that [the p]laintiff received his medication. This does not appear to be a case where, for example, a defendant intentionally deprives

a plaintiff of medication.") (citing, inter alia, Amberslie, 2019 WL 1024183, at *13 (dismissing deliberate-indifference claim based on the mens rea prong where the "plaintiff's allegations tend[ed] to show little more than an inadvertent failure to provide him with [his medication]")).

*14 Plaintiff has failed to allege any conduct that is more than potentially negligent. He does not allege that anyone acted intentionally to impose a harmful condition to his health or that the guards, doctor, or nurse acted with reckless disregard to a substantial risk to plaintiff's health and safety. Rather, plaintiff alleges that the doctor and nurses conducted an EKG, put him on medication, provided follow-up appointments to check his blood pressure, and saw him within thirty to forty-five minutes of a reaction to allegedly the wrong medication. See Compl. at 19-23. Two missed follow-up appointments only three days apart is not enough to establish a deliberate indifference claim. See Dkt. No. 7 at 2; see also Hamm v. Hatcher, No. 05-CV-503 (ER), 2013 WL 71770, at *9-10 (S.D.N.Y. Jan. 7, 2013) (collecting cases discussing delays in medical treatment ranging from several days to one year) ("The relevant case law makes clear that a greater showing of harm is required in order to meet the high standard of a constitutional violation within the context of a delay in treatment."). Further, plaintiff's disagreement with the nurse's and doctor's treatment methods and the possibility of a medication mix-up are insufficient to satisfy the subjective prong of a medical indifference claim; thus, it is recommended that the claims be dismissed for failure to state a claim. See Revels, 2022 WL 1224407, at *9; Dumel, 2021 WL 738365, at *9.

### b. Non-Medical Deliberate Indifference

Plaintiff alleges that he was threatened by another inmate. See Compl. at 22. "The Due Process Clause of the Fourteenth Amendment protects pre-trial detainees ... against intolerable prison conditions." Dzwonczyk v. Syracuse City Police Dep't, 710 F. Supp. 2d 248, 267 (N.D.N.Y. 2008) (citation omitted). "The failure to protect a pre-trial detainee from harm is one type of intolerable prison condition. Thus, a prison official's deliberate indifference to a substantial risk of serious harm to an inmate may form the basis of a deliberate indifference claim." Id. "[W]hen a pretrial detainee plaintiff brings § 1983 claims alleging deliberate indifference, including claims alleging failure to protect or intervene, the plaintiff must satisfy [the] two-prong" objective and subjective test. Barnes v. Harling, 368 F. Supp. 3d 573, 596 (W.D.N.Y. 2019)

Damon v. New York, Not Reported in Fed. Supp. (2023)

2023 WL 11965130

(quoting Hayes v. N. Y. C. Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996)).

"[W]hen a prisoner is subjected to specific threats from another inmate, and there are indication[s] that the threat will be carried out, the failure of prison officials to act may give rise to a deliberate indifference claim." Hartry v. Cnty. of Suffolk, 755 F. Supp. 2d 422, 436 (E.D.N.Y. 2010) (quotation marks and citation omitted). "[T]he objective prong can be satisfied even where no serious physical injury results." Randle v. Alexander, 960 F. Supp. 2d 457, 473-74 (S.D.N.Y. 2013) (citing Heisler v. Kralik, 981 F. Supp. 830, 836 (S.D.N.Y. 1997), aff'd sub nom. Heisler v. Rockland County, 164 F.3d 618 (2d Cir. 1998)). "At bottom, '[i]n assessing whether the risk of an inmate's violence against other inmates is 'sufficiently serious,' to trigger constitutional protection, the focus of inquiry must be, not the extent of the physical injuries sustained in an attack, but rather the existence of a 'substantial risk of serious harm." Id. at 474 (quotation marks omitted) (quoting Heisler, 981 F. Supp. at 836); accord Mazyck v. Keller, 531 F. Supp. 3d 630, 642 (W.D.N.Y. 2021).

Research has not revealed a case in which a court has concluded that a failure to protect claim can proceed past initial review, or can survive a dispositive motion, where there was no physical violence whatsoever. To be sure, courts have noted that "a plaintiff may satisfy the subjective prong by alleging that the defendants were aware of ... specific threats made against the plaintiff by the assailant," Shehan v. Barrone, No. 3:22-CV-879 (OAW), 2023 WL 122039, at *4 (D. Conn. Jan. 6, 2023), and relied on a plaintiff's allegations "that he informed [the] defendant [officer] of a substantial risk of serious harm that existed due to the threat from [another inmate] and his associates, but that [the] defendant [officer] failed to take any action to protect him." Mazyck, 531 F. Supp. 3d at 642. However, in those cases, there was always some act of violence following the threats and the threats that occurred before the violence were specific—calling the plaintiff a snitch and telling him to leave the cell block "or else" after the guards openly informed other inmates that the plaintiff was complaining about them; and where the plaintiff informed the guards of an ongoing feud between himself and a fellow inmate who he had cooperated with the government against. Shehan, 2023 WL 122039, at *1; Mazyck, 531 F. Supp. 3d at 636.

**\*15** Here, plaintiff's allegation that another inmate "threatened to assault" him, without more, is insufficient

to plausibly allege that the conditions were "sufficiently serious" or that there was a "substantial risk of serious harm." See Garcia v. Rodriguez, No. 05-CV-5915 (JSR), 2007 WL 2456631, at *2 (S.D.N.Y. Aug. 24, 2007) ("[T]he Court cannot agree ... that [the] isolated statement that [the plaintiff] would 'get hurt,' which was unaccompanied by any other words or actions or prior history between [the two inmates], was sufficient to put [the defendant], or any reasonable officer in his position, on notice that [the plaintiff] faced a substantial risk of serious harm or that it was anything more than an idle threat."); see also Livingston v. Hoffnagle, No. 9:19-CV-0353 (GLS/CFH), 2019 WL 7500501, at *7 (N.D.N.Y. Nov. 8, 2019) ("[G]iven the absence of allegations of actual physical injury, plaintiff has failed to satisfy the objective element of the test.") (citing, inter alia, Johnson v. Lynn-Caron, No. 9:11-CV-386 (GLS/CFH), 2013 WL 5465594, *5 (N.D.N.Y. Sept. 30, 2013) (dismissing the plaintiff's failure to protect claim where the plaintiff did not demonstrate actual physical harm)), report and recommendation adopted, 2020 WL 95431 (N.D.N.Y. Jan. 8, 2020).

Although plaintiff alleges that he complained to an officer, the officer informed the threatening inmate about the complaint, and the inmate threatened plaintiff again, this is insufficient to establish a "serious" risk of harm to plaintiff and a reckless disregard of that harm. It is, therefore, recommended that plaintiff's failure to protect claim be dismissed. See Maldonado v. John, No. 21-CV-3719 (LTS), 2021 WL 3292575, at *6-7 (S.D.N.Y. Aug. 2, 2021) (dismissing claims but allowing amendment where the plaintiff alleged he was assaulted, protective measures were put in place, when he was taken off protective measures, inmates threatened him and officers told inmates he was a snitch, and his cell was burned, property destroyed, and he was attacked but a mentally ill patient; but the court concluded that the inmates "threats coupled with corrections officers labeling him a snitch, may state a constitutional claim if these actions exposed [the p]laintiff to harm from other inmates, such as the attack on [the p]laintiff. But [the p]laintiff fails to allege sufficient facts to suggest that Medford was deliberately indifferent to a substantial risk of harm to him or that [the inmates] or other corrections officers' actions caused the other inmates to burn his cell, take his property, and attack him."); see also Best v. City of New York, No. 11-CV-4475 (JMF), 2012 WL 5458054, at *7 (S.D.N.Y. Nov. 8, 2012) ("[The plaintiff] has failed to plead facts capable of establishing that his injury was 'sufficiently serious.' Although he repeatedly alleges that he feared his life was in danger because he was not held in protective custody, he has not alleged that he was attacked

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 322 of 529
Damon v. New York, Not Reported in Fed. Supp. (2023)
2023 WL 11965130

or injured as a result of being denied protective custody status, or even that other inmates or correctional officers made significant threats against him."). [8]

[8]    The undersigned also notes that plaintiff did not name the officer who allegedly failed to protect him, Sergeant Hanse, as a defendant in this complaint. See Compl. at 1-2, 22. It also appears based on the face of the complaint that plaintiff's failure to protect claims might be unexhausted. "The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: 'No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.' " Smith v. Kelly, 985 F. Supp. 2d 275, 280 (N.D.N.Y. 2013) (quoting 42 U.S.C. § 1997e(a)). "This requirement applies to pretrial detainees as well as to sentenced prisoners." Id. (citing United States v. Al-Marri, 239 F. Supp. 2d 366, 367 n.1 (S.D.N.Y. 2002)). However, because the undersigned is recommending dismissal of plaintiff's complaint on other grounds, the undersigned will not analyze whether plaintiff exhausted his claim at this juncture.

**\*16** Next, plaintiff contends that he was forced to stand at a wall for forty-five minutes. See Dkt. No. 7 at 2. "Because as a pre-trial detainee [the plaintiff] was not being 'punished,' the 'cruel and unusual punishment' proscription of the Eighth Amendment does not apply." Cuoco v. Moritsugu, 222 F.3d 99, 106 (2d Cir. 2000). Rather, "[a] pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eigh[th] Amendment." Darnell, 849 F.3d at 29 (discussing two prong objective and subjective test to conditions of confinement claims).

Plaintiff has not alleged that being forced to stand at a wall for forty-five minutes posed an unreasonable risk of serious damage to his health or otherwise imposed a "sufficiently serious condition." See Dkt. No. 7 at 2. He has also not alleged that the officers ignored a serious risk imposed by that condition. Thus, he has failed to allege either the objective or subjective prong of a deliberate indifference claim. See,

e.g., Vargas v. Renzi, No. 21-CV-06165 (DGL), 2021 WL 1022849, at \*9 (W.D.N.Y. Mar. 15, 2021) (citing Herbert v. Smith, No. 20-CV-6348 (PMH), 2020 WL 5898977, at \*3 (S.D.N.Y. Oct. 5, 2020) (dismissing Fourteenth Amendment claim because the "[p]laintiff does not allege specific facts showing that these conditions put his health or safety at risk and that prison officials acted with deliberate indifference.")) ("While [the p]laintiff suggests a few different ways in which he may have contracted the virus, his allegations neither set forth that the conditions he alleges posed an excessive risk to his health or safety, nor that [defendant] officials or employees knew or should have known that the conditions alleged posed a significant risk of serious illness or death."), appeal dismissed (Jan. 14, 2022).

Similarly, to the extent plaintiff alleges that the jail's shower broke, he was left covered in soap, and he was unable to shower for four days, he has not asserted that these conditions resulted in any harm to his health, let alone an unreasonable risk of serious damage to his health or a "sufficiently serious condition." See Dkt. No. 7 at 2; see also Thorpe v. Vill. of Greenwich, No. 5:13-CV-0902 (GTS/ATB), 2014 WL 788816, at \*10 (N.D.N.Y. Feb. 25, 2014) (citations omitted) ("Deprivation of showers only rises to the level of a constitutional violation when the denial deprives the plaintiff of his 'basis human needs.' Courts are reluctant to consider even a temporary deprivation of showers a constitutional violation."); Anduze v. City of New York, No. 21-CV-519 (PGG/KHP), 2022 WL 4586967, at \*10 (S.D.N.Y. Aug. 8, 2022) (citations omitted) ("[The p]laintiff fails to assert how denials of a shower or razor on occasion posed an objective risk of serious harm to him. Thus, [the p]laintiff's allegations ... concerning denial of showers and razors are insufficient to state a claim that his Constitutional rights were violated."), report and recommendation adopted, 2022 WL 4547420 (S.D.N.Y. Sept. 29, 2022). As plaintiff has not alleged with respect to any of these conditions that J. Cook or any other officer intentionally or recklessly ignored a serious risk to plaintiff's health that was posed by the conditions, he has failed to allege a deliberate indifference claim. It is recommended that those claims against J. Cook and the Franklin County jail be dismissed.

### c. Tablet and Law Library Access

Plaintiff asks that the Court "[m]ake law library and word processor for inmates to work on their legal matters become available again as it sits unused"; to "[i]mplement a system in

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 323 of 529

Damon v. New York, Not Reported in Fed. Supp. (2023)

2023 WL 11965130

the tablet for submitting requests, complaints, grievances, and sick call requests and monitor it daily"; and to "[e]nsure jail administrators have the ability and training to manage tablet applications[.]" Compl. at 34. Plaintiff alleges that when he wanted to file a family court petition, he asked the court "for the forms, [and he] was refused and told to get them from the jail. When [he] requested them at the jail, [he] was told they were not available." Id. at 26.

**\*17** "The Constitution guarantees confined individuals meaningful access to courts, which, in the case of *pro se* litigants, includes access to a facility's law library, or to an alternative source of legal information." Little v. Mun. Corp., 51 F. Supp. 3d 473, 497 (S.D.N.Y. 2014) (citing Bounds v. Smith, 430 U.S. 817, 828 (1977)). "The 'right of access to the courts' requires states 'to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.' " Bass v. Schenck, No. 9:22-CV-1107 (LEK/ML), 2023 WL 2265740, at \*7 (N.D.N.Y. Feb. 28, 2023) (quoting Bounds, 430 U.S. at 828). "However, this right is not 'an abstract, freestanding right to a law library or legal instance and cannot ground a Section 1983 claim without a showing of actual injury.' Id. (quotation marks omitted) (quoting Collins v. Goord, 438 F. Supp. 2d 399, 415 (S.D.N.Y. 2006)); see also Benjamin v. Fraser, 264 F.3d 175, 185 (2d Cir. 2001) ("Because law libraries and legal assistance programs do not represent constitutional rights in and of themselves, but only the means to ensure a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts, prisoners must demonstrate actual injury in order to have standing."); Razzoli v. Exec. Office of U.S. Marshals, No. 10-CV-4269, 2010 WL 5051083, at \*3 (E.D.N.Y. Dec. 2, 2010) (noting that "the Constitution does not require unlimited and unsupervised access to a law library at the demand of a prisoner," and that "[p]rison officials may impose reasonable restrictions on the use of a prison law library").

To state a claim for denial of access to the courts, a plaintiff must plead "that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim[.]" Bass, 2023 WL 2265740, at \*7 (quoting Lewis v. Casey, 518 U.S. 343, 351 (1996)). "[F]or example, [the plaintiff must show] that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known." Id. (citation and quotations marks omitted). Additionally, "inmates do not

have a protected liberty interest in tablet use." Burrell v. DOCCS, No. 9:22-CV-0702 (DNH/ATB), 2023 WL 1861566, at \*9 (N.D.N.Y. Feb. 9, 2023) (citations omitted). Similarly, alleging "that the facility lacks a dedicated word processor ... for prisoner use ... does not state a constitutional claim." Little, 51 F. Supp. 3d at 498 (citing Taylor v. Coughlin, 29 F.3d 39, 40 (2d Cir. 1994) (per curiam) (noting that "due process requires that prisoners have access to paper, pens, notarial services, stamps, and adequate library facilities, [however] this court has ruled that there is no constitutional right to a typewriter as an incident to the right of access to the courts"); Brown v. Nelson, No. 05-CV-4498, 2008 WL 4104040, at \*6 (S.D.N.Y. Aug. 29, 2008) (noting that "the Constitution requires access to paper, pens, notarial services, stamps, and adequate library facilities as the tools to produce hand-written submissions necessary to satisfy the right" to access the courts, and rejecting the plaintiff's argument that access to a dictionary is constitutionally required)).

Here, plaintiff alleges that he was denied the ability to reset his "password to commissary", to retrieve socks from his property after they were purchased online, and permission to order a jigsaw puzzle. Compl. at 20. In his list of relief, he summarily seeks a new system for tablet usage and access to the law library and word processor. See id. at 34. Plaintiff has not alleged a viable constitutional claim concerning his access to the law library, a tablet, or word processor. First, he does not have a liberty interest in a tablet or word processor. See Little, 51 F. Supp. 3d at 497. Second, he has not alleged any actual injury stemming from a lack of access to the law library or the denial of specific forms for a family court petition. See Bass, 2023 WL 2265740, at \*7. Rather, plaintiff has been able to access the courts as demonstrated by his filing of the complaint and letter in this action. See generally Compl.; Dkt. No. 7. Accordingly, he has failed to state a cognizable constitutional claim concerning his access to the courts and it is recommended that any potential claim be dismissed.

### d. Cell Search

**\*18** Plaintiff contends that his constitutional rights were violated because he was not present during the search of his cell which he "order[ed]" by Franklin County Sherriff "J. Cook" and his bible was thrown on the floor which "is an overt act of arrogance and hatred as well as a bold challenge for a persons' right to express their faith without consequences to the 1st Amendment[.]" Dkt. No. 7 at 2-3.

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 324 of 529
Damon v. New York, Not Reported in Fed. Supp. (2023)
2023 WL 11965130

" '[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell' because '[t]he recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions.' " Corley v. City of New York, No. 1:14-CV-3202 (GHW), 2017 WL 4357662, at *15 (S.D.N.Y. Sept. 28, 2017) (quoting Hudson v. Palmer, 468 U.S. 517, 526 (1984)). However, "[t]he Second Circuit has observed that within their cells 'pretrial detainees may have some residual privacy interests that are protected by the Fourth Amendment....' " Leneau v. Ponte, No. 1:16-CV-776 (GHW), 2018 WL 566456, at *10 (S.D.N.Y. Jan. 25, 2018) (quoting United States v. Willoughby, 860 F.2d 15, 21 (2d Cir. 1988)). "In analyzing the claims of a pretrial detainee, the Second Circuit has explained that if a search was conducted by a prison official, 'established decisional law holds that the search would not be subject to constitutional challenge, regardless of whether the security needs could justify it.' " Corley, 2017 WL 4357662, at *15 (citing U.S. v. Cohen, 796 F.2d 20, 24 (2d Cir. 1988) (pretrial detainee retained sufficient expectation of privacy within his cell to challenge search ordered by the prosecutor for investigatory reasons rather than by a prison official for institutional security related reasons)); see also Ahlers v. Rabinowitz, 684 F.3d 53, 63 (2d Cir. 2012) (citing Block v. Rutherford, 468 U.S. 576, 590 (1984) (holding searches of pretrial detainees' cells are constitutional even when the detainees are absent during the searches)); Williams v. Ramos, No. 13-CV-826 (VB), 2013 WL 7017674, at *8 (S.D.N.Y. Dec. 23, 2013) (citations and quotation marks omitted) ("[W]hen a prison official initiates the search of a pre-trial detainee's cell, the search is not 'subject to constitutional challenge, regardless of whether security needs could justify it."). However, if a cell was "searched at the instigation of non-prison officials for non-institutional security related reasons, the validity of the search may be challenged." Cohen, 796 F.2d at 24 (holding that the pretrial detainee "retain[ed] an expectation of privacy within his cell sufficient to challenge the investigatory search ordered by the prosecutor.").

The Franklin County Sheriff oversees operation of the Franklin County Jail.[9] Plaintiff does not allege that a non-jail official initiated the search of his cell. See Dkt. No. 7 at 1-3. As plaintiff is challenging a cell search that was conducted at the behest of a jail official, he lacks a viable constitutional challenge. See Dkt. No. 7 at 2; see also Leneau, 2018 WL 566456, at *10. Further, "[u]nder Hudson ..., even the intentional destruction of an inmate's property by

a prison officer does not violate the Due Process Clause if the state provides that inmate with an adequate post-deprivation remedy." Little v. Mun. Corp., 51 F. Supp. 3d 473, 499 (S.D.N.Y. 2014) (citation omitted); see also Hudson, 468 U.S. at 536. "New York provides an adequate post-deprivation remedy in the form of state law causes of action for negligence, replevin, or conversion." Esperanza v. City of New York, 325 F. Supp. 3d 288, 307 (E.D.N.Y. 2018). Plaintiff has not alleged that his property was destroyed or, if it was, that he lacked adequate post-deprivation procedures to grieve the destruction. See Dkt. No. 7 at 2. As such, he has failed to sufficiently state a due process claim.

[9]    Sheriff Kevin A. Mulverhill, *Franklin County Sheriff's Office Activity Report for 2020*, https://cms8.revize.com/revize/franklincountyny/2020Annual% 20report.pdf.

**\*19** As to plaintiff's mention of the First Amendment in connection to his bible being thrown on the floor, "[t]o recover on a [F]irst [A]mendment claim under [section] 1983, a plaintiff must demonstrate that his [or her] conduct is deserving of [F]irst [A]mendment protection and that the defendants' conduct of harassment was motivated by or substantially caused by [plaintiff's] exercise of free speech." Milo v. City of New York, 59 F. Supp. 3d 513, 522 (E.D.N.Y. 2014) (alterations in original) (quoting Rattner v. Netburn, 930 F.2d 204, 208 (2d Cir. 1991)). To state a First Amendment retaliation claim, the plaintiff must allege that: "(1) the speech or conduct at issue was 'protected;' (2) the defendants took 'adverse action' against the plaintiff ... and (3) there was a causal connection between the protected speech and the adverse action[.]" Burroughs v. Petrone, 138 F. Supp. 3d 182, 205-06 (N.D.N.Y. 2015) (quoting Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)). Here, plaintiff has not alleged that he engaged in any protected conduct and that the officers retaliated against him for doing so, or that his bible being thrown on the floor was motivated by his exercise of free speech. See Dkt. No. 7 at 2-3. Accordingly, he has failed to allege a First Amendment claim and it is recommended that any such claim be dismissed.

### 6. Conspiracy Claim under 42 U.S.C. § 1985

Plaintiff summarily asserts that the named defendants "have conspired to commit these violations as a conspiracy to interest with civil liberties[.]" Compl. at 7. This is insufficient to allege a conspiracy claim under 42 U.S.C. § 1985.

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 325 of 529

Damon v. New York, Not Reported in Fed. Supp. (2023)

2023 WL 11965130

"[T]o make out a violation of § 1985(3), ... the plaintiff must allege ... four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws;" "and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in her person or property or deprived of any right or privilege of a citizen of the United States." United Broth. of Carpenters and Joiners of America, Local 610, AFL-CIO v. Scott, 463 U.S. 825, 828-29 (1983). In addition, "[t]he conspiracy must be motivated by racial animus." Brown v. City of Oneonta, 221 F.3d 329, 341 (2d Cir. 2000). "[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." Ciambriello v. City of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002).

Plaintiff has not stated any more than conclusory allegations in support of his purported conspiracy claim. See Sommer v. Dixon, 709 F.2d 173, 175 (2d Cir. 1983) (per curiam) ("A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss."). Additionally, "[p]laintiff's claims also would likely be barred by the 'intra-agency conspiracy' doctrine, which provides that officers, agents or employees of a single corporate entity are legally incapable of conspiring together." Hightower v. Veitch, No. 1:19-CV-00577 (GTS/TWD), 2020 WL 3978818, at *9 (N.D.N.Y. Jan. 21, 2020) (citing Everson v. New York City Transit Auth., 216 F. Supp. 2d 71, 75-76 (E.D.N.Y. 2002)), report and recommendation adopted, 2020 WL 2028287 (N.D.N.Y. Apr. 28, 2020). Insofar as plaintiff is attempting to allege a conspiracy between prosecutors or investigators, that claim is likely barred under the intra-agency conspiracy doctrine. See Hightower, 2020 WL 3978818, at *9 (citing, inter alia, Griffin-Nolan v. Providence Washington Ins. Co., No. 04-CV-1453 (FJS/GJD), 2005 WL 1460424, at *10-11 (N.D.N.Y. June 20, 2005) (dismissing the plaintiff's conspiracy claims where the defendants were officers of the City of Syracuse and the plaintiff did not allege that the individual defendants had a personal interest in their alleged conspiracy)). Accordingly, it is recommended that plaintiff's section 1985 claim be dismissed.

### 7. Claims Against Towns of Waverly and Lisbon

**\*20**  Plaintiff asserts that "code enforcement officers in the towns of Waverly and Lisbon have been used in an attempt to take my property from me." Compl. at 36. Plaintiff did not name either town as a defendant in his complaint.[10] See id. at 2. "A municipality may only be held liable under § 1983 when its policies or customs result in a plaintiff's constitutional injury." Griffin-Nolan, 2005 WL 1460424, at *3 (citing Monell, 436 U.S. at 694). To establish a municipal liability claim, "a plaintiff is required to plead and prove three elements: '(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.' " Lucente v. County of Suffolk, 980 F.3d 284, 297 (2d Cir. 2020) (quoting Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007)). Plaintiff has not alleged a policy or custom that resulted in the towns of Waverly or Lisbon seizing his property or resulted in their "attempt[ed]" seizing. Compl. at 36. As such, it is recommended that the claims be dismissed.

[10]      The Clerk of Court is ordered to add the Town of Waverly and the Town of Lisbon as defendants on the docket.

### 8. Claims Against Michelle Keffer

Plaintiff does not name Michelle Keffer as a defendant in this action but asks the Court to "[p]rosecute [her] for all crimes committed against [his children] as indicated by Child Protective Services." Compl. at 35. These claims must fail. Plaintiff lacks standing to initiate a criminal proceeding against any party. See Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."). This Court "does not have the authority or jurisdiction to ... seek the criminal prosecution of individuals at the request of a plaintiff," Walker v. CIBC Ltd., No. 1:20-CV-1337 (TJM/CFH), 2021 WL 3518439, at *5 (N.D.N.Y. Apr. 13, 2021), report and recommendation adopted, 2021 WL 3204860 (N.D.N.Y. July 29, 2021), or "commence its own investigation, commence a criminal prosecution, compel a law enforcement agency to investigate suspected criminal activity, nor compel a prosecutor to prosecute." Eggsware v. Doe, 1:22-CV-54 (BKS/CFH), 2022 WL 827640, at *5 (N.D.N.Y. Feb. 7, 2022), report recommendation adopted, 2022 WL 823646 (N.D.N.Y. Mar. 18, 2022). Thus, to the

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 326 of 529

Damon v. New York, Not Reported in Fed. Supp. (2023)

2023 WL 11965130

extent plaintiff wishes to proceed on criminal claims, it is recommended that such claims be dismissed with prejudice and without opportunity to amend for failure to state a claim upon which relief can be granted. See 28 U.S.C. § 1915(e)(2)(B)(i).

### III. Opportunity to Amend

Generally, "[a] *pro se* complaint should not be dismissed without the Court granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Nielsen v. Rabin, 746 F.3d 58, 62 (2d Cir. 2014) (citation omitted). "However, if the problems with a complaint are 'substantive' rather than the result of an 'inadequately or inartfully pleaded' complaint, an opportunity to re-plead would be 'futile' and 'should be denied.' " Edwards v. Penix, 388 F. Supp. 3d 135, 144-45 (N.D.N.Y. 2019) (quoting Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000)). Dismissal of claims under the Younger and/or Rooker-Feldman doctrines are generally without prejudice. See Rivera, 2022 WL 2341544, at *7 (dismissing claims under these doctrines but providing leave to amend). However, as plaintiff's claims cannot be brought against the State of New York, Tammy Gordon, Thomas Soucia, and Anson Rhodes; and for damages against the District Attorney's Offices, and Kelly Poupore, because of immunity grounds or the lack of a cognizable section 1983 claim, it is recommended that the claims against them be dismissed with prejudice and without leave to amend. As to the claims against the District Attorney's Offices and Kelly Poupore for injunctive relief, and Michael Perry, the New York State Troopers, and the Franklin County Public Defender's and Conflict Defender's Offices it is recommended that the claims be dismissed without prejudice but without leave to amend. As plaintiff's criminal and family court proceedings are ongoing, amendment at this time would be futile. Finally, as to the claims against Franklin County Jail, J. Cook, and the Towns of Waverly and Lisbon, it is recommended that the complaint be dismissed without prejudice and with leave to amend.

### IV. Conclusion

**\*21 WHEREFORE**, for the reasons set forth herein, it is hereby

**ORDERED**, that plaintiff's application to proceed in forma pauperis (Dkt. No. 8) is **GRANTED** for purposes of filing only; and it is further

**RECOMMENDED**, that plaintiff's complaint (Dkt. No. 2) against the State of New York, Franklin County Child Support Court, Tammy Gordon, Anson Rhodes, Thomas Soucia, Michelle Keffer; and insofar as he seeks monetary damages, against Franklin County District Attorney's Office, St. Lawrence County District Attorney's Office, and Kelly Poupore be **DISMISSED WITH PREJUDICE and WITHOUT LEAVE TO AMEND**; and it is further

**RECOMMENDED**, that plaintiff's complaint (Dkt. No. 2) against the New York State Troopers, Michael Perry, Franklin County Public Defender's Office, Franklin County Conflict Defender's Office; and Franklin County District Attorney's Office, St. Lawrence County District Attorney's Office, and Kelly Poupore insofar as the claims seek injunctive relief, be **DISMISSED WITHOUT PREJUDICE and WITHOUT LEAVE TO AMEND**; and it is further

**RECOMMENDED**, that plaintiff's complaint (Dkt. No. 2) against the Franklin County Jail, J. Cook, the Town of Waverly, and the Town of Lisbon be **DISMISSED WITHOUT PREJUDICE and WITH LEAVE TO AMEND**; and it is

**RECOMMENDED**, that should the District Judge adopt this Report-Recommendation and Order, plaintiff be given thirty (30) days from the date of the Order adopting this Report-Recommendation and Order to file an amended complaint, and if plaintiff does not file an amended complaint, it will be deemed as an abandonment of any claims for which leave to replead has been granted and will result in judgment being entered against plaintiff on these claims without further order by the Court; and it is

**ORDERED**, that plaintiff's letter motion (Dkt. No. 7) is granted to the extent set forth in this Report-Recommendation and Order; and it is further

**ORDERED**, that the Clerk of Court add J. Cook, Town of Lisbon, and Town of Waverly as named defendants in the action; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order in accordance with Local Rules.

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 327 of 529

**Damon v. New York, Not Reported in Fed. Supp. (2023)**
2023 WL 11965130

**IT IS SO ORDERED.**

Pursuant to 28 U.S.C. § 636(b)(1), plaintiff has **FOURTEEN (14)** days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a). [11]

[11]    If you are proceeding pro se and are served with this Report-Recommendation & Order by mail,

three (3) additional days will be added to the fourteen (14) day period, meaning that you have seventeen (17) days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(c).

**All Citations**

Not Reported in Fed. Supp., 2023 WL 11965130

---

**WESTLAW**   © 2025 Thomson Reuters. No claim to original U.S. Government Works.                    19

**Filings (2)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 8:23-CV-00074**<br>Damon v. State of New York et al | — | N.D.N.Y. | Jan. 19, 2023 | Docket |
| **2. Docket 1:22-CV-10707**<br>Damon v. State of New York et al | — | S.D.N.Y. | Dec. 19, 2022 | Docket |

**History (3)**

**Direct History (3)**

1.  Damon v. New York
2023 WL 1951372 , S.D.N.Y. , Jan. 12, 2023

*Transferred to*

2.  Damon v. New York 🐄
2023 WL 11965130 , N.D.N.Y. , Mar. 28, 2023

*Report and Recommendation Adopted by*

3.  Damon v. New York
2023 WL 11965128 , N.D.N.Y. , Apr. 24, 2023

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 331 of 529

Molina v. County of Westchester, Not Reported in Fed. Supp. (2017)

2017 WL 1609021

KeyCite Yellow Flag

Distinguished by  Davis v. McCready,  S.D.N.Y.,  October 23, 2017

2017 WL 1609021
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Arthur R. MOLINA, Plaintiff,

v.

The COUNTY OF WESTCHESTER; Correction
Officer Saraireh, Shield No. 1580; and
C.O. Santora, Shield No. 1598, Defendants.

16 CV 3421 (VB)
|
Signed 04/28/2017

**Attorneys and Law Firms**

Arthur R. Molina, Valhalla, NY, pro se.

David Polizzi, Westchester County Attorney's Office, White
Plains, NY, for Defendants.

### OPINION AND ORDER

Vincent L. Briccetti, United States District Judge

*1  Plaintiff Arthur R. Molina, proceeding pro se and in
forma pauperis, brings this action under 42 U.S.C. § 1983,
alleging defendants violated his constitutional rights while
he was incarcerated at Westchester County Jail, by failing
to protect him from assault by another inmate.

Now pending is defendants' motion to dismiss the complaint
pursuant to Rule 12(b)(6). [1] (Doc. #17).

[1]     Defendants filed their motion to dismiss on
September 22, 2016. Plaintiff filed his opposition,
after the Court sua sponte extended his time to do
so (Doc. #24), on November 14, 2016. (Doc. #25).
Defendants never submitted a reply or a request
for an extension of time, and their deadline to do so has
long passed. The Court therefore deems the motion
to be fully submitted.

For the reasons set forth below, the motion is GRANTED.
However, plaintiff is granted leave to file an amended
complaint, with the limitations explained below.

This Court has subject matter jurisdiction pursuant to 28
U.S.C. § 1331.

### BACKGROUND

For purposes of ruling on a motion to dismiss, the Court
accepts all factual allegations of the complaint as true, and
draws all reasonable inferences in plaintiff's favor.

On March 8, 2016, while plaintiff was an inmate at
Westchester County Jail, he was attacked by another inmate,
"Mr. Tucker," who had recently been moved from the
Special Housing Unit ("SHU") to the cell next to plaintiff's.
Specifically, plaintiff alleges while he was "walking the
yard," Tucker "ran up from behind ... and attacked [him,]
hitting [him], with closed[ ] fists," and that Tucker's "intention
[was] to cause plaintiff serious bodily harm."(Compl. at S), [2]
Plaintiff alleges Tucker carried out this assault because, five
minutes earlier, another inmate told Tucker that if he attacked
someone, he would be moved to another cell block.

[2]     Citations to the complaint refer to the page numbers
stamped by the ECF filing system at the top of the
page.

Plaintiff alleges correction officers Saraireh and Santora were
"not walking the rec/yard and sitting in the doorway that
enters the rec/yard therefor[e] could not see or hear what was
going on in the rec/yard." (Compl. at 11). In addition, he
alleges Saraireh and Santora "knew of the risk to [plaintiff's]
safety and [were] negligent for not tryin[g] to prevent the
assault before it happen[ed]." (Compl. at 9). He alleges they
"had reasonable knowledge to know that an incident was
tak[ing] place," but "waited to the last minute to defuse the
incident." (Id.).

Plaintiff suffered several injuries and was taken to the
emergency room, where he received medical care. When he
returned to Westchester County Jail, he was told he "would
not face any disciplinary action," and that the inmate who
attacked him would be put back in SHU. (Compl. at 9).
He was also told that "the facility [was going to] press[ ]
charges." (Id. at 10).

Molina v. County of Westchester, Not Reported in Fed. Supp. (2017)

2017 WL 1609021

**DISCUSSION**

I. <u>Standard of Review</u>

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under the "two-pronged approach" articulated by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). First, plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss. Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. at 679.

**\*2** To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility." Id. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id.

The Court must liberally construe submissions of pro se litigants, and interpret them "to raise the strongest arguments that they suggest." Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (internal quotation marks and citation omitted). Applying the pleading rules permissively is particularly appropriate when, as here, a pro se plaintiff alleges civil rights violations. See Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008). "Even in a pro se case, however ... threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation marks and citation omitted). Nor may the Court "invent factual allegations" plaintiff has not pleaded. Id.

II. <u>Failure to Protect Claim</u>

Defendants argue plaintiff has failed to state a constitutional violation for failure to protect him against assault by another inmate.

The Court agrees.

A claim for deliberate indifference brought by a convicted prisoner "is analyzed under the Eighth Amendment," Caiozzo v. Koreman, 581 F.3d 63, 69 (2d Cir. 2009) (overruled on other grounds by Darnell v. Pineiro, 849 F.3d 17 (2d Cir. 2017)), whereas "[a] pretrial detainee's claims ... are governed by the Due Process Clause of the Fourteenth Amendment." Darnell v. Pineiro, 849 F.3d at 29.

To to state a claim for deliberate indifference, whether under the Eighth or Fourteenth Amendment, plaintiff's allegations must satisfy a two-prong test. First, the plaintiff must plausibly allege he suffered a sufficiently serious constitutional deprivation. Second, the plaintiff must plausibly allege that the defendant acted with deliberate indifference. Taylor v. Goorde, 548 Fed. Appx. 696, 698 (2d Cir. 2013) (summary order) (convicted prisoner); [3] Darnell v. Pineiro, 849 F.3d at 29 (pretrial detainee).

[3]    Plaintiff will be provided with copies of all unpublished opinions cited in this decision. See Lebron v. Sanders, 557 P.3d 76, 79 (2d Cir. 2009).

With respect to the first prong, the standard is the same whether the claim is brought by a convicted prisoner or a pretrial detainee, "Under both the Eighth and Fourteenth Amendments, to establish an objective deprivation, 'the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health.' " Darnell v. Pineiro, 849 F.3d at 30 (quoting Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013)). "There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.' " Id. (quoting Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995)).

With respect to the second prong, however, the legal standards are different for convicted prisoners and pretrial detainees. See Darnell v. Pineiro, 849 F.3d at 32-36.

**\*3** For convicted prisoners, to whom the Eighth Amendment applies, a corrections officer acts with deliberate indifference when he <u>subjectively</u> "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996). The

Molina v. County of Westchester, Not Reported in Fed. Supp. (2017)

2017 WL 1609021

officer "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Cuoco v. Moritsugu, 222 F.3d 99, 107 (2d Cir. 2000).

However, for pretrial detainees, to whom the Fourteenth Amendment applies, the second prong "of a deliberate indifference claim is defined objectively." Darnell v. Pineiro, 849 F.3d at 35 (emphasis added). A "pretrial detainee must prove that the defendant-official acted intentionally ... or recklessly failed to act with reasonable care to mitigate the risk ... even though the defendant-official knew, or should have known," of the risk of harm. Id. Thus, unlike the Eighth Amendment, the Due Process Clause of the Fourteenth Amendment "can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." Id.

Here, defendants presume, without explaining, that plaintiff was a convicted prisoner, not a pretrial detainee, during the relevant period. Because neither party has clearly articulated whether plaintiff was a convicted prisoner or a pretrial detainee at the time of the alleged incident, the Court will evaluate plaintiff's complaint under both standards.

Applying the applicable standards, the Court concludes plaintiff's allegations are sufficient with respect to the first prong of the deliberate indifference claim, but are insufficient as to the second prong.

A. Sufficiently Serious Constitutional Deprivation

Plaintiff alleges defendants Saraireh and Santora did not "walk" the area where he was attacked, and instead sat "in the doorway" and that they "therefor[e] could not see or hear what was going on in the rec/yard,'" (Compl. at 11). In addition, in his opposition papers, plaintiff states there was an "absence of any correctional officers ... present or within any plain visible view at any time in the recreational yard[,] thus violating the procedures." (Opp. Br. ¶ 7).

The failure of a correction officer to oversee prisoners, intervene in an attack, or otherwise fail to abide by prison safety protocols may under certain circumstances create a condition which poses a substantial risk of serious harm thus constituting a sufficiently serious constitutional violation. See, e.g., Fernandez v. N.Y.C. Dep't of Corr., 2010 WL 1222017, at *4 (S.D.N.Y. Mar. 29, 2010) (finding complaint sufficiently alleged substantial risk of harm where it was

"possible that had [a corrections officer] been in the dorm area at the time of [plaintiff's] attack, he could have prevented or interrupted the attack"); Rennalls v. Alfredo, 2015 WL 5730332, at *4 (S.D.N.Y. Sept. 30, 2015) (the Court was "willing to assume, given the early stage in th[e] Action, Plaintiff ha[d] plausibly alleged that [defendant's] actions may have put Plaintiff at a substantial risk of serious harm," where plaintiff alleged one of the defendants failed to comply with a safety protocol).

Therefore, construing plaintiff's allegations liberally and drawing all reasonable inferences in his favor, the Court concludes plaintiff has plausibly alleged facts from which a sufficiently serious constitutional violation could be inferred.

B. Deliberate Indifference

**\*4** As mentioned previously, the second prong of a deliberate indifference claim differs depending on whether plaintiff is a convicted prisoner or a pretrial detainee. To survive a motion to dismiss, a convicted prisoner must plausibly allege the defendant(s) subjectively knew what they had done—here, their failure to intervene in the inmate-on-inmate attack—was unreasonable. A pretrial detainee, on the other hand, must plausibly allege the conduct complained of was objectively unreasonable, i.e., not reasonable under the circumstances.

Here, plaintiff alleges defendants Saraireh and Santora "knew of the risk to [his] safety and [were] negligent for not tryin[g] to prevent the assault before it happen[ed]." (Compl. at 9). He further alleges the corrections officers "had reasonable knowledge to know that an incident was tak[ing] place," but "waited to the last minute to defuse the incident." (Id.). However, plaintiff does not allege or explain how Saraireh or Santora learned of this risk or how plaintiff knows they became aware of this risk. These allegations are insufficient to show either objective or subjective deliberate indifference for several reasons.

First, such conclusory allegations of defendants' knowledge are insufficient. See Houston v. Nassau Cty., 2012 WL 729352, at *6 (E.D.N. Y. Mar. 7, 2012) ("Although plaintiff alleges that the County was [a]ware of plaintiff being at risk of being attacked,' ... this conclusory allegation is insufficient to maintain a Section 1983 deliberate indifference claim.").

Second, plaintiff alleges defendants were merely "negligent" in their actions. (Compl. at 9). Negligence is insufficient to state a Section 1983 violation under either the subjective or

Molina v. County of Westchester, Not Reported in Fed. Supp. (2017)

2017 WL 1609021

objective standard. Hayes v. N.Y.C. Dep't of Corr., 84 F.3d at 620 ("to state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice").

Finally, and most significantly, the allegations of the complaint suggest the attack happened quickly and with very little warning. Specifically, plaintiff alleges "at 9:50 AM" the inmate who attacked him was advised "to attack someone in the yard so he [would] be moved" to another housing block. (Compl. at 8). Plaintiff alleges the attack then took place five minutes later, at 9:55 a.m. (See id. at 2). Plaintiff does not allege any defendant corrections officer heard this advice or was otherwise aware or should have been aware of this advice. It is implausible defendants themselves, or reasonable corrections officers in their place, would have learned of the likelihood of an attack and been able to do something to prevent it within such a short period of time. Moreover, plaintiff does not allege he expressed fear for his safety prior to the attack or provide any other reason why any correction officer should have known there was danger of an attack. "Absent clear notice of a risk of harm to the prisoner, courts routinely deny deliberate indifference claims based upon surprise attacks." Fernandez v. N.Y.C. Dep't of Corr., 2010 WL 1222017, at *4 (internal quotation marks omitted). In addition, plaintiff does not say how long the alleged attack lasted. He states only that he "t[ook] multiple blows to the head and face causing a concussion," and that he "awoke to find the attacker being held on the wall by C.O. Santora." (Compl at 9). There are therefore insufficient allegations to suggest defendants Saraireh and Santora waited an unreasonable amount of time before they intervened. [4]

[4]    As part of his opposition papers, plaintiff also submitted the affidavit of Kevin Alvarez, a fellow inmate at Westchester County Jail. (Doc. #26). Mr. Alvarez writes in his affidavit that he witnessed the events and that "[i]t was not until much later that the prison inmate attacker was subdued and [plaintiff] was ... attended to." (Id. ¶¶ 6-9). However, "much later" is vague, and without additional factual context, this is insufficient to suggest defendants acted unreasonably.

*5  Under the circumstances alleged, it is not plausible either that defendants subjectively knew, or that a reasonable corrections officer in their place should have known, of any substantial risk to plaintiff, or would have been able to take actions that would have prevented the attack.

As a result, plaintiff has failed plausibly to allege the second prong of the failure to protect standard under either the Eighth or the Fourteenth Amendment, Accordingly, plaintiff's Section 1983 failure to protect claim against defendants Saraireh and Santora is dismissed.

### III. Monell Liability

Defendants argue plaintiff has failed to state a claim against Westchester County ("the County") under Monell v. Department of Social Services, 436 U.S. 658 (1978). [5]

[5]    Defendants also argue the Westchester County Department of Corrections ("DOCs") should be dismissed "because it is not a suable entity." (Defs.'s Br. at 1, n. 1). By Order dated June 7, 2016, the Court dismissed all claims against DOCs for that reason. (Doc. #7). In addition, defendants argue they are entitled to qualified immunity. (Defs.'s Br. at 9). The Court need not address qualified immunity at this time, as it dismisses all of plaintiffs' federal claims on the merits.

The Court agrees.

A municipality like the County is liable under Section 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [plaintiff's] injury." Monell v. Dep't of Soc. Servs., 436 U.S. at 694. To state a Monell claim, a plaintiff need not allege the policy or custom itself is unconstitutional; rather, liability exists when a municipal policy is valid but the municipality's actual practice is not. Amnesty America v. Town of W. Hartford, 361 F.3d 113, 125-26 (2d Cir. 2004) (practice of using excessive force can be basis for municipal liability even though city's policy on use of force is itself constitutional).

"While Monell claims are not subject to a 'heightened' pleading standard beyond that defined in Rule 8(a)(2), such claims nevertheless must meet the plausibility requirements of Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 572 (2007), and Ashcroft v. Iqbal, 556 U.S. 662, 678, (2009)." Guzman v. United States, 2013 WL 5018553, at *4 (S.D.N.Y. September 13, 2013) (quoting Leatherman v. Tarrant Cty. Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168 (1993)). "In other words, boilerplate allegations will not suffice." Id. (internal quotation marks omitted). In sum,

2017 WL 1609021

without more, "[t]he allegations [a defendant] acted pursuant to a 'policy,' without any facts suggesting the policy's existence, are plainly insufficient." Missel v. Cty. of Monroe, 351 Fed.Appx. 543, 545-46 (2d Cir. 2009) (summary order) (citing Dwares v. City of New York, 985 F.2d 94, 100-02 (2d Cir. 1993)).

Here, plaintiff alleges only that the individual defendants' failure to "walk[ ] the rec-yard" and "wait[ ] to the last minute to defuse the incident" were "part of a policy[,] practice, and custom." (Compl. at 9).

Applying the legal standards just outlined, plaintiff's boilerplate allegations against the County are plainly insufficient. Accordingly, plaintiff's claims against the County are dismissed.

### IV. State Law Claims

**\*6** Defendants argue any state law tort claims liberally construed from plaintiff's complaint—such as causes of action for negligence or negligent infliction of emotional distress—should be dismissed for failure to file a notice of claim.

The Court agrees.

"[I]n a federal court, state notice-of-claim statutes apply to state-law claims." Hardy v. N.Y.C. Health & Hosps. Corp., 164 F.3d 789, 793 (2d Cir. 1999). "In New York, filing a [n]otice of [c]laim with a municipality is a condition precedent to commencing a tort claim against any employee of that municipality.'" Chamberlain v. City of White Plains, 986 F. Supp. 2d 363, 396 (S.D.N.Y. 2013). "Failure to comply with [this] requirement[ ] ordinarily requires a dismissal for failure to state a cause of action." Hardy v. N.Y.C. Health & Hosps. Corp., 164 F.3d at 794.

In addition, "General Municipal Law § 50-e makes unauthorized an action against individuals who have not been named in a notice of claim." DC v. Valley Cent. Sch. Dist., 2011 WL 3480389, at * 1 (S.D.N.Y. June 29, 2011) (internal quotation marks omitted).

Here, plaintiff acknowledges he did not file a notice of claim. (See Opp. Br. ¶ 10). In an effort to overcome this deficiency, plaintiff requests permission to file a late notice of claim. This Court does not have the authority to grant plaintiff's request, however. New York General Municipal Law Section 50-e(7) "makes clear that [a]ll applications under this section shall be

made to the supreme court or to the county court." Horvath v. Daniel, 423 F. Supp. 2d 421, 424-25 (S.D.N.Y. 2006) (internal quotations omitted). "Accordingly, federal district courts are without jurisdiction to hear these applications." Id.

Plaintiff's state law claims are therefore dismissed.

### V. Leave to Amend

Rule 15(a)(2) instructs that courts "should freely give leave" to amend a complaint "when justice so requires." Liberal application of Rule 15(a) is warranted with respect to pro se litigants who "should be afforded every reasonable opportunity to demonstrate that [they have] a valid claim.'" Matima v. Celli, 228 F.3d 68, 81 (2d Cir. 2000) (quoting Satchel v. Dilworth, 745 F.2d 781, 785 (2d Cir. 1984)). District courts "should not dismiss [pro se complaints] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000) (quoting Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795 (2d Cir. 1999)).

However, leave to amend may "properly be denied for ... 'futility of amendment.' " Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182(1962)). This is true even when plaintiff is proceeding pro se. See Martin v. Dickson, 100 Fed.Appx. 14, 16 (2d Cir. 2004) (summary order).

Here, as explained above, the Court does not have the authority to grant plaintiff's request to file a late notice of claim with respect to his state law claims. In addition, plaintiff's Monell claim against the County is plainly insufficient to state a claim, and nothing in the complaint suggests he might have a valid claim against the County. Thus, granting plaintiff leave to amend his state law claims or his Monell claim against the County would be futile.

**\*7** However, a liberal reading of plaintiff's complaint suggests he may have a valid Section 1983 claim for failure to protect against defendants Saraireh and Santora. Moreover, plaintiff has not previously been provided an opportunity to amend his complaint.

Accordingly, plaintiff is granted leave to amend only the claim that Saraireh and Santora violated his constitutional rights by failing to protect him against the inmate attack.

Molina v. County of Westchester, Not Reported in Fed. Supp. (2017)

2017 WL 1609021

Plaintiff is reminded that any factual allegation in the amended complaint must be true to the best of his knowledge, information, and belief. See Fed. R. Civ. P. 11(b)(3). In the amended complaint, plaintiff shall clearly set forth the facts that give rise to failure to protect claim, including the dates, times, and places of the alleged underlying acts. See Lee v. Graziano, 2013 WL 4426447, at *8 (N.D.N.Y. Aug. 15, 2013). Plaintiff must also state whether he was a pretrial detainee or a convicted prisoner at the time of the alleged attack on March 8, 2016.

**The amended complaint will completely replace, not supplement, the existing complaint. Therefore, plaintiff must include in the amended complaint all information necessary for his failure to protect claim.**

## CONCLUSION

Defendants' motion to dismiss GRANTED.

Plaintiff is granted leave to amend only as to his Section 1983 failure to protect claim against the individual defendants Saraireh and Santora. Plaintiff shall file his amended complaint by no later than June 1, 2017. Plaintiff is directed to utilize the Amended Complaint form attached hereto. If plaintiff fails to comply with this order, his complaint may be dismissed for failure to prosecute or failure to comply with a court order. Fed. R. Civ. P. 41(b).

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

The Clerk is instructed to terminate the County of Westchester as a defendant.

The Clerk is further instructed to terminate the motion. (Doc. #17).

SO ORDERED.

Attachment

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 337 of 529
Molina v. County of Westchester, Not Reported in Fed. Supp. (2017)
2017 WL 1609021

## IV.    DEFENDANT INFORMATION

To the best of your ability, provide the following information for each defendant. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are identical to those listed in the caption. Attach additional pages as necessary.

Defendant 1:

First Name         Last Name         Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City         State         Zip Code

Defendant 2:

First Name         Last Name         Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City         State         Zip Code

Defendant 3:

First Name         Last Name         Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City         State         Zip Code

Defendant 4:

First Name         Last Name         Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City         State         Zip Code

## V.    STATEMENT OF CLAIM

Place(s) of occurrence:

Date(s) of occurrence:

FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and how each defendant was personally involved in the alleged wrongful actions. Attach additional pages as necessary.

## INJURIES:

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

## VI.    RELIEF

State briefly what money damages or other relief you want the court to order.

## VII.    PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I understand that if I file three or more cases while I am a prisoner that are dismissed as frivolous, malicious, or for failure to state a claim, I may be denied *in forma pauperis* status in future cases.

I also understand that prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions, 42 U.S.C. § 1997e(a), and that my case may be dismissed if I have not exhausted administrative remedies as required.

I agree to provide the Clerk's Office with any changes to my address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

Dated                         Plaintiff's Signature

First Name         Middle Initial         Last Name

Prison Address

County, City         State         Zip Code

Date on which I am delivering this complaint to prison authorities for mailing:

## All Citations

Not Reported in Fed. Supp., 2017 WL 1609021

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    7

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.** **Docket 7:16-CV-03421**<br>Molina v. Westchester County Dept. of Correction et al | — | S.D.N.Y. | May 09, 2016 | Docket |

**History (2)**

**Direct History (1)**

🚩 1. Molina v. County of Westchester
2017 WL 1609021 , S.D.N.Y. , Apr. 28, 2017

**Related References (1)**

2. Molina v. Saraireh
2017 WL 5004311 , S.D.N.Y. , Oct. 31, 2017

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Overruling Risk

Overruling Risk   Darnell v. Pineiro,   2nd Cir.,   February 21, 2017

2014 WL 4230889
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Charles BLAKE, Plaintiff,
v.
Raymond KELLY, Commissioner, New
York City Police Department, Israel Sexton,
Sergeant, New York City Police Department,
and The City of New York, Defendants.

No. 12 Civ. 7245(ER).
|
Signed Aug. 26, 2014.

*OPINION AND ORDER*

RAMOS, District Judge.

**\*1** *Pro se* Plaintiff Charles Blake (the "Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 against former New York Police Department Commissioner Raymond Kelly ("Kelly"), Sergeant Israel Sexton ("Sexton"), and the City of New York (the "City," and together with Kelly and Sexton, the "Defendants"). The Plaintiff alleges that he was assaulted and injured while awaiting arraignment in the holding cell of the New York State Supreme Court, Kings County. Am. Compl. 1–6, Doc. 18.

Presently before the Court is Defendants' motion to dismiss the Complaint under Rule 12(c) of the Federal Rules of Civil Procedure. *See* Doc. 33. For the reasons set forth below, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

**I. Factual Background**

The following facts are based on the allegations in the Amended Complaint, which the Court accepts as true for purposes of the instant motion. *See, e.g., Walker v. Schult,* 717 F.3d 119, 124 (2d Cir.2013).

On August 26, 2010 Plaintiff was held as a pretrial detainee at the Brooklyn County Court's Central Booking Detention Holding Facility in Brooklyn, New York. Am. Compl. 3. [1] Overcrowding forced multiple detainees, including Plaintiff, to sit or lie on the floor, rather than in seats, within the holding cell. *Id.* Detainees made several complaints to the holding cell officers regarding the overcrowding and shortage of seats. *Id.* At 6:45 p .m., approximately fifteen detainees left the holding cell to receive their dinner. *Id.* Plaintiff sat in a seat that opened up as a result. *Id.* One of the detainees returned to find Plaintiff sitting in the seat and demanded that he move. *Id.* at 4. When Plaintiff refused, the detainee began to physically assault Plaintiff. *Id.* A second detainee then joined Plaintiff's assailant, and started to severely beat Plaintiff. *Id.*

[1]   The Court notes that Plaintiff's Amended Complaint did not include page numbers. As a result, the Court will refer to the page numbers provided by the Court's electronic filing system (ECF).

Because the detainee holding cell was left unmonitored, Plaintiff was subjected to beatings for ten minutes before the first officer—Sergeant Sexton—arrived. *Id.* Initially, Sexton verbally demanded that the assailants stop beating Plaintiff, but Sexton "did not physically intercede to prevent further physical abuse upon [Plaintiff]." *Id.* After his verbal demands failed, Sexton went to seek assistance. *Id.* Sexton then returned approximately five minutes later with two other officers who helped break up the altercation. *Id.* After Sexton observed that Plaintiff had facial swelling, "defensive cuts" to his back, and a potentially fractured right ankle, he sent for emergency medical personnel; they arrived approximately fifteen minutes later. *Id.* Staff then transported Plaintiff to Kings County Hospital. *Id.*

Plaintiff claims that, as a result of Defendants' actions, he suffered serious injuries, including: closed dislocation of his right ankle, a right ankle fracture, blunt trauma, and facial lacerations, severe headaches, dizziness, difficulty sleeping, depression and mental anguish. *Id.* at 6. Plaintiff attached to his Amended Complaint various medical records, designated as Exhibit A, [2] which corroborate the allegations that he suffered a long-term or permanent physical injury. Plaintiff underwent two surgical operations on his right ankle, and was referred to physical therapy afterwards. Am. Compl. Ex. A. The records provided also indicate that Plaintiff may need further surgical work done in the future. *Id.* Plaintiff claims he is unable to stand for long periods of time, cannot run and is

unable to climb stairs without holding on to a rail for support. *Id.* at 6.

<sup>2</sup>    In a Rule 12(b)(6) analysis, a district court generally must confine itself to the four corners of the complaint and look only to the allegations therein. *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007). However, a court may also consider allegations in documents that are either attached to the complaint, incorporated by reference or integral to the complaint, provided that there is no dispute regarding their authenticity, accuracy or relevance. *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir.2010) (citations omitted). The Court finds that the medical records contained in Exhibit A may properly be considered in connection with the instant motion.

**\*2** Plaintiff alleges that the conditions of his confinement on August 26, 2010 violated his rights under the Eighth Amendment on several grounds. *Id.* at 5. First, Plaintiff asserts that the Defendants' deliberate indifference to the conditions of his confinement violated his civil rights. *Id.* The overcrowding in the holding cell caused excessive noise and anxiety, and ultimately created an unsupervised "den of violence." *Id.* Plaintiff also asserts that Sexton failed to exercise adequate care for Plaintiff's safety by failing to prevent reasonably foreseeable physical abuse. *Id.* at 4. Lastly, Plaintiff claims that Defendants deliberately and negligently exceeded the design capacity requirements for the holding cell. *Id.* at 5. Accordingly, Plaintiff seeks a total $10,000,000 judgment against the Defendants jointly and severally. *Id.* at 9.

### A. Procedural History

On September 24, 2012, Plaintiff commenced this action by filing the Complaint. Compl., Doc. 3. The Complaint included Commissioner Kelly and a John Doe Defendant. *Id.* Given Plaintiff's *pro se* status, the Court directed the Clerk of the Court to amend the caption of this action to include Defendant New York City and ordered the New York City Law Department to provide the identity and service address of the John Doe Defendant. Doc. 7. On February 22, 2012, the New York City Law Department ascertained the identity of the John Doe Defendant to be Sergeant Sexton. Doc. 12. Plaintiff then filed an Amended Complaint against Defendants on April 10, 2013. Doc. 18. The case was transferred to the undersigned from the Honorable Judge Colleen McMahon on July 17, 2013.

Defendants construe Plaintiff's Amended Complaint as raising claims under the due process clause of the Fourteenth Amendment for deliberate indifference to his safety and conditions of confinement. Through the instant motion, Defendants seek dismissal of Plaintiff's claims on the grounds that Plaintiff (1) fails to state a claim under 42 U.S.C. § 1983 for deliberate indifference against Sexton; and (2) fails to allege personal involvement by Kelly in a constitutional violation. Defs.' Mem. 1, 6, Doc. 35. On May 28, 2014, Plaintiff filed his memorandum of law in opposition to Defendants' motion. Pl.'s Opp., Doc. 38. Rather than file a reply brief, on June 9, 2014, Defendants submitted a letter to the Court indicating their intention to rely on the arguments set forth in their opening papers.<sup>3</sup>

<sup>3</sup>    The Court notes that Defendants' memorandum of law solely refers to Sexton and Kelly, and does not advance any arguments to dismiss the City from the instant action. Accordingly, the City will not be dismissed.

## II. Discussion

### A. Legal Standard

Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). The Court applies the same standard of review to a Rule 12(c) motion as it does to a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6). *Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir.2006).

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), district courts are required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in the plaintiff's favor. *Walker,* 717 F.3d at 124; *see also, e.g., Famous Horse Inc. v. 5th Ave. Photo Inc.,* 624 F.3d 106, 108 (2d Cir.2010). However, this requirement does not apply to legal conclusions, bare assertions or conclusory allegations. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In order to satisfy the pleading standard set forth in Rule 8 of the Federal Rules of Civil Procedure, a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Accordingly,

2014 WL 4230889

a plaintiff is required to support its claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly,* 550 U.S. at 557) (internal quotation marks omitted).

**\*3** The same standard applies to motions to dismiss *pro se* complaints. *Mancuso v. Hynes,* 379 F. App'x 60, 61 (2d Cir.2010) (summary order) (citing *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009)). However, the Court remains obligated to construe a *pro se* complaint liberally, *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir.2011), and to interpret a *pro se* plaintiff's claims as raising the strongest arguments that they suggest. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474–75 (2d Cir.2006). In order to survive a motion to dismiss, a plaintiff's pleadings must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 556 U.S. at 678. A complaint that "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id.* (quoting *Twombly,* 550 U.S. at 557) (internal quotation marks and alterations omitted); *see also Triestman,* 470 F.3d at 477 ("[*P*]ro se status 'does not exempt a party from compliance with relevant rules of procedural and substantive law.' " (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)).

**B. Plaintiff Fails to Allege Defendant Kelly's Personal Involvement**

Defendants argue that Plaintiff has failed to allege Kelly's personal involvement in any of the alleged constitutional deprivations. Defs.' Mem. 7–8. As a general matter, a prisoner who brings a § 1983 claim against individual defendants must allege that they were directly and personally involved in the alleged constitutional deprivations. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991); *see also Shomo v. City of New York,* 579 F.3d 176, 184 (2d Cir.2009) ( "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."). [4]

[4]  In *Colon v. Coughlin,* the Second Circuit held that a plaintiff may adequately allege personal involvement by showing that the defendant: (1) participated directly in the alleged constitutional violation; (2) after being informed of the violation through a report or appeal, failed to remedy the

wrong; (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) was grossly negligent in supervising subordinates who committed the wrongful act; or (5) exhibited deliberate indifference to rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. 58 F.3d 865, 873 (2d Cir.1995). "Only two *Colon* categories survive after *Iqbal*—(1) a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation, and part of (3) if that supervisor creates a policy or custom under which unconstitutional practices occurred. The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated —situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate." *McNair v. Kirby Forensic Psychiatric Ctr.,* No. 09 Civ. 6660(SAS), 2010 WL 4446772, at *6 (S.D.N.Y. Nov.5, 2010); *but see Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) ("Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standard[ ] of the ... Eighth Amendment[ ], the personal involvement analysis set forth in *Colon v. Coughlin* may still apply.").

Moreover, a defendant cannot be held liable based solely upon his supervisory capacities or under a theory of *respondeat superior. See Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003). "Mere presence in the 'prison chain of command' is not sufficient to demonstrate personal involvement for purposes of [§ ] 1983." *Rivera v. Bloomberg,* No. 11 Civ. 629(PGG), 2012 WL 3655830, at *8 (S.D.N.Y. Aug.27, 2012) (citing *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (per curiam)).

Here, Plaintiff's sole allegation in the Amended Complaint regarding Kelly asserts that he "operated" and "controlled the safety of" the Brooklyn County Court's Central Booking Detention Holding Facility "through his supervisors, agents, servants, officers, and employees." Am. Compl. 3. In his original complaint, Plaintiff additionally alleges that Kelly failed to exercise ordinary care because the practice of permitting overcrowded holding cells in the Brooklyn Detention Center created a foreseeable risk that pretrial detainees would be attacked, and that Kelly was "grossly negligent" in failing to protect Plaintiff. Compl. ¶ 23. [5]

5    Given Plaintiff's status as a *pro se* litigant, "it is appropriate for the court to consider materials outside of the complaint." *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (quotation marks omitted) (collecting district court cases); *see also Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering allegations in *pro se* plaintiff's opposition to motion to dismiss).

**\*4** Nevertheless, even construing the allegations in the light most favorable to him, the Court finds that Plaintiff fails to adequately allege Kelly's personal involvement. As in *Colon,* Plaintiff claims that Kelly was grossly negligent in failing to train or supervise his subordinates, but fails to set forth facts about Kelly within his own knowledge; his allegations "certainly contain[ ] nothing that would support a claim that [Kelly] either knew or should have known of the events of which [Plaintiff complains." 58 F.3d at 873–74. Indeed, "[a]side from the entirely conclusory allegation" that Kelly may have been "aware of and acquiesced to the unlawful practices," Plaintiff "offers no factual allegations against [Kelly], assuming, erroneously, that his mere status as DOCS Commissioner is enough to sustain this claim." *Collins v. Goord,* 438 F.Supp.2d 399, 420 (S.D.N.Y.2006). It is not. Because Plaintiff merely seeks to hold Kelly liable based on his supervisory capacity or place within the chain of command, his allegations thus merit dismissal. *See Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987) (approving dismissal of § 1983 claim where "plaintiff does no more than allege that [defendant] was in charge of the prison.") (internal quotation marks omitted). The Court therefore GRANTS Defendants' motion to dismiss with respect to Plaintiff's claims against Kelly.

### C. Plaintiff's Eighth Amendment Claim for Deliberate Indifference to Safety

Defendants also argue that Plaintiff fails to state a claim against Sexton for deliberate indifference to his safety. Defs.' Mem. 3–7. To state a claim under § 1983, a plaintiff must allege "that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution." *Newton v. City of New York,* 566 F.Supp.2d 256, 270 (S.D.N.Y.2008) (citing *Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004)). As opposed to deliberate indifference claims brought by post-conviction prisoners—which arise under the Eighth Amendment—claims for deliberate indifference brought by state pretrial

detainees arise under the Fourteenth Amendment. *See Caiozzo v. Koreman,* 581 F.3d 63, 69–72 (2d Cir.2009). However, this Circuit has found that "[c]laims for deliberate indifference ... should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment." *Id.* at 72; *see also Coronado v. Goord,* No. 99 Civ. 1674(RWS), 2000 WL 1372834, at *7 (S.D.N.Y. Sept.25, 2000) (stating that the standard for bring a Fourteenth Amendment claim is the same as under the Eighth Amendment). Accordingly, the Eighth Amendment provides the applicable framework here. *Caiozzo,* 581 F.3d at 72.

The Eighth Amendment requires that prison officials take "reasonable measure to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *see also Gilmore v. Rivera,* 13 CIV. 6955 RWS, No. 13 Civ. 6955, 2014 WL 1998227, at *2 (S.D.N.Y. May 14, 2014) ("Prison officials may neither deprive a prisoner of 'basic human needs, *e.g.,* food, clothing, shelter, medical care, and reasonable safety,' nor expose an inmate to conditions that 'pose an unreasonable risk of serious damage to his future health.' " (citations omitted)).

**\*5** Accordingly, a prison official's failure to protect a prisoner from harm may form the basis of a § 1983 claim. *Farmer v. Brennan,* 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Id.* However, negligence is not sufficient in itself to allege a § 1983 claim. *Hayes,* 84 F.3d at 620; *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988). A prison official may have a duty to protect an inmate when two requirements are satisfied: "First, the deprivations [of rights] alleged must be, objectively, 'sufficiently serious' ... and [second] a deliberate indifference to inmate health or safety." *Farmer,* 511 U.S. at 834 (citations omitted); *accord Coronado,* 2000 WL 1372834, at *3. Therefore, in order for a plaintiff to allege a constitutional deprivation of his Eighth Amendment rights on the basis of a failure to protect, he must show that a prison official acted unreasonably when aware of a "significant risk of serious injury." *Jones v. Goord,* 435 F.Supp.2d 221, 235–36 (S.D.N.Y.2006) (quoting *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997)).

The analysis under the Eighth Amendment requires courts to apply a two prong test. First, under the objective prong, the alleged deprivation must be "sufficiently serious." *Jones,* 435 F.Supp.2d at 234–35 (citing *Farmer,* 511 U.S. at 834). A plaintiff must, therefore, allege facts that amount to a denial of

2014 WL 4230889

"the minimal civilized measure of life's necessities." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Second, under the subjective prong, a plaintiff must demonstrate that the charged defendants acted with a "sufficiently culpable state of mind." *Jones,* 435 F.Supp.2d at 235 (citing *Helling v. McKinney,* 509 U.S. 25, 33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). The required state of mind is "deliberate indifference." *Wilson,* 501 U.S. at 303. Accordingly, to state a claim, a plaintiff must allege facts showing that a defendant knew of and disregarded an "excessive risk of inmate health and safety" or that he was aware of facts from which it could reasonably be inferred that a substantial risk of serious harm existed. *Farmer,* 511 U.S. at 837; *Caiozzo,* 581 F.3d at 71. "Evidence that a risk was 'obvious or otherwise must have been known to a defendant' may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk." *Walker,* 717 F.3d at 125 (citation omitted).

With respect to the objective element, conditions that place a prisoner at a "substantial risk of serious harm" from other inmates may constitute cruel and unusual punishment. *Walker,* 717 F.3d at 128 (citing *Jones,* 435 F.Supp.2d at 238). Generally, "[i]n assessing whether the risk of an inmate's violence against other inmates is 'sufficiently serious,' to trigger constitutional protection, the focus of inquiry must be, not the extent of the physical injuries sustained in an attack, but rather the existence of a 'substantial risk of serious harm.' " *Heisler,* 981 F.Supp. at 837 (S.D.N.Y.1997) (quoting *Wilson,* 501 U.S. at 298), *aff'd,* 164 F.3d 618 (2d Cir.1998). The Defendants assert that courts may find a substantial risk of serious harm only where there is "evidence of a previous altercation between a plaintiff and their attacker, coupled with a complaint by plaintiff regarding the altercation or a request by plaintiff to be separated from the attacker." Defs.' Mem. 5. In *Heisler,* however, the court determined that a substantial risk of serious harm may exist in the absence of any allegation of a history of altercations between the plaintiff and his attacker. 981 F.Supp. at 837. There, in deciding a motion for summary judgment, the court found that the plaintiff's allegations raised a genuine issue of material fact where the plaintiff alleged that another inmate attacked him while he was being held as a pretrial detainee, and that officers witnessed the assault, but failed to intercede to stop it. *Id.* So too here, Plaintiff's allegations raise a factual question as to whether a "substantial risk of serious harm" existed based upon the alleged conditions of overcrowding and a "den of violence." *Id.; see also Walker,* 717 F.3d at 128–29.

**\*6** Under the subjective prong, "a prison official acts with deliberate indifference and thus 'has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measure to abate the harm.' " *See Lee v. Artuz,* No. 96 Civ. 8604(JGK), 2000 WL 231083, at \*4 (S.D.N.Y. Feb.29, 2000) (quoting *Hayes,* 84 F.3d at 620). Plaintiff alleges that Sexton "failed to exercise adequate care for the Plaintiff's safety and to prevent further reasonably foreseeable physical harm, abuse, and violence." Am. Compl. 4. Allegedly, after Sexton arrived at the assault, he stood outside the cell and ordered the inmates to stop. *Id.* When they continued, he left to get help and did not come back for "about five minutes." *Id.* Sexton returned with two other officers, who stopped the assault. *Id.* From these allegations, even though Sexton returned to the holding cell, Plaintiff sufficiently alleges that he had knowledge of the "substantial risk of serious harm" in that Sexton actually witnessed the assault at the hands of two other detainees. Therefore, the question becomes whether Sexton's response to Plaintiff's assault was reasonable. The fact intensive nature of this question cannot be decided on a motion to dismiss. *See Braxton v. Nichols,* No. 08 Civ. 08568(PGG), 2010 WL 1010001, at \*5 (S.D.N.Y. Mar.18, 2010); *see also Rosen v. City of New York,* 667 F.Supp.2d 355, 360–61 (S.D.N.Y.2009) (finding that the question of whether a prison supervisor had a reasonable opportunity to intervene was an "issue of fact for the jury") (quoting *Pearson v. Correction Officer Principe,* No. 97 Civ. 3746(HB), 1999 WL 66521, at \*1 (S.D.N.Y. Feb.9, 1999)).

Defendants argue that the Court should focus on whether Plaintiff has shown "evidence that [the defendant] could have prevented the attack or injury," rather than on the reasonableness of Sexton's response. Defs.' Mem. 7 (quoting *Avincola v. Maldonado,* No. 04–3529–PR, 2005 WL 3116760, at \*1 (2d Cir. Nov.22, 2005) (summary order)). However, the cases cited by Defendants involve evidence adduced by the parties at the summary judgment stage, whereas here, the record is insufficient to allow the Court to make a comparable determination. *See Walker,* 717 F.3d at 129 (reversing district court's dismissal of *pro se* complaint concerning deliberate indifference to inmate safety and finding, *inter alia,* that the cases cited by defendants could be distinguished because they "were decided after development of the factual record").

2014 WL 4230889

Accordingly, the Court DENIES Defendants' motion to dismiss Plaintiff's claim against Sexton for deliberate indifference to his safety.

### III. Conclusion

For the reasons set forth above,

(1) Defendants' motion to dismiss is GRANTED as to all claims against Defendant Kelly;

(2) Defendants' motion to dismiss is DENIED as to Plaintiff's claims against Defendant Sexton; specifically, the Court finds that Plaintiff has adequately stated a

Section 1983 claim against Sexton based on his alleged failure to protect Plaintiff.

**\*7** The Clerk of Court is respectfully directed to terminate Kelly as a Defendant in this case, to mail a copy of this Opinion and Order to Plaintiff, and to terminate the motion (Doc. 33). The parties are further directed to appear before the Court for a conference on September 17, 2014 at 9:30 a.m.

It is SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4230889

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 1:12cv07245**<br>BLAKE v. SEXTON | — | S.D.N.Y. | Sep. 24, 2012 | Docket |

**History (2)**

**Direct History (1)**

1. Blake v. Kelly
2014 WL 4230889 , S.D.N.Y. , Aug. 26, 2014

**Related References (1)**

2. Blake v. Israel Sexton, Sergeant, New York City Police Department
2016 WL 1241525 , S.D.N.Y. , Mar. 24, 2016

2019 WL 4194297
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jeremiah LUCKEY, Plaintiff,

v.

Captain JONAS, et al., Defendants.

18 Civ. 8103 (AT) (KNF)
|
Signed 09/04/2019

**Attorneys and Law Firms**

Jeremiah Luckey, Rome, NY, pro se.

John Raymond Mechmann, III, New York City Law
Department, New York, NY, for Defendants.

**ORDER**

ANALISA TORRES, District Judge:

**\*1** Plaintiff *pro se*, Jeremiah Luckey, brings this action under
42 U.S.C. § 1983, alleging that during his detention at the
Manhattan Detention Complex ("MDC") various employees
of the New York City Department of Correction ("DOC"),
including DOC Captain Jonas, Correction Officers ("COs")
Yarygin, Simon, Simpson, Lisichkin, and Joseph violated his
constitutional rights. Compl., ECF No. 2. Construed liberally,
Plaintiff claims that Defendants (1) failed to protect Plaintiff
from an inmate attack; (2) and failed to protect him from
slipping on spilled water, each in violation of Plaintiff's
Fourteenth Amendment rights. Defendants move to dismiss
the complaint pursuant to Federal Rule of Civil Procedure
12(b)(6). ECF No. 15. [1] For the reasons stated below, the
motion is GRANTED in part and DENIED in part.

[1]    Lisichkin and Joseph did not initially join the
motion to dismiss because they had not yet been
served. Def. Mem. at 6 n.1, ECF No. 18. On March
7, 2019, the DOC executed a waiver of service on
behalf of both Defendants. ECF No. 20. On March
25, 2019, the Court granted Defendants' request
to have the motion apply equally to Lisichkin and
Joseph. ECF No. 22.

**BACKGROUND**

The following facts are taken from Plaintiff's complaint,
which the Court accepts as true for the purposes of this
motion. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493
F.3d 87, 98 (2d Cir. 2007). On July 9, 2019, while housed
at MDC, Plaintiff "slipped and fell due to water that wasn't
cleaned up" while being escorted within the facility. Compl.
at 4. There were no "wet floor signs" posted. *Id.* Plaintiff was
injured during the fall in part because his legs and hands were
shackled. *Id.*

After falling, Plaintiff remained on the floor for an hour and
a half until the Emergency Medical Technicians ("EMTs")
put him on a stretcher. *Id.* During that time, other inmates
hit him with objects and splashed him with "an unknown
substance which made [his] eyes go blurry." *Id.* Defendants
did nothing to stop the other inmates' behavior, which Plaintiff
characterizes as "assault[ ]." *Id.*

Plaintiff's lower back, ankles, and wrists "still bother [him]"
and his "eyesight hasn't been the same." *Id.* at 5. He "received
a neck brace." *Id.* The incident put him under "extreme
emotional and mental distress." *Id.*

**DISCUSSION**

I. Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, "a complaint
must contain sufficient factual matter ... to 'state a claim to
relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556
U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550
U.S. 544, 570 (2007)). The court must accept the allegations
in the complaint as true and draw all reasonable inferences in
favor of the non-movant. *See ATSI Commc'ns, Inc. v. Shaar
Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). A plaintiff is not
required to provide "detailed factual allegations," but must
assert "more than labels and conclusions." *Twombly*, 550 U.S.
at 555. Ultimately, the "[f]actual allegations must be enough
to raise a right to relief above the speculative level." *Id.*

**\*2** *Pro se* plaintiffs receive special solicitude from
courts. Courts must "liberally construe pleadings and briefs
submitted by *pro se* litigants, reading such submissions to
raise the strongest arguments they suggest." *Bertin v. United
States*, 478 F.3d 489, 491 (2d Cir. 2007) (internal quotation
marks and citations omitted). That said, pleadings cannot

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 350 of 529

Luckey v. Jonas, Not Reported in Fed. Supp. (2019)

2019 WL 4194297

survive by making "naked assertions devoid of further factual enhancement," and a court is not "bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal,* 556 U.S. at 678 (internal quotation marks and citation omitted). A court should reject "threadbare recitals" of the elements of a cause of action "supported by mere conclusory statements," *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir. 2010), and "bald assertions" unsupported by details which are sufficient to meet the minimum pleading requirements for a cause of action, *Lawtone-Bowles v. N.Y.C. Hous. Auth.,* No. 13 Civ. 1434, 2014 WL 705272, at *2–3 (S.D.N.Y. Feb. 20, 2014).

Finally, although Plaintiff failed to oppose Defendants' motion to dismiss, "failure to oppose a 12(b)(6) motion cannot itself justify dismissal of a complaint." *Haas v. Commerce Bank,* 497 F. Supp. 2d 563, 564 (S.D.N.Y. July 30, 2007). " '[T]he sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and knowledge of the law.' " *Gregory v. Ricigliano,* No. 12 Civ. 4372, 2014 WL 119475, at *5 (E.D.N.Y. Jan. 10, 2014) (quoting *Goldberg v. Danaher,* 599 F.3d 181, 184 (2d Cir. 2010)). The Court, therefore, "must assume the truth of a pleading's factual allegations and test only its legal sufficiency." *Id.* (internal quotation marks and citation omitted).

## II. Analysis

Construed liberally, Plaintiff claims that Defendants violated his Fourteenth Amendment rights by their (1) deliberate indifference to unconstitutional conditions of confinement, and (2) failure to protect him from an inmate-on-inmate attack.

### A. Conditions of Confinement

"A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight[h] Amendment." *Darnell v. Pineiro,* 849 F.3d 17, 29 (2d Cir. 2017).[2] This is because pretrial detainees "have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." *Id.* (internal quotation marks and citation omitted).

[2]    As of September 5, 2018, when Plaintiff filed his complaint, he indicated that he was a pretrial

detainee. Compl. at 2. Defendants' motion also treats Plaintiff as a pretrial detainee. Def. Mem. at 9. For purposes of this motion, the Court assumes that Plaintiff was a pretrial detainee at all relevant times. *See Holland v. City of N.Y.,* 197 F. Supp. 3d 529, 538 n.5 (S.D.N.Y. 2016).

To establish a claim for deliberate indifference to unconstitutional conditions of confinement, a pretrial detainee must show that "the officers acted with deliberate indifference to the challenged conditions." *Id.* This means that a pretrial detainee must satisfy two prongs to state a claim:

> an "objective prong" showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a "subjective prong"—perhaps better classified as a "*mens rea*" prong or "mental element prong"—showing that the officer acted with at least deliberate indifference to the challenged conditions.

*Id.* The "*mens rea* prong" is defined objectively: "the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35. Negligence is not enough. *Id.* at 36.

 **\*3** Courts in this Circuit have routinely held that "allegations of wet floor conditions that cause a prisoner to slip and fall, standing alone, do not satisfy the first prong of a conditions of confinement claim." *Lopez v. Phipps,* No. 18 Civ. 3605, 2019 WL 2504097, at *8 (E.D.N.Y. June 17, 2019) (collecting cases); *Strange v. Westchester Dep't of Corrs.,* No. 17 Civ. 9968, 2018 WL 3910829, at *3 (S.D.N.Y. Aug. 14, 2018) ("District courts in this Circuit have repeatedly held that, standing alone, a claim that a prisoner fell on a slippery floor and injured himself fails to satisfy the first prong of a conditions-of-confinement claim.").

Plaintiff's allegations also fail to satisfy the second prong because he does not allege any facts indicating that Defendants acted intentionally or recklessly. *Darnell,* 849

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 351 of 529

Luckey v. Jonas, Not Reported in Fed. Supp. (2019)

2019 WL 4194297

F.3d at 35; *Strange*, 2018 WL 3910829, at *3 (plaintiff failed to satisfy second prong when his allegations did not demonstrate that officers acted intentionally or recklessly). He does not plead any facts indicating that Defendants had prior knowledge of the wet floor such that the Court could reasonable infer that Defendants acted intentionally or recklessly.

Because Plaintiff fails to allege facts satisfying either prong of a deliberate indifference to conditions of confinement claim, Defendants' motion to dismiss the claim is GRANTED.[3]

[3]    Because the Court finds that the complaint fails to state a conditions of confinement claim against any Defendant, it does not reach Defendants' alternative argument that they are entitled to qualified immunity. *See Peterson v. Tomaselli*, No. 02 Civ. 6325, 2003 WL 22213125, at *8 (S.D.N.Y. Sept. 29, 2003); *Lee v. Coughlin*, No. 93 Civ. 8952, 1997 WL 193179, at *4 (S.D.N.Y. Apr. 18, 1997).

### B. Failure to Protect

The Constitution imposes a duty on prison officials to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks and citation omitted). "In particular, a prison official has a duty to protect prisoners from violence from other prisoners." *Nunez v. Goord*, 172 F. Supp. 2d 417, 430 (S.D.N.Y. 2001). However, not "every injury suffered by one prisoner at the hands of another ... translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. A prison official's failure to protect is a Fourteenth Amendment violation only "where the officer acted with 'deliberate indifference to a substantial risk of serious harm to an inmate.' " *Rosen v. City of N.Y.*, 667 F. Supp. 2d 355, 360–61 (S.D.N.Y. 2009) (quoting *Farmer*, 511 U.S. at 828).

The two-pronged framework for claims of deliberate indifference set forth in *Darnell* "applies with equal measure to failure to protect claims." *Taylor v. City of N.Y.*, No. 16 Civ. 7857, 2018 WL 1737626, at *12 (S.D.N.Y. Mar. 27, 2018). A plaintiff must therefore show "(1) that the failure to intervene or protect the inmate was sufficiently serious such that it caused an unquestioned and serious deprivation of basic human needs and (2) that the defendant acted with a sufficiently culpable state of mind." *Corley v. City of N.Y.*,

No. 14 Civ. 3202, 2017 WL 4357662, at *12 (S.D.N.Y. Sept. 28, 2017) (internal quotation marks and citation omitted). The second prong is measured by an objective standard: whether a defendant "knew, or should have known" that his or her conduct "posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 33, 35.

**\*4**  Beginning with the first prong, "[t]here is no static test to determine whether a deprivation is sufficiently serious; instead, the conditions themselves must be evaluated in light of contemporary standards of decency." *Darnell*, 849 F.3d at 30 (internal quotation marks and citation omitted). "The failure of a correction officer to ... intervene in an attack ... may under certain circumstances create a condition which poses a substantial risk of serious harm thus constituting a sufficiently serious constitutional violation." *Molina v. Cty. of Westchester*, No. 16 Civ. 3421, 2017 WL 1609021, at *3 (S.D.N.Y. Apr. 28, 2017). "[I]n assessing whether the risk of an inmate's violence against other inmates is sufficiently serious, to trigger constitutional protection, the focus of inquiry must be, not the extent of the physical injuries sustained in an attack, but rather the existence of a substantial risk of serious harm." *Blake v. Kelly,* No. 12 Civ. 7245, 2014 WL 4230889, at *5 (S.D.N.Y. Aug. 26, 2014) (internal quotation marks and citation omitted). Although "[a] substantial risk of serious harm can be demonstrated where there is evidence of a previous altercation between a plaintiff and an attacker, coupled with a complaint by plaintiff regarding the altercation or a request by plaintiff to be separated from the attacker," *Gilmore v. Rivera*, No. 13 Civ. 6955, 2014 WL 1998227, at *3 (S.D.N.Y. May 14, 2014), it can exist even "in the absence of any allegation of a history of altercations between plaintiff and his attacker," *Blake*, 2014 WL 4230889, at *5.

Here Plaintiff alleges that he was "hit with objects and splashed with an unknown substance which made his eyes go blurry" for "about an hour and a half" until the EMTs arrived. Compl. at 4. He further alleges that his "eyesight hasn't been the same" ever since. *Id.* at 5. He does not plead any facts indicating that there were prior altercations between him and his alleged attackers. The Court, however, finds this immaterial given the extended duration of the attack. Construing the complaint liberally, and drawing all reasonable inferences in Plaintiff's favor, the Court finds that Plaintiff has plausibly alleged that Defendants' actions may have put Plaintiff at risk of serious harm. Allowing Plaintiff to be "hit with objects and splashed with an unknown substance," Compl. at 4, for over an hour and a half as he

2019 WL 4194297

lay on the ground injured, waiting for an EMT to arrive, does not comport with "contemporary standards of decency." Moreover, this led to an impairment in Plaintiff's vision. In reaching this conclusion, the Court is cognizant that Plaintiff's injuries from the slip and fall were serious enough to necessitate EMTs and the use of a stretcher.

Defendants argue that Plaintiff has failed to meet the second prong because "there are no facts upon which this Court could plausibly infer that defendants were previously aware of any risk of attack by other inmates" and courts have "recognized that a defendant correction officer cannot be liable for a surprise attack." Def. Mem. at 13–14. A "surprise attack," however, is only a surprise for so long: Plaintiff alleges that he was on the floor being "assaulted" for an hour and a half while the Defendants "did nothing to stop" the attack. Compl. at 4. The "surprise attacks" in the cases Defendants cite involve situations where the defendants (1) had no prior knowledge to suggest an attack was coming, and (2) were not present for the attack or the attack was so short that there was no time to intervene. *See Franzese v. City of N.Y.*, No. 17 Civ. 3020, 2018 WL 5924354, at *3 (S.D.N.Y. Nov. 13, 2018) (subjective prong was not met when defendant had no reason to know that the plaintiff's safety was at risk and it was "not plausible that [the d]efendant would have been able to intervene and prevent the [30 second] attack"); *Parris v. N.Y. State Dep't of Corr. Servs.*, 947 F. Supp. 2d 354, 358 (S.D.N.Y. 2013) (correctional officers did not notice the assault for several minutes); *Fernandez v. N.Y.C. Dep't of Corr.*, No. 08 Civ. 4294, 2010 WL 1222017, at *1 (S.D.N.Y. Mar 29, 2010) (alleging that no officers were monitoring the area when the assault occurred and separated the two inmates when they saw the altercation).

 **\*5** Although Defendants might not have had prior knowledge that the attack was going to occur, once it began, their failure to stop it for over an hour is sufficient for Plaintiff to adequately allege the second prong.[4] *See Taylor*, 2018 WL 1737626 at *12 ("Likewise, plaintiff here has stated a claim for deliberate indifference to safety against [defendant], who witnessed the attack on plaintiff and allegedly failed to take action to prevent it."). Plaintiff, therefore, has alleged sufficient facts to satisfy the second prong.

[4]   Defendants argue that "there are no facts suggesting that defendants could see the inmates throwing liquid and objects, such that they had a reasonable opportunity to intervene." Def. Mem. at 14. The Court disagrees. Plaintiff alleges that

the "assault" took place after he fell while being transported by "the northmax captain and 2 other correctional officers." Compl. at 4. Accordingly, making all reasonable inferences in Plaintiff's favor, the facts suggest that those individuals were present for the attack.

### C. Qualified Immunity

"Under 42 U.S.C. § 1983, a public official is entitled to qualified immunity if her acts did not violate clearly established rights of which a reasonable officer would have known, or if she reasonably believed that her conduct did not violate those rights." *Desulma v. City of N.Y.*, No. 98 Civ. 2078, 2001 WL 798002, at *8 (S.D.N.Y. July 6, 2001). Defendants acknowledge that "[i]t is clearly established that inmates have the right to be free from harm inflicted by fellow prisoners and that corrections officers have an obligation to protect inmates from a known and substantial risk of serious harm," Def. Mem. at 18 (citing *Dublin v. N.Y.C. Law Dept.*, No. 10 Civ. 2971, 2012 WL 4471306, at *7 (S.D.N.Y. Sept. 26, 2012)), but contend that they are entitled to qualified immunity on Plaintiff's failure to protect claim because there is no clearly established right to be free from harm inflicted by a "surprise attack." Def. Mem. at 18. However, as discussed above, due to the prolonged nature of this attack, it cannot properly be deemed a surprise attack. Defendants, therefore, are not entitled to qualified immunity on that ground.

### D. Potential State Law Claims

Construed liberally, Plaintiff also asserts negligence-based claims arising out of the slip and fall and the inmate assault. Defendant moves to dismiss the negligence claim "premised upon defendants' purported failure to clean up water on the floor." Def. Mem. at 20.

"Under New York law, which applies to this case, a plaintiff must establish three elements to prevail on a negligence claim: (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) (internal quotation marks and citation omitted). "[T]he State owes a duty of care to inmates for foreseeable risks of harm." *Sanchez v. State of New York*, 99 N.Y.2d 247, 255 (N.Y. 2002). "[F]oreseeability is defined not simply by actual notice but by actual or constructive notice." *Id.* (italics omitted). In other words, what Defendants "knew

or had reason to know" or what they "[are] or should be aware of." *Id.* Defendants argue that Plaintiff has failed to allege that the wet floor was a foreseeable risk. Def. Mem. at 20. The Court agrees. As previously discussed, Plaintiff has failed to allege any facts demonstrating that Defendants had any prior knowledge of the wet floor, or that they should have. [5]

[5]  Defendants do not move to dismiss Plaintiff's claim for negligent supervision arising out of the inmate attack. *See generally* Def. Mem. Accordingly, the Court does not address the issue.

## CONCLUSION

**\*6**  For the reasons stated above, Defendants' motion to dismiss is GRANTED in part and DENIED in part. Plaintiff may proceed on his claims for failure to intervene under 42 U.S.C. § 1983 and negligent supervision under state law arising from the inmate attack.

Plaintiff is warned that failure to respond to Court orders may result in dismissal for failure to prosecute under Federal Rule of Civil Procedure 41(b).

The Clerk of the Court is directed to terminate the motion at ECF No. 15 and to mail a copy of this order and all unpublished cases cited herein to Plaintiff *pro se*.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4194297

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 1:18-CV-08103**<br>Luckey v. Jonas et al | — | S.D.N.Y. | Sep. 05, 2018 | Docket |

**History**

There are no History results for this citation.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 902187

2008 WL 902187
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Pernell WILSON, Plaintiff,

v.

James CAMPBELL, Sheriff of Albany County,
and Thomas Wigger, Superintendent, Defendants.

No. 06-cv-0175 (GLS-RFT).
|
March 31, 2008.

**Attorneys and Law Firms**

Pernell Wilson, Staten Island, NY, pro se.

Roche, Corrigan Law Firm, Robert P. Roche, Esq., of
Counsel, Albany, NY, for the Defendants.

### *DECISION AND ORDER*

GARY L. SHARPE, District Judge.

**\*1** The above-captioned matter comes to this court
following a Report-Recommendation and Order ("R & R")
by Magistrate Judge Randolph F. Treece, filed February
11, 2008. (Dkt. No. 73.) The R & R recommended that
defendants' motion for summary judgment be granted.
Plaintiff Pernell Wilson has filed no timely objections to the R
& R; instead, he requests permission to amend his Complaint.
(*See* Dkt. No. 74.) Wilson's request is denied. The Scheduling
Order in this case required that any request to amend a party's
pleadings be made no later than October 31, 2006. (*See* Dkt.
No. 16.) Moreover, the court will not consider an argument
raised for the first time in response to an R & R. Any request
to amend could, and should, have been made earlier in these
proceedings, prior to the expenditure of the parties' and the
court's resources.

Accordingly, no objections having been filed, and the court
having reviewed the R & R for clear error, it is hereby

**ORDERED** that Wilson's request to amend his Complaint is
DENIED; and it is further

**ORDERED** that the Report-Recommendation and Order of
Magistrate Judge Randolph F. Treece filed February 11, 2008
is accepted in its entirety for the reasons stated therein; and
it is further

**ORDERED** that defendants' motion for summary judgment
is GRANTED and Wilson's Complaint is dismissed; and it is
further

**ORDERED** that the Clerk enter judgment in favor of the
defendants and close the case; and it is further

**ORDERED** that the Clerk provide copies of this Decision
and Order to the parties.

**IT IS SO ORDERED.**

### *REPORT-RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Pernell Wilson brings this civil rights action
pursuant to 42 U.S.C. § 1983 alleging that Defendants
Campbell and Wigger failed to protect him while he was
incarcerated as a pre-trial detainee at the Albany County
Correctional Facility in violation of the Eighth Amendment.
Dkt. No. 1, Compl. Plaintiff further alleges that several
individuals conspired to have him released from a Special
Housing Unit (SHU) into the general population so that
other inmates would have an opportunity to assault him. *Id.*
Defendants now move for Summary Judgment (Dkt. No. 56),
which Plaintiff opposes, (Dkt. No. 61). For the reasons that
follow, it is recommended that the Defendants' Motion for
Summary Judgment be **granted.**

### I. BACKGROUND

On August 24, 2005, Plaintiff, who was incarcerated in the
Albany County Correctional Facility (Albany County) while
awaiting trial, was placed in the SHU for disciplinary reasons.
Dkt. No. 67, Defs.' Rule 7.1 Statement of Material Facts at
¶ 1. [1] After serving a portion of his time in SHU, Plaintiff's
disciplinary sentence was modified on October 3, 2005, by
Chief Corrections Officer Mark Kramek [2] as a reward for
Wilson's behavior modification. Defs.' 7.1 Statement at ¶ 6.
On or about November 28, 2005, Plaintiff filed an Inmate
Grievance stating that Corrections Officer (C.O.) Stewart [3]

2008 WL 902187

had threatened to kill him, and requesting to be removed from Albany County because he feared for his life. Compl., Ex. A, Inmate Grievance Form, dated Nov. 28, 2005. That Grievance was denied by Grievance Coordinator Courcelle, [4] as were his appeals to the Chief Administrative Officer and the Citizens Policy and Complaint Review Council. *Id.* at p. 2; Compl., Ex. C, Lt. from State Commission of Corr., dated Jan. 5, 2006. The basis for the denials was that an investigation into the matter revealed no evidence that C.O. Stewart threatened Plaintiff, nor that Plaintiff's safety was otherwise in danger. Compl., Ex. A, Inmate Grievance Form, dated Nov. 28, 2005 & Decision of the Chief Admin. Officer, Dated Dec. 1, 2005.

[1]    When the Plaintiff has not objected to a particular statement of fact proffered in the Defendants' 7.1 Statement, or visa versa, we will not cite to both 7.1 Statements. *See* N.D.N.Y.L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* ) (emphasis in original).

[2]    Mark Kramek is not a named Defendant in this action.

[3]    C.O. Stewart is not a named Defendant in this action.

[4]    Grievance Coordinator Courcelle is not a named Defendant in this action.

**\*2** Plaintiff asserts that on November 21, 2005, he filed a Complaint to Defendant Superintendent Wigger stating that he feared his life was in danger because C.O. Stewart had called him a rapist in front of other inmates. Compl. at p. 10. Plaintiff further alleges that a family member, Ms. Cleo Childs, called Defendant Sheriff Campbell explaining that Plaintiff's life was in danger and requesting that he move Plaintiff to another facility. [5] *Id.* at p. 11. Plaintiff does not indicate, and the record does not reflect, that any of these complaints warned the Defendants that Plaintiff's release from SHU into the general prison population would put his safety in danger.

[5]    Plaintiff does not state when this alleged call was made.

As his disciplinary sentence had been reduced, Plaintiff was moved from SHU to the 3-East Housing Unit on December 8,

2005. Dkt. No. 70, Pl.'s Resp. to Defs.' 7.1 Statement, Ex. B, Discharge Form, dated Dec. 8, 2005. The next day Plaintiff was assaulted by two inmates outside of his cell who broke his jaw and caused Plaintiff to be hospitalized for two days. Dkt. No. 70, Ex. A, Incident Rep., dated Dec. 9, 2005; Defs.' 7.1 Statement at ¶ 7. The two inmates who assaulted Plaintiff were charged, prosecuted, and punished for their crime. Defs.' 7.1 Statement at ¶ 8.

Plaintiff asserts Defendants Wigger and Campbell failed to protect him and thus violated their duty of care. *Id.*

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is

better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

**\*3** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

## B. Failure to Protect

It appears from Plaintiff's submissions that at all times relevant to his constitutional claims, he was incarcerated as a pre-trial detainee at Albany County. Thus, the proper analysis of Plaintiff's claim is under the Due Process Clause of the Fourteenth Amendment. *Lareau v. Manson,* 651 F.2d 96, 102 (2d Cir.1981) (constitutional standard for substantive rights of pre-trial detainees is Fourteenth Amendment due process) (cited in *Bowman v. Campbell,* 850 F.Supp. 144, 147 (N.D.N.Y.1994)); *see also Johnson v. Glick,* 481 F.2d 1028, 1032 (2d Cir.1973) (Eighth Amendment does not apply prior to conviction and therefore is not applicable to pre-trial detainees). Because a person "lawfully committed to pretrial detention has not been adjudged guilty of any crime," pre-trial detainees "may not be punished in any manner-neither cruelly and unusually nor otherwise." *Benjamin v. Fraser,* 343 F.3d 35, 49-50 (2d Cir.2003) (citing *Bell v. Wolfish,* 441 U.S. 520, 535-36 (1979)). Nonetheless, "[t]he standard for analyzing a pretrial detainee's Fourteenth Amendment claim is the same as the Eighth Amendment standard." *Bourdon v. Roney,* 2003 WL 21058177, at \*10 (N.D.N.Y. Mar. 6, 2003) (citing *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996)); *see also Walton v. Breeyear,* 2007 WL 446010,

at \*8 n. 16 (N.D.N.Y. Feb. 8, 2007) (noting that Fourteenth Amendment protections for pretrial detainees provide parallel "protection" of those Eighth Amendment protections for sentenced prisoners). Thus, we will analyze Plaintiff's due process claim under the Eighth Amendment standard.

Plaintiff asserts that the Defendants should be held liable because they were warned about the risks to his safety and failed to act in response. A prison inmate has a constitutional right under the Eighth and Fourteenth Amendments to be free from the "unnecessary and wanton infliction of pain." *Hendricks v. Coughlin,* 942 F.2d 109, 112 (2d Cir.1991) (citation omitted). The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (1996); *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) ("[p]rison officials have a constitutional duty to act reasonably to ensure a safe environment for a prisoner when they are aware that there is a significant risk of serious injury to that prisoner."); *see also Hendricks v. Coughlin,* 942 F.2d at 113; *Avincola v. New York State Dep't of Corr. Servs.,* 1998 WL 146280, at \*3 (N.D.N.Y. Mar. 27, 1998).

**\*4** In order to state such a claim, the prisoner must demonstrate that the prison officials "acted with deliberate indifference with respect to his safety or with an intent to cause harm to him." *Hendricks v. Coughlin,* 942 F.2d at 113. A showing of mere negligence on behalf of the defendants is not enough to state a constitutional claim. *Whitley v. Albers,* 475 U.S. 312, 319 (1986) (cited in *Hendricks v. Coughlin,* 942 F.2d at 113); *Daniels v. Williams,* 474 U.S. 327, 328 (1985). The key element of a failure to protect claim is the existence or potential existence of a substantial risk of serious harm and not the actual harm which may or may not ensue. *Farmer v. Brennan,* 511 U.S. 825, 836 (1994). To prove deliberate indifference, the plaintiff must show that the "official knew of and disregarded an excessive risk to the plaintiff's health or safety." *Id.* at 837 (cited in *Ramirez v. Mantello,* 1998 WL 146246, at \*2 (N.D.N.Y. Mar. 24, 1998). "The official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists *and* he must also draw the inference." *Id.* at 836 (emphasis in original).

Further, a supervisor can be held liable when he or she has actual or constructive notice of unconstitutional practices but similarly acted with gross negligence or deliberate indifference in failing to act. *See Meriwether v. Coughlin,*

2008 WL 902187

879 F.2d 1037, 1048 (2d Cir.1989). "Such a supervisor may not escape the consequences of his or her failure to act by pleading the doctrine of qualified immunity." *Fossett v. Morris,* 1991 WL 67093, at *3 (S.D.N.Y. Apr. 22, 1991).

Based on the record before us, there is no admissible evidence that either Defendant was aware that Plaintiff faced a substantial risk of serious harm. Plaintiff asserts he filed a Complaint with Defendant Wigger stating that he felt his life was in danger, and that a member of his family called Defendant Campbell and explained that Plaintiff's life was in danger and requested that he be moved to another facility. Compl. at p. 11. Regarding the alleged phone call, such a statement is hearsay and is therefore non-admissible evidence which cannot be considered in this Motion for Summary Judgment. *See Bickerstaff v. Vassar College,* 196 F.3d 435, 447 (2d Cir.1999) (affirming that even for summary judgment purposes, evidence must be admissible); *Barau v. Credit Lyonnais-U.S. Branches,* 1998 WL 915892, at *4 (S.D.N.Y. Dec. 30, 1998) (granting summary judgment where "much of the plaintiff's proffered 'evidence' is either inadmissible hearsay or so conclusory as to fail to satisfy the requirements of [Federal] Rule [of Civil Procedure] 56(e).").

Considering now the alleged Complaint sent to Defendant Wigger, there is no such Complaint on the record apart from the Inmate Grievance Form submitted by Plaintiff on November 28, 2005. As discussed above, Plaintiff stated in the Grievance that C.O. Stewart had threatened him and he requested to be transferred to another facility. That Grievance was denied both initially and on appeal. In response to Plaintiff's safety concerns, the initial denial noted that Plaintiff was "in a camera cell in the SHU Unit, where he is watched 24 hours a day." Compl., Ex. A, Grievance, dated Nov. 28, 2005. Additionally, an investigation revealed no evidence that Plaintiff was threatened by C.O. Stewart. *Id.* at p. 2, Decision of the Chief Admin. Officer, dated Dec. 1, 2005. Thus, Plaintiff's fears with respect to C.O. Stewart were investigated and ultimately rejected.

 **\*5** There is no evidence on the record that either named Defendant was warned that Plaintiff's safety would be in danger should he be released from SHU. Plaintiff's Grievance did not indicate any other threat besides C.O. Stewart, nor did his general request to be moved to another facility put the Defendants on notice as to any potential threat that existed in the general prison population. A general, conclusory statement that an inmate fears for his safety, without more, is insufficient information from which an inference can be

drawn that such inmate's safety is actually at risk. *See Arroyo v. Coughlin,* 1993 WL 117529, at *1 (W.D.N.Y. Apr. 13, 1993)* ("An official demonstrates deliberate indifference when he has actual or constructive notice of a specific risk to an inmate's safety and fails to take steps to protect the inmate from injury.") (citing *Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989)); *see also Sims v. Bowen,* 1998 WL 146409, at *3 (N.D.N.Y. Mar. 23, 1998) (stating that "an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"). Thus, because there is no evidence nor indication that the Defendants were warned about the potential threat to Plaintiff's safety should he be released into the general population, Plaintiff has failed to make a valid constitutional claim. *Farmer v. Brennan,* 511 U.S. at 837 (plaintiff must show that the "official knew of and disregarded an excessive risk to the plaintiff's health or safety.").

Therefore, it is recommended that Defendants' Motion for Summary Judgment be **granted** as to Plaintiff's Eighth Amendment failure to protect claim.

### C. Personal Involvement and Supervisory Liability

Plaintiff asserts that C.O. Stewart and Mark Kramek arranged for Plaintiff to be released from SHU because they knew that once released, Plaintiff would be assaulted by other inmates in the general prison population due to the fact that his high profile rape charge was well known. Compl. at pp. 7-11. Although the bulk of Plaintiff's Complaint focuses on the actions of Stewart and Kramek, those individuals are not named as Defendants in this action. *See generally* Compl. Plaintiff does not overtly assert that Defendants Wigger and Campbell were part of this alleged conspiracy, though he maintains that they failed to exercise reasonable care in protecting him. *Id.* at p. 11.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a prison official may not be found liable for a constitutional violation merely because of the acts of those under his control." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v.*

*Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted).

**\*6** If a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of the supervisor may exist

> in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d at 873) (further citations omitted).

As stated above, Plaintiff does not allege that the Defendants directly participated in the alleged conspiracy to release him into the general prison population. Nor does Plaintiff allege that the Defendants failed to remedy a wrong that befell him. To the contrary, the record shows Defendant James Campbell investigated the assault on Plaintiff, and that the responsible inmates were arrested and punished. Dkt. No. 61, Pl.'s Opp. to Defs.' Mot. for Summ. J., Ex. G, Investigative Rep., dated Jan. 25, 2006; Dkt. No. 56-7, Mark Kramek, Assistant Superintendent, Albany County Corr. Facility, Aff., dated Aug. 14, 2007, at p. 3.

To the extent Plaintiff is claiming that the Defendants created an unconstitutional policy or custom by allowing inmates charged with rape to be released into the general population, that claim must also fail. Plaintiff asserts that the general prison population knew about his rape charge because it was reported in the media and because C.O. Stewart called him a rapist within earshot of other inmates. Plaintiff contends it was for that reason he was attacked upon his release into the general population. Pl.'s Opp. to Defs.' Mot. for Summ. J. at ¶¶ 5-6. The record shows that there was no policy of controlling what information inmates received

via the press in Albany County. Dkt. No. 56-4, James I. Campbell, Sheriff of Albany County, Aff., dated Aug. 20, 2007. Nor does Albany County have a policy or custom of segregating inmates in any way based on the crime for which they have been convicted or charged. *Id.* These policies do not sanction unconstitutional conduct, rather, they serve the purpose of protecting the individual privacy of inmates and providing access to information from the outside world. Thus, implementation of these policies does not create supervisory liability on the part of Defendants.

Finally, there is no accusation nor evidence in the record to indicate that the Defendants were grossly negligent in their supervision of subordinates. Plaintiff's accusations against C.O. Stewart were duly investigated and subsequently dismissed by prison personnel. And, as discussed above, Defendants did not have any advance warning that Plaintiff's safety would be in jeopardy once released into the general population. Thus, there is no ground upon which supervisory liability can attach to the Defendants.

**\*7** Therefore, it is recommended that Plaintiff's claim on this ground be **dismissed.**

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 56) be **granted;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

### All Citations

Not Reported in F.Supp.2d, 2008 WL 902187

**Wilson v. Campbell, Not Reported in F.Supp.2d (2008)**

2008 WL 902187

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 9:06cv00175**<br>WILSON v. CAMPBELL ET AL | — | N.D.N.Y. | Feb. 09, 2006 | Docket |

**History**

There are no History results for this citation.

Moncrieffe v. Witbeck, Not Reported in F.Supp.2d (2000)

2000 WL 949457

KeyCite Yellow Flag

Distinguished by  Inesti v. Hogan,  S.D.N.Y.,  March 5, 2013

2000 WL 949457

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Shawn MONCRIEFFE, Plaintiff,

v.

Linda WITBECK, Corrections Officer at
Coxsackie Correctional Facility; B. Schwebler;
Dominic Mantello, Superintendent; C.O. Weeks;
C.O. Jensen; and C.O. McFarlene, Defendants.

No. 97–CV–253.
|
June 29, 2000.

**Attorneys and Law Firms**

Shawn Moncrieffe, Auburn Correctional Facility, Auburn,
New York, Plaintiff, pro se.

Hon. Dennis C. Vacco, Attorney General for the State of
New York, Steven H. Schwartz, Assistant Attorney General,
Department of Law, the Capitol, Albany, New York, for
Defendants.


MEMORANDUM–DECISION AND ORDER

MORDUE, J.


*INTRODUCTION*

**\*1** Plaintiff moves and defendants cross-move for summary
judgment under Section 56(b) of the Federal Rules of Civil
Procedure in this *pro se* action pursuant to 42 U.S.C. § 1983
alleging violations of his rights under the Fourth, Eighth and
Fourteenth Amendments to the United States Constitution.

Presently before the Court is the Report–Recommendation of
the Hon. Magistrate Judge David R. Homer dated December
23, 1998, recommending that plaintiff's motion be denied and
defendants' cross-motion be granted in part and denied in part.

Plaintiff filed timely objections to the Report–
Recommendation.


*FACTS*

In his complaint, plaintiff alleges that between August
and November, 1996, while he was housed in the Special
Housing Unit of Coxsackie Correctional Facility, defendant
Correctional Officer Linda Witbeck deprived him of a
food tray six times; that Witbeck deprived him of things
such as recreation and supplies six times; that Witbeck
laughed at him four times while he was in the shower;
that Witbeck sexually harassed plaintiff once "when she
felt [plaintiff's] genitals and rear end during a regular
recreation pat frisk;" that Witbeck ransacked his cell; and
that in some unspecified manner Witbeck gave him a death
threat. Plaintiff further alleges that during the same period
defendant Correctional Officer Weeks sexually harassed him
during a routine pat frisk when Weeks "felt [plaintiff's]
genitals a few times." Plaintiff claims that on two occasions
defendant Correctional Officer McFarlene entered his cell
and ransacked it while plaintiff was in the shower and
once confiscated "a few of [plaintiff's] things." Plaintiff also
claims that defendant Correctional Officer Jensen threatened
him once and assaulted him once by kicking him in the
back. Plaintiff states that the grievance supervisor, defendant
Schwebler, did not log and number plaintiff's grievances
as required and that Superintendent Dominic J. Mantello
disregarded plaintiff's numerous complaints.

Magistrate Judge Homer recommended denial of plaintiff's
motion for summary judgment and dismissal of all of
plaintiff's claims except his Eighth Amendment claim against
Witbeck for denial of food.


*DISCUSSION*

Pursuant to 28 USC § 636(b)(1)(C), this Court must make
a de novo determination of those portions of the Magistrate
Judge's Report–Recommendation to which plaintiff has
specifically objected. Here, plaintiff objects to Magistrate
Judge Homer's recommendations except with respect to the
issues of verbal harassment, threats and denial of recreation.
He erroneously states that the Report–Recommendation does
not address the claim that Witbeck laughed at him while he
was in the shower; however, this allegation amounts to a claim
of verbal harassment, which is not actionable under 42 U.S.C.
§ 1983. *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474
(S.D.N.Y.1998). Accordingly, the Court will address all other
issues de novo.

Summary Judgment is appropriate when the pleadings, affidavits, and any other supporting papers demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). Facts, inferences therefrom and ambiguities must be examined in a context which is most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

**\*2** The movant bears the initial burden of showing that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). When the moving party has met this burden the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita* at 586. The moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P.56(e); *Liberty Lobby* at 250.

Where summary judgment is sought against a *pro se* litigant the Court must afford him special solicitude. *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

A. *Defendant Mantello*
Plaintiff alleges that defendant Mantello is liable because, as Superintendent of the Coxsackie Correctional Facility, he "disregarded" numerous complaints made to him by plaintiff. More specifically, plaintiff alleges that (1) Mantello failed to remedy a wrong after having learned of it and (2) that Mantello was negligent in his supervision of subordinate employees.

Magistrate Judge Homer concluded in his Report–Recommendation that plaintiff failed to demonstrate a claim against Mantello. With respect to plaintiff's first allegation that Mantello failed to remedy a wrong, the Magistrate Judge determined that either Mantello or his subordinates investigated plaintiff's grievances. Because plaintiff's complaints were investigated and it was concluded that the grievances were without merit, Mantello satisfied his obligations with respect to plaintiff's grievances.

The Magistrate Judge similarly rejected plaintiff's second claim that Mantello negligently supervised subordinate employees who were allegedly violating his constitutional rights. Magistrate Judge Homer concluded that no claim was stated because, whereas the law requires gross negligence

to impose supervisor liability, plaintiff merely alleged negligence. In addition to determining that plaintiff's claim was without merit for failure to plead and prove gross negligence, Magistrate Judge Homer also concluded that plaintiff had failed to establish even ordinary negligence on the part of Mantello.

Plaintiff objects to Magistrate Judge Homer's conclusion that he failed to establish supervisor liability. Plaintiff argues that the record establishes gross negligence in that Mantello was aware that plaintiff's rights were being violated but chose to ignore them by failing to investigate or remedy same.

In order to establish a successful § 1983 claim, a plaintiff must establish that a defendant was personally involved in the alleged rights violation. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). An official is not liable in a § 1983 action under the doctrine of respondeat superior. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981). However, an individual who occupies a supervisory position may be found personally involved by: (1) direct participation; (2) failing to remedy a wrong after learning of the violation through a report or appeal; (3) creating a policy or custom under which unconstitutional practices occurred or allowing the policy or custom to continue; or (4) gross negligence in managing subordinates whose conduct caused the unlawful condition or event. *See Wright,* 21 F .3d at 501.

**\*3** With respect to plaintiff's objection arguing that Mantello was grossly negligent, plaintiff simply reiterates his original arguments and relies on evidence already in the record and considered by the Magistrate Judge. Plaintiff merely reiterates in his objections to the Report–Recommendation that he has established a case

which includes gross negligence as evidence [sic] in plaintiff's motion. (See plt. motion for summary judgment, memo. Of law pg. 23 with annexed exibits [sic] and plt. Reply decl. Pg. 11 with attached exibits [sic] ). Moreover, the record is legally sufficient to establish and impose supervisory liability. (See exibits [sic] attached to plt. motion for summary judgment and Reply motion).

As Magistrate Judge Homer correctly stated, the record clearly reveals that Mantello or his subordinate employees investigated plaintiff's grievances and rejected them as being without merit. As such, there is nothing in the record indicating that Mantello either turned a blind eye to plaintiff's complaints. Simply stated, plaintiff's assertion that Mantello ignored his complaints is refuted by the investigations conducted regarding the complaints. Similarly, plaintiff's allegation that Mantello failed to remedy a wrong is without merit because the record reflects that the investigation of the complaints came to the conclusion that no wrongs were being committed.

Aside from reiterating his initial arguments, plaintiff has failed to provide the Court with anything further in his objection which would warrant disturbing the sound conclusion of the Magistrate Judge. Accordingly, this Court accepts Magistrate Judge Homer's determination to dismiss plaintiff's claim with respect to defendant Mantello.

B. *Verbal Threats and Harassment*

Plaintiff alleges that he was subjected to verbal threats and harassment in that corrections officers laughed and insulted him while he showered. Plaintiff also maintains that he was subjected to threats of violence. Magistrate Judge Homer recomended that defendants were entitled to summary judgment because plaintiff failed to establish an actual injury resulting from the alleged threats or harassment.

A claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998); *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995). As correctly noted by the Magistrate Judge, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Picco* 994 F.Supp. at 474. Similarly, "threats do not amount to violations of constitutional rights." *Malsh,* 901 F.Supp. at 763.

Even assuming that the alleged verbal harassment and threats occurred, plaintiff has failed to plead or prove that there were any accompanying actual injuries. Furthermore, plaintiff does not object to the findings of the Magistrate Judge with respect to verbal threats and harassment. After a thorough review of the Report–Recommendation the Court adopts the recommendation of the Magistrate Judge.

C. *Excessive Force*

**\*4** Plaintiff alleges that defendant Jensen kicked him once in the back on November 9, 1996. He states that he suffered pain but does not claim that he sought medical assistance. Plaintiff does not allege that Jensen acted maliciously or sadistically.

Magistrate Judge Homer found that plaintiff had failed to annunciate an actionable claim for excessive force. More particularly, he concluded that the alleged kick, even if true, was of limited duration and that there was no malicious intent on the part of the corrections officer.

It is well settled that "the unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hudson v. McMillian,* 503 U.S. 1, 5 (1992) (quoting *Whitley v. Albers,* 475 U.S. 312 (1986))(internal quotation marks omitted). In reviewing a prisoner's claim a Court must consider whether the prison official acted with a sufficiently culpable state of mind and whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation. *Hudson* at 8. In considering whether the prison official possessed a culpable state of mind while engaging in the use of force, the inquiry is whether the prison official applied force maliciously and sadistically to cause harm. *Id.* at 7. The extent of an inmate's injuries is relevant to this inquiry, as is the nature and duration of the act. *James v. Coughlin,* 13 F.Supp.2d 403, 409 (W.D.N.Y.1998); *Reyes v. Koehler,* 815 F.Supp. 109, 113–14 (S.D.N.Y.1993). Important in considering the alleged wrongdoing is determining whether the force was applied in a good faith effort to maintain or restore prison discipline or maliciously and sadistically to cause harm. *Hudson* at 7.

With respect to the nature of the wrongdoing, a prisoner must demonstrate that the deprivation alleged is sufficiently serious or harmful enough to reach constitutional dimensions. *Romano v. Howarth,* 998 F.2d 101, 104–05 (2d Cir.1993). A prisoner is not required to demonstrate that he sustained a serious injury; *de minimis* use of force does not, however, give rise to an Eighth Amendment claim. *Hudson* at 9–10.

Plaintiff's allegations, even if true, do not support a determination that Jensen acted maliciously or sadistically. Interestingly, in his objections to the Report–Recommendation, plaintiff admits that the kick was of limited duration. In the balance of his objection plaintiff merely reiterates his opinion that the evidence submitted supports an inference of malice. The Court concludes that

2000 WL 949457

the conduct alleged is not sufficiently serious or harmful to reach constitutional dimensions. Accordingly, defendants are entitled to summary judgment dismissing plaintiff's excessive force claim.

### D. *Access to the Courts*

Plaintiff alleges that he was denied access to the courts as a result of cell searches, confiscation of documents and denial of supplies between August and November 1996. Plaintiff alleges that these actions were motivated to frustrate his efforts to litigate.

 **\*5** Magistrate Judge Homer recommended that the defendant's motion to dismiss this claim should be granted. The Magistrate Judge found that plaintiff's claim of denial of access to the courts was unsubstantiated with any evidence which demonstrated that plaintiff had suffered any actual injuries from any alleged wrongful conduct. To the contrary, Magistrate Judge Homer concluded that plaintiff's claims were supported by a thirty-five page memorandum of law containing both case and statutory authority as well as an exhibit related to state court proceedings—all of which demonstrated plaintiff's full and adequate ability to litigate his claims.

It is well established that prisoners have a constitutional right to access the courts. "To state a claim that his constitutional right to access the court was violated, plaintiff must allege facts demonstrating that defendants deliberately and maliciously interfered with his access to the courts, and that such conduct materially prejudiced a legal action he sought to pursue." *Smith v. O'Connor,* 901 F.Supp. 644, 649 (S.D.N.Y.1995); *see Morello v.. James,* 810 F.2d 344, 347 (2d Cir.1987). In other words, in order to establish a violation of his right of access to the courts, an inmate must demonstrate that he has suffered or imminently will suffer actual harm in presenting a claim to the court. *Lewis v. Casey,* 518 U.S. 343 (1996).

In his objections to the Report–Recommendation, plaintiff restates arguments already considered by Magistrate Judge Homer. He states that "[p]laintiff further reiterates that he has incurred irreparable harm and injury as a result of the lack of legal services he received while confined in Coxsackie SHU." Plaintiff goes on to note that his complaints would not have been able to have been brought had he not been transferred to the Elmira Correctional Facility. Implicit in this statement is that plaintiff was in fact allowed to bring his claims. Assuming *arguendo* that plaintiff was not allowed to bring his

claims until after transfer, the fact still remains that plaintiff did in fact have the ability to air his grievances. Therefore, at best, plaintiff's hardship was delay in bringing his claims. As plaintiff has not established how such an alleged delay has prejudiced his rights or amounted to an injury, he fails to make the requisite showing of actual injury for a successful claim. As such, the Court accepts Magistrate Judge Homer's recommendation and grants defendant's motion as to this claim.

### E. *Sexual Harassment*

With respect to plaintiff's sexual harassment claim, Magistrate Judge Homer concluded that plaintiff failed to establish an actionable case. Magistrate Judge Homer found that the conduct involved was *de minimus* and, therefore, did not violate a constitutionally protected right.

Sexual abuse of an inmate by a corrections officer may reach constitutional dimensions and give rise to an Eighth Amendment claim. *Boddie v. Schnieder,* 105 F.3d 857, 859 (2d Cir.1997). When reviewing an Eighth Amendment claim stemming from an allegation of sexual abuse, a Court must consider whether the conduct alleged is sufficiently serious to violate contemporary standards of decency and cause severe physical and psychological harm. *Id* at 861. The Court must further consider whether the prison official involved possessed a sufficiently culpable state of mind. Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may be sufficient evidence of a culpable state of mind. *Id.* at 861.

 **\*6** As set forth above, plaintiff claims that defendants Weeks and Witbeck, each on one occasion, conducted pat frisks in an improper manner. Assuming the truth of these allegations for the purposes of these motions, they are not sufficiently serious to violate contemporary standards of decency and cause severe physical and psychological harm. Plaintiff has failed to demonstrate any severe physical or psychological harm that he has suffered as a result of the alleged harassment. Thus, plaintiff's allegations of sexual abuse fail to state a claim cognizable under the Eighth Amendment. Defendants are therefore entitled to summary judgment dismissing this claim.

### F. *Cell Searches*

Plaintiff alleges that he was subjected to cell searches which were designed to harass. Plaintiff's initial pleadings merely

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 369 of 529
Moncrieffe v. Witbeck, Not Reported in F.Supp.2d (2000)
2000 WL 949457

allege same with no evidence to support the claim. As a result, Magistrate Judge Homer concluded that plaintiff's claim was without merit and recommended that defendant's motion be granted.

"[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell," *Hudson v. Palmer,* 468 U.S. 517, 526 (1984), even where the search is retaliatory in nature. *Higgins v. Coombe,* 1997 WL 328623, at *7 (S.D.N.Y.1997). Prisoners do, however, enjoy Eighth Amendment protection from searches that lack any legitimate penological interest and are intended solely to harass. *Nilsson v. Coughlin,* 1987 WL 129823, at *4 (S.D.N.Y.1987), see also *Hudson* at 530.

Plaintiff fails to raise anything in his objections to the Magistrate Judge's Report–Recommendation which would warrant disturbing the sound conclusion and recommendation found therein. As Magistrate Judge Homer correctly stated the law with respect to plaintiff's claim, and since plaintiff fails to provide any evidence to support his argument that the alleged searches were improper, the Court concludes that this claim is without merit and grants defendant's motion.

G. *Deprivation of Food and Recreation*

Prison officials have a duty under the Eighth Amendment to provide humane conditions of confinement: adequate food, clothing, shelter and medical care. Denial of a minimal civilized measure of life's necessities violates the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825 (1994). Depriving an inmate of food or serving him contaminated food may constitute a violation of the Eighth Amendment. *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983); *Odom v. Sielaff,* 1995 WL 625786, at *5 (E.D.N.Y.1995); *see also Rhodes v. Chapman,* 452 U.S. 337, 348 (1981).

Plaintiff alleges that corrections officer Witbeck denied him food on six occasions and on at least two occasions contaminated his food with spit or perfume. In support of their motion to dismiss, defendants rely on an affidavit from Witbeck denying the allegations. Defendants also rely on copies of logbook entries for the SHU in which plaintiff was housed. Because these logbooks do not contain clear entries for some of the dates in issue and would not likely reflect the wrongful denial of meals to an inmate by a corrections officer, they do not establish as a matter of law that defendants never denied plaintiff food. Credibility assessments and choices between conflicting versions of events are matters for a fact-

finder at trial, not for the Court on a summary judgment motion. *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997). Thus, plaintiff's motion and defendants' cross-motion for summary judgment are denied with respect to the issue of whether plaintiff's Eighth Amendment rights were violated by deprivation of food.

*7 Plaintiff further alleges that he was deprived of his Eighth Amendment rights where he was allegedly denied recreation on a single occasion. Magistrate Judge Homer concluded that denial of recreation on a single occasion was not sufficiently serious to support a constitutional claim. Plaintiff does not object to these recommendations.

Although prisoner's have a constitutional right to exercise, a claim alleging deprivation of this right requires a showing of a serious deprivation and deliberate indifference on the part of prison officials. *Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996); *Barnham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996). As illustrated by the Report–Recommendation, denial of recreation for eighteen out of nineteen days has been upheld in the Second Circuit and denials of up to seventy-five days have been upheld elsewhere. *Arce v. Walker,* 907 F.Supp. 658 (W.D.N.Y.1995), *aff'd in part, vacated in part* 139 F.3d 329 (2d Cir.1998); *Green v. Ferrell,* 801 F.2d 765 (5th Cir.1986).

Based on the foregoing, the Court concludes that the alleged denial of recreation on a single occasion does not support a claim for deprivation of constitutional rights. Accordingly, defendant's motion is granted with respect to this element of plaintiff's claim.

*CONCLUSION*

After a careful review of the file, party submissions and applicable law, it is hereby

ORDERED that Magistrate Judge Homer's Report–Recommendation dated December 23, 1998 is ACCEPTED IN FULL; and it is further

ORDERED that plaintiff's motion for summary judgment is DENIED in all respects; and it is further

ORDERED that defendant's cross-motion for summary judgment be DENIED with respect to plaintiff's claim against

**Moncrieffe v. Witbeck, Not Reported in F.Supp.2d (2000)**

2000 WL 949457

defendant Witbeck regarding the alleged deprivation of food and GRANTED in all other respects.

IT IS SO ORDERED

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 949457

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings**

There are no Filings for this citation.

**History**

There are no History results for this citation.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 373 of 529

Celestin v. Angeletta, Not Reported in Fed. Supp. (2021)

2021 WL 1062344

KeyCite Yellow Flag

Distinguished by Kirton v. Doe,  S.D.N.Y.,  March 21, 2023

2021 WL 1062344
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Ricky CELESTIN, Plaintiff,
v.
Captain ANGELETTA, et al., Defendants.

19 CV 1887 (NSR)
|
Signed 03/19/2021

**Attorneys and Law Firms**

Ricky Celestin, Valhalla, NY, pro se.

Jane Hogan Felix, Westchester County Attorney's Office, White Plains, NY, for Defendants.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

**\*1**  *Pro se* Plaintiff Ricky Celestin ("Plaintiff") commenced this action under 42 U.S.C. § 1983 ("Section 1983") against Defendants Captain Angeletta, [1] Sergeants Hollis and Davis, Officers Moore, Cardillo, Rodrigues, Maganello, Albohn, and Adames (collectively, "Defendants") for alleged violations of his right to be free from excessive force under the Due Process Clause of the Fourteenth Amendment. Defendants moved to dismiss arguing that Plaintiff has not pled a cognizable Section 1983 violation under the Fourteenth Amendment. ("Defs.' Mem." (ECF No. 23).) For the following reasons, Defendants' Motion is GRANTED.

[1]    There is a discrepancy in the spelling of Captain Angeletta's name. Defendants' Motion to Dismiss refers to him as Captain Angelotta. The Court will use "Angeletta" for clarity.

**BACKGROUND**

The facts herein are drawn from Plaintiff's Complaint (ECF No. 2) and the Court accepts those facts as true for purposes of this motion.

**I. Plaintiff's Allegations**

Plaintiff alleges that on February 2, 2019, while he was a pretrial detainee, Defendants violated his constitutional rights by assaulting him. (Compl. at 2.) Plaintiff alleges that a sergeant pepper sprayed him for "no apparent reason," and that Plaintiff pushed towards the pepper spray in an attempt to shield his body and face from the "chemical agent." (Compl. at 4.) Plaintiff alleges that the Emergency Response Team ("ERT") then arrived and took control of the situation. They punched, kicked and elbowed every part of Plaintiff's body until he fell to the floor, still trying to get "the mace" out of his eyes. (Compl. at 4). Plaintiff was on the floor, in full body restraints, and ERT continued their assault. ERT screamed at Plaintiff to stop resisting. Plaintiff alleges that ERT deliberately slapped cuffs on Plaintiff's wrists and ankles and tightened the restraints, which cut off Plaintiff's circulation, pinched his skin, and caused abrasions. When ERT escorted Plaintiff to the Solitary Housing Unit, they continued whispering obscenities to him and threatening future assaults. (Compl. at 4.)

Plaintiff further alleges that the pepper spray and beatings caused abrasions to his wrist and ankles; chronic back pain; eye blurriness; excruciating neck pain; overall shooting body pains; mental deterioration, and mental anguish. (Compl. at 5.)

**II. Procedural History**

Plaintiff filed his Complaint on February 26, 2019 seeking (1) an injunction to stop the unnamed Sergeant and other corrections officers from using pepper spray without cause; and (2) transfer him out of the Westchester County Jail correctional system. (ECF No. 2.). The Court granted Plaintiff's request to proceed in forma pauperis (ECF No. 5), and directed the Clerk of Court and the U.S. Marshals to effect service on Plaintiff's behalf (ECF No. 6). By order dated May 29, 2020, the Court granted Defendants leave to file their Motion to Dismiss. (ECF No. 18.) Defendants filed an affidavit indicating that they served the Court's order on Plaintiff by mail at his last known address, which Plaintiff had not provided to the Court, because Plaintiff was released from jail on April 11, 2019. (ECF No. 18.) Defendants subsequently served their Motion to Dismiss on Plaintiff by mail on July 14, 2020 at Plaintiff's last known

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 374 of 529

Celestin v. Angeletta, Not Reported in Fed. Supp. (2021)

2021 WL 1062344

address. (ECF No. 20.) By letter dated August 27, 2020, Defendants indicated that Plaintiff had not opposed their Motion and asked the Court to treat the Motion as fully submitted. (ECF No. 25.) The Court granted this request by order dated December 23, 2020. (ECF No. 26.) The Clerk of Court mailed a copy of the Court's Order to Plaintiff at the address on ECF—Westchester County Jail—however, that mailing was returned as unable to forward. To date, Plaintiff has not informed the Court of his new address so ECF still lists his address as Westchester County Jail.

## LEGAL STANDARDS

 **\*2**  Under Federal Rule of Civil Procedure 12(b)(6), a court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, but the court is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.* (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678, 129 S.Ct. 1937.

Plaintiff in this case is a *pro se* litigant and therefore the Court is obligated to construe his pleadings liberally. *Thomas v. Colletti*, No. 13-CV-04827, 2014 WL 1329947, at \*1-2 (S.D.N.Y. Mar. 28, 2014). A court must read *pro se* complaints " 'to raise the strongest arguments that they suggest.' " *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006) (internal quotation marks omitted); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("[E]ven after *Twombly*, though, we remain obligated to construe a pro se complaint liberally."). However, even *pro se* plaintiffs' pleadings asserting civil rights claims must "contain factual allegations sufficient to raise a right to relief above the speculative level." *Jackson v. N.Y.S. Dep't of Labor*, 709 F.Supp.2d 218, 224 (S.D.N.Y. 2010) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955) (internal quotation marks omitted). "Dismissal is justified, therefore, where 'the complaint lacks an allegation regarding an element necessary to obtain relief,' and therefore, the 'duty to liberally construe a plaintiff's complaint [is not] the

equivalent of a duty to re-write it.' " *Colletti*, 2014 WL 1329947, at \*1-2 (quoting *Geldzahler v. N.Y. Med. Coll.*, 663 F.Supp.2d 379, 387 (S.D.N.Y. 2009) (internal citations and alterations omitted)).

In a motion to dismiss pursuant to Rule 12(b)(6), a court is generally confined to the facts alleged in the complaint. *Marhone v. Cassel*, 2018 WL 4189518 at \*5 (S.D.N.Y. August 31, 2018). The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) "is merely to assess the legal feasibility of the complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)). [2]

[2]    In support of their motion, Defendants submitted a video that purportedly claims that no excessive force was used. They cite two cases in support of their request that the Court consider the video: *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) and *Alston v. Butkiewicu*, No. 3:09-CV-207 CSH, 2012 WL 6093887 at \*3-4 (D. Conn. 2012). However, those two cases refer to motions for summary judgment and not motions to dismiss. It would be inappropriate for the Court to weigh this evidence in a motion to dismiss and it would be premature to convert this motion to one for summary judgment based on the video alone before any discovery has occurred. Accordingly, the Court has not reviewed the video.

A court should allow the *pro se* plaintiff to amend his or her complaint at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (internal quotation marks omitted); see *Colletti*, 2014 WL 1329947, at \*4.

## DISCUSSION

 **\*3**  To state a Section 1983 claim, a plaintiff "must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. Cnty. of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997). In other words, to state a plausible

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 375 of 529

Celestin v. Angeletta, Not Reported in Fed. Supp. (2021)

2021 WL 1062344

Section 1983 claim, a plaintiff must allege both a violation of plaintiff's constitutional right and personal involvement of the defendant(s). *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); see also *Baker v. McCollan*, 43 U.S. 137, 140 (1979) ("The first inquiry in any § 1983 suit, therefore, is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.' ") (quoting 42 U.S.C. § 1983 (1996)). Excessive force is a violation of the Fourteenth Amendment's Due Process Clause. [3]

[3]    In their Motion to Dismiss, Defendants rely on an excessive force standard that applies to convicted prisoners under the Eighth Amendment. *See Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Hudson v. McMillian*, 503 U.S. 1, 7-8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). Since Plaintiff is a pretrial detainee, the Court applies the objective reasonableness standard for Fourteenth Amendment Due Process Clause violations.

Defendants contend that Plaintiff has failed to allege both a constitutional violation and personal involvement. The Court will address each issue in turn.

**I. Excessive Force**

A pretrial detainee's claims "are evaluated under the Due Process Clause because, '[p]retrial detainees have not been convicted of a crime and thus 'may not be punished in any manner - neither cruelly and unusually nor otherwise.' " *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (quoting *Iqbal v. Hasty*, 490 F.3d 143,0 168 (2d Cir. 2007) *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). Under *Kingsley v. Hendrickson*, any time a prison guard engages in excessive force against a pretrial detainee, even if there is no evidence of serious injury, there is always a constitutional violation because "pretrial detainees (unlike convicted prisoners) cannot be punished at all[.]" 576 U.S. 389, 400, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015). In other words, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 576 U.S. at 396-7, 135 S.Ct. 2466.

A factfinder must apply an "objective reasonableness" standard that "turns on the facts and circumstances of each particular case." *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 252 (2d Cir. 2020) (quoting *Kingsley*, 576 U.S. at 397, 135 S.Ct. 2466). Important factors to consider include "the

relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397, 135 S.Ct. 2466. The factfinder must also "take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). Balancing those needs, force which "is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose" fails the test. *Kingsley*, at 398, 135 S.Ct. 2466 (quoting *Cf. Block v. Rutherford*, 468 U.S. 576, 585-586, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984)). Moreover, "claims for excessive force under the Fourteenth Amendment must involve force that is either 'more than de minimis' or 'repugnant to the conscience of mankind.' " *Lewis v. Huebner*, No. 17-CV-8101, 2020 WL 1244254, at *5 (S.D.N.Y. Mar. 16, 2020) (citing *United States v. Walsh*, 194 F.3d 37, 48 (2d Cir. 1999)).

**A. Pepper Spray**

**\*4** Plaintiff alleges a sergeant pepper sprayed him for "no apparent reason" and that he was not resisting the sergeant. Pepper spray can be considered objective excessive force. In the case of a pretrial detainee who was pepper sprayed while restrained, the "Second Circuit has recognized, 'infliction of pepper spray' may have 'a variety of incapacitating and painful effects, and as such, its use constitutes a significant degree of force' " *Toliver v. N.Y.C. Dep't of Corr.*, 202 F.Supp.3d 328, 335 (S.D.N.Y. 2016) (quoting *Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010)). Here, Plaintiff alleges he suffered more than *de minimis* harm from the pepper spray and assault, including: abrasions to his wrist and ankles, chronic back pain, eye blurriness, excruciating neck pain, overall shooting body pains, mental deterioration and mental anguish. Plaintiff's allegations of objective force without reason sufficiently meets the *Kingsley* standard for a violation of constitutional rights.

**B. Assault**

Plaintiff accuses the ERT officers of punching, kicking, elbowing, every part of his body, even after Plaintiff was put in full body restraints and on the ground. Where an arrestee brought a Section 1983 claim for excessive force,

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 376 of 529

Celestin v. Angeletta, Not Reported in Fed. Supp. (2021)

2021 WL 1062344

the court in *Bueno Diaz v. Mercurio*, held that while " 'not every push or shove' violates the [Constitution], [p]laintiff claims that he was punched, kicked, choked, hit with the butts of the officers' pistols ... [t]hese actions, assumed true for the purposes of deciding the motion to dismiss, exceed reasonable force." 442 F.Supp.3d 701, 713 (S.D.N.Y. 2020) (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865). Additionally, the Second Circuit has held that, "an officer cannot strike an individual who is compliant and does not pose an imminent risk of harm to others." *Frost*, 980 F.3d at 257. The force Plaintiff alleges, even after being restrained and on the ground, fails an objective reasonableness standard for similar reasons as the pepper spray. Both are more than de minimis uses of force with no obvious governmental purpose.

**II. Personal Involvement**

Since Plaintiff has plausibly alleged that excessive force was used, the Court next considers whether Plaintiff has stated a claim against any of the named officials. To state a plausible Section 1983 claim, Plaintiff must allege each Defendant's personal involvement in the alleged attack. Deliberate indifference in this context "means the official must 'know [ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Tangreti v. Bachmann*, 983 F.3d 609, 619 (2d Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Under Section 1983, a plaintiff "must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability." *Id.* at 620.

A. Captain David Angeletta

Plaintiff's claim against Captain David Angeletta fails because Plaintiff does not connect Captain Angeletta to the purported assault. Under *Tangreti*, a Plaintiff must establish a tangible connection between the Captain and the alleged constitutional amendment violations " 'through the official's own individual actions, has violated the Constitution.' " 983 F.3d at 618 (quoting *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937). Merely being in the chain of command or a supervisory role is not enough to satisfy this standard. Plaintiff must allege Captain Angeletta's direct role in the assault or his supervisory role as one of deliberate indifference. The "deliberate-indifference standard 'require[es] a showing that the official was subjectively aware of the risk,' " *Farmer*, 511 U.S. at 829, 114 S.Ct. 1970. Since Plaintiff does not allege Captain Angeletta's direct role, Plaintiff has not stated a plausible claim against Captain Angeletta. *Costello v. City of Burlington*, 632 F.3d 41, 48-49 (2d Cir. 2011) (holding that failure to establish personal involvement is "fatal" for a claim under Section 1983).

B. Defendant Sergeants Kevin Hollis and Alexander Davis

**\*5** Plaintiff alleges that "[t]he Sergeant" pepper sprayed him "for no apparent reason." However, Plaintiff's use of "[t]he Sergeant" does not sufficiently identify which of the two sergeants he named as Defendants, if either, used the pepper spray. In addition, Plaintiff does not mention a second sergeant in his description of the assault. Since Plaintiff must plead and prove "that each Government-official defendant, through the official's own individual actions, has violated the Constitution," *Tangreti*, 983 F.3d at 618 (quoting *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937), his claims against the unnamed sergeant(s) fail because he does not specify or detail the actions of each sergeant individually such that either or each personally violated Plaintiff's rights.

C. Correction Officers Todd Moore, Dean Cardillo, Michael Rodrigues, Frank Maganello, Thomas Albohn, Juan Adames

Plaintiff plausibly alleges that the ERT officers violated his rights. While Plaintiff does not specifically mention the names of the ERT officers in his description of the assault, read liberally, his complaint alleges that the six officers, Moore, Cardillo, Rodrigues, Maganello, Albohn, and Adames makeup the ERT staff who carried out the alleged assault. *See Messina v. Mazzeo*, 854 F.Supp. 116, 125-26 (E.D.N.Y. 1994) (holding: plaintiff's reference to defendants collectively as "defendant Police Officers" is sufficient to withstand a motion to dismiss on personal involvement grounds because "[i]t would be asking too much for an arrestee to remember and plead the role each of several police officers played in an alleged instance of police brutality").

**III. Relief**

Even if Plaintiff has stated a claim against the six ERT officers, he does not seek any viable relief. A plausible request for relief is necessary to establish standing in a federal court. *Deshawn E. v. Safir*, 156 F.3d 340, 342 (2d Cir. 1998). A Section 1983 claim allows for both monetary and injunctive relief, *Jackson v. Dep't of Corr.*, 20-CV-9420, 2021

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 377 of 529
Celestin v. Angeletta, Not Reported in Fed. Supp. (2021)
2021 WL 1062344

WL 706828 (S.D.N.Y. Feb. 22, 2021), and "when sued for prospective injunctive relief in his official capacity, a state officer is a 'person' for the purposes of Section 1983," *Stack v. Hartford,* 170 F.Supp.2d 288, 293 (D. Conn. 2001) (quoting *Graham,* 473 U.S. at 167, 105 S.Ct. 3099).

In *City of Los Angeles v. Lyons,* plaintiff sought injunctive relief against the use of choke holds "except in situations where the proposed victim of said control reasonably appears to be threatening the immediate use of deadly force." 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). *Lyons* held: (1) "[a]bstract injury is not enough"; (2) plaintiff must be in danger "of sustaining some direct injury" because of the challenged conduct and (3) the threat of injury must be "real and immediate," not "conjectural" or "hypothetical." 461 U.S. at 101-2, 103 S.Ct. 1660. The Second Circuit has held that a plaintiff must prove "(1) he or she has suffered an injury; (2) the injury is traceable to the defendants' conduct; and (3) a federal court decision is likely to redress the injury." *Deshawn E.,* 156 F.3d at 344. Injunctive or declaratory relief "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future." *Id.*

Plaintiff seeks two forms of injunctive relief: (1) relocation to another facility, and (2) control on the use of force (pepper spray). As explained below, neither is a viable remedy for Plaintiff's allegations on the current record.

As to the requested transfer, Plaintiff no longer resides at Westchester County Jail so he can neither be relocated nor is there "likelihood that he or she will be injured in the future." *Deshawn E.,* 156 F.3d at 341.

As to the use of pepper spray, even if Plaintiff were still at Westchester County Jail, Plaintiff's request for injunctive relief from pepper spray use would likely not be valid under *Lyons* because he has not alleged that he is likely to be pepper sprayed again. To obtain such relief, Plaintiff would need to allege that a repeated assault was likely and not speculative, and that the correction facility had officially endorsed policies of excessive use of force in non-resisting situations. Moreover, whether the use of pepper spray is excessive force requires a case by case factual determination which must be resolved by the trier of fact. *See Brown v. City of New York,* 798 F.3d 94, 103 (2d Cir. 2015) (holding that whether use of pepper spray constituted excessive force was a factual determination for the jury to determine guided by their collective common sense and life experiences).

## CONCLUSION

**\*6** For the foregoing reasons, Defendants' Motion to Dismiss the Complaint for failure to state a cognizable Section 1983 claim is GRANTED and the Court dismisses Plaintiff's claims without prejudice. Plaintiff may file an Amended Complaint consistent with this Opinion on or before April 22, 2021, should he choose to reassert his claims against Defendants of acts or omissions which were directly involved in the alleged deprivation of his federal rights and request a valid form of relief.

Because the Amended Complaint will completely replace, not supplement, the original Complaint, any facts or claims that Plaintiff wishes to remain must be included in the Amended Complaint. An Amended Civil Rights Complaint form is attached to this Opinion.

If Plaintiff elects to file an Amended Complaint, Defendants shall have thirty days from the date of Plaintiff's filing to respond. If Plaintiff does not timely file an Amended Complaint by April 22, 2021, and he cannot show good cause to excuse such a failure, the claims dismissed without prejudice by this Order will be deemed dismissed with prejudice, and the case will be closed.

SO ORDERED.

Attachment

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 378 of 529

Celestin v. Angeletta, Not Reported in Fed. Supp. (2021)

2021 WL 1062344

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

_____ CV _____
Write the full name of each plaintiff.          (Include case number if one has been assigned)

-against-                          AMENDED
                                   COMPLAINT
_____        (Prisoner)

_____        Do you want a jury trial?
                                        ☐ Yes    ☐ No
_____

Write the full name of each defendant. If you cannot fit the names of all of the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section IV.

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

Rev. 5/2016

---

**I.    LEGAL BASIS FOR CLAIM**

State below the federal legal basis for your claim, if known. This form is designed primarily for prisoners challenging the constitutionality of their conditions of confinement; those claims are often brought under 42 U.S.C. § 1983 (against state, county, or municipal defendants) or in a "Bivens" action (against federal defendants).

☐ Violation of my federal constitutional rights

☐ Other:

**II.    PLAINTIFF INFORMATION**

Each plaintiff must provide the following information. Attach additional pages if necessary.

_____    _____    _____
First Name       Middle Initial   Last Name

State any other names (or different forms of your name) you have ever used, including any name you have used in previously filing a lawsuit.

Prisoner ID # (if you have previously been in another agency's custody, please specify each agency and the ID number (such as your DIN or NYSID) under which you were held)

_____
Current Place of Detention

_____
Institutional Address

_____    _____    _____
County, City             State         Zip Code

**III.    PRISONER STATUS**

Indicate below whether you are a prisoner or other confined person:

☐ Pretrial detainee
☐ Civilly committed detainee
☐ Immigration detainee
☐ Convicted and sentenced prisoner
☐ Other:

Page 2

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 379 of 529

**Celestin v. Angeletta, Not Reported in Fed. Supp. (2021)**
2021 WL 1062344

## IV. DEFENDANT INFORMATION

To the best of your ability, provide the following information for each defendant. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are identical to those listed in the caption. Attach additional pages as necessary.

**Defendant 1:**

| First Name | Last Name | Shield # |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
|---|---|---|

**Defendant 2:**

| First Name | Last Name | Shield # |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
|---|---|---|

**Defendant 3:**

| First Name | Last Name | Shield # |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
|---|---|---|

**Defendant 4:**

| First Name | Last Name | Shield # |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
|---|---|---|

Page 3

## V. STATEMENT OF CLAIM

Place(s) of occurrence:

Date(s) of occurrence:

**FACTS:**

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and how each defendant was personally involved in the alleged wrongful actions. Attach additional pages as necessary.

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

## VI. RELIEF

State briefly what money damages or other relief you want the court to order.

Page 4

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 380 of 529

Celestin v. Angeletta, Not Reported in Fed. Supp. (2021)

2021 WL 1062344

**VII.  PLAINTIFF'S CERTIFICATION AND WARNINGS**

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I understand that if I file three or more cases while I am a prisoner that are dismissed as frivolous, malicious, or for failure to state a claim, I may be denied *in forma pauperis* status in future cases.

I also understand that prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions, 42 U.S.C. § 1997e(a), and that my case may be dismissed if I have not exhausted administrative remedies as required.

I agree to provide the Clerk's Office with any changes to my address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| | |
|---|---|
| Dated | Plaintiff's Signature |

| | | |
|---|---|---|
| First Name | Middle Initial | Last Name |

Prison Address

| | | |
|---|---|---|
| County, City | State | Zip Code |

Date on which I am delivering this complaint to prison authorities for mailing.

Page 6

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1062344

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 7:19-CV-01887**<br>Celestin v. Angeletta et al | — | S.D.N.Y. | Feb. 26, 2019 | Docket |

**History**

There are no History results for this citation.

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 383 of 529

Urena v. City of New York, Not Reported in Fed. Supp. (2024)

2024 WL 4149182
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Amaury URENA, Plaintiff,

v.

The CITY OF NEW YORK; Captain Terrance Shaw; Co
Ingram Laguerre; and Co Abraham Ortiz, Defendants.

No. 22-CV-4679 (RA)
|
Signed September 10, 2024

**Attorneys and Law Firms**

Amaury Urena, East Elmhurst, NY, Pro Se.

Bailey Forcier, New York City Law Department, New York,
NY, for Defendant Abraham Ortiz.

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

 **\*1**  Plaintiff Amaury Urena brings this action against Captain
Terrance Shaw, Correction Officers Ingram Laguerre and
Abraham Ortiz, and the City of New York ("Defendants").
Urena, a pre-trial detainee on Rikers Island, alleges that
Defendant Shaw used excessive force against him during a
strip search, in violation of 42 U.S.C. § 1983; that Defendants
Laguerre and Ortiz acted with deliberate indifference to
unlawful conditions of confinement, also in violation of
42 U.S.C. § 1983; and that all Defendants violated his
rights under the New York City Administrative Code. Now
before the Court are the parties' cross-motions for summary
judgment. For the reasons that follow, Plaintiff's motion is
denied in full, while Defendants' motion is granted in part
and denied in part. In particular, Defendants' motion is denied
with respect to Urena's excessive force claim under 42 U.S.C.
§ 1983 against Shaw, but granted as to Urena's remaining
claims.

**BACKGROUND**

The following facts are drawn from the pleadings, the parties'
Rule 56.1 Statements, and their opposition papers.[1] The facts
cited are undisputed unless otherwise noted. On April 21,

2022, Urena was housed at the North Infirmary Command on
Rikers Island as a pre-trial detainee. Dkt. No. 44 ("Def. 56.1
Statement") ¶ 1. That morning, he started a fire in his cell
because, he asserts, he was "feeling suicidal" and was in a
"deep depression" after officers gave his "bag of commissary
away." Dkt. No. 48 ("Pl. 56.1 Statement") ¶ 2; *see* Dkt. No.
43 ("Forcier Decl."), Ex. A ("Pl. Tr.") at 15.[2]  Later that
day, Shaw, Laguerre, and Ortiz escorted him to a single-
person intake cell "to be searched for contraband before being
transferred to a different facility." Def. 56.1 Statement ¶¶
3–4. The intake cell was entirely enclosed by a chain-link
structure. *See* DOC Genetec Video Footage ("DOC Footage")
at 18:10:58–18:11:03. Initiating a strip search, Defendants
instructed Urena to remove his clothing. Def. 56.1 Statement
¶¶ 3–4. Although he did remove his clothes, Urena "refused
to comply with the search by not showing both of his hands
at the same time and moving to the back of the search pen."
*Id.* ¶ 5; *see* DOC Footage at 18:00:14–18:09:25. Defendants
then left Urena alone in his intake cell for approximately ten
minutes, although Shaw returned periodically in an attempt
to gain Urena's compliance. Def. 56.1 Statement ¶¶ 6–7.
Urena asserts that, during this time, Shaw "threatened the
deployment of chemical agents." Pl. 56.1 Statement ¶ 3.[3]
Eventually, Urena complied with the strip search and the
officers returned his clothes. Def. 56.1 Statement ¶¶ 9–10.

[1]   In light of the "special solicitude" afforded to
     *pro se* litigants "when confronted with motions
     for summary judgment," *Graham v. Lewinski*,
     848 F.2d 342, 344 (2d Cir. 1988), the Court has
     "endeavored to discern from the record if there is
     any evidentiary support for the assertions contained
     in the [c]omplaint ... and to determine if there
     are any other material issues of fact based on
     the evidence in the record." *Cherry v. Byram
     Hills Cent. Sch. Dist.*, No. 11-cv-3872, 2013 WL
     2922483, at *2 (S.D.N.Y. June 14, 2013); *see
     Geldzahler v. N.Y. Med. Coll.*, 746 F. Supp. 2d
     618, 620 n.1 (S.D.N.Y. 2010). Defendants argue
     that some of Urena's statements, without citation
     to admissible evidence, violate Local Rule 56 and
     should be disregarded entirely. *See* Dkt. No. 50
     ("Def. 56.1 Response") ¶¶ 1–2 & n.1, ¶ 8. The
     Court, however, has "in its discretion opt[ed] to
     conduct an assiduous review of the record even
     where one of the parties" failed to comply with
     local rules. *Holtz v. Rockefeller & Co.*, 258 F.3d
     62, 73 (2d Cir. 2001), *abrogated in part on other*

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 384 of 529

Urena v. City of New York, Not Reported in Fed. Supp. (2024)

grounds by *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

2    Defendants dispute Urena's assertion that officers gave his commissary items away. Def. 56.1 Response ¶ 2.

3    Defendants dispute that Shaw "threatened the deployment of chemical agents," Def. 56.1 Response ¶ 3, although it appears from the video footage that Shaw was holding a spray can in his right hand during most, if not all, of Urena's strip search, *see* DOC Footage 18:09:27–18:11:03.

**\*2** As Urena dressed, however, he began to argue with Shaw. *Id.* ¶ 11; Pl. Tr. at 27. During the argument, Urena used vulgar, antagonistic language, which he alleges "ticked [Shaw] off." Pl. Tr. at 27. Urena also asserts that Shaw "argu[ed] back and forth" with him, and taunted him by saying, "[w]hat you gonna do about it? I do what I want." *Id.* He further maintains that Shaw "read[ied] himself for the premeditated deployment" of chemical spray. Pl. 56.1 Statement ¶ 7. Urena then spit at Shaw, who was standing several feet away, outside of Urena's locked cell. *See* DOC Footage at 18:09:27–18:11:12. [4] In response, Shaw immediately deployed chemical spray at Urena's face. *Id.*; *see* Def. 56.1 Statement ¶¶ 12–13. [5] Urena retreated to the corner of the intake cell, and Shaw briefly adjusted the direction of the chemical spray toward Urena before stopping. *See* DOC Footage at 18:11:00–18:11:03. The chemical spray deployment lasted approximately two seconds. *See id.* As a result, Urena says his "whole body felt like it was on fire," he "couldn't breathe" because his "lungs [were] closed in," and his "eyes felt blurry." Pl. Tr. at 32. Urena stumbled to the floor and remained there for approximately ten minutes before officers, dressed in decontamination gear, escorted him out of his cell. *See* DOC Footage at 18:11:24–18:22:35. He was then decontaminated and treated with pain medication. His pain subsided after twenty-four hours. Pl. Tr. at 32. He was later transferred to a different correctional facility. *Id.* at 34.

4    Although Urena denies doing so, it is clear from the video footage that that he did spit at Shaw. Defendants claim that Urena's saliva "ma[de] contact with [Shaw's] face," and that Shaw subsequently left the area to wash his face. Forcier Decl., Ex. C ("DOC Use of Force Report") at D000021–22, Ex. D ("DOC Use of Force Witness Report") at D000023. The holes in the chain-link

intake cell appear large enough for saliva to exit the cell. *See* DOC Footage at 18:10:58–18:11:03.

5    Urena alleges that Shaw deployed a "riot-sized can of chemical agent" that "is reserved only for situations where officers need to gain the compliance of an entire group" rather than an individual "already confined in a cell." Am. Compl. ¶ 32; *see* Dkt. No. 49 ("Pl. Br.") at 4. He defines this spray as "riot spray" and "chemical mace" in the amended complaint, and as "MK9 (bear repellent/pepper spray)" in his Memorandum of Law. *See* Am. Compl. ¶¶ 36, 40; Pl. Br. at 1. Defendants describe the chemical agent as "chemical spray" without specifying what type or whether its intended use is for groups or individuals. *See* Def. 56.1 Statement ¶ 13; Def. 56.1 Response ¶ 7.

Urena initiated this action, with the assistance of counsel, on June 3, 2022, and filed an amended complaint—the now operative complaint—on February 1, 2023. On September 8, 2023, Defendants filed a motion for summary judgment. Dkt. No. 42. On September 11, 2023, Urena, proceeding *pro se*, filed a cross-motion for summary judgment. Dkt. No. 49.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *WWBITV, Inc. v. Vill. of Rouses Point*, 589 F.3d 46, 49 (2d Cir. 2009). [6] A fact is material if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary [under the governing law] will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there is a genuine issue of material fact, the Court must view all facts in the light most favorable to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008). But where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 385 of 529

Urena v. City of New York, Not Reported in Fed. Supp. (2024)

6     Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, omissions, and alterations.

While "[t]he movant has the burden of showing that there is no genuine issue of fact," the non-moving party "is not thereby relieved of [her] own burden of producing in turn evidence that would support a jury verdict." *Anderson*, 477 U.S. at 256. In other words, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial" to defeat summary judgment. *Id.*; *see also Crawford-El v. Britton*, 523 U.S. 574, 600 (1998) ("[I]f the [defendant] has made a properly submitted motion [for summary judgment], the plaintiff ... must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden.").

**\*3** Lastly, it is "well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants, particularly where motions for summary judgment are concerned." *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016). Thus, "[c]ourts read the pleadings, briefs, and opposition papers of pro se litigants 'liberally and interpret them to raise the strongest arguments that they suggest.' " *Rivera v. Goulart*, No. 15-cv-2197, 2018 WL 4609106, at *2 (S.D.N.Y. Sept. 25, 2018) (quoting *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999)).

## DISCUSSION

### I. Excessive Force Claim

Urena first alleges that Shaw unlawfully used excessive force when he sprayed him with a chemical agent, in violation of the Fourteenth Amendment. Dkt. No. 19 ("Am. Compl.") ¶¶ 39–42. [7] Defendants respond that any use of force against Urena was "objectively reasonable and justified," and that, even, assuming *arguendo*, that Shaw violated Urena's constitutional rights, he is nevertheless entitled to qualified immunity. Dkt. No. 45 ("Def. Br.") at 4–7, 9–11. For the reasons that follow, the Court denies both parties' summary judgment motions as to this claim because a rational jury could find either that Shaw's actions were objectively reasonable or unreasonable, and because material, factual disputes exist that also preclude summary judgment on qualified immunity grounds at this time.

7     Urena brings his claim under 42 U.S.C. § 1983, which imposes civil liability on individuals, acting under color of state law, who deprive a plaintiff of any federal rights. *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980). "A pretrial detainee who is subjected to excessive force may bring a claim under § 1983." *Quinones v. Rollison*, No. 18-cv-1170, 2020 WL 6420181, at *3 (S.D.N.Y. Nov. 1, 2020).

### A. Objective Reasonableness of Force

The right of pretrial detainees to be free from excessive force is protected by the Due Process Clause of the Fourteenth Amendment. *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999); *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015). [8] To prevail on an excessive force claim, a pretrial detainee "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 576 U.S. at 396–97. When evaluating objective reasonableness, courts must consider the "facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. The Supreme Court has also provided several "potentially relevant" factors that "may bear on the reasonableness or unreasonableness of the force used," including: whether the amount of force was proportionate to the need for the use of force; the extent of the plaintiff's injury; whether an officer made efforts to limit the amount of force; the "severity of the security problem at issue"; whether the plaintiff was "actively resisting"; and "the threat reasonably perceived by the officer." *Kingsley*, 576 U.S. at 397.

8     While many excessive force claims invoke the Fourth Amendment's prohibition against unreasonable seizures or the Eighth Amendment's ban on cruel and unusual punishments, *Graham v. Connor*, 490 U.S. 386, 393–94 (1989), Urena's claim is governed by the Fourteenth Amendment. As a pretrial detainee, Urena is within the "legal twilight zone" between arrest and conviction. *Wilson v. Spain*, 209 F.3d 713, 715 (8th Cir. 2000). The Fourteenth Amendment establishes his right against excessive force because "[t]he touchstone of due process" is the "protection of the individual against arbitrary action of government." *Edrei v. Maguire*, 892 F.3d 525, 533 (2d Cir. 2018) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)). Fourth and Eighth Amendment excessive force cases are nonetheless instructive when evaluating the scope of a pretrial detainee's rights. *Hart v.*

Case 5:25-cv-00956-AJB-MJK  Document 9  Filed 12/08/25  Page 386 of 529

Urena v. City of New York, Not Reported in Fed. Supp. (2024)

*Suffolk Cnty.*, No. 17-cv-5067, 2023 WL 5720075, at \*14 n.15 (E.D.N.Y. Sept. 5, 2023).

**\*4** Courts must make an objective reasonableness determination from the perspective of a reasonable officer on the scene without hindsight bias, and, in the context of a correctional facility, they must consider the "legitimate interests" officers have in managing a facility, which include "preserv[ing] internal order and discipline" and "maintain[ing] institutional security." *Id.*; *see Graham*, 490 U.S. at 396–97 ("The calculus of reasonableness must embody allowance for the fact that ... officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a[n inmate's] constitutional rights." *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973). Nonetheless, when exercising any force, an officer must still show that the force was objectively "necessary and proportionate to the circumstances." *Edrei*, 892 F.3d at 540.

The use of pepper spray "constitutes a significant degree of force." *Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010). Accordingly, the Second Circuit has cautioned that pepper spray "should not be used lightly or gratuitously against an arrestee who is complying with police commands or otherwise poses no immediate threat to the arresting officer." *Id.* Given the "variety of incapacitating and painful effects" that pepper spray produces, *id.*, courts must carefully consider whether a detainee is "actively resisting" or poses a "threat to the safety of officers or others" when the officer deploys such force, *Jones v. Treubig*, 963 F.3d 214, 225 (2d Cir. 2020). When considering an excessive force claim on summary judgment, a court's role "is to determine whether a jury, instructed as to the relevant factors, could reasonably find that the force used was excessive." *Brown v. City of New York*, 798 F.3d 94, 103 (2d Cir. 2015).

Here, Defendants argue that Shaw's use of the spray was objectively reasonable, and therefore not excessive, under the circumstances. *See* Def. Br. at 5. They contend that Urena "provoked the incident" by spitting at Shaw, that Shaw only used a two-second burst of spray in response, that the force was necessary because Shaw "repeatedly refused to comply with orders, yelled, and acted aggressively," and that Urena's resulting injuries were mild. *Id.* at 5–7. Defendants also aver that Urena's "surprise attack" provoked a "split second decision" by Shaw, which itself "was a reasonable reaction ...

in order to restore and maintain discipline." *Id.* at 7. Thus, they argue, Urena's excessive force claim fails as a matter of law. *Id.*

As Defendants rightly note, it was Urena who provoked Shaw's use of the spray when he intentionally spat in Shaw's direction. Although Urena appears to contest Defendants' characterization of his abrupt spitting, *see* Pl. Br. at 6, the video evidence clearly corroborates Defendants' depiction of these events, *see* DOC Footage at 18:10:58–18:11:03. *See also Scott v. Harris*, 550 U.S. at 380. Under New York law, the act of spitting in someone's face may constitute civil assault and civil battery. *D.K. by L.K. v. Teams*, 260 F. Supp. 3d 334, 364 (S.D.N.Y. 2017); *see also United States v. Delis*, 558 F.3d 177, 183–84 (2d Cir. 2009) (holding that "offensive touching," which can include "spitting on another," constitutes simple assault, as criminalized by 18 U.S.C. § 113(a)(5)). The act of spitting may also reasonably require the use of some force "to control [a] plaintiff from committing further [such] acts." *Bonet v. Shaw*, 669 F. Supp. 2d 300, 304 (W.D.N.Y. 2009).[9] Thus, the use of some force may, in certain circumstances, be consistent with the legitimate law enforcement objectives of preventing further spitting and "preserv[ing] internal order and discipline." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). Defendants make this argument here, maintaining that one burst of the spray was a proportionate attempt "to stop the assault, restore order, and maintain discipline." *See* Def. Br. at 5.[10]

[9] For example, some courts have held that if a detainee spits at an officer, the officer may use a "spit mask" or "spit veil" to prevent repeated violations. *See, e.g.*, *Baltas v. Rivera*, No, 19-cv-1043, 2020 WL 6199821, at \*16 (D. Conn. Oct. 22, 2020) (also holding that "there are no reported cases in this circuit finding a constitutional right preventing" an officer's use of a spit veil).

[10] Defendants cite several district court decisions for the proposition that "a correction officer's use of pepper spray on an inmate who refuses to comply with orders in [an effort] to maintain or restore discipline and stop an assault is reasonable." Def. Br. 6. But each of those cases is distinguishable from this one in terms of the danger presented to the officer. In *Anderson v. Darby*, for example, a confined plaintiff "proceeded to grab [an officer's] right arm and pulled [him] into the feeding slot," ignoring "loud verbal commands" to release the

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 387 of 529

Urena v. City of New York, Not Reported in Fed. Supp. (2024)

officer before the officer deployed a chemical spray. No. 15-cv-0635, 2017 WL 933085, at *2 (E.D.N.Y. Feb. 13, 2017). Similarly, in *Frost v. Davis*, a plaintiff "abruptly" stood up and moved toward officers as they were exiting his cell and "pushe[d] into" an officer's shield before being tackled and sprayed with a chemical agent. No. 17-cv-8418, 2019 WL 4512620, at *3 (S.D.N.Y. Sept. 18, 2019); *see also Vazquez v. Spear*, No. 12-cv-6883, 2014 WL 3887880, at *1, 4–5 (S.D.N.Y. Aug. 5, 2014) (noting the plaintiff's active, physical resistance to being handcuffed and the officer's subsequent use of de minimis force to place the plaintiff in handcuffs). Defendants have provided no case more akin to this one—where an officer used chemical spray after an inmate spat at the officer from inside a locked cell. *See Lewis v. Clarkstown Police Dep't*, No. 11-cv-2487, 2014 WL 1364934, at *5 (S.D.N.Y. Mar. 31, 2014) (rejecting the argument that chemical spray "is always permitted simply because a detainee, confined to his cell, is noncompliant").

  **\*5** A reasonable jury might agree, but, weighing the following countervailing factors, it also might not.

First, a jury might be swayed by the fact that Urena was locked by himself in an enclosed, single-person intake cell when he spat at Shaw, who stood several feet away. *See* DOC Footage at 18:10:58–18:11:03. Unlike cases where chemical spray is deployed to break up fights or the environment otherwise presents a serious risk to officer safety, *see, e.g., Quinones*, 2020 WL 6420181 at *2, Defendants here faced no similar threat, *see Soto v. Bautista*, 2023 WL 2624785, at *4 (5th Cir. 2023) ("[W]e are unconvinced that spitting a single time poses more than a de minimis risk to an officer's safety."). A jury could thus find that Urena, spitting from within a locked enclosure, did not pose a serious "threat to the safety of officers or others." *Jones*, 963 F.3d at 225; *see also Tracy*, 623 F.3d at 98 ("conclud[ing] that a reasonable juror could find that the use of pepper spray deployed mere inches away from the face of a defendant already in handcuffs and offering no further active resistance constituted an unreasonable use of force" and denying summary judgment).

Second, Shaw deployed the spray immediately, without any attempt to deescalate the situation or use any other strategy to address Urena's actions. Recognizing that pepper spray "should not be used lightly or gratuitously" against individuals who pose "no immediate threat," *Tracy*, 623 F.3d

at 98, Shaw could have verbally warned Urena that any successive spitting would be met with chemical spray. Or he could have taken a few steps back and reprimanded Urena before resorting to the use of the spray. Although Shaw had a legitimate interest in preventing further spitting and maintaining order and discipline, a reasonable jury could find that—by immediately deploying the "incapacitating and painful" chemical spray, *Tracy*, 623 F.3d at 98—Shaw failed to reasonably "temper or ... limit the amount of force" used against Urena, *Kingsley*, 576 U.S. at 397. *See also Brown*, 798 F.3d at 102–03 (noting "the availability of a much less aggressive technique" for obtaining compliance); *Soto*, 2023 WL 2624785, at *4 (finding that force against a plaintiff who spat once at an officer reflected "an impulsive, violent response to perceived disrespect" rather than an objectively reasonable response).

Third, despite Urena's relatively short-lived injuries, even a single burst of chemical spray can constitute more than a de minimis use of force. *See, e.g., Javier v. Russo*, No. 21-cv-7097, 2023 WL 5532468, at *2, *7 (S.D.N.Y. Aug. 28, 2023) (rejecting defendant's argument that pepper spraying a plaintiff locked in his cell was a de minimis use of force); *Jones v. Wagner*, No. 20-cv-475, 2022 WL 1525134, at *2, *6 (D. Conn. May 13, 2022) (denying summary judgment where a defendant "deployed a single burst of chemical agent" in a plaintiff's face); *Mobley v. Mallow*, No. cv-18-3515, 2019 WL 6217881, at *6 (D. Md. Nov. 21, 2019) ("Use of a chemical agent against an inmate confined in a 'strip cage' is a nontrivial use of force."); *Tracey*, 623 F.3d at 98. Here, Shaw deployed the chemical spray into Urena's face from several feet away, and Urena's reaction—covering his eyes, retreating to the corner of his cell, and stumbling to the floor—evinces a painful experience. *See* DOC Footage at 18:10:58–18:12:13. Further, Urena remained on the floor for approximately ten minutes before officers removed him from the cell to be decontaminated. *Id.* at 18:11:24–18:22:35; Pl. Tr. at 34. A reasonable jury could therefore find that Shaw used more than de minimis force against Urena. *See Feliciano v. Thomann*, 747 F. App'x 885, 887 (2d Cir. 2019); *Edrei*, 892 F.3d at 540 (noting the "longstanding test" for excessive force claims that "force must be necessary and proportionate to the circumstances").

  **\*6** Ultimately, the "assessment of a jury is needed," *Brown*, 798 F.3d at 103, as to whether Shaw's use of force was proportionate to Urena's provocation. At the summary judgment stage, even when "most of the facts concerning the application of force are undisputed," the factual determination

of excessiveness is left to a jury, "whose collective common sense, informed by their life experiences, may well exceed" that of this Court. *Brown*, 798 F.3d at 103. In this case, a rational jury could conclude that Shaw's decision to deploy chemical spray was objectively reasonable or unreasonable under the circumstances.

**B. Qualified Immunity**

Shaw next argues that he is entitled to qualified immunity, thereby shielding him from liability at this stage in the litigation. The Court disagrees. The doctrine of qualified immunity serves to protect government officials from civil liability for actions taken under color of law. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In assessing whether officials are entitled to qualified immunity, courts conduct a two-step analysis, considering "(1) whether the facts presented make out a violation of a constitutional right; and (2) whether the right at issue was clearly established when it was allegedly violated." *Torcivia v. Suffolk Cnty.*, 17 F.4th 342, 367 (2d Cir. 2021). While the first inquiry necessary overlaps with whether there was a violation of Urena's Fourteenth Amendment rights, the second inquiry also "tends to converge with the first [inquiry] in excessive force cases, with the question ultimately being whether, in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed was lawful." *Weather v. City of Mount Vernon*, 474 F. App'x 821, 824 (2d Cir. 2012); *see Saucier v. Katz*, 533 U.S. 194, 210 (2001) (Ginsburg, J., concurring) (acknowledging that "paradigmatically, the determination of [officer] misconduct in excessive force cases and the availability of qualified immunity both hinge on the same question").[11]

[11] "Even where this convergence occurs, however, courts should" still address the "clearly established" prong. *Cowan ex rel. Est. of Cooper v. Breen*, 352 F.3d 756, 764–65 n.7 (2d Cir. 2003) (noting that "genuine issues of material fact" may preclude summary judgment on "both the question [of] whether [a defendant] used excessive force and the question [of] whether he reasonably believed that his use of force was lawful"); *see Pearson*, 555 U.S. at 236.

As discussed above, there is an open factual question as to whether Shaw violated Urena's constitutional rights. The first prong of the qualified immunity test thus does not foreclose

Urena's excessive force claim. The Court therefore turns to whether Shaw met his burden of establishing that the right to be free of the force at issue here was not clearly established. *Lewis*, 2014 WL 1364934, at *9; *see Pearson*, 555 U.S. at 227 (holding that, where a government official violates a plaintiff's constitutional rights, the doctrine of qualified immunity nonetheless shields that official from liability if "it was not clearly established at the time ... that [the officer's] conduct was unconstitutional").

"A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022). "This requires that controlling authority or a robust consensus of cases of persuasive authority have recognized the right at issue." *Id.* at 738–39. In excessive force cases, the ultimate question becomes "whether, in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed was lawful." *Weather*, 474 F. App'x at 824.

**\*7** As relevant here, the Second Circuit has held that it is "well established" that "the use of entirely gratuitous force is unreasonable and therefore excessive." *Tracy*, 623 F.3d at 99 n.5; *see Jones*, 963 F.3d at 226. It is also "beyond doubt that any reasonable ... officer would know that the use of ... pepper spray[ ] constitutes significant force," *Jones*, 963 F.3d at 226. In light of such precedent, "no reasonable officer could ... believe[ ] that he [is] entitled to use pepper spray gratuitously against a restrained and unresisting arrestee." *Tracy*, 623 F.3d at 99 n.5; *see also Taylor v. Nieves*, No. 17-cv-7360, 2020 WL 7028907, at *3 (S.D.N.Y. Nov. 30, 2020) ("Second Circuit precedent clearly disallows the gratuitous use of pepper spray against restrained individuals.").

The Supreme Court, moreover, has reiterated that "the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment," which can include force that is not "rationally related to a legitimate nonpunitive governmental purpose" or that "appear[s] excessive in relation to that purpose." *Kingsley*, 576 U.S. at 398; *see Graham*, 490 U.S. at 395 n.10 ("It is clear ... that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment."). Courts in this Circuit regularly find unconstitutional the intentional use of force that serves no legitimate, nonpunitive purpose. *See Moran v. Tesei*, No. 19-cv-722, 2023 WL 3570670, at *12 (D. Conn. May 19, 2023) (collecting cases); *Sanders v. Garden City Police Dep't*, No. 09-cv-2393, 2015 WL 5518589, at *7

Case 5:25-cv-00956-AJB-MJK   Document 9   Filed 12/08/25   Page 389 of 529

Urena v. City of New York, Not Reported in Fed. Supp. (2024)

n.2 (E.D.N.Y. Sept. 16, 2015) (noting that an officer's use of force would be excessive if the conduct "serv[ed] no purpose other than to inflict discomfort and pain").

The question of "whether a reasonable official would reasonably believe his conduct did not violate a clearly established right[ ] is a mixed question of law and fact." *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004). Thus, although a qualified immunity defense "can be disposed of by summary judgment where possible," summary judgment is not appropriate "when there are material factual disputes." *Stephenson v. Doe*, 332 F.3d 68, 76–77 (2d Cir. 2003). Indeed, the Second Circuit has cautioned that a jury must weigh in where excessive force and qualified immunity issues "overlap" due to material facts in dispute. *Id.* at 81. When this occurs, "the jury should decide these issues on special interrogatories." *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990); *see Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007); *Oliveira v. Mayer*, 23 F.3d 642, 650 (2d Cir. 1994).

"[A] judicial determination as to what a reasonably competent officer would conclude in a particular situation requires an objective factual determination as to the mindset of reasonably competent officers." *Brown v. City of New York*, No. 13-cv-1018, 2016 WL 1611502, at *6 (S.D.N.Y. Apr. 20, 2016), *aff'd*, 862 F.3d 182 (2d Cir. 2017). As the Circuit has explained, "it is the jury's province to resolve the reasonableness of an officer's perception of the facts that confronted him," and "those same facts ... can also sometimes be critical in deciding the [clearly-established step of a court's] qualified immunity analysis." *Jones*, 963 F.3d at 231.

As noted earlier, although video footage captures the incident in question, there remain disputed factual questions—such as the degree of risk that Urena posed to Shaw or others and whether Shaw deployed the spray for a legitimate or punitive purpose—that are material to whether it was objectively reasonable for Shaw to believe his use of force was lawful under the circumstances. Thus, the "assessment of a jury is needed in this case," *Brown*, 798 F.3d at 103, to determine, among other things, whether Shaw's force was "entirely gratuitous," *Ross v. Willis*, No. 16-cv-6704, 2021 WL 3500163, at *14 (S.D.N.Y. Aug. 9, 2021), not "rationally related to a legitimate nonpunitive governmental purpose," *Kingsley*, 576 U.S. at 398, or—if rationally related to a legitimate nonpunitive governmental purpose—"excessive in relation to that purpose," *id.*

*8 Other courts in this district have concluded as much in similar circumstances. For example, in *Wiggan v. NYC Dep't of Corrs.*, which concerned an officer's use of pepper spray on an inmate who had disobeyed orders but was confined in a cell, the court denied summary judgment because a factfinder might infer that the officer's use of the spray was "in retribution for plaintiff's refusal to obey his order and the disrespect he showed" rather than "in a good-faith effort to maintain or restore discipline." No. 12-cv-1405, at *1, *27 (S.D.N.Y. Aug. 21, 2014) (ECF No. 46), *report and recommendation adopted*, 2014 WL 4631456 (S.D.N.Y. Sept. 16, 2014). In *Ross v. Willis*, moreover, the court held that a defendant officer who pepper sprayed an inmate was not entitled to summary judgment on the basis of qualified immunity because there was a factual question as to whether the inmate, who had been confined to his cell, physically resisted attempts to be handcuffed. No. 16-cv-6704, 2021 WL 3500163, at *13–14 (S.D.N.Y. Aug. 9, 2021).

Accordingly, the Court denies the parties' cross-motions for summary judgment as to Urena's excessive force claim against Shaw.

## II. Deliberate Indifference Claims

Urena next argues that Laguerre and Ortiz failed to intervene, "leaving [him] naked inside of a search pen for a prolonged period and duration." Pl. Br. at 1. Urena acknowledges that "there was nothing [Laguerre and Ortiz] could do" about Shaw's use of chemical spray in the moment, Pl. Br. at 1, but he nonetheless alleges that the officers acted with "deliberate indifference" by "knowingly and deliberately" leaving him alone "to suffer the effects of the spray, rather than rending him aid," Am. Compl. ¶ 46. [12] Urena thus brings a claim for deliberate indifference to his conditions of confinement, which can include officers depriving detainees of the right to receive medical care, among other basic human needs. *See Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012).

[12]    As Defendants correctly note, Urena has abandoned the specific claim that Laguerre and Ortiz failed to intervene in the alleged use of excessive force. *See Lipton v. Cnty. of Orange*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004); Dkt. No. 51 ("Def. Reply Br.") at 5–6 & n.6. But Defendants wrongly contend that the Court "need not" consider claims against Laguerre and Ortiz, because, contrary to their assertions, *id.*, the amended complaint does assert a deliberate indifference

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 390 of 529

Urena v. City of New York, Not Reported in Fed. Supp. (2024)

claim, *see* Am. Compl. ¶ 46 ("Laguerre and Ortiz knowingly and deliberately left Plaintiff naked and alone to shame him, and then left him a second time to suffer the effects of the spray, rather than rendering him aid, thereby displaying deliberate indifference to Plaintiff's rights.").

A pretrial detainee's claim of unconstitutional conditions of confinement is governed by the Due Process Clause of the Fourteenth Amendment. *Darnell v. v. Pinheiro*, 849 F.3d 17, 29 (2d Cir. 2017). To succeed on a deliberate indifference claim alleging a failure to provide medical treatment, a detainee first must show "that the injury or illness caused a serious medical condition." *Ross*, 2021 WL 3500163, at *17. In particular, a "serious medical condition is generally understood to be one that may produce death, degeneration, or extreme pain." *Id.*; *Johnson v. Schiff*, No. 17-cv-8000, 2019 WL 4688542, at *14 (S.D.N.Y. Sept. 26, 2019) (noting that a condition is sufficiently serious if a plaintiff "suffer[s] permanent effects" or "lasting physical injuries"). Second, a plaintiff must show that "the defendant acted with deliberate indifference toward that medical condition, so as either to cause it or expose the plaintiff to risk from it." *Ross*, 2021 WL 3500163, at *17. To establish deliberate indifference under the Fourteenth Amendment, a plaintiff needs to show that "the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed ... even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. This second element is referred to as the "*mens rea* prong," and "is defined objectively." *Id.*

 **\*9**  "In cases of delayed medical treatment, ... the Court should focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Williams v. City of New York Dep't of Corr.*, 2020 WL 3893929, at *4 (S.D.N.Y. July 10, 2020) (emphasis omitted). Here, after Shaw sprayed Urena, Defendants let Urena lie on the floor for approximately ten minutes before officers in decontamination gear entered his cell and escorted him to be decontaminated and treated. These actions do not constitute an objective deprivation of Urena's right to due process.

First, numerous judges in this district have routinely held that the "temporary effects of chemical spray"—while "undoubtedly uncomfortable and painful"—"do not rise to the level of producing death, degeneration, or extreme pain" as is required to establish a deliberate indifference claim.

*Holmes v. City of New York*, No. 17-cv-3874, 2018 WL 4211311, at *7 (S.D.N.Y. June 30, 2022); *see, e.g.*, *Lewis*, 2014 WL 1364934, at *7 (rejecting a deliberate indifference claim based on the effects of chemical gel as a matter of law because "the temporary discomfort caused by pepper spray or mace does not constitute a sufficiently serious injury"); *Ross*, 2021 WL 3500163, at *18 (dismissing a deliberate indifference claim based on the deployment of pepper spray); *Johnson*, 2019 WL 4688542, at *14 (same); *Rodriguez v. Cohall*, No. 21-cv-1810, 2022 WL 1228411, at *4–5 (S.D.N.Y. Apr. 26, 2022) (same).

Urena asserts that the chemical spray caused his whole body to "fe[el] like it was on fire," that he "was having trouble breathing," and that his eyes "felt blurry." Pl. Tr. at 32. But, as Defendants note and Urena does not dispute, he was decontaminated ten minutes later and received additional treatment that same day. Def. 56.1 Statement ¶ 14; Pl. Tr. at 32, 34. Urena was also provided pain medication and acknowledges that his pain subsided after twenty-four hours. *Id.* To be sure, the deployment of chemical spray into Urena's face appears to have resulted in significant pain. *See* DOC Footage at 18:10:58–18:12:13. But there is no evidence that he "suffered permanent effects or serious injury from the ... spray" sufficient to establish a deliberate indifference claim. *Johnson*, 2019 WL 4688542, at *14.

Second, even if Urena's medical needs resulting from the chemical spray had been sufficiently serious to meet prong one of this claim, he nonetheless fails to raise a genuine factual dispute concerning whether Laguerre and Ortiz acted recklessly in their temporary denial of his medical care. No evidence has been presented suggesting that the ten-minute delay risked serious damage to his health or worsened any medical condition, and the short duration of the delay militates against a finding of objective recklessness. Numerous courts in this circuit have similarly held that temporary delays in treatment after a chemical spray incident do not, without more, establish deliberate indifference. *See, e.g.*, *Liverpool v. Davis*, 442 F. Supp. 3d 714, 737 (S.D.N.Y. 2020) (rejecting a deliberate indifference claim, in the Eighth Amendment context, where a plaintiff was forced to wait three hours to receive medical attention after being exposed to "a chemical irritant akin to pepper spray"); *Blond v. City of Schenectady*, No, 10-cv-0598, 2010 WL 4316810, at *5 (N.D.N.Y. Oct. 26, 2010) (rejecting an inadequate medical care claim whether plaintiff "was sprayed with pepper spray and [ ] was not permit[ed] to rinse his eyes for thirty to sixty minutes"). Further, the record does not establish that "the

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 391 of 529

Urena v. City of New York, Not Reported in Fed. Supp. (2024)

delay in treatment caused his condition to worsen," nor does Urena challenge "the reasonableness of the medical treatment that he eventually received." *Liverpool,* 442 F. Supp. 3d at 737. Accordingly, the Court grants Defendants' summary judgment motion as to Urena's deliberate indifference claims against Laguerre and Ortiz. [13]

[13]     In light of this ruling, the Court need not determine whether the officers are entitled to qualified immunity. *See Posr v. City of New York,* No. 10-cv-2551, 2013 WL 2419142, at *10 n.8 (S.D.N.Y. June 4, 2013), *aff'd sub nom. Posr v. Ueberbacher,* 569 F. App'x 32 (2d Cir. 2014) ("Because [the defendant] did not violate the p]laintiff's Fourteenth Amendment rights, there is no need to consider if [the defendant] is entitled to qualified immunity.").

**III. NYCAC Claim**

**\*10**  Finally, Urena brings a claim against Shaw, Laguerre, Ortiz, and the City of New York to enforce the right established by the New York City Administrative Code ("NYCAC") § 8-802 "to be secure ... against unreasonable searches and seizures, and to be secure against the use of excessive force regardless of whether such force is used in connection with a search or seizure." Defendants state, and Urena does not dispute, that he failed to file a notice of claim related to the incident underlying this lawsuit. Def. 56.1 Statement ¶ 16; Pl. Br. at 11. Defendants thus argue that Urena's claim fails because he did not serve a notice of claim in compliance with New York General Municipal Law § 50-e. *See* Def. Br. at 15–16. Urena asks the Court to extend the deadline for service of a notice of claim—if required—in light of his *pro se* status. Pl. Br. at 11.

The Court need not address the notice of claim issue because, even assuming Urena had not been required to provide notice, his claim under New York City Administrative Code §§ 8-801 through 8-807 would fail. Pursuant to § 8-803, "[a] covered individual" acting under color of law "is liable" when he "subjects or causes to be subjected ... any other natural person to the deprivation of any right that is created, granted, or protected by section 8-802." NYCAC § 8-803(a).

The provision also makes "[t]he employer of a covered individual" liable "based upon the conduct of such covered individual." *Id.* § 8-803(b). Under § 8-801, "[t]he term 'covered individual' means (i) an employee of the police department or (ii) a person who is appointed by the police commissioner as a special patrolman." *Id.* § 8-801. Urena does not contend that any of the individual officers were employed by the "police department" or were appointed as "special patrolm[e]n." *Id.* To the contrary, Urena asserts that the officers are "members of the New York City Department of Correction." Am. Compl. ¶ 1. Therefore, Shaw, Laguerre, and Ortiz are not "covered individual[s]" under the code, and cannot be held liable under § 8-803. Because these officers are not "covered individual[s]," the City also cannot be held liable as an "employer of a covered individual." NYCAC § 8-803. The Court thus grants Defendants summary judgment as to Urena's claim under NYCAC §§ 8-801 through 8-807.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is denied with respect to Urena's excessive force claim against Defendant Shaw under 42 U.S.C. § 1983, and granted as to all other claims. Urena's motion for summary judgment is denied in its entirety.

Because Defendants prevail on all claims against Laguerre, Ortiz, and the City of New York, those Defendants are dismissed from this action and the Clerk of Court is respectfully directed to amend the caption accordingly.

The Clerk of Court is also respectfully directed to terminate the motion pending at Dkt. No. 42 and to mail a copy of this Opinion and Order to Urena.

No later than October 10, 2024, Urena shall notify the Court whether he seeks counsel to represent him at trial.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4149182

---

**Filings (1)**

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **1.  Docket 1:22-CV-04679**<br>Urena v. Shaw | — | S.D.N.Y. | June 03, 2022 | Docket |

**History**

There are no History results for this citation.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 395 of 529

Campbell v. City of Yonkers, Not Reported in Fed. Supp. (2023)

2023 WL 4867459

2023 WL 4867459
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Eric CAMPBELL, individually and as the Administrator
d.b.n. of the Estate of Erick Campbell; Michael
Campbell, as the Administrator of the Estate of
Robert Campbell; and Aida Campbell, Plaintiffs,
v.
CITY OF YONKERS; Police Officer Timothy
Cooper; Police Officer Thomas Braig; Police
Officer Adam Walencik; Detective Thomas Marello;
Sergeant Mark Wissner; Detective Brian Menton;
Detective Terence Malone; Sergeant Joseph
Barosa; Detective Michael McGee; Agent Brendan
Kenney; Agent Andrew Fisher; Agent Daniel
Conlon; and Agent Daniel McKenna, Defendants.
Eric Campbell, individually and as the Administrator
d.b.n. of the Estate of Erick Campbell; Michael
Campbell, as the Administrator of the Estate of
Robert Campbell; and Aida Campbell, Plaintiffs,
v.
United States of America, Defendant.

19 CV 2117 (VB), 19 CV 9444 (VB)
|
Signed July 31, 2023

**Attorneys and Law Firms**

Uri Nazryan, Philip Michael Hines, Held & Hines, LLP,
Brooklyn, NY, for Plaintiffs Aida Campbell, Eric Campbell,
Michael Campbell in 19 CV 2117, 19 CV 9444.

Rory Carleton McCormick, Corporation Counsel, City of
Yonkers, Yonkers, NY, for Defendants City of Yonkers, Police
Officer Timothy Cooper, Police Officer Thomas Braig in 19
CV 2117.

Zachary Bannon, DOJ-USAO, New York, NY, Ilan Stein,
U.S. Attorney's Office, New York, NY, for Defendant in 19
CV 9444.

**OPINION AND ORDER**

Briccetti, United States District Judge:

**\*1**  These consolidated actions arise out of the attempted
arrest and fatal shooting of Erick Campbell during a
surveillance operation conducted by federal and local law
enforcement officers. Plaintiffs, members of Campbell's
family and the administrator of his estate, [1] bring federal
and related state law claims against the law enforcement
officers involved in the operation, the City of Yonkers, and
the United States of America, pursuant to 42 U.S.C. § 1983
and Monell v. Department of Social Services, 436 U.S. 658
(1978) ("Monell"), Bivens v. Six Unknown Named Agents of
Fed. Bureau of Narcotics, 403 U.S. 388 (1971) ("Bivens"),
and the Federal Tort Claims Act ("FTCA").

[1]
> Plaintiff Eric Campbell is Campbell's son and
> the administrator of his estate. Plaintiff Aida
> Campbell is Campbell's mother. Robert Campbell,
> Campbell's father, was a plaintiff in these cases,
> both individually and as the original administrator
> of Campbell's estate, before his death in September
> 2021. Michael Campbell was then substituted as
> a plaintiff, in his capacity as the administrator of
> Robert Campbell's estate.

Now pending are four motions for summary judgment,
filed by (i) Federal Bureau of Investigation ("FBI") Special
Agents Brendan Kenney, Andrew Fisher, and Daniel Conlon;
Supervising Special Agent Daniel McKenna (the "FBI
defendants"); and the United States (together with the FBI
defendants, the "federal defendants") (Doc. #169 and FTCA
Doc. #89); [2] (ii) Tarrytown Police Department ("TPD")
Detective Michael McGee and Sergeant Joseph Barosa (the
"Tarrytown defendants") (Doc. #174); (iii) Yonkers
Police Department ("YPD") Officers Timothy Cooper,
Thomas Braig, and Adam Walencik; Sergeant Mark Wissner;
Detectives Thomas Marello and Brian Menton; and the City
of Yonkers (the "Yonkers defendants") (Doc. #178); and (iv)
Westchester County Police Department ("WCPD") Detective
Terence Malone (Doc. #186). [3]

[2]
> Unless otherwise noted, "Doc. #__" refers to
> documents filed in the lead case, 19 Civ. 2117;
> "FTCA Doc. #__" refers to documents filed in the
> member case, 19 Civ. 9444.

[3]
> The individual defendants who are not FBI
> agents—Barosa, Braig, Cooper, Malone, Marello,
> McGee, Menton, Walencik, and Wissner—are

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 396 of 529

Campbell v. City of Yonkers, Not Reported in Fed. Supp. (2023)
2023 WL 4867459

collectively referred to herein as the "local police defendants."

For the following reasons, the federal defendants' and the Yonkers defendants' motions are GRANTED IN PART and DENIED IN PART, and the Tarrytown defendants' and Malone's motions are GRANTED.

The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

**BACKGROUND**

The Court presumes the parties' familiarity with the factual allegations and procedural history of these actions, including the Court's Opinion and Order dated September 15, 2020, which ruled on the federal defendants' and Malone's motions to dismiss. (Doc. #107 and FTCA Doc. #34 (the "MTD Decision")). [4] Accordingly, the Court summarizes below only the relevant background, as reflected in the parties' memoranda of law, statements of undisputed material facts pursuant to Local Civil Rule 56.1, and supporting declarations and exhibits.

[4]     The operative pleadings in these consolidated actions are plaintiffs' October 11, 2019, complaint filed against the United States (FTCA Doc. #1 ("Compl.")), and plaintiffs' November 4, 2019, second amended complaint, filed against all other named defendants (Doc. #67 ("SAC")).

**I. The Task Force**

 **\*2**  When the events relevant to this action occurred, the FBI defendants and three of the local police defendants, Marello, Menton, and Malone, were members of the FBI Westchester County Safe Streets Gang and Violent Crime Task Force, Squad C-26 (the "task force"). Marello, Menton, and Malone were formally deputized and assigned to serve as Task Force Officers ("TFOs"), pursuant to Memorandums of Understanding between the FBI and their respective agencies. (Doc. #187-3).

The other individual defendants were not members of the task force. However, they agreed to assist with the surveillance operation, at the request of Kenney and Menton. [5]

[5]     The individual defendants are collectively referred to herein as the "team."

**II. The Surveillance Operation**

In the month before the surveillance operation, the task force was investigating two bank robberies, which occurred at a Chase Bank in Tarrytown, New York, on November 13, 2017, and a Chase Bank in Elmsford, New York, on December 7, 2017. During both robberies, an unknown individual wore a dark mask, displayed a firearm, and fled the scene in a stolen vehicle.

The getaway car in the Tarrytown robbery was discovered by the FBI on November 20, 2017. The car was apparently abandoned and bore New York license plates registered to a different vehicle.

On the night of December 14, 2017, members of the Greenburgh Police Department ("GPD") located a stolen Oldsmobile sedan on a residential street in Yonkers, New York, believed to be the getaway car from the Elmsford robbery. A GPD detective notified Kenney. They decided GPD would maintain surveillance of the vehicle overnight and the task force would relieve GPD in the morning.

During the night, task force members including Kenney, Fisher, McKenna, Marello, and Menton, discussed a plan to surveil the vehicle and to arrest any individual who entered it for possession of a stolen vehicle. Kenney was designated the leader of the operation.

Around 6:00 a.m. on December 15, Fisher and Marello took over surveillance from GPD, as planned. Kenney then requested assistance from other task force members. In addition, Kenney asked Menton to request backup from YPD, Menton's home agency. Menton called Wissner, who led YPD's plainclothes pattern crimes unit, to ask if Wissner had any officers available to assist with the operation. Three members of the unit—Braig, Cooper, and Walencik—agreed to provide the requested backup, as did Wissner himself. Barosa and McGee, who led TPD's investigation of the Tarrytown robbery, also assisted with the operation at Kenney's request.

The team members arrived at the scene at various times that morning and afternoon. Upon arrival, they were briefed by Kenney or Menton, who explained they were surveilling a vehicle used in an armed bank robbery and the person who

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 397 of 529

Campbell v. City of Yonkers, Not Reported in Fed. Supp. (2023)

2023 WL 4867459

entered the vehicle might have a gun. Team members were given FBI radios for communicating during the operation.

Early that afternoon, Fisher obtained a warrant to install a GPS tracking device on the vehicle. FBI agents installed and turned on the device shortly thereafter. But because Kenney had a "hunch" the subject was going to rob a third Chase Bank location on December 15, the team planned to continue surveillance until around 6:00 p.m., when most banks in the area closed. (Doc. #197-9 ("Kenney Dep.") at 50).[6] If the subject did not show up that evening, the task force would monitor the vehicle via the GPS device.

[6]    Citations to "Dep. at __" refer to the page number at the top right-hand corner of each deposition transcript page.

**\*3** Around 3:50 p.m., Marello radioed that a man, wearing dark clothing and holding a bag, was approaching the subject vehicle.

The man—identified after the shooting as Erick Campbell—entered the vehicle through the front passenger side door, placed a duffel bag inside, and started the engine. He then exited the vehicle from the driver's side door and began clearing snow from the vehicle. After Campbell reentered the vehicle, Kenney directed the team to converge.

Kenney positioned his unmarked law enforcement vehicle a few inches behind the subject vehicle, while Malone approached from the front in an unmarked rental vehicle. Both then exited their vehicles, with guns drawn. Soon thereafter, Braig, accompanied by Cooper, pulled his unmarked vehicle up alongside the driver's side of the subject vehicle. Other team members parked their own unmarked vehicles nearby and approached on foot, with weapons drawn. The team announced themselves as "police" and shouted at Campbell to "turn off the car," "get out of the car," and "show me your hands." (Kenney Dep. at 111; Doc. #197-3 ("Malone Dep.") at 129–30; Doc. #197-5 ("Braig Dep.") at 137; Doc. #197-6 ("Menton Dep.") at 91; Doc. #197-12 ("Barosa Dep.") at 80).

When the team converged, Campbell tried to drive away. As Campbell began pulling away from the curb, Braig's vehicle collided with Campbell's vehicle and pushed it back between Kenney's and Malone's vehicles. Campbell moved the subject vehicle back and forth several times to try to flee. However, Kenney repeatedly rammed into the vehicle to keep it wedged

between Malone's vehicle and his own, until Campbell's vehicle became disabled.

The parties disagree about what happened next.

Defendants claim Campbell reached over to the passenger seat, picked up what appeared to be a black handgun (but was later determined to be a replica), and pointed it toward one or more officers.

According to Marello, as he ran up to the passenger side of the vehicle from the rear, he saw Campbell reach over to the passenger seat and pick up the replica gun. Marello testified he shouted "gun" several times to warn the other team members. (Doc. #197-15 ("Marello Dep.") at 90). He then moved behind Braig's vehicle after hearing another officer yell "watch the crossfire" and realizing he was at risk of being shot by or shooting other officers. (Id. at 92–97).

Meanwhile, Cooper was in the passenger seat of Braig's vehicle, near the driver's side of the subject vehicle and approximately three to four feet away from Campbell. Cooper testified he saw Campbell "reach down to the passenger side interior of the floorboard," heard someone yell "he's got a gun," and then saw Campbell "pull up with a gun in his right hand." (Doc. #197-4 ("Cooper Dep.") at 133–37, 143–44). Cooper further testified he saw Campbell point the replica gun toward the front passenger side of the vehicle, and believed Campbell "intend[ed] to shoot those officers on the sidewalk." (Id. at 143). "A second or two" later, without warning anyone he was going to shoot, Cooper fired his own weapon at Campbell's chest. (Id. at 140). Cooper fired sixteen rounds, the capacity of his weapon. Cooper testified he kept firing until he was out of ammunition, even though he was "fairly certain" he had hit Campbell, because Campbell "was still moving and still had a gun in his hand." (Id. at 144–47).

**\*4** Shortly before the shooting started, Braig was standing on the driver's side of his own vehicle, looking over the roof and down into the subject vehicle. He testified he saw Campbell's right hand reach toward the passenger seat, disappear for a moment, and then reappear holding the replica gun, right as "somebody yelled gun." (Braig Dep. at 143–44). Braig claims he then saw Campbell "swinging his right arm from the passenger seat up into the direction towards our car." (Id. at 146). At that point, Braig "heard the gunshots," saw "glass flying everywhere," and "thought [Cooper] was being shot by this guy." (Id. at 145–47). Seconds after hearing the gunshots, Braig fired his own weapon at Campbell. (Id.

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 398 of 529

Campbell v. City of Yonkers, Not Reported in Fed. Supp. (2023)

2023 WL 4867459

at 147). Braig fired three shots at Campbell. Braig claims he stopped shooting when he saw Campbell's hand was down and thus Campbell no longer posed a threat. (Id. at 151–52).

When Kenney first heard "gun," he was behind the subject vehicle and could not see Campbell's hands. He "had tunnel vision at that point" and was focused on Campbell's head. (Kenney Dep. at 123). Kenney testified that when the shots fired by Cooper and Braig blew out the back passenger-side window of the subject vehicle, he thought Campbell had fired on Malone, who Kenney believed was standing on that side of the vehicle. (Id. at 125–26, 128). Kenney then fired two shots at Campbell, aiming for his head. Kenney claims he shot Campbell "[t]o save" Malone. (Id. at 128). Kenney did not warn that he was going to shoot before firing his weapon, and did not hear any officer do so.

The shooting lasted only a few seconds. Of the twenty-one rounds fired, ten hit Campbell. Most of the rounds entered the left side of Campbell's torso and back; two of those perforated his left lung. (Doc. #172-14 ("FBI Inspector's Report") at 10, 13; Doc. #172-31 ("Autopsy Report") at ECF 6). [7]

[7]    "ECF __" refers to page numbers automatically assigned by the Court's Electronic Case Filing system.

Plaintiffs dispute that any officer saw Campbell brandishing the replica gun before or during the shooting. In support, plaintiffs offer testimony from Barosa and McGee that heavy snow and exhaust fumes made the visibility so bad they could not see anything inside the vehicle—even though Barosa was right next to the driver's side door and McGee was next to the passenger's side, right by Marello. (Barosa Dep. at 69–70, 78; Doc. #197-13 ("McGee Dep.") at 52–54). In addition, plaintiffs argue Marello's account of events—in which Campbell purportedly brandished the gun while simultaneously changing gears and steering—would have required Campbell to have three hands. (Doc. #196 ("Pls. Opp.") at 25 (citing Marello Dep. at 86–89)). Plaintiffs also note no fingerprints were found on the replica gun.

Plaintiffs further contend that even if Campbell did raise the replica gun, there is a question of fact as to whether he pointed it at any officers. For example, although Cooper testified he shot Campbell to save "those officers on the sidewalk" (Cooper Dep. at 143), McGee's testimony indicates he and the other officers who had been standing on the sidewalk—Marello and Malone—had already moved away

from the subject vehicle and were back by Kenney's vehicle when Cooper fired his weapon. (McGee Dep. at 60; see also Marello Dep. at 100–03).

Immediately after the shooting stopped, several officers emerged from the positions where they had taken cover and approached the subject vehicle. McGee testified he saw Campbell through a bullet hole in the rear passenger window, and that Campbell was facing the passenger side window, with his shoulder blades pressed against the driver's side door. According to McGee, the replica gun was on the passenger seat, with Campbell's "fingertips at the edge of the weapon on the seat." (McGee Dep. at 62).

McGee then reached through the bullet hole and unlocked the front passenger door of the subject vehicle. He picked up the replica gun, at which point he realized it was not real, and put it on the roof of the car, along with the duffel bag. Malone and Menton removed Campbell from the vehicle and placed him on the ground.

 *5  At that point—less than a minute after the shooting ended—Menton called an ambulance, while Barosa patted Campbell down and inspected him for injuries. Campbell "seemed to be on the verge of death." (Barosa Dep. at 82). And although Campbell initially had a pulse, "that quickly stopped" and he seemed to stop breathing. (Id. at 82–83). Barosa and McGee immediately began administering CPR, and asked Menton to expedite emergency medical personnel. Menton then made another radio call, requesting a rush on the ambulance. (Menton Dep. at 107–08; Doc. #179-20 ("YPD Radio Log") at ECF 1).

At some point before the ambulance came, a YPD Emergency Services Unit arrived at the scene. They took over CPR from Barosa and McGee and used a defibrillator on Campbell.

The ambulance arrived approximately twelve minutes after the shooting. Campbell was transported to a hospital, where he died from the gunshot wounds to his torso less than an hour after the shooting. (Autopsy Report at ECF 2; FBI Inspector's Report at 13).

### III. Plaintiffs' Claims
Plaintiffs bring Bivens claims against the FBI defendants, and Section 1983 claims against the other individual defendants, for purported violations of Campbell's constitutional rights. Specifically, plaintiffs claim Campbell's Fourth Amendment rights were violated in four main ways: (i) Cooper, Braig,

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 399 of 529

Campbell v. City of Yonkers, Not Reported in Fed. Supp. (2023)

2023 WL 4867459

and Kenney used excessive force when they fired their weapons; (ii) the team used excessive force when boxing in the subject vehicle; (iii) the team's tactical decisions and certain omissions from the plan made the use of deadly force inevitable; and (iv) the non-firing defendants failed to prevent or stop the use of deadly force. Plaintiffs further claim the individual defendants violated Campbell's Fifth and Fourteenth Amendment rights by failing timely to provide adequate medical care. Plaintiffs also bring related state-law claims against individual defendants. [8]

[8]    In the MTD Decision, the Court dismissed plaintiffs' claims against the federal defendants and Malone for (i) purported violations of the First and Eighth Amendments; (ii) unlawful search and seizure in contravention of the Fourth Amendment; (iii) conspiracy to violate Campbell's constitutional rights; (iv) negligence; (v) negligent hiring, training, and supervision; and (vi) negligent and intentional infliction of emotional distress. (See MTD Decision at 11–13, 22–24, 28–31).
The Yonkers defendants and Tarrytown defendants, who did not file motions to dismiss, argue they are entitled to summary judgment on those same claims. (See Doc. #175 ("Tarrytown Mem.") at 11–12; Doc. #180 ("Yonkers Mem.") at 10–12, 17–19). Plaintiffs' opposition brief makes no attempt to respond to defendants' arguments regarding those claims. Accordingly, the Court deems the claims abandoned. See Jackson v. Federal Exp., 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims."); Cowan v. City of Mount Vernon, 95 F. Supp. 3d 624, 645 (S.D.N.Y. 2015) (granting summary judgment on claims because of plaintiff's failure to respond to defendant's arguments). And in any event, the claims fail as a matter of law, for the reasons set forth in the MTD Decision.

In addition, plaintiffs bring Monell claims against the City of Yonkers for the purported constitutional violations, on the ground that the City did not adequately train YPD officers regarding its use of force policies, and respondeat superior claims for the YPD officers' alleged torts.

*6  Finally, plaintiffs assert FTCA claims against the United States for (i) assault and battery; (ii) wrongful death; (iii) conscious pain and suffering; and (iv) loss of love, support, and familial relationships.

## DISCUSSION

### I. Legal Standard

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law .... Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). [9]

[9]    Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010). It is the moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 323. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011). "[T]he mere existence of a scintilla of evidence" supporting the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for it. Dawson v. Cnty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

Campbell v. City of Yonkers, Not Reported in Fed. Supp. (2023)

2023 WL 4867459

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If "there is any evidence in the record from which a reasonable inference could be drawn in favor of the [non-moving] party" on the issue on which summary judgment is sought, "summary judgment is improper." See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004).

Importantly, "in cases in which officers have used deadly force, leaving the witness most likely to contradict the officers' version of the events unable to testify, the court may not simply accept what may be a self-serving account by the police officer but must instead consider circumstantial evidence that, if believed, would tend to discredit the police officer's version and must undertake a fairly critical assessment of, inter alia, the officer's original reports or statements to decide whether the officer's testimony could reasonably be rejected at a trial." Soto v. Gaudett, 862 F.3d 148, 157 (2d Cir. 2017).

## II. Bivens Claims Against the FBI Defendants

 **\*7**  In its September 2020 MTD Decision, the Court dismissed all of plaintiffs' claims against the FBI defendants, except the Bivens claims for excessive force and deliberate indifference to serious medical needs. The FBI defendants argue the Bivens claims cannot stand in light of intervening Supreme Court precedent, specifically Egbert v. Boule, 142 S. Ct. 1793 (2022), decided in 2022.

The Court agrees.

### A. Applicable Law

In Bivens, the Supreme Court implied a private right of action under the Fourth Amendment for an unreasonable search and seizure claim against federal drug enforcement agents who handcuffed a man in his own home without a warrant. See Bivens v. Six Unknown Narcotics Agents, 403 U.S. 388, 389, 397 (1971). "Since then, the Supreme Court has recognized Bivens claims in only two other circumstances: (1) under the Fifth Amendment's Due Process Clause for gender discrimination against a congressman for firing his female secretary, and (2) under the Eighth Amendment's prohibition on cruel and unusual punishment against prison officials for failure to treat an inmate's asthma which led to his

death." Rivera v. Samilo, 370 F. Supp. 3d 362, 366 (E.D.N.Y. 2019) (citing Davis v. Passman, 442 U.S. 228 (1979), and Carlson v. Green, 446 U.S. 14 (1980)).

In Egbert v. Boule, the Supreme Court set out a two-step inquiry for courts to determine whether to imply a Bivens cause of action. First, the court must determine "whether the case presents 'a new Bivens context,'—i.e., is it 'meaningfully' different from the three cases in which the [Supreme] Court has implied a damages action." Egbert v. Boule, 142 S. Ct. at 1803 (quoting Ziglar v. Abbasi, 582 U.S. 120, 139–40 (2017)). The Supreme Court's "understanding of a 'new context' is broad. Hernandez v. Mesa, 140 S. Ct. 735, 743 (2020). For example, "a new context arises when there is a new constitutional right at issue," Egbert v. Boule, 142 S. Ct. at 1807, or when the defendants were operating under a different "statutory or legal mandate." Ziglar v. Abbasi, 582 U.S. at 139–40. And importantly, "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." Hernandez v. Mesa, 140 S. Ct. at 743.

"Second, if a claim arises in a new context, a Bivens remedy is unavailable if there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.' " Egbert v. Boule, 142 S. Ct. at 1803 (quoting Ziglar v. Abbasi, 137 S. Ct. at 1858). Because "recognizing a cause of action under Bivens is a disfavored judicial activity," a court may not imply a Bivens remedy if there is "[e]ven a single sound reason to defer to Congress." Id. According to the Supreme Court, "in most every case," it is Congress, not the judiciary, "who should decide whether to provide for a damages remedy." Id. Moreover, "a court may not fashion a Bivens remedy if Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure"—even if "existing remedies do not provide complete relief" or a "a wrong ... would ... go unredressed" without a judicial remedy. Id. at 1804.

The Egbert Court held a plaintiff had no Bivens remedy against a border patrol agent who allegedly entered the plaintiff's property without a warrant and assaulted him. First, the Court found the claim presented a new context for Bivens purposes and that Congress was better equipped to decide whether to provide a damages remedy. Egbert v. Boule, 142 S. Ct. at 1805. In doing so, the Court acknowledged Bivens also involved allegations of excessive force and thus the two cases "arguably present 'almost parallel circumstances' or

2023 WL 4867459

a similar 'mechanism of injury.' " Id. However, the Court reasoned "these superficial similarities are not enough to support the judicial creation of a cause of action." Id. Second, the Court concluded "Congress has provided alternative remedies for aggrieved parties in [the plaintiff's] position"— namely, internal investigations of alleged misconduct and the Border Patrol's grievance process—which "independently foreclose[d] a Bivens action." Id. at 1806.

B. Application

**\*8** Although this Court previously concluded plaintiffs had pleaded Bivens claims against the FBI defendants, the Court must reconsider its conclusion in light of Egbert v. Boule. Having done so, the Court is convinced the Supreme Court, if confronted with plaintiffs' claims, would find no cause of action under Bivens.

First, there are several meaningful differences between this case and Bivens, such that plaintiffs' asserted claims arise in a new context. Bivens involved a warrantless arrest and search of the plaintiff's home, whereas this case involves an arrest made on a public street with probable cause. Moreover, the officers involved in Bivens were federal drug enforcement agents, whereas here the officers were FBI agents, task force officers, and other local law enforcement officers. And the Court in Bivens reasoned that the right at issue was primarily a Fourth Amendment right to privacy, 403 U.S. at 389, whereas here the Fourth Amendment right at issue is the right to be free from excessive force.

Plaintiff's deliberate indifference claim also arises in a new context. Plaintiffs' allegations materially differ from those in Carlson v. Green, the only case in which the Supreme Court has found a Bivens remedy for constitutionally inadequate medical care. 446 U.S. 14 (1980). The defendants in Carlson v. Green were federal prison officials who allegedly failed to treat an inmate's asthma, not law enforcement officers who allegedly delayed treatment of an arrestee's injuries. Id. at 16. Moreover, the claim in Carlson v. Green was brought under the Eighth Amendment, as opposed to plaintiffs' Fifth Amendment claim here. Id.

With respect to the second step in the Bivens analysis, several factors counsel hesitation in extending Bivens to plaintiffs' claims. First, there are sound reasons to believe Congress is better suited to decide whether to permit a damages action for aggrieved parties in plaintiffs' position:

> It is not necessarily a judicial function to establish whole categories of cases in which federal officers must defend against personal liability claims in the complex sphere of litigation, with all of its burdens on some and benefits to others. It is true that, if equitable remedies prove insufficient, a damages remedy might be necessary to redress past harm and deter future violations. Yet the decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide. Those matters include the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when the tort and monetary liability mechanisms of the legal system are used to bring about the proper formulation and implementation of public policies.

Ziglar v. Abbasi, 137 S. Ct. at 1858; see also Egbert v. Boule, 142 S. Ct. at 1803 ("[A] court likely cannot predict the systemwide consequences of recognizing a cause of action under Bivens.").

Moreover, there are multiple alternative remedial structures available to plaintiffs on their claims against the FBI Defendants. Plaintiffs could—and did—bring tort claims against the United States under the FTCA. And pursuant to Department of Justice and FBI policy, the FBI conducted an internal investigation after the shooting. (See generally FBI Inspector's Report; Doc. #173). These alternative remedies "independently foreclose a Bivens action." Egbert v. Boule, 142 S. Ct. at 1806.

**\*9** Accordingly, plaintiffs' Fourth and Fifth Amendment claims against the FBI defendants must be dismissed.

III. Section 1983 Claims Against the Local Police Defendants

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 402 of 529
Campbell v. City of Yonkers, Not Reported in Fed. Supp. (2023)
2023 WL 4867459

### A. Excessive Force Claims

Braig and Cooper argue they are entitled to summary judgment on plaintiffs' excessive force claims because the amount of force they used was reasonable as a matter of law. Barosa, Malone, Marello, Menton, McGee, Walencik, and Wissner argue they are entitled to summary judgment because the undisputed facts establish they did not use excessive force or have a reasonable opportunity to prevent the use of excessive force. The local police defendants also argue they are entitled to summary judgment on the basis of qualified immunity.

The Court disagrees that Braig and Cooper are entitled to summary judgment with respect to plaintiffs' excessive force claim against them premised on their use of deadly force. However, the Court agrees plaintiffs' other excessive force claims must be dismissed.

#### 1. Applicable Law

"A police officer violates the Fourth Amendment if the amount of force he uses in effectuating an arrest is 'objectively unreasonable' in light of the facts and circumstances confronting the officer." Lennox v. Miller, 968 F.3d 150, 155 (2d Cir. 2020) (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)). Determining "whether an officer has used excessive force requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id.

"The fact that a person whom a police officer attempts to arrest resists no doubt justifies the officer's use of some degree of force, but it does not give the officer license to use force without limit." Brown v. City of New York, 798 F.3d 94, 103 (2d Cir. 2015). And "an officer's use of deadly force in a police shooting case is not, as a matter of law, reasonable unless an officer had probable cause to believe that the individual posed a significant threat of death or serious physical injury to the officer or others." Callahan v. Wilson, 863 F.3d 144, 152 (2d Cir. 2017).

In addition, "planners may be liable under section 1983 to the extent that a plan for a search or seizure, as formulated and approved by those defendants, provides for and results in an unconstitutionally excessive use of force." Terebesi v. Torreso, 764 F.3d 217, 234 (2d Cir. 2014). "A defendant who plans or directs an unreasonable use of force is liable for the resulting constitutional violation as a direct participant." Id. On the other hand, a defendant cannot be held liable for excessive force on the grounds that he "himself created the situation in which the use of deadly force became necessary by violating police procedure" before the shooting, or that his "ill-conceived ruse, which did not contemplate excessive force, provoked [a] deadly confrontation." Id. at n.16.

**\*10** Finally, "all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994). "Failure to intercede results in liability where an officer observes excessive force is being used or has reason to know that it will be." Jean-Laurent v. Wilkerson, 461 F. App'x 18, 21 (2d Cir. 2012) (summary order). "However, in order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." Id.

"In each case, the question whether a defendant had a realistic chance to intercede will turn on such factors as the number of officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other considerations." Figueroa v. Mazza, 825 F.3d 89, 107 (2d Cir. 2016). "Among these considerations, of course, the assault's duration will always be relevant and will frequently assume great importance." Id. "The essential inquiry is whether, under the circumstances actually presented, an officer's failure to intervene permits a reasonable conclusion that he became a tacit collaborator in the unlawful conduct of another." Id. at 107–08.

"In light of the fact-specific nature of the inquiry on an excessive force claim, granting summary judgment against a plaintiff on such a claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." Lennox v. Miller, 968 F.3d at 155.

#### 2. Use of Deadly Force

It is undisputed that Braig and Cooper, but none of the other local police defendants, shot Campbell. And here, plaintiffs have raised genuine, material disputes as to "the facts and circumstances confronting" Braig and Cooper when they fired their weapons, and thus as to whether their use of deadly force was "objectively reasonable." Lennox v. Miller, 968 F.3d at 155.

The reasonableness of Cooper's initial decision to fire his weapon largely depends on whether, as he claims, he reasonably believed Campbell posed a significant threat of death or serious injuries to officers standing by the passenger side of the subject vehicle. Similarly, the reasonableness of Braig's decision to fire his weapon depends on whether he reasonably believed Campbell was firing at Cooper. And the reasonableness of each officer's decision to fire subsequent shots depends on whether they reasonably believed Campbell remained a threat when they fired those additional rounds. See Estate of Jaquez v. City of New York, 104 F. Supp. 3d 414, 437 (S.D.N.Y. 2015) ("While it may have been reasonable for [the officer] to use lethal force earlier in the altercation when [the decedent] threatened the officers with a knife, such authority does not extend indefinitely.").

These are jury questions.

On the one hand, the record contains evidence from which a reasonable jury could conclude Cooper and Braig had probable cause to believe Campbell posed a significant threat to officers before and throughout the shooting. For example, the replica gun was found on the passenger seat, "in close proximity" to Campbell's right hand, from which a reasonable juror might conclude Campbell brandished it. (McGee Dep. at 64). And jurors could certainly credit testimony by Cooper, Braig, and Marello that they saw Campbell point the gun at other officers, as well as Malone's testimony that he was standing by the passenger side of the subject vehicle throughout the shooting.

 *11  On the other hand, the record also contains "circumstantial evidence that, if believed, would tend to discredit" Cooper's and Braig's explanations for why they shot Campbell. Soto v. Gaudett, 862 F.3d at 157. For example, jurors could credit McGee's testimony that he, Malone, and Marello were no longer standing by the passenger side of the subject vehicle when Cooper began firing. A reasonable juror could also infer from autopsy evidence regarding the location of the bullet wounds, combined with McGee's testimony that both of Campbell's "shoulder blades were pressed against the

driver's door" immediately after the shooting, that Campbell was not pointing the gun in Cooper's direction when Braig fired at least one of the rounds. (McGee Dep. at 62). Moreover, jurors could use autopsy evidence regarding the severity of the wounds, and testimony that Campbell was "on the verge of death" a minute after the shooting ended, to determine Braig and Cooper could not have reasonably believed Campbell was a threat when they fired their final shots. (Barosa Dep. at 82).

In short, there are triable issues of fact as to whether Cooper's and Braig's use of deadly force was reasonable. And "disputed material issues regarding the reasonableness of an officer's perception of the facts (whether mistaken or not) is the province of the jury." Jones v. Treubig, 963 F.3d 214, 231 (2d Cir. 2020); see also Terebesi v. Torreso, 764 F.3d at 240 ("The credibility of [an officer's] recollection and the sufficiency of the asserted basis for his mistaken impression that [the decedent] was firing at the officers are ... matters to be determined by the factfinder.").

Accordingly, summary judgment as to Braig and Cooper on plaintiffs' excessive force claim is not warranted.

### 3. The Box-In Maneuver

No reasonable juror could conclude the local police defendants used excessive force when boxing in the subject vehicle.

The undisputed facts show only Kenney, Braig, and Malone's vehicles made contact with the subject vehicle during the operation, and that they did not do so until after Campbell tried to flee. Braig's vehicle collided with Campbell's as Campbell pulled away from the curb. After that collision, Campbell reversed into Kenney's vehicle. Kenney then "pressed the accelerator and rammed [Campbell] into [Malone's] car." (Kenney Dep. at 115–16). As Campbell moved back and forth to try to escape, Kenney repeatedly "push[ed] [Campbell's] car forward into [Malone's] car to keep it pinned." (Id. at 119).

There is also no genuine dispute that when Kenney, Braig, and Malone used their vehicles to prevent Campbell from leaving the scene, they believed he was connected to—and had likely committed—two armed bank robberies, and might be armed at that moment. And although plaintiffs speculate that Campbell may not have known he was surrounded by

2023 WL 4867459

police or heard the officers' commands to show them his hands and get out of the car (Pl. Opp. at 23), those commands <u>were</u> shouted. (<u>See</u> Doc. #171 ("Fed. Defs. 56.1 Statement") ¶ 43). [10] As such, a reasonable officer could have believed Campbell refused to submit to arrest and was attempting to flee the scene. Thus, on the undisputed facts, viewed "from the perspective of a reasonable officer on the scene," the force used to trap Campbell's vehicle was objectively reasonable. <u>Kisela v. Hughes</u>, 138 S. Ct. at 1152.

[10]    Plaintiffs purport to "dispute that these commands were yelled" on the grounds that "there is no audio or video recording of the shooting." (Doc. #198 ("Pls. 56.1 Response to Fed. Defs.") ¶ 43). But plaintiffs' contention is mere speculation, unsupported by any citation to evidence. Accordingly, for the purpose of deciding the motions, the Court finds it undisputed that team members yelled the commands enumerated in the corresponding statement of material fact. See <u>Baity v. Kralik</u>, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) ("[R]esponses that do not point to any evidence in the record that may create a genuine issue of material fact do not function as denials, and will be deemed admissions of the stated fact," pursuant to Local Civil Rule 56.1).

 **\*12** Accordingly, plaintiffs' excessive force claim premised on the use of force during the box-in maneuver must be dismissed.

### 4. Planner Liability

Plaintiffs claim Marello and Menton "could ... be held liable under" <u>Terebesi v. Torreso</u>, 764 F.3d 217, because they helped Kenney develop the plan for the operation. (Pls. Opp. at 30). But this claim fails as a matter of law.

The undisputed facts show the plan did not "provide[ ] for ... an unconstitutionally excessive use of force." Cf. <u>Terebesi v. Torreso</u>, 764 F.3d at 234. With respect to the use of deadly force, Menton testified "the plan was to get [Campbell] out of the car peacefully, but [Campbell] kind of changed the plan." (Menton Dep. at 133). Indeed, plaintiffs themselves point out "the potential that officers would need to use their weapons," and "how the Team would use force," were "not part of the Plan and were not briefed to the Team." (Pls. Opp. at 3–4). And for the reasons stated above, the planned box-in

maneuver does not constitute excessive force, so there can be no "planner" liability with respect to that alleged use of force.

Plaintiffs' policing practices expert might be correct that the plan was "overly vague," lacked "critical information," and "required unreasonably close contact between numerous officers and the bank robbery suspect" (Doc. #197-1 at 12–13), and thus "created a tactical scenario whereby the use of deadly force against Erick Campbell was the foreseeable and likely outcome." (<u>Id.</u> at 11). But developing an "ill-conceived" plan does not implicate an excessive force claim, unless the operation "<u>as planned</u>, even if it had gone perfectly," constituted an excessive use of force. <u>Terebesi v. Torreso</u>, 764 F.3d at 235 n.16.

Accordingly, to the extent plaintiffs assert a planner liability claim against Marello and Menton, this claim must be dismissed.

### 5. Failure to Intervene

No reasonable juror could conclude the non-firing local police defendants—Barosa, Malone, Marello, Menton, McGee, Walencik, and Wissner—had a realistic opportunity to prevent or stop the shooting.

The undisputed facts show the shooting happened in a matter of seconds and that no officer warned he was going to shoot before opening fire. Nor is there a genuine dispute that when the shooting began, Walencik and Wissner were not close to the scene and the other non-firing defendants had taken cover behind various police vehicles. Accordingly, the record establishes these defendants could not have intervened to stop the shooting. See <u>Crockett v. City of New York</u>, 2015 WL 5719737, at \*7 (E.D.N.Y. Sept. 29, 2015) ("Based upon the distances between the Other Defendant–Officers and [the firing officer], and the fact that the two shots were fired in rapid succession and without notice or warning, the Other Defendant–Officers did not have a realistic opportunity to intervene to prevent the shooting.").

The Court is not persuaded the defendants "should have known" the surveillance operation "would lead to the inevitable use of deadly force" and thus were obligated to "intervene" by objecting to the plan or removing their subordinates from the operation. (<u>Cf.</u> Pls. Opp. at 31). As explained above, the plan did not provide for the use of deadly force, or even address the possibility that officers might need

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 405 of 529

Campbell v. City of Yonkers, Not Reported in Fed. Supp. (2023)

2023 WL 4867459

to use their weapons. Under these circumstances, the non-firing police defendants did not "have reason to know" deadly force would be used. Jean-Laurent v. Wilkerson, 461 F. App'x at 21.

**\*13** Accordingly, plaintiffs' failure to intervene claims against Barosa, Malone, Marello, Menton, McGee, Walencik, and Wissner must be dismissed.

### 6. Qualified Immunity

Braig and Cooper argue that, to the extent the record supports an excessive force claim, such claim should be dismissed because they are entitled to qualified immunity, as a matter of law. [11]

> [11]    The Court need not consider whether the other local police defendants are entitled to qualified immunity, since plaintiffs' claims against them fail on the merits.

The Court disagrees.

Qualified immunity shields government officials whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The scope of qualified immunity is broad, and protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996). "Defendants bear the burden of establishing qualified immunity." Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2015).

In the context of an excessive force claim, "the question for the purposes of qualified immunity is whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances." Lennon v. Miller, 66 F.3d 416, 425 (2d Cir. 1995); see also O'Bert ex rel. Estate of O'Bert v. Vargo, 331 F.3d 29, 37 (2d Cir. 2003) ("in Fourth Amendment unreasonable force cases, unlike in other cases, the qualified immunity inquiry is the same as the inquiry on the merits.").

Here, as explained above, there are genuine material issues of fact as to whether Braig and Cooper's use of deadly force during the surveillance operation was reasonable under the circumstances.

Accordingly, summary judgment in favor of Braig and Cooper on the basis of qualified immunity is inappropriate.

### B. Deliberate Indifference to Serious Medical Needs Claim

The local police defendants argue they are entitled to summary judgment because the undisputed facts establish they were not deliberately indifferent to Campbell's medical needs.

The Court agrees.

### 1. Applicable Law

Deliberate indifference to serious medical needs claims brought by pretrial detainees or arrestees against state actors under Section 1983 are analyzed under the Fourteenth Amendment's Due Process Clause. Logan v. City of Schenectady, 2019 WL 3803631, at \*4 (N.D.N.Y. Aug. 13, 2019) (citing Darnell v. Pineiro, 849 F.3d 17, 33 n.9 (2d Cir. 2017)).

To establish a claim for deliberate indifference to serious medical needs, a plaintiff must satisfy a two-prong test, comprising an objective prong and a mens rea prong. Darnell v. Pineiro, 849 F.3d at 29. Namely, a plaintiff must establish "the challenged conditions were sufficiently serious," and defendants "acted with at least deliberate indifference to the challenged conditions." Id.

**\*14** For the objective prong, a plaintiff must establish the challenged conditions "either alone or in combination, pose[d] an unreasonable risk of serious damage to his health." Darnell v. Pineiro, 849 F.3d at 30 (quoting Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013)). "There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.' " Id. (quoting Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995)).

To satisfy the mens rea prong, a pretrial detainee must sufficiently show defendants "recklessly failed to act with

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 406 of 529

Campbell v. City of Yonkers, Not Reported in Fed. Supp. (2023)

2023 WL 4867459

reasonable cause to mitigate the risk that the condition posed to the pretrial detainee even though the [defendants] knew, or should have known, that the condition posed an excessive risk to health or safety." Darnell v. Pineiro, 849 F.3d at 35. The mens rea prong "is defined objectively" and "can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." Id.

"A delay in providing necessary medical care may in some cases constitute deliberate indifference." Maldonado v. Town of Greenburgh, 460 F. Supp. 3d 382, 396 (S.D.N.Y. 2020). And "delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for the delay." Id. at 396–97.

## 2. Application

No reasonable jury could conclude the local police defendants deprived Campbell of constitutionally adequate medical treatment.

The record establishes Menton called for an ambulance within a minute after the shooting occurred, and then radioed again to request a rush on the ambulance. (YPD Radio Log at ECF 1). The Constitution requires no more. See Tatum v. City & County of San Francisco, 441 F.3d 1090, 1099 (9th Cir. 2006) ("[D]ue process requires that police officers seek the necessary medical attention for a detainee when he or she has been injured while being apprehended by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital."); Rasmussen v. City of New York, 766 F. Supp. 2d 399, 414 (E.D.N.Y. 2011) ("The obligation of the police to provide necessary medical treatment upon request by a detainee or based upon the obvious need for treatment is satisfied when the police summon medical assistance; they have no duty to provide that assistance themselves.").

Indeed, the undisputed facts show Barosa and McGee provided Campbell with medical treatment beyond what the Constitution requires. Immediately after observing the gravity of Campbell's condition, Barosa and McGee performed CPR on him until emergency medical professionals arrived.

Plaintiffs contend the team should have "arrange[d] for an ambulance or EMT to be on call." (Pls. Opp. at 31–32.) But plaintiffs do not cite, and the Court is not aware of, any cases suggesting the absence of such arrangements violates the Fourteenth Amendment. And even if defendants' failure to have an ambulance or EMT on call violated Campbell's constitutional rights, defendants would be entitled to qualified immunity as the law does not clearly establish such a requirement. See Salim v. Proulx, 93 F.3d at 89.

Accordingly, plaintiffs' deliberate indifference to medical needs claim must be dismissed.

## IV. Monell Claim Against the City of Yonkers

**\*15** The City of Yonkers argues plaintiffs' Monell claim fails because they have not established that a municipal policy or custom proximately caused Braig and Cooper's alleged use of excessive force.

The Court agrees.

"For the purpose of Section 1983, a municipality is not vicariously liable for the acts of its employees." Green v. City of New York, 465 F.3d 65, 80 (2d Cir. 2006). Instead, a municipality is liable under Section 1983 only "when execution of a [municipal] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [plaintiff's] injury." Monell v. Dep't of Soc. Servs., 436 U.S. at 694.

"Failure to train subordinate municipal employees will trigger municipal liability 'only where the failure to train amounts to deliberate indifference to the rights' of members of the public with whom the employees will interact." Green v. City of New York, 465 F.3d at 80 (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)). And "at the summary judgment stage, plaintiffs must identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." Id. at 81.

To support their Monell claim, plaintiffs cite deposition testimony indicating Braig, Cooper, Menton, and Wissner "recalled only some new definitions and a new diagram" from their training in 2017 on YPD's then-new use of force policy, "but nothing new in how the policy operated." (Pls. Opp. at 35). However, these officers also testified the new policy provided more detailed information regarding the use of force, and that officers were trained and tested on the new policy. In addition, the officers testified their use-of-force training included hypotheticals, written materials, and

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 407 of 529

Campbell v. City of Yonkers, Not Reported in Fed. Supp. (2023)

2023 WL 4867459

case studies, and that they received training in de-escalation tactics. (E.g., Braig Dep. at 49–50; Cooper Dep. at 24–26, 33–34; Menton Dep. at 25).

Plaintiffs provide no evidence as to "how better or different training could have prevented the challenged conduct." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 130 (2d Cir. 2004). Nor do plaintiffs provide evidence of a pattern of deadly force by YPD officers so pervasive as to place the City on actual or constructive notice of an inadequacy in YPD's training program. See Jones v. Town of East Haven, 691 F.3d 72, 81 (2d Cir. 2012) ("[I]solated acts of excessive force by non-policymaking municipal employees are generally not sufficient" to hold a municipality liable under Section 1983).

Finally, "plaintiffs have provided no evidence tending to rule out those causes of the excessive force that would not support municipal liability, such as the negligent administration of a valid [training] program, or one or more officers' negligent or intentional disregard of their training." Amnesty Am. v. Town of W. Hartford, 361 F.3d at 130.

Plaintiffs have therefore failed to raise an inference that YPD officers were improperly trained and that this deficient training caused Braig and Cooper to use excessive force. Accordingly, the Monell claim against the City of Yonkers must be dismissed.

## V. Assault and Battery Claims

**\*16** Plaintiffs assert assault and battery claims against the local police defendants and the United States. [12]

[12]  The Court previously dismissed plaintiffs' assault and battery claim as to the FBI defendants because such a claim is not actionable under Bivens and federal employees are immune from tort claims arising out of conduct undertaken in the course of their official duties. (MTD Decision at 24).

### A. Local Police Defendants

The local police defendants argue plaintiffs' assault and battery claim must be dismissed because the undisputed facts show they did not use excessive force.

The Court disagrees as to defendants Braig and Cooper, but agrees as to the other local police defendants.

"Except for § 1983's requirement that the tort be committed under color of state law, the essential elements of excessive force and state law assault and battery claims are substantially identical." Humphrey v. Landers, 344 F. App'x 686, 688 (2d Cir. 2009) (summary order).

Here, because a reasonable jury could find Braig and Cooper used excessive force against Campbell, plaintiffs' assault and battery claim against these defendants may also proceed.

But because plaintiffs' excessive force claim against Barosa, Malone, Marello, McGee, Menton, Walencik, and Wissner fails, the assault and battery claim against these defendants likewise fails.

### B. United States

The United States argues plaintiffs' FTCA claim for assault and battery must be dismissed because the United States cannot be held liable for the conduct of Braig and Cooper, and because no reasonable juror could conclude the FBI defendants used excessive force or had an opportunity to prevent the shooting.

The Court disagrees that Kenney's use of deadly force was reasonable as a matter of law. However, the Court agrees summary judgment in favor of the United States is warranted to the extent plaintiffs' assault and battery claim is premised on Braig's and Cooper's use of deadly force and the other FBI defendants' conduct.

### 1. Applicable Law

"The [FTCA] is a limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment." United States v. Orleans, 425 U.S. 807, 813 (1976). "Although assault and battery claims against the federal government are usually prohibited, the FTCA permits such claims where, as here, federal law enforcement officers are alleged to have committed assault or battery." Cuoco v. U.S. Bureau of Prisons, 2003 WL 22203727, at \*4 (S.D.N.Y. Sept. 22, 2003) (citing 28 U.S.C. § 2680(h)). Indeed, "[t]he FTCA explicitly avoids waiving sovereign immunity for 'any claim arising out of assault, battery,' and several other intentional torts." Leytman v. U.S. Dep't of Homeland Sec., 804 F. App'x 78,

2023 WL 4867459

80 (2d Cir. 2020) (summary order) (quoting 28 U.S.C. § 2680(h)).

The FTCA defines federal employee to include individuals "acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." 28 U.S.C. § 2671. "For the purposes of the FTCA, the common law of torts and agency defines the distinction between an independent contractor (for whose torts the Government is not responsible) and an employee, servant or agent (for whose torts the Government is responsible)." O'Neil v. United States, 927 F. Supp. 599, 604 (E.D.N.Y. 1996).

**\*17** Thus, an individual is deemed a federal employee under the FTCA only if the "strict control test" is satisfied. In other words, the United States is liable for an individual's torts only if the federal government maintained control over and "manage[d] the details of" the individual's work, or "supervise[d] him in his daily duties." Leone v. United States, 910 F.2d 46, 50 (2d Cir. 1990). It is not enough for the federal government to have acted "generally as an overseer." Id. And "[t]he government's retention of overall authority" over a law enforcement operation, "even in its setting of specific objectives, will not convert local actors to federal employees, so long as the local actors 'are largely free to select the means' of reaching those objectives." Mick v. Brewer, 1995 WL 41679, at \*2 (D. Kan. Jan. 26, 1995), rev'd on other grounds, 76 F.3d 1127 (10th Cir. 1996) (quoting United States v. Orleans, 425 U.S. 807, 816 (1976)).

### 2. FTCA Liability for Braig and Cooper's Allegedly Tortious Conduct

The undisputed facts establish Braig and Cooper are not federal employees for FTCA purposes.

Plaintiffs concede Braig and Cooper were not members of the task force, employees of the FBI, paid by the FBI, or subject to the FBI's disciplinary authority. (Pls. 56.1 Response to Fed. Defs. ¶ 21). And although "the FBI was in command" of the operation (Braig Dep. at 72), the FBI did "not manage the details" of Braig and Cooper's work or "supervise [them] in [their] daily duties." Leone v. United States, 910 F.2d at 50. As plaintiffs point out, "[t]here were no details provided" to Braig and Cooper regarding the plan for "converging on or boxing-in the vehicle" or "the use of deadly force." (Pls. Opp. at 5) (citations omitted). Braig independently decided

to position his vehicle along the driver's side of the subject vehicle, after "surveying the situation" and determining that "the suspect [ ] almost had enough room to come out from ramming" Kenney's and Malone's vehicles. (Braig Dep. at 123, 127). Likewise, no one in the FBI told Braig or Cooper to fire their weapons at Campbell.

Because the strict control test has not been met, the United States cannot be held liable for any torts allegedly committed by Braig and Cooper.

### 3. FTCA Liability for Kenney's Conduct

There are triable issues of fact as to whether Kenney committed assault and battery when acting within the scope of his employment as an FBI agent.

As with the assault and battery claims against the local police defendants, "[t]he same excessive force ... principles apply to the FTCA cause of action for assault and battery against the United States." Scott v. City of White Plains, 2013 WL 1313774, at \*8 (S.D.N.Y. Mar. 18, 2013). Thus, to prevail on their FTCA claim, plaintiffs "must demonstrate that the amount of force used was objectively unreasonable." Id.

There are genuine disputes as to the facts and circumstances confronting Kenney when he fired his weapon, and thus as to whether his use of deadly force was objectively reasonable. Lennox v. Miller, 968 F.3d at 155. For example, a reasonable juror might credit McGee's testimony that Malone was no longer standing by the passenger side of the subject vehicle when the shooting began. Thus, whether Kenney reasonably, although mistakenly, believed that Campbell had "opened fire on TFO Malone" (Doc. #170 ("Fed. Defs. Mem.") at 16), is "the province of the jury." Jones v. Treubig, 963 F.3d at 231.

Accordingly, plaintiffs' FTCA assault and battery claim, to the extent it is premised on Kenney's use of deadly force, may proceed.

### 4. FTCA Liability for the Other FBI Defendants' Conduct

No reasonable juror could conclude Conlon, Fisher, or McKenna used excessive force against Campbell when acting within the scope of their employment as FBI agents. It is undisputed that these defendants did not fire their weapons at Campbell. And to the extent plaintiffs' assault and battery

Case 5:25-cv-00956-AJB-MJK   Document 9   Filed 12/08/25   Page 409 of 529

Campbell v. City of Yonkers, Not Reported in Fed. Supp. (2023)

2023 WL 4867459

claim against these defendants is based on planner liability, failure to intervene, or the box-in maneuver, this claim fails for the reasons set forth in Part III.A above.

**\*18** Accordingly, plaintiffs' FTCA assault and battery claim, insofar as it is premised on the conduct of Conlon, Fisher, and McKenna, must be dismissed.

## VI. Loss of Love, Support, and Familial Relationships Claims

The federal defendants argue plaintiffs' twentieth cause of action—comprising Eric Campbell's claim for the loss of his father's "love, support, familial relationships, and parental guidance" (SAC ¶ 277), and Aida and Robert Campbell's claims for the loss of their son's "love, support, and familial relationships" (id. ¶ 276)—must be dismissed because such losses are not compensable under New York law.

The Court agrees.

In New York, the spouse of an injured or deceased individual may recover for the "loss of consortium," which encompasses the "loss of support or services," as well as "love, companionship, affection, society, sexual relations, solace and more." Rangolan v. County of Nassau, 370 F.3d 239, 248 (2d Cir. 2004) (quoting Millington v. Se. Elevator Co., 22 N.Y.2d 498, 504-05 (1968)). But New York courts do not permit a child to recover for "the loss of parental care, companionship, guidance, love and training," or a parent to recover for the loss of their child's "affection, love and companionship." De Angelis v. Lutheran Med. Ctr., 84 A.D.2d 17, 26–27 (2d Dept. 1981), aff'd De Angelis v. Lutheran Med. Ctr., 58 N.Y.2d 1053, 1055 (1983); see also Devito v. Opatich, 215 A.D.2d 714, 715 (2d Dep't 1995) (plaintiffs' "loss of their minor daughter's society ... is not compensable").

Accordingly, plaintiffs' claims for loss of love, support, familial relationships, and parental guidance must be dismissed.

## VII. Wrongful Death and Conscious Pain and Suffering Claims

Plaintiffs' claims for wrongful death and conscious pain and suffering are derivative of their claims for excessive force and assault and battery. See Chamberlain v. City of White Plains, 986 F. Supp. 2d 363, 398–99 (citing N.Y. Est. Powers & Trusts Law §§ 5–4.1, 11–3.2(b)).

Because there are genuine issues of material fact as to whether the use of deadly force was objectively reasonable, for the reasons stated above, the Court declines to dismiss plaintiffs' wrongful death and conscious pain and suffering claims as against Braig, Cooper, and the United States.

However, because plaintiffs' excessive force and assault and battery claims fail as against Barosa, Malone, Marello, McGee, Menton, Walencik, and Wissner, the wrongful death and conscious pain and suffering claims against these defendants likewise fail. See Chamberlain v. City of White Plains, 986 F. Supp. 2d at 399 ("Because [the defendant] committed no underlying wrong against [the decedent], the conscious pain and suffering and wrongful death claims also fail as a matter of law.").

## VIII. Respondeat Superior Claims

Plaintiffs bring respondeat superior claims against the City of Yonkers premised on the allegedly tortious conduct of the YPD officers who participated in the operation, defendants Braig, Cooper, Marello, Menton, Walencik, and Wissner.

Unlike Section 1983, New York law permits plaintiffs to hold municipalities vicariously liable for torts committed by municipal employees while acting within the scope of their employment. See Triolo v. Nassau Cnty., 24 F.4th 98, 110 (2d Cir. 2022); Jones v. State of New York, 33 N.Y.2d 275, 279-80 (1973) ("A long line of cases has held the State or municipalities liable for the actions of their police officers in the line of duty.").

**\*19** Because plaintiffs have "not demonstrated any basis for liability on the part of" Marello, Menton, Walencik, or Wissner, they "cannot establish respondeat superior liability for those claims." Yusuf v. City of New York, 2022 WL 393882, at \*11 (E.D.N.Y. Feb. 9, 2022).

However, for the reasons stated above, a reasonable jury could find Braig's and Cooper's use of deadly force was excessive, and thus constituted assault and battery under New York law. Accordingly, plaintiffs' claim against the City of Yonkers for assault and battery, and the derivative claims for wrongful death and conscious pain and suffering, may proceed.

**CONCLUSION**

The Tarrytown defendants' motion for summary judgment (19 Civ. 2117 Doc. #174) is GRANTED.

Defendant Malone's motion for summary judgment (19 Civ. 2117 Doc. #186) is GRANTED.

The federal defendants' motion for summary judgment (19 Civ. 2117 Doc. #169 and 19 Civ. 9444 Doc. #89) is DENIED as to plaintiffs' claims against the United States for assault and battery, wrongful death, and conscious pain and suffering, solely to the extent such claims are premised on Kenney's use of deadly force. The federal defendants' motion is otherwise GRANTED.

The Yonkers defendants' motion for summary judgment (19 Civ. 2117 Doc. #178) is DENIED as to (i) plaintiffs' respondeat superior claim against the City of Yonkers for assault and battery, wrongful death, and conscious pain and suffering, and (ii) plaintiffs' claims against Braig and Cooper for excessive force, assault and battery, wrongful death, and conscious pain and suffering, solely to the extent such claims are premised on Braig's and Cooper's use of deadly force. The Yonkers defendants' motion is otherwise GRANTED.

The Clerk is instructed to terminate the following defendants: Police Officer Adam Walencik, Detective Thomas Marello, Sergeant Mark Wissner, Detective Brian Menton, Detective Terence Malone, Sergeant Joseph Barosa, Detective Michael McGee, Agent Brendan Kenney, Agent Andrew Fisher, Agent Daniel Conlon, and Agent Daniel McKenna.

Counsel for the remaining parties shall attend a case management conference on September 12, 2023, at 11:00 a.m., at which time the Court will set a trial date and a schedule for pretrial submissions. Counsel shall also be prepared to discuss what efforts they have made and will continue to make to settle this case.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 4867459

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (4)**

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **1. Complaint**<br>Robert CAMPBELL, as the Administrator of the Estate of Erick Campbell, Robert Campbell, individually, Aida Campbell, and Eric Campbell, Plaintiff, v. CITY OF YONKERS and Police Officers John Doe 1-25, fictitious names used to identify presently unknown police officers, individually and in their official capacities, Defendants.<br>2019 WL 13537043 | — | S.D.N.Y. | Mar. 07, 2019 | Pleading |
| **2. (Deposition of Dr. Michael D. Lyman, B.S., M.S., Ph.D.)**<br>Eric CAMPBELL, as the Administrator d.b.n. of the Estate of Erick Campbell, Eric Campbell, Individually, Michael Campbell, as the Administrator of the Estate of Robert Campbell, and Aida Campbell, Individually, Plaintiffs, v. CITY OF YONKERS, Police Officer Timothy Cooper, Police Officer Thomas Braig, Police Officer Adam Walencik, Detective Thomas Marello, Sergeant Mark Wissner, Detective Brian Menton, Detective Terence Malone, Sergent Joseph Barosa, Detective Michael Mcgee, Agent Brendan Kenney, Agent Andrew Fisher, Agent Daniel Conlon, and Agent Daniel Mckenna, Defendants; Eric Campbell, as the Administrator d.b.n. of the Estate of Erick Campbell, Eric Campbell, Individually, Michael Campbell, as the Administrator of the Estate of Robert Campbell, and Aida Campbell, Individually, Plaintiffs, v. United States of America, Defendant.<br>2022 WL 20016929 | — | S.D.N.Y. | June 01, 2022 | Expert Materials |
| **3. (Report or Affidavit of Dr. Michael D. Lyman, B.S., M.S., Ph.D.)**<br>Robert CAMPBELL, et al., v. UNITED STATES OF AMERICA.<br>2022 WL 20032614 | — | S.D.N.Y. | Jan. 03, 2022 | Expert Materials |
| **4. Docket 7:19-CV-09444**<br>Campbell et al v. United States Of America | — | S.D.N.Y. | Oct. 11, 2019 | Docket |

**History (2)**

**Direct History (1)**

1.  Campbell v. City of Yonkers
    2023 WL 4867459 , S.D.N.Y. , July 31, 2023

**Related References (1)**

⚑ 2.  Campbell v. City of Yonkers
    2020 WL 5548784 , S.D.N.Y. , Sep. 16, 2020

2022 WL 991402
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Yolanda KEYES, Administratrix of the
Estate of Francisco DeJesus; Herron
Emerenciano; and Rashad Scott, Plaintiffs,
v.
Donald VENETTOZZI, Director Special Housing and
Inmate Discipline; Michael Dixon, Sergeant; Jeffery
Rock, Lieutenant; Earl Bell, Deputy Superintendent
of Security; Jerry Kowalowski, Recreation Program Leader;
and Richard Houck, Transfer Coordinator, Defendants.

9:18-CV-0372 (GTS/DJS)
|
Signed 03/31/2022

**Attorneys and Law Firms**

HALLIE E. MITNICK, ESQ., MEGAN WELCH, ESQ.,
PRISONERS' LEGAL SERVICES OF NY, Counsel for
Plaintiffs, 114 Prospect Street, Ithaca, NY 14850.

HON. LETITIA A. JAMES, Attorney General for the State
of New York, ERIK B. PINSONNAULT, ESQ., Assistant
Attorney General, Counsel for Defendants, The Capitol,
Albany, NY 12224.

## DECISION and ORDER

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this prisoner civil rights
action filed by Yolanda Keyes (as administratrix of the estate
of Francisco DeJesus), [1] Herron Emerenciano, and Rashad
Scott ("Plaintiffs") against Special Housing and Inmate
Discipline Director Donald Venettozzi, Sergeant Michael
Dixon, Deputy Superintendent of Security Earl Bell, Sergeant
Jeffery Rock, Recreation Program Leader Jerry Kowalowski,
and Transfer Coordinator Richard Houck ("Defendants"), is
Defendants' motion for summary judgment. (Dkt. No. 69.)
For the reasons set forth below, Defendants' motion is granted
in part and denied in part.

[1] The Court notes that, for the ease of reading, it will
still refer to Francisco DeJesus as a plaintiff in this
action.

## I. RELEVANT BACKGROUND

### A. Plaintiffs' Amended Complaint

Generally, Plaintiffs' Amended Complaint alleges that
Defendants violated their due process rights and took various
adverse actions against them at Clinton Correctional
Facility ("Clinton") in 2015 and 2016 as a result of Plaintiffs' election
(by fellow prisoners) to Clinton's Inmate Liaison Committee
("ILC") following the well-publicized escape of two inmates
(Richard Matt and David Sweat) from Clinton's Honor
Block. (Dkt. No. 17 [Pls.' Am. Compl.].) Five claims in the
Amended Complaint survived the Court's Decision and Order
of September 23, 2019: (1) a First Amendment retaliation
claim by Plaintiff DeJesus against Defendants Dixon and
Rock; (2) a First Amendment retaliation claim by Plaintiff
Emerenciano against Defendants Kowalowski and Bell; (3) a
First Amendment retaliation claim by Plaintiff Scott against
Defendant Houck; (4) a Fourteenth Amendment due process
claim by Plaintiff Emerenciano against Defendants Bell and
Venettozzi; and (6) a supervisory liability claim by Plaintiffs
against Defendant Venettozzi. (Dkt. No. 40, at 50.)

### B. Undisputed Material Facts on Defendants' Motion
### for Summary Judgment

Before reciting the undisputed material facts on Defendants'
motion, the Court observes that, in addition to their Rule 7.1
Response, Plaintiffs have submitted what they characterize as
a "Statement of Additional Facts" that "are either undisputed
or at least supported by sufficient record evidence that the
jury could accept them...." (Dkt. No. 73, Attach. 1, at 9-22.)
Of course, no Statement of *Undisputed* Additional Facts is
permitted under the District's Local Rules of Practice. *See*
N.D.N.Y. L.R. 56.1(b) ("In addition, the opposing party's
Response may set forth any assertions that the opposing party
contends are in dispute in a short and concise Statement of
Additional Material Facts *in dispute* ....") (emphasis added).
Furthermore, many of Plaintiffs' additional factual assertions
are immaterial to the resolution of the issues presented
by Defendants' motion. *Id.* (permitting a "Statement of
Additional *Material* Facts in Dispute....") (emphasis added).
However, to the extent Plaintiffs actually assert additional
material facts not in dispute, the Court will take them
into consideration in its below recitation of the undisputed
material facts.

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 414 of 529

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)
2022 WL 991402

**\*2** The following facts were asserted and supported with accurate record citations by Defendants in their Statement of Material Facts and either expressly admitted by Plaintiffs or denied by them without appropriate record citations in their response thereto. (*Compare* Dkt. No. 69, Attach. 1 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 73, Attach. 1 [Pls.' Rule 7.1 Resp.].)

Defendant Dixon's Misbehavior
Report Against Plaintiff DeJesus

1. At some point before January 27, 2016, Defendant Dixon received from the staff at Clinton both a copy of both a letter authored and sent by Plaintiff DeJesus to the State Commission on Corrections ("SCOC") and a direction to investigate the letter (at least in part) for a possible violation of disciplinary rules by Plaintiff DeJesus. [2]

[2]    The Court notes that, although Plaintiffs dispute "in part" this statement of material fact, they cite to no admissible record evidence controverting it.

2. During his investigation into the matter, Defendant Dixon interviewed Plaintiff DeJesus.

3. During this interview, Plaintiff DeJesus reiterated the same assertions that he had included in his letter to the SCOC.

4. Based upon the letter that Plaintiff DeJesus had sent to the SCOC, his remarks made to Defendant Dixon during his interview, and Defendant Dixon's consultation with Defendant Rock, Defendant Dixon issued a misbehavior report against Plaintiff DeJesus dated January 27, 2016, charging him with violations of Disciplinary Rules 102.10 and 107.11.

5. On February 1, 2016, Defendant Rock began to conduct Plaintiff DeJesus' Tier III disciplinary hearing. Defendant Rock was the only Defendant who conducted Plaintiff DeJesus' Tier III disciplinary hearing.

6. Defendant Rock completed this hearing on February 12, 2016, finding Plaintiff guilty of both charges.

7. On June 3, 2016, Defendant Venettozzi reversed the decision that had been issued by Defendant Rock after the completion of the Tier III hearing on February 12, 2016. [3]

[3]    The Court notes that the Superintendent's hearing reversal resulted in the expunction of both charges against Plaintiff DeJesus.

8. Defendant Venettozzi electronically signed the document memorializing the reversal of Defendant Rock's decision.

Defendant Kowalowski's Misbehavior
Report Against Plaintiff Emerenciano

9. Defendant Kowalowski is currently employed by the New York State Department of Corrections and Community Supervision ("DOCCS") as a Recreation Program Leader Two ("RPL Two").

10. Excluding a brief stint between early 2016 through July 2016, when he served as a Recreation Program Leader Three ("RPL Three") at Upstate Correctional Facility ("Upstate"), Defendant Kowalowski has held the position of RPL Two at Clinton since approximately 2004 or 2005.

11. During one of the ILC's meetings at Clinton in or around October 2015, some ILC members had expressed their disagreement with a policy that requires inmates to lay on the ground when an altercation occurs in the prison yard. [4]

[4]    The Court deems this fact to be undisputed because Plaintiffs have failed to provide a specific record cite in support of their partial dispute of this fact. *See* N.D.N.Y. L.R.(a)(3) ("Each fact listed shall set forth a specific citation to the record where the fact is established ... Each denial shall set forth a specific citation to the record where the factual issue arises."); *see also, e.g., Rizzo v. Health Rsch., Inc.,* 12-CV-1397, 2016 WL 632546, at \*2 (N.D.N.Y. Feb. 16, 2016) ("Of these 136 denials, 117 denials do not contain a specific citation to the record. Therefore, the facts 'denied' by these paragraphs will be deemed admitted."); *Benson v. Otis Elevator Co.,* 10-CV-3246, 2012 WL 4044619, at \*1, n.1 (S.D.N.Y. Sept. 13, 2012) (deeming fact asserted by movant to be admitted by non-movant where non-movant supported denial "only with non-specific citations to the entire testimony of several witnesses"); *Univ. Calvary Church v. City of New York,* 96-CV-4606, 2000 WL 1538019, at \*2, n.6 (S.D.N.Y. Oct. 17, 2000)

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 415 of 529

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

2022 WL 991402

("Despite the clear language of Rule 56 requiring specificity, Plaintiffs rarely offers an exact cite in support of their version of the facts ... [A] vague cite to all of the exhibits is simply unacceptable.").

**\*3** 12. During the ILC meeting, Plaintiff Emerenciano expressed concerns about problems the policy could lead to at the prison. [5]

[5]     The Court notes that Defendant Kowalowski (who was present at the meeting) has testified that he heard Plaintiff Emerenciano say that "it would only take one inmate to stand up during a similar situation in the future, and that there will be another 'eighty-three' as a result." Defendant Kowalowski interpreted this use of the term "eighty-three" as a reference to a prison riot that had occurred at Clinton in 1983. However, Plaintiff Emerenciano has testified that he never said such a thing and had not even known of the 1983 riot at the time.

13. After this ILC meeting, the administration instructed Defendant Kowalowski to issue a misbehavior report against Plaintiff Emerenciano for making threats. [6] Defendant Kowalowski issued a misbehavior report against Plaintiff Emerenciano dated October 2, 2015, charging him with violating Disciplinary Rules 102.10 and 104.12.

[6]     The Court deems this fact to be undisputed by Plaintiffs because Plaintiffs' Rule 7.1 Response begins with the word "Undisputed," and then attempts to provide more "specific[s]" about the above asserted fact. *See Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at \*1 n.2 (S.D.N.Y. June 5, 2009) (holding that "the statement provided by Defendants is taken as true because Plaintiff[']s initial response in each instance is 'Admit'"); *CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at \*2 n.3 (E.D.N.Y. Apr. 8, 2015) (holding that "the Court will consider each statement provided by [Plaintiff] as undisputed because [Defendant's] initial response in each instance is, in fact, 'Undisputed'").

14. On October 8, 2015, Defendant Bell conducted Plaintiff Emerenciano's Tier III disciplinary hearing at Upstate.

15. At Plaintiff Emerenciano's Tier III disciplinary hearing, Defendant Bell served as the hearing officer.

16. Defendant Bell found Plaintiff Emerenciano guilty of the charges set forth in the misbehavior report that Defendant Kowalowski had issued.

17. On November 30, 2015, the Acting Director of the Special Housing and Inmate Disciplinary Program, Corey Bedard, reviewed and modified Plaintiff Emerenciano's Special Housing Unit ("SHU") confinement time from 270 days to 180 days, with 90 of those days being suspended. On April 16, 2016, Defendant Venettozzi reversed the outcome of the Tier III disciplinary hearing that had occurred on October 8, 2015.

### Defendant Houck's Transfer of Plaintiff Scott

18. Defendant Houck is employed by DOCCS as a classification analyst in its Office of Classification and Movement ("OCM").

19. Defendant Houck works at the DOCCS' offices located in Albany, New York, and not at Clinton.

20. In his role as a classification analyst, Defendant Houck oversees inmate transfers between DOCCS correctional facilities. Defendant Houck receives reviews from individual correctional facilities, processes those reviews and decides these transfers. Specifically, Defendant Houck receives reviews when a correctional facility sends an electronic copy of a transfer referral through one of two possible methods. First, some of the inmate "transfer referrals are scheduled at the facility, possibly due to a change in security, or due to an inmate's preference." Second, some of the inmate transfer referrals are "unscheduled transfer reviews from facilities for other reasons, including medical or mental health reasons." However, before Defendant Houck receives a transfer referral from a DOCCS facility, three DOCCS employees—the Offender Rehabilitation Coordinator ("ORC"), Supervising Offender Rehabilitation Coordinator ("SORC"), and the Deputy Superintendent of Programs working at that facility —ordinarily must approve the transfer referral. Furthermore, ordinarily, Defendant Houck receives several hundred transfer referrals each month.

**\*4** 21. On October 7, 2015, Plaintiff Scott underwent what is known as a "preference lateral transfer" review at Clinton.

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 416 of 529

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

2022 WL 991402

22. Plaintiff Scott had indicated a preference to be transferred to the Sullivan hub.

23. On or about October 27, 2015, Plaintiff Scott was transferred from Clinton to Green Haven Correctional Facility ("Green Haven").

## I. RELEVANT LEGAL STANDARDS

### A. Standard Governing Motions for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). [7] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

[7]  As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[the non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).

### B. Standard Governing Claims Under 42 U.S.C. § 1983

Section 1983 of the Civil Rights Act of 1871 provides a civil claim for damages against any person who, acting under color of state law, deprives another person of a right, privilege or immunity secured by the Constitution or the laws of the United States. 42 U.S.C. § 1983; *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999). Section 1983 does not create any substantive right in and of itself, but rather serves as the statutory vehicle by which individuals can seek redress in federal court for alleged violations of federal statutory or constitutional rights. It is well established that state prisoners are protected by Section 1983 and may bring claims based on their deprivation of rights while subject to confinement. *Cooper v. Pate*, 378 U.S. 546, 546 (1964). In a case where a prisoner is suing prison officials based on their deprivation of rights, Section 1983 serves a dual purpose: first, to deter prison officials, acting as state actors, from using their authority to deprive prisoners of their constitutional rights, and second, to provide relief to prisoners when necessary. *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

### 1. Standard Governing Retaliation Claims Under the First Amendment

**\*5** To establish a First Amendment retaliation claim under Section 1983, a prisoner must show the following: "(1) ... the speech or conduct at issue was protected, (2) ... the defendant took adverse action against the plaintiff, and (3) ... there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted). "[I]n the prison context ... adverse action" is "defined ... objectively[ ] as retaliatory conduct that would deter a similarly situated individual of ordinary fitness from exercising ... [his or her] constitutional rights." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (internal quotation marks and citation omitted). Notably, "this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill*, 389 F.3d at 381. With respect to the existence of a causal connection between the plaintiff's alleged protected conduct and the defendant's alleged adverse action, although " '[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was in close in time to the adverse action[,]' [s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." *Rosebro v. Gillespie*, 791 F. Supp.2d 353, 370 (S.D.N.Y. 2011) (quoting *Espinal*, 558 F.3d at 129).

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 417 of 529

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

2022 WL 991402

However, "[e]ven if [a] plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct." *Brooks v. Rock*, 11-CV-1171, 2014 WL 1292232, at *18 (N.D.N.Y. Mar. 28, 2014) (Sharpe, C.J.); *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred.") (italics omitted).

"[P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennet v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks and citations omitted). As a result, the Second Circuit requires courts to "examine prisoners' claims of retaliation with skepticism and particular care." *Colon*, 58 F.3d at 872. Therefore, "a plaintiff asserting such a claim bears a heightened burden of proof and must plead the claim with particularity." *Green v. Phillips*, 04-CV-10202, 2006 WL 846272, at *3 (S.D.N.Y. Mar. 31, 2006) (citing *Brown v. Middaugh*, 41. F. Supp.2d 172, 191 [N.D.N.Y. 1999]). Furthermore, a plaintiff must provide non-conclusory allegations in support of his or her retaliation claim. *Green*, 2006 WL 846272, at *3; *see Williams v. Goord*, 111 F. Supp.2d 280, 290 (S.D.N.Y. 2000) ("In recognition of the reality that retaliation claims can be fabricated easily, plaintiffs bear a somewhat heightened burden of proof, and summary judgment can be granted if the claims appear insubstantial.") (internal quotation marks and citation omitted).

Finally, allegations set forth in support of retaliation claims "may still be deemed conclusory if [they are] (1) largely unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." *Smith v. Woods*, 03-CV-0480, 2006 WL 1133247, at *3 (N.D.N.Y. Apr. 24, 2006).

**2. Standard Governing Procedural Due Process Claims Under the Fourteenth Amendment**

The Fourteenth Amendment's Due Process Clause protects an individual's procedural and substantive rights. *Page v. Cuomo*, 478 F. Supp.3d 355, 370 (N.D.N.Y. 2020). With regard to an individual's procedural due process rights, a prisoner "has the right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). Therefore, to establish a procedural due process claim, a plaintiff must show two elements: "(1) that he possessed a liberty interest and (2) that the defendants deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F. Supp.3d 223, 225 (2d Cir. 2001).

**\*6** With regard to the first element, generally, "[p]rison discipline implicates a liberty interest when it imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Burroughs*, 325 F. Supp.3d at 275. To constitute an "atypical and significant hardship," the conditions imposed upon the inmate must be compared with those imposed upon the rest of the population of the facility as well as those in administrative and protective confinement." *Id.* at 276. The Court should consider both the duration and the conditions of confinement when assessing the severity of the hardship. *Id.* Generally, confinements in SHU for a period up to 101 days under normal conditions will not constitute an atypical hardship, while confinement for a period of more than 305 days has been considered atypical even under normal conditions. *Id.* The Second Circuit has indicated that "the ultimate issue of atypicality is one of law." *Sealey v. Giltner*, 187 F.3d 578, 585 (2d Cir. 1999).

With regard to the second element, generally, the amount of process given to a plaintiff depends on three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of erroneous deprivation of such interest through the procedures used;" and (3) "the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

**3. Standard Governing Supervisory Liability Claims Under the First and Fourteenth Amendments**

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d

2022 WL 991402

880, 885 [2d Cir. 1991]); *see also McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977)* (reiterating that, in order to award damages under Section 1983, defendants must be personally involved in the plaintiff's alleged constitutional deprivation). Pursuant to this requirement, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas, 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008)* (quoting *Bass v. Jackson, 790 F.2d 260, 263 [2d Cir. 1986]*) (other citation omitted). More simply stated, a complaint needs to allege who did what, and how that behavior is actionable under the law. *Hendrickson v. U.S. Attorney Gen.*, 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994). As for who did what, the Second Circuit has defined "personal involvement" to include both direct participation (i.e., the personal participation by a person who has knowledge of the facts that make their conduct illegal) and indirect participation (i.e., the ordering or helping of others to conduct themselves in an unlawful manner). *Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001).*

With respect to how to establish the personal involvement of supervisory officials, "a plaintiff asserting a Section 1983 claim against a supervisory official in his individual capacity must allege that the supervisor was personally involved in the alleged constitutional deprivation." *Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 254 (2d Cir. 2001).* This means that "a defendant in a Section 1983 action may not be held liable for damages for constitutional violations merely because [he or she] held a high position of authority." *Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996); see also Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013)* (affirming a district court's dismissal of claims against a prison officer where the inmate-plaintiff failed to allege the officer's personal involvement in, or awareness of, the health and safety concerns raised by the plaintiff).

Until 2009, when the Supreme Court decided *Ashcroft v. Iqbal, 556 U.S. 662 (2009)* ("*Iqbal*"), the Second Circuit's general rule was that a supervisory official's personal involvement could have been proven by showing any five factors:

> **\*7** (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy

the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)* ("*Colon*").

However, *Iqbal* cast some doubt on the supervisory liability test set forth in *Colon*. *See Reynolds v. Barrett, 685 F.3d 193, 205 (2d Cir. 2012)* (stating that the decision in *Iqbal* caused conflict with the Second Circuit about the continued vitality of the supervisory liability test, but declining to rule on the issue because it did not apply to the facts of the case). [8] It was unclear in the Second Circuit, up until recently, how the *Iqbal* decision would affect the *Colon* test. [9]

[8]
> In *Iqbal*, after a Pakistani Muslim detainee filed suit against federal officials for confinement based on religion, race, and/or national origin, the Supreme Court held that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution. *Iqbal, 556 U.S. at 676.*

[9]
> In 2013, the Second Circuit decided two cases surrounding this issue: (1) in *Grullon v. City of New Haven*, the Circuit implied that *Iqbal* may have heightened the requirements for showing a supervisor's personal involvement (but did not directly rule on it) and (2) in *Hogan v. Fischer, 738 F.3d 509, 513 n.3 (2d Cir. 2013)*, the Circuit expressed no view on the extent to which Iqbal may have heightened the requirements for showing a supervisor's personal involvement. *Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2013).* More recently, in 2019, this Court explained that the Second Circuit had not yet addressed how *Iqbal* affected the standards in *Colon* for establishing

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 419 of 529

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

2022 WL 991402

supervisory liability, it may have limited the *Colon* factors (so as to permit the use of only the first and third factors listed above). *Rasheen v. Adner*, 356 F. Supp.3d 222, 233-34 (N.D.N.Y. 2019).

In December 2020, the Second Circuit held that "there is no special rule for supervisory liability" and, that a "plaintiff must plead and prove 'that each [g]overnment-official defendant, through the official's *own individual actions*, had violated the Constitution.' " *Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676) ("*Tangreti*"). " 'The factors necessary to establish a [Section 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary." *Tangreti*, 983 F.3d at 618 (quoting *Iqbal*, 556 U.S. at 676). Therefore, any constitutional violation brought under Section 1983 must be established against the supervisory official directly. *Tangreti*, 983 F.3d at 618.

Since *Tangreti* was decided in December 2020, courts in this Circuit have interpreted it in the same way: that the new standard in *Tangreti* has abrogated and completely replaced the factors set forth in *Colon*. *See, e.g., Zielinski v. Annucci*, 17-CV-1042, 2021 WL 2744684, at *8 (N.D.N.Y. July 2, 2021) (explaining that the Second Circuit's holding in *Tangreti* abrogated the factors from *Colon* and catalogued the confusion over to what extent the Supreme Court's decision in *Iqbal* effected those factors); *Delaney v. Perez*, 19-CV-6084, 2021 WL 3038642, at *3 (S.D.N.Y. July 16, 2021) (stating that the standards for supervisory liability set out in *Colon* may not be used, as they have been replaced with the new standard set forth in *Tangreti*: that each government-official, through the official's own individual actions, must have violated the Constitution); *Smith v. Westchester Cnty.*, 19-CV-3605, 2021 WL 2856515, at *6 (S.D.N.Y. July 7, 2021) (explaining that in the context of a Fourteenth Amendment claim, the standards for supervisory liability from *Colon* may not be used, and instead, a plaintiff must demonstrate, through factual allegations, that each individual defendant meets all the elements required by the specific claim raised by the plaintiff); *Savarese v. City of New York*, 18-CV-5956, 2021 WL 2784501, at *28 (S.D.N.Y. July 2, 2021) (stating that *Tangreti* repudiated *Colon* and established a new standard); *Hill v. Cook*, 21-CV-0851, 2021 WL 2661676, at *3 (D. Conn. June 29, 2021) (explaining that the Second Circuit adopted the holding from *Iqbal* in their decision in *Tangreti*, so ultimately, the new standard is that each defendant must be personally aware of or disregard the alleged constitutional violation being raised by the plaintiff).

**\*8** "[I]n order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Rasheen v. Adner*, 356 F. Supp.3d 222, 235 (N.D.N.Y. 2019). Where the defendants are supervisory officials, "a mere linkage to the unlawful conduct through the prison chain of command (i.e., under the doctrine of *respondeat superior*) is insufficient to show his or her personal involvement in that unlawful conduct." *Id.* (citing *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 [1981]; *Richardson v. Goord*, 347 F.3d 431, 435 [2d Cir. 2003].)

## II. ANALYSIS

### A. Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' First Amendment Retaliation Claims Against Them

#### 1. Plaintiff DeJesus' First Amendment Retaliation Claim Against Defendant Dixon

It is well settled that an inmate's filing of grievances while participating on an ILC and writing of complaints to the SCOC constitute constitutionally protected activity. *See Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (holding that "filing or voicing grievances on behalf of a prison population as a member of an inmate grievance body, such as the ILC," constitutes constitutionally protected conduct; *Vega v. Artus*, F. Supp.2d 185, 206 (N.D.N.Y. 2009) (Suddaby, J.) (recognizing that filing grievances is a constitutionally protected activity); *Wheeler v. Goord*, 03-CV-0787, 2005 WL 2180451, at *9 (N.D.N.Y. Aug. 29, 2005) (Peebles, M.J.) ("[P]laintiff's alleged filing of grievances and writing of letters to prison authorities ... constituted protected activity within the ambit of First Amendment retaliation jurisprudence.").

Moreover, the receipt of a false misbehavior report resulting in punishment and/or the receipt of a transfer to a different facility have been found to constitute adverse actions. *See Cabbagestalk v. Hudson*, 15-CV-0167, 2016 WL 5404233, at *4 (N.D.N.Y. Aug. 29, 2016) (Hummel, M.J.) ("[A]n inmate's transfer to a different facility does constitute an adverse action if done in retaliation for the inmate's exercise of his or her rights under the First Amendment.") (citing *Smith v. Levine*, 510 F. App'x 17, 21 [2d Cir. 2013]), *adopted by* 2016 WL 5394734 (N.D.N.Y. Sept. 27, 2016) (Sharpe, J.); *Reed v. Doe No. 1*, 11-CV-0250, 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (Peebles, M.J.) (finding that the

"filing of a false misbehavior report can qualify as an adverse action for the purposes of a First Amendment retaliation" where the report resulted in a fourteen-day term in keeplock confinement), *adopted by* 2012 WL 4486085 (N.D.N.Y. Sept. 27, 2012) (McAvoy, J.); *Tafari v. McCarthy*, 714 F. Supp.2d 317, 373 (N.D.N.Y. 2010) (Lowe, M.J., Hurd, J.) (finding that a misbehavior report that resulted in SHU confinement constituted an adverse action).

As a result, the issue before the Court is whether the causation element of a retaliation claim has been established. Defendants argue that Plaintiff DeJesus has failed to provide evidence that Defendant Dixon issued a misbehavior report against DeJesus for retaliatory purposes. (Dkt. No. 69, Attach. 2, at 6-9 [Defs.' Mem. of Law].) [10] According to Defendant Dixon, he neither attended any ILC meetings nor served on the IGRC at the relevant time period (i.e., 2015 through 2016), during which Plaintiff DeJesus made complaints of assault and harassment by DOCCS staff. (*Id.* at 7-8.)

[10]    Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office, and not the numbers on the documents themselves.

**\*9** More specifically, Defendant Dixon argues that he received a copy of the letter-complaint that Plaintiff DeJesus had sent to the SCOC, and was directed to investigate whether Plaintiff DeJesus had violated any prison disciplinary rules. (Dkt. No. 69, Attach. 6, at 2 [Dixon Decl.].) As part of his investigation, Defendant Dixon interviewed Plaintiff DeJesus, and Plaintiff DeJesus repeated the same assertions that he had made in his letter to the SCOC. (*Id.*) At the conclusion of his investigation, Defendant Dixon believed that Plaintiff DeJesus "constituted a threat ... to the safety and operation of the facility." (*Id.*) Specifically, Defendant Dixon believed that the letter written to SCOC had indicated that Plaintiff DeJesus "would take action against any [DOCCS] staff member who attempted to discipline [him] for future misconduct." (*Id.*) Before issuing the misbehavior report to Plaintiff DeJesus, Defendant Dixon consulted with both a member of the IGRC and Clinton's "tier hearing lieutenant" to determine if Defendant Dixon was correctly perceiving a threat from Plaintiff DeJesus. (*Id.* at 2-3.) [11] Both individuals informed Defendant Dixon that Plaintiff DeJesus' actions warranted the issuance of a misbehavior report. (*Id.*)

[11]    The Court notes that this "tier hearing lieutenant" was Defendant Rock (Dkt. No. 69, Attach. 10, at 78.)

Not surprisingly, Plaintiff DeJesus disputes Defendant Dixon's version of events. Plaintiff DeJesus argues that Defendant Dixon issued him a misbehavior report "expressly upon the nature and content of his complaint letter [sent] to the SCOC," and his statement that he would pursue legal action if his protected conduct resulted in unlawful retaliation. (Dkt. No. 73, at 19-20 [Pls.' Opp'n Mem. of Law].) More specifically, Plaintiffs argue that it is undisputed that Defendant Dixon issued a misbehavior report to Plaintiff DeJesus for "filing grievances and writing complaints to the SCOC and imposing disciplinary sanctions and placing him in [k]eeplock confinement as retaliation for [filing] those grievances, all of which resulted in his summary removal from the ILC and loss of an opportunity to appear early before the merit parole board for release consideration." (*Id.* at 18-24.)

According to Defendant Dixon's inmate misbehavior report against Plaintiff DeJesus dated January 27, 2016, Plaintiff DeJesus was interviewed in the IGRC office about the letter complaint he had sent to the SCOC regarding DOCCS officers Benware and Favreau. (Dkt. No. 69, Attach. 18.) Furthermore, according to the misbehavior report, Plaintiff DeJesus had written that "any attempt to discipline him will result in a '[c]ivil [a]ction' against [DOCCS officers Benware and Favreau]." (*Id.*) As a result, according to the misbehavior report, Defendant Dixon charged Plaintiff DeJesus with making threats and engaging in verbal harassment, and ordered that he "keeplocked," because Defendant Dixon had found that Plaintiff DeJesus' statements constituted a "clear threat to the operation of 40-1 building where he is housed as well as the safety of [DOCCS] [o]fficers Benware and Favreau." (*Id.*)

Generally, no violation of Rules 102.10 and 107.11 occurs when a prisoner tells a corrections officer that the prisoner will file a lawsuit against the corrections officer, unless the lawsuit is patently frivolous. *Compare Davidson v. Lee*, 104 F.3d 352, at \*1 (2d Cir. 1996) (denying defendants' motion for summary judgment where "Wood's [misbehavior] report arguably supports Davidson's allegation as it refers to Davidson's threat of litigation—'I'm going to sue you and your family'—therefore indicating that Davidson's propensity for filing lawsuits may have been a factor the defendants considered in filing the reports.") *and Amaker v. Goord*, 06-CV-0490, 2012 WL 4718661, at \*7 (W.D.N.Y. Aug. 16, 2012) ("[T]he hearing

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 421 of 529

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

2022 WL 991402

officer found '[i]ndicating you intend to sue is not a violation of 102.10' ....") *with Henry v. Dinelle*, 10-CV-0456, 2011 WL 5975027, at *7, n.11 (N.D.N.Y. Nov. 29, 2011) ("[F]iling a court action that is frivolous is not constitutionally protected activity.").

Here, based on the current record, the Court is unable to find that the lawsuit referenced by Plaintiff DeJesus was patently frivolous. The Court respectfully disagrees with Defendant Rock's understanding that Plaintiff DeJesus was saying that he would sue even if he were charged with a disciplinary violation "for good cause." (Dkt. No. 69, Attach. 14, at 81.) To the contrary, Plaintiff DeJesus expressly conditioned the filing of a lawsuit on "any *fabrication* of contraband; drugs; weapons, etc." (Dkt. No. 69, Attach. 19, at 8 [emphasis added].)

 **\*10** Under the circumstances, the Court finds that a jury could reasonably find that there was a causal connection between Plaintiff DeJesus' protected speech (i.e., his statement that he would pursue future legal action against officers Benware and Favreau if they continued to discipline him) and the adverse action taken by Defendant Dixon (i.e., his filing of the misbehavior report against Plaintiff DeJesus that resulted in his keeplock confinement).

For all these reasons, the Court denies Defendants' motion for summary judgment on Plaintiff DeJesus' First Amendment retaliation claim against Defendant Dixon.

### 2. Plaintiff DeJesus' First Amendment Retaliation Claim Against Defendant Rock

Defendants argue that Plaintiff DeJesus has failed to provide evidence that Defendant Rock took any adverse action against DeJesus and that, if he did so, the adverse action was caused by DeJesus' protected speech. (Dkt. No. 69, Attach. 2, at 9-10 [Defs.' Mem. of Law].) More specifically, Defendants argue that no evidence exists that Defendant Rock conspired with any other Defendants, or served as a biased hearing officer at Plaintiff DeJesus' Tier III disciplinary hearing. (*Id.*) Defendants also argue that the admissible record evidence indicates that Defendant Rock was not involved in the investigation into Plaintiff DeJesus' alleged misbehavior before being appointed hearing officer. (*Id.*) Finally, Defendants argue that Defendant Rock was unaware of Plaintiff DeJesus' discipline history, because he was never mentioned in any of Plaintiff DeJesus' prior grievances made

against officers Benware and Favreau, he never served in an active capacity at the ILC meetings, and no other Plaintiffs testified to interacting with (or even meeting) Rock. (*Id.*)

Plaintiffs respond that Defendant Rock acted with a retaliatory motivation when he improperly punished Plaintiff DeJesus for engaging in protected conduct. (Dkt. No. 73, at 24 [Pls.' Opp'n Mem. of Law].) More specifically, Plaintiffs argue that "[i]t is clear from the content of the misbehavior report, which Defendant Rock upheld and condoned, that 'but for' Mr. DeJesus' protected activities the misbehavior report would not have been issued [sic]." (*Id.*)

Defendant Rock served as the presiding hearing officer for Plaintiff DeJesus' Tier III disciplinary hearing. According to his declaration, when Defendant Rock was scheduled to serve as a hearing officer, he would not partake in any substantive pre-hearing discussions with DOCCS staff. (Dkt. No. 69, Attach. 5, at 3 [Rock Decl.].) At the conclusion of Plaintiff DeJesus' Tier III disciplinary hearing, Defendant Rock found Plaintiff DeJesus guilty of the charges contained within the misbehavior report issued by Defendant Dixon. (*Id.*) More precisely, Defendant Rock determined that, by threatening future legal action, Plaintiff DeJesus "was trying to preemptively identify future conflicts with [DOCCS] staff as retaliation and to potentially deter staff from doing their jobs." (*Id.*)

"An inmate subject to a disciplinary proceeding is entitled to an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996). An impartial hearing officer is "one who, *inter alia*, does not prejudge the evidence and who cannot say ... how he would assess the evidence he has not seen yet." *Patterson v. Coughlin*, 905 F.2d 564, 569-70 (2d Cir. 1990); *see also Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989) ("[I]t would be improper for prison officials to decide the disposition of a case before it was heard.").

 **\*11** Granted, "prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen*, 100 F.3d at 259. "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* On a motion for summary judgment, an inmate's subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis*, 891 F.2d at 47; *Clyde v. Schoellkopf*, 714 F. Supp.2d 432, 437-38 (W.D.N.Y. 2010).

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 422 of 529
Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)
2022 WL 991402

Here, it is uncontroverted that that Defendant Dixon consulted with Defendant Rock before he issued the misbehavior report to Plaintiff DeJesus. (Dkt. No. 69, Attach. 10, at 78.) According to Defendant Dixon, Defendant Rock "concurred with [his] interpretation" that, in Plaintiff DeJesus' letter to SCOC, his threat of future "civil action," constituted a "threat[ ] [against] two officers in the operation of the dorm," thereby warranting the issuance of a misbehavior report. (*Id.* at 78.) Moreover, liberally construed, Plaintiff DeJesus' retaliation claim against Defendant Rock alleges retaliation not simply by failing to recuse himself as the hearing officer (due to his involvement in the charging decision) [12] but by conspiring with Defendant Dixon to charge him without adequate grounds. (Dkt. No. 1, at ¶¶ 13, 67, 83, 183, 185.)

[12]    The Court notes that "both DOC[C]S regulations and the law of this Circuit prohibit a prison official who was involved in investigating the underlying charges from acting as a hearing officer." *Silva v. Sanford*, 91-CV-1776, 1994 WL 455170, at *12 (S.D.N.Y. Aug. 18, 1994); *see also Powell v. Ward*, 542 F.2d 101, 103 (2d Cir. 1976) ("[N]o person who has *participated* in the investigation of [the] acts complained of or who has been a witness to such acts could be a member of a ... Superintendent's Proceeding relating to those acts." [emphasis added]).

For these reasons, the Court denies Defendants' motion for summary judgment on Plaintiff DeJesus' First Amendment retaliation claim against Defendant Rock.

### 3. Plaintiff Emerenciano's First Amendment Retaliation Claim Against Defendant Kowalowski

Defendants argue that Plaintiff Emerenciano has failed to provide any evidence establishing that any adverse action taken by Defendant Kowalowski against Emerenciano was caused by Emerenciano's protected speech. (Dkt. No. 69, Attach. 2, at 10 [Defs.' Mem. of Law].) Instead, Defendants argue that Plaintiff Emerenciano could only "surmise" that Defendant Kowalowski "probably had to retaliate against [him]" because of a prior grievance that Plaintiff Emerenciano had submitted against Defendant Kowalowski. [13] (*Id.*)

[13]    The Court notes that Plaintiff Emerenciano had submitted a grievance against Defendant

Kowalowski because Kowalowski had not placed Emerenciano on the ILC callout list. (Dkt. No. 69, Attach. 17, at 53-54 [Emerenciano Tr.].) In the same grievance, Plaintiff Emerenciano also requested that Defendant Kowalowski be removed from his role as the ILC civilian representative. (*Id.*)

In response, Plaintiffs argue that the evidence establishes as follows: (1) Plaintiff Emerenciano engaged in protected conduct when he was voicing and relaying his constituents' concern at the ILC meeting regarding a newly-imposed prison yard policy that had been implemented by Defendant Bell; (2) Defendant Kowalowski issued a misbehavior report against Plaintiff Emerenciano for engaging in that protected conduct; and (3) Plaintiff Emerenciano's protected conduct directly caused Defendant Kowalowski to issue the misbehavior report. (Dkt. No. 73, at 25-29 [Pls.' Opp'n Mem. of Law].)

**\*12** During a Clinton ILC meeting in or around October 2015, Plaintiff Emerenciano and his fellow ILC members expressed disagreement with a newly implemented policy implemented by Defendant Bell that required inmates to remain seated on the prison yard ground when an altercation occurs. [14] (Dkt. No. 73, Attach. 13, at 1-2.) In particular, inmates expressed the collective frustration that this new policy required them to either lay down or sit on the ground for approximately 20 to 30 minutes if any sort of altercation between inmates occurred in the prison yard, and as a result, be exposed to the potentially severe weather for an unnecessarily long period of time. (*Id.*) For example, at the ILC meeting, Plaintiff Emerenciano discussed a previous fistfight (where no weapons were involved) that had occurred between two inmates in Clinton's North Yard. (*Id.*) After DOCCS officers had broken-up the fistfight and escorted the two involved inmates off the yard, the other inmates (who were not involved in the altercation) in the yard were required to sit "in the cold [and] mud" for approximately 25 minutes. (*Id.*) At the ILC meeting, Plaintiff Emerenciano communicated to Sergeant Hutti, Clinton's Yard Sergeant, that the inmates were left feeling frustrated and angry that day. (*Id.* at 1-2.) In addition, Plaintiff Emerenciano informed Sergeant Hutti that, in the approaching winter months, inmates may be less willing to comply with this new policy given the cold weather. (*Id.* at 2.) Plaintiff Emerenciano stated that one inmate's decision to not comply with this policy may create a "chain reaction" in other inmates—a conflict that he wished to avoid. (*Id.*)

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 423 of 529
Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

2022 WL 991402

14    Defendant Kowalowski attended this ILC meeting as the "civilian staff advisor." (Dkt. No. 73, Attach. 13, at 1.)

Approximately 45 minutes after the ILC meeting had ended, when Plaintiff Emerenciano had already returned to his cell, four DOCCS officers placed him in keeplock restraints and escorted him to SHU. (*Id.*) After spending almost three hours in SHU, Plaintiff Emerenciano was informed that he was being transferred to Upstate later that same day. (*Id.*) On October 2, 2015, Plaintiff Emerenciano was transferred from Clinton to the SHU at Upstate. (Dkt. No. 73, Attach. 15.) On October 5, 2015, Plaintiff Emerenciano was served a misbehavior report issued by Defendant Kowalowski. (*Id.*) According to this misbehavior report, at the ILC meeting, "[Plaintiff Emerenciano] stated that if [the policy requiring inmates to remain on the ground of the prison yard] continues we will have another 83 ...." (Dkt. No. 69, Attach. 25, at 1.)

Under these circumstances, the Court finds that there is a genuine dispute of material fact as to the second element of a claim for retaliation. While a "prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report," "false accusations contained in a misbehavior report can rise to the level of a constitutional violation ... where the false accusation is based on something more, such as 'retaliation against the prisoner for exercising a constitutional right.' " *Tafari v. McCarthy*, 714 F. Supp.2d 317, 372 (N.D.N.Y. 2010) (quoting *Boddie v. Schnieder*, 105 F.3d 857, 862 [2d Cir. 1997]). In other words, in the context of a retaliation claim, there is no question that a falsified misbehavior report constitutes an adverse action. *See Gill*, 389 F.3d at 381 (holding that a plaintiff's allegations that defendants issued false misbehavior reports against him was sufficient to allege adverse action).

As a result, again, the issue before the Court is whether the causation element of a retaliation claim has been established. According to Defendant Kowalowski's deposition testimony, the basis for his issuing of a misbehavior report against Plaintiff Emerenciano was Emerenciano's reference to a prison riot that had occurred at Clinton in 1983. (Dkt. No. 69, Attach. 13, at 139-142, 146 [Kowalowski Tr.].) Specifically, Defendant Kowalowski testified that, during the ILC committee meeting, Plaintiff Emerenciano stated that the newly implemented prison yard policy could lead to frustration among the inmates, which may ultimately lead to a riot (similar to the riot at Clinton Correctional Facility in 1983). (*Id.*)

Plaintiff Emerenciano argues that he made no such reference to the 1983 Clinton prison riot, and therefore Defendant Kowalowski's falsified misbehavior report constituted an adverse action. (Dkt. No. 73, at 25-26 [Pls.' Opp'n Mem. of Law].) In fact, Plaintiff Emerenciano testified that he was "unaware of any incident [at Clinton] in 1983" until Defendant Kowalowski issued him the misbehavior report. (Dkt. No. 69, Attach. 17, at 52 [Emerenciano Tr.].) Additionally, other members—Inmate Leon, Inmate Rashawn Scott, Inmate David Maxwell, Inmate Selah, Inmate Newman, Inmate Matos—of the ILC committee testified to the fact that they did not recall hearing Plaintiff Emerenciano remark to an "83." (Dkt. No. 69, Attach. 26, at 11, 14-15, 18, 20-21, 24-25, 29-30.) Instead, Plaintiff Emerenciano argues that, given his role on the ILC committee, he was merely informing DOCCS staff of the inmates' growing frustration regarding the prison yard policy, and proposing possible solutions for the future. (Dkt. No. 73, at 26-27 [Pls.' Opp'n Mem. of Law].) Finally, of at least some materiality is the fact that Plaintiff Emerenciano had previously filed a grievance against Defendant Kowalowski.

**\*13**  For all of these reasons, the Court denies Defendants' motion for summary judgment on Plaintiff Emerenciano's First Amendment retaliation claim against Defendant Kowalowski.

### 4. Plaintiff Emerenciano's First Amendment Retaliation Claim Against Defendant Bell

Defendants argue Plaintiff Emerenciano has failed to provide evidence showing "one particular thing" that would motivate Defendant Bell to retaliate against him. (Dkt. No. 69, Attach. 2, at 14 [Defs.' Mem. of Law].)

Plaintiff Emerenciano responds (persuasively) that has adduced admissible record evidence from which a reasonable juror could find that (1) Emerenciano had engaged in constitutionally protected conduct by voicing generalized inmate concern over the newly implemented prison yard policy to Defendant Kowalowski, and (2) he suffered an adverse action by being charged with a disciplinary violation by Defendant Kowalowski, and was found guilty at his Tier III disciplinary hearing and then punished by Defendant Bell. (Dkt. No. 73, at 25-29 [Pls.' Opp'n Mem. of Law].) Less clear, however, is whether Plaintiff Emerenciano has shown a causal connection between his protected conduct and the adverse action by Defendant Bell.

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 424 of 529

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

2022 WL 991402

Generally, "it is difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden*, 09-CV-3135, 2011 WL 1453798, at *4 (S.D.N.Y. Apr. 14, 2011) (citing *Wright v. Goord*, 554 F.3d 255, 274 [2d Cir. 2009]). Here, Plaintiff Emerenciano must show "a genuine issue of material fact that the protected conduct was a substantial or motivating factor in his discipline." *Graham v. Henderson*, 89 F.3d 75, 81 (2d Cir. 1996).

Defendant Kowalowski has testified that, after the ILC meeting at which Plaintiff Emerenciano had allegedly mentioned the 1983 Clinton riot, Kowalowski informed Defendant Bell of the remarks that Plaintiff Emerenciano had made. (Dkt. No. 69, Attach. 13, at 140-41 [Kowalowski Tr.].) However, Plaintiff Emerenciano has not provided any admissible evidence supporting a reasonable finding that Defendant Bell had somehow been made aware of the fact that Defendant Kowalowski had been lying, and/or that any portion of his misbehavior report had been falsified (an issue that still remains in dispute). In addition, before the taking of the adverse action at issue, Plaintiff Emerenciano had never filed any grievances against Defendant Bell, and had had no interaction with him. (Dkt. No. 69, Attach. 17, at 15-16 [Emerenciano Tr.].) At best, Plaintiff Emerenciano has provided only conclusory allegations that Defendant Bell acted with a retaliatory motivation when he found him guilty at Emerenciano's Tier III disciplinary hearing.

The Court would add only that a guilty finding in an inmate disciplinary hearing only needs to be supported by "some evidence from the conclusion ... could be deduced." *Hill v. Superintendent*, 472 U.S. 445, 455 (1987). "[I]t is well-established that a correction officer's misbehavior report may constitute reliable evidence of guilt." *Chavez v. Gutwein*, 20-CV-0342, 2021 WL 4248917, at *12 (S.D.N.Y. Sept. 17, 2021) (citing Jensen v. Mullin, 14-CV-1337, 2016 WL 5394744, at *4 [N.D.N.Y. Sept. 27, 2016]). Here, the Court need not scrutinize Defendant Bell's reliance on certain pieces of evidence at Plaintiff Emerenciano's Tier III disciplinary hearing, because it is the hearing officer's responsibility, not the Court's, to make determinations regarding a witness's credibility. *See Hill*, 472 U.S. at 455 (explaining that application of the "some evidence" standard does not require that the Court conduct an independent assessment of the credibility of the witnesses).

*\*14 For all of these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Emerenciano's First Amendment retaliation claim against Defendant Bell.

### 5. Plaintiff Scott's First Amendment Retaliation Claim Against Defendant Houck

Defendants argue that Plaintiff Scott has failed to show that, before Defendant Houck authorized Scott's facility transfer, Houck had been aware of Scott's exercise of his constitutional rights. (Dkt. No. 69, Attach. 2, at 14-17 [Defs.' Mem. of Law].) According to Defendants, it was Plaintiff Scott himself who had requested the facility transfer. (*Id.* at 16.) Therefore, Defendants argue that Plaintiff Scott has not shown that there was a causal connection between Defendant Houck's approval of Plaintiff Scott's facility transfer request and Scott's communication with media outlets and elected officials who were seeking information on the 2015 prison escape of inmates David Sweat and Richard Matt. (*Id.*)

Plaintiffs respond that Defendant Houck retaliated against Plaintiff Scott by abruptly facilitating his transfer from Clinton to the Green Haven hub. (Dkt. No. 73, at 29-32 [Pls.' Opp'n Mem. of Law].) According to Plaintiffs, Defendant Houck retaliated against Plaintiff Scott because Scott had communicated with outside entities, including the media and the *New York Times*, about the living conditions at Clinton. (*Id.* at 29.) More precisely, Plaintiffs argue that a jury could reasonably conclude, based on the nature and timing of Plaintiff Scott's transfer that, Defendant Houck retaliated against him by having him summarily removed from both the ILC and Clinton. (*Id.*)

It is well established that a prison official may not transfer an inmate in retaliation for the exercise of a constitutional right. *Smith v. Greene*, 06-CV-0505, 2010 WL 985383, at *8 (N.D.N.Y. Feb. 3, 2010) (Baxter, M.J.) (citing *Davis v. Kelly*, 160 F.3d 917, 920 [2d Cir. 1998]) report-recommendation *adopted by* 2010 WL 985388 (N.D.N.Y. Mar. 16, 2010) (Suddaby, J.).

Plaintiff Scott has adduced admissible record evidence from which a rational jury could find that he engaged in constitutionally protected conduct when he communicated with reporters from the *New York Times* to discuss the overall environment and alleged mistreatment and abuse of incarcerated individuals by DOCCS staff at Clinton during the aftermath of the 2015 prison escape. Plaintiff Scott has also

Case 5:25-cv-00956-AJB-MJK   Document 9   Filed 12/08/25   Page 425 of 529

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

2022 WL 991402

adduced admissible record evidence from which a rational
jury could find that he suffered adverse action by being
transferred from Clinton to the Green Haven hub.

As a result, again, the issue before the Court is whether the
causation element of a retaliation claim has been established.
To establish a causal connection between protected conduct
and an adverse action, a plaintiff must show that "the
protected conduct was a substantial or motivating factor in the
prison officials' decision to take action against the plaintiff."
*Ciaprazi v. Goord*, 02-CV-0915, 2005 WL 3531464, at *6
(N.D.N.Y. Dec. 22, 2005) (internal quotation marks omitted).
When evaluating whether a causal connection exists between
the protected conduct and the adverse action, a court may
consider the following: "(1) the temporal proximity between
the protected activity and the alleged retaliatory act; (2) the
inmate's prior good disciplinary record; (3) vindication at a
hearing on the matter; and (4) statements by the defendant
concerning his motivation." *Vega v. Artus*, 610 F. Supp.2d
185, 207 (N.D.N.Y. 2009).

**\*15** To establish the third element of his retaliation claim,
Plaintiff Scott relies primarily on the shortness of time
between his making a transfer request and receiving a transfer
(which was less than a month). [15] (Dkt. No. 73, at 30 [Pls.'
Opp'n Mem. of Law].) Moreover, Plaintiff Scott argues that
a jury could reasonably accept his testimony that "he did not
want to go to the Green Haven hub, nor that he ever expected
such a swift transfer that would prevent him completing his
ILC term at Clinton." (*Id.*)

[15]    In his role as a DOCCS classification analyst,
Defendant Houck oversees inmate transfers
between DOCCS correctional facilities. (Dkt.
No. 69, Attach. 7, at 2 [Houck Decl.].) At
the beginning of each month, Defendant Houck
receives several hundred transfer referrals from the
DOCCS facilities. (*Id.* at 3.)

Defendant Houck receives electronic reviews from individual
correctional facilities, and based on these reviews, classifies
inmates based on a security level. [16] (Dkt. No. 69, Attach.
11, at 20-21 [Houck Tr.].) Defendant Houck received Plaintiff
Scott's facility transfer request on which he indicated that he
wanted to be transferred to the Sullivan hub for programming
purposes. (Dkt. No. 69, Attach. 30, at 4.) According to
Defendant Houck, DOCCS staff at Clinton approved Plaintiff
Scott's transfer request on October 9, 2015. [17] (Dkt. No. 69,
Attach. 11, at 60 [Houck Tr.].) On October 26, 2015, Plaintiff

Scott was transferred from Clinton to the Green Haven hub.
(Dkt. No. 69, Attach. 31.)

[16]    The Court notes that inmates are reviewed on semi-
annual basis for a potential facility transfer. (Dkt.
No. 69, Attach. 7, at 3 [Houck Decl.].) This review
includes an interview of the inmate. (*Id.*)

[17]    Before Defendant Houck receives a transfer
referral from a correctional facility, three DOCCS
employees must ordinarily approve the referral:
the offender rehabilitation coordinator ("ORC"),
the supervising offender rehabilitation coordinator
("SORC"), and the deputy superintendent of
programs. (Dkt. No. 69, Attach. 7, at 2 [Houck
Decl.].)

However, although Plaintiff Scott had *requested* to be
transferred to the Sullivan hub, there was no guarantee that
DOCCS would have been able to accommodate his request.
Simply put, Plaintiff Scott overlooks the fact that he had no
right to be confined to an institution of his choosing. *See
Davis*, 160 F.3d at 920 ("A prisoner has no liberty interest in
remaining at a particular correctional facility.").

Generally, the most desirable DOCCS "hubs" (amongst
inmates) are located in the downstate area of New York. [18]
(*Id.* at 5.) As a result, these hubs have the longest waiting
list for inmates seeking a transfer to them. [19] (*Id.*) Therefore,
when an inmate requests to be transferred to a facility in any of
the three downstate hubs, Defendant Houck selects a facility
based on that inmate's preference, the availability of bed space
at those facilities, and the relevant security concerns. (*Id.*)
Ultimately, the goal of overseeing an inmate's facility request
is to have the inmate transferred to the facility that is closest to
his or her preferred location (subject to the available bed space
and security considerations). (*Id.*) Finally, an inmate plays
no part in making the final determination regarding which
facility he or she is transferred to. (*Id.*)

[18]    The Court notes that the most desirable DOCCs
hubs include the Sullivan hub, the Green Haven
hub, and the New York City hub. (Dkt. No. 69,
Attach. 7, at 5 [Houck Decl.].)

[19]    According to Defendant Houck, the wait time for
inmates seeking a transfer to the Green Haven hub
ordinarily takes approximately one year. (Dkt. No.
69, Attach. 11, at 56 [Houck Tr.].) However, the

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 426 of 529

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

2022 WL 991402

Sullivan hub experiences wait times approximately up to two years because of its small maximum-security orientation. (*Id.* at 56-57.)

 **\*16** Moreover, the Court is not persuaded by Plaintiff Scott's argument that he "[n]ever expected such a swift transfer that would prevent him from completing his ILC term at Clinton." (Dkt. No. 73, at 30 [Pls.' Opp'n Mem. of Law].) The Court notes that Plaintiff Scott could have submitted his facility transfer once his ILC term had ended (and not before) if he wished to serve-out the remaining portion of his term on the ILC, or at least specified the time that he wanted to be transferred. Given the other evidence in the case, it is of no consequence that Plaintiff Scott was transferred less than thirty days after submitting his request, because it is well-settled that "temporal proximity without more is insufficient to survive summary judgment." *Cooper v. Annucci*, 18-CV-0762, 2020 WL 8474802, at \*14 (N.D.N.Y. Nov. 9, 2020) (Hummel, M.J.) (quoting *Flynn v. Ward*, 15-CV-1028, 2018 WL 3195095, at \*11 [N.D.N.Y. June 7, 2018].) Indeed, Plaintiff Scott could only "surmise" that his transfer was made in retaliation based on the relative speed at which his transfer had been processed. (Dkt. No. 69, Attach. 13, at 76 [Scott Tr.].) Such speculation, of course, is insufficient to create a genuine dispute of material fact. *See Henson v. Gagnon*, 13-CV-0590, 2015 WL 9809874, at \*12 (N.D.N.Y. Dec. 10, 2015) (Dancks, M.J.) ("[C]onclusory statements are not sufficient to support causation in retaliation claims; the claims must be supported by specific facts."), *report and recommendation adopted by*, 2016 WL 204494 (N.D.N.Y. Jan. 15, 2016).

Finally, Plaintiff Scott argues that DOCCS is prohibited from transferring an inmate to another facility while that inmate is serving on the IGRC.[20] (*Id.* at 30-31.) The Court finds this argument to be unconvincing, because, as Plaintiff Scott himself correctly points out, he was not a member of the IGRC at the time of his transfer to the Green Haven hub.

[20]    The Court notes that 7 N.Y.C.R.R. § 701.4 details the procedures for removing an inmate from his or her role on the IGRC.

For all of these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Scott's First Amendment retaliation claim against Defendant Houck.

**B. Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Fourteenth Amendment Due Process Claims Against Them**

**1. Plaintiff Emerenciano's Fourteenth Amendment Due Process Claim Against Defendant Bell**

In their response to Defendant's motion for summary judgment, Plaintiffs have not opposed Defendants' request for judgment on Plaintiff Emerenciano's due process claim against Defendant Bell. (Dkt. No. 73, at 7, n.2 [Pls.' Opp'n Mem. of Law].) For these reasons, and the reasons stated in Defendants' memoranda of law, the Court grants Defendants' motion for summary judgment on this claim.

**2. Plaintiff Emerenciano's Fourteenth Amendment Due Process Claim Against Defendant Venettozzi**

Defendants argue that the Court must grant summary judgment on Plaintiff Emerenciano's due process claim against Defendant Venettozzi, because Emerenciano has failed to establish Venettozzi's personal involvement in the alleged incidents giving rise to the violation of Emerenciano's due process rights. (Dkt. No. 69, Attach. 2, at 18-19 [Defs.' Mem. of Law].)

Plaintiffs respond that Defendant Venettozzi was personally involved in the deprivation of Plaintiff Emerenciano's constitutional rights, because the evidence shows that Defendant Venettozzi modified the Tier III disciplinary hearing officer's determination. (Dkt. No. 73, at 35-36 [Pls.' Opp'n Mem. of Law].) Moreover, the Second Circuit's ruling in *Tangreti*, Plaintiffs urge the Court to reconsider its dismissal of their supervisory claim against Defendants Annucci and Kirkpatrick based on their deliberate indifference. (*Id.*)

The Court will address Plaintiffs' arguments out of order, beginning with the argument urging reconsideration of the Court's Decision and Order of September 23, 2019. When a party files a motion for reconsideration, "[t]he standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked-matters, in other words, that might reasonably be expected to alter the conclusions reached by the court." *Shrader v. CSX Transp.*, 70 F.3d 255, 257 (2d Cir. 1995). Such a motion is

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 427 of 529

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

2022 WL 991402

"not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple[.]' " *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 41 (2d Cir. 2012) (quoting *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 [2d Cir. 1998].)

**\*17** In support of Plaintiffs' sole argument for reconsideration (that, "even before *Tangreti*[,] the Second Circuit had indicated that there are cases where deliberate indifference is so egregious that it rises to and can satisfy a requisite unlawful discriminatory intent"), they fail to provide the Court with any new controlling decisions or data that it had overlooked in initially deciding the matter on Defendants' motion to dismiss. (Dkt. No. 73, at 36 [Pls.' Opp'n Mem. of Law].) In other words, Plaintiffs merely provided the Court with argument that it had already considered on the motion to dismiss. For this reason, Plaintiffs' motion for reconsideration is denied as to the supervisory liability claims against Defendants Annucci and Kirkpatrick.

Turning to Plaintiffs' other argument (that Defendant Venettozzi was personally involved in the deprivation of Plaintiff Emerenciano's constitutional rights), the Court begins by observing that, in his role as the DOCCS' Director of Office of Special Housing and Inmate Discipline, Defendant Venettozzi oversees the appeals submitted by inmates stemming from their disciplinary hearing determinations. (Dkt. No. 69, Attach. 12, at 23-24 [Venettozzi Tr.].) Although Defendant Venettozzi's office does not supervise the disciplinary hearing officers, it does contact the hearing officer if an inmate appeals the hearing determination. (*Id.* at 24.) Among the DOCCS employees assigned to the Office of Special Housing and Inmate Discipline are support staff, two Correctional Facility Operations Specialists, one Lieutenant, one Captain, one Assistant Director, and one Director. (*Id.* at 25.) Defendant Venettozzi could not recall the approximate number of disciplinary hearing reviews (i.e., appeals) that his office handled, but believed it was more than eight thousand per year. (*Id.* at 30.)

Defendant Venettozzi had a limited understanding of the ILC and the nature of its meetings. (*Id.* at 39-40.) Defendant Venettozzi also expressed a general unfamiliarity with the inmate grievance process, and at his deposition could not recall receiving any formalized training on it.[21] (*Id.* at 41.) Defendant Venettozzi was also unfamiliar with IGRC Directive Number 4040 that detailing the prohibition on

officer reprisals against inmates for filing grievances. (*Id.* at 47.)

21    The Court notes that, as a corrections officer, Defendant Venettozzi had never served on the IGRC. (*Id.* at 42.)

After the disciplinary hearing officer makes his or her determination, an inmate has the right to appeal that determination. (*Id.* at 60.) Defendant Venettozzi's office is designated by Commissioner Annucci to review all of the appeals stemming from Tier III disciplinary hearing determinations. (*Id.*) Upon Defendant Venettozzi's office receiving an appeal, it has 60 business days to either affirm, modify, or reverse the appeal. (*Id.*) There is no standard procedure for assigning specific appeals to specific members of Defendant Venettozzi's team. (*Id.* at 63-64.) Once a member of Defendant Venettozzi's team reviews and comes to an initial decision on an inmate's appeal, either Defendant Venettozzi or the office's Assistant Director, Anthony Rodriguez ("Mr. Rodriguez"), must approve it. (*Id.* at 66-67.) For some appeals, Defendant Venettozzi approves the review decision without reviewing the hearing packet that accompanies the appeal. (*Id.* at 67.) Furthermore, Defendant Venettozzi has approved the review decision of appeals without reviewing the inmate's appeal letter. (*Id.* 67-68.) In other words, for efficiency purposes, Defendant Venettozzi and Mr. Rodriguez do not "do a complete and thorough stoppage and [conduct a] re-review of everyone's work." (*Id.* at 68.)

According to Defendant Venettozzi, if an inmate claimed as his or her defense to disciplinary charges that he or she was retaliated against by a DOCCS employee, and that inmate was able to establish sufficient evidence of the alleged retaliation, then the disciplinary hearing officer should dismiss the charges against that inmate. (*Id.* at 111.) In previous instances, but not all of them, when Defendant Venettozzi had approved a reversal of a hearing officer's determination, he has spoken with hearing officers to offer them guidance in how to not make mistakes when issuing their determinations. (*Id.* at 109-10.)

**\*18** On October 19, 2015, the Office of Special Housing and Inmate Discipline received Plaintiff Emerenciano's appeal of his Tier III disciplinary hearing determination. (Dkt. No. 73, Attach. 13.) As a result of his adjudication of guilty of the charges set forth within the misbehavior report, Plaintiff Emerenciano received 270 days in the SHU, as well as a loss of privileges. (*Id.* at 6.)

On April 19, 2016, after a review of Plaintiff Emerenciano's appeal, the Office of Special Housing and Inmate Discipline modified his punishment to 180 days in the SHU, effectively suspending 90 days of the initial punishment of SHU confinement and loss of privileges. (Dkt. No. 69, Attach. 29.)

On April 16, 2016, Defendant Venettozzi sent an internal memorandum to the DOCCS Superintendent of Great Meadow Correctional Facility, Christopher L. Miller, to inform him that the Office of Special Housing and Inmate Discipline had modified the determination of the disciplinary hearing that had found Plaintiff Emerenciano guilty of the charges contained within his misbehavior report issued by Defendant Dixon and had initially ordered him to serve 270 days in the SHU. (Dkt. No. 69, Attach. 29.) The memorandum stated that, "per conversation with the Attorney General's Office, no substantial evidence to support the charges [against Plaintiff Emerenciano]." (*Id.*)

In an email dated April 15, 2016, from Assistant Attorney General Christopher Fleury ("AAG Fleury") to Defendant Venettozzi and Nancy Heywood, and copying Corey Bedard and Tanya Selvaag, AAG Fleury informed Defendant Venettozzi of his "real concerns regarding the allegations" made by Plaintiff Emerenciano and his counsel. (Dkt. No. 73, Attach. 17.) Specifically, AAG Fleury stated that he did not believe, and a reviewing court would not believe, that the charges set forth in the misbehavior report had not been supported by substantial evidence. (*Id.*) AAG Fleury stated his conclusion was based on the testimony of five inmate witnesses who had corroborated the fact that Plaintiff Emerenciano made no such reference to a 1983 prison riot during an ILC meeting. (*Id.*)

A letter entitled "Review of Superintendent's Hearing" was sent to Plaintiff Emerenciano to notify him that "[o]n behalf of the Commissioner and in response to ... [his] appeal, ... [the] Superintendent's hearing of October 8, 2015, has been reviewed and administratively reversed on April 19, 2016." (Dkt. No. 69, Attach. 29, at 2.) Defendant Venettozzi's electronic signature is affixed towards the bottom portion of this letter. (*Id.*) Also contained within the discovery exchanged in this case is a letter titled "Review of Superintendent's Hearing." (*Id.* at 3.) This letter was sent to Plaintiff Emerenciano to notify him that, "[o]n behalf of the Commissioner and in response to ... [his] appeal, ... [the] Superintendent's hearing of October 8, 2015, has been reviewed and modified on November 30, 2015. (*Id.*) This

letter was electronically signed by Corey Bedard, who at the time was serving as the DOCCS Acting Director of Special Housing and Inmate Discipline. (*Id.*) According to Defendant Venettozzi, Plaintiff Emerenciano's Tier III disciplinary hearing determination was only modified, and not completely reversed, because his office "did not believe that the appeal overrode what the hearing officer (i.e., Defendant Bell) put in [his determination] for evidence." (Dkt. No. 69, Attach. 12, at 156 [Venettozzi Tr.].) Defendant Venettozzi was unaware of which DOCCS employee in his office had conducted the review of Plaintiff Emerenciano's appeal, and he was unable to recall details or any correspondence regarding the appeal. (*Id.* at 157, 166.)

**\*19**  As discussed above in Part II.B. of this Decision and Order, "a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation" to establish his liability in a suit under § 1983. *Grullon,* 720 F.3d at 138. Among district courts in the Second Circuit, there has been a persistent split as to "whether an allegation that a defendant affirmed a disciplinary proceeding is sufficient to establish" that defendant's personal involvement in the underlying constitutional violation. *Samuels v. Fischer,* 168 F. Supp.3d 625, 643 (S.D.N.Y. 2016); *compare Hinton v. Prack,* 12-CV-1844, 2014 WL 4627120, at *17 (N.D.N.Y. Sept. 11, 2014) (Kahn, J.) ("Courts within the Second Circuit are split over whether the mere allegation that a supervisory official affirmed a disciplinary determination is sufficient to establish personal liability. We subscribe to the affirmance plus standard, which holds that the mere rubber-stamping of a disciplinary determination is insufficient to plausibly allege personal involvement.") *with Murray v. Arquitt,* 10-CV-1440, 2014 WL 4676569, at *12 (N.D.N.Y. Sept. 18, 2014) ("The affirmation of an allegedly unconstitutional disciplinary hearing appears to establish personal involvement.") (Mordue, S.J.)

Relying on the Second Circuit's 2020 decision in *Tangreti v. Bachmann,* 983 F.3d 609 (2d Cir. 2020)—"which eliminated special standards for supervisory liability and required that alleged constitutional violations be 'established against supervisory officials directly,' 983 F.3d at 618" two district courts within this circuit have found that "a defendant's 'fail[ure] to correct another officer's violation" at a prison disciplinary hearing "does not suffice" to establish that defendant's personal involvement in the alleged constitutional violations. *Chavez,* 2021 WL 4248917, at *14 (citing *Washington v. Fitzpatrick,* 20-CV-0911, 2021 WL 966085, at *10 [S.D.N.Y. Mar. 15, 2021]).

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

2022 WL 991402

" 'In general, the mere fact that a supervisory official affirmed the result of a disciplinary hearing will not suffice to establish that official's personal involvement in an alleged constitutional violation....' " *Caimite v. Rodriguez*, 17-CV-0919, 2020 WL 6530780, at *9 (N.D.N.Y. Apr. 9, 2020) (Hummel, M.J.) (quoting *Collins v. Ferguson*, 804 F. Supp.2d 134, 140 [W.D.N.Y. 2011]). However, a supervisory official will be found to have been personally involved if he or she "proactively participated in reviewing the administrative appeals as opposed to merely rubber-stamping the results." *Whitley v. Miller*, 57 F. Supp.3d 152, 161 (N.D.N.Y. 2014).

In this case, a letter titled "Review of Superintendent's Hearing" was sent to Plaintiff Emerenciano. (Dkt. No. 69, Attach. 29, at 3.) This letter notified Plaintiff Emerenciano that "[o]n behalf of the Commissioner and in response to ... [his] letter of appeal ... [the] Superintendent's hearing of October 8, 2015, has been reviewed and modified on November 30, 2015. (*Id.* at 3.) The letter contained an itemized breakdown of the modified penalties imposed upon Plaintiff Emerenciano. (*Id.*) Corey Bedard's signature is affixed towards the bottom portion of this letter. (*Id.*)

On April 19, 2016, Defendant Venettozzi sent an internal memorandum to the DOCCS Superintendent of Great Meadow Correctional Facility, Christopher L. Miller, to inform him that the Office of Special Housing and Inmate Discipline had reversed the determination of the Superintendent's hearing that had found Plaintiff Emerenciano guilty of the charges contained within his misbehavior report issued by Defendant Kowalowski. (*Id.* at 1.) The memorandum stated that, "per conversation with the [New York State] Attorney General's Office, no substantial evidence to support the charges." (*Id.*) A second letter titled "Review of Superintendent's Hearing" was sent to Plaintiff Emerenciano notifying him that, "[o]n behalf of the Commissioner ..., [the] Superintendent's hearing of October 8, 2015, has been reviewed and administratively reversed on April 19, 2016." (*Id.* at 2.) Defendant Venettozzi's electronic signature is affixed towards the bottom portion of this letter. (*Id.*)

**\*20**  To the extent that Plaintiff Emerenciano argues that Defendant Venettozzi's electronic signature affixed on the letter notifying him of the expunction of the charges constitutes personal involvement, the Court finds that *Whitley* is persuasive. There, a judge of this District held that a modification of the plaintiff's punishment and a "typewritten form response" which stated that "there was not sufficient grounds to reconsider the previous decision on that hearing," and "do[es] not constitute sufficient evidence that either defendant proactively participated in reviewing the merits of [the plaintiff's] claim or had otherwise 'actively considered the issues raised by [plaintiff] in reviewing and responding to [his] appeal[s]' to give rise to a question of fact regarding either individual's personal involvement." *Whitley*, 57 F. Supp.3d at 162. As a result, the Court finds that Defendant Venettozzi's electronic signature does not constitute his personal involvement in Plaintiff Emerenciano's alleged due process deprivation.

For these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Emerenciano's Fourteenth Amendment due process claim against Defendant Venettozzi.

### C. Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Supervisory Liability Claims Against Defendant Venettozzi

#### 1. Plaintiff DeJesus' Supervisory Liability Claim Against Defendant Venettozzi

Defendant Venettozzi argues that the Court must grant summary judgment in his favor as to Plaintiff DeJesus' supervisory liability claim against him, because DeJesus has failed to establish any grounds on which he could be held liable as a supervisor with regard to DeJesus' surviving retaliation claim against Defendant Dixon. (Dkt. No. 69, Attach. 2, at 17-20 [Defs.' Mem. of Law].)

Plaintiffs respond that, given the totality of the circumstances, Defendant Venettozzi should not be rewarded with diminished liability because he ignored the unconstitutional violations occurring at Clinton after having received notice of them. (Dkt. No. 73, at 32-38 [Pls.' Opp'n Mem. of Law].) More specifically, Plaintiff DeJesus argues that Defendant Venettozzi violated his First Amendment rights because he failed to prevent the Defendant Dixon's retaliation and acted with deliberate indifference by not remedying the alleged constitutional violations in a timely manner. (*Id.*) Furthermore, Plaintiff DeJesus argues that Defendant Venettozzi was deliberately indifferent to the retaliation that he suffered, because "his actions ... directly enabled, condoned, and ratified the unlawful retaliation being carried out against ... Plaintiff DeJesus, such that it too can be said [that] Defendant Venettozzi ... engaged in unlawful

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 430 of 529

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

2022 WL 991402

retaliation." (*Id.*) Therefore, argues Defendant DeJesus, a "jury can reasonably and readily conclude [that] Defendant Venettozzi was not only directly involved in the retaliation by virtue of his direct role in relation to their disciplinary appeals and by virtue of having not only created and/or tolerated a custom or policy through which retaliation against ILC members ..., but that he was aware that the charges against these individuals were discriminatory by being directly and expressly based upon protected conduct and protected speech." (*Id.* at 37.)

"It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers." *Cicio v. Lamora*, 08-CV-0431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24, 2010) (Peebles, M.J.). To prove a claim of failure-to-intervene, the plaintiff must establish that the officer-defendant had "(1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle*, 10-CV-0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *Jean-Laurent v. Wilkinson*, 540 F. Supp.2d 501, 512 [S.D.N.Y. 2008]).

**\*21** On March 8, 2016, counsel for Plaintiff DeJesus submitted a preliminary appeal from his Tier III disciplinary hearing determination to Defendant Venettozzi's office. (*Id.* at 117.) Defendant Venettozzi's office received Plaintiff DeJesus' appeal on March 17, 2016. (*Id.*) On June 3, 2016, Defendant Venettozzi's office reversed the Superintendent's determination as to Plaintiff DeJesus' Tier III disciplinary hearing because the issued misbehavior report did not support the charges filed against Plaintiff DeJesus. (*Id.* at 107-08, 121-23.) As a result of the decision to reverse the Superintendent's determination, the two charges that had been brought against Plaintiff DeJesus were dropped. (Dkt. No. 69, Attach. 23, at 1.) Defendant Venettozzi acknowledged that every appeal reviewed by his office is evaluated on a case-by-case basis, and reviews, more likely than not, go much further in depth than merely reading the misbehavior report that was issued to the inmate. (Dkt. No. 69, Attach. 12, at 119-21 [Venettozzi Tr.].)

Put simply, the evidence does not support Plaintiff DeJesus' argument regarding Defendant Venettozzi's failure to intervene in the alleged retaliation against DeJesus by Defendant Dixon. Instead, Plaintiff DeJesus' argument

assumes that, because of his title as the Director of the Office of Special Housing and Inmate Discipline, Defendant Venettozzi knew, or reasonably should have known, about Defendant Dixon's alleged retaliation against Plaintiff DeJesus. Additionally, Plaintiff DeJesus does not provide evidence showing *how* Defendant Venettozzi "intentionally built and maintained a system ... [that] tolerates a wrongful custom and policy" of deliberate indifference towards unconstitutional retaliatory conduct. (*Id.*)

With regard to Plaintiffs' apparent argument that the length of time it took for Defendant Venettozzi's office to review Plaintiff DeJesus' appeal was insufficient, Plaintiffs point to the fact that, before the reversal of the disciplinary hearing officer's determination, counsel for Plaintiff DeJesus and Plaintiff DeJesus himself contacted Defendant Venettozzi to alert him to the pending appeal, and yet, the appeal was decided more than sixty days after it was received by Defendant Venettozzi's office. (Dkt. No. 73, at 34 [Pls.' Opp'n Mem. of Law].) Of course, "[r]eceiving letters of complaint from an inmate and failing to respond is generally insufficient to establish personal involvement." *Johnson v. McKay*, 14-CV-0803, 2015 WL 1735102, at *9 (N.D.N.Y. Apr. 16, 2015) (report-recommendation by Dancks, M.J., adopted by Sannes, J.); *Smart v. Goord*, 441 F. Supp.2d 631, 643 (S.D.N.Y. 2006) (noting that the defendant "cannot be held liable on the sole basis that he did not act in response to letter of protest by [plaintiff]"); *accord, Chaney v. Vena*, 15-CV-0653, 2017 WL 6756645, at *7-8 (N.D.N.Y. Nov. 29, 2017) (Baxter, M.J.), *adopted by* 2017 WL 6734186 (N.D.N.Y. Dec. 29, 2017) (McAvoy, J.). Plaintiffs do not specify the manner in which they "contacted" Defendant Venettozzi, nor the extent of any communication that they might have had. To the extent that Plaintiff DeJesus argues that Defendant Venettozzi did not follow DOCCS policies regarding the sixty-day deadline to decide an appeal, a failure to adhere to an internal policy or state law does not constitute a violation of § 1983. *H'Shaka v. Gorman*, 444 F. Supp.3d at 355, 384-85 (N.D.N.Y. 2020) (Suddaby, C.J.).

In any event, a violation of the 60-day deadline for a decision on such an appeal does not violate Plaintiff DeJesus' due process rights, because the Fourteenth Amendment does not require any administrative review of disciplinary convictions. *See Austin v. Fischer*, 09-CV-4812, 2010 WL 3187642, at *2 (S.D.N.Y. Aug. 11, 2020) ("Plaintiff alleges that the Commissioner issued a decision sixty eight days after Plaintiff's submission of his administrative appeal, exceeding the sixty-day limit set forth in ... § 254.8 .... However, this

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 431 of 529

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

2022 WL 991402

eight day delay does not violate Plaintiff's due process rights, because the Fourteenth Amendment does not require any administrative review of disciplinary convictions.") (internal quotation marks omitted), *aff'd*, 453 F. App'x 80 (2d Cir. 2011).

**\*22** Finally, although there may be a genuine dispute of fact as to the degree of personal involvement that Defendant Venettozzi had in reviewing Plaintiff DeJesus' appeal, any such genuine dispute of fact is not a *material* one. This dispute of fact lacks materiality because, even if Defendant Dixon had committed a constitutional violation by issuing a misbehavior report to Plaintiff DeJesus, Defendant Venettozzi's office *reversed* the Tier III disciplinary decision; it did not affirm or partially modify the hearing officer's determination. In other words, Defendant Venettozzi's office did indeed intervene to correct the repercussions stemming from Defendant Dixon's alleged unlawful retaliation.

For these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff DeJesus' supervisory liability claim against Defendant Venettozzi.

### 2. Plaintiff Emerenciano's Supervisory Liability Claim Against Defendant Venettozzi

Because Plaintiff Emerenciano has decided to abandon his due process claim against Defendant Bell, and pursue his due process claim against only Defendant Venettozzi, the Court need only focus on Venettozzi's actions while supervising Defendant Kowalowski in connection with Emerenciano's disciplinary hearing.

For his supervisory liability claim to survive the pending motion, Plaintiff Emerenciano must provide admissible evidence from which a rational jury could render the following three findings of fact: (1) that Defendant Venettozzi had a realistic opportunity to intervene and prevent Defendant Kowalowski from allegedly retaliating against Plaintiff Emerenciano; (2) that a reasonable person in Defendant Venettozzi's position would have known that Emerenciano's First Amendment rights were being violated; and (3) that Defendant Venettozzi did not take reasonable steps to intervene to prevent further alleged retaliation by Defendant Kowalowski. *Henry*, 2011 WL 5975027, at *4.

It is undisputed that, on November 30, 2015, Defendant Venettozzi's office modified the punishment that had initially

been imposed upon Plaintiff Emerenciano after a finding of guilt at his Tier III disciplinary hearing. (Dkt. No. 69, Attach. 29, at 3-4.) It is also undisputed that, on April 16, 2016, Defendant Venettozzi's office ultimately reversed the finding of guilt. (*Id.* at 1-2.) As indicated above in Part III.C.1. of this Decision and Order, this reversal of a finding of guilt actually shows that Defendant Venettozzi did indeed intervene in Defendant Kowalowski's alleged unlawful retaliation. As a result, Plaintiff's theory of liability involves an argument that Defendant Venettozzi should have done so sooner: more specifically, that, when Venettozzi's office modified Plaintiff Emerenciano's punishment on November 30, 2015, Venettozzi should have reversed the finding of guilt.

The problem with this argument is that Defendant Venettozzi has no recollection of personally participating in that modification. (Dkt. No. 69, Attach. 12, at 138-67 [Venettozzi Tr.].) Furthermore, Plaintiff Emerenciano has no personal knowledge of such participation. Instead, he relies on Defendant Venettozzi's title as the head of the office that modified Plaintiff Emerenciano's punishment as the grounds for his supervisory liability, which is precisely the sort of *respondeat superior* theory of liability that has long been prohibited under the law. Finally, the record contains uncontroverted evidence that, the same day that Defendant Venettozzi learned of the concerns of an Assistant Attorney General regarding Plaintiff Emerenciano's disciplinary conviction, Venettozzi passed those concerns along to a subordinate; and the very next day Venettozzi's office reversed the finding of guilt. (*See, e.g.,* Dkt. No. 73, Attach. 17 [attaching email message dated April 15, 2016].) Simply stated, based on the current record, no reasonable jury could find Defendant Venettozzi liable for Defendant Kowalowski's alleged unlawful retaliation.

**\*23** For these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Emerenciano's supervisory liability claim against Defendant Venettozzi.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 69) is **GRANTED in part** and **DENIED in part** as described above in this Decision and Order; and it is further

**ORDERED** that the Clerk of Court shall enter Judgment for Defendants on the following claims, which are **DISMISSED**:

(a) Plaintiff Emerenciano's retaliation claim under the First Amendment against Defendant Bell;

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)
2022 WL 991402
Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 432 of 529

(b) Plaintiff Scott's retaliation claim under the First Amendment against Defendant Houck;

(c) Plaintiff Emerenciano's due process claim under the Fourteenth Amendment against Defendant Bell;

(d) Plaintiff Emerenciano's due process claim under the Fourteenth Amendment against Defendant Venettozzi;

(e) Plaintiff DeJesus' supervisory liability claim against Defendant Venettozzi; and

(f) Plaintiff Emerenciano's supervisory liability claim against Defendant Venettozzi; and it is further

**ORDERED** that the following claims **SURVIVE** this motion for summary judgment:

(a) Plaintiff DeJesus' retaliation claim under the First Amendment against Defendant Dixon;

(b) Plaintiff DeJesus' retaliation claim under the First Amendment against Defendant Rock; and

(c) Plaintiff Emerenciano's retaliation claim under the First Amendment against Defendant Kowalowski; and it is further

**ORDERED** that the Clerk of Court shall **TERMINATE** the following individuals as Defendants in this action: Earl Bell, Richard Houck, and Donald Venettozzi.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 991402

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 9:18-CV-00372**<br>Keyes et al v. Annucci et al | — | N.D.N.Y. | Mar. 27, 2018 | Docket |

**History (2)**

**Direct History (1)**

1. Keyes v. Venettozzi
   2022 WL 991402 , N.D.N.Y. , Mar. 31, 2022

**Related References (1)**

2. Keyes v. Annucci
   2019 WL 4602240 , N.D.N.Y. , Sep. 23, 2019

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 686796
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ryan S. McNAMEE, Plaintiff,

v.

SCHOHARIE COUNTY JAIL, Lt. James Hazzard, CPL
J. Cronk, Deputy Paul Marsh, Jr., Deputy N. Alexander,
Deputy Howland, Deputy Hirst, Schoharie County
Medical Dept., Dr. Weitz, Dr. Belinger, Defendants.

No. 9:06-CV-1364 (LEK/GHL).
|
March 10, 2008.

**Attorneys and Law Firms**

Ryan S. McNamee, Wappingers Falls, NY, Plaintiff, pro se.

O'Connor, O'Connor, Bresee & First, P.C., Justin O. Corcoran, Esq ., of Counsel, Albany, NY, for Defendants Weitz and Belanger.

### *DECISION AND ORDER*

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report-Recommendation filed on February 13, 2008, by the Honorable George H. Lowe, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report-Rec. (Dkt. No. 32).

Within ten days, excluding weekends and holidays, after a party has been served with a copy of a Magistrate Judge's Report-Recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations," in compliance with L.R. 72.1. No objections have been raised in the allotted time with respect to Judge Lowe's Report-Recommendation. Furthermore, after examining the record, the Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 32) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendants Weitz and Belanger's Motion to dismiss (Dkt. No. 16) is **GRANTED** and Plaintiff's claims against them are **DISMISSED with prejudice;** and it is further

**ORDERED,** that Plaintiff's remaining claims are *sua sponte* **DISMISSED with prejudice** for failure to diligently litigate; and it is further

**ORDERED,** that Case no. 9:06-CV-1364 be closed; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

### *REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, brought pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Local Rules of Practice for this Court. Generally, the Amended Complaint of Ryan S. McNamee ("Plaintiff") asserts claims under the First and Eighth Amendments against the Schoharie County

Jail, the County Medical Department, and nine employees of the Jail arising from Plaintiff's incarceration at the Jail between September of 2005 and November of 2006. (*See generally* Dkt. No. 5 [Plf.'s Am. Compl.].) Among these claims is a claim that, in September and October of 2006, Defendants Zeev Weitz (a physician) and David Belanger (a nurse) [1] violated Plaintiff's Eighth Amendment right to adequate medical care by "abruptly" taking him off the prescription drug Lexapro with "no valid explanation" and merely "to save money," and by failing to cause him to be placed back on that drug. (*Id.* at 11-13.)

[1]     While Plaintiff's Amended Complaint and the caption of this case refer to "Dr. Belinger," I

note that defense counsel has stated that the correct spelling of this individual's name is "Belanger." (*See* Dkt. No. 16, Part 3, at 1 [Defs.' Mem. of Law].) Defense counsel has stated also that Defendant Belanger is a Nurse Practitioner, not a doctor, as Plaintiff alleges. (*Id.*)

Currently pending before the Court is a motion by Defendants Weitz and Belanger to dismiss Plaintiff's Eighth Amendment inadequate-medical-care claim against them for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 16.) Despite having been specifically advised of the consequences of failing to respond to Defendants Weitz and Belanger's motion, and having been *sua sponte* granted an extension of the deadline by which he had to so response, Plaintiff has failed to so respond. (Dkt. No. 30.)

**\*2** For the reasons stated below, I recommend that Defendants Weitz and Belanger's motion to dismiss Plaintiff's claim against them be granted. I also recommend that Plaintiff's deliberate-indifference claim against Defendant "Jane Doe # 1" be *sua sponte* dismissed with prejudice due to Plaintiff's failure to name or serve her and/or for his failure to state a claim against her upon which relief might be granted. I also recommend that Plaintiff's claims against Defendant Schoharie County Medical Department be *sua sponte* dismissed with prejudice due to Plaintiff's failure to serve that entity and/or his failure to diligently litigate his claims against that entity. Finally, I recommend that Plaintiff's claims against the remaining Defendants (i.e., Defendants Hazzard, Cronk, Marsh, Hirst, Alexander, Grippin, and Schoharie County Jail) be *sua sponte* dismissed with prejudice due to Plaintiff's failure to diligently litigate his claims against them, unless Plaintiff shows cause for this failure within ten (10) days of the date of this Report-Recommendation.

## I. RECENTLY CLARIFIED LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

Under Fed.R.Civ.P. 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); [2] or (2) a challenge to the legal cognizability of the claim. [3]

[2] *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted); *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

[3] *See* *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ( "There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") (citation omitted); *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8 [a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") (citation omitted); *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at \*4-5, 2004 WL 2613993 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of

action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-02 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Such a statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." [4] The purpose of this rule is to "facilitate a proper decision on the merits." [5] A complaint that fails to comply with this rule "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [6]

[4]  *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) (quoting *Conley,* 355 U.S. at 47); *see also Swierkiewicz,* 534 U.S. at 512 (quoting *Conley,* 355 U.S. at 47); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (quoting *Conley,* 355 U.S. at 47).

[5]  See *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48).

[6]  *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

The Supreme Court has long characterized this pleading requirement under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. [7] However, it is well established that even this liberal notice pleading standard "has its limits." [8] As a result, several Supreme Court decisions, and Second Circuit decisions, exist holding that a pleading has failed to meet this liberal notice pleading standard. [9]

[7]  *See, e.g., Swierkiewicz,* 534 U.S. at 513-14 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

[8]  2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

[9]  *See, e.g., Bell Atlantic Corp. v. Twombly,* --- U.S. ----, ---- - ----, 127 S.Ct. 1955, 1964-74, 167 L.Ed.2d 929 (2007) (pleading did not meet Fed.R.Civ.P. 8[a][2]'s liberal requirement), *accord, Dura Pharmaceuticals,* 125 S.Ct. at 1634-1635, *Christopher v. Harbury,* 536 U.S. 403, 416-22, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-35 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Fed.R.Civ.P. 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Fed.R.Civ.P. 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing

an appellate decision holding that a complaint had stated a claim upon which relief could be granted, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." --- U.S. ----, ---- - ----, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007). [10] Rather than turning on the conceivability of an actionable claim, the Court clarified, the *Fed.R.Civ.P.* 8 standard turns on the "plausibility" of an actionable claim. *Id.* at 1965-74. More specifically, the Court held that, for a plaintiff's complaint to state a claim, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]" assuming, of course, that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.; accord, Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) ("[W]e believe the [Supreme] Court in *Bell Atlantic Corp. v. Twombly*] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*") [emphasis in original].

[10]  The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

**\*3**  Having said that, it should be emphasized that, "[i]n reviewing a complaint for dismissal under *Fed.R.Civ.P.* 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [11] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" [12] In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are to be construed with an *extra* degree

of liberality. Indeed, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [13]

[11]  *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

[12]  *Hernandez,* 18 F.3d at 136 (citation omitted); *see also Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) (citation omitted).

[13]  *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

Moreover, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [14] Of course, granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading. [15] Finally, "all normal rules of pleading are not absolutely suspended." [16] For example, an opportunity to amend should be denied where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [17]

[14]  *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also Fed.R.Civ.P.* 15(a) (leave to amend "shall be freely given when justice so requires"). Of course, granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading.

[15]  *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at \*2, n. 14 (N.D.N.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04CV1433, 2007 WL 201109, at \*5, n. 34 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at \*2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-

2008 WL 686796

recommendation of Lowe, M .J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4, n. 30 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Goros v. Cent. Office Review Comm.,* 03-CV-0407, 2006 WL 2794415, at *5, n. 18 (N.D.N.Y. Sept., 26, 2006) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Williams v. Weaver,* 03-CV0912, 2006 WL 2799417, at *4, n. 16 (N.D.N.Y. Sept. 26, 2006) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

16    *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980) (citations omitted), *accord, Gil v. Vogilano,* 131 F.Supp.2d 486, 491 (S.D.N.Y.2001).

17    *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted).

## II. BACKGROUND

### A. Summary of Claims Asserted in Plaintiff's Amended Complaint

Liberally construed, Plaintiff's Amended Complaint sets forth the following claims:

(1) Between September of 2005 and November of 2006, Defendants Hazzard, Cronk, Marsh, Hirst, Alexander, and Grippin (and the Jail and the County Medical Department) violated Plaintiff's First Amendment rights by denying him access to the courts and interfering with his ability to practice his Catholic religion, and violated his Eighth Amendment rights by failing to protect him from an assault by a violent inmate, which occurred on November 7, 2005;

(2) During the days following November 7, 2005, Defendant "Jane Doe # 1," who was a physician at the Schoharie County Jail, violated Plaintiff's Eighth Amendment rights by "misdiagnos[ing] [Plaintiff's injury] and prescrib[ing] the wrong medication to [Plaintiff] for headaches that were occurring" as a result of a head injury he suffered during the referenced assault;

(3) On or about September 25, 2006, "with no valid explanation" but merely "to save money for the Schoharie County Jail," Defendant Weitz "abruptly" took Plaintiff off the prescription drug Lexapro (which he had been taking regularly since September 2005 for "anxiety, depression and uncontrollable rage attacks"), causing Plaintiff to suffer "loss of sleep, disorientation, and illusions [sic]."; and

(4) During the early weeks of October 2006, after three requests to see medical staff about the discontinuation of his Lexapro medication, Plaintiff was finally seen by Defendant Belanger, who failed to discover why Plaintiff had been taken off Lexapro, failed to cause Plaintiff to be placed back on Lexapro, and callously stated that Plaintiff should not be experiencing the side effects he was claiming (although a year before Defendant Belanger had told Plaintiff that an "abrupt" discontinuation of the drug would be "dangerous"). (Dkt. No. 5 [Plf.'s Am. Compl.].)

### B. Defendants' Legal Arguments in Favor of Dismissal

**\*4** In their memorandum of law, Defendants Weitz and Belanger argue that Plaintiff's inadequate-medical-care claim against them should be dismissed for two reasons: (1) Plaintiff has failed to allege facts plausibly suggesting either that he suffered from a serious medical need for purposes of the Eighth Amendment during the time in question, or that Defendants Weitz and/or Belanger was deliberately indifferent to such a need; and (2) Plaintiff has failed to allege facts plausibly demonstrating that, before filing this action in federal court, he exhausted his administrative remedies with regard to his inadequate-medical-care claim against Defendants Weitz and Belanger. (Dkt. No. 16, Part 4, at 5-11 [Defs.' Mem. of Law].)

## III. ANALYSIS

### A. First Basis for Dismissal: Facial Merit of Defendants Weitz and Belanger's Unopposed Motion to Dismiss

Defendants Weitz and Belanger filed their motion to dismiss on May 15, 2007. (Dkt. No. 16.) In light of Plaintiff's special status as a *pro se* civil rights litigant, on August 14, 2007, the Court advised Plaintiff that, while he was not required to respond, Defendants Weitz and Belanger's motion could be granted if the Court determined that they had met their requisite burden, thereby resulting in their dismissal from Plaintiff's action. (Dkt. No. 30.) The Court also *sua sponte* granted Plaintiff an extension of time in which to respond to

their motion, until September 13, 2007. (*Id.*) Still, Plaintiff did not respond to the motion.

"Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the nonmoving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown." N.D.N.Y. L.R. 7.1(b)(3).

Here, Defendants Weitz and Belanger's motion to dismiss has been properly filed, Plaintiff has failed to oppose it (despite being warned of the possible consequences of that failure), and Plaintiff has failed to show good cause as to why his failure to oppose the motion should not be deemed as "consent" to the granting of the motion. Therefore, the sole issue remaining before the Court is whether Defendants have met their "burden to demonstrate entitlement to the relief requested" in their motion. N.D.N.Y. L.R. 7.1(b)(3).

As a practical matter, an inquiry into whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1(b)(3) is a more limited endeavor than a review of a contested motion to dismiss.[18] Specifically, on an uncontested motion to dismiss, the movant's burden of persuasion is lightened such that, in order to succeed, his motion need only be "facially meritorious."[19] A movant's burden in making legal arguments that are facially meritorious has appropriately been characterized as "modest."[20]

[18]    *See, e.g., Hernandez v. Nash,* 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, at *7-8, 2003 WL 22143709 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before an unopposed motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially meritorious*" ) [emphasis added; citations omitted]; *Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109-10 (N.D.N.Y.2003) (Munson, J.) (reviewing whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *see also Wilmer v. Torian,* 96-CV-1269, 1997 WL 640982, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M .J.) (applying prior version of Rule

7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2, 1997 WL 640982 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-0989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.) *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.)

[19]    *See, e.g., Hernandez,* 2003 U.S. Dist. LEXIS 1625, at *8, 2003 WL 22143709; *accord, Topliff v. Wal-Mart Stores East LP,* 04-CV-0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n. 43, 2007 WL 911891 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); *Hynes v. Kirkpatrick,* 05-CV-0380, 2007 U.S. Dist. LEXIS 24356, at *5-6 & n. 2, 2007 WL 894375 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04-CV-1311, 2007 U.S. Dist. LEXIS 26583, at *28-29 & n. 40, 2007 WL 951447 (N.D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458, 2007 WL 969576 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03-CV-0170, 2006 U.S. Dist. LEXIS 95065, at *5 & n. 2, 2006 WL 3940592 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336, 2007 WL 189021 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

[20]    *See, e.g., Ciaprazi v. Goord,* 02-CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.).

**\*5**    After carefully reviewing Plaintiff's Amended Complaint, and Defendants Weitz and Belanger's memorandum of law in support of their motion to dismiss, I find that Defendant Weitz and Belanger have met their lightened burden on their unopposed motion, for the reasons stated in their memorandum of law. (*Compare* Dkt. No. 5

[Plf.'s Am. Compl.] *with* Dkt. No. 16, Part 3, at 1-11 [Defs.' Mem. of Law].)

For these reasons, I recommend that the Court grant Defendants Weitz and Belanger's motion to dismiss. Because adequate reason exists to grant Defendants Weitz and Belanger's unopposed motion, the Court need proceed no further in its analysis of Plaintiff's Amended Complaint. However, in the interest of thoroughness, and toward the end of describing an *alternative basis* for dismissal of Plaintiff's claims against Defendants Weitz and Belanger, I will subject their motion to the more rigorous scrutiny appropriate for a contested motion to dismiss.

### B. Alternative Basis for Dismissal: Substantive Merit of Defendants Weitz and Belanger's Motion to Dismiss

### 1. Failure by Plaintiff to Allege Facts Plausibly Suggesting that Defendants Were Deliberately Indifferent to a Serious Medical Need

A prisoner's allegation of deliberate indifference to a serious medical need arises under the Eighth Amendment when the alleged deliberate indifference occurred while prisoner was incarcerated on a sentence of conviction, and under the Fifth Amendment when the alleged deliberate indifference occurred while prisoner was detained awaiting trial. *Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000). Under either constitutional amendment, the legal standard (for a deliberate indifference claim) is the same. *Cuoco,* 222 F.3d at 106.

Generally, to state a claim for inadequate medical care under the United States Constitution, a plaintiff must allege facts plausibly suggesting two things: (1) that he had a sufficiently serious medical need; and (2) that the defendants were deliberately indifferent to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

### a. Whether Plaintiff Had a Sufficiently Serious Medical Need

To be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance,* 143 F.3d at 702.

Here, Plaintiff alleges that, during the time in question, he suffered from "mental health problems," specifically, "anxiety, depression and uncontrollable rage attacks." (Dkt. No. 5, at 13 [Plf.'s Am. Compl.].) Conspicuously absent from Plaintiff's Amended Complaint (which is otherwise very lengthy and detailed) is any allegation that, during the time in question, he suffered from panic attacks or that he had attempted (or even contemplated) suicide.

**\*6** After reviewing the relevant case law, I am unable to find that Plaintiff has alleged facts plausibly suggesting a serious medical need under the Eighth Amendment. *See Doty v. County of Lassen,* 37 F.3d 540, 546 (9th Cir.1994) (depression, headaches, nausea and shakes not serious medical needs); *Jones v. Tammany Parish Sheriff,* 06-CV-2875, 2007 U.S. Dist. LEXIS 18816, at \*27-28, 2007 WL 647299 (E.D.La. Feb. 1, 2007) ("While some courts have characterized mental illnesses as a 'serious medical need' for purposes of constitutional analysis in Section 1983 claims by detainees, they have generally done so in circumstances in which the plaintiff also exhibited seriously harmful or severe symptoms or other ailments in combination with a mental illness sufficient to render plaintiff's overall condition serious.") [collecting cases]; *White v. Ghost,* 456 F.Supp.2d 1096, 1102-03 (D. Dakota 2006) (bare allegations of "depression" and "suicide" not sufficiently serious, but allegation of two *attempted* suicides sufficiently serious).

### b. Whether Defendants Weitz and/or Belanger Were Deliberately Indifferent to any Serious Medical Need

In any event, even if I were to assume, for the sake of argument, that Plaintiff has alleged facts plausibly suggesting that (during the time in question) he suffered from a serious medical need, I would find that he has not alleged facts plausibly suggesting that either Defendant Weitz or Belanger possessed a sufficient state of mind during the time in question to make him *deliberately indifferent* to that need.

An official is "deliberately indifferent" to a serious medical need when he " 'knows of and disregards an excessive risk to inmate health or safety.' " [21] " '[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " [22] What this means, as a practical matter, is that "deliberate indifference describes a state of mind more blameworthy than negligence," [23] one that is "equivalent to criminal recklessness." [24]

McNamee v. Schoharie County Jail, Not Reported in F.Supp.2d (2008)

2008 WL 686796

21    *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005) (citing *Farmer v. Brennan,* 511 U.S. 825, 837 [1994] ).

22    *Johnson,* 412 F.3d at 403 (citing *Farmer,* 511 U.S. at 837).

23    *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV1684, 1998 WL 166840, at *4 (N.D.N.Y. Apr.9, 1998) (Pooler, J.) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim.... Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].").

24    *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *cf. Farmer,*

511 U.S. at 827 ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment.").

There is no such criminal recklessness alleged in Plaintiff's Amended Complaint. (See Dkt. No. 5, at 10-13 [Plf.'s Am. Compl.].) Plaintiff alleges facts plausibly suggesting that, for some if not all of the relevant time period, both Defendants Weitz and Belanger were acting under the *mistaken* belief that, during the weeks before Plaintiff had been taken off of Lexapro, he had not been taking the drug. (*Id.* at 12.) Moreover, Plaintiff does not even conclusorily allege that Defendant Weitz was aware of the withdrawal symptoms that Plaintiff was allegedly experiencing. (*Id.* at 11-13.) At most, there might be a *hint* of negligence alleged. However, negligence is not sufficient to state a claim for deliberate indifference. Nor is a disagreement over a treatment decision-which is what Plaintiff is essentially alleging. *See Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) ("[D]isagreements [between a prisoner and prison officials] over medications ... are not adequate grounds for a section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.") [citation omitted]. As the Second Circuit once observed:

> **\*7** It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff [ ] understandably seeks.... We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs

McNamee v. Schoharie County Jail, Not Reported in F.Supp.2d (2008)

2008 WL 686796

but to provide the minimum level
of [medical] care required by the
Constitution.... The Constitution does
not command that inmates be given the
kind of medical attention that judges
would wish to have for themselves....
The essential test is one of medical
necessity and not one simply of
desirability.

_Dean v. Coughlin,_ 804 F.2d 207, 215 (2d Cir.1986) [internal
quotations and citations omitted].

For the above reasons, I recommend that, in the alternative,
the Court dismiss Plaintiff's claims against Defendants Weitz
and Belanger due to Plaintiff's failure to allege facts plausibly
suggesting that either Defendants Weitz or Belanger was
deliberately indifferent to any serious medical need possessed
by Plaintiff.

**2. Whether Plaintiff Failed to Exhaust Administrative Remedies**

In the alternative, Defendants Weitz and Belanger argue that
Plaintiff's claim against them should be dismissed because
Plaintiff's Amended Complaint "contains no allegation that
plaintiff ever complained administratively about the same
medical decisions by Dr. Weitz and Mr. Belanger about
which plaintiff complains at pages 11 through 13 of his
complaint." (Dkt. No. 16, Part 3, at 10 [Defs.' Mem. of Law].)

Although I agree with the main thrust of this argument (i.e.,
that Plaintiff's claim against Defendants Weitz and Belanger
should be dismissed due to Plaintiff's failure to exhaust his
available administrative remedies), I disagree somewhat with
Defendant Weitz and Belanger's reasoning.

For some years now, it has been the majority rule (followed
by the Second Circuit) that a prisoner's fulfillment of his
duty to exhaust his available administrative remedies under
the Prison Litigation Reform Act ("PLRA") is not a fact
that the prisoner had to plead in order to state a claim
under 42 U.S.C. § 1983 but a fact that may be challenged
by a defendant through an affirmative defense (such as on
a motion for summary judgment pursuant to Fed.R.Civ.P.
56, or a motion to dismiss for lack of subject-matter
jurisdiction pursuant to Fed.R.Civ.P. 12[b][1] ) established by
the PLRA. _See, e.g., Jenkins v. Haubert,_ 179 F.3d 19, 28-29

(2d Cir.1999) ("Because, under the PLRA, a prisoner must
exhaust administrative remedies before filing a § 1983 suit ...,
a defendant in a prisoner § 1983 suit may also assert as an
affirmative defense the plaintiff's failure to comply with the
PLRA's requirements."); _Snider v. Melindez,_ 199 F.3d 108,
114 (2d Cir.1999) ("A court may not dismiss for failure to
exhaust administrative remedies unless the court determines
that such remedies are available. Snider's answers [on a form
complaint] cannot establish that.").

**\*8**  Recently, the Supreme Court upheld this interpretation
of the exhaustion requirement, prohibiting circuits (such as
the Sixth, Tenth and Eleventh Circuits) from using exhaustion
as a heightened pleading requirement in prisoner civil rights
case. _See Jones v. Block,_ 549 U.S. 199, ---- - ----, ---- - 127,
127 S.Ct. 910, 914-915, 918-923, 166 L.Ed.2d 798 (2007).
A prisoner has no independent _duty_ to plead facts plausibly
suggesting that he exhausted his available administrative
remedies, in order to state an actionable claim under 42 U.S.C.
§ 1983. _Block,_ 127 S.Ct. at 919-21. "[T]his is not to say that
failure to exhaust cannot be a basis for dismissal for failure
to state a claim." _Id._ at 921. If a prisoner _chooses_ to plead
facts regarding exhaustion, and those facts plausibly suggest
that he failed to exhaust his available administrative remedies,
then his Complaint may be dismissed for failure to state a
claim. _Id._ at 920-21. Simply stated, if a prisoner says nothing
or little about exhaustion in his _pro se_ civil rights complaint,
he is likely protected from a Fed.R.Civ.P. 12(b)(6) motion to
dismiss premised on failure to exhaust. However, if he says
too much about exhaustion in that complaint so that his non-
exhaustion is readily apparent, he may "plead himself out of
court," as the saying goes.

This is what has happened here. Addressing the exhaustion
requirement in his Amended Complaint, Plaintiff alleges as
follows:

The plaintiff Mr. McNamee (# 21562)
believes the exhaustion rule is not
inflexible and _need not be followed_
when the facility has previously
been challenged by other inmates.
Challenges have been made with
grievances and determinations have
been made that to resort [t]o
administrative remedies would be
obviously futile and pursuit would
cause irreparable injuries. The County

Defendants take advantage of not answering grievances and delaying them for the sole purpose of causing harm to plaintiffs.

(Dkt. No. 5, at 7 [Plf.'s Am. Compl.] [emphasis added].) Through this allegation, Plaintiff has effectively acknowledged that the Schoharie Jail had a grievance procedure during the time in question, and that he knowingly did not pursue that grievance procedure.

Granted, Plaintiff appears to attempt to invoke the "unavailability," "estoppel," and "special circumstances" exceptions to the exhaustion rule. More specifically, Plaintiff appears to rely on the three-part inquiry that the Second Circuit has held is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. [25] *First,* "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." [26] *Second,* if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." [27] *Third,* if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." [28]

[25]    *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).

[26]    *Hemphill,* 380 F.3d at 686 (citation omitted).

[27]    *Id.* [citations omitted].

[28]    *Id.* [citations and internal quotations omitted].

**\*9** However, Plaintiff provides absolutely no factual allegations supporting his conclusory allegation that he "need not ... follow[ ]" the exhaustion procedure since (1) unidentified courts or administrative bodies have accepted the argument of "other inmates" that their pursuit of their

administrative remedies would have been futile, and (2) "[t]he County Defendants take advantage of not answering grievances and delaying them for the sole purpose of causing harm to plaintiffs." (*See generally* Dkt. No. 5 [Plf .'s Am. Compl.].) For example, Plaintiff does not allege that any court or administrative body has ruled that *Plaintiff's* administrative remedies have ever been unavailable at *the Schoharie County Jail.* Nor does Plaintiff allege that either Defendant Weitz or Defendant Belanger in any way frustrated Plaintiff's ability to administratively grieve his claim against them. The closes he comes is when he alleges that his "litigation" has been "injure[d]" by the refusal of the County "Medical Department" to release to him his medical records supporting his claim against Defendant "Jane Doe # 1." (*Id.* at 11.) Such an allegation in no way supports Plaintiff's conclusory allegation that he did not have to exhaust his administrative remedies before filing his claim against *Defendants Weitz and Belanger.*

For the above reasons, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendants Weitz and Belanger due to Plaintiff's having alleged facts demonstrating that, before filing this action in federal court, he failed to exhaust his administrative remedies with regard to his inadequate-medical-care claim against Defendants Weitz and Belanger.

### C. Failure to Name or Serve, and/or Failure to State Claim Against, Defendant "Jane Doe # 1"

Plaintiff had a duty to diligently litigate his deliberate-indifference claim against Defendant "Jane Doe # 1," including a specific duty to identify, name and serve her. *See* Fed.R.Civ.P. 41(b); N.D.N.Y. L.R. 41.2(a); Fed.R.Civ.P. 4(m); Fed.R.Civ.P. 16(e),(f). (*See also* Dkt. No. 6, at 2-4 [Order of Judge Kahn, filed 1/22/07, advising Plf. that "the U.S. Marshals cannot effect service on a 'Jane Doe' defendant," and that "if this individual is not timely served, this action will be dismissed as against her," and directing Plf. to "take reasonable steps to ascertain her identity" and "file a Motion to amend his Complaint and add such individual[ ], by name, as [a] defendant[ ] to this lawsuit"].) Plaintiff has failed to fulfill that duty, and has not shown good cause excusing that failure.

Furthermore, using the well-known five-part balancing test appropriate for a failure-toprosecute analysis, [29] I find that this failure to name and serve has persisted for more than a year; Plaintiff has had specific notice of the failure and

2008 WL 686796

the consequences of the failure; the individual designated as "Jane Doe # 1" (whomever she may be) has been prejudiced by the failure; and no sanction less drastic than dismissal would be appropriate. Under the circumstances, I find that Plaintiff's deliberate-indifference claim against "Jane Doe" should be dismissed under a variety of authorities. [30]

29    In the Second Circuit, courts consider five factors (none of which is dispositive) when deciding whether or not to dismiss an action for failure to prosecute: "[1] the duration of the plaintiff's failures, [2] whether plaintiff had received notice that further delays would result in dismissal, [3] whether the defendant is likely to be prejudiced by further delay, [4] whether the district judge has taken care to strike the balance between alleviating court calendar congestion and protecting a party's right to due process and a fair chance to be heard and [5] whether the judge has adequately assessed the efficacy of lesser sanctions." *Shannon v. GE Co.,* 186 F.3d 186, 193 (2d Cir.1999) (affirming Fed.R.Civ.P. 41[b] dismissal of plaintiff's claims by U.S. District Court for Northern District of New York based on plaintiff's failure to prosecute the action) [citations omitted].

30    I note that the Court need not issue such an order only upon motion of defense counsel but may do so *sua sponte. See* Fed. R. Civ. 4(m) ("[T]he Court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time."); Fed. R. Civ. 16(f) ("[T]he judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just...."). Furthermore, with regard to Fed.R.Civ.P. 41(b), which speaks only of a *motion* to dismiss on the referenced grounds, courts retain the "inherent power" to *sua sponte* "clear their calendars of cases that have remained dormant because of the inaction or dilatoriness of the parties seeking relief." *Link v. Wabash R.R. Co.,* 370 U.S. 626, 630, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962); *see also Saylor v. Bastedo,* 623 F.2d 230, 238 (2d Cir.1980); *Theilmann v. Rutland Hospital, Inc.,* 455 F.2d 853, 855 (2d Cir.1972). Indeed, Local Rule 41.2(a) recognizes this authority. *See* N.D.N.Y. L.R. 41.2(a) ("Whenever it appears that the plaintiff has failed to prosecute an action or

proceeding diligently, the assigned judge *shall* order it dismissed.") [emphasis added].

**\*10** However, even if the Court were to overlook Plaintiff's failure to name and serve Defendant "Jane Doe # 1," and to review the pleading sufficiency of Plaintiff's deliberate-indifference claim against her, the Court would find that Plaintiff's factual allegations against her do not state a claim upon which relief maybe granted. [31] Liberally construed, Plaintiff's Amended Complaint alleges that, during the days following November 7, 2005, Defendant "Jane Doe # 1," who was a physician at the Schoharie County Jail, violated Plaintiff's Eighth Amendment rights by "misdiagnos[ing] [Plaintiff's injury] and prescrib[ing] the wrong medication to [Plaintiff] for headaches that were occurring" as a result of "a head injury" that he suffered during the November 7, 2005, assault. (Dkt. No. 5, at 11 [Plf.'s Am. Compl.].) For the sake of argument, I will assume that the vague "head injury" that Plaintiff suffered during the referenced assault constituted a *sufficiently serious medical need* for purposes of the Eighth Amendment. In any event, the alleged errors that Defendant Jane Doe # 1 committed during the days following that injury constitute, at most, *negligence,* not the sort of *criminal recklessness* that is required to state a claim under the Eighth Amendment. (*See, supra,* Part III.B. 1.b. of this Report-Recommendation.)

31    I note that the Court is authorized to conduct such an analysis of the pleading sufficiency of Plaintiff's claims pursuant 28 U.S.C. § 1915(e)(2)(B)(ii) and/ or 28 U.S.C. § 1915A(b).

For all of these reasons, I recommend that the Court *sua sponte* dismiss Plaintiff's deliberate indifference claim against Defendant "Jane Doe # 1" due to Plaintiff's failure to name or serve her, and/or his failure to state a claim against her upon which relief may be granted.

### D. Failure to Serve Defendant Schoharie County Medical Department

As indicated above in Part III.C. of this Report-Recommendation, Plaintiff had a duty to diligently litigate his claims against Defendant Schoharie County Medical Department (if there exists such an entity), including a specific duty to serve that entity. *See* Fed.R.Civ.P. 41(b); N.D.N.Y. L.R. 41.2(a); Fed.R.Civ.P. 4(m); Fed.R.Civ.P. 16(e), (f). (*See also* Dkt. No. 8, at [Order of Magistrate Judge Lowe, filed 3/5/07, directing that Plf. "must comply with the requests by the Clerk's Office for any documents [including

accurate USM 285 Forms] that are necessary to maintain this action.".] [32] Plaintiff has failed to fulfill that duty. (*See* Dkt. No. 27 [Summons Returned Unexecuted as to Schoharie County Medical Dept., filed 5/23/07].) Furthermore, he has not shown good cause excusing that failure.

[32]    To the extent Plaintiff misnamed this entity, he had a duty to discover and correct that error. (*See* Dkt. No. 6, at 4 [Order of Judge Kahn, filed 1/22/07, advising Plf. that he shall "take reasonable steps to ascertain the identities of any other individual(s) that purportedly violated plaintiff's civil and/or constitutional rights and, if appropriate, file a Motion to amend his Complaint and add such individual [ ], by name, as [a] defendant[ ] to this lawsuit"].)

Finally, using the balancing test appropriate for a failure-to-prosecute analysis, I find that this failure to name and serve has persisted for approximately nine months; Plaintiff has had specific notice of the failure and the consequences of the failure; the entity designated as "The Schoharie County Medical Department" (whichever entity that may be) has been prejudiced by the failure; and no sanction less drastic than dismissal would be appropriate. Under the circumstances, I find that Plaintiff's claims against Defendant Schoharie County Medical Department should be dismissed under a variety of authorities. (*See, supra,* note 30 of this Report-Recommendation.)

 **\*11**  For these reasons, I recommend that the Court *sua sponte* dismiss Plaintiff's claims against Defendant Schoharie County Medical Department due to Plaintiff's failure to serve, and/or his failure to diligently litigate his claims against, that entity.

### E. Failure to Prosecute Claims Against Remaining Defendants

As indicated above in Part III.C. of this Report-Recommendation, Plaintiff had a duty to diligently litigate his claims against the remaining Defendants (i.e., Defendants Hazzard, Cronk, Marsh, Hirst, Alexander, Grippin, and Schoharie County Jail). *See* Fed.R.Civ.P. 41(b); N.D.N.Y. L.R. 41.2(a); Fed.R.Civ.P. 4(m); Fed.R.Civ.P. 16(e),(f).

Using the balancing test appropriate for a failure-to-prosecute analysis, I find that Plaintiff has failed to diligently prosecute this action for approximately eight months, i.e., since about *June 4, 2007.* I reach this conclusion for two reasons. First,

June 4, 2007, was the original deadline for Plaintiff's papers in response to Defendants Weitz and Belanger's motion to dismiss. Since that date, the Court has delayed deciding the motion to dismiss, in large part, out of special solicitude to Plaintiff, to permit him an adequate opportunity to respond. I note that Local Rule 7.1(b)(3) gives a non-movant a duty to promptly notify the Court when he intends to not respond to a motion, and makes the failure to fulfill such a duty punishable by the imposition of sanctions. N.D.N.Y. L.R. 7.1(b)(3). Plaintiff has failed to provide such notice to the Court. Second, Local Rule 41.2(a) of the Local Rules of Practice for this Court provides that "[i]n the absence of an order by the assigned judge or magistrate judge setting any date for any pretrial proceeding or for trial, the plaintiff's failure to take action for four (4) months shall be presumptive evidence of lack of prosecution ." N.D.N.Y. L.R. 41.2(a). As of June 4, 2007, the last time that Plaintiff had taken any action in this matter was about four months before, i.e., on February 2, 2007. (Dkt. No. 7 [Plf.'s IFP App., filed 2/2/07].)

Furthermore, I find that Plaintiff has had adequate notice of his failure to prosecute and the consequences of the failure, due to (1) Local Rules 7.1(b)(3) and 41.2(a) of the Local Rules of Practice for this Court, which were available at Plaintiff's correctional facility when he signed his Complaint in this action in August of 2006, and (2) the several Orders that have been filed in this action reminding Plaintiff, in part, of his various litigation duties. (*See* Dkt. Nos. 4, 6, 8, 30, 31.)

Moreover, I find that the remaining Defendants have been prejudiced by Plaintiff's failure to prosecute, and will continue to be prejudiced by a further failure to prosecute. Further delay by Plaintiff may very well result in the fading of memories, the discarding of relevant documents, and the retirement or transfer of witnesses. [33]

[33]    *See, e.g., Geordiadis v. First Boston Corp.,* 167 F.R.D. 24, 25 (S.D.N.Y.1996) ("The passage of time always threatens difficulty as memories fade. Given the age of this case, that problem probably is severe already. The additional delay that plaintiff has caused here can only make matters worse.").

Additionally, I find that the need to alleviate congestion on the Court's docket outweighs Plaintiff's right to receive a further chance to be heard in this action. It is cases like this one that delay the resolution of other cases, and that contribute to the Second Circuit's dubious distinction as having (among the twelve circuits, including the D.C. Circuit) the longest median

2008 WL 686796

time to disposition for prisoner civil rights cases, between 2000 and 2005 (9.8 months, as compared to a national average of 5.7 months). Simply stated, I am unable to afford Plaintiff with further special solicitude without impermissibly burdening the Court and unfairly tipping the scales of justice against the remaining Defendants.

 **\*12** Finally, I have considered all less-drastic sanctions and rejected them, in part because they would be futile under the circumstances (e.g., an Order warning or chastising Plaintiff would likely fall upon deaf ears, as did the Court's extension Order of August 14, 2007, due to Plaintiff's apparent intent to abandon pursuit of his claims in this action). (*See* Dkt. No. 30 [Order filed 8/14/07].)

For these reasons, I recommend that the Court dismiss Plaintiff's claims against the remaining Defendants (i.e., Defendants Hazzard, Cronk, Marsh, Hirst, Alexander, Grippin, and Schoharie County Jail) due to Plaintiff's failure to diligently litigate his claims against them, unless Plaintiff shows cause for this failure within ten (10) days of the date of this Report-Recommendation.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants Weitz and Belanger's motion to dismiss for failure to state a claim (Dkt. No. 16) be **GRANTED,** and that Plaintiff's claim of inadequate medical care by Defendants Weitz and Belanger, set forth in Count Three of Plaintiff's Amended Complaint (Dkt. No. 5), be **DISMISSED** **with prejudice** for failure to state a claim; and it is further

**RECOMMENDED** that Plaintiff's claim of inadequate medical care by Defendant "Jane Doe # 1," set forth in Count

Three of Plaintiff's Amended Complaint (Dkt. No. 5), be *sua sponte* **DISMISSED** **with prejudice** due to Plaintiff's failure to name or serve her, or, in the alternative, due to his failure to state a claim upon which relief might be granted; and it is further

**RECOMMENDED** that Plaintiff's claims against Defendant Schoharie County Medical Department be *sua sponte* **DISMISSED** **with prejudice** due to Plaintiff's failure to serve that entity and/or his failure to diligently litigate his claims against that entity; and it is further

**RECOMMENDED** that Plaintiff's claims against the remaining Defendants (i.e., Defendants Hazzard, Cronk, Marsh, Hirst, Alexander, Grippin, and Schoharie County Jail) be *sua sponte* **DISMISSED** **with prejudice** due to Plaintiff's failure to diligently litigate his claims against them, unless Plaintiff shows cause for this failure within **TEN (10) DAYS** of the date of this Report-Recommendation.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 686796

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 9:06cv01364**<br>MCNAMEE v. THE SCHOHARIE COUNTY JAIL ET AL | — | N.D.N.Y. | Nov. 09, 2006 | Docket |

**WESTLAW**   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History**

There are no History results for this citation.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 451 of 529

Lewis v. Huebner, Not Reported in Fed. Supp. (2020)

2020 WL 1244254

2020 WL 1244254
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Regina LEWIS, Plaintiff,
v.
Ellen HUEBNER, et al., Defendants.

No. 17-CV-8101 (KMK)
|
Signed 03/16/2020

**Attorneys and Law Firms**

Regina Lewis, Newburgh, NY, Pro Se Plaintiff.

Antwaun Gavins, Esq., New York State Office of the Attorney General, New York, NY, Counsel for Defendants.

OPINION & ORDER

KENNETH M. KARAS, United States District Judge:

 **\*1** Plaintiff Regina Lewis ("Plaintiff") brings this pro se Action, under 42 U.S.C. § 1983, against Nurses Ellen Huebner ("Huebner") and Lisa Wallace ("Wallace"), and Security Hospital Treatment Assistants ("SHTAs") MaryAnn Franqui ("Franqui"), Barry Marlow ("Marlow"), and Edward Campbell ("Campbell") (collectively, "Defendants"), alleging violations of her constitutional rights while she was committed at Mid-Hudson Psychiatric Center ("Mid-Hudson"). (*See* Second Am. Compl. ("SAC") (Dkt. No. 51).) Before the Court is Defendants' Motion To Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). (Not. of Mot. (Dkt. No. 72).) For the reasons that follow, the Motion is partially granted.

I. Background

A. Factual Background

The following facts are drawn from Plaintiff's SAC, and matters of which judicial notice may be taken, and are assumed to be true for the purposes of the instant Motion.

At the time of the relevant events, Plaintiff was a forensic patient at Mid-Hudson. (*See* Compl. 4 (Dkt. No. 1).) Mid-Hudson is a secure adult psychiatric hospital operated by the New York State Office of Mental Health ("OMH") that provides treatment to patients admitted by court order because they have been found unfit to stand trial, or not responsible by reason of mental defect, under § 730 of the New York Criminal Procedure Law ("CPL"). *See Lombardo v. Freebern, No. 16-CV-7146, 2018 WL 1627274, at \*2 (S.D.N.Y. Mar. 30, 2018).*

On the morning of September 6, 2017, Plaintiff refused to get out of bed because she was "suffering from a nervous breakdown." (SAC 1.) Defendant Marlow then "slapped the left side of [her] face before using excessive force to put [her] in a wheelchair" and told her that he "tried to break [her] ... wrists." (*Id.*) Marlow also announced that Plaintiff and her "God damn letter writing" had "no credibility," and falsely accused her of threatening to punch him in the face. (*Id.*) In response to Marlow's accusation, Defendants Wallace and Huebner called a doctor to administer an injection to Plaintiff, even though they "knew" the accusation was false. (*Id.*)

At approximately 9:20 a.m., Huebner pulled down Plaintiff's pajama pants "well beneath [her] butt crack" in order to administer the injection. (*Id.*) Plaintiff alleges that Huebner did so "to intentionally shame and humiliate" her, to "cause [her] pain," and to "mock [her] for the [benefit of the] male SHTAs holding [her]." (*Id.*) Plaintiff alleges that she "felt sexually assaulted" and "violated." (*Id.*) Defendant Franqui said, "Good work guys! Now we [can] finally can [give Plaintiff] meds over [her] objection[s]." (*Id.*)

At 12:20 p.m., Plaintiff refused to go to lunch because the seven flights of stairs were "too much" for her. (*Id.*) A non-party SHTA, "Mr. Turnyae," put his knee into Plaintiff's back while Huebner administered a second injection. (*Id.* 1–2.) Plaintiff was then taken by wheelchair to the Special Services Unit ("SSU"), a "unit for the acutely mentally ill," where she remained for three weeks. (*Id.* 2.)

 **\*2** Sometime in November 2017, Defendant Campbell was assigned to Plaintiff's ward. (*Id.*) As Plaintiff returned from breakfast at approximately 9:20 a.m., another patient ("Shaw") stepped on the back of Plaintiff's boots three times, kicked Plaintiff, and knocked Plaintiff's hat off. (*Id.*) When Shaw refused to move and "remained behind [Plaintiff] on [her] back," Campbell radioed for the assistance of a senior SHTA, Defendant Franqui. (*Id.*)

Shaw began to walk away, but upon reaching the stairwell, she suddenly began kicking and punching Plaintiff. (*Id.*)

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 452 of 529

Lewis v. Huebner, Not Reported in Fed. Supp. (2020)

2020 WL 1244254

As Plaintiff turned around to defend herself, Campbell, "slammed" Plaintiff into the stairs "so hard that [her] back and tailbone were in severe pain ... for nearly five weeks." (*Id.*) While Campbell restrained Plaintiff, another non-party SHTA, "Mr. Lowry" restrained Shaw. (*Id.*) When Franqui arrived, he asked Shaw "if she wanted to press charges" against Plaintiff, and Campbell filed a report identifying Plaintiff as the aggressor. (*Id.*)

Campbell's report caused Wallace and Huebner to "insist[ ]" that Plaintiff "take medication." (*Id.*) Wallace and Huebner also "wrote a risk assessment that characterized [Plaintiff] as unpredictable and assaultive, and ordered [Plaintiff] to be on close-observation with no sharps and no hot liquid." (*Id.*) Wallace and Huebner renewed their assessment and order every three days for four weeks, despite the fact that neither was a member of Plaintiff's treatment team. (*Id.*) As a result of their assessment, Plaintiff was forced to "write with a crayon, sit by [her]self, and eat with [her] hands in the dining hall." (*Id.*) Plaintiff "also received an ['][X['], which is the loss of privileges for as long as [she] was on close observation," which was "about four weeks." (*Id.*) Plaintiff was prevented from filing charges against both Shaw and Campbell. (*Id.* at 3.) Eventually, Shaw told Plaintiff that Campbell "put her up to attacking [Plaintiff] with the promise of a sandwich and a soda." (*Id.*)

On an unspecified date, "[w]hile in the dining hall," Campbell mocked Plaintiff by stating that "[she] gave [her] daughter away for adoption" and "call[ing] [her] other derogatory names such as 'ugly Newburgh bitch.' " (*Id.*) On November 29, 2017, Campbell needlessly chose to walk near Plaintiff and "insult[ed] and "intimidate[ed] her." (*Id.*) Plaintiff alleges that Campbell's behavior is part of a "pattern of practice," that he "is under investigation for other brutal patient assaults" and "for instigating other patient[-]on[-]patient assaults," that he has "a history of abusing minors in his former employment," and that he is "incapable of refraining from harassing [Plaintiff] when he's around [her] with his words and body language." (*Id.*)

Plaintiff seeks punitive and compensatory damages and whatever other relief the Court deems proper. (*Id.*)

B. Procedural Background

Plaintiff filed her initial Complaint on October 19, 2017, (*see* Compl.), and an Application to proceed in forma pauperis ("IFP") on November 29, 2017, (Dkt. No. 7). On December 12, 2017, the Court made a preliminary finding that, because

Plaintiff adequately pleaded imminent danger of serious physical injury, she was entitled to IFP status despite having filed three frivolous claims. *See* 28 U.S.C. § 1915(g). (Dkt. No. 9.) The Court noted, however, that its decision to do so was "without prejudice to Defendants' making a motion seeking to revoke Plaintiff's IFP status" or to dismiss. (*Id.*)

**\*3** On February 6, 2018, the Court directed Plaintiff to file an amended complaint by February 28, 2018. (Dkt. No. 20.) On March 15, 2018, the Court docketed Plaintiff's Amended Complaint, which contains a return address in Newburgh, New York, thereby indicating that she had been released from Mid-Hudson. (Am. Compl. 4 (Dkt. No. 21).) On May 24, 2018, Defendants filed a Motion to Revoke Plaintiff's IFP Status and Dismiss Plaintiff's Amended Complaint. (Dkt. Nos. 37–40.) On March 18, 2019, the Court granted Defendants' Motion to Revoke Plaintiff's IFP Status without prejudice, but permitted Plaintiff to renew the Action within 30 days if she paid the appropriate filing fee or submitted an IFP Application indicating her inability to do so. (Dkt. No. 46.)

On April 12, 2019, Plaintiff filed the operative SAC and an IFP Application. (Dkt. No. 51.) On April 16, 2019, the Court again granted Plaintiff IFP status. (Dkt. No. 52). On August 15, 2019, Defendants filed the instant Motion and accompanying papers. (Dkt. No. 72–73.) On August 26, 2019, Plaintiff filed a paper, styled "Motion for Summary Judgment," which the Court construed as Plaintiff's Opposition. (Dkt. Nos. 76, 80.) On October 10, 2019, Defendants filed a Reply. (Dkt. No. 81.) Plaintiff has since filed several additional letters, all of which the Court has reviewed and considered in deciding the instant Motion. (Dkt. Nos. 83–88).

II. Discussion

A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft*

2020 WL 1244254

*v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[ ] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same). However, when the complaint is from a pro se plaintiff, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint." *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted).

**\*4** Where, as here, a plaintiff proceeds pro se, the court must "construe[ ] [her] [complaint] liberally and interpret[ ]

[it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and quotation marks omitted)).

### B. Analysis

Defendants argue that all official capacity claims are barred by the Eleventh Amendment; that Defendants Franqui and Wallace were not alleged to be personally involved in the purported constitutional violations; and that Plaintiff's allegations do not support claims for excessive force or impermissible medical treatment under the Fourteenth Amendment. (*See generally* Defs.' Mem. of Law in Supp. of Mot. To Dismiss ("Defs.' Mem.") 5–12 (Dkt. No. 73).) The Court considers these arguments to the extent necessary for resolution of the Motion.

### 1. Official Capacity Claims

As a threshold matter, insofar as Plaintiff pursues claims against Defendants in their official capacities, such claims are precluded by the Eleventh Amendment. "[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity when acting pursuant to its authority under Section 5 of the Fourteenth Amendment." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) (citation, alteration, and quotation marks omitted). "Courts have routinely held that New York has not waived, and Congress has not abrogated, sovereign immunity with respect to claims for constitutional violations under [§§] 1981, 1983, or 1985." *Carnell v. Myers*, No. 17-CV-7693, 2019 WL 1171489, at *4 (S.D.N.Y. Mar. 13, 2019) (citation and quotation marks omitted); *see also Murray v. Thomason*, No. 17-CV-7004, 2018 WL 5113955, at *4 (S.D.N.Y. Oct. 19, 2018) (same). Mid-Hudson is operated by OMH, an agency of New York State. *See Babcock v. N. Y. State Office of Mental Health*, No. 04-CV-2261, 2009 WL 1598796, at *26 (S.D.N.Y. June 8, 2009) (stating that psychiatric facilities

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 454 of 529

Lewis v. Huebner, Not Reported in Fed. Supp. (2020)

2020 WL 1244254

established within OMH are state agencies protected by the Eleventh Amendment); *Vallen v. Mid-Hudson Forensic Office of Mental Health*, No. 02-CV-5666, 2004 WL 1948756, at *3 (S.D.N.Y. Sept. 2, 2004) ("By statute the Mid-Hudson Forensic Psychiatric Center is a 'hospital' within the 'office' of the Commissioner of OMH. It is a state facility and entitled to the state's immunity." (citation omitted)). As employees of OMH facilities, Defendants are state officials and claims against Defendants in their official capacities are barred by the Eleventh Amendment. *See McNair v. Kirby Forensic Psychiatric Ctr.*, No. 09-CV-6660, 2010 WL 4446772, at *7 (S.D.N.Y. Nov. 5, 2010) ("The individual defendants, all of whom are employees of OMH, have been sued in both their official as well as individual capacities."). Accordingly, "[b]ecause the Eleventh Amendment bars claims against state employees sued in their official capacities, [P]laintiff's claims against [Defendants] in their official capacities must be dismissed." *Id.* (footnote omitted).

## 2. Excessive Force Claims

**\*5** "The rights of patients who are involuntarily committed have been likened to the rights of detainees awaiting trial." *Lombardo*, 2018 WL 1627274, at *15 (citations and quotation marks omitted); *see also Buthy v. Comm'r of Office of Mental Health of N.Y. State*, 818 F.2d 1046, 1050–51 (2d Cir. 1987) (applying Due Process Clause protections afforded to pre-trial detainees to persons confined due to incompetence to stand trial or acquittal by reason of insanity). Thus, like pretrial detainees, Plaintiff's rights under the Due Process Clause are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citation omitted).

In bringing a claim for excessive force under the Fourteenth Amendment, a plaintiff must allege that force was applied "purposefully, knowingly, or (perhaps) recklessly" because "accidental or negligent acts are not subject to Fourteenth Amendment liability." *Edrei v. Maguire*, 892 F.3d 525, 534 (2d Cir. 2018) (citation omitted), *cert. denied*, 139 S. Ct. 2614 (2019). A plaintiff must also allege facts suggesting that the use of force was "objectively unreasonable" under the circumstances. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). The Supreme Court has suggested that the following factors bear on the objective reasonableness of force used: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper

or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* at 2473. Moreover, courts considering the reasonableness of force under the Fourteenth Amendment must account for the "legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that ... are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (citation, alterations, and quotation marks omitted). Additionally, claims for excessive force under the Fourteenth Amendment must involve force that is either "more than *de minimis*" or "repugnant to the conscience of mankind." *United States v. Walsh*, 194 F.3d 37, 48 (2d Cir. 1999) (citation and quotation marks omitted); *see also Lynch v. City of New York*, —— F.3d ——, 2020 WL 1036620, at *7–8 (2d Cir. Mar. 4, 2020) (explaining that "there is a *de minimis* level of imposition with which the Constitution is not concerned," and therefore holding that a protestor who was detained for five hours and punitively denied food, drink, and access to a bathroom failed to state a Fourteenth Amendment claim (citation and quotation marks omitted)); *Rahman v. Schriro*, 22 F. Supp. 3d 305, 314–15 (S.D.N.Y. 2014) (explaining that "*de minimis* uses of force are necessarily excluded from constitutional recognition" (citation omitted)). [1]

---

[1]    Although the protections offered by the Fourth, Eighth and Fourteenth Amendments differ in substantial ways, courts generally consider Fourth and Eighth Amendment excessive force cases instructive when determining what constitutes de minimis force, or force that is reasonable under the circumstances, for Fourteenth Amendment purposes as well. *See Edrei*, 892 F.3d at 542 (noting "the practice of the Supreme Court and [the Second] Circuit, both of which cross-pollinate between Fourth, Eighth, and Fourteenth Amendment contexts" with respect to claims of excessive force); *Darnell*, 849 F.3d at 34 (explaining that Eighth Amendment cases are relevant to Fourteenth Amendment claims insofar as "they address the practical importance of taking into account the legitimate safety-related concerns of those who run jails"); *Walsh*, 194 F.3d at 48 (explaining that the same standards apply, under both the Eighth and Fourteenth Amendment, in determining the objective reasonableness of force in ensuring prison discipline); *see also Graham v.*

Case 5:25-cv-00956-AJB-MJK   Document 9   Filed 12/08/25   Page 455 of 529

Lewis v. Huebner, Not Reported in Fed. Supp. (2020)

2020 WL 1244254

*Connor*, 490 U.S. 386, at 398 (1989) (explaining that Fourth Amendment standards are stricter than Eighth and Fourteenth Amendment standards); *Shakir v. Derby Police Dep't*, 284 F. Supp. 3d 165, 209 (D. Conn. 2018) (same).

### a. Marlow

**\*6** Under these standards, Plaintiff cannot sustain an excessive force claim against Marlow. With respect to Marlow, Plaintiff alleges only that when she refused to get out of bed, Marlow "slapped the left side of [her] face before using excessive force to put [her] in a wheelchair" and told her that he "tried to break [her] ... wrists." (SAC 1.) Courts have repeatedly held that a single slap that results in no injury constitutes unactionable, *de minimis* force. *See Santiago v. City of Yonkers*, No. 13-CV-1077, 2015 WL 6914799, at \*8 (S.D.N.Y. Oct. 30, 2015) (explaining, in the context of the Fourth Amendment, that "an open-handed slap ... with no medical evidence and no other evidentiary support of injury, does not rise to the level of a constitutional violation." (citation and quotation mark omitted)); *Benjamin v. Flores*, No. 11-CV-4216, 2012 WL 5289513, at \*3 (E.D.N.Y. Oct. 23, 2012) (holding that a single slap that resulted in "no injury at all" was insufficient to state a Fourteenth Amendment claim); *Santiago v. C.O. Campisi Shield No. 4592*, 91 F. Supp. 2d 665, 674 (S.D.N.Y. 2000) (explaining that "an open-handed slap" is insufficient to give rise to an excessive force claim under both the Eighth and Fourteenth Amendments (citation omitted)); *see also Vallen v. Newson*, Nos. 16-CV-2632, 16-CV-2893, 2019 WL 1317569, at \*4 (E.D.N.Y. Mar. 22, 2019) ("Courts have held that isolated, *de minimus* [sic] uses of force against involuntarily committed plaintiffs do not constitute excessive force and are thus not constitutional deprivations." (citation omitted)); *cf. Ben-Reuben v. Westchester County*, No. 17-CV-9156, 2019 WL 1406868, at \*4 (S.D.N.Y. Mar. 28, 2019) (declining to dismiss an excessive force claim based on an alleged slap where the court could not determine the extent of the injuries from the complaint, and because the alleged use of force was "entirely gratuitous" (citation omitted)). Moreover, here, Plaintiff acknowledged that she was actively resisting instructions at the time of the incident, (*see* SAC 1 ("I refused to get out of bed ...")), suggesting that the use of some force by facility personnel was reasonable under the circumstances, *see Kingsley*, 135 S. Ct. at 2473 (encouraging courts to consider "whether the plaintiff was actively resisting" in analyzing the reasonableness of force under the Fourteenth Amendment); *Kalwasinski v. Artuz*, No. 02-CV-2582, 2003 WL 22973420, at \*6–7 (S.D.N.Y. Dec. 18, 2003) (holding that a prison official did not use excessive force in violation of the Eighth Amendment when he pressed prisoner's face into wall while attempting to secure the prisoner's compliance).

Similarly, Plaintiff's claim that Marlow used "excessive force to put [her] in a wheelchair," (SAC 1), fails because it is a classic example of a conclusory allegation. *See Gulley v. Lizon*, No. 19-CV-310, 2019 WL 1559432, at \*3 (D. Conn. Apr. 10, 2019) (explaining that the plaintiff's excessive force claim "consists of one conclusory statement" and that "[a] conclusory statement is insufficient to state a plausible claim for use of excessive force"); *see also Iqbal*, 556 U.S. at 678 (explaining that Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation" (citation omitted)). In any case, the allegation that Marlow "merely push[ed] Plaintiff back into [her] wheelchair, without more," is de minimis and therefore insufficient to state a constitutional violation. *Vallen*, 2019 WL 1317569, at \*4; *see also Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) (explaining, in an Eighth Amendment context, that an "inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim." (citation and quotation marks omitted)). Similarly, Plaintiff's allegations that Marlow cursed at her, threatened to break her wrists, announced she had "no credibility," and reprimanded her for writing letters cannot support a claim because "[i]n this Circuit, allegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged." *Walker v. Fierro*, No. 17-CV-05245, 2019 WL 6841798, at \*3 (S.D.N.Y. Dec. 13, 2019) (quotation marks omitted) (citing, inter alia, *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986)); *Whitaker v. Campbell*, No. 19-CV-1357, 2019 WL 5696035, at \*3 (D. Conn. Nov. 4, 2019) (same); *see also Williams v. Dubray*, 557 F. App'x 84, 86 (2d Cir. 2014) (expressly applying the same principle in a Fourteenth Amendment context).

### b. Campbell

With respect to Campbell, however, Plaintiff has adequately alleged an excessive force violation. First, Plaintiff alleges that Campbell "slammed [Plaintiff] to the stairs[ ] so hard that [her] back and tailbone were in severe pain ... for nearly five weeks." (SAC 2.) To be sure, Plaintiff admits that Campbell purportedly did so in order to separate Plaintiff and another inmate engaged in an altercation. (*See id.*) Ordinarily, the use of limited force in such situations may be considered

Lewis v. Huebner, Not Reported in Fed. Supp. (2020)

2020 WL 1244254

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 456 of 529

reasonable. *See Barnes v. Harling*, 368 F. Supp. 3d 573, 593 (W.D.N.Y. 2019) ("It is beyond dispute that attempting to stop an inmate fight is a legitimate governmental objective for a Corrections Officer." (citation, alterations, and quotation marks omitted)); *Vargas v. N. Y. C. Dep't of Corr.*, No. 17-CV-2544, 2018 WL 3392873, at *3 (S.D.N.Y. July 12, 2018) (explaining that a use of force was "objectively reasonable because [the defendant] was attempting to stop an inmate fight, which is a legitimate governmental objective" and because the defendant "did not use more force than necessary to quell the inmate altercation"), *appeal dismissed*, No. 18-2334 (2d Cir. Oct. 18, 2018). Here, however, several additional allegations plausibly suggest that Campbell's use of force may have been objectively unreasonable. First, Plaintiff alleges a prior history of altercations between herself and Campbell. (*See* SAC 2 (explaining that Plaintiff had previously filed a complaint against Campbell after an incident where Campbell closed a gym door on, and then twisted, Plaintiff's arm).) Insofar as this prior history adds plausibility to Plaintiff's claim that Campbell tackled her "for the very purpose of causing harm," such allegations also suggest that his conduct was "objectively unreasonable." *Kingsley*, 135 S. Ct. at 2476 (explaining that indications of a "purpose to cause harm ... might help show that the use of force was excessive" (citations and quotation marks omitted)).

 *7 Second, Plaintiff alleges that Campbell *initiated* the altercation between Plaintiff and Shaw. (*See* SAC 3 (explaining that Shaw maintains that Campbell "put her up to attacking [Plaintiff] with the promise of a sandwich and a soda").) Taken as true, these allegations suggest that Campbell's use of force may not have been a reasonable attempt to maintain order, but rather the culmination of a premeditated plan to inflict physical harm on Plaintiff. If so, the use of force was not the pursuit of "legitimate interests that stem from the government's need to manage the facility." *Kingsley*, 135 S. Ct. at 2473 (citation, alteration, and quotation marks omitted). On the contrary, Campbell's conduct was "intended to injure in some way unjustifiable by any government interest." *Edrei*, 892 F.3d at 533 (citation and quotation marks omitted). Accordingly, insofar as Plaintiff seeks to pursue a claim against Campbell based on this incident, that claim survives the instant Motion.[2]

[2]  Because the right to be free from excessive force is clearly established, *see Kingsley*, 135 S. Ct. at 2470, and because Plaintiff has alleged that Campbell's conduct was intentional, (*see* SAC 3),

Campbell's conduct cannot have been "based on reasonable mistakes of law or fact," *Naumovski v. Norris*, 934 F.3d 200, 210 (2d Cir. 2019) (footnote omitted). Accordingly, his claim of qualified immunity fails.

### 3. Unwanted Medical Treatment

In general, individuals—including prisoners—"retain a Fourteenth Amendment right to refuse medical treatment." *Perkins v. Perez*, No. 17-CV-1341, 2020 WL 248686, at *6 (S.D.N.Y. Jan. 16, 2020) (citing *Pabon v. Wright*, 459 F.3d 241, 251 (2d Cir. 2006)); *see also Washington v. Harper*, 494 U.S. 210, 229 (1990) ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty.") However, "[i]f an involuntarily committed psychiatric patient is acting in a manner in which he is dangerous to himself and those around him, psychiatrists may administer emergency medication against the patient's will without violating his rights." *Muhammad v. New York City*, No. 15-CV-5603, 2016 WL 4367970, at *3 (S.D.N.Y. Aug. 12, 2016) (citation omitted); *see also Washington*, 494 U.S. at 227 (holding that "the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest"). Moreover, the Supreme Court has emphasized that decisions concerning the treatment of committed individuals should be "made by medical professionals rather than a judge," assuming adequate procedural safeguards exist. *Id.* at 231. Thus, "decisions of professionals are presumptively valid and will result in liability only when the decision ... is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Lombardo*, 2018 WL 1627274, at *18 (quotation marks omitted) (ultimately quoting *Youngberg v. Romeo*, 457 U.S. 307, 320 (1982)).

Here, Plaintiff alleges that several individuals were involved in the administration of unwanted treatments. For example, Plaintiff alleges that Marlow falsely accused her of threatening to "punch him in the face." (SAC 1.) She further alleges that although Wallace and Huebner "knew" that Marlow's accusation was false, they nevertheless "called the doctor and [Plaintiff] received an injection based on the allegations." (*Id.*) Huebner administered the injection, and at some point thereafter, Franqui allegedly exclaimed, "Good

Case 5:25-cv-00956-AJB-MJK   Document 9   Filed 12/08/25   Page 457 of 529

Lewis v. Huebner, Not Reported in Fed. Supp. (2020)

2020 WL 1244254

work guys! Now we [can] finally can [give Plaintiff] meds over [her] objection[s]." (*Id.*) Additionally, later that day, Huebner gave Plaintiff "a second shot, because [Plaintiff] refused to move again." (*Id.* at 2.)

**\*8** These allegations support a claim against Marlow, but not against the rest of the Defendants. With respect to Marlow, the SAC suggests that Marlow fabricated the basis on which a decision was reached to administer the disputed injection. If so, and if Marlow's accusation was indeed the sole basis for the treatment decision, then Marlow was directly responsible for ensuring that the treatment decision was *not* based on a proper "professional judgment" of Plaintiff's situation, *Youngberg*, 457 U.S. at 321–22, and was therefore without a rational connection to a "legitimate governmental objective," *Edrei*, 892 F.3d at 535. Marlow would thereby have participated directly in a constitutional violation—even if those administering the injection were entirely innocent. *See Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (explaining that "a person who, with knowledge of the illegality, participates in bringing about a violation of the victim's rights but does so in a manner that might be said to be 'indirect'—such as ordering or helping others to do the unlawful acts, rather than doing them him—or herself" may be held liable under § 1983); *see also Case v. City of New York*, 233 F. Supp. 3d 372, 397 (S.D.N.Y. 2017) (denying a motion to dismiss a false arrest claim where the plaintiff alleged that a defendant officer "processed his arrest" even though that officer "may not have been present when [the plaintiff] was seized" (citations omitted)). Plaintiff has therefore adequately pleaded a Fourteenth Amendment claim against Marlow.[3]

[3]   Because the right to refuse unwanted and unnecessary medical treatment is clearly established, *see Washington*, 494 U.S. at 229; *Pabon*, 459 F.3d at 251, and because Plaintiff has alleged that Marlow's conduct was intentional, (*see* SAC 1), Marlow's conduct cannot have been "based on reasonable mistakes of law or fact," *Naumovski*, 934 F.3d at 210 (footnote omitted). Accordingly, his claim of qualified immunity fails.

Plaintiff's unwanted medical treatment claims against all other Defendants, however, fail as a matter of law. "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). "[D]irect participation

as a basis of liability in this context requires intentional[, grossly negligent, or deliberately indifferent] participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Provost*, 262 F.3d at 155 (footnote omitted); *see also Grullon*, 720 F.3d at 138 (explaining that liability under § 1983 can exist for grossly negligent or deliberately indifferent conduct). Here, Plaintiff has provided no non-conclusory allegations to suggest that any Defendant other than Marlow had reason to know the injection might be improper. Indeed, Plaintiff acknowledges that several medical professionals involved in the decision to administer the injection, (*see* SAC 1); thus, that decision was "presumptively valid." *Lombardo*, 2018 WL 1627274, at \*18 (ultimately quoting *Youngberg*, 457 U.S. at 320). While Plaintiff asserts that Wallace and Huebner "knew" that Marlow's accusation was false, Plaintiff provides no facts to support this assertion. (SAC 1.) The assertion is therefore conclusory and should be discounted. *See Boykin v. Moreno*, No. 17-CV-6869, 2020 WL 882195, at \*7 (S.D.N.Y. Feb. 24, 2020) (explaining that "conclusory allegations of [D]efendants' knowledge are insufficient" (alteration in original) (citation and quotation marks omitted)). Relatedly, while Plaintiff alleges that Franqui expressed happiness at the opportunity to administer treatment "over [Plaintiff's] objection," the alleged statement was only made after the treatment had already occurred. (SAC 1.) Moreover, Plaintiff does not allege that Franqui was involved in the decision to administer the unwanted injection, or that he had reason to know that the basis for that injection might be fabricated. (*See id.*) Therefore, from the perspective of Wallace, Huebner and Franqui, the treatment was properly authorized and objectively reasonable. Accordingly, as alleged, these Defendants were not personally involved in a constitutional violation. *See Anthony v. City of New York*, 339 F.3d 129, 142 (2d Cir. 2003) (explaining that because facility staff "reasonably believed that [the plaintiff] was a danger to herself or to others, ... the involuntary hospitalization was therefore constitutional under the Fourteenth Amendment"). Moreover, insofar as these Defendants were involved in such a violation, such involvement "was based on reasonable mistakes of ... fact," and so they are shielded by qualified immunity. *Naumovski*, 934 F.3d at 210 (footnote omitted). All claims against Defendants other than Marlow based on unwanted medical treatment are therefore dismissed.

4. Sexual Assault

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 458 of 529

Lewis v. Huebner, Not Reported in Fed. Supp. (2020)

2020 WL 1244254

**\*9**  In *Crawford v. Cuomo*, 796 F.3d 252 (2d Cir. 2015), the Second Circuit explained that an inmate pursuing a sexual abuse claim under the Eighth Amendment must allege both subjective and objective elements, namely that the "officer's intentional contact with an inmate's genitalia or other intimate area ... serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate[.]" 796 F.3d at 257. In general, protections under the Fourteenth Amendment are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Darnell*, 849 F.3d at 29 (citation and quotation marks omitted). However, it is presently unclear whether both prongs required for Eighth Amendment sexual abuse claims are also required for claims of "sexual abuse under the Fourteenth Amendment." *See Gilliam v. Black*, No. 18-CV-1740, 2019 WL 3716545, at \*10 (D. Conn. Aug. 7, 2019) (discussing the effect of *Kingsley* on Fourteenth Amendment sexual abuse claims and noting a lack of clarity concerning whether the same elements are necessary) (citations omitted); *Holland v. City of New York*, 197 F. Supp. 3d 529, 546 (S.D.N.Y. 2016) (noting that it is unclear whether "sexual abuse claims of a pretrial detainee must still meet both the objective and subjective prongs of the traditional Eighth Amendment analysis" (footnote omitted)).

Here, Plaintiff's claims cannot survive under either prong. Plaintiff alleges only that, in the process of administering an injection, Huebner "pulled [Plaintiff's] pajamas down well beneath [her] butt crack and injected [her];" and that she do so "to intentionally shame and humiliate" her, to "cause [her] pain," and to "mock [her] for the [benefit of the] male SHTAs holding [her]." (SAC 1.) In acknowledging that Huebner's contact with Plaintiff's "intimate area" came in the context of an injection, Plaintiff acknowledges that Huebner's actions served, at least facially, a legitimate purpose. *Crawford*, 796 F.3d at 257; *see also Washington*, 494 U.S. at 226 (recognizing "the State's legitimate interest in treating [a committed individual] where medically appropriate for the purpose of reducing the danger he poses"). Moreover, the Supreme Court has emphasized that "courts must show deference" to the professional judgment of medical practitioners in the context of such treatment. *Youngberg*, 457 U.S. at 322. Accordingly, Plaintiff's allegations have not satisfied the "objective" prong of a Fourteenth Amendment sexual abuse claim, i.e., that Huebner's conduct served "no penological purpose." *Crawford*, 796 F.3d at 257.

With respect to the "subjective" prong, Plaintiff does not allege any overtly sexual comments or conduct; rather, she simply asserts knowledge of Huebner's intent and state of mind in conclusory fashion. (*See* SAC 1 ("[Huebner] did this to intentionally shame and humiliate me, and to cause me pain.").) Absent supporting factual allegations, such conclusory statements are insufficient. *See Grant v. Norfleett*, No. 17-CV-328, 2017 WL 1902150, at \*3 (D. Conn. May 9, 2017) (granting a motion to dismiss where the sexual abuse claim was based on a conclusory allegation that the defendants conducted the search for their own sexual gratification, and the assertion that on occasions after the plaintiff was strip searched, the defendants "watched him like a piece of meat" (quotation marks omitted)); *see also Shaw v. Prindle*, 661 F. App'x 16, 19 (2d Cir. 2016) (noting that the court "cannot infer solely from the thoroughness of the search"—described, inter alia, as "excessive searching of [the] crotch area"—that the defendant "intended to search ... with intent to arouse or gratify [his] sexual desires or to humiliate [the plaintiff]" (quotation marks omitted)); *cf. Crawford*, 796 F.3d at 257–58 (finding an Eighth Amendment violation where the defendant "fondl[ed] and squeeze[d] [the plaintiff's] penis in order to make sure [he] did not have an erection," because "[t]here is no penological justification for checking to see if an inmate has an erection" (alteration and quotation marks omitted)); *id.* at 258–59 (noting that demeaning, overtly sexual comments "suggest[ed] that [the defendant] undertook the search in order to arouse himself, humiliate [the plaintiff], or both" (record citation omitted)). Accordingly, the Court dismisses Plaintiff's Fourteenth Amendment claim of sexual abuse.

### 5. Remaining Allegations

**\*10**  Plaintiff's remaining allegations fail to state a claim altogether. While Plaintiff alleges that, at some unspecified time, Wallace and Huebner "insisted that [she] take medication," (SAC 2), Plaintiff offers no further details, rendering the allegations impermissibly threadbare, *see Neal v. Asta Funding, Inc.*, No. 13-CV-2176, 2014 WL 3887760, at \*4 (S.D.N.Y. June 17, 2014) (explaining that "threadbare allegations fail even to satisfy the liberal 'plausibility' pleading standard" (citing *Twombly*, 550 U.S. at 547)). At best, "Plaintiff's claims boil down to nothing more than a dispute ... over the treatment [she] has received.... [S]uch disagreement regarding the particularities of [her] treatment is insufficient to state a claim." *Lombardo*, 2018 WL 1627274, at \*19 (citing, inter alia, *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)). Similarly, while Plaintiff alleges that Wallace and Huebner's risk assessment led to

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 459 of 529

Lewis v. Huebner, Not Reported in Fed. Supp. (2020)

2020 WL 1244254

various restrictions on Plaintiff's activities and privileges, (SAC 2), these restrictions do not amount to constitutional deprivations, *see id.* at \*18 (noting that an individual committed in Mid-Hudson had "constitutionally-protected liberty interests in adequate food, shelter, clothing, medical care, and conditions of reasonable care and safety," but that the loss of various privileges did not amount to a deprivation of protected liberty interests or pose an unreasonable risk of serious damage to health (citation and quotation marks omitted)); *see also Falls v. Campbell*, No. 17-CV-35, 2019 WL 6251245, at \*6 (S.D.N.Y. Nov. 21, 2019) (rejecting Fourteenth Amendment claims based on the denial of commissary and telephone privileges and other minor disciplinary measures). Finally, while Plaintiff alleges that Campbell called Plaintiff "derogatory names" and "insult[ed] and intimidate[ed]" her, (SAC 3), "verbal harassment or profanity alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and is therefore not actionable," *Vogelfang v. Capra*, 889 F. Supp. 2d 489, 508 (S.D.N.Y. 2012) (citation and quotation marks omitted); *see also Walker*, 2019 WL 6841798, at \*3 ("In this Circuit, allegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged." (citation and quotation marks omitted)). Accordingly, any purported claims based on these allegations are dismissed.

## III. Conclusion

For the reasons stated above, Defendants' Motion To Dismiss is partially granted and partially denied. Plaintiff may proceed with a claim for administration of unwanted medical treatment against Marlow based on the September 6, 2017 incident. Similarly, Plaintiff may proceed with a claim for excessive use of force against Campbell based on the November 2017 incident involving Plaintiff and Shaw. All other claims, including any official capacity claims and all claims against Huebner, Franqui and Wallace, are dismissed.

Because this is the first adjudication on the merits of Plaintiff's claims, the dismissals are without prejudice. If Plaintiff wishes to file a third amended complaint, Plaintiff must do so within 30 days of the date of this Opinion & Order. Plaintiff should include within that third amended complaint all changes to correct the deficiencies identified in this Opinion & Order that Plaintiff wishes the Court to consider. Plaintiff is advised that the third amended complaint will replace, not supplement, the SAC. The third amended complaint must contain *all* of the claims, factual allegations, and exhibits that Plaintiff wishes the Court to consider. If Plaintiff fails to abide by the 30-day deadline, the dismissed claims may be dismissed with prejudice, and the Action will proceed on the remaining claims.

The Clerk is respectfully directed to terminate the pending Motion, (Dkt. No. 72), as well as Plaintiff's purported "Motion for Summary Judgment," (Dkt. No. 76).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1244254

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History (3)**

**Direct History (1)**

1. Lewis v. Huebner
   2020 WL 1244254 , S.D.N.Y. , Mar. 16, 2020

**Related References (2)**

2. Lewis v. Huebner
   2019 WL 1236299 , S.D.N.Y. , Mar. 18, 2019

3. Lewis v. Marlow
   2021 WL 2269553 , S.D.N.Y. , June 03, 2021

**Filings**

There are no Filings for this citation.

1994 WL 708150

1994 WL 708150
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Eugene FORMAN, Plaintiff,

v.

Commissioner Thomas A.
COUGHLIN, III, et al., Defendants.

No. 93 CIV. 8412 (LAK).
|
Dec. 20, 1994.

**MEMORANDUM AND ORDER**

KAPLAN, District Judge.

**\*1** Plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), alleges that one of his property bags was lost during a transfer between DOCS facilities in the period May 2 through 5, 1993. He further alleges that the bag contained legal materials relating to various pending actions and proceedings and that the loss therefore deprived him of access to the courts. Plaintiff has brought this action, pursuant to 42 U.S.C. § 1983, against sixteen DOCS officials, ranging from the former Commissioner to the bus drivers who transported him during one part of the transfer trip.

On September 27, 1994, Judge Mukasey, to whom the action then was assigned, entered an order directing plaintiff, who is proceeding *pro se,* to set forth a "written statement of facts as to why this action should be maintained." On October 7, 1994, defendants moved to dismiss, arguing that the complaint fails to state a claim upon which relief may be granted and, in any case, that the Eleventh Amendment bars the claims against the defendants in their official capacities. Plaintiff responded with a memorandum of law, a written statement pursuant to the September 27 order, a request to amend the complaint, and proposed amendments. He concedes that the defendants may not be sued in their official capacities and proposes to drop that claim via the amendment to the complaint. The proposed amendment, which we grant leave to file and deem served and filed as of the date hereof, alleges also that the missing bag turned up on December 23, 1993, just after this action was commenced. It contained the pretrial hearing and sentencing

minutes to plaintiff's criminal case, but was missing the trial minutes and certain other legal papers. [1]

Although the amendment to the complaint charges "as yet unidentified correction officer(s) with removing the legal papers," [2] plaintiff does not accuse any of the defendants of any specific action with respect to the loss. Indeed, plaintiff specifically disavows any claim that any of the defendants intentionally deprived him of the legal materials or obstructed his access to the courts. [3] Rather, the essence of plaintiff's claim is that his legal materials were lost somewhere between Point A and Point B, that the defendants all had some connection with his transfer at one level of remove or the other, and that their collective actions were reckless or grossly negligent and resulted in, or failed to prevent, the loss. [4]

Plaintiff may be viewed as alleging two different claims: a claim that he was deprived of his property without due process, and a claim that defendants' actions improperly obstructed his access to the courts.

The property deprivation claim, if indeed plaintiff is making that assertion, is without merit irrespective of the alleged level of culpability because no constitutional injury is alleged. New York has adequate remedies via recourse to the New York Court of Claims. The Constitution requires nothing more. *Daniels v. Williams,* 474 U.S. 327, 329 (1986); *Hudson v. Palmer,* 468 U.S. 517, 533 (1984) (intentional deprivation); *Parratt v. Taylor,* 451 U.S. 527, 543 (1981) (negligent deprivation); *Morello v. James,* 810 F.2d 344 (2d Cir.1987).

**\*2** The claim of deprivation of access to the courts stands on a different footing. As the right of access to the courts is a substantive constitutional right, the existence of a State post-deprivation remedy is not controlling where the defendants intentionally interfere with its exercise. *E.g., Morello,* 810 F.2d at 348. It is equally clear that mere negligence cannot form the predicate for a Section 1983 claim. *Daniels,* 474 U.S. at 329; *Morello,* 810 F.2d at 347.

Here, plaintiff alleges loss through gross negligence or reckless disregard, disavowing any claim of intentional interference, on the one hand, or simple negligence, on the other. The complaint appears to raise precisely the issue foreshadowed—but not decided—in *Daniels:* "whether something less than intentional conduct, such as recklessness or 'gross negligence,' is enough to trigger the protections of the Due Process Clause." *Daniels,* 474 U.S. at 334 n. 3. This

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 464 of 529

Forman v. Coughlin, Not Reported in F.Supp. (1994)

1994 WL 708150

appears to be an open question in this Circuit, but we have no occasion to resolve it at this time.

Neither the complaint, plaintiff's memorandum, the statement of facts filed in response to Judge Mukasey's order, nor the proposed amended complaint contains any factual allegation that supports the characterization of defendants' actions here as recklessness or gross negligence. Plaintiffs are obliged to set forth facts sufficient to support conclusory generalizations or characterizations such as those made here. *E.g., Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988); *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987). Since there are no allegations sufficient to support any charge against these defendants beyond simple negligence, despite amendment of the complaint and Judge Mukasey's September 27 order, the complaint fails to state a claim upon which relief may be granted in light of *Parratt, Daniels,* and *Morello* even given the latitude properly afforded *pro se* litigants.

The Court is sympathetic to the inconvenience and frustration that plaintiff has experienced. Moreover, we recognize that it is difficult to imagine how plaintiff could be more specific at this stage of the proceedings. His bag was taken from him at the Clinton Correctional Facility. He then was transferred, first to Downstate and then to Sing Sing, arriving at Sing Sing three days later. The bag was missing for seven months and then turned up with part of its alleged contents missing. Plaintiff presumably is no more able to account for what happened to his bag on its odyssey than would be the average airline passenger who checked his or her bag in New York only to have the bag turn up some time later in Los Angeles,

damaged and missing part of its contents. But plaintiff's frustration does not justify his suing one, much less sixteen, people in their individual capacities without having any basis for suggesting any culpability on their part. [5] While the inference that DOCS had something to do with the loss perhaps would justify an action against the State in the Court of Claims, it does not support charges of deprivation of constitutional rights by any of these sixteen defendants.

**\*3** The motion to dismiss the complaint, as amended, is granted.

SO ORDERED.

[1]  *E.g.,* Memorandum of law in reply to defendants' "motion to dismiss memorandum" ("Pl.Mem.") at 19–21.

[2]  Pl.Mem. at 20.

[3]  Pl.Mem. at 8.

[4]  *E.g.,* Pl.Mem. at 6, 8.

[5]  There is a brief statement in the complaint that plaintiff was denied adequate access to the Sing Sing law library. But there is no indication that any of the defendants was responsible.

**All Citations**

Not Reported in F.Supp., 1994 WL 708150

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (3)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Brief for Defendants-Appellees**<br>Eugene FORMAN, Plaintiff-Appellant, v. Commissioner Thomas A. COUGHLIN, III; et al., Defendants-Appellees.<br>1995 WL 17201946 | PDF | C.A.2 | Mar. 31, 1995 | Brief |
| **2. Plaintiff-Appellant's Pro Se Memorandum of Law Brief and appendix**<br>Eugene FORMAN, Plaintiff-Appellant, v. Thomas A. COUGHLIN, III; C.O. D. James; Stephen Dalshiem, Superintendent, ; Lieutenant Nobile; Sargeant Scoppa; Sargeant Ohligher; Sargeant Keeinen; Brian Fischer, Superintendent,; C.O. Jones; C.O. Eley; Correction Officer Cousins; John P. Keane, Superintendent,; F. Feldstein, Correction Officer; J. Bishop, Correction Officer; Sgt. Kelly, Correction Officer; Daniel A. Senkowski, Superintendent, Defendants-Appellees.<br>1995 WL 17201945 | PDF | C.A.2 | Feb. 16, 1995 | Brief |
| **3. Docket 1:93cv08412**<br>FORMAN v. COUGHLIN, ET AL | — | S.D.N.Y. | Dec. 08, 1993 | Docket |

**History (3)**

**Direct History (3)**

1. Forman v. Coughlin 🖑
   1994 WL 708150 , S.D.N.Y. , Dec. 20, 1994

   *Affirmed by*

2. Forman v. Coughlin
   60 F.3d 812 , 2nd Cir.(N.Y.) , June 26, 1995

   *Certiorari Denied by*

3. Forman v. Coombe
   516 U.S. 949 , U.S. , Oct. 30, 1995

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 6200397
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Elminio ORTIZ, Plaintiff,

v.

The CITY OF NEW YORK, The City of New
York Department of Correction, New York City
Department of Health and Mental Hygiene, New
York City Health and Hospitals Corporation, Bellevue
Hospital Center, Manhattan Detention Center, North
Infirmary Command/Annex at Rikers Island, Dr.
Dolores Curbelo, Correction Officer "John" Howell,
Correction Officer "John" Harris, Captain "Jane"
Thomas, "John Does Nos. 1–20," Defendants.

No. 12 Civ. 3118(HB).
|
Dec. 12, 2012.

**OPINION & ORDER**

Hon. HAROLD BAER, JR., District Judge.[1]

[1]     John Runne, a second-year student at Brooklyn
        Law School and a Summer and Fall 2012 intern
        in my Chambers, provided substantial assistance in
        researching and drafting this opinion.

 **\*1**  Before the Court is a motion to dismiss the
Complaint pursuant to Rule 12(b)(6) of the Federal Rules
of Civil Procedure ("FRCP"). Elminio Ortiz ("Plaintiff")
seeks to recover compensatory and punitive damages
against numerous institutional and individual defendants;
all of whom, Plaintiff alleges, played a role in Plaintiff's
mistreatment while in the custody of the New York City
Department of Corrections and other related institutions.
Plaintiff brings suit pursuant to 42 U.S.C. §§ 1983, 1985
and 1986, as well as Title II of the Americans with Disabilities
Act ("ADA"), 29 U.S.C. § 12131 *et seq.,* and § 504 of
the Rehabilitation Act, 29 U.S.C. § 794. In addition to
these federal causes of action, Plaintiff asserts state tort
claims for negligent medical care; negligent hiring, training,
supervision, and retention; premises liability; intentional
infliction of emotional distress; and conversion. For the

following reasons, the defendants' motion to dismiss is
GRANTED in part and DENIED in part.

**Background**

Plaintiff brings suit against numerous municipal and
individual defendants. In all, Plaintiff is suing: The City
of New York; the New York City Department of Health
and Mental Hygiene ("DOHMH"); the New York City
Health and Hospitals Corporation ("NYHHC"); the Bellevue
Hospital Center; the New York City Department of Correction
("NYDOC"); the Manhattan Detention Center; the North
Infirmary Command/Annex at Rikers Island; and the agents,
servants and/or employees of these institutions, including
but not limited to; medical personnel, such as the Medical
Director (unnamed), Dolores Curbelo, M.D., physicians,
nurses, therapists, other medical staff, and John Does 1—
10; and NYDOC personnel such as the Warden (unnamed),
grievance committee members, Corrections Officer ("CO")
"John" Howell, CO "John" Harris, Captain "Jane" Nicholas,
Captain "John" Thomas, John Does 11–20.

For two periods of time between September 2007 and
September 2009, Plaintiff was under the defendants' "control
and care." Compl. ¶ 71–72. From September 2007 to
February 25, 2009, Plaintiff was held at Rikers as a pre-trial
detainee. *Id.* Plaintiff returned to the defendants' custody for
approximately one month beginning on September 13, 2009;
Plaintiff had been transferred on a temporary basis from the
New York State Department of Correction and Community
Supervision.[2] *Id.* While in the defendants' custody, Plaintiff
spent the majority of his time housed in Dorm 3 of the
Northern Infirmary Command/Annex at Rikers Island. *Id.* ¶
73. The North Infirmary Command/Annex is a facility for
inmates that "require medical services ... or other assistance
with their daily living." *Id.* Plaintiff also alleges that he
spent time in the Manhattan Detention Center and the George
Motchan Detention Center at Rikers Island. *Id.*

[2]     Plaintiff does not name the New York State
        Department of Correction and Community
        Supervision as a defendant in this action.

Plaintiff is an above-the-knee amputee and, in order to
ambulate, requires the assistance of a prosthetic leg or
wheelchair. Compl. ¶ 71–72. Shortly after he began his
first stretch of time in the defendants' custody in September
2007, Plaintiff began to complain to NYDOC personnel

about the condition of his prosthetic leg. Plaintiff alleges he experienced pain, discomfort, and impaired mobility from the "exposed metal and bolts" on the prosthesis where it attached to his leg. *Id.* ¶ 74. On three separate occasions, Plaintiff consulted with doctors regarding the condition of his prosthetic leg. Plaintiff does not name the doctors with whom he consulted as individual defendants in this action. On October 15, 2007, Plaintiff saw Dr. Michael Wieder, M.D., a DOHMH employee. *Id.* ¶ 75. Plaintiff alleges that Dr. Wieder diagnosed an infection at the point where the prosthesis came in contact with Plaintiff's leg and "directed ... the prosthetic [sic] be repaired." *Id.* The defendants did not act upon Dr. Wieder's order and did not repair the prosthesis. *Id.* ¶ 76. On November 19, 2007, Plaintiff saw Dr. Joseph Thomas, M.D., another DOHMH employee. *Id.* ¶ 77. Plaintiff avers that Dr. Thomas stated that the prosthesis was unsalvageable and directed that it be replaced. *Id.* Like with Dr. Wieder's order, the defendants failed to act upon Dr. Thomas's order and replace the prosthetic leg. *Id.* ¶ 78. Sometime in January, 2008, Plaintiff was transported to Bellevue Hospital where he saw Dr. Jeffery Van Gelderen, M.D. *Id.* ¶ 79. Dr. Van Gelderen concurred with Dr. Thomas's assessment and directed the prosthesis be replaced. *Id.* Dr. Van Gelderen further provided Plaintiff with a wheelchair and authorized Plaintiff to use the wheelchair until the prosthetic leg was replaced. *Id.* No action was taken pursuant to Dr. Van Gelderen's order until some six months later on April 22, 2008, when Plaintiff was measured and fitted for a new prosthesis. *Id.* ¶ 82. Despite the fitting session, Plaintiff never received the new prosthesis and instead continued to rely upon his deteriorated prosthesis and the wheelchair. *Id.* ¶ 83. Throughout this time, Plaintiff claims that he repeatedly complained of his condition, including voicing grievances to Dr. Dolores Curbelo, M.D., the medical director of NYDOC facilities. *Id.* ¶ 74.

**\*2** On August 13, 2008, NYDOC staff, including CO "John" Harris, Captain "Jane" Nicholas, Captain "John" Thomas, and John Does 11–20, seized Plaintiff's wheelchair. *Id.* ¶ 84. The seizure of the wheelchair left Plaintiff only with the use of his tattered prosthesis. The next day, Plaintiff fell and sustained injury to his shoulder, wrist, and back as he attempted to shower on one leg. *Id.* ¶ 86. Plaintiff alleges that the shower lacked hand rails, grab bars, rubber mats, or "any other means of assistance for disabled inmates...." *Id.* Whether Plaintiff had previously showered with the assistance of his prosthesis or in his wheelchair is not disclosed in the complaint.

On January 22, 2009, NYDOC staff, including CO "John" Howell and Correction Defendant John Does 11–20 conducted a search of Plaintiff's cell. *Id.* ¶ 87. During the search, these defendants inspected the prosthetic leg and removed its synthetic and foam cover, thereby "rendering it unusable." *Id.*

It was only after Plaintiff transferred out of NYDOC custody on February 25, 2009, some ten months later after being fitted for a new prosthesis, that his treatment improved. *Id.* ¶ 90. On September 13, 2009, Plaintiff was transferred on a temporary basis back into NYDOC custody. Before being admitted back into the defendant's facilities, Plaintiff underwent a physical examination. *Id.* ¶ 93. During this evaluation, the NYDOC confiscated the treaded shoes Plaintiff received while in state custody and replaced them with NYDOC's standard-issue, non-treaded shoes. *Id.* Soon thereafter, on September 23, 2009, Plaintiff slipped between two beds on "sloped flooring and/or a broken tile" in Dorm 3 of the North Infirmary Command/Annex at Rikers Island and sustained injuries. *Id.* ¶ 95. Plaintiff asserts that the lack of traction in his new shoes caused him to slip and fall. *Id.* ¶ 97.

The present action is Plaintiff's second attempt at recovery. Plaintiff first brought a nearidentical set of claims in the Eastern District before Judge Sterling Johnson in November, 2009. In March, 2012, that Court dismissed Plaintiff's claims, neither with nor without prejudice, pursuant to FRCP 12(b)(3). *Ortiz v. City of New York,* No. 09–CV–4215 (E.D.N.Y. Mar. 30, 2012), ECF No. 32. The Court noted that Rikers Island is part of Bronx County and therefore falls within the Southern District's jurisdiction pursuant to 28 U.S.C. § 1391. *Id.* Plaintiff moved to transfer his case to the Southern District on the same day Judge Johnson dismissed the case. Judge Johnson later denied Plaintiff's motion for transfer. *Ortiz v. City of New York,* No 09–CV4215 (E.D.N.Y. Apr. 4, 2012), ECF No. 33.

### Discussion

#### I. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). The requirement that the court accept all factual allegations as true does not apply to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* The court's determination of whether a complaint states a "plausible claim for relief" is a "context-specific task" that requires application of "judicial experience and common sense." *Id.* at 679.

**\*3** The defendants' grounds for dismissal are fairly straightforward. The gist of their argument is that the conduct giving rise to Plaintiff's constitutional claims occurred outside of the relevant statutes of limitations, and thus Plaintiff's federal causes of action are time-barred. In the alternative, the defendants argue that Plaintiff's federal claims are insufficiently pled. If either argument held true, they argue, this Court must dismiss the federal claims and should decline to exercise supplemental jurisdiction over the remaining state claims. In the event that this Court does not dismiss Plaintiff's federal claims, the defendants ask this Court to nonetheless exercise its discretion and decline to hear Plaintiff's state tort claims. The defendants, however, do not challenge the pleadings or merits of the pendant state claims.

## II. Section 1983 Claims

Plaintiff raises several § 1983 claims and asserts that, while under their custody, various combinations of the named defendants, his First, Fourth, Eighth, and Fourteenth Amendment rights were violated.[3] The statute provides a private cause of action against state actors that deprive one of his rights afforded by federal law and the Constitution. *See* 42 U.S.C. § 1983. "To state a claim under Section 1983, a plaintiff must show: '(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation, [and]; (4) damages .' " *Rahman v. Fisher,* 607 F.Supp.2d 580, 584 (S.D.N.Y.2009) (quoting *Roe v. City of Waterbury,* 542 F.3d 31, 36 (2d Cir.2008)). "A defendant's conduct must be a proximate cause of the claimed violation in order to find that the defendant deprived the plaintiff of his rights." *Id.* (citing *Martinez v. California,* 444 U.S. 227, 285 (1980)).

---

[3] As noted in *Bell v. Wolfish,* the Eighth Amendment does not directly apply to pretrial detainees. *See* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Pretrial detainees are entitled to equivalent constitutional protection from the Fourteenth Amendment's due process clause.

As a threshold matter, I reject Defendants' argument that Plaintiff's § 1983 claims are time-barred. The defendants assert that the majority of the alleged conduct giving rise to Plaintiff's § 1983 claims fall outside of the statute of limitations. Any conduct that occurred while Plaintiff was temporarily held by NYDOC in September 2009, the defendants argue, is insufficient to sustain any claims. Plaintiff entered into NYDOC custody in September 2007 and filed his first complaint in the Eastern District on October 10, 2009. Upon its dismissal on March 30, 2012, Plaintiff re-filed a nearly identical complaint in the Southern District in early April 2012.

Plaintiff's § 1983 claims are subject to a three-year statute of limitations. *See Owens v. Okure,* 488 U.S. 235, 249–50, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989) ("[W]here state law provides multiple statutes of limitations for personal injury actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions."); *see also* N.Y. C.P.L.R. § 214(5) (imposing three year statute of limitations on personal injury actions). In addition to adhering to the state's statute of limitations, § 1983 actions are subject to the state's tolling rules. *See Pearl v. City of Long Beach,* 296 F.3d 76, 80 (2d Cir.2002) ("The Supreme Court has instructed that in section 1983 actions, we borrow not only a state's limitations period but also its tolling rules ..., unless applying the state's tolling rules would defeat the goals of the federal statute at issue." (internal quotation marks omitted)). New York's tolling rule, in pertinent part, states:

> **\*4** If an action is timely commenced and is terminated in any other manner than by a voluntary discontinuance, a failure to obtain personal jurisdiction over the defendant, a dismissal of the complaint for neglect to prosecute the action, or a final judgment upon the merits, the plaintiff ... may commence a new action upon the same transaction or occurrence or series of transactions or occurrences within six months after the termination provided that the new action would have been timely commenced at the time of commencement of the prior action and that service upon defendant is effected within such six-month period.

N.Y. C.P.L.R. § 205(a). As one sister court has noted, "[n]either § 1983's chief goals of compensation and deterrence ... or its subsidiary goals of uniformity and federalism would be defeated by applying § 205(a)'s tolling rule." *Gashi v. County of Westchester,* No. 02 CIV. 6934(GBD), 2005 WL 195517 (S.D.N.Y. Jan.27, 2005). I concur. Plaintiff's original action in the Eastern District was dismissed on venue grounds, not because Plaintiff "failed to obtain personal jurisdiction over the defendant[s]" or "for [Plaintiff's] neglect to prosecute the action." N.Y. C.P.L.R. 205(a). Consequently, I find that Plaintiff's § 1983 claims based upon all of Defendants' alleged conduct is timely pursuant to N.Y. C.P.L.R. 205(a).

### a. Deliberate Indifference Claim

Plaintiff's first § 1983 claim asserts that all named defendants exhibited deliberate indifference towards his serious medical needs. As a pretrial detainee, Plaintiff's claim for deliberate indifference arises under the Fourteenth Amendment. The analysis of his claim, however, "involves the same test as that used to analyze claims by convicted inmates under the Eighth Amendment." *Mayo v. County of Albany,* 357 F. App'x 339, 341 (2007). "The Eighth Amendment prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes, which includes punishments that 'involve the unnecessary and wanton infliction of pain.' " *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). Under the Eighth Amendment, prison officials have a duty to provide inmates adequate medical care. *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). A concept that from a reading of the Complaint appears to have been lost on those responsible here.

In order to demonstrate that Plaintiff's constitutional rights were infringed, he must show that he suffered from an objectively serious medical condition and that his minders acted with deliberate indifference in addressing his condition. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether a medical condition is sufficiently serious include: "(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003) (internal quotation marks omitted). Applying this framework, I find Plaintiff's allegations support the

conclusion that he suffered from a sufficiently serious medical condition. On multiple occasions, doctors ordered Plaintiff's prosthetic leg either be replaced or repaired. Plaintiff's tattered prosthesis caused infection, and its disrepair prolonged his pain and decreased his mobility. *Cf. id.* at 702 (finding the plaintiff's allegations of extreme oral pain, deteriorating teeth, and an inability to chew properly were sufficiently serious as a medical condition to survive a motion to dismiss).

**\*5** Upon demonstrating that his condition was sufficiently serious, Plaintiff must further show that "a particular defendant 'kn[ew]' of and disregard[ed] an excessive risk to inmate health or safety.' " *Brock v. Wright,* 315 F.3d 158, 164 (2d Cir.2003) (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). " 'Deliberate indifference' describes a mental state more blameworthy than negligence; but a plaintiff is not required to show that the defendant acted for the very purpose of causing harm or with knowledge that harm will result." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (internal quotation marks omitted). "[E]vidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it." *Brock,* 315 F.3d at 164. Plaintiff alleges throughout the complaint that he repeatedly complained about the condition of his prosthesis and his leg. However, Plaintiff's allegations fall short of successfully demonstrating that all named defendants were aware of, and yet disregarded, Plaintiff's condition. Plaintiff's allegations convince me that only the Bellevue Hospital Center, where Plaintiff received his consultations; the NYDOC, which includes the North Infirmary Command/Annex at Rikers Island where Plaintiff was primarily housed; and Dr. Curbelo, COs Harris and Howell, and Captains Nicholas and Thomas, all of whom received Plaintiff's complaints, were sufficiently aware of Plaintiff's condition. Despite this awareness, these defendants never addressed Plaintiff's condition and in some instances made it worse. Consequently, Plaintiff's claim of deliberate indifference remains but is dismissed against all other defendants.

### b. Retaliation Claim

Plaintiff brings a § 1983 First Amendment retaliation claim against CO Harris, Captains Nicholas and Thomas, and Corrections Officer John Does, alleging that these defendants retaliated against Plaintiff's repeated complaints and that they did this by confiscating Plaintiff's wheelchair and crutches. Plaintiff asserts a second retaliation claim against CO Howell and John Does 11–20 for the search and seizure of Plaintiff's

2012 WL 6200397

cell and the subsequent destruction of Plaintiff's prosthesis, claiming that the defendants' conduct was in retaliation for Plaintiff's complaints. To maintain a § 1983 First Amendment retaliation claim, Plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). "For a retaliation claim to survive a motion to dismiss, it must be 'supported by specific and detailed factual allegations, not stated in wholly conclusory terms.' " *Edwards v. Horn,* No. 10 CIV. 6194 RJS JLC, 2012 WL 760172 at * 12 (S.D.N.Y. Mar.8, 2012) (quoting *Friedl v. City of New York,* 210 F.3d 79, 86 (2d Cir.2000)). Courts are instructed to "approach such retaliation claims with skepticism and particular care, since virtually any adverse action taken against a prisoner by a prison official-even those not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Smith v. City of New York,* No. 03 CIV. 7576(NRB), 2005 WL 1026551, at *3 (S.D.N.Y. May 3, 2005) (internal quotation marks omitted); *accord Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

**\*6** Plaintiff's pleadings for this claim, while to say the least troubling, are insufficient to survive the motion to dismiss. Specifically, Plaintiff fails to establish the necessary causal link between Plaintiff's complaints and the alleged retaliatory conduct. Courts may consider several factors to determine whether a causal relationship between a plaintiff's protected activity and the retaliatory action, including: "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation." *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002) (citing *Colon,* 58 F.3d at 872–73). Plaintiff asserts that the destruction of Plaintiff's prosthetic leg and the seizure of his wheelchair and crutches were "in retaliation for the numerous complaints, grievances and notices of claim filed by Plaintiff." Compl. ¶ 188–89. However, unlike in *Smith v. City of New York* where the plaintiff's cell was searched and his legal papers destroyed only hours after he served corrections officers with summons and complaints, here, Plaintiff does not provide any factual or temporal link for me to attribute the conduct of these defendants staff to Plaintiff's complaints. 2005 WL 1026551, at *3. Plaintiff's pleadings fail to disclose any aberrations

in his disciplinary record, any connection in time between his grievances and alleged misconduct, or any statements by the implicated defendants attributing the motivation behind their behavior to Plaintiff's complaints. *See Baskerville,* 224 F. Supp 2d at 732–33 (finding that the plaintiff's failure to establish temporal link was overcome by a showing of frivolous misbehavior reports and defendants' comments linking their retaliatory actions to the plaintiff's protected activity). Such claims are to be treated with skepticism and, without more from the Plaintiff, I must dismiss his § 1983 First Amendment retaliation claim. Suffice it to say that in other than a prison setting, the allegations here could be sufficient to avoid a motion to dismiss.

### c. Search of Cell and Destruction of Prosthesis

Plaintiff's final § 1983 claim asserts that the January 22, 2009, search of Plaintiff's cell and the subsequent destruction of his prosthesis constituted a violation of Plaintiff's Fourth Amendment rights. Plaintiff brings this claim against the City of New York, the NYDOC, the North Infirmary Command/Annex at Rikers Island, CO Howell, Captains Thomas and Nicholas, and John Does 11–20.

At the time of the search, Plaintiff was in the defendant's custody as a pretrial detainee. While, in general, the restraints imposed upon a pretrial detainee's constitutional rights are less severe than those imposed upon incarcerated inmates, this distinction is less meaningful in the context of Fourth Amendment claims where a facility's institutional security stands as a competing consideration. "Although pretrial detainees may have some residual privacy interests that are protected by the Fourth Amendment, the maintenance of prison security and the preservation of institutional order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *United States v. Willoughby,* 860 F.2d 15, 21 (2d Cir.1988) (internal citations and quotation marks omitted). [4] "Prison officials must be free to take appropriate action to ensure the safety of inmates ...," and so "[p]rison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Consequently, a limitation on a pretrial detainee's Fourth Amendment rights is justified so long as it "rests on the twin-rationale of *objective* administrators insuring prison *security* ...." *United States v.*

*Cohen,* 796 F.2d 20, 23–24 (2d Cir.1986). Where, however, this rationale is not met, "a limitation imposed on prisoners' constitutional rights cannot stand...." *Id.* at 24 (holding that because it was instigated by a prosecutor and not prison administrators, the search of a pretrial detainee's cell did not serve an institutional purpose and therefore could be challenged on constitutional grounds).

4    Plaintiff does not claim that the search of his cell and the seizure of his prosthetic leg constituted "punishment" in contravention of the Fourteenth Amendment's due process clause. To succeed on such a claim, Plaintiff would have to demonstrate an "expressed intent to punish on the part of detention facility" and that the inspection of his cell and prosthetic leg was not reasonably related to the maintenance of order and security within the jail. *Bell,* 441 U.S. at 538–39 (internal quotation marks omitted).

**\*7** Plaintiff asserts that "without reasonable basis and in violation of regulation, procedure and protocol, [the defendants] authorized and/or performed an illegal and improper seizure of Plaintiff's personal possessions, ... prosthesis, and medical equipment." Compl. ¶ 181. The search, seizure, and destruction of Plaintiff's prosthesis "was clearly unreasonably intrusive and abusive." Compl. ¶ 185. Despite averring that the implicated defendants' conduct fell outside proper search protocol, Plaintiff does not provide any factual allegations for me to infer that the search and inspection of his cell and prosthesis diverted from standard NYDOC procedures.

> The task of determining whether a policy is reasonably related to legitimate security interests is peculiarly within the province and professional expertise of corrections officials ... [I]n the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations[,] courts should ordinarily defer to their expert judgment in such matters."

*Florence v. Bd. of Chosen Freeholders of County of Burlington,* ─── U.S. ───, ───, 132 S.Ct. 1510, 1517, 182 L.Ed.2d 566 (2012) (internal quotation marks omitted) (holding that a policy of conducting strip-searches on arriving detainees, including the petitioner who was arrested for a minor offense, does not violate detainee's Fourth Amendment rights). Further, the deprivation of property, even if intentional, cannot support a due process § 1983 claim where "adequate state post-deprivation remedies are available." *Davis v. New York,* 311 F. App'x 397, 400 (2d Cir.2009) (finding that the seizure of inmate-plaintiff's package was not actionable pursuant to § 1983 because New York "affords an adequate post-deprivation remedy in the form of ... a Court of Claims action"). Plaintiff, here, does not offer any factual support to suggest that this search was conducted for any reason other than the "the maintenance of prison security and the preservation of institutional order." *United States v. Willoughby,* 860 F.2d 15, 21 (2d Cir.1988). While I find the destruction of Plaintiff's prosthesis to be troublesome, I cannot conclude, based on Plaintiff's pleadings, that the inspection of his cell and Prosthesis were in contravention to his limited Fourth Amendment rights. Consequently, the defendants' motion to dismiss Plaintiff's claim that the defendants violated Plaintiff's Fourth Amendment rights is dismissed.

### III. Monell Claim

Plaintiff seeks to impute liability upon the municipal defendants for engendering a custom or policy that enabled the deprivation of Plaintiff's constitutional rights. Municipal liability may be imputed

> (1) when the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers or (2) for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels.

**\*8** *Bernshtein v. City of New York, No.* 11−0545−CV, 2012 WL 4040215 (2d Cir. Sept.14, 2012) (internal quotation marks omitted) (quoting *Monell v. Dep't of Soc. Serv.,* 436 U.S. 658, 694–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). A plaintiff raising a *Monell* claim must establish the existence of the policy or custom as well as "a casual connection—an 'affirmative link'—between the policy and [the] deprivation y(4)27" *Vippolis v. Village of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985) (citations omitted). Plaintiff's pleadings must advance sufficient facts to clear the *Iqbal* and *Twombley* plausibility standard; boilerplate assertions of a policy that caused injury will not survive a motion to dismiss. *See Plair v. City of New York,* 789 F.Supp.2d 459, 468 (S.D.N.Y.2011) (collecting cases of insufficiently pled *Monell* claims).

Plaintiff's allegations of a municipal policy or custom, one that fostered the deprivation of his constitutional rights, do not surmount the pleading requirements, and Plaintiff's allegations are too conclusory and do not provide this Court with a sufficient factual foundation to impute municipal liability. For example, Plaintiff contends, without factual support, that the "municipal defendants' actions and omissions have created and maintained the perception among highranking supervisors that a supervisor who turns a blind eye towards evidence of staff [abuse and neglect] will suffer no damage to his or her career." Compl. ¶ 163. But one might ask "where's the meat"; there are no supporting allegations. Likewise, I cannot accept that the policies and customs of municipal defendants were the "moving force" behind the constitutional violations without any facts to support this proposition. *Id.* ¶ 158. Consequently, Plaintiff's § 1983 *Monell* claim is dismissed.

## IV. Conspiracy Claims

### a. Section 1985

Plaintiff alleges that the defendants [5] conspired to deprive Plaintiff his constitutional rights and brings suit pursuant to 42 U .S.C. § 1985. For the following reasons, the defendants' motion to dismiss Plaintiff's § 1985 is granted.

[5]    Plaintiff does not specify against whom he asserts this claim.

In order to maintain a § 1985(3) claim, Plaintiff must plead:

(1) a conspiracy[;] (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States.

*Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999). "Such claims ... must be predicated upon a causal link between the conduct complained of and animus or invidious discrimination that is based upon the plaintiff's membership in a protected class." *Pabon v. New York City Transit Auth.,* 703 F.Supp.2d 188, 202 (E.D.N.Y.2010). "Claims of conspiracy that are vague and provide no basis in fact must be dismissed." *Mumin v. Johnson,* No. 07−CV−4973 (NG), 2008 WL 976268 (E.D.N.Y. Apr.9, 2008).

**\*9** Plaintiff's allegations are insufficient to sustain a § 1985 claim. Plaintiff contends that "the defendants, acting in concert, willfully denied and unreasonably delayed the plaintiff, a disabled inmate, equal protection of the law ...." Compl. ¶ 199. Aside from noting that the defendants acted in concert, Plaintiff fails to allege the existence of an agreement or to spell out the members of the conspiracy. Further, Plaintiff does not allege the existence of a conspiracy fueled by Plaintiff's membership in a protected class. Consequently, the defendants' motion to dismiss Plaintiff's § 1985 claim is granted.

### b. Section 1986

"Section 1986 imposes liability on an individual who has knowledge of discrimination prohibited under § 1985. Hence, a § 1986 claim is contingent on a valid § 1985 claim." *Graham v. Henderson,* 89 F.3d 75, 82 (2d Cir.1996). Without a valid § 1985 claim, Plaintiff's § 1986 must be dismissed. The defendant's motion to dismiss Plaintiff's § 1986 claim is granted.

## V. ADA and Rehabilitation Acts Claim

2012 WL 6200397

Plaintiff alleges that, as public entities pursuant to ADA, 42 U.S.C. § 12131(a)-(b), the institutional defendants the City of New York, the NYDOC, the DOHMH, the NYHHC, the Bellevue Hospital Center, the Manhattan Detention Center, the George Motchan Detention Center, and the North Infirmary Command/Annex at Rikers Island, discriminated against Plaintiff and thereby ran afoul of the ADA, 42 U.S.C. § 12131, and § 504 of the Rehabilitation Act, 29 U.S.C. § 794. Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Specifically, Plaintiff claims that these defendants discriminated against him by, among other things, exhibiting deliberate indifference towards his medical condition, "failing to provide ... reasonable and adequate accommodations; ... failing to repair and/or replace [the] prosthesis;" and by depriving Plaintiff methods to ambulate. Compl. ¶ 176. In addition to the defendants' arguments regarding the timeliness and sufficiency of Plaintiff's claims, they also argue that Plaintiff cannot maintain an ADA claim grounded in negligent medical care. The defendants cite *Alexander v. Galeno* in support of this proposition. No. 07 CIV 9662 RMB DFE, 2009 WL 3754254 (S.D.N.Y. Nov.5, 2009) (dismissing inmate plaintiff's ADA claim based upon the pain management regime put in place after the plaintiff received multiple shoulder surgeries because the plaintiff failed to establish the defendant's disability-based discrimination). For the reasons below, the defendants' motion to dismiss this claim is granted in part and denied in part.

As a threshold matter, I find that Plaintiff's ADA and Rehabilitation claim is timely. Plaintiff's ADA and Rehabilitation Act claim is subject to a three-year statute of limitations. *See Maccharulo v. Gould,* 643 F.Supp.2d 587, 592–93 (S.D.N.Y.2009) (noting that Rehabilitation Act and Title II ADA claims are "governed by the applicable state statute of limitations for personal injury actions"); *see also* N.Y. C.P.L.R. § 214(5) (imposing three year statute of limitations on personal injury actions). Plaintiff's complaint in the Eastern District was timely; and while the Court there dismissed on venue grounds on March 30, 2012, Plaintiff re-filed his complaint in the Southern District in early April 2012. New York's tolling rules apply to the present claim. *Cf. Pearl v. City of Long Beach,* 296 F.3d 76, 80 (2d Cir.2002) ("The Supreme Court has instructed that in section 1983 actions, we borrow not only a state's limitations period but

also its tolling rules ..., unless applying the state's tolling rules would defeat the goals of the federal statute at issue."). The Second Circuit has expressed that the purpose of the ADA and Rehabilitation Acts are "to eliminate discrimination on the basis of disability and to ensure evenhanded treatment between the disabled and the able-bodied." *Doe v. Pfrommer,* 148 F.3d 73, 82 (2d Cir.1998). Allowing the present action to proceed—albeit several years after the alleged discriminatory conduct—does not frustrate the statutes' goals of achieving a level playing field among those of differing abilities.

**\*10** To demonstrate an ADA violation, Plaintiff must establish that: "(1) [he is a] "qualified individual[ ]" with a disability; (2) that the defendants are subject to the ADA; and (3) that [the] plaintiff[ ][was] denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiff[']s[ ] disabilities." *Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir.2003). The elements of a § 504 Rehabilitation Act claim are nearly identical, and require only that a plaintiff also demonstrate that "the benefit [in question] is part of a program or activity receiving Federal financial assistance ." *Doe v. Pfrommer,* 148 F.3d 73, 82 (2d Cir.1998) (internal quotation marks omitted). For the purposes of this motion, Plaintiff has pled, and the defendants do not contest, that Plaintiff has a disability protected by the ADA and Rehabilitation Acts and that the implicated defendants are public entities subject to the ADA and Rehabilitation Acts.

Like with the causal deficiency in his First Amendment Retaliation claim, Plaintiff's ADA and Rehabilitation Act claim that is founded upon a deprivation of adequate medical treatment fails because Plaintiff cannot demonstrate that these services or benefits were denied to him "by reason of plaintiff's disabilities." *Henrietta D.,* 331 F.3d at 272. Plaintiff's allegations to this effect are conclusory; I find no support within the complaint to conclude that Plaintiff was deprived medical care because of his status as a qualified individual with a disability. However, I believe that for the purposes of surviving a motion to dismiss, Plaintiff has sufficiently alleged that he was deprived of reasonable accommodations. " 'Reasonable' is a relational term: it evaluates the desirability of a particular accommodation according to the consequences that the accommodation will produce." *Fulton v. Goord,* 591 F.3d 37, 44 (2d Cir.2009) (quoting *Borkowski v. Valley Cent. Sch. Dist.,* 63 F.3d 131, 138 (2d Cir.1995)). "This requires a factspecific, case-by-case inquiry ... not only into the benefits of the accommodation but

its costs as well." *Id* . (internal quotation marks omitted). "[T]he demonstration that a disability makes it difficult for a plaintiff to access benefits that are available to both those with and without disabilities is sufficient to sustain a claim for a reasonable accommodation." *Henrietta D., 331 F.3d at 276–76 (2d Cir.2003).* Plaintiff notes that his wheelchair was seized despite a doctor's order permitting its use, that a shower in which he fell lacked handrails or other means of assistance for someone with Plaintiff's disability, and that his treaded footwear was confiscated upon his return to Rikers. *See Shaw v. New York Dep't. of Corr. Servs., 451 F. App'x 18, 20–21 (2d Cir.2011)* (vacating district court's dismissal of an ADA claim where inmateplaintiff alleged that defendants failed to reasonably accommodate his learning disability by allowing, for example, oral examinations or recorded lectures). Consequently, Plaintiff's ADA and Rehabilitation Acts claim survives this motion to dismiss but only for the alleged failure to provide reasonable accommodations.

## VI. Plaintiff's Pendant State Claims and Request for Leave to Amend the Complaint

 **\*11** In his opposition brief, Plaintiff informally requests for leave to amend the complaint "in the event one or more claims are dismissed by [the] Court." Pl.'s Mem. Opp. 30. The decision to grant leave to amend is at the discretion of the Court. *Carter v. City of New York,* 11 CIV. 643 NRB, *2012 WL 1034914 (S.D.N.Y. Mar.23, 2012).* "The court should freely give leave when justice so requires," *FRCP 15(a)(2),* and "[a]bsent evidence of undue delay, bad faith or dilatory motive on the part of the [plaintiff], undue prejudice to the opposing party, or futility, *Rule 15*'s mandate must be obeyed." *Monahan v. New York City Dept. of Corr., 214 F.3d 275, 283 (2d Cir.2000).* "An amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to *Rule 12(b)(6)*." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 88 (2d Cir.2002).* Finally, a court's decision to grant leave to amend "must be balanced against the requirement under Rule 16(b) that the Court's scheduling order shall not be modified except upon a showing of good cause." *Velez v. Burge, 11–2897–PR, 2012 WL 1889402 (2d Cir. May 25, 2012)* (internal quotation marks omitted).

As noted above, I dismissed many of Plaintiff's claims because his pleadings lacked sufficient factual support. Before I grant Plaintiff's request for leave to amend, I first must understand how Plaintiff intends to cure the deficiencies of his pleadings. *See Hayden v. County of Nassau, 180 F.3d 42, 51 (2d Cir.1999)* ("[W]here the plaintiff is unable to

demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied."). Consequently, I am denying Plaintiff's request for leave to amend but invite Plaintiff to write to the Court within ten days of this order and explain how he intends to amend the complaint.

In addition to his several federal claims, Plaintiff brings state tort claims for negligent medical care; negligent hiring, training, supervision, and retention; premises liability; intentional infliction of emotional distress; and conversion. [6] While the defendants do not challenge the merits of these claims, I am concerned that certain of them suffer from the same or similar deficiencies for which I dismissed certain federal claims. Plaintiff is therefore given an opportunity to explain why his state-based claims for negligent hiring, training, supervision, and retention and intentional infliction of emotional distress satisfy the requisite pleading standards. If Plaintiff chooses to pursue these claims, he must write the Court within ten days from date or they will be dismissed with prejudice.

[6]    The defendants ask this Court to exercise its discretion and decline to hear these claims. As an initial matter, I find that these claims "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *28 U.S.C. § 1367(a).* Exercising supplemental jurisdiction over these claims, therefore, is proper.

### Conclusion

For the reasons stated above, the defendants' motion to dismiss Plaintiff's *§ 1983* claims for First Amendment Retaliation; Fourth Amendment unreasonable search and seizure; and municipal liability is GRANTED. Further, the defendants' motion to dismiss Plaintiff's *§ 1985, § 1986,* and ADA and Rehabilitation claim based upon deliberate indifference is GRANTED. The defendant's motion to dismiss Plaintiff's *§ 1983* claim for deliberate indifference as against specific defendants and Plaintiff's ADA and Rehabilitation Act claim for failure to provide reasonable accommodation is DENIED. Finally, the defendants' request that this Court decline to exercise supplemental jurisdiction over Plaintiff's state tort claims is DENIED. Plaintiff is invited to explain why his state claims for negligent hiring,

training, supervision, and retention and intentional infliction of emotional distress satisfy the requisite pleading standards. The Clerk of Court is instructed to close this motion and remove it from my docket.

**\*12  SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 6200397

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (2)**

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **1. Verified Complaint**<br>Elminio ORTIZ, Plaintiff, v. THE CITY OF NEW YORK, The City of New York Department of Correction, New York City Department of Health and Mental Hygiene, New York City Health and Hospitals Corporation, Bellevue Hospital Center, Manhattan Detention Center, George Motchan Detention Center, North Infirmary Command/Annex at Rikers Island, Dr. Dolores Curbelo, M.D., Correction Officer "John" Howell, Correction Officer "John" Harris, Captain "Jane" Nicholas,<br>2012 WL 12298832 |  | S.D.N.Y. | Apr. 20, 2012 | Pleading |
| **2. Docket 1:12cv03118**<br>ORTIZ v. THE CITY OF NEW YORK ET AL | — | S.D.N.Y. | Apr. 20, 2012 | Docket |

**History**

There are no History results for this citation.

KeyCite Yellow Flag

Distinguished by *Francis v. Rehman,* D.C., February 26, 2015

2012 WL 987473
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Nathaniel GREEN, Plaintiff,
v.
G. NILES, Superintendent et al., Defendants.

No. 11 Civ. 1349(PAE).
|
March 23, 2012.

*OPINION & ORDER*

PAUL A. ENGELMAYER, District Judge.

**\*1** Defendants Superintendent Gene Niles, Joanne Comeau, and the New York State Department of Corrections and Community Supervision move to dismiss the second amended complaint (the "Complaint") of *pro se* plaintiff Nathaniel Green ("Green"), which seeks $2 million in damages for claims under 42 U.S.C. § 1983 arising out of the alleged mishandling of his prison mail as retaliation for a complaint he had made about mail handling. For the following reasons, defendants' motion is granted and Green's Complaint is dismissed.

## I. Background [1]

[1]  The Court's account of the underlying facts is drawn from Green's second amended complaint, dated September 27, 2011. *See* Decl. of Jeb Harben in Supp. of Defs.' Mot. to Dismiss (Dkt.23), Ex. A. This document was never filed with the Clerk of Court, but defendants' motion responds to it, and treats it as the operative Complaint in this case. Because defendants accept this document as the operative Complaint, the Court has ordered it docketed, retroactive to September 30, 2011. Except where specifically referenced, no further citation to the Complaint will be made.

Green is an inmate at Otisville Correctional Facility. His Complaint describes an episode in which defendant Comeau,

a mailroom clerk at Otisville during the period at issue, allegedly mishandled two related pieces of his mail. [2]

[2]  Green's prior two complaints referred to three such alleged episodes. In his second amended complaint, however, Green alleges only one incident, involving two pieces of mail.

As background, Green alleges that he had filed a grievance against Comeau on October 22, 2010, complaining of delay in sending his mail. Thereafter, on October 31, 2010, Green submitted a disbursement form for $100, to be deducted from his inmate account and sent to Green's home. A check was issued by non-party Ms. House, [3] an employee at Otisville's business office, to be mailed to an address supplied by Green. However, on or about November 7, 2010, Green spoke with the intended recipient of the check and learned that the check had not been received. On November 8, 2010, Green attempted to resolve this issue with an inmate counselor, and visited the inmate grievance office in an attempt to get answers. After a grievance officer spoke informally with House and Comeau, Green completed a written "stop payment" form to cancel the $100 check, and submitted a new disbursement form, this time for a $150 check, to be sent to the intended recipient of the first check.

[3]  Green's prior two complaints name House as a defendant, the present Complaint does not.

On November 12, 2010, the $150 was deducted from Green's inmate account, along with $5.10 to cover mailing and processing fees. Some two weeks thereafter, having not received confirmation of receipt of the $150 check, Green again visited the grievance office to inquire. Green learned that the "stop payment" order had not been processed as to the original $100 check, and that the $150 check had not yet been mailed. Green then requested that the $150 check be forwarded immediately to its intended recipient. Two weeks later, however, he spoke to the addressee, who had still not received either check. [4]

[4]  Green's first amended complaint claims that the original $100 check was received by the addressee on or about November 27, 2010; the second amended complaint does not specify whether that original check was ever received.

Green continued to inquire as to what had become of his mail. From a grievance officer who inquired on his behalf,

Green learned that Comeau had, allegedly, admitted that she had mistakenly misplaced the $150 check; Green does not state whether that check was ever mailed or received. In fact, Green alleges, Comeau's "mistake" was a deliberate attempt to sabotage his mail, in retaliation for his earlier complaint against her.

Green alleges that the delay in sending out his checks has damaged relations between himself and his children, the checks' intended recipients. The resulting distress, Green claims, has left him unable to sleep or function normally.

**\*2** Green asserts that the mishandling of his mail violated his rights under the First and Fourteenth Amendments, and was cruel and unusual punishment, and thus violates his Eighth Amendment rights. He also claims violations of unspecified rights under the Ninth Amendment. For these constitutional violations, Green claims $1 million damages. Green alleges that the mishandling of his mail evinces a degree of incompetence and malice such that he is entitled to punitive damages against Comeau. [5]

[5]    In total, Green seeks $2 million in damages, comprised of $1 million for "pain and suffering caused by the disruption of family ties"; $500,000 for the violation of his constitutional rights; and $500,000 in punitive damages.

Courts in this Circuit have an obligation to construe *pro se* complaints to raise "the strongest arguments they suggest." *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474–75 (2d Cir.2006). Here, Green's Complaint clearly denotes an intent to sue under 42 U.S.C. § 1983. The Complaint, liberally construed, raises claims that: (1) Green was retaliated against by defendant Comeau for complaining about the handling of his mail; (2) Green was subjected to cruel and unusual punishment under the Eighth and Fourteenth Amendments; and (3) Green was deprived of property without due process of law under the Fourteenth Amendment, insofar as checks were drawn from his inmate account and then allegedly mishandled. [6]

[6]    Green's Complaint asserts a retaliation claim against defendant Comeau, but not, in the Court's view, a stand-alone First Amendment claim based on the delay in sending out his mail. This is clear from the difference between Green's first amended complaint and the current Complaint. As presently pled, the Complaint articulates

exclusively a retaliation theory; the previous iteration complained of mail tampering more generally. Case law in this Circuit does note a prisoner's right to the free flow of mail. *See, e.g., Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) ("a prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment"). The Second Circuit has stated that "incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." *Id.* Pleading such a claim requires "specific allegations of invidious intent." *Id.* Green's present complaint falls short of meeting these standards. He does not allege an ongoing practice of censorship, but merely a single episode involving delay in sending out two related pieces of mail; he does not make specific allegations of "invidious intent" but merely a conclusory claim of animosity; and there is no claim that his mail involved access to the courts or affected his legal representation.

In any event, the Court is aware of no case finding a First Amendment violation premised on an isolated instance of delay in processing non-legal mail, as opposed to a practice of opening and reading prisoner mail, or stanching the flow of mail entirely. *Compare Angulo v. Manny,* No. 11–cv–878, 2012 U.S. Dist. LEXIS 23088, at \*10–11, 2012 WL 569190 (S.D.N.Y. Feb. 14, 2012) (dismissing claim for failure to plead invidious intent where return of inmate's letters was caused by mistake in prison mailroom); *and Bellezza v. Holland,* No. 09–cv–8434, 2011 U.S. Dist. LEXIS 76030, at \*16–18, 2011 WL 2848141 (S .D.N.Y. July 12, 2011) (declining to dismiss First Amendment claim where prisoner had adequately pled "an ongoing practice of censorship") *with Robinson v. N.Y. State Dep' t of Corr. Servs.,* No. 08–cv–911, 2009 U.S. Dist. LEXIS 92294, at \*29–36 (N.D .N.Y. Sept. 8, 2009) (no constitutional violation where prisoner's outgoing mail was delayed by regulation imposing waiting period on commissary transactions to buy stamps); *and Webster v. Fischer,* 694 F.Supp.2d 163,

193 (N.D.N.Y.2010) ("delay in delivery of a single piece of mail" due to possible mishandling insufficient to raise First Amendment claim); *and Wesolowski v. Washburn,* 615 F.Supp.2d 126, 129 (W.D.N.Y.2009) ("At most, [plaintiff] appears to have been inconvenienced, and to have had some delays in his outgoing mail. That is not enough to support a § 1983 claim."). It would, therefore, not "be clear to a reasonable [official]" that imposing a delay in the processing of two related pieces of mail, even if done intentionally, was "unlawful in the situation" here presented. *Nagle v. Marron,* 663 F.3d 100, 114 (2d Cir.2011) (citing *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). As a result, even if Green's Complaint were construed to raise a stand-alone First Amendment claim, defendants would be entitled to qualified immunity on such a claim.

On November 29, 2011, defendants moved to dismiss. They argue that: (1) Green has not plausibly pled any constitutional violation, because the conduct complained of does not implicate Green's constitutional rights; (2) Green has not plausibly alleged a claim of retaliation against defendant Comeau; (3) Green has not plausibly alleged the personal involvement of defendant Niles; (4) defendants are entitled to qualified immunity; (5) to the extent the state official defendants are sued in their official capacities, such claims are barred by the Eleventh Amendment; and (6) Green did not exhaust his administrative remedies under the Prison Litigation Reform Act before filing suit.

On or about February 10, 2012, Green submitted an opposition to defendants' motion. On March 2, 2012, defendants submitted a reply.

## II. Discussion

### A. Applicable Legal Standards—Rule 12(b)(6) and Section 1983

To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Despite the well-established rule in this circuit that *pro se* submissions are to be liberally construed and interpreted to raise "the strongest arguments they suggest," *Triestman,* 470 F.3d at 474–75, the plausibility standard

applies equally to *pro se* complaints. See *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir.2011); *Okoh v. Sullivan,* No. 11–1303– cv, 2011 U.S.App. LEXIS 25117, at *2–3, 2011 WL 6318226 (2d Cir. Dec. 19, 2011) (summ.order).

To state a claim for relief that is facially plausible, an allegation must be "more than an unadorned, the-defendant- unlawfully-harmed me accusation"; a claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). Accordingly, where a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly,* 550 U.S. at 570.

**\*3** In making that determination, the Court must accept as true all well-pleaded factual allegations in the complaint, and "draw[ ] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus,* 433 F.3d 248, 249–50 (2d Cir.2006) (internal quotation marks and citation omitted). On the other hand, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949; *see also Twombly,* 550 U.S. at 555 (court is " 'not bound to accept as true a legal conclusion couched as a factual allegation' ") (quoting *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)).

The claims in Green's Complaint are brought under 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citing *City of Okla. City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)). "To state a claim under Section 1983, a plaintiff must allege facts indicating that some official action has caused the plaintiff to be deprived of his or her constitutional rights." *Zherka v. Amicone,* 634 F.3d 642, 644 (2d Cir.2011) (citing *Colombo v. O' Connell,* 310 F.3d 115, 117 (2d Cir.2002) (per curiam)); *see also Ross v. Westchester Cnty. Jail,* No. 10–cv–3937, 2012 U.S. Dist. LEXIS 3502, at *26, 2012 WL 86467 (S.D.N.Y. Jan. 11, 2012). A defendant's conduct must therefore be a proximate cause of the claimed violation in order to find that the individual defendant deprived the plaintiff of his rights. *Ross,* 2012 U.S. Dist. LEXIS 3502, at *26, 2012 WL 86467 (citing *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980)). Additionally,

where, as here, a plaintiff is seeking money damages against the defendants, the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite" to recovery under § 1983. *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010) (citing *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006)).

### B. Personal Involvement of Defendant Niles

Because Green has, as a threshold matter, failed to plausibly allege the personal involvement of defendant Niles, the claims against Niles must be dismissed. Green argues that Niles, as Superintendent of Otisville, is liable for allowing negligent mailroom procedures to persist under his watch. However, "the mere fact that a defendant possesses supervisory authority is insufficient to demonstrate liability for failure to supervise under § 1983." *Styles v. Goord,* 431 F. App'x 31, 33 (2d Cir.2011) (summ.order); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) ("mere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim.") Green does not plead any facts suggesting Niles's personal involvement in the events complained of; indeed, beyond making the conclusory claim that Niles knew of all happenings within the prison walls, Green does not specifically allege how Niles was or could have been aware of the events at issue in this case. As such, Green has not plausibly pled Niles's personal involvement. The claims as against Niles are, therefore, dismissed.

### C. Green's Section 1983 Claims

**\*4** As noted, the Court construes the Complaint to assert that (1) Green was retaliated against by defendant Comeau for complaining about the handling of his mail, in violation of the First Amendment; (2) Green was subjected to cruel and unusual punishment under the Eighth and Fourteenth Amendments; and (3) Green was deprived of property without due process of law under the Fourteenth Amendment, insofar as checks were drawn from his inmate account and then allegedly mishandled. Each claim is addressed in turn.

#### 1. Retaliation

Green primarily complains that the mishandling of his mail in November and December 2010 was in retaliation for his October 2010 complaint that defendant Comeau had mishandled his mail. "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show [ ] '(1) that the speech or conduct at issue was protected, (2) that

the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir.2009) (quoting *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (quoting *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002))). To meet the requirement of adverse action, in turn, a plaintiff must show that the defendant's "retaliatory conduct ... would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.... Otherwise, the retaliatory act is simply *de minimis,* and therefore outside the ambit of constitutional protection." *Dawes,* 239 F.3d at 492–93 (citations omitted); *Jones v. Harris,* 665 F.Supp.2d 384, 397 (S.D.N.Y.2009).

As an initial matter, Green's factual assertion that he had filed a formal grievance against Comeau in October 2010 appears, quite clearly, to be a recent fabrication. Both Green's original complaint (Dkt.2) and first amended complaint (Dkt.6) expressly state that Green contemplated filing a formal grievance against Comeau in October and November 2010 but declined to do so, waiting instead until December 2010 to file such a grievance. *See, e.g.,* Dkt. 2 at ECF p. 7 ("I did not grieve her nor the matter and simply allowed the matter to be informally handled"); *Id.* at ECF p. 17 ("I informed them that I had intended to file a grievance about the whereabouts of my funds and certified mail but that since [the prison counselor] was so helpful and we got to the bottom of the issue ... I would for the fourth time reserve my position and allow the matter to be handled informally"); *Id.* at ECF p. 22 ("On 12–21–10, I proceeded to file a formal grievance in regards to this matter").

Green's second amended complaint, however, reverses course and tells a completely different story. It claims that he did, in fact, file a formal grievance in October 2010. *See* Harben Decl., Ex. A at ECF p. 3–4 ("On the 22nd day of October, 2010, the plaintiff lodged a complaint with the grievance office against the def. MRS. J. COM EAU ... The plaintiff contends that after the filing of said complaint the defendant, M RS. COM EAU began to retaliate against him."). Notably, shortly before Green's second amended complaint was served on the defendants, the parties appeared before the Hon. Richard M. Berman, to whom this case was then assigned, and Green received, both in a letter preceding that conference and at the conference itself, a preview of defendants' arguments in their motion to dismiss. One such argument was that any mishandling of Green's

mail in November and December 2010 could not form the basis of a retaliation claim, because the protected activity Green now asserts—the filing of a formal grievance—had not occurred until late December 2010, after any allegedly-retaliatory conduct occurred. Under these circumstances, it appears highly probable that Green's revised portrait of the sequence of events in his second amended complaint reflects not a genuinely refreshed recollection, but an attempt to change the pleading so as to salvage his case.

**\*5** The Court is dubious that Green's newfound assertion as to the timing of his grievance should be credited, so as to defeat a motion to dismiss. Green has made patently contradictory factual allegations across his Complaints as to the timing of his 2010 grievance. Not only is his new claim utterly irreconcilable with his earlier sworn complaints, but it was made under circumstances under which Green had an obvious motive to invent it: As he had been notified, his retaliation claim was, otherwise, poised for dismissal. And Green has not offered any explanation for changing his factual claims.

It is, further, well-settled that, although the Court must accept as true all of the factual allegations set out in a plaintiff's complaint, draw inferences from those allegations in the light most favorable to the plaintiff, and construe a *pro se* complaint liberally, "the court need not accept as true allegations that conflict with a plaintiff's prior allegations." *Dozier v. Deutsche Bank Trust Co. Ams.,* No. 09–cv–9865, 2011 U.S. Dist. LEXIS 100467, at *5, 2011 WL 4058100 (S.D.N.Y. Sept. 1, 2011) (citing *Colliton v. Cravath, Swaine & Moore LLP,* No. 08–cv–400, 2008 U.S. Dist. LEXIS 74388, at *19, 2008 WL 4386764 (S.D.N.Y. Sept. 24, 2008) ("Where a plaintiff blatantly changes his statement of the facts in order to respond to the defendant['s] motion to dismiss ... [and] directly contradicts the facts set forth in his original complaint a court is authorized to accept the facts described in the original complaint as true.")); *see also Palm Beach Strategic Income, LP v. Stanley P. Salzman, P.C.,* No. 10–cv–261, 2011 U.S. Dist. LEXIS 46867, at *15–22, 2011 WL 1655575 (E.D.N.Y. May 2, 2011) (declining to accept plaintiff's new allegations which conflicted with those in three previous versions of plaintiff's complaint and granting defendant's motion to dismiss); *Wallace v. New York City Dep't of Corr.,* No. 95–cv–4044, 1996 U.S. Dist. LEXIS 22368, at *4, 1996 WL 586797 (E.D.N.Y. Oct. 9, 1996). This is such a case. The Court therefore does not credit Green's factual allegation that he filed a grievance against Comeau in October 2010. Accordingly, Green has failed to plead

that any of the claimed retaliatory conduct—which allegedly occurred in October and November 2010—occurred *after* he engaged in the protected First Amendment activity of filing a grievance. On these facts, Green's retaliation claim is patently implausible, and is dismissed on this basis.

However, even if Green's factual allegation were credited, his First Amendment claim would still merit dismissal, because Green has failed to allege that the retaliatory acts directed at him were sufficiently serious to reach constitutional dimension. Here, Green claims that the alleged delay in the processing of his mail was an adverse action undertaken in response to his grievance against defendant Comeau. Courts in this circuit have, however, held that limited withholding or delay of a prisoner's mail does not constitute an adverse action sufficient to support a retaliation claim. *See Roseboro v. Gillespie,* 791 F.Supp.2d 353, 374 (S.D.N.Y. May 24, 2011) (no adverse action where defendant temporarily withheld a letter from plaintiff's wife); *Tafari v. McCarthy,* 714 F.Supp.2d 317, 347 (N.D.N.Y. Mar.31, 2010) ("Courts in this circuit have held that claims of mail tampering do not constitute adverse action."); *Islam v. Goord,* No. 05–cv–7502, 2006 U.S. Dist. LEXIS 71853, at *21–22, 2006 WL 2819651 (S.D.N.Y. Sept. 29, 2006) ("Plaintiff also suggests that [a defendant's] alleged tampering with his family and legal mail was retaliatory. However, this is not the type of conduct that would deter an ordinary individual from exercising his constitutional rights. Plaintiff does not allege that he suffered any injury as a result of the alleged tampering, and therefore these isolated instances of mail tampering are not adverse actions supporting a cause of action for First Amendment retaliation."); *Battice v. Phillip,* No. 04–cv–669, 2006 U.S. Dist. LEXIS 53407, at *19, 2006 WL 2190565 (E.D.N.Y. Aug. 2, 2006) (Defendant's "failure to deliver [plaintiff's] mail on one occasion does not constitute the type of conduct that would deter an ordinary individual from exercising his constitutional rights. [Plaintiff] does not allege, much less present any evidence to show, that he suffered any injury as a result of the minor delay in receiving one piece of mail. Even if intentional, this isolated incident is simply *de minimis* and therefore outside the ambit of constitutional protection.") (internal quotation marks omitted); *Rivera v. Pataki,* No. 04–cv–1286, 2005 U.S. Dist. LEXIS 2747, at *67–68 (S.D.N.Y. Feb. 14, 2005). Green's retaliation claim, based on similar delays in mail processing must, therefore, be dismissed as well. [7]

[7]     According to his prior two complaints, Green himself did, in fact, file a grievance against

defendant Comeau, after the alleged mail withholding. The Court's adverse action analysis is not premised on this fact. The inquiry is an objective one, an adverse action can be found "even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill,* 389 F.3d at 381.

### 2. Cruel and Unusual Punishment

 **\*6** Green also claims that he was subject to cruel and unusual punishment by virtue of the unwarranted and retaliatory delays imposed on his outgoing mail. To establish a claim of cruel and unusual punishment cognizable under the Eighth Amendment, a claimant must satisfy a two-part inquiry consisting of both an objective and a subjective element. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999) (citing *Wilson v. Seiter,* 501 U.S. 294, 298–99, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). The objective element focuses on the harm done in light of "contemporary standards of decency," *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009), and asks whether "the deprivation alleged is sufficiently serious or harmful enough to reach constitutional dimensions." *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993) (internal citations omitted). To establish the subjective element of an Eighth Amendment claim, a plaintiff must show that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." *Wright,* 554 F.3d at 268 (quoting *Blyden,* 186 F.3d at 262) (additional internal quotation marks omitted)).

Here, although Green's Complaint alleges numerous errors by Comeau and repeatedly impugns her competence, it does not allege any fact from which the Court could plausibly conclude that Comeau acted wantonly under the circumstances. Indeed, although the Complaint alleges that the delay in sending out his checks caused Green stress, and caused his relationship with his children to deteriorate, there is no indication whatsoever that Comeau was or could have been aware of these consequences. There is no factual allegation from which the Court can infer that Comeau understood that withholding Green's mail would cause him particular distress or difficulty. Green therefore has not plausibly pled that Comeau acted "wantonly" under the circumstances in allegedly withholding his mail. His claim of cruel and unusual punishment is, therefore, dismissed.

### 3. Deprivation of Property

Finally, the Court construes Green's Complaint to claim a violation of the Fourteenth Amendment, based on the possibility (the Complaint is silent on this point) that the money debited from his inmate account never reached its intended beneficiary. However, a prison's loss of an inmate property "whether intentional or negligent—will not support a due process claim redressable under § 1983 if 'adequate state post-deprivation remedies are available.' " *Davis v. New York,* 311 F. App'x 397, 400 (2d Cir.2009) (summ.order) (quoting *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)); *see also Fogelfang v. Capra,* No. 10–cv–3827, 2012 U.S. Dist. LEXIS 33874, at *40– 41 (S.D.N.Y. Mar. 13, 2012). "New York in fact affords an adequate postdeprivation remedy in the form of, *inter alia,* a Court of Claims action pursuant to N.Y. Comp.Codes R. & Regs. tit. 7, § 1700.3(b)(4)." *Davis,* 311 F. App'x at 400 (citing *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir.2001)); *see also Love v. Coughlin,* 714 F.2d 207, 208–09 (2d Cir.1983) (New York post-deprivation remedies adequate to preclude prisoner's due process claim for loss of personal property). Accordingly, even if any defendant was responsible for a loss of money debited from Green's account, that injury is not cognizable under § 1983.

### D. Eleventh Amendment Immunity

 **\*7** Green's Complaint does not specify the capacity in which the defendants are sued. The Complaint is susceptible of a reading that the defendants are sued in their official capacities, as Green repeatedly refers to their titles throughout the complaint. *See, e.g.,* Harben Decl. at ECF p. 3 (listing defendants and their official positions); *id.* (in text of allegations, referring to defendant Comeau as "J. COMEAU, (INSTITUTIONAL MAILROOM CLERK)"); *id.* at ECF p. 8 ("MRS. COMEAU, an employee of the NEW YORK DEPARTMENT OF CORRECTIONAL SERVICES, showed a complete disregard for the duties in which she was intrusted [sic] to perform with diligence"). Because the Court has found the Complaint to be implausibly pled in substance, the question of the capacity in which defendants are sued need not be resolved. However, to the extent that Green names the defendants in their official capacities, all such claims would, independently, have to be dismissed, because claims for money damages against state employees in their official capacities are deemed claims against the state itself, and are barred by the Eleventh Amendment. *See Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Dube v. State Univ. of New York,* 900 F.2d 587, 594–95 (2d Cir.1990), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991); *Brims v. Ramapo Police Dep't,* No. 11–

2012 WL 987473

cv–712, 2011 U.S. Dist. LEXIS 152760, at *19, 2011 WL 7101233 (S.D.N.Y. Dec. 23, 2011).

**E. Leave to Replead**

A court should generally grant a *pro se* plaintiff "leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal citations and quotation marks omitted). Here, however, Green has submitted two amended complaints, for a total of three complaints. He has thus far failed to state a claim, and the Court is unpersuaded that a third amended complaint would fare any better. Further, Green's second amendment was undertaken after Green had gained a preview of defendants' arguments in support of a motion to dismiss, and the present Complaint reflects at least one specific factual change that, circumstantially, appears to have been an invention made in response to the Court's identification of factual deficiencies in Green's pre-existing pleading. In such circumstances, the Court declines to grant Green leave to file a third amended complaint.

## CONCLUSION

For the foregoing reason, defendants' motion to dismiss is granted. The Clerk of Court is directed to terminate the motion at docket number 21 and to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 987473

---

End of Document    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 1:11cv01349**<br>GREEN v. THE NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES | — | S.D.N.Y. | Feb. 22, 2011 | Docket |

**History**

There are no History results for this citation.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 489 of 529

Clay v. Doe, Not Reported in Fed. Supp. (2020)

2020 WL 6151436

2020 WL 6151436
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Daniel CLAY, Plaintiff,
v.
Sergeant John DOE, et al., Defendants.

20-CV-07692 (PMH)
|
Signed 10/20/2020

**Attorneys and Law Firms**

Daniel Clay, Marcy, NY, pro se.

**PARTIAL TRANSFER ORDER,
AND VALENTIN ORDER**

PHILIP M. HALPERN, United States District Judge:

**\*1** Plaintiff, currently incarcerated at Midstate Correctional Facility, brings this *pro se* action under 42 U.S.C. § 1983, alleging that four John Doe correction officers assaulted him at Downstate Correctional Facility (the "Downstate claims"). He also alleges that after he was transferred to Great Meadow Correctional Facility, an unnamed doctor denied him medical attention (the "Great Meadow claims"). Plaintiff names as defendants the four John Doe correction officers he alleges assaulted him, and the one John Doe doctor he alleges denied him care.

By order dated October 16, 2020, the Court granted Plaintiff's request to proceed without prepayment of fees, that is, *in forma pauperis*. [1]

[1]    Prisoners are not exempt from paying the full filing fee even when they have been granted permission to proceed *in forma pauperis. See* 28 U.S.C. § 1915(b)(1).

For the reasons set forth below, the Court severs the Great Meadow claims and transfers those claims to the United States District Court for the Northern District of New York. The Downstate claims will remain in this District.

**STANDARD OF REVIEW**

The Prison Litigation Reform Act requires that federal courts screen complaints brought by prisoners who seek relief against a governmental entity or an officer or employee of a governmental entity. See 28 U.S.C. § 1915A(a). The Court must dismiss a prisoner's *in forma pauperis* complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b); *see Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007). The Court must also dismiss a complaint if the court lacks subject matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest*," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted) (emphasis in original). But the "special solicitude" in *pro se* cases, *id.* at 475 (citation omitted), has its limits – to state a claim, *pro se* pleadings still must comply with Rule 8 of the Federal Rules of Civil Procedure, which requires a complaint to make a short and plain statement showing that the pleader is entitled to relief.

**DISCUSSION**

A. Severance of the Great Meadow claims

Rules 18 and 20 of the Federal Rules of Civil Procedure govern joinder of claims and parties, respectively. Rule 18 permits a plaintiff to join as many claims as he has against a particular defendant. *See* Fed. R. Civ. P. 18(a). By contrast, under Rule 20, a plaintiff may not pursue unrelated claims against multiple defendants. *Deskovic v. City of Peekskill*, 673 F. Supp. 2d 154, 167 (S.D.N.Y. 2009).

Rule 20(a)(2) permits a plaintiff to join multiple defendants in one action if: "(A) any right to relief is asserted against them jointly, severally, or in the alternative arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." *Id.* Although courts have interpreted Rule 20(a) liberally to allow related claims to be tried within a single proceeding, *Barr Rubber*

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 490 of 529
Clay v. Doe, Not Reported in Fed. Supp. (2020)
2020 WL 6151436

*Products Co. v. Sun Rubber Co.*, 425 F.2d 1114, 1126-27 (2d Cir. 1970), "the mere allegation that Plaintiff was injured by all Defendants is not sufficient to join unrelated parties as defendants in the same lawsuit pursuant to Rule 20(a)," *Deskovic*, 673 F. Supp. 2d at 167.

**\*2** Rule 21 of the Federal Rules of Civil Procedure provides that "on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party." *Id.* In determining whether to sever a claim, the court considers "the two requirements of Rule 20 and additional factors, including (1) whether severance will serve judicial economy; (2) whether prejudice to the parties would be caused by severance; and (3) whether the claims involve different witnesses and evidence." *Kehr v. Yamaha Motor Corp.*, 596 F. Supp. 2d 821, 826 (S.D.N.Y. 2008) (relying on *Laureano v. Goord*, No. 06-CV-7845, 2007 WL 2826649, at *8 (S.D.N.Y. Aug. 31, 2007)). Put another way, courts "look to the logical relationship between the claims and determine 'whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.' " *Kalie v. Bank of Am. Corp.*, No. 12-CV-9192 (PAE), 2013 WL 4044951, at *3 (S.D.N.Y. Aug. 9, 2013) (quoting *United States v. Aquavella*, 615 F.2d 12, 22 (2d Cir. 1979)).

Joinder of Plaintiff's claims against the Downstate Defendants with his claims against the doctor at Great Meadow does not comport with Rule 20(a) because the allegations involve different defendants and separate events occurring at different facilities. Thus, the Downstate claims are not logically connected to the Great Meadow claims. *See, e.g., Smith v. Goord*, No. 04-CV-6432, 2006 WL 2850597, at *3 (W.D.N.Y. Sep. 22, 2006) (disallowing joinder of claims against defendants at different correctional facilities where there was no suggestion that original defendants were involved in the actions taken against plaintiff in a different facility more than one year later); *Webb v. Maldonado*, No. 3:13-CV-144 (RNC), 2013 WL 3243135, at *3 (D. Conn. June 26, 2013) ("Unrelated claims against different defendants belong in different suits ... to prevent the sort of morass" created by a complaint with more than twenty defendants and countless unrelated claims.") (quotation and citation omitted).

For these reasons, the Court concludes that it is appropriate to sever the Downstate claims from the Great Meadow.

**B.** Transfer of the Great Meadow Claims

When a court orders the severance of claims, it creates two or more separate "actions," and the court may transfer one action while retaining jurisdiction of another. *Wyndham Assoc. v. Bintliff*, 398 F.2d 614, 618 (2d Cir. 1968).

Under the general venue provision, a civil action may be brought in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred ...; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b). For venue purposes, a "natural person" resides in the district where the person is domiciled. 28 U.S.C. § 1391(c)(1).

The events giving rise to the Great Meadow claims occurred in Washington County, which is located in the Northern District of New York. *See* 28 U.S.C. § 112(a). The complaint does not suggest that the Great Meadow doctor resides in this District. Thus, venue for Plaintiff's Great Meadow claims does not appear to be proper in this District under § 1391(b)(1) or (2).

Even if venue were proper here, however, the Court may transfer claims "[f]or the convenience of the parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). "District courts have broad discretion in making determinations of convenience under Section 1404(a) and notions of convenience and fairness are considered on a case-by-case basis." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006). Moreover, courts may transfer cases on their own initiative. *See Bank of Am., N.A. v. Wilmington Trust FSB*, 943 F. Supp. 2d 417, 426-427 (S.D.N.Y. 2013) ("Courts have an independent institutional concern to see to it that the burdens of litigation that is unrelated to the forum that a party chooses are not imposed unreasonably on jurors

**Clay v. Doe, Not Reported in Fed. Supp. (2020)**
Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 491 of 529
2020 WL 6151436

and judges who have enough to do in determining cases that are appropriately before them. The power of district courts to transfer cases under Section 1404(a) *sua sponte* therefore is well established." (quoting *Cento v. Pearl Arts & Craft Supply Inc.*, No. 03-CV-2424, 2003 WL 1960595, at *1 (S.D.N.Y. Apr. 24, 2003))); *see also Lead Indus. Ass'n Inc. v. OSHA.*, 610 F.2d 70, 79 (2d Cir. 1979) (noting that "broad language of 28 U.S.C. § 1404(a) would seem to permit a court to order transfer *sua sponte*").

**\*3** In determining whether transfer is appropriate, courts consider the following factors: (1) the convenience of witnesses; (2) the convenience of the parties; (3) the locus of operative facts; (4) the availability of process to compel the attendance of the unwilling witnesses; (5) the location of relevant documents and the relative ease of access to sources of proof; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded to the plaintiff's choice of forum; (9) trial efficiency; and (10) the interest of justice, based on the totality of circumstances. *Keitt v. N.Y. City*, 882 F. Supp. 2d 412, 459-60 (S.D.N.Y. 2011); *see also N.Y. Marine and Gen. Ins. Co. v. LaFarge No. Am., Inc.*, 599 F.3d 102, 112 (2d Cir. 2010) (setting forth similar factors). A plaintiff's choice of forum is accorded less deference where the plaintiff does not reside in the chosen forum and the operative events did not occur there. *See Iragorri v. United Tech. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001).

Under § 1404(a), transfer of the Great Meadow claims appears to be appropriate in this case because the events underlying these claims occurred in a county that falls within the Northern District of New York, *see* 28 U.S.C. § 112(a), and venue is therefore proper in the Northern District of New York. *See* 28 U.S.C. § 1391(b). Based on the totality of the circumstances, the Court concludes that it is in the interest of justice to transfer the Great Meadow claims to the United States District Court for the Northern District of New York. 28 U.S.C. § 1404(a).

C. *Valentin* Order

Under *Valentin v. Dinkins, a pro se* litigant is entitled to assistance from the district court in identifying a defendant. 121 F.3d 72, 76 (2d Cir. 1997). In the complaint, Plaintiff supplies sufficient information to permit the New York State Attorney General to identify the four John Doe defendants who Plaintiff alleges assaulted him at Downstate. It is therefore ordered that the Attorney General, who is the attorney for and agent of the New York State Department of Corrections and Community Supervision, must ascertain the identity and badge number of each John Doe whom Plaintiff seeks to sue here and the address where the defendant may be served. The Attorney General must provide this information to Plaintiff and the Court within sixty days of the date of this order.

Within thirty days of receiving this information, Plaintiff must file an amended complaint naming the John Doe defendants. The amended complaint will replace, not supplement, the original complaint. An amended complaint form that Plaintiff should complete after receiving this information is attached to this order. Once Plaintiff has filed an amended complaint, the Court will screen the amended complaint and, if necessary, issue an order directing the Clerk of Court to complete the USM-285 forms with the addresses for the named John Doe Defendants and deliver to the U.S. Marshals Service all documents necessary to effect service.

D. Rule 33.2

Local Civil Rule 33.2, which requires defendants in certain types of prisoner cases to respond to specific, court-ordered discovery requests, applies to this action. Those discovery requests are available on the Court's website under "Forms" and are titled "Plaintiff's Local Civil Rule 33.2 Interrogatories and Requests for Production of Documents." Within 120 days of service of the complaint, Defendants must serve responses to these standard discovery requests. In their responses, Defendants must quote each request verbatim. [2]

[2]    If Plaintiff would like copies of these discovery requests before receiving the responses and does not have access to the website, Plaintiff may request them from the Pro Se Intake Unit.

## CONCLUSION

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *Cf. Coppedge v. United States*, 369 U.S. 438, 444-45 (1962) (holding that an appellant demonstrates good faith when he seeks review of a nonfrivolous issue).

**SO ORDERED.**

Attachment

Clay v. Doe, Not Reported in Fed. Supp. (2020)
Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 492 of 529
2020 WL 6151436

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

_____    _____CV_____

Write the full name of each plaintiff.    (Include case number if one has been assigned)

-against-    AMENDED
COMPLAINT
(Prisoner)

_____    Do you want a jury trial?
_____        ☐ Yes    ☐ No

Write the full name of each defendant. If you cannot fit the
names of all of the defendants in the space provided, please
write "see attached" in the space above and attach an
additional sheet of paper with the full list of names. The
names listed above must be identical to those contained in
Section IV.

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed
with the court should therefore not contain: an individual's full social security number or full
birth date; the full name of a person known to be a minor; or a complete financial account
number. A filing may include only: the last four digits of a social security number; the year of
an individual's birth; a minor's initials; and the last four digits of a financial account number.
See Federal Rule of Civil Procedure 5.2.

**I.    LEGAL BASIS FOR CLAIM**

State below the federal legal basis for your claim, if known. This form is designed primarily for
prisoners challenging the constitutionality of their conditions of confinement; those claims are
often brought under 42 U.S.C. § 1983 (against state, county, or municipal defendants) or is a
"Bivens" action (against federal defendants).

☐  Violation of my federal constitutional rights

☐  Other:

**II.    PLAINTIFF INFORMATION**

Each plaintiff must provide the following information. Attach additional pages if necessary.

| First Name | Middle Initial | Last Name |
|---|---|---|
| | | |

State any other names (or different forms of your name) you have ever used, including any name
you have used in previously filing a lawsuit.

Prisoner ID # (if you have previously been in another agency's custody, please specify each agency
and the ID number (such as your DIN or NYSID) under which you were held)

Current Place of Detention

Institutional Address

| County, City | | State | Zip Code |
|---|---|---|---|

**III.    PRISONER STATUS**

Indicate below whether you are a prisoner or other confined person:

☐  Pretrial detainee
☐  Civilly committed detainee
☐  Immigration detainee
☐  Convicted and sentenced prisoner
☐  Other:

Page 2

Rev. 5/20/16

Clay v. Doe, Not Reported in Fed. Supp. (2020)

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 493 of 529

2020 WL 6151436

## IV.    DEFENDANT INFORMATION

To the best of your ability, provide the following information for each defendant. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are identical to those listed in the caption. Attach additional pages as necessary.

Defendant 1.

| First Name | Last Name | Shield # |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
|---|---|---|

Defendant 2.

| First Name | Last Name | Shield # |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
|---|---|---|

Defendant 3.

| First Name | Last Name | Shield # |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
|---|---|---|

Defendant 4.

| First Name | Last Name | Shield # |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
|---|---|---|

Page 3

## V.    STATEMENT OF CLAIM

Place(s) of occurrence: _____

Date(s) of occurrence: _____

FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and how each defendant was personally involved in the alleged wrongful actions. Attach additional pages as necessary.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Page 4

Clay v. Doe, Not Reported in Fed. Supp. (2020)

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 494 of 529

2020 WL 6151436

## VII. PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I understand that if I file three or more cases while I am a prisoner that are dismissed as frivolous, malicious, or for failure to state a claim, I may be denied *in forma pauperis* status in future cases.

I also understand that prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions, 42 U.S.C. § 1997e(a), and that my case may be dismissed if I have not exhausted administrative remedies as required.

I agree to provide the Clerk's Office with any changes to my address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| Dated: | | Plaintiff's Signature |
|---|---|---|
| First Name | Middle Initial | Last Name |
| Prison Address: | | |
| County, City | State | Zip Code |

Date on which I am delivering this complaint to prison authorities for mailing:

### INJURIES:

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

### VI.  RELIEF

State briefly what money damages or other relief you want the court to order.

## All Citations

Not Reported in Fed. Supp., 2020 WL 6151436

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 7:20-CV-07692**<br>Clay v. Doe et al | — | S.D.N.Y. | Sep. 17, 2020 | Docket |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History (2)**

**Direct History (1)**

1. Clay v. Doe
2020 WL 6151436 , S.D.N.Y. , Oct. 20, 2020

**Related References (1)**

2. Clay v. Doe
2021 WL 6051729 , S.D.N.Y. , Dec. 20, 2021

2006 WL 2850597
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Andre SMITH, Plaintiff,
v.
Glenn GOORD, et al., Defendants.

No. 04-CV-6432CJS.
|
Sept. 22, 2006.

**Attorneys and Law Firms**

Andre Smith, Comstock, NY, pro se.

Tamara B. Christie, NYS Office of the Attorney General, Rochester, NY, for Defendants.

*REPORT & RECOMMENDATION*

MARIAN W. PAYSON, Magistrate Judge.

 **\*1** On September 8, 2004, plaintiff Andre Smith filed a *pro se* complaint pursuant to 42 U.S.C. § 1983, alleging that his constitutional rights had been violated because he was not permitted to participate in Muslim religious services while incarcerated at the Lakeview Correctional Facility. (Docket # 1). Currently pending is Smith's motion for leave to file a supplemental complaint, alleging, *inter alia,* that after he was transferred to the Southport Correctional Facility, certain defendants at that facility assaulted him in retaliation for his filing of the original complaint. (Docket # 39). Also before the Court is a separate motion by Smith for leave to file a second amended complaint. In that motion, Smith seeks to assert additional claims relating to violations of his constitutional rights allegedly committed while he was still at the Lakeview Correctional Facility by the original defendants, as well as certain newly-identified defendants. (Docket # 57). Defendants generally oppose both of Smith's motions.[1] (Docket # 60).

[1]     As described below, with respect to Smith's motion for leave to file a second amended complaint, defendants do not oppose the assertion of an Eighth Amendment claim against defendant Thomas Whelan. Their opposition papers are silent as to

Smith's request to add claims under the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA").

**DISCUSSION**

**I.** *Standard of Review*

Rule 15(a) of the Federal Rules of Civil Procedure provides that once the time for amending a pleading as of right has expired, a party may request leave of the court to amend, which "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Similarly, Rule 15(d) permits the Court, upon motion of a party, to allow the filing of a supplemental pleading "setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." Fed.R.Civ.P. 15(d). Supplemental relief "may include the addition of new defendants and new claims, if adequately related to the originally stated claims." *McLean v. Scully,* 1991 WL 274327, \*1 (S.D.N.Y.1991). *See Carter v. Atruz,* 1998 WL 782022, \*2 (S.D.N.Y.1998) (purpose of Rule 15(a) is to permit assertion of matters that were "either overlooked or unknown" at time of original pleading; purpose of Rule 15(d) is to enable a party to set forth in a supplemental pleading events that "happened since the date of original pleading").

If the supplemental claim is filed before the applicable statute of limitations has run, as it was in this case, the standard of review for both Rule 15(a) and Rule 15(d) is the same. *See Gittens v. Sullivan,* 670 F.Supp. 119, 123-24 (S.D.N.Y.1987) ("The standard for the exercise of discretion on a motion to supplement the pleading is the same as that for disposition of a motion to amend"), *aff'd,* 848 F.2d 389 (2d Cir.1988). Thus, under either rule, if the underlying facts or circumstances relied upon by the party seeking leave to amend may be a proper subject of relief, the party should be allowed to test the claim on its merits. *See United States ex rel. Maritime Admin. v. Continental Illinois Nat. Bank and Trust Co. of Chicago,* 889 F.2d 1248, 1254 (2d Cir.1989). "In the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.-the leave sought should, as the rules require, be 'freely given.' " *Foman v. Davis,* 371 U.S. 178, 182 (1962).

 **\*2** While the court retains discretion to grant or deny leave to amend under Rule 15(a), "[the] outright refusal to grant

the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Id.* at 182; *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *Evans v. Syracuse City Sch. Dist.,* 704 F.2d 44, 46 (2d Cir.1983).

Despite the ordinarily lenient standard imposed, if the amendment proposed by the moving party is futile, "it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d at 131. The determination whether a proposed amendment is futile is made under the same standard as that used to determine whether a claim would be subject to a motion to dismiss. *See Hampton Bays Connections, Inc. v. Duffy,* 212 F.R.D. 119, 123 (E.D.N.Y.2003) (citing *A.V. by Versace, Inc. v. Gianni Versace S.p.A.,* 160 F.Supp.2d 657, 666 (S.D.N.Y.2001)). Thus, the court "must view the claim in the light most favorable to the moving party and determine whether there is a colorable claim for relief." *Santiago v. Steinhart,* 1993 WL 410402, *2 (S.D.N.Y.1993).

In addition, in considering whether to permit the inclusion of additional parties, Rule 20(a) of the Federal Rules of Civil Procedure provides:

> All persons ... may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.

Fed.R.Civ.P. 20(a). Courts have interpreted the requirements of Rule 20(a) liberally so as to promote judicial economy and to allow related claims to be tried within a single proceeding. *See, e.g., Barr Rubber Products Co. v. Sun Rubber Co.,* 425 F.2d 1114, 1127 (2d Cir.) (Rule 20 "specifically vests in the district court the discretionary power to make such orders as may be required to prevent delay or prejudice"), *cert. denied,* 400 U.S. 878 (1970); *Liegey v. Ellen Figg, Inc.,* 2003 WL 21361724, *3 (S.D.N.Y.2003) ( "requirements of Rule 20(a) should be interpreted liberally"); *Kovian v. Fulton County Nat. Bank and Trust Co.,* 1990 WL 36809, *9 (N.D.N.Y.1990)

("there is no rigid rule as to what constitutes the same series of transactions or occurrences"); *City of New York v. Joseph L. Balkan, Inc.,* 656 F.Supp. 536, 549 (E.D.N.Y.1987) (requirements of Rule 20 are to be "liberally interpreted") (citations omitted).

## II. *Smith's Motion to Supplement his Complaint*

Smith's original complaint was filed in September 2004 and alleged that defendants at the Lakeview Correctional Facility denied him the right to practice the Muslim religion in violation of the First Amendment. (Docket # 1). In his motion to supplement his complaint, Smith seeks to include claims arising from events at a different correctional facility, which Smith contends were committed in retaliation for his filing of the original complaint. (Docket # 39). The proposed supplemental claims are based primarily upon Smith's allegations that Correctional Officers Augustine, Gilbert and Hable assaulted him on July 5, 2005, approximately one year after the filing of the original complaint. According to Smith, prior to and immediately following the assault, Officer Augustine taunted him with derogatory statements about his religion and his previously-filed lawsuit. The complaint further alleges that Augustine had learned about the lawsuit approximately two months earlier when he escorted Smith to a telephone conference with the court concerning the case. (Docket # 39).

 **\*3** As stated above, the purpose of a supplemental complaint is to allow the inclusion of new defendants and new claims arising since the date of the original pleading, if the new claims are "adequately related to the original claims." *McLean v. Scully,* 1991 WL 274327 at * 1. Here, the original complaint relates principally to the allegation that all Muslim prisoners at the Lakeview Correctional Facility are denied the right to practice their religion, while the proposed supplemental claims focus on acts allegedly targeted at and perpetrated on Smith personally, namely, the July 5, 2005 assault that is at the heart of the claims. None of the defendants named in the original complaint (from the Lakeview facility) are alleged to have been involved in the assault committed at the Southport facility. The only defendant common to both the original and supplemental claims is Commissioner Goord, who Smith fails to allege was personally involved in the alleged retaliatory assault. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (in § 1983 cases, plaintiff must demonstrate a particular defendant's personal involvement in the alleged constitutional deprivation); *Al-Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989) (doctrine of *respondeat superior* does not apply in § 1983 cases).

The only connection between the original complaint and the proposed supplemental claims are Smith's allegations that the events giving rise to the supplemental claims were committed in retaliation for his initiation of this lawsuit. Those allegations are indeed quite specific and appear to adequately state a claim for relief. *See Colon v. Coughlin, 58 F.3d at 872.* The question before this Court, however, is whether the purpose of Rule 20 and judicial economy would be served by combining the original and the supplemental claims into a single proceeding. I conclude that they would not.

Other than Commissioner Goord, there is no overlap between the named defendants in both complaints; the events at issue in both complaints are separated by more than a year; and, there is no suggestion that the original defendants were involved in the alleged retaliatory actions taken against Smith in a different facility over a year later. Indeed, the allegations are to the contrary. It appears that the events at issue in the proposed supplemental complaint began when one of the proposed supplemental defendants learned about Smith's lawsuit when he escorted him to a telephone conference with the court concerning that suit. Considering these allegations, I find no basis to conclude that any efficiencies would be gained by consolidating these claims for trial. Nor do I find that Smith's right to relief based upon the allegations in the supplemental complaint "aris[es] out of the same transaction, occurrence, or series of transactions or occurrences" at issue in the original complaint or that it gives rise to "any question of law or fact common to [the] defendants" in both complaints. *See Fed.R.Civ.P. 20(a). See Davis v. State of New York, 1999 WL 1390247, \*5 (W.D.N.Y.1999)* (denying motion to supplement complaint because "[p]laintiff's conclusory allegations concerning the conduct of the defendants are not sufficient to show a retaliatory motive"); *Klos v. Haskell, 835 F.Supp. 710, 716 (W.D.N.Y.1993)* (denying motion to supplement complaint to include claims occurring at subsequent correctional facility; "[a]lthough the proposed supplemental complaint contains allegations of retaliation, he fails to connect these actions with the named defendants [in the original complaint]"), *aff'd, 48 F.3d 81 (2d Cir.1995).*

**\*4** Accordingly, it is my recommendation that Smith's motion for leave to file a supplemental complaint be denied. If Smith wishes to file claims relating to the alleged constitutional violations committed at the Southport Correctional Facility, he may do so by filing a separate complaint.

### III. *Smith's Motion to Amend his Complaint*

Smith's second motion seeks leave to amend his complaint to include proposed defendants Chaplain W. Werbicki and Deputy Superintendent of the Lakeview Correctional Facility Tim F. Sheehan, and to add eight additional causes of action against the new and existing defendants. (Docket # 57). Defendants oppose the motion as to several of the proposed amended claims and also oppose the inclusion of Commissioner Goord in any of the proposed claims. [2] According to defendants, Smith has failed to allege any personal involvement by Goord and thus may not assert the proposed new Section 1983 claims against him. (Docket # 60).

[2]    Defendants' opposition papers do not address Smith's first three proposed amended claims relating to claims under the Religious Land Use and Institutionalized Persons Act and the Establishment Clause and the Free Exercise Clause of the First Amendment. (Docket # 60).

In Section 1983 cases, a plaintiff must demonstrate a defendant's personal involvement in the alleged constitutional deprivation. *Colon, 58 F.3d at 873; Johnson v. Newburgh Enlarged Sch. Dist ., 239 F.3d 246, 254 (2d Cir.2001); see also Al-Jundi v. Estate of Rockefeller, 885 F.2d at 1065* (doctrine of *respondeat superior* does not apply in Section 1983 cases). Personal involvement of a supervisory official may be demonstrated through evidence that: "(1) the [official] participated directly in the alleged constitutional violation, (2) the [official], after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the [official] created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the [official] was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the [official] exhibited deliberate indifference to the rights of [others] by failing to act on information indicating that unconstitutional acts were occurring." *Colon, 58 F.3d at 873.*

Applying this law, I recommend, as set forth below, that certain claims against Commissioner Goord should proceed, while others should be foreclosed.

**1. *RLUIPA Claim:*** The first proposed claim Smith seeks to assert through his amended complaint is based upon the Religious Land Use and Institutionalized

Persons Act ("RLUIPA"). Smith alleges that previously-named defendants Superintendent Moscicki, Drill Instructor Whelan and Counselor Allessi and proposed defendants Commissioner Goord, Deputy Superintendent Sheehan and Chaplin Werbicki "placed a substantial burden on his religious exercise for no compelling reason." (Docket # 57 at ¶ 38).

The RLUIPA provides, *inter alia,* that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a).

 **\*5** Smith's original complaint alleges that DOCS personnel imposed substantial burdens upon Lakeview Correctional Facility inmates' exercise of the Muslim religion. (Docket # 1). In his proposed amended complaint, Smith raises additional factual allegations of religious discrimination and seeks to base a RLUIPA claim upon those and the original allegations. Smith's proposed RLUIPA claim alleges a proper subject of relief and may proceed. Further, pursuant to Federal Rule of Civil Procedure 20, I find that proposed defendants Goord, Sheehan and Werbicki are proper parties to this action. *See* 41 U.S.C. § 2000cc-5(4). Smith's motion to amend to include this claim should therefore be granted.

**2. *First Amendment Establishment Clause Claim:*** In his second proposed claim, Smith asserts that Superintendent Moscicki, Deputy Superintendent Sheehan, Drill Instructor Whelan, Counselor Allessi and Chaplin Werbicki violated the Establishment Clause of the First Amendment through their religious proselytizing, which "had the effect of advancing the Catholic religion," as well as through assaults and intimidation. (Docket # 57 at ¶ 39).

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I. According to the Supreme Court, this clause guarantees at a minimum that the government "may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.' " *Lee v. Weisman,* 505 U.S. 577, 587 (1992) (quoting *Lynch v. Donnelly,* 465 U.S. 668, 678 (1984)).

As with the previous claim, Smith's original and proposed amended complaints sufficiently allege facts that would, if proven, state a claim for relief. Accordingly, Smith's motion to amend his complaint to include a First Amendment Establishment Clause claim against the existing and newly-identified defendants should be granted.

**3. *First Amendment Free Exercise Claim:*** Like the second claim, Smith's third proposed claim is based upon the First Amendment. In this claim, Smith alleges that Superintendent Moscicki, Deputy Superintendent Sheehan, Drill Instructor Whelan, Counselor Allessi and Chaplin Werbicki violated the Free Exercise Clause of the First Amendment by interfering with Muslim religious beliefs and practices. (Docket # 57 at ¶ 40). That clause forbids Congress from making any laws prohibiting "the free exercise" of religion. U.S. Const. amend. I.

The Free Exercise Clause is an "unflinching pledge to allow our citizenry to explore ... religious beliefs in accordance with the dictates of their conscience." *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999) (quoting *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir.1984)). Prisoners retain their right to religious freedom even during their incarceration, and therefore they are entitled to reasonable accommodation of their religious beliefs. *Id.* (citing *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975)).

 **\*6** I find that Smith's proposed Free Exercise Clause claim is properly asserted here, and his motion to amend his complaint to include such claim against the existing and newly-identified defendants should be granted.

**4. *First Amendment Retaliation Claim:*** In his fourth proposed claim, Smith asserts a First Amendment retaliation claim against original defendants Allessi and Whelan for alleged retaliatory actions against him based upon his religious beliefs. (Docket # 57 at ¶ 41). To properly assert a First Amendment retaliation claim, a prisoner must show that: "(1) his actions were protected by the Constitution or federal law; and (2) 'the defendant's conduct complained of was in response to that protected activity.' " *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000) (quoting *Posr v. Court Officer Shield # 207,* 180 F.3d 409, 418 (2d Cir.1999)).

In his proposed amended complaint, Smith alleges that Whelan assaulted him when he was praying. In my opinion, that allegation is sufficient to state a claim for retaliation. As to Counselor Allessi, Smith alleges that Allessi

2006 WL 2850597

made derogatory comments about Smith's lawsuit when arrangements were being made for Smith to participate in a conference call with the presiding judge on that case. The complaint further alleges that Allessi refused to allow Smith to participate in that conference call. (Docket # 57 at ¶ 42). These facts, assuming their truth, are sufficient to state a claim against Allessi for retaliation. Thus, I recommend that Smith be permitted to amend his complaint to add claims for retaliation against defendants Allessi and Whelan.

**5. *Sixth Amendment Right to Counsel Claim:*** Smith's fifth proposed claim alleges that Allessi violated his Sixth Amendment right to counsel based upon Allessi's conduct in apparently preventing Smith from participating in the telephone conference with the presiding judge. According to Smith, Allessi refused to allow him to participate in the telephone conference "in retaliation of plaintiff's religious beliefs and pursuit of a lawsuit." (Docket # 57 at ¶ 42).

The Sixth Amendment to the United States Constitution guarantees:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

U.S. Const. amend VI. As this Amendment clearly states, the right to counsel applies only to criminal prosecutions. *See Texas v. Cobb,* 532 U.S. 162, 173 n. 3 (2001) ("the text of the Sixth Amendment confines its scope to 'all criminal prosecutions' "). The legal matter that Smith was scheduled to discuss during the January 5, 2004 telephone conference was a civil action. Accordingly, Smith's allegations, even if true, do not support a Sixth Amendment violation. I therefore recommend that his motion to amend his complaint to include a right to counsel claim against defendant Allessi be denied.

**\*7  6. *Eighth Amendment Cruel and Unusual Punishment Claim:*** Smith alleges that Goord, Moscicki, Sheehan, Whelan, Allessi and Werbicki violated his Eighth Amendment right to be free from cruel and unusual punishment. (Docket # 57). According to Smith, Whelan "assaulted and intimidated [him] every time he caught [Smith] making silent (prayer)." (Docket # 57 at ¶¶ 5, 16). Smith further asserts that the "religious proselytizing activities and deliberate indifference" of the remaining referenced defendants towards Smith and other Muslim inmates was "malicious and sadistic in nature." (Docket # 57 at p. 23, ¶ 6).

The Eighth Amendment provides protection against the infliction of cruel and unusual punishment, thereby forbidding conditions involving the "wanton and unnecessary infliction of pain" or that are "grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981). In order to establish that the conditions of his confinement amount to a constitutional violation, a prisoner must satisfy both an objective component and a subjective component. *See Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996). The objective component requires that the conditions of confinement result in "unquestioned and serious deprivation of basic human needs" or "deprive inmates of the minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. at 347. "Ultimately, to establish the objective element of an Eighth Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary standards of decency." *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002). The subjective component requires a showing that the defendant acted with a "sufficiently culpable state of mind." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). The state of mind requirement is one of "deliberate indifference to inmate health or safety." *Id.*

In this matter, defendants concede that Smith's accusations that Whelan assaulted Smith when he was engaged in silent prayer are sufficient to allege an Eighth Amendment claim as to defendant Whelan. Smith's motion to amend should be granted to that extent. Smith's allegations of "religious proselytizing" by the other defendants, however, do not sufficiently allege facts that would constitute a serious deprivation of a basic need or violate contemporary standards of decency. *See Rhodes,* 452 U.S. at 347; *Phelps v. Kapnolas,* 308 F.3d at 185. Nor do the allegations against Allessi that she refused to allow Smith to participate in a court conference

2006 WL 2850597

in retaliation for his religious beliefs amount to an Eighth Amendment violation. I therefore recommend that the motion be granted as to defendant Whelan and denied as to the remaining defendants.

**7. Fourteenth Amendment Due Process Claim:** Similar to the above claim, Smith also alleges that Goord, Moscicki, Sheehan, Whelan, Werbicki and Allessi, through their "religious proselytizing activities and deliberate indifference towards plaintiff and other Muslims," violated his Fourteenth Amendment right to due process. (Docket # 57 at ¶ 44). I recommend that this claim not be permitted to proceed.

 **\*8** "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.' " *Albright v. Oliver,* 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor,* 490 U.S. 386, 395 (1989)). Thus, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier,* 520 U.S. 259, 272 n. 7 (1997) (citing *Graham v. Connor,* 490 U.S. at 394).

Here, as addressed in the preceding section, Smith has been permitted to proceed on his First Amendment claims against Moscicki, Sheehan, Whelan, Allessi and Werbicki and on his Eighth Amendment claim against Whelan. Applying the Supreme Court's holdings in *Albright* and *Graham,* I find that Smith's proposed due process claim is misplaced, and his amendment to include such claim should be denied.

**8. Fourteenth Amendment Equal Protection Claim:** In the final proposed claim, Smith alleges that Goord, Moscicki, Sheehan, Whelan, Werbicki and Allessi violated his Fourteenth Amendment equal protection rights because they failed to treat his "religious exercise in a neutral manner in comparison with inmates of the Catholic religion." (Docket # 57 at ¶ 45).

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." Essentially, this clause directs that all similarly-situated persons must be treated alike. *Plyler v. Doe,* 457 U.S. 202, 216 (1982). To establish an equal protection violation, a plaintiff

must demonstrate "purposeful discrimination directed at an identifiable or suspect class." *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing *McCleskey v, Kemp,* 481 U.S. 279, 292 (1987); *Kadrmas v. Dickinson Pub. Schs.,* 487 U.S. 450, 457-58 (1988)).

In this matter, throughout his original and proposed amended complaint, Smith alleges that defendants have discriminated against him and other Muslims and denied them the right afforded to prisoners of other faiths to freely exercise their religion. (Docket # # 1, 57). Smith has properly alleged an equal protection claim, and his motion to amend to include such claim against the original and newly-identified defendants should be granted.

## CONCLUSION

For the foregoing reasons, it is the recommendation of this Court that Smith's motion for leave to file a supplemental complaint **(Docket # 39)** be **DENIED** and that his motion for leave to file a second amended complaint **(Docket # 57)** be **GRANTED IN PART and DENIED IN PART.**

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

 **\*9 ORDERED,** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed.R.Civ.P. 72(b), 6(a) and 6(e) and Local Rule 72.3(a)(3).

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See e.g. Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.,* 840 F.2d 985 (1st Cir.1988).

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988).

**Smith v. Goord, Not Reported in F.Supp.2d (2006)**

2006 WL 2850597

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." ***Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection .***

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2850597

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 6:04cv06432**<br>SMITH v. GOORD ET AL | — | W.D.N.Y. | Sep. 08, 2004 | Docket |

## History (4)

**Direct History (2)**

1. Smith v. Goord 👓
   2006 WL 2850597 , W.D.N.Y. , Sep. 22, 2006

*Report and Recommendation Adopted by*

🚩 2. Smith v. Goord
   2007 WL 496371 , W.D.N.Y. , Feb. 12, 2007

**Related References (2)**

3. Smith v. Goord
   2006 WL 4070305 , W.D.N.Y. , Dec. 07, 2006

4. Smith v. Goord
   541 Fed.Appx. 133 , 2nd Cir.(N.Y.) , Nov. 15, 2013

Smith v. Goord, Not Reported in F.Supp.2d (2007)

2007 WL 496371

KeyCite Yellow Flag

Distinguished by   Wang v. Paterson,   S.D.N.Y.,   December 18, 2008

2007 WL 496371
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Andre SMITH, Plaintiff

v.

Glenn GOORD, et al., Defendant.

No. 04-CV-6432.
|
Feb. 12, 2007.

**Attorneys and Law Firms**

Andre Smith, Auburn, NY, pro se.

Tamara B. Christie, NYS Office of the Attorney General, Rochester, NY, for Defendant.

DECISION AND ORDER

CHARLES J. SIRAGUSA, United States District Judge.

**\*1** This is an action brought pursuant to 42 U.S.C. § 1983 in which the plaintiff, a prison inmate proceeding *pro se,* contends that defendants violated his constitutional rights by, *inter alia,* denying him Muslim religious services and by physically assaulting him. Now before the Court are plaintiff's Objections [# 65] to a Report and Recommendation [# 64] by the Honorable Marian W. Payson, United States Magistrate Judge, which denied plaintiff's motion [# 39] to file a supplemental complaint, and granted in part and denied in part plaintiff's application [# 57] to amend his complaint. For the reasons that follow, plaintiff's objections are denied, and Magistrate Judge Payson's Report and Recommendation [# 64] is affirmed and adopted in all respects.

BACKGROUND

The facts of plaintiff's claims are set forth in the Report and Recommendation and need not be repeated in their entirety here. It is sufficient to note that plaintiff began this lawsuit by alleging that certain officials with the New York State Department of Correctional Services ("DOCS") and certain employees at Lakeview Correctional Facility ("Lakeview") violated his constitutional rights by assaulting him and by failing to provide Muslim religious services at Lakeview. Plaintiff now seeks to supplement that complaint by alleging that, after he was transferred to Southport Correctional Facility ("Southport"), approximately one year after commencing this action, he was retaliated against by corrections staff there. Additionally, plaintiff seeks to amend his complaint to add new claims (and new defendants) relating to the alleged assaults and denial of Muslim religious services at Lakeview.

The instant objections involve only that portion of the Report and Recommendation which denied plaintiff's application to supplement his complaint by adding the Southport claims. As to that ruling, the Magistrate Judge denied the application, finding that "judicial economy would [not] be served by combining the original and supplemental claims into a single proceeding." (Report and Recommendation [# 64] p. 6). The Magistrate Judge further stated, in relevant part:

> Other than Commissioner Goord, there is no overlap between the named defendants in both complaints; the events at issue in both complaints are separated by more than a year; and, there is no suggestion that the original defendants were involved in the alleged retaliatory actions taken against Smith in a different facility over a year later. Indeed, the allegations are to the contrary.

\* \* \*

> Considering these allegations, I find no basis to conclude that any efficiencies would be gained by consolidating these claims for trial. Nor do I find that Smith's right to relief based upon the allegations in the supplemental complaint 'aris[es] out of the same transaction, occurrence, or series of transactions or occurences' at issue in the original complaint or that it gives rise to 'any question of law or fact common to [the] defendants' in both complaints.

**\*2** (Report and Recommendation [# 64] p. 6) (citing Fed.R.Civ.P. 20(a); *Davis v. State of New York,* 1999 WL 1390247 at \*5 (W.D.N.Y.1999); *Klos v. Haskell,* 835 F.Supp. 710, 716 (W.D.N.Y.1993) *aff'd* 48 F.3d 81 (2d Cir.1995)).

In his objections, plaintiff contends that this ruling was erroneous because both his original complaint and his proposed supplemental complaint include allegations against Glenn Goord, former Commissioner of DOCS:

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 508 of 529
Smith v. Goord, Not Reported in F.Supp.2d (2007)
2007 WL 496371

[Plaintiff] successfully connects the actions of a named defendant (Goord) in the original complaint with the actions of a named defendant (Goord) in the supplemental complaint. The plaintiff proves that the supplemental complaint gives rise to a question of law and fact common to a defendant (Goord) in both complaints.

* * *

These complaints are adequately related, because they show that defendant Commissioner Goord has tacitly authorized the practice of mistreating Muslim prisoners and their religion, based on the fact that he has routinely and intentionally failed to act on prior prisoner complaints regarding the mistreatment of Muslim prisoners and their right to practice their religion, which had the effect of inviting the abuses and constitutional violations that the plaintiff mentioned in the supplemental complaint....

(Pl. Objections [# 65] p. 3).

ANALYSIS

The general principles of law involved when a district court is asked to rule upon objections to a decision by a magistrate judge are well settled:

28 U.S.C. § 636(b)(1)(A) provides that "a judge may designate a magistrate to hear and determine any pretrial matter pending before the court," except for certain enumerated dispositive motions. See also Fed.R.Civ.P. 72(b) (referring to dispositive motions as those "dispositive of a claim or defense of a party"). Although a magistrate may hear dispositive pretrial motions, he may only submit proposed findings of fact and recommendations for disposition of the matter. The district court must make de novo determinations as to those matters to which the party has objected. § 636(b)(1)(B)-(C); Fed.R.Civ.P. 72(b). The court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." § 636(b)(1)(C); see also Fed.R.Civ.P. 72(b). A magistrate, however, may issue orders regarding nondispositive pretrial matters. The district court reviews such orders under the "clearly erroneous or contrary to law" standard. § 636(b)(1)(A); Fed.R.Civ.P. 72(a).

Thomas E. Hoar, Inc. v. Sara Lee Corp., 900 F.2d 522, 525 (2d Cir.1990).

As for motions to amend pleadings, courts in this Circuit treat such motions as nondispositive when reviewing a decision by a magistrate judge to which an objection has been made. See, e.g., Rubin v. Valicenti Advisory Servs., Inc., No. 03-CV-6201 L, 2007 WL 196680 at *2 (W.D.N.Y. Jan. 26, 2007) ("Although the Court of Appeals for the Second Circuit has not ruled on whether a motion to amend a pleading is properly classified as dispositive or nondispositive, 'the weight of authority within this Circuit classifies a motion to amend a [pleading] as a non-dispositive pre-trial motion, and holds that a magistrate's order should be reviewed under the 'clearly erroneous standard.' ") (quoting Palmer v. Monroe County Sheriff, 378 F.Supp.2d 284, 289 (W.D.N.Y.2005)). A finding is clearly erroneous if, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948).

*3 Rule 15(d) states, in relevant part, that "[u]pon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." The standard for evaluating a motion to supplement under Rule 15(d) is well settled:

An application for leave to file a supplemental pleading is addressed to the discretion of the court, and permission should be freely granted where such supplementation will promote the economic and speedy disposition of the controversy between the parties, will not cause undue delay or trial inconvenience, and will not prejudice the rights of any other party.

Bornholdt v. Brady, 869 F.2d 57, 68 (2d Cir.1989) (citations omitted).

In the instant case, plaintiff contends that the proposed supplemental claims are sufficiently related to the original claims, based primarily, if not exclusively, upon the fact that Goord is a common defendant. However, the presence of a common defendant is not, by itself, sufficient to

satisfy Rule 15(d). *See, Albrecht v. Long Island R.R.,* *134 F.R.D. 40, 41 (E.D.N.Y.1991)* ("Plaintiff asserts that the two accidents are related since the alleged injuries, medical experts, and defendant are the same. However, these similarities are essentially superficial, and based on the papers before the Court it is clear that the two accidents are distinct and unrelated. In point of fact, they each occurred at different stations, and apart from the common ownership by defendant, plaintiff does not dispute that the stations are separate and unrelated."). Here, the Court agrees with Magistrate Judge Payson's finding, that plaintiff's proposed supplemental claims, involving events at Southport, are not sufficiently related to the original claims, involving events at Lakeview one year earlier, and that adding the new claims would not promote the economical and speedy disposition of the controversy. Consequently, the Court finds that the

Magistrate's ruling was not clearly erroneous, and moreover, the Court would reach the same result applying a *de novo* standard of review.

CONCLUSION

Plaintiff's objections [# 65] are denied, and Magistrate Judge Payson's Report and Recommendation [# 64] is affirmed and adopted in all respects.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 496371

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 6:04cv06432**<br>SMITH v. GOORD ET AL | — | W.D.N.Y. | Sep. 08, 2004 | Docket |

**History (4)**

**Direct History (2)**

1. Smith v. Goord

2006 WL 2850597 , W.D.N.Y. , Sep. 22, 2006

*Report and Recommendation Adopted by*

2. Smith v. Goord

2007 WL 496371 , W.D.N.Y. , Feb. 12, 2007

**Related References (2)**

3. Smith v. Goord

2006 WL 4070305 , W.D.N.Y. , Dec. 07, 2006

4. Smith v. Goord

541 Fed.Appx. 133 , 2nd Cir.(N.Y.) , Nov. 15, 2013

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 3243135
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Daniel J.A. WEBB, Plaintiff,

v.

Warden Eduardo MALDONALDO, et al., Defendants.

No. 3:13–cv–144(RNC).
|
June 26, 2013.

**Attorneys and Law Firms**

Daniel J.A. Webb, Somers, CT, pro se.

*RULING AND ORDER*

ROBERT N. CHATIGNY, District Judge.

**\*1** Plaintiff Daniel Webb, a death row inmate at Northern Correctional Institution, brings this action pro se pursuant to 42 U .S.C. § 1983 against personnel of the Connecticut Department of Correction ("DOC"). Named as defendants are Warden Eduardo Maldonaldo, District Administrator Angel Quiros, Lieutenants Pensavaly, Bujnicki and Doe, Correctional Officers Mumin, Brace, Krob, McGoldrick and Castinguay, Counselor Tourangeau, Counselor Supervisor Cassandra Davis and Correctional Health Nurse Doe. Because the complaint fails to comply with the requirements of Rules 8 and 20 of the Federal Rules of Civil Procedure, it is dismissed with leave to amend.

Under 28 U.S.C. § 1915A, a district court is required to screen a prisoner's complaint against governmental entities, officers or employees and dismiss the complaint if it is frivolous or malicious, fails to state a claim upon which relief may be granted or seeks monetary relief from a defendant who is immune from such relief. In reviewing a *pro se* complaint, a court must assume the truth of the factual allegations and interpret them liberally to "raise the strongest arguments [they] suggest[ ]." *Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007). To avoid dismissal, a complaint must allege "enough facts to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

In this case, the screening required by the statute is inordinately burdensome because the complaint fails to comply with Rule 8's pleading requirements. Rule 8(a)(2) provides that a complaint "must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Rule 8(d)(1) requires that "[e]ach allegation must be simple, concise, and direct." *Id.* 8(d)(1). The purpose of Rule 8 is "to permit the defendant to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery [.]" *Ricciuti v. New York City Trans. Auth.,* 941 F.2d 119, 123 (2d Cir.1991) (citation omitted). In addition, "the rule serves to sharpen the issues to be litigated and to confine discovery and the presentation of evidence at trial within reasonable bounds." *Powell v. Marine Midland Bank,* 162 F .R.D. 15, 16 (N.D.N.Y.1995) (citation and quotation omitted). The plaintiff's statement of his claim "should be short because '[u]nnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage.' " *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1281, at 365 (1969)); *see also Infanti v. Scharpf,* 06 CV 6552(ILG), 2008 WL 2397607, at \*1 (E.D.N.Y. June 10, 2008) ("Complaints which ramble, which needlessly speculate, accuse, and condemn, and which contain circuitous diatribes far removed from the heart of the claim do not comport with these goals and this system; such complaints must be dismissed." (citation and quotation omitted)).

**\*2** "When a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative or in response to a motion by the defendant, to strike any portions that are redundant or immaterial, *see* Fed.R.Civ.P. 12(f), or to dismiss the complaint." *Salahuddin,* 861 F.2d at 42. In *Salahuddin,* a case brought by a prisoner under § 1983, the Court of Appeals had "no doubt" that the pro se complaint failed to comply with Rule 8. *Id.* at 43. The complaint "span[ned] 15 single-spaced pages and contain[ed] explicit descriptions of 20–odd defendants, their official positions, and their roles in the alleged denials of Salahuddin's rights," along with a "surfeit of detail." *Id.* The Court of Appeals concluded that the district court had discretion to dismiss the complaint for noncompliance with Rule 8 and that the plaintiff should be ordered to file an amended complaint

omitting unnecessary detail. *Id.; see also Blakely v. Wells,* 209 Fed. App'x 18, 20 (2d Cir.2006) (stating that "[t]he District Court acted within the bounds of permissible discretion in dismissing the second amended complaint for noncompliance with Rule 8(a)" because "[t]he pleading, which spanned 57 pages and contained 597 numbered paragraphs, was far from short or plain."); *Rosa v. Goord,* 29 Fed. App'x 735, 735 (2d Cir.2002) (affirming dismissal of complaint and amended filings that "remained prolix and not susceptible of a responsive pleading").

In this case, the complaint is neither "short and plain," Fed.R.Civ.P. 8(a), nor "simple, concise, and direct," *id.* 8(d)(1). The complaint "reads more like a novel than a legal document." *Sleigh v. Charlex, Inc.,* No. 03 Civ. 1369(MBM), 2004 WL 2126742, at *8 (S.D.N.Y. Sept. 14, 2004). It spans 44 singlespaced handwritten pages, containing 156 paragraphs, and is supplemented by 132 pages of attached materials. Numerous claims are made against a total of 13 defendants. The allegations encompass a wide range of alleged wrongs, including: (1) verbal harassment and threats; (2) deliberate indifference to serious medical needs; (3) inhumane conditions of confinement; (4) false disciplinary reports; (5) confiscation of property; (5) loss of privileges; and (6) excessive force.

The complaint also fails to comply with the limits on permissive joinder of claims against multiple defendants under Rule 20(a)(2). Joinder of claims against multiple defendants is permitted by this Rule if two criteria are met: (1) the claims "aris[e] out of the same transaction, occurrence, or series of transactions and occurrences"; and (2) "any question of law or fact common to all defendants will arise in the action." Fed.R.Civ.P. 20(a)(2). "What will constitute the same transaction or occurrence under the first prong of Rule 20(a) is approached on a case by case basis." *Kehr ex rel. Kehr v. Yamaha Motor Corp., U.S.A.,* 596 F.Supp.2d 821, 826 (S.D.N.Y.2008) (citation omitted). "In construing the term 'transaction or occurrence' under Rule 20, many courts have drawn guidance from the use of the same term in Rule 13(a), applying to compulsory counterclaims." *Barnhart v. Town of Parma,* 252 F.R.D. 156, 160 (W.D.N.Y.2008) (citation omitted); *see also* 7 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1653 (3d ed.). As the Court of Appeals has observed in the Rule 13 context, whether a counterclaim arises out of the same transaction as the original claim depends upon the logical relationship between the claims and whether the "essential facts of the various claims are so logically connected that considerations

of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Harris v. Steinem,* 571 F.2d 119, 123 (2d Cir.1978).

**\*3** In this case, the complaint joins in one action claims that are wholly unrelated. For instance, it asserts Eighth Amendment claims of excessive force against some of the defendants, while also asserting a First Amendment claim against other defendants based on a DOC policy prohibiting certain sexually explicit materials. Because these and other claims in the complaint do not "aris[e] out of the same transaction, occurrence, or series of transactions and occurrences," Fed.R.Civ.P. 20(a)(2), the complaint exceeds the bounds of permissible joinder under Rule 20(a)(2).

When a prisoner's complaint improperly joins unrelated claims against multiple defendants, the plaintiff may be attempting to circumvent the three strikes and filing fee provisions of the Prison Litigation Reform Act. *See George v. Smith,* 507 F.3d 605, 607 (7th Cir.2007) ("Unrelated claims against different defendants belong in different suits, not only to prevent the sort of morass that this 50–claim, 24–defendant suit produced but also to ensure that prisoners pay the required filing fees-for the Prison Litigation Reform Act limits to 3 the number of frivolous suits or appeals that a prisoner may file without prepayment of the required fees. 28 U.S.C. § 1915(g)."). Even if that is not the reason for the misjoinder, a court performing the screening required by § 1915A may find it convenient to exercise its authority to sever parties *sua sponte* as permitted by Rule 21 and direct the plaintiff to proceed against those parties in separate actions. *See* Fed.R.Civ.P. 21. But when a prisoner's complaint is as lengthy and detailed as the one here, making it subject to dismissal for noncompliance with Rule 8, it makes little sense for a court to attempt to cure the misjoinder of parties on its own. In the absence of prejudice to the plaintiff's substantive rights, the better course is to require the plaintiff to choose the claims he wishes to bring in the action and drop the remainder. *See Wilson v. Bruce,* 400 Fed. App'x 106, 108 (7th Cir.2010) (declining to disturb dismissal predicated on prisoner's failure to comply with district court's order conditioning his right to proceed on his willingness to drop misjoined claims).

Accordingly, the complaint is hereby dismissed without prejudice. Plaintiff will be given leave to file an amended complaint that (1) provides a short and concise statement of his claims; and (2) does not attempt to impermissibly join unrelated claims against multiple defendants. The amended complaint will be due on or before July 26, 2013.

The Clerk will send the plaintiff an amended complaint form with this order. Plaintiff is cautioned that his amended complaint must comply with the instructions on the form, specifically the instructions on page 5 concerning the requirements for a valid complaint. If the amended complaint fails to comply with those instructions, the action will be subject to dismissal with prejudice.

So ordered.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 3243135

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    3

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 3:13cv00144**<br>WEBB v. MALDONALDO ET AL | — | D.Conn. | Jan. 30, 2013 | Docket |

**History**

There are no History results for this citation.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Griffith v. New York State, Not Reported in Fed. Supp. (2024)

2024 WL 1641587

2024 WL 1641587
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Howard GRIFFITH, Plaintiff,

v.

NEW YORK STATE, Attorney General, Defendant.

5:23-CV-1266 (DNH/ML)
|
Signed March 20, 2024

**Attorneys and Law Firms**

HOWARD GRIFFITH, Plaintiff, Pro Se, 2903 James Street, #1R, Syracuse, New York 13206.

## ORDER and REPORT-RECOMMENDATION

MIROSLAV LOVRIC, United States Magistrate Judge

### I. INTRODUCTION

**\*1** The Clerk has sent this *pro se* complaint (Dkt. No. 1) together with an application to proceed *in forma pauperis* (Dkt. No. 2) filed by Howard Griffith ("Plaintiff") to the Court for review. For the reasons discussed below, I grant Plaintiff's *in forma pauperis* application (Dkt. No. 2) and recommend that Plaintiff's Complaint (Dkt. No. 1) be dismissed in its entirety without leave to amend.

### II. BACKGROUND

The Complaint is forty-four pages long and includes a series of allegations that are difficult to follow and appear to have little in common. (*See generally* Dkt. No. 1.)

More specifically, Plaintiff appears to allege that between October 2019 and July 2020 he had issues with various individuals on real property that he rented from non-party Jan Nastri in the City of Syracuse. (Dkt. No. 1 at 4-5.) Plaintiff alleges that he drafted a N.Y. C.P.L.R. Article 78 petition against Onondaga County and provided a copy of the draft petition to Jan Nastri. (*Id.* at 5-6.)

Plaintiff alleges that on September 14, 2020, he attempted to comply with his obligation to update his address with the sex offender registry but that the Syracuse Police Department would not include an apartment number with his address. (*Id.*

at 7.) Plaintiff alleges that he filed the Article 78 petition he previously drafted with the addition of three points. (*Id.*) Plaintiff alleges that on October 30, 2020, New York State Judge McClusky rejected Plaintiff's request for poor person status. (Dkt. No. 1 at 9.)

The Complaint refers to an action that Plaintiff previously commenced in this Court, *Griffith v. New York*, 5:20-CV-1312 (GLS/ML) ("*Griffith I*"), which was dismissed. (Dkt. No. 1 at 11.)

The Complaint alleges that on November 3, 2020, Plaintiff contacted then-Congressman Katko to lodge a complaint about his "false address demonstrated with his sex offender registry which provided the remedy to obtain mail-in ballots." (*Id.* at 12.) Plaintiff alleges that in response to his correspondence, then-Congressman Katko sued the Onondaga County Board of Elections. (*Id.*)

The Complaint alleges that on January 10, 2002, Plaintiff was convicted of Rape in the first degree pursuant to N.Y. Penal Law § 130.35(1). (Dkt. No. 1 at 13.) The Complaint alleges that as a result of that conviction, Plaintiff was deemed a Level III sex offender pursuant to N.Y. Correct. Law § 168. (*Id.*) Plaintiff alleges that he sought (1) to vacate his judgment of conviction, (2) modification of his sex offender registry obligations, and (3) habeas corpus relief. (*Id.* at 13-19.)

Plaintiff alleges that on March 9, 2021, he responded to a reward notification posted by the Federal Bureau of Investigation with information about individuals producing pipe bombs and explosive devices used on January 6, 2021, in Washington DC. (Dkt. No. 1 at 19.) The Complaint alleges that Plaintiff discovered evidence in the dumpster where he disposes of trash and referred the evidence to the Onondaga County District Attorney's office. (*Id.* at 19-20.)

The Complaint alleges that on June 8, 2021, Plaintiff was incarcerated for failure to register as a sex offender pursuant to N.Y. Correct. Law § 168-f(3). (Dkt. No. 1 at 22.) The Complaint alleges that Plaintiff was incarcerated "because the police needed a reason to place [Plaintiff] in jail for a psychiatric evaluation ... after he had recovered from a grand-mal seizure." (*Id.*)

**\*2** The Complaint alleges that Plaintiff sought a modification to his SORA level, which apparently was denied because, the Complaint alleges that had the modification been granted, he would have only been required to register once

2024 WL 1641587

per year. (Dkt. No. 1 at 23.) Plaintiff alleges that he was denied access to the law library while incarcerated at the Onondaga County Justice Center because he was not given the inmate handbook. (*Id.*) Plaintiff alleges that he was placed in segregated housing because he struck a deputy who refused to authorize him use of the law library. (*Id.*) Plaintiff alleges that he was unable to exhaust his administrative remedies with respect to the associated disciplinary hearing because he was transferred to the Central New York Psychiatric Center ("CNYPC"). (*Id.*)

The Complaint alleges that Plaintiff was released from custody on bail on October 18, 2021. (Dkt. No. 1 at 27.) The Complaint alleges that after Plaintiff was released, "he obtained a medicare voucher at his mailbox for the person identified on the flier that he filed with 'Howard Griffith v. Onondaga County, [ ]'. The medicare voucher was addressed to the fake address he attempted to demonstrate with his sex offender registry.... Plaintiff demonstrated how New York citizens had just voted against proposals that would ease restrictions on voting laws with regards to redistricting, mail-in ballots and same day voter registration." (*Id.*)

The Complaint alleges that on February 18, 2022, Plaintiff was convicted of failing to fulfill his duty to register as a sex offender pursuant to N.Y. Corr. Law § 168-f(3). (Dkt. No. 1 at 30.) The Complaint alleges that on March 7, 2022, Plaintiff was arrested and charged with harassment in the second degree for striking his roommate, Rebecca Sklaney. (*Id.* at 31.)

The Complaint does not appear to assert any causes of action, but states that it is "brought pursuant to 42 USC § 1983, to remedy the deprivation, under color of state law, of the rights guaranteed under the Fifth and Fourteenth Amendments of the United States Constitution." (Dkt. No. 1 at 2.) As relief, the Complaint seeks, *inter alia,* (1) reconsideration of *Griffith I,* (2) a declaration that mail-in voting ballots be eliminated from elections, and (3) an investigation "into whether any person or entity has engaged in ... fraudulent, illegal or deceptive conduct in the ownership, operation or management of the residential properties owned, operated and/or managed by Jan Nastri." (Dkt. No. 1 at 43-44.)

## III. PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $405, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however,

to permit a litigant to proceed *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1). [1] After reviewing Plaintiff's *in forma pauperis* application (Dkt. No. 2), the Court finds that Plaintiff meets this standard. Therefore, Plaintiff's application to proceed *in forma pauperis* is granted. [2]

[1]     The language of that section is ambiguous because it suggests an intent to limit availability of IFP status to prison inmates. *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making IFP status available to any litigant who can meet the governing financial criteria. *Hayes v. United States,* 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.,* 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

[2]     Plaintiff is reminded that, although the application to proceed *in forma pauperis* has been granted, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

## IV. LEGAL STANDARD FOR INITIAL REVIEW OF COMPLAINT

**\*3** "Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke,* 490 U.S. at 327; *Harkins v. Eldridge,* 505 F.2d 802, 804 (8th Cir. 1974); *see Fitzgerald v. First East Seventh Street Tenants Corp.,* 221 F.3d 362, 364 (2d Cir. 2000) (a district court "may dismiss a frivolous complaint *sua sponte* even when the plaintiff has paid the required filing fee[.]"); *see also Pflaum v. Town of Stuyvesant, Columbia Cnty., N.Y.,* 11-CV-0335, 2016 WL 865296, at \*1, n.2 (N.D.N.Y. Mar. 2, 2016) (Suddaby, C.J.) (finding that the Court had the power to address and dismiss additional

2024 WL 1641587

theories of the plaintiff's retaliation claim *sua sponte* because those theories were so lacking in arguable merit as to be frivolous).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (emphasis added) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 [2007]). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." Iqbal, 556 U.S. at 679 (internal citation and punctuation omitted).

"In reviewing a complaint ... the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

Courts are "obligated to construe a pro se complaint liberally." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009); *see also* Nance v. Kelly, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim). "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties ... have had an opportunity to respond." Anderson v. Coughlin, 700 F.2d 37, 41 (2d Cir. 1983).

**V. ANALYSIS**

 **\*4**  In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Complaint with this principle in mind, I recommend that all causes of action be dismissed.

Plaintiff brings this action pursuant to Section 1983, which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." German v. Fed. Home Loan Mortg. Corp., 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)) (footnote omitted). "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted). To establish liability under the statute, a plaintiff must plead that each government official defendant violated the Constitution through that official's own individual actions. Tangreti v. Bachmann, 983 F.3d 609, 618 (2d Cir. 2020).

Plaintiff's Complaint is largely incomprehensible and must be dismissed for two reasons.

**A. Frivolous**

First, Rule 8 of the Fed. R. Civ. P. requires a "short and plain statement" of a claim, showing that "the pleader is entitled to relief." Whitfield v. Johnson, 763 F. App'x 106, 107 (2d Cir. 2019) (quoting Fed. R. Civ. P. 8(a)). Each statement must be "simple, concise, and direct,' and must give 'fair notice of the claims asserted." Whitfield, 763 F. App'x at 107 (quoting Simmons v. Abruzzo, 49 F.3d 83, 86 (2d Cir. 1995)). A pleading must also contain "a demand for the relief sought[.]" *Id.* "A complaint may be dismissed under Rule 8 if it is 'so confused, ambiguous, or otherwise unintelligible that its true substance, if any, is well disguised.' " *Id.* Moreover, Rule 10 of the Fed. R. Civ. P. provides that "[a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances[.]" Fed. R. Civ. P. 10(b). Rule 10's purpose is to "provide an easy mode of identification for referring to a particular paragraph in a prior pleading[.]" Clervrain v. Robbins, 22-CV-1248, 2022 WL 17517312, at \*2 (N.D.N.Y. Dec. 8, 2022) (Stewart, M.J.) (citation omitted), *report and recommendation adopted*, 2023 WL 3170384 (N.D.N.Y. May 1, 2023) (D'Agostino, J.). A complaint that does not comply with these Rules "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [the plaintiff's] claims," and may properly be dismissed by the court. Gonzales v. Wing, 167 F.R.D. 352, 355 (N.D.N.Y. 1996) (McAvoy, C.J.).

2024 WL 1641587

As it currently stands, Plaintiff's Complaint wholly fails to provide fair notice of the claims he attempts to assert. Although the Complaint begins using numbered paragraphs on pages 1 and 2, the remaining forty-two pages of the Complaint are unnumbered paragraphs. (*See generally* Dkt. No. 1.) Moreover, the Complaint is extremely difficult to follow and, as mentioned above, alleges a series of grievances that appear to have little to do with one another. As best as the undersigned can decipher, Plaintiff appears to believe that his arrest—and ultimate conviction—for failing to comply with his duty to register as a sex offender is somehow related to voting regulations in New York State. (*Id.*) Given its lack of clarity, the undersigned recommends dismissal of the Complaint because it is not acceptable under Rules 8 and 10 of the Fed. R. Civ. P. and because Plaintiff's Section 1983 claim or claims against Defendant are entirely unclear.

### B. Immunity

**\*5** Second, and in the alternative, I recommend that Plaintiff's Complaint be dismissed because it seeks relief from New York State, which is immune from suit.

The Eleventh Amendment bars individuals from suing states in federal court, unless Congress abrogates states' immunity or a state consents to suit. *See* U.S. Const. Amend. XI; *Gollomp v. Spitzer*, 568 F.3d 355, 365-66 (2d Cir. 2009). Eleventh Amendment immunity in this case extends to arms of New York State, including the New York State Attorney General. *See Smith v. United States*, 554 F. App'x 30, 31 (2d Cir. 2013) (affirming dismissal of claims against the New York State Attorney General on sovereign immunity grounds). Accordingly, I recommend that Plaintiff's claims asserted against the New York State Attorney General be dismissed pursuant to Section 1915(e)(2)(B)(i).

### VI. OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a

plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.). [3]

[3]  *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

Here, better pleading could not cure the Court's lack of subject matter jurisdiction based on the immunities described above. [4]  *See Roark v. New York*, 23-CV-1237, 2023 WL 8827185, at *6 (N.D.N.Y. Dec. 21, 2023) (Lovric, M.J.) (recommending dismissal without leave to amend the plaintiff's claims against the People of the State of New York and the Watertown District Attorney's Office because those governmental entities were immune from suit), *report and recommendation adopted*, 2024 WL 125512 (N.D.N.Y. Jan. 11, 2024) (Hurd, J.).

[4]  The undersigned notes that a dismissal based on the doctrine of sovereign immunity, is consequently a dismissal for lack of subject matter jurisdiction. *Crumble v. United States*, 23-CV-4427, 2023 WL 5102907, at *7 (S.D.N.Y. Aug. 7, 2023); *Nguyen v. Kijakazi*, 20-CV-0607, 2022 WL 542265, at *8 (E.D.N.Y. Feb. 23, 2022). Moreover, the Second Circuit has directed that dismissals for lack of subject matter jurisdiction are to be made without prejudice. *Abadi v. City of New York*, 22-CV-1560, 2023 WL 3295949, at *3 n.3 (2d Cir. May 8, 2023) (summary order) (citing *Katz v. Donna Karan Co.*, 872 F.3d 114, 116 (2d Cir. 2017) ("[A] complaint must be dismissed without prejudice where the dismissal is due to the court's lack of subject matter jurisdiction.")) ("Because the Court

Case 5:25-cv-00956-AJB-MJK    Document 9    Filed 12/08/25    Page 523 of 529

**Griffith v. New York State, Not Reported in Fed. Supp. (2024)**
2024 WL 1641587

lacks subject matter jurisdiction ... the amended complaint should be dismissed *without* prejudice.") (emphasis in original).

**\*6  ACCORDINGLY**, it is

**ORDERED** that Plaintiff's IFP application (Dkt. No. 2) is **GRANTED**; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITHOUT PREJUDICE BUT WITHOUT LEAVE TO REPLEAD** Plaintiff's Complaint (Dkt. No. 1) for frivolousness and because Defendant is immune from suit, pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Order and Report-Recommendation on Plaintiff, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[5] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b) (1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

[5]     If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2024 WL 1641587

---

End of Document                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 5:23-CV-01266**<br>Griffith v. New York State Attorney General | — | N.D.N.Y. | Oct. 10, 2023 | Docket |

**History (2)**

**Direct History (2)**

1. Griffith v. New York State
   2024 WL 1641587 , N.D.N.Y. , Mar. 20, 2024

*Report and Recommendation Adopted by*

2. Griffith v. New York State Attorney General
   2024 WL 1639856 , N.D.N.Y. , Apr. 16, 2024

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 1639856
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Howard GRIFFITH, Plaintiff,

v.

NEW YORK STATE ATTORNEY
GENERAL, Defendant.

5:23-CV-1266
|
Signed April 16, 2024

**Attorneys and Law Firms**

HOWARD GRIFFITH, Plaintiff, Pro Se, 2903 James Street, #1R, Syracuse, NY 13206.

## ORDER ON REPORT & RECOMMENDATION

DAVID N. HURD, United States District Judge

 **\*1**  On October 10, 2023, *pro se* plaintiff Howard Griffith ("plaintiff") filed this civil action alleging that defendant somehow violated his rights in connection with a real property rental dispute with non-parties. Dkt. No. 1. Along with his complaint, plaintiff moved for leave to proceed *in forma pauperis* ("IFP Application"). Dkt. No. 2.

On March 20, 2024, U.S. Magistrate Judge Miroslav Lovric granted plaintiff's IFP Application, conducted an initial review of the pleading, and advised by Report & Recommendation ("R&R") that plaintiff's complaint be dismissed without prejudice but without leave to amend. Dkt. No. 7. As Judge Lovric explained, plaintiff's pleading was frivolous. *Id.*

Plaintiff has lodged objections. Dkt. No. 8. Upon *de novo* review, the R&R is accepted and will be adopted. 28 U.S.C. § 636(b)(1)(C).

Therefore, it is

ORDERED that

1. The Report & Recommendation (Dkt. No. 7) is ACCEPTED;

2. Plaintiff's complaint is DISMISSED without prejudice but without leave to amend.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 1639856

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.** **Docket 5:23-CV-01266**<br>Griffith v. New York State Attorney General | — | N.D.N.Y. | Oct. 10, 2023 | Docket |

**History (2)**

**Direct History (2)**
1. Griffith v. New York State
2024 WL 1641587 , N.D.N.Y. , Mar. 20, 2024

*Report and Recommendation Adopted by*

2. Griffith v. New York State Attorney General
2024 WL 1639856 , N.D.N.Y. , Apr. 16, 2024

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.